**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HANNAH'S BOUTIQUE, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 13-cv-02564 |
| BARBARA ANN SURDEJ, ROY SURDEJ and JEFFREY SURDEJ d/b/a PEACHES BOUTIQUE, | ) ) ) ) | Honorable Amy St. Eve |
| Defendants. | ) ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**
**ON PLAINTIFF'S ANTITRUST CLAIMS**

John W. Treece
Theodore R. Scarborough
Ashley K. Martin
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Tel. (312) 853-7000
Fax (312) 853-7063
Firm I.D. No. 42418

-and-

Eric D. Anderson
STAUB ANDERSON GREEN, LLC
55 West Monroe, Suite 1925
Chicago, Illinois 60603
Tel. (312) 345-0545
Fax (312) 345-0544
I.D. No. 6220092

*Attorneys for Defendants Barbara Ann Surdej,*
*Roy Surdej, and Jeffrey Surdej, d/b/a Peaches*
*Boutique*

## TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ...................................................................................1

STATEMENT OF FACTS .......................................................................................3

      A.     THE DESIGNER MARKET FOR PROM AND HOMECOMING DRESSES .....3

      B.     THE GROWTH OF INTERNET SALES ...........................................6

      C.     THE SURDEJ DEFENDANTS AND PEACHES BOUTIQUE ...........................7

      D.     PLAINTIFF HANNAH'S BOUTIQUE. ..............................................9

ARGUMENT ..........................................................................................................12

I.     PLAINTIFF'S ANTITRUST CLAIMS REQUIRE PROOF THAT PEACHES HAS MONOPOLY POWER OR SUBSTANTIAL MARKET POWER IN A PROPERLY DEFINED RELEVANT ANTITRUST MARKET. ....................................12

II.    PLAINTIFF HAS FAILED TO DEFINE A PROPER RELEVANT ANTITRUST MARKET. ..........................................................................................14

      A.     Plaintiff Improperly Limits Its Product Market To Include Only Dresses Made By Sixteen Specific Designers. ...............................................16

      B.     Plaintiff Improperly Limited Its Product Market To Include Only Dresses Sold In "Specialty Boutiques." .........................................................20

            1.     Excluding department stores is indefensible..............................20

            2.     No defensible basis exists to exclude dresses sold on the internet. ...........21

      C.     Plaintiff's Geographic Market Definition Is Overly Narrow And Arbitrary. ........22

III.   PLAINTIFF'S CLAIMS FAIL BECAUSE THERE ARE NO BARRIERS TO ENTRY AT THE DESIGNER OR RETAIL LEVELS. ................................................25

IV.   PLAINTIFF'S CLAIMS FAIL BECAUSE PEACHES DOES NOT HAVE MARKET POWER IN ANY PROPERLY DEFINED RELEVANT MARKET. .............................26

      A.     Using Plaintiff's Own Data, Peaches Lacks Market Power. ...............................27

      B.     Alternative Analyses Validate Peaches' Lack of Market Power. .........................28

      C.     Including Internet Sales In The Relevant Market Renders Plaintiff's Allegations Of Market Power Frivolous. ...............................................29

i

V.      PLAINTIFF CANNOT DEFEAT SUMMARY JUDGMENT BASED ON
        ALLEGATIONS OF "DIRECT" ANTICOMPETITIVE EFFECTS.............................30

        A.      In Cases Involving Vertical Restraints, Proof Of Direct Anticompetitive Effects
                Does Not Relieve A Plaintiff Of Its Burden To Prove Market Power..................30

        B.      Plaintiff's Allegations of Direct Anticompetitive Effects Are Not Evidence of
                Market Power....................................................................................32

                1.      Peaches' MSRP + 15% prices are not evidence of market power............33

                2.      Peaches' requests to enforce its exclusivity arrangements with designers
                        are evidence of neither market power nor anticompetitive effects...........35

CONCLUSION..............................................................................................39

# TABLE OF AUTHORITIES

**CASES**                                                        **Page(s)**

*42nd Parallel N. v. E St. Denim Co.,*
286 F.3d 401 (7th Cir. 2002) ................................................................ *passim*

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,*
881 F.2d 1396 (7th Cir. 1989) .......................................................................28

*Apple, Inc. v. Psystar Corp.,*
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ......................................................17

*Ashkanazy v. I. Rokeach & Sons, Inc.,*
757 F. Supp. 1527 (N.D. Ill. 1991) ...............................................................29

*Audio Car Stereo, Inc. v. The Little Guys, Inc.,*
No. 04 C 3562, 2004 WL 3019298 (N.D. Ill. Dec. 28, 2004) (St. Eve, J.)..................... *passim*

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.,*
784 F.2d 1325 (7th Cir. 1986) .........................................................13, 26, 29

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993)...........................................................................2, 14, 27

*Brown Shoe Co. v. U.S.,*
370 U.S. 294 (1962)...............................................................................15, 40

*Bus. Elecs. Corp. v. Sharp Elecs.,*
485 U.S. 717 (1988).............................................................................. *passim*

*Chicago Prof'l Sports v. Nat'l Basketball Ass'n,*
961 F.2d 667 (7th Cir. 1992) .......................................................................14

*Digital Equip. Corp. v. Uniq Digital Techs, Inc.,*
73 F.3d 756 (7th Cir. 1996) .....................................................................14, 28

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.,*
129 F.3d 240 (2d Cir. 1997)..........................................................................39

*F.T.C. v. Indiana Fed'n of Dentists,*
476 U.S. 447 (1986)................................................................................32, 34

*Fishman v. Estate of Wirtz,*
807 F.2d 520 (7th Cir. 1986) .................................................................15, 20, 21

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
　　No. 04-MD-1628RMBMHD, 2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009),
　　*aff'd sub nom. Am. Banana Co. v. J. Bonafede Co.*, 407 F. App'x 520 (2d Cir.
　　2010) ................................................................................................................18

*Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*,
　　960 F. Supp. 701 (S.D.N.Y. 1997) (Sotomayor, J.)..............................................17

*Hannah's Boutique v. Barbara Surdej, et al.*,
　　No. 13 C 2564, 2013 WL 4553313 (N.D. Ill. Aug. 28, 2013)...............................13

*Hardy v. City Optical Inc.*,
　　39 F.3d 765 (7th Cir. 1994) ...........................................................................14, 29

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
　　No. 11 C 07834, 2014 WL 64657 (N.D. Ill. Jan. 8, 2014) (Tharp, J.).........17, 18, 21

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
　　No. 11 C 07834, 2014 WL 6845862 (N.D. Ill. Dec. 4, 2014) ...............................34

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
　　864 F.2d 1409 (7th Cir. 1989) .......................................................................27, 29

*Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*,
　　No. 13 C 1129, 2013 WL 4599903 (N.D. Ill. Aug. 29, 2013)...............................18

*The Jeanery, Inc. v. James Jeans, Inc.*,
　　849 F.2d 1148 (9th Cir. 1988) .............................................................................39

*Kochert v. Greater Lafayette Health Servs., Inc.*,
　　372 F. Supp. 2d 509 (N.D. Ind. 2004), *aff'd*, 463 F.3d 710 (7th Cir. 2006) .....16, 24

*L.G. Motorsports, Inc. v. NGMCO, Inc.*,
　　No. 4:11CV112, 2012 WL 718603 (E.D. Tex. March 6, 2012)..............................17

*Laughlin v. Evanston Hosp.*,
　　133 Ill. 2d 374, 550 N.E.2d 986 (1990)...............................................................13

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
　　551 U.S. 877 (2007)............................................................................................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
　　475 U.S. 574 (1986)............................................................................................27

*McLaughlin Equip. Co., Inc. v. Servaas*,
　　No. IP98–0127–C–T/K, 2004 WL 1629603 (S.D. Ind. Feb. 18, 2004)..................18

iv

*Menasha Corp. v. News Am. Mktg.*,
    354 F.3d 661 (7th Cir. 2004) ..................................................................14

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)................................................................................39

*Nat'l Marine Elec. Distrib. v. Raytheon*,
    778 F.2d 190 (4th Cir. 1985) ..................................................................39

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ................................................................38

*Paladin Assocs., Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ................................................................15

*Parmelee Transp. Co. v. Keeshin*,
    292 F.2d 794 (7th Cir. 1961) ....................................................................2

*Premium Plus Partners, L.P. v. Davis*,
    No. 04 C 1851, 2005 WL 711591 (N.D. Ill. Mar. 28, 2005) ..................14

*PSKS, Inc. v. Leegin Creative Leather Prods, Inc.*,
    615 F.3d 412 (5th Cir. 2010) .............................................................17, 18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)....................................................................15

*Reifert v. So. Cent. Wisc. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) ..................................................................15

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ...........................................................*passim*

*Robinson-Bock Distributing Co. v. Pioneer/Eclipse Corp.*,
    No. 92-2578, 92-2585, 1993 WL 326365 (7th Cir. Aug. 25, 1993)........39

*Roland Machinery Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ..................................................................14

*People ex rel. Scott v. Coll. Hills Corp.*,
    91 Ill. 2d 138, 435 N.E.2d 463 (1982).....................................................13

*People ex rel. Scott v. Schwulst Bldg. Ctr., Inc.*,
    89 Ill. 2d 365, 432 N.E.2d 855 (1982)....................................................13

*Siemer v. Quizno's Franchise Co. LLC*,
    No. 07 C 2170, 2008 WL 904874 (N.D. Ill. Mar. 31, 2008) ................15

*Spectrum Sports, Inc. v. McQuillan,*
    506 U.S. 447 (1993)........................................................................................13

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island,*
    373 F.3d 57 (1st Cir. 2004)..........................................................................38

*In re Sulfuric Acid Antitrust Litig.,*
    703 F.3d 1004 (7th Cir. 2012) ....................................................................27

*Tampa Elec. Co. v. Nashville Coal Co.,*
    365 U.S. 320 (1961)........................................................................................16

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.,*
    959 F.2d 468 (3d Cir. 1992)..........................................................................17

*Toys "R" Us, Inc. v. F.T.C.,*
    221 F.3d 928 (7th Cir. 2000) ..........................................................32, 33, 34

*United States v. E.I. Du Pont de Nemours & Co.,*
    351 U.S. 377 (1956)................................................................................17, 31

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966)........................................................................................13

*Unity Ventures v. Lake Cnty.,*
    631 F. Supp. 181 (N.D. Ill. 1986) *aff'd,* 841 F.2d 770 (7th Cir. 1988)................................32

*Valley Liquors, Inc. v. Renfield Importers, Ltd.,*
    822 F.2d 656 (7th Cir. 1987) ................................................................15, 28

*Wagner v. Magellan Health Servs., Inc.,*
    121 F. Supp. 2d 673 (N.D. Ill. 2000) ..........................................................29

**STATUTES**

740 ILCS 10/11................................................................................................13

Illinois Antitrust Act ......................................................................................13

Section 1 of the Sherman Act, 15 U.S.C. § 1................................................13, 29, 39

Section 2 of the Sherman Act, 15 U.S.C. § 2................................................13, 29

Section 3 of the Clayton Act, 15 U.S.C. § 15 ..............................................13, 14, 33

**OTHER AUTHORITIES**

Local Rule 56.1 ...................................................................................................................3

P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 1802d (2014).......................................14

Defendants Barbara Surdej, Roy Surdej and Jeffrey Surdej (collectively, "Defendants") respectfully submit this memorandum in support of their motion for summary judgment as to all antitrust claims made against them.

## SUMMARY OF ARGUMENT

In Counts I through VII of the Amended Complaint, plaintiff Hannah's Boutique ("Hannah's" or "Plaintiff") asserts various antitrust claims against Defendants based on the allegation that they "demand[ed]" and "coerc[ed]" sixteen specific designers of prom and homecoming dresses not to sell their dresses to Hannah's. Each of Plaintiff's antitrust claims requires proof that Peaches Boutique ("Peaches") has market power in a properly defined relevant market. Defendants are entitled to summary judgment because the undisputed facts show that Hannah's cannot meet its burden.

First, Hannah's has not properly defined a relevant market. It has offered instead an *ad hoc* market definition, grounded in neither the law nor economics and plainly gerrymandered to exclude stores in certain geographic areas, as well as products, that clearly compete with Peaches and the prom and homecoming dresses it sells.

Second, if the relevant market is reasonably defined, it quickly becomes obvious that Peaches—a single store in a strip mall on South Archer Avenue close to Midway Airport—does not possess market power in the market in which it competes. The Supreme Court noted long ago that "[r]etail market power is rare," *see Bus. Elecs. Corp. v. Sharp Elecs.*, 485 U.S. 717, 727 n.2 (1988), and the Chicago retail market for prom and homecoming dresses is no exception. Even under the most generous assumptions, Peaches' share of any properly defined market remains in single digits, far below the minimum required by the Seventh Circuit to establish market power. Moreover, the structure of the market does not permit any single retailer to exercise market power. Prom and homecoming dress markets in Chicago and across the country

are fragmented, unconcentrated, and highly competitive. At the designer level, barriers to entry are low, there are many competing designers, and the market is highly dynamic—designers' fortunes often change quickly and dramatically, depending on how consumers react to their new dress designs. Similarly, at the retail dress store level, barriers to entry are virtually nonexistent, as demonstrated by the sheer number of competing retail outlets and internet sites available to Chicago consumers.

In short, teenage girls looking for prom and homecoming dresses in the Chicago area have many, many options, and if any retailer, including Peaches, charges too much, does not offer what they want, or provides inadequate service, they can, and do, go elsewhere. That describes a quintessentially competitive market—and explains why Plaintiff's antitrust claims fail. Plaintiff's complaints that Peaches has hurt its business (and allegedly, the business of a handful of other stores) do not, without much more, implicate the antitrust laws. Those laws protect the functioning of competitive markets and do not protect competitors from competition, even allegedly unfair competition. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) ("It is axiomatic that the antitrust laws were passed for the 'protection of *competition*, not *competitors.*'") (emphasis in original). The undisputed facts unambiguously show that competition among prom and homecoming dress retailers in the Chicago area is vigorous and that the markets are properly functioning without the need for judicial intervention. If Peaches has committed a business wrong against Hannah's (which Peaches denies), Hannah's may have a business tort claim against Peaches, but it does not have an antitrust claim. *See Parmelee Transp. Co. v. Keeshin*, 292 F.2d 794, 804 (7th Cir. 1961) ("The antitrust laws were never meant to be a panacea for all wrongs.").

2

Defendants are entitled to summary judgment because there is no genuine issue of material fact over whether Peaches possesses market power in a properly-defined relevant antitrust market.  It does not.

## STATEMENT OF FACTS

### A.    THE DESIGNER MARKET FOR PROM AND HOMECOMING DRESSES

There are at least 75 designers who market prom and homecoming dresses in the United States.  (SOF ¶ 4.)[1]  No one, or any handful, of those designers has a dominant market share. (SOF ¶ 5.)  Competition among these designers is fierce, in part because new designers face no meaningful barriers to entry or expansion.  (SOF ¶ 6.)  To start or expand a line, a designer needs little more than drawings, modest financial backing, and a plane ticket to Asia, where any number of manufacturers are eager to make the designer's dresses.  (SOF ¶ 6.)  Designers are not subject to any burdensome licensing or regulatory requirements, and they do not need a factory, equipment, or even employees to make their dresses.  (SOF ¶ 6.)  The intense competition among designers is evident from the fact that designers often succeed and fail in a matter of years.[2] (SOF ¶¶ 16-20.)

Because consumers who purchase prom and homecoming dresses place a high value on uniqueness (SOF ¶ 22), designers have a concern about "oversaturating" a market with their

---

[1] The facts set forth in this memorandum are taken from Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment, pursuant to Local Rule 56.1, which Defendants are filing simultaneously herewith.  Citations to "(SOF ¶ __)" are to that document.  Citations to "(SOF, Ex. __)" are to the exhibits attached to the Rule 56.1 Statement of Undisputed Material Facts.

[2] For example, Sherri Hill started her line in 2008 and is already considered a leading designer; Allure went from a startup company to a very successful prom dress line in about ten years; Maggie Sottero, a successful bridal gown designer for many years, and a top prom dress designer, has recently exited the prom dress business altogether; Party Time Formals, one of the "Named Designers," recently re-branded itself as Rachel Allan; Peaches, impressed by House of Wu's designs, was one of the first retailers in Illinois to sell its prom and homecoming dresses; and today, House of Wu has 7 authorized retailers in northern Illinois (SOF ¶¶ 16-20.)

dresses. (SOF ¶¶ 23-24.) If a dress is sold by many stores in an area, the dress loses its caché and will be less valuable to the customer; consequently, consumers will lose interest in the dress, and the retailer will be less likely to sell it. (SOF ¶ 25.) Designers, therefore, must balance their desire to sell as many dresses as they can against the risk of eroding the value of their brands by oversaturating the market. (SOF ¶ 24.) Retailers, of course, may also have an interest in avoiding oversaturation of a designer's dresses. If they have made a significant investment in those dresses in order to stock their stores,[3] they do not want the value of that inventory or their ability to sell it damaged because the designer has sold the same dresses to many other stores in the area.[4]

Designers typically sell their dresses to the public through a network of authorized retailers, including specialty boutiques, department stores, and internet sites (SOF ¶ 21), that have agreed to the designer's policies, including the following:

**Exclusivity**. To avoid oversaturation and provide authorized retailers with the incentive to promote their brands, designers often agree to provide their retailers with some level or form of "exclusivity." (SOF ¶¶ 23, 35.) The nature of this "exclusivity" varies. Most often, this "exclusivity" means only that the designer tells a retailer that makes a significant investment in its line that it will "protect" it, i.e., not sell any (or many) of the same dresses to any other (or

---

[3] Designers typically do not permit retailers to return unsold merchandise at the end of the season; i.e., the retailer bears the full risk of loss on the dresses it purchases for its inventory. (SOF ¶ 26.) Because Peaches cannot return unsold merchandise, the Surdejs sell out-of-season dresses ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (SOF ¶ 69); and donate any dresses that do not sell during the sidewalk sale to charities (SOF ¶ 71).

[4] Consider the contrast with mass-marketed brands where uniqueness is not valued. While the goal of the brand manager at Heinz may be to have its bottle of ketchup on the shelf in every grocery store and on a shelf in every home, a strategy of selling as many prom dresses as possible to as many retail outlets and consumers as possible would spell a quick demise for a prom and homecoming dress designer.

4

many) stores in the retailer's vicinity.  (SOF ¶¶ 35, 39, 88.)  Sometimes, the designer merely agrees to notify and perhaps consult with an existing retailer before it opens a new account in the retailer's vicinity that buys the same dresses.  In response, the retailer may ask the designer not to sell to the proposed new account or decide to adjust its purchase volume going forward.  (SOF ¶ 39.)  These arrangements are not written; they are not enforceable; and they are typically not precise as to geographic scope.  (SOF ¶¶ 36, 39.)  They are also transitory.  If the designer becomes unhappy with the retailer's representation of its line or if a competing retailer offers to place a larger order for its dresses, the designer is likely to give the business to a competitor the next season.  (SOF ¶ 38.)

**Manufacturer's Suggested Retail Price ("MSRP").**  Virtually all designers establish an MSRP for their dresses, a minimum price at which a retailer may sell them.  (SOF ¶ 29.)  MSRP is generally set at twice the wholesale price paid to the designer (and sometimes called the "keystone" price).  (SOF ¶ 29.)  Retailers are free to sell above the MSRP to the extent they are able to.  (SOF ¶ 29.)  From the designer's perspective, the MSRP protects the reputation of its brand by reducing the risk that customers perceive it as a bargain or discount dress, while helping to ensure an adequate margin for the retailer network on which the designer relies to promote its product.  (SOF ¶ 30.)  From the retailer's perspective, MSRP partially offsets the risk it takes by purchasing inventory.  (SOF ¶ 31.)

The foregoing—as well as minimum order requirements and prohibitions against trans-shipping[5]—are well-established practices in the industry that designers use to promote the long-

---

[5] Designers typically prohibit "trans-shipping," *i.e.*, the sale of a dress by an authorized retailer to an unauthorized retailer, because doing so helps the designer avoid oversaturation by allowing it to control the number of dresses sold in a local market and ensuring that only retailers subject to the designer's policies sell its dresses.  (SOF ¶¶ 27, 28.)  Designers also typically require retailers to purchase a minimum number of dresses because doing so helps to ensure that the designer's brand is well represented to the consumer.  (SOF ¶¶ 27, 28.)

run success of their businesses. (SOF ¶¶ 27-30, 35.) They are not unique to the Chicago Market. (SOF ¶¶ 35.) Nor are they dictated by Peaches, which is subject to all of the same terms and conditions imposed on other retailers. (SOF ¶¶ 34, 87.)

### B. THE GROWTH OF INTERNET SALES

As in many other industries, in the recent past, internet sales of prom and homecoming dresses have grown considerably. (SOF ¶ 40.) Michael Levin, a sales representative for designer Mac Duggal, testified that "[r]etail stores are . . . increasingly concerned that girls are buying the dresses online as opposed to going and buying in a store. . . It's an issue that won't go away because the Internet is not going to go away." (SOF ¶ 42.)

For example, two well-known internet sellers, NewYorkDress.com and Promgirl.com, together carry all of the 16 designers specifically named by Plaintiff in the Amended Complaint (Am. Compl. ¶¶ 31-46) (the "Named Designers"), as well as scores of other designers of prom and homecoming dresses ("Non-Named Designers"), and offer thousands of different styles, colors, and sizes, virtually all which are offered at MSRP prices. (SOF ¶¶ 125, 126.)

Internet sales impose competitive challenges for both designers and brick-and-mortar retailers. For designers, the internet has facilitated the sale of illegal knock-off dresses. (SOF ¶¶ 15, 44.) For retailers, the internet has made it increasingly difficult—now, perhaps, impracticable—to charge above MSRP (because consumers can so readily find the MSRP prices charged on the internet). (SOF ¶ 45.) The internet channel also offers cheaper and more flexible ways for consumers to buy dresses (*e.g.*, free shipping, liberal return policies, and no sales tax at time of sale), as well as a selection of thousands of styles that no retailer, including Peaches, could ever hope to carry in inventory. (SOF ¶¶ 45, 46.) Moreover, even if a store like Peaches attempted to raise its prices too greatly, the availability of dresses on the internet would immediately undercut its ability to do so: Peaches would quickly be reduced to a showroom for

internet retailers. That is, consumers would try on and select a dress at Peaches, walk away, and then purchase the same dress, at a lower price, from an internet seller on their smart phones, as they return to their cars in Peaches' parking lot. (SOF ¶ 45.)

## C.    THE SURDEJ DEFENDANTS AND PEACHES BOUTIQUE

Defendants Roy and Barbara Surdej are husband and wife; Jeffrey Surdej is their son. (SOF ¶ 3.) Roy and Barbara Surdej opened Peaches in the mid-1980s on South Archer Avenue, in a commercial and light industrial area near Midway Airport, in a 2,400 square foot shop selling women's ready-to-wear apparel. (SOF ¶¶ 47, 49.) Peaches has remained at the same location ever since, but it has expanded—in 2003, from 4,400 to 8,400 square feet, and in 2010 through early 2011, to its current size of 25,000 square feet. (SOF ¶¶ 48, 53.) The last expansion was particularly important because ███████████████████████████ ██████████████████████████████████████████████████████ (SOF ¶ 54.)[6] In 2014, Peaches sold dresses from 24 designers. (SOF ¶ 72.) Despite its success, Peaches represents only a tiny percentage of any designer's total revenue. (SOF ¶ 86.)

When Peaches first began selling prom and homecoming dresses in the mid 1990s, it faced many of the issues that Hannah's now faces. In particular, it could not buy dresses from many of the designers whose dresses it wanted to buy because they were satisfied with their existing representation in the area and were not willing to add Peaches as another authorized retailer. (SOF ¶ 50.) Peaches therefore sought out designers whose dresses were not already sold in the area—often younger or newer designers who, in Barbara Surdej's judgment, had

---

[6] ███████████████████████████████████████████████████ ████████████████████████████████████████

designs that Peaches' customers would find desirable. (SOF ¶ 51.) For many years, Peaches struggled with little or no profit. (SOF ¶ 52.)

Today, Peaches is "not typical of [specialty boutiques in] the industry." (SOF ¶ 56.) As Plaintiff's expert explains, specialty boutiques that sell prom and homecoming dresses are typically small in size and often found in neighborhood strip malls. (SOF ¶ 57.) They buy only a few stock dresses, which they use as sample merchandise, and then re-order the stock to fill customer orders. (SOF ¶ 57.) Peaches pursues a very different business model. Housed in a 25,000 square foot store, with 40 dressing rooms, Peaches carries a very large inventory of dresses— ██████████████████████████████████████████
████████████████████████████ (SOF ¶¶ 53, 58.) ████████████████████████
████████████████████████████████████████████████████████████
████████████████████ (SOF ¶ 58.) ████████████████████████████████
████████████████████████████████████ (SOF ¶¶ 59, 60.) Plaintiff's expert economist admits that each of these elements of Peaches' business model ██████████████████
████████████████████████████████████████████████ (SOF ¶ 64.)

In the past several years, Peaches, like other brick-and mortar retailers across the country, has faced intense competition from the internet. To meet that challenge, in 2006, the Surdejs began selling dresses through a website, and in 2009-2011, two other websites were added. (SOF ¶¶ 73-75.) As shown in Exhibit A hereto, the Surdejs' sales of prom and homecoming dresses over the internet have ████████████████ over the years. (SOF ¶ 76.)

When Peaches first opened in 1985, it priced its merchandise at MSRP + 15%, and it continued that practice, at least as to some dresses, until 2013. (SOF ¶¶ 79-81.) However, by 2009, the Surdejs ████████████████████████████████████████████████████

8



(SOF ¶¶ 77, 82.) ████████ the Surdejs began experimenting with different pricing strategies.  In November 2010, Jeff Surdej expressed concern that the brick-and-mortar business was in jeopardy because the prices on a website his father owned were less than Peaches' in-store prices.  (Am Compl. at Ex. 31.)  Likewise, ████████████████████ ██████████████████████████████████ (SOF ¶ 82.)  Thus, in 2012, Peaches abandoned its long-standing MSRP + 15% pricing in favor of a tiered pricing system; less expensive dresses were priced at MSRP + 15% as before, but more expensive dresses were priced at MSRP.  (SOF ¶ 83.)  A year later, the Surdejs █████████████████████ █████████████████████████ (SOF ¶ 84.) ██████████lowered nearly all of its in-store dress prices to MSRP, where they have remained since.[7]  (SOF ¶ 85.)

### D.    PLAINTIFF HANNAH'S BOUTIQUE.

Hannah's is a specialty boutique that sells prom and homecoming dresses.  (SOF ¶ 2.)  Located in Palos Park, Illinois, Hannah's is owned by Ms. Susan Shaban.  (SOF ¶ 2.)  She opened Hannah's in 2009 in Chicago Ridge in a 700 square foot store with three dressing rooms.  (SOF ¶¶ 99-100.)  Within two years, she realized that Hannah's had a "miserable" parking situation that was hurting her business, so in April 2012, Hannah's moved to its current location, a 2,600 square foot store with five dressing rooms.  (SOF ¶¶ 101-03.)  Between 2010 and 2013, Hannah's annual gross sales █████████████████████████ as shown in Exhibit B hereto.  (SOF ¶ 106.)

In this lawsuit, Hannah's complains that Chicago-area specialty dress stores, including Hannah's, are unable to buy dresses made by the 16 Named Designers, whose dresses Peaches

---

[7] The pricing above applies to in-season dresses.  (SOF ¶ 85.)

carries and which Hannah's alleges are the "most desirable." (Am. Compl. ¶¶ 14, 31-47.)  That is

not correct.  For example, Table 1 below identifies the selection of designers sold at a sample of

retailers near Peaches, including That Girl Boutique (located 7.9 miles from Peaches), The

Kimberly Bond Boutique (located 13.8 miles from Peaches), Debbie's Dresses (located 17.8

miles from Peaches), and Hannah's (located 10.8 miles from Peaches), as well as the designers

available to consumers on just two websites.[8]  The designers whose names are shaded are the 16

Named Designers whose dresses, according to Hannah's, are unavailable to boutiques in the

Chicago area.

**Table 1**
**Designers Sold At Four Brick-and-Mortar Retailers & On Two Websites**

| Designer | Peaches | Kimberly Bond | That Girl | Hannah's | Debbie's Dresses | NY Dress[9] | PG.com[10] |
|---|---|---|---|---|---|---|---|
| Allure | x | | | x | x | x | x |
| Angela & Alison | | x | | x | | x | |
| Alyce | x | x | x | x | x | x | x |
| Bari J Shimmer | x | | | | x | x | x |
| BG Haute | x | | | | x | x | x |
| Blush | x | | | | | x | x |
| Clarisse | | x | | x | x | x | |
| Dave & Johnny | | x | | x | x | x | x |
| Faviana | x | | x | x | x | x | x |
| Maggie Sottero[11] | | | | | x | x | x |

---

[8] *See* Ex. C hereto for a more complete list of retailers.  The list for the two websites is based on a review of those websites conducted in October 2014.

[9] NewYorkDress.com.  NewYorkDress.com carries additional prom and homecoming dress lines that none of the boutiques carry; Defendants have only listed the lines NewYorkDress.com carries that are also sold in the five boutiques listed in Table 1.  (SOF ¶ 113 n.2.)

[10] Promgirl.com.  Promgirl.com carries additional prom and homecoming dress lines that none of the boutiques carry; Defendants have only listed the lines Promgirl.com carries that are also sold in the five boutiques listed in Table 1.  (SOF ¶ 113 n.3.)

[11] Maggie Sottero no longer sells prom and homecoming dresses (SOF ¶ 17), but Plaintiff identified that line as one of the designers that it could not obtain.  The stores listed above continue to list her as a

10

| Designer | Peaches | Kimberly Bond | That Girl | Hannah's | Debbie's Dresses | NY Dress[9] | PG.com[10] |
|---|---|---|---|---|---|---|---|
| House of Wu | x | x | | x | x | x | x |
| Janique | | | | x | | x | |
| Jasz | x | | | | x | x | x |
| Josh & Jazz | | | | | x | | |
| Johnathan Kayne | | | | x | | x | |
| Jovani | x | x | x | | x | | x |
| Karishma | | x | | | | | |
| La Femme | x | x | | | | x | x |
| Landa | x | | | | x | x | |
| MNM | | | x | x | | x | |
| Mac Duggal | x | x | | | x | x | x |
| Mori Lee | x | | | | x | x | x |
| Nika | | | x | x | | x | |
| PC Mary/Kiss Kiss | | x | | | x | | |
| Precious Formals | x | | x | | x | | |
| Primavera | | x | | x | | x | |
| Rachel Allan (formerly Party Time) | x | x | x | x | x | x | |
| Riva | x | x | x | | x | x | x |
| Saboroma | | | x | x | | x | |
| Scala | x | | | | x | x | x |
| Sean | x | | | | | x | x |
| Shail K | x | | | | | x | |
| Sherri Hill | x | x | | | x | x | x |
| Tarik Ediz | x | | | | | x | |
| Terani | x | x | x | x | x | x | x |
| Mon Cheri | x | x | | | x | x | x |
| Wow | | | | | x | | |
| Xcite | | | x | | x | x | |

(SOF ¶ 113.) Table 1 demonstrates that Hannah's faces competition from three boutiques other than Peaches in its immediate vicinity that collectively sell 14 of the 16 Named Designers. And the two referenced internet sites sell all of the 16 Named Designers—plus many others. If one

---

designer they carry. Similarly, Plaintiff identified Party Time as a Named Designer, but that line was discontinued and rebranded in 2015 as "Rachel Allan." (SOF ¶ 19.)

adds other specialty boutiques and department stores in the Chicago Market (*see infra* p. 20-22 and Ex. C hereto) and the rest of the internet retailers, it is clear that young women in the Chicago area can purchase the dresses sold at Peaches from many other retailers.

## ARGUMENT

I.     **PLAINTIFF'S ANTITRUST CLAIMS REQUIRE PROOF THAT PEACHES HAS MONOPOLY POWER OR SUBSTANTIAL MARKET POWER IN A PROPERLY DEFINED RELEVANT ANTITRUST MARKET.**

In the Amended Complaint—which was filed on July 29, 2014 after substantial discovery and which eliminated many of the original allegations of anticompetitive conduct[12]—Hannah's asserts claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, for attempted monopolization (Count I), conspiracy to monopolize (Count II) and monopolization (Count III). Claims under Section 2 require proof that the defendant possesses monopoly power or that there is a dangerous probability that it will achieve monopoly power. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986). Hannah's also brings claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, for concerted refusal to deal

---

[12] The Amended Complaint eliminated many of the allegations of bad behavior and purported anticompetitive effects alleged in the initial complaint, including several discussed in this Court's decision denying Defendants' motion to dismiss. Most important, *Hannah's no longer alleges*—nor could it do so in good faith—*that "Peaches caused prices in the relevant market to rise significantly."* *See Hannah's Boutique v. Barbara Surdej, et al.*, No. 13 C 2564, 2013 WL 4553313, at *3 (N.D. Ill. Aug. 28, 2013). Nor does it allege that Peaches (i) "greatly inflate[d] dress prices to consumers by as much as 200-250%; (ii) made "specific false statements to Hannah's . . . clients," (iii) told "several designers. . . that Hannah's was illegally selling. . . 'knockoff[ ]'" dresses, or (iv) reported Hannah's to the Palos Park Police Department. *Id.* at *4. Moreover, the Amended Complaint significantly narrowed the definition of the relevant market, *compare* Am. Compl. ¶¶ 1, 6 & 50 *with Hannah's Boutique*, 2013 WL 4553313 at *3, in what Defendants believe is a disingenuous attempt to increase Peaches' share of the alleged market.

(Count IV) and unreasonable restraint of trade (Count V), and under Section 3 of the Clayton Act, 15 U.S.C. § 15, for exclusive dealing (Count VI).[13]

All of these claims arise out of the same allegations—namely, that the Surdejs allegedly "direct[ed], demand[ed], and coerc[ed]" the 16 Named Designers "not to sell [their] dresses to . . . other specialty boutiques" in the Chicago area. (Am. Compl. ¶ 10.) Hannah's has made no allegation of any horizontal agreement, *i.e.*, an agreement between Peaches and any of its competitors. Instead, all of its allegations concern *vertical* restraints, between a designer and a retailer. *See, e.g., Bus. Elecs. Corp.*, 485 U.S. at 730 (restraints "imposed by agreement between firms at different levels of distribution [are] vertical restraints").

Allegations of vertical restraints are analyzed using the rule of reason. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007). "The Seventh Circuit has repeatedly taught that 'a threshold inquiry in any Rule of Reason case is whether the defendant has market power.'" *Premium Plus Partners, L.P. v. Davis,* No. 04 C 1851, 2005 WL 711591, *16 (N.D. Ill. Mar. 28, 2005); *Menasha Corp. v. News Am. Mktg.,* 354 F.3d 661, 663 (7th Cir. 2004) ("The first requirement in every suit based on the Rule of Reason is market power. . . . "); *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) (rejecting argument that plaintiff need not show market power to analyze allegations of vertical restraints).[14] This is because although vertical restraints may injure *competitors*, they cannot

---

[13] Plaintiff also asserts a derivative count under the Illinois Antitrust Act (Count VII). However, for all purposes relevant to this action, the Illinois Antitrust Act is based on Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act and, therefore, the standard governing the state law claims is the same. 740 ILCS 10/11; *Laughlin v. Evanston Hosp.*, 133 Ill. 2d 374, 384, 550 N.E.2d 986, 990 (1990); *People ex rel. Scott v. Coll. Hills Corp.*, 91 Ill. 2d 138, 150, 435 N.E.2d 463, 469 (1982); *People ex rel. Scott v. Schwulst Bldg. Ctr., Inc.*, 89 Ill. 2d 365, 369, 432 N.E.2d 855, 857 (1982).

[14] *Accord Hardy v. City Optical Inc.*, 39 F.3d 765, 767 (7th Cir. 1994) ("[S]ubstantial market power is a threshold requirement of all rule of reason (as well as some per se) cases."); *Digital Equip. Corp. v. Uniq Digital Techs, Inc.*, 73 F.3d 756, 761 (7th Cir. 1996) ("[S]ubstantial market power is an indispensable

injure *competition* in the absence of market power. *See Brooke Group*, 509 U.S. at 224 ("It is axiomatic that the antitrust laws were passed for 'the protection of *competition*, not *competitors.*'") (emphasis in original); *see also* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 1802d (2014) (it is necessary to examine market share when analyzing exclusive dealing; foreclosing a small market share will not injure competition). Plaintiff's Clayton Act Section 3 claim, which is also judged under a rule of reason analysis, also requires a showing of market power. *See Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984).

In short, all of Hannah's claims require it to prove that Peaches possesses monopoly or market power. But the Supreme Court's observation that "[r]etail market power is rare," *see Bus. Elecs. Corp.*, 485 U.S. at 727 n.2, remains true today. *See also 42nd Parallel North v. E Street Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002) (finding that "a 'competitive battle'" between two retailers did not amount to an antitrust suit). Peaches is not the rare exception.

## II. PLAINTIFF HAS FAILED TO DEFINE A PROPER RELEVANT ANTITRUST MARKET.

Plaintiff must, as an initial matter, properly define a relevant market. *See, e.g., Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987); *Audio Car Stereo, Inc. v. The Little Guys, Inc.*, No. 04 C 3562, 2004 WL 3019298, at *6-7 (N.D. Ill. Dec. 28, 2004) (St. Eve, J.). The relevant market has two aspects: a relevant product market and a relevant geographic market. *See Republic Tobacco*, 381 F.3d at 738; *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 324 (1962). A relevant product market is comprised of all the products that are "reasonably interchangeable by consumers for the same purposes. . . ." *Fishman v. Estate of Wirtz*, 807 F.2d

---

ingredient of every claim under the Rule of Reason."); *42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 405 (7th Cir. 2002) ("[T]his circuit has adopted a threshold requirement, a 'shortcut' as it were, that the plaintiff needs to show that the defendant has market power."); *Chicago Prof'l Sports v. Nat'l Basketball Ass'n*, 961 F.2d 667, 673 (7th Cir. 1992) (noting rule in Seventh Circuit that "the first step in any Rule of Reason case is an assessment of market power") (collecting cases).

520, 531 (7th Cir. 1986) (quoting *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)); *Brown Shoe Co.*, 370 U.S. at 325. Products are in the same product market when they are good substitutes for one another, *Reifert v. So. Cent. Wisc. MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006), based on factors such as uses, quality, and price. *See, e.g.*, *Siemer v. Quizno's Franchise Co. LLC*, No. 07 C 2170, 2008 WL 904874, at *10 (N.D. Ill. Mar. 31, 2008) ("The relevant product market must include all 'products that have reasonable interchangeability for the purposes for which they are produced-price, use, and qualities considered.'") (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)).[15]

Similarly, the relevant geographic market is measured by the "area of effective competition" in which the seller operates and where consumers can practicably turn to purchase products. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-28 (1961); *see Republic Tobacco*, 381 F.3d at 738. Thus, courts look to the distance consumers are willing to travel to purchase products as the proper measure of the relevant geographic market. *See Tampa Elec.*, 365 U.S. at 327-28 (the geographic market is measured by the area where consumers can practicably turn to purchase products); *Kochert v. Greater Lafayette Health Servs., Inc.*, 372 F. Supp. 2d 509, 518 (N.D. Ind. 2004) (finding plaintiff's geographic market improper because it excluded areas to which consumers were willing to travel), *aff'd*, 463 F.3d 710 (7th Cir. 2006).

Hannah's expert economist, Dr. Leslie Schafer, has defined wholly implausible, legally deficient, and extremely narrow geographic and product markets in an apparent attempt to suggest that Peaches has market power when it plainly does not.

First, Dr. Schafer opines that the relevant product market in this case is narrowly defined as "*high-end* special occasion prom and homecoming dresses *sold in specialty boutiques* from

---

[15] *See also Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997).

*16 specific designers.*" (SOF ¶ 7; *see also* Am. Compl. ¶¶ 6, 73.) Her relevant product market

thus contains three baseless limitations: (1) it includes only prom and homecoming dresses from

16 Named Designers, but not such dresses from any of the 60-plus "Non-Named Designers"; and

(2) it includes Named Designers' prom and homecoming dresses "*sold in specialty boutiques*"

but not those same dresses when they are sold (a) on internet retail sites or (b) in department

stores (or other retail outlets). Despite this market definition, Dr. Schafer ultimately conceded

that Named and Non-Named Designers compete with one another and that specialty boutiques

compete with the internet and department stores in the sale of prom and homecoming dresses.

(SOF ¶¶ 8, 41, 116.) Thus, Plaintiff's relevant product market is contrary to law requiring that a

relevant product market contain *all* reasonably interchangeable products. *E.I. du Pont de*

*Nemours & Co.*, 351 U.S. at 404.

      Second, Dr. Schafer opines that the relevant geographic market, which she calls the

"Chicago Market," is "the greater Chicago area covered by the area codes in which Peaches

foreclosed its competition from receiving inputs . . . approximated by area codes 630/331,

847/224, 708, 312/872, and 773." (SOF at C; *see also* Am. Compl. ¶¶ 1, 74.) This market

definition, too, is fatally flawed because it excludes geographic areas from which Peaches draws

a substantial number of its customers, including areas that are closer to Peaches' store than areas

that are included in her market definition.

    **A.**    **Plaintiff Improperly Limits Its Product Market To Include Only Dresses**
                **Made By Sixteen Specific Designers.**

      Defining a relevant product market by identifying 16 Named Designers whose dresses

Peaches carries (and Hannah's would like to carry) contravenes well-established law that, absent

rare circumstances not applicable here, a plaintiff cannot define a product market in terms of

brands. *See, e.g.*, *PSKS, Inc. v. Leegin Creative Leather Prods, Inc.*, 615 F.3d 412, 418 (5th Cir.

16

2010); *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 07834, 2014 WL 64657, at *6 (N.D. Ill. Jan. 8, 2014) (Tharp, J.) ("The law usually requires that a relevant product market for antitrust purposes comprise more than a single brand"; rejecting a proposed market comprised of dresses made by a single "highly differentiated" and "unique" designer).[16] This is because a brand name does not create a "structural barrier to the interchangeability of" various manufacturers' products. *PSKS, Inc.*, 615 F.3d at 418; *House of Brides*, 2014 WL 64657, at *6; *see also Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, No. 13 C 1129, 2013 WL 4599903, at *4-5 (N.D. Ill. Aug. 29, 2013) (explaining that a market defined by a single brand is not appropriate unless "there are no interchangeable substitutes to that single brand"). The same rationale prohibits defining a market by a collection of brands when the collection—such as Plaintiff's collection of 16 designers—faces competition from other manufacturers' products, such that consumers have interchangeable choices among the collection of brands and other products. *Cf. PSKS, Inc.*, 615 F.3d at 418.[17]

---

[16] *See also Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 480 (3d Cir. 1992) (refusing to find that Chrysler cars, by themselves, comprised product market); *L.G. Motorsports, Inc. v. NGMCO, Inc.*, No. 4:11CV112, 2012 WL 718603, at *4 (E.D. Tex. March 6, 2012) (rejecting product market limited to Michelin tires); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1197-99 (N.D. Cal. 2008*) (rejecting claim that Mac OS constitutes single-product market); *Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705-06 (S.D.N.Y. 1997) (Sotomayor, J.) (rejecting product market limited to travel on TWA between certain city pairs, explaining that argument was "analogous to a contention that a consumer is 'locked into' Pepsi because she prefers the taste, or NBC because she prefers 'Friends,' 'Seinfeld,' and 'E.R.,' . . . but at base, Pepsi is one of many sodas, and NBC is just another television network" and consumers are not "locked in" to either).

[17] Similarly, brand *preferences* do not define a relevant product market. "The question is not whether one product is a perfect substitute for another . . . but rather whether two products are 'reasonably interchangeable. . . . . [A] mere preference for a specific manufacturer's brand . . . is not sufficient for purposes of establishing a relevant product market." *McLaughlin Equip. Co., Inc. v. Servaas*, No. IP98-0127–C–T/K, 2004 WL 1629603 at *18 (S.D. Ind. Feb. 18, 2004); *accord House of Brides*, 2014 WL 64657, at *6; *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-MD-1628RMBMHD, 2009 WL 3241401, at *10 (S.D.N.Y. Sept. 30, 2009), *aff'd sub nom. Am. Banana Co. v. J. Bonafede Co.*, 407 F. App'x 520 (2d Cir. 2010). Thus, even if it were true that consumers preferred Named Designers to Non-Named Designers, that does not mean that Named and Non-Named Designers are *not* reasonably interchangeable.

It is undisputed that there are no structural barriers to the interchangeability of the dresses made by the 16 Named Designers with dresses made by Non-Named Designers. (SOF ¶¶ 9-13.) Nor is there any shortage of substitutes for the Named Designers' dresses: there are more than 60 Non-Named Designers that sell prom and homecoming dresses into the Chicago area, often in the same store as, and in direct price competition with, the Named Designers' dresses. (SOF ¶ 8.) Indeed, as Table 1 above demonstrates (*supra* pp. 10-11), in the area immediately surrounding Peaches and Hannah's, prom and homecoming dresses made by 22 Non-Named Designers are sold in the same stores as the dresses made by the Named Designers (which are shaded in the table).[18] Even Plaintiff's expert, Dr. Schafer, admits that Named and Non-Named Designers are sold in the very same stores, potentially even side-by-side (SOF ¶ 8), and she was unaware of any barrier to consumers' ability to choose a Non-Named Designer dress over Named Designer dress hanging in the same store (SOF ¶ 13).

There is no genuine dispute that Named and Non-Named Designers' dresses have the same uses, quality, and price. (SOF ¶ 9-13.) Dr. Schafer admits that Named and Non-Named Designers' dresses have the same use (SOF ¶ 13), and she disclaims any intent to opine that their dresses differ in quality (SOF ¶ 13).[19] Nor did she undertake any economic analysis to show that

---

[18] *See also* Ex. C hereto, which shows additional area retailers selling Named and Non-Named Designer dresses.

[19] While Dr. Schafer testified that she is not opining that Named and Non-Named Designers' dresses differ in quality, her expert report contains several statements suggesting she believes that there nonetheless are material differences between the two groups, *e.g.*, that Named Designers' dresses have more "bling" (Schafer Rep., SOF Ex. 26, ¶ 22), are "high-end" (*id.*), and the most "sought after" brands (*id.*), that are an "absolute necessity" to get customers into stores (*id.* ¶ 32). However, she admitted at her deposition that Named and Non-Named Designer dresses alike may be considered "high-end" (Schafer Dep., SOF Ex. 28, at 79:15-82:11), that Non-Named Designers' dresses also have "bling" (*id.* at 91:15-92:16), and that her statements that Named Designers are "sought after" and an "absolute necessity" are not based on any economic analysis (*id.* at 101:20-103:25). *See also* Daubert Mot. 8-9.

18

Named and Non-Named Designer dresses differ meaningfully in prices, such that they are not reasonably interchangeable. (SOF ¶¶ 9, 11.)

In fact, it is undisputed that Named and Non-Named Designer dresses have significantly overlapping price points, showing that consumers perceive their values to be the same. (SOF ¶ 10.) For example, as Defendants' expert, Dr. Kneuper, has shown, data Dr. Schafer relies upon shows that ███ of the Named Designer dresses sold at Peaches' brick-and-mortar store in 2012 were priced in the range of ██████████ while ███ of the Non-Named Designer dresses were priced in the range of █████████ showing that ███ of Non-Named Designer dresses sold at prices that are directly competitive to the Named Designer dresses' prices. (SOF ¶ 11; *see also*, Daubert Mot. 10-12 (analysis of price overlap)). Likewise, the chart below, a scatter plot of prices of dresses sold at Hannah's in 2012, plainly illustrates that Named Designer dresses (represented by red triangles) and Non-Named Designer dresses (represented by blue dots) were priced in the same range:

**Hannah's Prom Season Dress Prices**
*January 2012 - May 2012*



These data based on Hannah's sales as reported in Schafer Exhibit 7.

(SOF ¶ 12.)  The pricing data consistently show that Named and Non-Named Designer dresses are clearly "reasonably interchangeable by consumers for the same purpose." *Fishman*, 807 F.2d at 531.  Indeed, at her deposition, Dr. Schafer conceded that two dresses hanging in the same store—one a Named Designer and one a Non-Named Designer—**do in fact compete with each other**.  (SOF ¶ 8.)[20]

Consumers thus have an abundance of interchangeable prom and homecoming dress brands from which they can choose; they are not "locked in" to the 16 Named Designers.  *See, e.g., Fishman*, 807 F.2d at 531; *see also House of Brides*, 2014 WL 64657, at *7 (dismissing antitrust claim because plaintiff failed to "plausibly suggest that the commercial realities facing consumers prevent them from simply choosing another brand of bridal gown" rather than the single brand by which plaintiff defined its product market).  Accordingly, the relevant product market cannot properly be limited to dresses from just the 16 Named Designers.

**B.      Plaintiff Improperly Limited Its Product Market To Include Only Dresses Sold In "Specialty Boutiques."**

By defining its relevant product market to include only dresses sold in "specialty boutiques," Plaintiff excludes dresses sold in other retail channels from which consumers purchase prom and homecoming dresses—most notably, in department stores and via the internet.  Plaintiff's exclusion of these two retail channels from the relevant market lacks any factual basis and is an unfounded attempt to narrow the market definition.

**1.      Excluding department stores is indefensible.**

The undisputed evidence shows that consumers can and do purchase prom and homecoming dresses—including the same dresses sold in specialty boutiques—from a wide

---

[20] This conclusion is supported by the Named Designers themselves, who consider their competition to include both other Named Designers and Non-Named Designers.  (SOF ¶¶ 4, 5, 8.)

variety of department stores in the Chicago Market, *e.g.*, Nordstrom, Macy's, Dillard's, Neiman Marcus, Saks Fifth Avenue, and Lord & Taylor. (SOF ¶¶ 119-20.) In fact, Dr. Kneuper found approximately 42 department stores selling prom and homecoming dresses within 30 miles of Peaches, and another 12 between 30 and 50 miles of Peaches. These department stores sell both Named[21] and Non-Named Designers' dresses at prices that are the same or comparable to the prices at which the same dresses are sold in specialty boutiques. (SOF ¶ 121.)[22] Even Dr. Schafer does not dispute that the same Named and Non-Named Designers' dresses found in specialty boutiques are sold in department stores. (SOF ¶ 119.) Accordingly, Plaintiff has no valid basis to assert that prom and homecoming dresses sold in department stores do not compete with such dresses sold in specialty boutiques.

**2.     No defensible basis exists to exclude dresses sold on the internet.**

Plaintiff's expert concedes that consumers can and do purchase prom and homecoming dresses on websites selling prom and homecoming dresses. (SOF ¶ 122.) These websites offer Named and Non-Named Designers' dresses at the MSRP prices at which boutiques generally sell the same dresses. (SOF ¶ 123.)

Since they began operating their websites, the ███████████████████████████ ████████████████████ and the Surdejs' experience mirrors the larger trend in the industry of increasing internet sales of prom and homecoming dresses.[23] (SOF ¶¶ 40-45.) There is no

---

[21] For example, Mon Cheri sells to Von Maur, Jovani sells to Neiman Marcus and Dillard's, Sherri Hill sells to Nordstrom, and Mac Duggal sells to Von Maur. (SOF ¶ 119.)

[22] Moreover, department stores have an ability to carry more inventory that they can distribute in stores across the country but is accessible to a consumer at any store; they have a large amount of retail space that they can easily expand to sell a larger supply of prom and homecoming dresses; they have liberal return policies; and they often offer online sales. (SOF ¶¶ 117, 155, 156.)

[23] As described in the Statement of Facts, *supra* p. 8-9, Peaches' pricing decisions in the last few years demonstrate the competition between internet and brick-and-mortar retailers. Ever since it opened in 1985, Peaches had priced its dresses at MSRP + 15%. (SOF ¶¶ 79-81.) But faced with increasing price

basis to claim that internet sites do not compete with brick-and-mortar stores selling the same products.

Brief visits to a few internet retailers' sites powerfully demonstrate the ready availability of competitively-priced prom and homecoming dresses over the internet. As of October 2014, NewYorkDress.com sold over 3,000 prom and 2,500 homecoming dress styles, including dresses from 14 of the 16 Named Designers (and at least 64 Non-Named Designers) (SOF ¶ 125); Promgirl.com sold dresses from 15 of the 16 Named Designers (and at least 25 Non-Named Designers); Missesdressy.com sold dresses from 14 of the 16 Named Designers (and at least 23 Non-Named Designers); and all these websites sell at MSRP, accept returns, offer free shipping for U.S. orders, and sometimes do not charge sales tax to Illinois residents. (SOF ¶¶ 126-27.)

Because the evidence indisputably shows that specialty boutiques compete with internet retailers, the relevant product market cannot properly exclude prom and homecoming dresses sold over the internet.

### C. Plaintiff's Geographic Market Definition Is Overly Narrow And Arbitrary.

It is undisputed that customers will travel up to 45-60 minutes to shop for a prom or homecoming dress, which translates to a distance of approximately 30-50 miles (SOF ¶¶ 105, 128, 129.) This is consistent with the typical relevant geographic market used in antitrust cases involving retail stores and long travel patterns. Peaches' expert Dr. Kneuper therefore proposes two alternative geographic markets: (1) an area within 30 miles of Peaches, or (2) an area within 50 miles of Peaches, both of which are supported by Peaches' sales data. (SOF ¶ 130.)

Hannah's expert Dr. Schafer, however, does not define her proposed relevant geographic market in terms of the distance that consumers are willing to travel. This is contrary to law and

---

competition from internet retailers, which generally charge MSRP (and often do not charge sales tax), ██████████████████████████████████████████████████ (SOF ¶ 82.)

economics. *See Kochert*, 372 F. Supp. 2d at 518. Instead, she proposes a narrower geographic

market defined by area codes set by the FCC (which, like her relevant product market, is the

same relevant geographic market that Plaintiff alleged in the Amended Complaint before Dr.

Schafer was retained (SOF at C, ¶ 7.) In Figure 1 below, Dr. Schafer's geographic market is

shaded in pink, with a red star indicating Peaches' location.


Figure 1
**Plaintiff's Geographic Market Compared to a Traditional 30 or 50-mile Radius**



On its face, Dr. Schafer's proposed geographic market is plainly gerrymandered. It inexplicably

*excludes* densely-populated areas in the 815/779 (Joliet) and 219 (Gary, Hammond) area codes

that are well within 30 miles of Peaches, while it *includes* areas that are beyond 30 miles from Peaches—and even beyond 50 miles from Peaches.[24]  (SOF ¶ 131.)

       Peaches' sales data confirm that Plaintiff's proposed geographic market is improper because it excludes, without reason, areas from which Peaches draws a substantial portion of its customers.  Dr. Schafer agrees that at least ▮ of Peaches in-store sales of Named Designer dresses for the years 2011 to 2012 were to customers who came from ***outside*** her "Chicago Market."  (SOF ¶¶ 131, 136.)  In 2013, ▮ and ▮ of Peaches' in-store dress sales were to customers from the 815/779 and 219 area codes, respectively, portions of which are within 30 miles and portions of which are between 30 and 50 miles of Peaches, but all of which are excluded from Plaintiff's "Chicago Market."  (SOF ¶¶ 131, 137, 138.)  Similarly, in 2011 and 2012, approximately ▮ and ▮ of Peaches' in-store dress sales were to customers from the excluded 815/779 and 219 area codes, respectively.  (SOF ¶ 135.)[25]  Faced with these facts, Dr. Schafer conceded that there is "not really" an economic justification for excluding these areas from the relevant geographic market.  (SOF ¶ 131.)

---

[24] Ms. Shaban testified that Hannah's also has customers from the Joliet area and northern Indiana, which are excluded from the "Chicago Market."  (SOF ¶¶ 105, 131.)

Hannah's may have deliberately decided to exclude the 815 area code from the market because it is the home of Bridal Elegance – which claims to be the largest prom dress store in the country and ▮ ▮ as well as several other specialty dress stores selling prom dresses, including Kathryn's Bridal (McHenry) and Gipper Prom and Pageant (McHenry).  (SOF ¶¶ 132-34.)

[25] Peaches also has significant in-store sales even beyond a 50 mile radius from its store—and well outside of Plaintiff's Chicago Market.  In 2013, for example, Peaches sold more prom and homecoming dresses to consumers attending a prom in ▮ than to attendees of any other event.  (SOF ¶ 139.)  And more than ▮ and ▮ of Peaches' prom and homecoming sales came from Wisconsin and Indiana, respectively.  (SOF ¶ 140.)

* * * * *

In sum, Plaintiff has not defined a proper relevant product market or a proper relevant geographic market. This failure, by itself, is a sufficient basis for dismissal of its claims. *See 42nd Parallel*, 286 F.3d at 405 (dismissing plaintiff's antitrust claims for failure to define a proper relevant market); *Audio Car Stereo*, 2004 WL 3019298, at *7 (St. Eve, J.) (same). Accordingly, this Court should grant Defendants summary judgment.

## III.     PLAINTIFF'S CLAIMS FAIL BECAUSE THERE ARE NO BARRIERS TO ENTRY AT THE DESIGNER OR RETAIL LEVELS.

Market power is "the ability to raise price significantly higher than the competitive level by restricting output." *Ball Mem'l Hosp., Inc.*, 784 F.2d at 1331. *See also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1007 (7th Cir. 2012) (market power is "the power to raise price above the competitive level without losing so much business to other sellers that the price would quickly fall back to that level"); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414-16 (7th Cir. 1989) (even a firm with a relatively high market share does not have market power without the ability to control total market prices and output).

The Supreme Court has recognized, however, that where, as here, barriers to entry are low, a firm cannot possess market power, regardless of that firm's market share. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 591 n.15 (1986). Simply, without meaningful barriers to entry, it is impossible for a firm to maintain supra-competitive pricing for any extended time, and in that case, monopolization claims should be summarily dismissed. *Id.*; *see also Brooke Group*, 509 U.S. at 226 ("In certain situations—for example, where the market is highly diffuse and competitive, or where new entry is easy . . . summary disposition of the case is appropriate."). Absent meaningful barriers to entry and expansion, if a

firm raises prices above supra-competitive levels, then new firms can enter the market and defeat the anti-competitive practices, by charging lower prices and increasing output.

Here, there are no meaningful barriers to entry or expansion at the designer level for the reasons discussed above. (*See supra* p. 3.) Nor do retailers face any meaningful barriers to entry. A specialty retailer typically opens a single store in a strip mall, and needs only a minimal upfront investment to do so. For example, Ms. Shaban opened Hannah's with no relevant retail experience, a one-year lease for a small retail space, and a supply of dresses she purchased using her personal savings and a credit card. (SOF ¶¶ 98-100.) Low barriers to entry are further illustrated by the entry of several specialty retailers to the Chicago Market in just the last few years, including Eva's Bridal, Wolsfelt's Prom, and Gipper's Prom and Pageant. (SOF ¶ 108.)

In the absence of meaningful barriers to entry or expansion, as exists here, Peaches cannot have market power as a matter of law and basic economics. Accordingly, Defendants are entitled to summary judgment on Counts I through VII, without further inquiry.

## IV.    PLAINTIFF'S CLAIMS FAIL BECAUSE PEACHES DOES NOT HAVE MARKET POWER IN ANY PROPERLY DEFINED RELEVANT MARKET.

If the Court considers market power notwithstanding the low barriers to entering the retail prom and homecoming dress business, the analysis must start with Peaches' market share, which indisputably falls short of any minimum threshold recognized by the Seventh Circuit.

Under controlling Seventh Circuit precedent, a "20%-25% market share or less does not constitute market power." *Valley Liquors,* 822 F.2d at 666. "Cases frequently say that as a matter of law, single-firm shares of 30% or less cannot establish market power." *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,* 881 F.2d 1396, 1403 (7th Cir. 1989); *see also Digital Equip. Corp. v. Uniq Digital Technologies, Inc.,* 73 F.3d 756, 761 (7th Cir. 1996) ("DEC's share of the mid-range business is substantially less than 30%, and . . . 30% is not enough to confer

substantial market power unless there are high barriers to competition.").[26]  The share required

for Section 2 claims is even higher.  Section 2 requires a showing that a defendant possesses

monopoly power, which is rarely found with less than 50% market share.  *See Eastman Kodak,*

504 U.S. at 481 ("Monopoly power under § 2 requires, of course, something greater than market

power under § 1."); *Indiana Grocery,* 864 F.2d at 1414-16 (50% of sub-market share did not

constitute monopoly power).

### A.    Using Plaintiff's Own Data, Peaches Lacks Market Power.

Hannah's alleges that "[c]onsumer demand for prom and homecoming dresses is

controlled by high school aged girls ages 14-19"; that there are between 221,146 and 271,761

such girls in the "Chicago Market"; and that "high school girls attend one (1) or more prom and

homecoming dances each year, and many of these high school girls purchase different dresses

for each event."  (Am. Compl. ¶¶ 3-5; SOF ¶¶ 141-43.)  Hannah's has therefore admitted that *at*

*least* 221,000 to 272,000 girls purchase a prom and/or homecoming dress in the "Chicago

Market" each year.  Comparing those numbers to the number of those dresses Peaches sold in the

"Chicago Market" in 2013, Dr. Kneuper estimates that Peaches sold between ███ and ███

---

[26] *Accord Hardy*, 39 F.3d at 767 ("[I]t seems highly unlikely that through its optometrists it writes 30 percent or more of the contact-lens specifications written in Indiana each year, the minimum market share from which the market power required to be shown at the threshold of a tying case can be inferred."); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1330-31, 1334-37 (7th Cir. 1986) (even shares ranging from 50% to over 80% do not confer power over price if entry is easy); *Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 680-81 (N.D. Ill. 2000) (citing *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic,* 65 F.3d 1406, 1411 (7th Cir. 1995) (33% market share insufficient to infer market power)); *Ashkanazy v. I. Rokeach & Sons, Inc.*, 757 F. Supp. 1527, 1542 (N.D. Ill. 1991) ("Rokeach's share [40%] therefore exceeds the 30% mark that has frequently been pronounced insufficient as a matter of law to confer market power.  But even higher market shares may not trigger antitrust concern if mitigating factors, such as low entry barriers, are present.") (internal citation omitted).

of the prom and homecoming dresses (made by any designer) purchased that year (from any retail channel).[27]  (SOF ¶ 144.)

Even if one makes extremely conservative changes to the numbers stated in the Amended Complaint and supported by Ms. Shaban's testimony—by assuming that only half of the high school-aged girls attend prom or homecoming and only three-fourths of them purchase one new dress—Peaches' market share is still under ▮▮ of all new sales of prom and homecoming dresses bought in Plaintiff's "Chicago Market."  (SOF ¶¶ 147-48.)

### B.    Alternative Analyses Validate Peaches' Lack of Market Power.

Dr. Kneuper also estimated Peaches' market share in the alleged "Chicago Market," as well as markets defined by 30-mile and 50-mile radiuses around Peaches, while accepting Plaintiff's flawed assumption that only dresses sold in specialty boutiques—but not department stores or over the internet—are in the relevant market.

To do so, Dr. Kneuper identified 56 specialty retailers in the overly-narrow "Chicago Market," 70 such retailers within a 30-mile radius of Peaches, and 89 such retailers within a 50-mile radius of Peaches.  (SOF ¶¶ 149-51.)  He then estimated the square footage of floor space for each such retailer, and calculated Peaches' "market share" of the total floor space in each defined market.  (SOF ¶ 153.)  Using such a method is common in antitrust matters involving retailers, especially where, as here, retail sales data from multiple small retailers is not available.  (SOF ¶ 152.)  Using this method, Dr. Kneuper concludes that Peaches' market share was ▮▮▮▮ (in the "Chicago Market"), ▮▮▮▮ (within 30 miles of Peaches), and ▮▮▮▮ (within 50 miles of Peaches).  (SOF ¶ 153.)

---

[27] Dr. Kneuper performed a similar market share analysis using the number of girls *actually* enrolled in *public* high schools in the Chicago metro area (and within Illinois).  In 2013, Peaches sold ▮▮ dresses for prom and homecoming events at Illinois public high schools within the Chicago metro area, which translates to a ▮▮▮ of that market.  (SOF ¶ 146.)

28

But Dr. Kneuper concludes that excluding department stores from the relevant market is unjustified.  (SOF ¶¶ 116-21.)  He therefore identified 42 department stores that sell prom and homecoming dresses either in stores or from websites within 30 miles of Peaches and another 12 within 30-50 miles of Peaches.  (SOF ¶ 118.)  Even if those department stores devoted only 500 square feet to prom and homecoming dresses, Peaches' market share declines further to between ███ to ███ (SOF ¶ 154.)

More competitively significant than just mere floor space, however, is the flexibility that department stores have with regard to their inventory.  Because department stores are chain operations that function on a national level, they can carry large chain-wide inventory and readily ship that inventory among individual stores.  (SOF ¶ 155.)  Moreover, they can easily expand the floor space they devote to the sale of prom and homecoming dresses in response to changes in demand (*i.e.*, during prom season).  (SOF ¶ 156.)  Unlike most specialty boutiques, therefore, the space that an individual department store devotes to prom and homecoming dresses does not constrain the volume of dresses it can sell to consumers, and does not represent its full inventory of dresses.  As a result, department stores have a unique ability to respond to another retailer's supra-competitive pricing or restriction of output in the market, and therefore must clearly be included as competitors in the relevant market.  (SOF ¶¶ 116-21, 156.)

C.  **Including Internet Sales In The Relevant Market Renders Plaintiff's Allegations Of Market Power Frivolous.**

There is no question that internet retailers, which sell dresses nationally, compete with brick-and-mortar retailers, which sell locally.  Consequently, internet retailers are appropriately in the relevant market.  *See U. S. v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 400 (1956) (considering the "responsiveness of the sales of one product to price changes of the other" in determining the products that comprise the market); *Unity Ventures v. Lake Cnty.*, 631 F. Supp.

29

181, 192 (N.D. Ill. 1986) *aff'd*, 841 F.2d 770 (7th Cir. 1988). ("A relevant *product* market includes products which are interchangeable, as determined by . . . how small a price increase would cause a consumer to switch to a substitute product."). When internet sales are properly included in the relevant market, Peaches' market share falls well below Dr. Kneuper's calculations of market share. (SOF ¶ 158.)

In sum, Peaches' share of any market—even Plaintiff's improperly defined one—is, as a matter of law, far too low to give it monopoly power or even market power. Once again, the Supreme Court's observation that "[r]etail market power is rare," *see Bus. Elecs. Corp.,* 485 U.S. at 727 n.2, applies with full force to the facts of this case. Accordingly, Plaintiff's claims fail as a matter of law.

## V.    PLAINTIFF CANNOT DEFEAT SUMMARY JUDGMENT BASED ON ALLEGATIONS OF "DIRECT" ANTICOMPETITIVE EFFECTS.

From the outset of this action, Plaintiff has repeatedly urged this Court to ignore Peaches' insubstantial market share and focus instead on the alleged "direct" anti-competitive effects of Peaches' behavior. This focus cannot rescue Plaintiff's antitrust claims.

### A.    In Cases Involving Vertical Restraints, Proof Of Direct Anticompetitive Effects Does Not Relieve A Plaintiff Of Its Burden To Prove Market Power.

Plaintiff has urged the Court to infer Peaches' market power—and ignore both the low barriers to entry and Peaches' small market share—from the purported "direct" anticompetitive effects that its agreements, dealings, and conduct supposedly have had on the Chicago Market. Plaintiff relies on *Toys "R" Us, Inc. v. F.T.C.,* 221 F.3d 928, 937 (7th Cir. 2000) and *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986). However, those cases, under very different facts and legal theories, considered only the issue of whether a showing of direct anticompetitive effects can relieve a plaintiff of its burden to prove a properly-defined relevant market, and not whether a party can be relieved of its burden to show market power in a properly-defined

relevant market. More importantly, both the Seventh Circuit in *Republic Tobacco,* 381 F.3d at 737 and this Court, in *Audio Car Stereo*, 2004 WL 3019298, at *7 (St. Eve, J.), expressly rejected the applicability of these cases to disputes, such as this one, involving alleged vertical restraints of trade.

In *Republic Tobacco,* the plaintiff challenged the "enhanced exclusivity agreements" between the defendant (a manufacturer) and its distributors and retailers. 381 F.3d at 722. Like Hannah's here, the plaintiff alleged that such agreements failed a rule of reason test and thereby violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. *Id*. at 736. Additionally, like Hannah's, the plaintiff in *Republic Tobacco* argued that it should be relieved of its burden "to prove that defendant wielded market power in a properly defined geographic market, and may rely instead on direct evidence of anticompetitive effects." *Id.*

The Seventh Circuit rejected the plaintiff's argument, noting that ***no other court*** had permitted a plaintiff to use "direct evidence of anticompetitive effects" to relax its burden of proof "outside the context of horizontal agreements. . . ." *Id*. at 737. "This distinction matters," *Audio Car Stereo,* 2004 WL 3019298, at *6 (St. Eve, J.), because vertical restraints on trade— such as an exclusivity agreement between a manufacturer and retailer—are "presumptively legal," while horizontal restraints are "generally more suspect" and frequently *per se* illegal. *Republic Tobacco*, 381 F.3d at 736-37. The Seventh Circuit specifically distinguished the authority on which Hannah's relies, *Toys "R" Us* and *Indiana Federation of Dentists*, because those cases involved horizontal restraints in markets in which the defendants commanded substantial market shares.[28] Thus, only when a plaintiff can establish the "rough contours of a

---

[28] *See Toys "R" Us,* 221 F.3d at 937 (defendant controlled 20% of national market and up to 49% market share in some local markets); *Indiana Fed'n of Dentists*, 476 U.S. 447 at 460 (defendants had "heavy majorities" of the market).

relevant market and ***show that the defendant commands a substantial share of that market"*** will "direct evidence of anticompetitive effects . . . establish the defendant's market power – in lieu of the usual showing of a precisely defined relevant market and a monopoly market share." *Id.* at 737 (emphasis added). This Court in *Audio Car Stereo*, 2004 WL 3019298, at \*6-7, adopted the reasoning and holding of *Republic Tobacco*, holding that because vertical restraints are presumptively legal, the plaintiff had to prove "actual, sustained adverse effects" in a market area where the defendants "**had market power**." *Id.* (emphasis added); *see also House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 07834, 2014 WL 6845862 at \*5 (N.D. Ill. Dec. 4, 2014) (finding that vertical restraints on trade require a showing that the defendant has market power in the relevant market).

The reasoning and holdings in *Republic Tobacco* and *Audio Car Stereo* apply to this case. Plaintiff cannot substitute evidence of alleged direct anticompetitive effects for actual proof that Peaches possesses "monopoly power" because it has not (and cannot) establish that Peaches "commands a substantial share of" the Chicago Market. *Republic Tobacco*, 381 F.3d at 737. Accordingly, this Court should grant Defendants' motion for summary judgment without the need for further inquiry into Plaintiff's "direct effects" argument.[29]

> **B.      Plaintiff's Allegations of Direct Anticompetitive Effects Are Not Evidence of Market Power.**

Even if the Court were to accept Plaintiff's invitation to consider "direct anticompetitive effects," Plaintiff's claims still fail.

---

[29] Indeed, Plaintiff's expert, Dr. Schafer, admitted that she is aware of no case that has relied on alleged direct effects to conclude that a defendant has market power when that defendant has a market share less than ▉ (Schafer Dep., SOF Ex. 26, at 214.)

1.      **Peaches' MSRP + 15% prices are not evidence of market power.**

Plaintiff claims that despite Peaches' insubstantial market share in any reasonably defined relevant market, a jury could nevertheless infer that Peaches has market power because, from 2009 through 2012, it charged MSRP + 15% for certain dresses. (Am. Compl. ¶ 67.) For this proposition, Plaintiff relies on the testimony of its expert Dr. Schafer, who presents a three-part syllogism: (1) MSRP was the one (and only) "competitive price"; (2) Peaches charged more than MSRP (for at least some dresses); and so (3) Peaches necessarily had "market power." (Schafer Rep., SOF Ex. 26, ¶ 14; Schafer Dep., SOF Ex. 28, at 246.) This syllogism, however, relies entirely on the untested assumption that there was a *single* "competitive" price for prom and homecoming dresses—MSRP.[30] (*See* Schafer Dep., SOF Ex. 28, at 233-234.) But, that assumption is contradicted by overwhelming record evidence, including Dr. Schafer's own admissions.

It is undisputed that products in a differentiated retail market are commonly sold at more than one price. As Peaches' expert economist Dr. Kneuper explains, "[i]t is well understood in the economic literature that competitive markets are characterized by a range of 'competitive' price points, particularly in a differentiated product setting such as retail," based on factors such as location, size, level of service, and level of mark-up. (SOF ¶ 163.) Dr. Schafer agrees. (SOF ¶ 163.) Indeed, she admitted that different retail stores may charge different prices for the same product for a variety of reasons, including to recover higher costs incurred to provide customers greater choice and a more desirable shopping experience:

---

[30] Dr. Schafer bases her opinion that MSRP was the "competitive" price not on any economic analysis, but rather on interviews of a handful of lay witnesses (Plaintiff, two former competitors of Peaches, and a former independent sales rep), as well as a gross mischaracterization of the opinions of Peaches' expert Dr. Kneuper. (Schafer Rep., SOF Ex. 26 ¶ 36 & n.78; *see* Kneuper Supp. Rep., SOF Ex. 30, ¶ 105.) These lay opinions fail to create a fact issue on the economic question of the "competitive" price in the relevant market in this matter.

> Q.  Here is a quote.  Do you agree with it:  "To make a profit, retailers that offer broader variety, deeper assortments, and additional services need to charge higher prices"?  . . .
>
> A.  Well, if you are saying that those things that provide them additional costs, then they would charge a higher price to cover their costs.  **I [think] that sounds reasonable.**

(Schafer Dep. SOF Ex. 28, at 255-256 (emphasis added); SOF ¶ 65.)  Correspondingly, she

agreed that customers may be willing to pay more to buy the same product from a store that

offers it a better service and options and overall superior shopping experience. (Schafer Dep.

SOF Ex. 28, at 252 (agreeing that customers may be willing to pay more for the same bottle of

mustard at grocery store Treasure Island than they would pay at Costco because Treasure Island

offers a better shopping experience with more choices, staff and inventory); *id.* at 250 (agreeing

that different retailers sell the same products at different prices because those different retailers

offer a different shopping experience); *see also* SOF ¶ 163.)

Nor is there any dispute that Peaches' business model is characterized by precisely the

factors that Dr. Schafer *admits* would cause a retailer in a competitive market to charge prices

that are higher than its competitors' for the same product.  As she explains, specialty boutiques

selling prom and homecoming dresses "are typically small in size," and they generally do not

allow customers the opportunity to try on the dress they will ultimately purchase because they

typically stock only samples.  (SOF ¶ 57.)

By contrast, "Peaches is not typical of the industry."  (SOF ¶ 56.)  Peaches buys a



SOF ¶ 54, 58.)  Peaches also is unique

because of

(SOF ¶¶ 54, 58, 64.)  Dr. Schafer agrees that all of these elements

34

of Peaches' business model ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ (SOF ¶ 58.)

In light of its expert's admissions that the facts of this case fit—to a "T"—the circumstances in which economists expect there to be multiple "competitive prices," Plaintiff cannot rely on a syllogistic argument that assumes the opposite. Because the complete record compels the conclusion that there is no *single* "competitive" price for prom and homecoming dresses, Peaches' prices cannot be deemed "supra-competitive" simply because they were higher than MSRP; nor do those prices suggest that Peaches had "market power."[31] Plaintiff's "direct effects" analysis accordingly fails.

> **2.  Peaches' requests to enforce its exclusivity arrangements with designers are evidence of neither market power nor anticompetitive effects.**

Plaintiff also contends that Peaches' purported "market power" is reflected in emails in which Peaches asked various designers not to sell their dresses to certain stores or to stores

---

[31] Moreover, market power requires that a company be able to "raise prices above a competitive level *without losing its business.*" *42nd Parallel North*, 286 F.3d at 405. It is undisputed that, during the years in which Plaintiff's expert contends that Peaches had market power (2009-2012), Peaches moved away from charging MSRP + 15% for its dresses because ████████████████████████████████ ████████████████████ (SOF ¶¶ 78, 82.) Then, in 2010, Jeff Surdej expressed concern that the in-store sales would be lost entirely if the Surdejs continued to charge 15% above MSRP in store. (Am Compl., Ex. 31.) ████████ starting in 2012, Peaches abandoned its long-standing practice of charging MSRP + 15%, and tried implementing a tiered pricing structure, which priced some dresses at MSRP and some above MSRP. (SOF ¶ 83.) ████████████████ Beginning in 2013, Peaches lowered its prices to MSRP for virtually all of its ████████ dresses. (SOF ¶¶ 84-85.) Because Peaches was unable to sustain its MSRP plus 15% pricing without losing business, Peaches' MSRP + 15% prices during 2009 to 2012 provide no basis to infer market power. (*See* Schafer Dep., SOF Ex. 28, at 249 (pricing at a high, but non-profit-maximizing prices, does not suggest market power).)

within certain areas. But these emails—and designers' reactions to them—do not suggest either

market power or anticompetitive effects.

In exchange for placing large orders, Peaches has an expectation that it will receive some

loose form and degree of exclusivity from designers, including Named Designers. (SOF ¶ 88;

*supra* pp. 4-5.) Such "exclusive" arrangements are not anticompetitive. Many courts, including

this court, *see Audio Car Stereo, supra,* have recognized that exclusive vertical arrangements are

very common, almost always *pro-competitive,* and therefore *presumptively legal* absent

extraordinary circumstances that do not exist here.[32] Likewise, efforts to enforce those

agreements—including demands to suppliers to recognize and honor them—are not illegal and

"do[] not alone raise special antitrust concerns." *Elecs. Commc'ns Corp. v. Toshiba Am.*

*Consumer Prods., Inc.,* 129 F.3d 240, 246 (2d Cir. 1997).[33] Indeed, even Plaintiff's expert Dr.

Schafer admitted that agreements providing fully exclusive territories, which Peaches does not

---

[32] *See Republic Tobacco.,* 381 F.3d at 736 ("[V]ertical exclusive distributorships . . . are presumptively legal"; "[C]ourts often approve [exclusive dealing arrangements] because of their procompetitive benefits."); *Omega Envtl., Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1162-63 (9th Cir. 1997) (exclusive dealing arrangements have "well-recognized economic benefits . . including the enhancement of interbrand competition"); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island,* 373 F.3d 57, 65 (1st Cir. 2004) (exclusive arrangements "can achieve legitimate economic benefits (reduced cost, stable long-term supply, predictable prices) [and therefore] . . . no presumption against such agreements exists today").

[33] *Accord Bus. Elecs.,* 485 U.S. at 721 (holding manufacturer's termination of dealer after receiving "ultimatum" from competing dealer did not give rise to per se liability under Section 1); *Robinson-Bock Distributing Co. v. Pioneer/Eclipse Corp.,* No. 92-2578, 92-2585, 1993 WL 326365, at *5-6 (7th Cir. Aug. 25, 1993) (no Section 1 violation where defendant threatened to end its business relationship with manufacturer if it did not terminate plaintiff as a distributor); *Nat'l Marine Elec. Distrib. v. Raytheon,* 778 F.2d 190, 192-93 (4th Cir. 1985) (no Section 1 violation where "complaints rose to the level of threats that the dealers would cease doing business with [manufacturer] if the relationship with [other dealer] was not terminated," even where the "complaints played a part in the [termination] decision"); *The Jeanery, Inc. v. James Jeans, Inc.,* 849 F.2d 1148, 1155 (9th Cir. 1988) (no violation where retailer threatened not to purchase any more goods from manufacturer until manufacturer stopped selling to the terminated retailer). Moreover, a manufacturer's decision to do business with one retailer and not another is presumptively a legitimate competitive response. *See, e.g., Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764 (1984); *Euromadas,* 368 F.3d 11, 20 (1st Cir. 2004).

have, are generally pro-competitive, and that if so, a distributor's efforts to enforce those agreements are also pro-competitive. (SOF ¶ 37.)

Nor does the record support the conclusion that Peaches' requests for exclusivity had anticompetitive effects. Notwithstanding the terminology used, none of Peaches' "exclusive" arrangements grants it full exclusivity within any relevant market. (SOF ¶¶ 35, 36, 90, 93, 94, 113, 114.) To the contrary, these arrangements are typically ill-defined, subject to numerous exceptions, and always subject to the designer's judgment as to whether the exclusivity is in *its* best interest. (SOF ¶¶ 35, 36, 90, 93, 94.) Accordingly, it is undisputed that **every one** of the Named Designers sells the same dresses that Peaches buys to other specialty boutiques (and often, department stores) in the Chicago area. (SOF ¶ 90.) For example, Table 1 above (*supra* pp. 10-11) demonstrates that three specialty boutiques in the vicinity of Peaches and Hannah's collectively sell 14 of the 16 Named Designers' dresses, as well as the dresses of 22 Non-Named Designers. Exhibit C hereto is similar; it shows that numerous boutiques within thirty miles of Peaches sell dresses from many Named (and Non-Named) Designers. In short, there is no evidence that Peaches' allegedly exclusionary conduct had the "direct effect" of foreclosing consumers' access to Named Designers' dresses.

Faced with the evidence that both Named and Non-Named Designers' products were readily available to consumers in the Chicago area, Plaintiff will undoubtedly point, as Dr. Schafer does, to claims by two specialty boutiques—International House of Couture and Fit 2B Tied—that they were forced to exit the market because they were unable to get the Named Designer dresses they wanted, allegedly due to Peaches' exclusivity arrangements. (Schafer Rep., SOF Ex. 26, ¶¶ 59-64.) Although Peaches disputes that these boutiques exited the market

37

for this reason, that factual dispute does not provide a basis for denying Defendants summary judgment.

Even if it were true that Peaches' efforts to enforce its exclusive arrangements led to the exit of these two boutiques (or even a handful of retailers), that fact would have no relevance for antitrust purposes. Under the antitrust laws, the question is not whether two competitor boutiques were eliminated—for whatever reason—but whether *competition* has been sufficiently reduced and foreclosed such that the remaining boutiques have been able to raise prices or restrict output. *See Brown Shoe Co.*, 370 U.S. at 320 (the purpose of antitrust laws is the "protection of *competition*, not *competitors*").

There is no evidence of any such injury to competition here. To the contrary, the evidence shows that even with the closing of Fit 2B Tied and International House of Couture, consumers are able to purchase prom and homecoming dresses (Named and Non-Named Designers' alike) from numerous retail outlets in the Chicago Market, and that most retailers, including Peaches, sell those dresses at MSRP. (SOF ¶¶ 112-14; *see also* Ex. C.) That is, the alleged harm to International House of Couture and Fit 2B Tied does not establish, or even suggest, harm to competition.[34]

Thus, Plaintiff simply has not shown—nor can it—that Peaches' exclusive arrangements, and efforts to enforce those arrangements, caused anticompetitive effect whatsoever on the market. At a minimum, Plaintiff cannot rely on a supposed "direct effects" analysis to prove that notwithstanding low barriers to entry and insubstantial market share, Peaches had market power.

---

[34] Fit 2B Tied provides an especially easy illustration as to why its market exit cannot be presumed to result in harm to competition. There are *seven* boutiques selling prom and homecoming dresses within just 5 miles of Fit 2B Tied's former location. (SOF ¶ 115.) Consumers consequently still enjoy the benefits of competition, even after Fit 2B Tied's departure.

## CONCLUSION

Defendants respectfully request that the antitrust claims made against it, Counts I through

VII of the Amended Complaint, be dismissed with prejudice.


Dated:  March 19, 2015                          Respectfully submitted,


                                                By:  /s/ Ashley K. Martin _____

                                                One of Its Attorneys
                                                John W. Treece
                                                Theodore R. Scarborough
                                                Ashley K. Martin
                                                SIDLEY AUSTIN LLP
                                                One South Dearborn Street
                                                Chicago, Illinois 60603
                                                Tel. (312) 853-7000
                                                Fax (312) 853-7063
                                                Firm I.D. No. 42418

                                                -and-

                                                Eric D. Anderson
                                                STAUB ANDERSON GREEN, LLC
                                                55 West Monroe, Suite 1925
                                                Chicago, Illinois 60603
                                                Tel. (312) 345-0545
                                                Fax (312) 345-0544
                                                I.D. No. 6220092

                                                *Attorneys for Defendants Barbara Ann Surdej,*
                                                *Roy Surdej, and Jeffrey Surdej, d/b/a Peaches*
                                                *Boutique*

# Exhibit A
# (Filed Under Seal)

## Peaches' Gross Sales
## 2003-2013



Sources:
Peaches tax documents: PEACHES0005456-75, 5861.

Peaches' Gross Sales
*2003-2013*

| Year | Gross Sales |
|------|-------------|
| 2003 | |
| 2004 | |
| 2005 | |
| 2006 | |
| 2007 | |
| 2008 | |
| 2009 | |
| 2010 | |
| 2011 | |
| 2012 | |
| 2013 | |

Sources:
PEACHES0005456-75, 5861.

# Exhibit B
# (Filed Under Seal)

## Hannah's Gross Sales
## 2010-2013



Sources:
HANNAH'S1816-46, 10714.

Hannah's Gross Sales
2010-2013

| Year | Gross Sales |
|------|-------------|
| 2010 | ████████ |
| 2011 | ████████ |
| 2012 | ████████ |
| 2013 | ████████ |

Sources:
HANNAH'S1816-46, 10714.

# Exhibit C
# (Filed Under Seal)

**Selected Examples of Specialty Boutiques that Sell Prom and Homecoming Dresses in the Chicago MSA
And Designer Lines Carried by These Boutiques**

| Designer | House of Brides | That Girl Boutique | Elegant Couture | Hannah's Boutique | Eva's Bridal on La Grange | The Kimberly Bond Boutique | Martellen's | Monalisa Boutique | Robin Elliot | Debbie's Dresses | The Dress by Nicole | Bri'Zan Couture | Elegance Wedding & Evening Wear | Everything 4 Pageants | Special Occasions on the Avenue | Wolsfelt's Prom | Park Avenue Brides | The Prom Shoppe | A Pink Boutique | Shelley's Bridal Couture |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Miles from Peaches** | 5.1 | 7.9 | 8.9 | 10.8 | 13.3 | 13.8 | 15.0 | 15.9 | 17.1 | 17.8 | 18.5 | 19.8 | 22.7 | 23.3 | 28.5 | 29.3 | 29.8 | 31.4 | 32.2 | 33.8 |
| Allure (nka Madison James) | | | | X | | | | | | X | | | | | | X | | | | |
| Alyce | | X | | X | | X | X | X | | X | | X | | | | X | | X | X | |
| Angela & Alison | | | X | X | X | X | | | | X | X | | | | | X | | | | |
| Bari J Shimmer | | | | | | | X | | | X | | | | | | | | | | |
| BG Haute | | | | | | | | | | X | | | | | | | | | | |
| Blush | | | | | | | | X | | | | | | | | X | | X | X | |
| Cinderella's | | | | | | | | | | | | | | | | | | | | |
| Clarisse | | | X | X | | | X | X | X | X | X | | | | | | | X | X | |
| Dave & Johnny | X | | X | X | | X | | | | X | | | | | X | | | | X | |
| Faviana | | | | X | | | | X | | X | X | X | | | | | | | | |
| House of Wu | X | | | X | | X | | | | X | | | | | X | | X | X | X | X |
| Janique | | | X | X | | | | | | | | | | | | | | | | |
| Jasmine | | | | | X | | | | | | | | | | | | | X | | |
| Jazz | | | | | | | | X | | X | | | | | | | | | X | |
| John Paul Ataker | | | | X | | | | | | | | | | | | | | | | |
| Johnathan Kayne | | | X | X | | | | | | | | | | | | | | X | | |
| Jordan Fashions | | | | | | X | | | | | | | | | | | | | | |
| Josh & Jazz (Jolene) | | | | | | | | X | | X | | | | | | | | | | |
| Jovani | X | X | | | | X | | X | X | X | | | | | X | X | | X | X | |
| Karishma | | | | | | X | | X | | | | | | | | | | | | |
| La Femme | | | | | | X | | X | | | | | | | X | X | | | X | |
| Landa | | | X | | | | | | | | | | | | X | | X | | | |
| Mac Duggal | | | X | | | X | | X | | X | | | | | X | X | | X | X | |
| Macis | | X | | | | | | | | | | | | | | | | | | |
| Maggie Sottero | | | | | | | | X | | X | | | | | | | | X | | X |
| Milano | | | | | | | | X | | | | | | | X | | | | | |
| MNM | | X | | X | | | | | | | | | | | | | | | | |
| Mon Cheri (Tony Bowls) | X | | X | | X | X | | X | | X | | | | | X | | | | | X |
| Mori Lee | | | X | | | X | X | X | | X | | | | | X | | | X | X | |
| Morrell Maxie | X | | X | | | | | | | | | | | | | | | | | |
| Nika | | X | X | | | | | | | | | | | | | | | | | |
| Nina Canacci | X | | | | | | | | | | | | | | X | | | X | | |
| PC Mary / Kiss Kiss | | | | X | | | | | | X | | | | | | | | X | | |
| Precious Formals | | X | | | | | | | | X | | | | | | | | X | | |
| Primavera | | | X | X | | | | | | | | X | | | | | | | | |
| Rachel Allan (formerly known as Party Time) | X | | X | X | | X | | | | | | | | | X | X | X | | | |
| Rina Di Montella | | | X | | | | | | | | | | | | | | | | | |
| Riva | | X | | | | X | | | | X | | | | | | | | | | X |
| Saboroma | | X | | X | | | | | | X | | | | | | | | | | |
| Scala | | | | X | | | | | | | | | | | | | | | | |
| Shail K | | | | | | | | | | | | | | | | | | | | |
| Sherri Hill | | | X | | | | | | | X | | X | | | | X | | | | |
| Tarik Ediz | | | X | | | | | | | | | | | | | | | | | |
| Temptation | | | | | | | | | | | X | | | | | | | | | |
| Terani | X | X | | X | | | | | | X | | | | | | | | | X | |
| Wow | | | | | | | | | | X | | | | | | | | | | |
| Xcite | | | X | | | | | | | X | | | | | | | | | | |

Notes:
Named Designers shaded grey.
Distances based on Google Maps straight line distances.
Listed designer lines represent a sampling of all lines available at these retailers and may not reflect all lines currently carried.
Information was collected in 2014 for the following retailers: Eva's Bridal on La Grange, and BriZan Couture
Information was collected in 2015 for the following retailers: House of Brides, That Girl Boutique, Elegant Couture, The Kimberly Bond Boutique, Martellen's, Debbie's Dresses, The Dress by Nicole, Elegance Wedding & Evening Wear, Everything 4 Pageants, Special Occasions on the Avenue, Park Avenue Brides, A Pink Boutique, and Shelley's Bridal Couture
Information was collected in both 2014 and 2015 for the following retailers: Hannah's Boutique, Monalisa Boutique, Robin Elliot, Wolsfelt's Prom, and The Prom Shoppe

Sources:
Retailer Websites:
A Pink Boutique: http://www.apinkbtq.com/; BriZan Couture: http://www.brizancouture.com/product/prom-dresses/; Debbie's Dresses: http://debbiesdresses.wix.com/debbiesdresses#!page-5; Elegance Wedding & Evening Wear: http://www.elegancewedding.net/prom---quinces%C3%B1leras.html; Elegant Couture: http://elegantcouture.com/prom/1233323; Eva's Bridal on La Grange: http://www.evasonlagrange.com/Evening-Gowns/; Everything 4 Pageants: http://www.everythings4pageants.com/Prom-Gowns-c3449.htm; House of Brides: http://www.houseofbrides.com/c-573-prom.aspx; Martellen's: http://www.martellens.com/; Monalisa Boutique: http://monalisaboutique.net; Park Avenue Brides: http://www.parkavenuebrides.net/bmandf.htm; Robin Elliot: http://robinelliottofchicago.com/prom/; Shelley's Bridal Couture: http://www.shelleysbridalcouture.com/#!prom/c14iy; Special Occasions on the Avenue: http://specialoccasionsontheavenue.com/; That Girl Boutique: http://www.thatgirl.boutique/#about; The Dress by Nicole: http://shopthedress.com/prom/; The Kimberly Bond Boutique: http://www.kimberlybondboutique.com/Prom.html; The Prom Shoppe: http://www.thepromshoppe.com/; Wolsfelt's Prom: http://wolsfeltsprom.com/photos/

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 19, 2015, I electronically filed the foregoing Notice of

Motion; Defendants' Motion for Summary Judgment on Plaintiff's Antitrust Claims;

Defendants' Memorandum in Support of Their Motion for Summary Judgment on Plaintiff's

Antitrust Claims; and Defendants' Statement of Undisputed Material Facts In Support of Their

Motion for Summary Judgment on Plaintiff's Antitrust Claims with the Clerk of the Court by

using the CM/ECF System, which will send a Notice of Electronic Filing to all counsel of record.


<u>/s/ Ashley K. Martin</u>