**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HANNAH'S BOUTIQUE, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 13-cv-02564 |
| BARBARA ANN SURDEJ, ROY SURDEJ and JEFFREY SURDEJ d/b/a PEACHES BOUTIQUE, | ) ) ) ) | Hon. Amy St. Eve |
| Defendants. | ) ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR *DAUBERT* MOTION TO EXCLUDE CERTAIN OPINIONS OF
PLAINTIFF'S ECONOMIC EXPERT, DR. LESLIE E. SCHAFER**

John W. Treece
Theodore R. Scarborough
Ashley K. Martin
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Tel. (312) 853-7000
Fax (312) 853-7063
Firm I.D. No. 42418

-and-

Eric D. Anderson
STAUB ANDERSON GREEN, LLC
55 West Monroe, Suite 1925
Chicago, Illinois 60603
Tel. (312) 345-0545
Fax (312) 345-0544
I.D. No. 6220092

*Attorneys for Defendants Barbara Ann Surdej,
Roy Surdej, and Jeffrey Surdej, d/b/a Peaches
Boutique*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................4

I.     DR. SCHAFER MAY NOT RELY ON DIRECT EFFECTS TO SHOW MARKET POWER WITHOUT ANALYZING PEACHES' MARKET SHARE ..........................4

II.    THE COURT SHOULD EXCLUDE DR. SCHAFER'S OPINIONS REGARDING THE DEFINITION OF THE RELEVANT MARKET ...........................................6

     A.    Dr. Schafer's Relevant Product Market Is Contrary To The Law, Ignores Contrary Evidence And Is Fundamentally Unreliable .........................................6

          1.    Dr. Schafer's Opinion That The Relevant Product Market Is Limited to the Same Sixteen Named Designers Identified in the Amended Complaint Should Be Excluded ..........................................................7

          2.    The Court Should Exclude Dr. Schafer's Opinion That The Relevant Product Market Does Not Include Dresses Sold By Internet Retailers .....12

          3.    The Court Should Exclude Dr. Schafer's Opinion That The Relevant Product Market Does Not Include Dresses Sold By Department Stores ...14

     B.    Dr. Schafer's Relevant Geographic Market Is Contrary To The Law and Evidence and Unsupported By Reliable Economic Methods .................................15

     C.    Dr. Schafer's Purported Application Of The "Hypothetical Monopolist" Test Is Contrary To Law, Unreliable, and Fails To Justify Her Proposed Market...........18

III.   DR. SCHAFER'S RELIANCE ON "DIRECT EFFECTS" TO SHOW MARKET POWER CONTRADICTS HER OWN ADMISSIONS, IGNORES RELEVANT EVIDENCE, AND IS THUS WHOLLY UNRELIABLE ...............................................20

     A.    Dr. Schafer's Opinion That There Is A Single "Competitive" Price Is Contrary to Her Testimony And Ignores Obvious Alternative Hypotheses ............................22

     B.    Dr. Schafer Fails To Establish A Causal Connection Between Peaches' Alleged Antitrust Misconduct and Its "MSRP + 15%" Pricing .........................................25

CONCLUSION....................................................................................................29

i

# TABLE OF AUTHORITIES

**CASES**                                                                                        **Page(s)**

*42nd Parallel North v. E Street Denim Co.*,
    286 F.3d 401 (7th Cir. 2002) ...................................................................25

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
    881 F.2d 1396 (7th Cir. 1989) .................................................................4

*Audio Car Stereo, Inc. v. The Little Guys, Inc.*,
    No. 04 C 3562, 2004 WL 3019298 (N.D. Ill. Dec. 28, 2004) (St. Eve, J.)............................2, 5

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*,
    784 F.2d 1325 (7th Cir. 1986) .................................................................4

*Barber v. United Airlines, Inc.*,
    17 Fed. App'x 433 (7th Cir. 2001) .........................................................17, 25, 28

*Bielskis v. Louisville Ladder, Inc.*,
    663 F.3d 887 (7th Cir. 2011) ...................................................................8

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    186 F.3d 781 (7th Cir. 1999) .................................................................22

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)...............................................................................6, 13, 28

*Brown v. Burlington N. Santa Fe Ry. Co.*,
    765 F.3d 765 (7th Cir. 2014) .................................................................24

*Daubert v. Merrill Dow Pharms.*,
    509 U.S. 579 (1993).................................................................................. *passim*

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
    744 F. Supp. 2d 870 (E.D. Wis. 2010)...................................................12, 14, 25

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
    No. 04-MD-1628RMBMHD, 2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009) .................12, 20

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...............................................................................25

*Hardy v. City Optical Inc.*,
    39 F.3d 765 (7th Cir. 1994) ...................................................................4

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
No. 11 C 07834, 2014 WL 64657 (N.D. Ill. Jan. 8, 2014) .................................................6, 9

*Indiana Grocery v. Super Valu Stores, Inc.*,
864 F.2d 1409 (7th Cir. 1989) .............................................................................................4

*Klaczak v. Consolidated Medical Transport*,
458 F.Supp.2d 622 (N.D. Ill. 2006) ...............................................................................11, 28

*Kochert v. Greater Lafayette Health Servs., Inc.*,
372 F. Supp. 2d 509 (N.D. Ind. 2004), *aff'd*, 463 F.3d 710 (7th Cir. 2006) ............................6

*LeClercq v. The Lockformer Co.*,
No. 00 C 7164., 2005 WL 1162979 (N.D. Ill. April 28, 2005) ........................................11, 28

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................................................19, 20

*McLaughlin Equipment Co., Inc. v. Servaas*,
No. IP98–0127–C–T/K, 2004 WL 1629603 (S.D. Ind. Feb. 18, 2004)........................9, 13, 17

*Medicines Co. v. Mylan Inc.*,
No. 11-CV-1285, 2014 WL 1227214 (N.D. Ill. Mar. 25, 2014) (St. Eve, J.)......................2, 5

*Obrycka v. City of Chicago*,
792 F. Supp. 2d 1013 (N.D. Ill. 2011) (St. Eve, J.) .............................................................25

*Paladin Assocs., Inc. v. Montana Power Co.*,
328 F.3d 1145 (9th Cir. 2003) .............................................................................................6

*PSKS, Inc. v. Leegin Creative Leather Prods, Inc.*,
615 F.3d 412 (5th Cir. 2010) ...............................................................................................9

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997).................................................................................................6

*Republic Tobacco v. N. Atl. Trading*,
381 F.3d 717 (7th Cir. 2004) ...................................................................................... *passim*

*Sanner v. Bd. of Trade of City of Chicago*,
No. 89 C 8467, 2001 WL 1155277 (N.D. Ill. Sept. 28, 2001)................................................8

*Sloan Valve Co. v. Zurn Indus., Inc.*,
33 F. Supp. 3d 984, 1000 (N.D. Ill. 2014) (St. Eve, J.) .......................................................13

*State Farm Fire & Cas. Co. v. Electrolux Home Products, Inc.*,
980 F. Supp. 2d 1031 (N.D. Ind. 2013) .............................................................................27

*In re Super Premium Ice Cream*,
    691 F.Supp. 1262 (N.D. Cal. 1988) ............................................................... 14

*Sys. Dev. Integration, LLC v. Computer Sciences Corp.*,
    886 F. Supp. 2d 873 (N.D. Ill. 2012) (St. Eve, J.) ..................................... 5

*U.S. E.E.O.C. v. Rockwell Int'l Corp.*,
    60 F. Supp. 2d 791 (N.D. Ill. 1999), *aff'd* 243 F.3d 1012 (7th Cir. 2001) ........................... 17

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) .................................................................................... 6

*Valley Liquors, Inc. v. Renfield Importers, Ltd.*,
    678 F.2d 742 (7th Cir. 1982) ..................................................................... 4

*Valley Liquors, Inc. v. Renfield Importers, Ltd.*,
    822 F.2d 656 (7th Cir. 1987) ................................................................ 4, 25

*Virginia Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*,
    98 F. Supp. 2d 729 (W.D. Va. 2000) ............................................. *passim*


## OTHER AUTHORITY

DOJ/FTC Horizontal Merger Guidelines (Aug. 19, 2010) ..................................... 18, 19

Federal Rule of Evidence 702 ........................................................................ 2, 4, 29

Defendants Barbara Surdej, Roy Surdej, and Jeffrey Surdej d/b/a Peaches Boutique (collectively "Defendants" or "Peaches") respectfully submit this memorandum of law in support of their *Daubert* motion to exclude certain opinions of Plaintiff Hannah's Boutique's ("Plaintiff" or "Hannah's") Economic Expert, Dr. Leslie E. Schafer.

## INTRODUCTION

Discovery in this antitrust case has revealed a market structure that makes monopolization or "market power" utterly implausible. At the designer level, barriers to entry are low, there are at least 75 designers selling prom and homecoming dresses in the U.S. (not including suppliers of "knock off" dresses), and no one designer, or handful of designers, dominates the market. Similarly, barriers to opening or expanding a prom and homecoming dress retail store are low, there are dozens of specialty boutiques and department stores selling those dresses within 30 miles of Peaches, and virtually all the dresses they sell are also available on the internet at the same, or slightly lower, prices. No retailer has a dominant share; Peaches' share of the various relevant markets proposed by the parties' economists is estimated to be at most ■ to ■. Moreover, despite Plaintiff's core allegation that Peaches "demand[ed]" and "coerc[ed]" 16 specific designers (the "Named Designers") not to sell their dresses to certain stores or areas, the evidence shows, and Plaintiff's expert admits, that numerous boutiques and department stores in the Chicago area carry many of the 16 Named Designers' dresses (and the dresses of many other designers that are comparably priced and compete directly with the Named Designers). For example, located close to Peaches and Hannah's are three stores that collectively sell 14 of the 16 Named Designers' dresses, and those dresses are sold in numerous retail outlets throughout the Chicago area. (*See* Appendices I & II hereto.)

In the face of this evidence, Plaintiff's economics expert, Dr. Schafer, opines that, from at least 2009 to 2012, Peaches possessed "market power" in the sale of Named Designers' dresses

by specialty boutiques in the "Chicago Market." (Expert Report of Leslie E. Schafer, Ph.D. ("Rep.") ¶ 14 (attached as Exhibit A).) Contrary to settled Seventh Circuit law and sound economics, Schafer ignores Peaches' insubstantial market share and the interchangeability of the Named Designers' dresses with other designers' dresses, and instead, she relies entirely on a so-called "direct effects" analysis. She assumes without investigation or econometric analysis that Peaches' ability to charge more than the Manufacturer's Suggested Retail Price ("MSRP") is evidence of a "direct" anticompetitive effect caused by "do not sell" requests Peaches made to Named Designers.

Dr. Schafer's opinion that Peaches had "market power," and her subsidiary opinions, should be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993), for three principal reasons:

First, Dr. Schafer's reliance on "direct effects" alone to show market power is contrary to the longstanding precedent—recognized by both the Seventh Circuit and this Court—that a plaintiff must show "that the defendant commands a ***substantial share of the market***" before evidence of "direct effects" of alleged anticompetitive conduct can be used to prove market power. *Republic Tobacco v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) (emphasis added); *see also Audio Car Stereo, Inc. v. The Little Guys, Inc.*, No. 04 C 3562, 2004 WL 3019298, at *7 (N.D. Ill. Dec. 28, 2004) (St. Eve, J.). Dr. Schafer, however, admits that she did *not* estimate Peaches' market share in *any* relevant market. (*See* Deposition of Leslie E. Schafer, Ph.D. ("Schafer Dep.") 213:8-12 (attached as Exhibit B).) Her core opinion that Peaches has market power thus reflects an analysis that is prohibited by law and should therefore be excluded. *See, e.g., Medicines Co. v. Mylan Inc.*, No. 11-CV-1285, 2014 WL 1227214, at *5

2

(N.D. Ill. Mar. 25, 2014) (St. Eve, J.) (excluding expert opinions that "applie[d] the wrong legal standard . . . because they are legally flawed and will not be helpful to the trier of fact").

Second, even the so-called "direct effects" analysis requires that she first "precisely establish a relevant market," including both a product market and a geographic market. *Republic Tobacco*, 381 F.3d at 738. Dr. Schafer's proposed relevant product and geographic markets, however, are gerrymandered to mirror exactly the highly-circumscribed market alleged in Plaintiff's First Amended Complaint ("Amended Complaint")—which was filed well before Dr. Schafer was retained.[1] Her market definitions are not based on any economic analysis, but rather solely on her legally and factually flawed conclusion that, because Peaches had "market power" in the relevant market Plaintiff alleges, it was not necessary to consider substitute products or other geographic areas where girls may look for dresses. In fact, Dr. Schafer *admits* that her proposed relevant market *excludes* products that compete directly with products in that market. Her proposed relevant market is thus contrary to law, unreliable, and should be excluded.

Third, even if it were legally permissible for Dr. Schafer to consider "direct effects" to show market power, her opinions are wholly unreliable. Dr. Schafer's opinion rests on the assumption that MSRP was the single "competitive" price for prom and homecoming dresses from 2009 to 2012, and that because Peaches charged above MSRP, it necessarily had market power. However, Dr. Schafer ignores economic literature showing that retailers often sell at more than one competitive price and the obvious alternative explanation—confirmed by her own admissions— ██████████████████████████████████████

████████████████████████████████████████ She also conducts no economic analysis whatsoever to confirm that Peaches' higher prices were caused by—*i.e.*, were

---

[1] Dr. Schafer did not begin substantive work on the case until after she received the Report of Peaches' economic expert, Dr. Robert Kneuper, in October 2014. (*See* Schafer Dep. 8:1-17.)

the *direct effect* of—Peaches' alleged misconduct, or that this conduct harmed *competition*, as opposed to a few competitors. Thus, her opinion that Peaches' prices are "direct evidence" of "anticompetitive" effects fails to meet the standards of *Daubert* and Rule 702.

For these and other reasons explained below, Dr. Schafer's opinions that Peaches had "market power" in a relevant antitrust market should be excluded.

## ARGUMENT

I. **DR. SCHAFER MAY NOT RELY ON DIRECT EFFECTS TO SHOW MARKET POWER WITHOUT ANALYZING PEACHES' MARKET SHARE**

Every rule of reason case requires proof of "substantial market power" in a properly defined relevant antitrust market. *Hardy v. City Optical Inc.*, 39 F.3d 765, 767 (7th Cir. 1994). Market power is "the ability to raise price significantly higher than the competitive level by restricting output." *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1331 (7th Cir. 1986). "Since market power can rarely be measured directly by the methods of litigation, it is normally inferred from possession of a ***substantial percentage*** of the sales in a market carefully defined in terms of both product and geography." *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 745 (7th Cir. 1982) (emphasis added).[2]

Dr. Schafer, however, does not calculate Peaches' market share in *any* market, much less show that it exceeds any recognized threshold for market power. (Schafer Dep. 213:8-12.) She instead skips this step and relies entirely on purported "direct effects" of Peaches' alleged antitrust misconduct as evidence of market power. Specifically, she claims that during the relevant period, MSRP was the "*de facto* competitive price" for prom and homecoming dresses,

---

[2] A 20 to 25% market share does not constitute market power, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987), and even a market share as high as 30% would rarely suffice. *See A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1403 (7th Cir. 1989). For Section 2 claims, a defendant must possess monopoly power, which is rarely found with less than 50% market share. *See, e.g., Indiana Grocery v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414-16 (7th Cir. 1989).

and because Peaches sold dresses for more than MSRP, it charged "super competitive" prices and *ipso facto*, had "market power." (*See, e.g., id.* at 54:10-14, 55:2-14.)

But both this Court and the Seventh Circuit have rejected the argument that "direct effects" alone may show market power in a vertical restraint case, such as here. *Republic Tobacco,* 381 F.3d at 737; *Audio Car Stereo,* 2004 WL 3019298, at *7. This is because vertical restraints on trade, including exclusivity agreements between a manufacturer and retailer, are "presumptively legal"—and, indeed, typically *procompetitive*—while, horizontal restraints are generally *per se* illegal. *Republic Tobacco,* 381 F.3d at 736-37.

Thus, the Seventh Circuit has warned that courts must be "cautious about importing relaxed standards of proof from horizontal agreement cases"—including the use of "direct effects" to infer market power—"into vertical agreement cases." *Id.* at 737. To avoid "harm[ing] competition and frustrat[ing] the very goals that antitrust law seeks to achieve," "direct evidence of anticompetitive effects can establish the defendant's market power—in lieu of the usual showing of a precisely defined relevant market and a monopoly market share"— **only when** a plaintiff can establish the "rough contours of a relevant market and show that the defendant commands a ***substantial share of the market****.*" *Id.* at 737 (emphasis added; footnote omitted); *see also Audio Car Stereo,* 2004 WL 3019298, at *6-7.

But Dr. Schafer does not attempt to show that Peaches "commands a substantial share of the market" here. Accordingly, her opinion that Peaches has market power, based solely on the purported "direct effects" of Peaches' conduct, is, as a threshold matter, contrary to law, unhelpful to the jury, and should be excluded. *See, e.g., Medicines Co.,* 2014 WL 1227214, at *5; *see also Sys. Dev. Integration, LLC v. Computer Sciences Corp.,* 886 F. Supp. 2d 873, 879 (N.D. Ill. 2012) (St. Eve, J.) (expert's opinion inadmissible because it was contrary to law).

II.    **THE COURT SHOULD EXCLUDE DR. SCHAFER'S OPINIONS REGARDING THE DEFINITION OF THE RELEVANT MARKET**

To prove that Peaches had market power, Plaintiff must, as an initial matter, "precisely establish a relevant market." *Republic Tobacco*, 381 F.3d at 738. A relevant product market is defined by the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *see also House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 07834, 2014 WL 64657, at *5 (N.D. Ill. Jan. 8, 2014) (Tharp, J.) ("A relevant product market is defined as the line of goods or services that are reasonably interchangeable in use for the same purposes."). "For antitrust purposes, a 'market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.'" *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) (same). The relevant geographic market is determined by "the area or areas to which a potential buyer may rationally look for the goods or services that he seeks," *i.e.*, the distance consumers will travel. *United States v. Grinnell Corp.*, 384 U.S. 563, 588-89 (1966); *Kochert v. Greater Lafayette Health Servs., Inc.*, 372 F. Supp. 2d 509, 518 (N.D. Ind. 2004), *aff'd*, 463 F.3d 710 (7th Cir. 2006).

A.    **Dr. Schafer's Relevant Product Market Is Contrary To The Law, Ignores Contrary Evidence And Is Fundamentally Unreliable**

Dr. Schafer opines that the relevant product market in this case is narrowly defined as "*high-end*, special occasion prom and homecoming dresses *sold in specialty boutiques* from *16 specific designers*." (Rep. ¶ 11 (emphasis added).) The italicized limitations reflect three supporting opinions about her proposed relevant product market definition:

- That the market is limited to prom and homecoming dresses from just the 16 "Named Designers" and does not include dresses from any of the scores of other designers (the "Non-Named Designers");

6

- That the market is limited to Named Designers' prom and homecoming dresses "*sold in specialty boutiques*" and does not include those dresses (or Non-Named Designers' dresses) when they are sold on internet retail sites; and

- That the relevant product market excludes prom and homecoming dresses sold in department stores—or any other type of retail outlet except specialty boutiques.

As explained below, each of these supporting opinions—and her opinion regarding the relevant product market as a whole—should be excluded.

        **1.**       **Dr. Schafer's Opinion That The Relevant Product Market Is Limited to the Same Sixteen Named Designers Identified in the Amended Complaint Should Be Excluded**

Dr. Schafer limits the relevant product market to the **very same 16** Named Designers identified in the Amended Complaint. (*See* Am. Compl. ¶ 16.) But, contrary to law governing the definition of a relevant product market, Dr. Schafer conducted **no economic analysis** of the reasonable interchangeability of Named and Non-Named Designer dresses. (*See* Schafer Dep. 41:20-42:16, 43:23-45:11, 131:16-133:17.) Nor does she attempt to show that these dresses differ in their use, quality, and price—nor could she, as the evidence (and Dr. Schafer's own admissions) overwhelmingly demonstrates that Named and Non-Named Designer dresses are good substitutes for one another.

<u>**Use and Quality Differences.**</u> Dr. Schafer readily admits that Named and Non-Named Designer prom and homecoming dresses have the same use. (Schafer Dep. 59:18-60:2.) She also disclaims any intent to opine that Named Designer dresses are higher quality than Non-Named Designer dresses. (*Id.* at 68:5-11.)

Her Report, however, suggests that she believes that there are differences between Named and Non-Named Designer dresses that justify treating them as in different markets. But Dr. Schafer has no prom or retail expertise that would enable her to draw such distinctions from

7

her knowledge or experience;[3] she offers opinions solely as an economist. Yet, none of these statements is based on any reliable data or economic analysis. *See, e.g., Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) ("An expert's opinion must be reasoned and founded on data. It must also utilize the methods of the relevant discipline . . . .").

First, Dr. Schafer states that the Named Designers "produce *high-end* products" that "stand[] out especially as the styles demanded by consumers—in recent years, dresses with '*bling*' (*e.g.*, embellishment, complex beadwork, colored crystals)." (Rep. ¶ 22 (emphasis added).) However, she admitted that Named and Non-Named Designer dresses alike may be considered "high-end"; that Named Designer dresses do not all have "bling"; that some Non-Named Designer dresses do have "bling"; and that she has not analyzed whether Named or Non-Named Designer dresses have more "bling." (Schafer Dep. 79:15-82:11, 91:15-92:16.)

Second, her Report cites two recent prom-related teen magazines for the propositions that Named Designer dresses appear on those magazines' covers, advertise in those magazines, and adorn celebrities appearing in those magazines. (Rep. ¶¶ 21, 25, 26.) She ignored, however, that those magazines contain scores of advertisements by Non-Named Designers and feature celebrities wearing their dresses, and she conducted no analysis as to whether Named Designers advertise more in prom magazines than Non-Named Designers.[4] (Schafer Dep. 87:2-88:4.) There is nothing remotely scientific about her methodology. *See, e.g., Daubert*, 509 U.S. at 589-90 ("The subject of an expert's testimony must be 'scientific . . . knowledge'."); *Sanner v. Bd. of*

---

[3] Dr. Schafer does not purport to be an expert in the prom and homecoming industry. Nor has she published any articles regarding retail markets or the economics of retailing or rendered an expert opinion on the economics of retailing. (Schafer Dep. 14:21-15:1, 15:15-18, 16:6-14.)

[4] The 2015 Edition of Teen Prom (one of the magazines Dr. Schafer cites) is included with this filing as Exhibit 10 to the Supplemental Report of Dr. Kneuper ("Kneuper Supp.") (attached hereto as Exhibit C).

*Trade of City of Chicago*, No. 89 C 8467, 2001 WL 1155277, at *7 (N.D. Ill. Sept. 28, 2001) (expert opinion must be based on more than "guesswork and eyeballing").

Third, Dr. Schafer says that Named Designer dresses "are generally considered the *most sought after* for specialty boutiques." (Rep. ¶ 22 (emphasis added).) But, this opinion is based solely on the views of a few of Peaches' competitors—two of whom claim Peaches drove them out of business—and Dr. Schafer did not take any steps to verify these statements. (*See id.*; Schafer Dep. 101:20-103:25, 111:9-25, 112:6-114:1.) Moreover, even if these statements were true, Dr. Schafer ignores the rule of law that brand preferences do not define a product market:

> [T]he question is not whether one product is a perfect substitute for another . . .
> but rather whether two products are 'reasonably interchangeable.' . . . . [A] mere
> preference for a specific manufacturer's brand . . . is not sufficient for purposes of
> establishing a relevant product market.

*McLaughlin Equipment Co., Inc. v. Servaas*, No. IP98–0127–C–T/K, 2004 WL 1629603 at *18 (S.D. Ind. Feb. 18, 2004); *see also House of Brides*, 2014 WL 64657, at *6 (claim that bridal products were "highly differentiated" and "unique" failed to show that other products were not reasonably interchangeable); *Virginia Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*, 98 F. Supp. 2d 729, 737 (W.D. Va. 2000) (expert's focus on "perfect substitute . . . ignored the power of a flexible elastic buyer . . . that will find substitutes, even if the substitutes are imperfect").

Indeed, as numerous courts have held, the relevant product market cannot be defined around particular brands **unless** there are structural barriers to switching to other brands—for example, if the customer is "'locked in' to a specific brand due to the nature of the product." *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010); *see also, e.g., House of Brides*, 2014 WL 64657, at *7 (dismissing antitrust complaint where plaintiffs failed to plausibly allege "that consumers are for any reason unable to choose wedding dresses produced by competitors to the Alfred Angelo brand"). But Dr. Schafer was unaware of *any*

barrier to consumers' ability to choose between a Named and Non-Named Designer dress. (Schafer Dep. 75:6-11.) Accordingly, Dr. Schafer's opinion limiting the relevant product market to the purportedly "most sought after" brands is contrary to law, and thus inadmissible.

**Price Differences.** Dr. Schafer also failed to undertake any analysis of prices to show that Named and Non-Named Designer dresses belong in different markets. While her Report presents data showing a difference between the average and median prices of the Named and Non-Named Designers' dresses sold by Peaches in 2012 (Rep. ¶ 26 & n.43), she testified that these and other similar calculations were *not intended* to support her opinion that Named and Non-Named Designer dresses were in separate markets. (Schafer Dep. 129:14-130:4, 135:7-16.) In fact, she conceded that her relevant product market opinion would not change even if she found *no* statistical differences in these prices. (*Id.* at 140:18-141:14.)

Further, as Dr. Schafer admits, prices of Named and Non-Named Designer dresses substantially overlap, establishing that, as an economic matter, the products are close substitutes. (Schafer Dep. 78:16-23, 135:20-136:17; *see also* Kneuper Supp. ¶ 34.) For example, Figure 1 below (based on Dr. Schafer's calculations) compares the range of prices charged for more than 95% of the Named and Non-Named Designer prom dresses sold at Peaches in 2011; clearly, the two groups of dresses were comparably priced. (*See also* Kneuper Supp. ¶ 35.)

**Figure 1**
**Peaches Price Ranges at Time of Sale**
**Full-Price Dresses Only**
*2011*



Source:
Exhibit 3, Expert Report of Leslie E. Schafer, Ph.D., January 21, 2015

Similarly, Figure 2 presents the prices for dresses sold at Hannah's in 2012, which plainly illustrates that Named Designer dresses (the red triangles) and Non-Named Designer dresses (the blue dots) were comparably priced at that store, too. (*See also* Kneuper Supp. ¶ 36.)

**Figure 2**
**Hannah's Prom Season Dress Prices**
*January 2012 - May 2012*



But Dr. Schafer does not address these overlapping prices. Such "disregard of relevant data undermines the reliability of [her] entire opinion." *LeClercq v. The Lockformer Co.*, No. 00 C 7164., 2005 WL 1162979, at *4 (N.D. Ill. April 28, 2005) (excluding opinion of hydrogeology expert that "failed to acknowledge and account for" data undermining his opinion); *see also Klaczak v. Consolidated Medical Transport*, 458 F.Supp.2d 622, 667 (N.D. Ill. 2006) ("[A] purported expert must consider obviously relevant information in forming his opinion.").

Dr. Schafer thus fails to establish (or even attempt to establish) that the use, quality, and price of Named and Non-Named Designers' dresses materially differ. To the contrary, Dr. Schafer had to concede that two dresses hanging in the same store—one a Named Designer and

11

one a Non-Named Designer—**do in fact compete with each other**. (Schafer Dep. 87:23-25 ("I think we've already discussed that it is fair that named designers do compete with non-named designers.").) This concession by itself confirms that Named and Non-Named Designers are reasonably interchangeable and that Dr. Schafer's exclusion of Non-Named Designers from the relevant product market is contrary to law, contrary to the evidence, and wholly unreliable. Her opinion should be excluded. *See, e.g., Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 891 (E.D. Wis. 2010) (excluding expert opinion that "wholly ignore[d] the fact that the marketplace offers a host of products that compete with the Guardian"); *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04 MD 1628, 2009 WL 3241401, at *7-8 (S.D.N.Y. Sept. 30, 2009), *aff'd* 407 Fed. App'x 520 (2d Cir. 2010) (excluding expert's relevant product market opinion where expert "d[id] not consider meaningfully" whether other products were reasonable substitutes and "overlook[ed] relevant facts" showing that they were).

> ### 2. The Court Should Exclude Dr. Schafer's Opinion That The Relevant Product Market Does Not Include Dresses Sold By Internet Retailers

Dr. Schafer readily admits that consumers can choose to buy prom or homecoming dresses at a specialty boutique or over the internet (Rep. ¶ 27; Schafer Dep. 146:4-16), and that dresses sold in a specialty boutique typically can be found on the internet at the same or a slightly lower price (Schafer Dep. 146:10-16, 147:20-148:14, 149:17-25, 156:6-20). Indeed, Dr. Schafer admits "that it is **reasonable to say there is some competition between the boutiques and the internet**." (*Id.* 155:12-14 (emphasis added); *see also id.* 156:21-24.)

Nevertheless, Dr. Schafer opines that dresses sold over the internet are in a different relevant market than the same dresses sold in specialty boutiques. (*See* Rep. ¶ 11.) To support this opinion, Dr. Schafer asserts that consumers who shop on the internet for prom and

homecoming dresses have "a different set of economic preferences" than their friends who

purchase dresses at brick-and-mortar stores. (*Id.* ¶ 30.) She explained this at her deposition:

> So from my understanding, from what I read and from interviews and so forth,
> there are different things that happen when you go to a store versus when you
> order online. So the girls who go to a store have different characteristics because,
> clearly, they value the ability to touch the dress, to try it on, so on and so forth.
> Whereas, say, there is a girl who really doesn't care about that. She just wants to
> go on the internet and buy a dress from her couch. She has different preferences.

(Schafer Dep. 157:7-17.) Under Dr. Schafer's logic, Nordstrom and Bloomingdale's would be in

different relevant markets merely because some customers prefer to shop at one over the other.

But that is not the law—mere consumer preferences do not define relevant markets. *See, e.g.*,

*McLaughlin*, 2004 WL 1629603, at *18; *Virginia Vermiculite*, 98 F. Supp. 2d at 737.

Moreover, Dr. Schafer neither cites a study nor engages in any economic analysis

regarding the strength or prevalence of consumer preferences for shopping online or in-store.[5]

Nor does she conduct any analysis of the "reasonable interchangeability of use or the cross-

elasticity of demand" between dresses sold in those two outlets, as required to define a relevant

product market. *Brown Shoe Co.*, 370 U.S. at 325. Indeed, Dr. Schafer offers no economic

analysis at all of the availability and prices of dresses sold over the internet compared to brick-

and-mortar stores, and she ignores substantial evidence that those dresses have the same use,

quality, and prices. *Sloan Valve Co. v. Zurn Indus., Inc.*, 33 F. Supp. 3d 984, 1000 (N.D. Ill.

2014) (St. Eve, J.) (lack of "any economic analysis tied to the relevant facts" was "fatal" to

expert's opinion). She cannot pick and choose evidence that fits her theory, while ignoring the

---

[5] She also fails to consider whether even those girls who want to "touch the dress" and "try it on" visit
specialty boutiques for that purpose, buy nothing at the store, and then order the dress they have chosen
over the internet on their smart phone as they walk to their car—taking advantage of free shipping, liberal
return policies, and no sales tax offered by internet retailers. (*See* Schafer Dep. 230:25-231:8 (admitting
this is a risk specialty boutiques must bear); Defs. Rule 56.1 Statement ("SOF") ¶¶ 45-46.)

inconvenient and overwhelming contrary facts. *See, e.g., Fail-Safe,* 744 F. Supp. 2d at 891

(excluding expert opinion that "focuse[d] only on the evidence that supports his conclusion").

### 3. The Court Should Exclude Dr. Schafer's Opinion That The Relevant Product Market Does Not Include Dresses Sold By Department Stores

Dr. Schafer admits that prom and homecoming dresses—Named and Non-Named

Designer dresses alike—are sold in department stores (Rep. ¶ 27; Schafer Dep. 202:15-20), and

that specialty boutiques and department stores may compete (Schafer Dep. 91:1-14). Yet, she

excludes from the relevant market prom and homecoming dresses sold in department stores—or

in any other retail outlet except specialty boutiques—based on evidence that purportedly shows

that the Named Designer dresses are less frequently available in department stores than at

Peaches. (Rep. ¶¶ 96-99.) Given that the Named Designers were selected specifically because

they are the designers that Barbara Surdej chose for her store, this is hardly surprising, but it does

not undercut the undisputed fact that Named and Non-Named Designer dresses are sold in

department stores in competition with specialty boutiques.

Dr. Schafer also tries to justify this exclusion because "[t]here are different segments of

consumers who buy designer dresses from boutiques or other dresses from department stores,

just like there are different segments of consumers who buy economy or luxury cars." (*Id.* ¶ 99.)

By that, she means that department stores may carry some cheaper dresses that boutiques do not.

(Schafer Dep. 199:11-24.) But she does not conduct any economic analysis on this point. In

contrast, Peaches' expert Dr. Kneuper compared prom dress prices at Chicago department stores

and found that they overlapped substantially with the prices at Chicago specialty boutiques.

(Kneuper Supp. ¶ 49; Schafer Dep. 190:5-12.) Thus, even assuming there are differences in the

range of prom dress prices in department stores, as compared to boutiques, a relevant product

market is not defined by such variations in price. *See, e.g., In re Super Premium Ice Cream,* 691

F.Supp. 1262, 1268 (N.D. Cal. 1988) ("Courts have repeatedly rejected efforts to define markets by price variances or product quality variances," because "[s]uch distinctions are economically meaningless where the differences are actually a spectrum of price and quality differences.").

Dr. Schafer's blanket exclusion from the relevant product market of dresses sold in department stores (and other retail outlets), without any assessment of their "reasonable" interchangeability with dresses *in* the relevant market, ignores relevant facts and is contrary to law. Her opinion is thus unreliable and should be excluded.

### B. Dr. Schafer's Relevant Geographic Market Is Contrary To The Law and Evidence and Unsupported By Reliable Economic Methods

Dr. Schafer agrees that the geographic market in this case should be determined by the distances consumers are willing to travel to buy prom and homecoming dresses; that the evidence shows that girls are willing to travel up to 45-60 minutes to shop for a dress; that this translates to a distance of between 30-50 miles; and that, in fact, Peaches' in-store customers come from areas within 50 miles of the store. (Schafer Dep. 203:15-204:20.) Yet, rather than logically conclude that the relevant geographic market should be described by a 30 to 50 mile-wide radius around Peaches' store, Dr. Schafer instead opines that the relevant geographic market is "the greater Chicago area covered by the area codes . . . 630/331, 847/224, 708, 312/872, and 773." (Rep. ¶¶ 12, 135.) This geographic market definition is exactly the same as alleged in the Amended Complaint. (*See* Am. Compl. ¶¶ 1, 74.)

Dr. Schafer claims that the area codes defining her relevant geographic market comprise "an area approximately 30 miles around Peaches Boutique." (Rep. ¶ 135.) As Figure 3 below shows, this is plainly untrue. Rather, Dr. Schafer's relevant geographic market has been conspicuously gerrymandered to exclude densely populated areas well within 30 miles of Peaches, most notably Joliet (in area code 815) and Hammond and Gary (in area code 219) (*see*

Schafer Dep. 206:5-20), while it includes areas that are beyond 30 miles (but generally within 50 miles) of Peaches. Dr. Schafer even admits that there is "not really" *any economic justification* for this exclusion. (Schafer Dep. 208:24-209:3.)[6]

**Figure 3**
**Plaintiff's Geographic Market Compared to a Traditional 30 or 50-mile Radius**



---

[6] At her deposition, Dr. Schafer implied that limitations in Peaches' data prevented her from conducting an appropriate economic analysis. (*See* Schafer Dep. 208:24-209:5.) It appears she means that she could not tell from Peaches' data whether customers from the 815 and 219 area codes were from areas within 30 miles of Peaches or from further away. (*Id.* at 205:9-206:2.) The relevance of this "limitation" is unclear, given that she derived her relevant market not from where Peaches' customers originated but from area codes mentioned in emails Peaches sent to Named Designers. Moreover, she gives no indication that she attempted to calculate the size of this error or the impact it would have on her analysis. And, if Dr. Schafer really was concerned that including the 815/779 and 219 area codes would lead to an overly large geographic market (*see* Rep. ¶ 138; Schafer Dep. 205:18-206:2), she could have estimated the number of Peaches' customers from portions of these area codes that are close to Peaches either from county population data or from the high school names associated with each of Peaches' sales transactions. (*See* Kneuper Supp. ¶ 57.)

16

Dr. Schafer's own calculations show that ▮▮ of Peaches' sales of Named Designer dresses were made by customers from *outside* the geographic market she defines. (Rep. ¶ 135; Schafer Dep. 209:16-24.) There is no mystery as to where much of the missing ▮▮ came from: in 2011 and 2012, approximately ▮▮ and ▮▮ of Peaches' in-store sales were to customers from the 815/779 and 219 area codes, respectively. (Schafer Dep. 210:21-211:4.) Yet, departing from sound economic analysis, Dr. Schafer did not analyze whether the relevant geographic area should be expanded beyond the area codes alleged in the Amended Complaint to account for these sales. (Kneuper Supp. ¶ 56 & n.74.) This is grounds for exclusion. *See, e.g., Barber v. United Airlines*, 17 Fed. App'x 433, 437 (7th Cir. 2001) (affirming exclusion when expert "merely accepted some of the testimony and . . . data that suited his theory and ignored other portions of it that did not").

Furthermore, Dr. Schafer's relevant geographic market is derived solely from Peaches' efforts to convince designers to enforce exclusivity agreements in certain area codes. (Rep. ¶ 135.) But this focus is contrary to law: it is the distance consumers are willing to travel, *not* the seller's activities, that define the relevant geographic market. *See, e.g., McLaughlin*, 2004 WL 1629603, at *8.[7] In sum, Dr. Schafer's opinion regarding the relevant geographic market is contrary to both the law and the evidence, lacks economic justification, and should be excluded.

---

[7] Moreover, Dr. Schafer does not follow her own methodology. *See, e.g., U.S. E.E.O.C. v. Rockwell Int'l Corp.*, 60 F. Supp. 2d 791, 797 (N.D. Ill. 1999), *aff'd* 243 F.3d 1012 (7th Cir. 2001). As Dr. Schafer recognizes, Peaches' emails to designers also referenced the 779/815 and 219 area codes omitted from her geographic market. (Rep. ¶¶ 69, 71, 72, 73; Kneuper Supp. ¶ 59.) This "selective use of facts fails to satisfy the scientific method and *Daubert*" and confirms that her relevant geographic market is unreliably gerrymandered. *Barber,* 17 Fed. App'x at 437.

**C.** **Dr. Schafer's Purported Application Of The "Hypothetical Monopolist" Test Is Contrary To Law, Unreliable, and Fails To Justify Her Proposed Market**

Dr. Schafer's sole justification for her gerrymandered relevant product and geographic markets is that, because she finds that Peaches had "market power" in the relevant market Plaintiff proposes, then competition from outside of that market—including from Non-Named Designers, the internet, department stores, and stores in area codes 779/815 and 219—need not be considered. (Rep. ¶¶ 95, 132-33, 139, 141; Schafer Dep. 132:18:133:25.) She cites the "hypothetical monopolist" test described in the DOJ/FTC Horizontal Merger Guidelines (Aug. 19, 2010) ("Guidelines") to support this position. (Rep. ¶¶ 131-33.) However, Dr. Schafer's application of this test is contrary to law, and she fails to reliably apply it to the facts of this case.

The hypothetical monopolist test looks to whether a hypothetical profit-maximizing firm that is the only seller of the products under consideration "likely would impose at least a ***small but significant and non-transitory increase in price ('SSNIP')*** on at least one product in the market." Guidelines § 4.1.1 (emphasis added).[8] Consistent with Seventh Circuit law, the goal of the hypothetical monopolist test is "to identify a set of products that are ***reasonably interchangeable***." *Id.* (emphasis added). The Guidelines instruct that the test is to be applied "flexibly," *id.* § 4.0, and that a relevant product market should be expanded to include additional close substitutes, even if a narrower product market would satisfy the test, *id.* § 4.1.1.[9]

Dr. Schafer did not apply this test. Dr. Schafer conducts no economic analysis to determine whether Peaches, if it were in fact the only seller of the Named Designers (which it

---

[8] *Available at:* https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf.

[9] The Guidelines provide the following example to illustrate: "In Example 5, suppose that half of the unit sales lost by Product A when it raises its price are diverted to Product C, which also has a price of $100, while one-third are diverted to Product B. Product C is a closer substitute for Product A than is Product B. Thus Product C will normally be included in the relevant market, even though Products A and B together satisfy the hypothetical monopolist test." Guidelines § 4.1.1.

was not), could profitably raise prices by a "small but significant non-transitory amount," as the Guidelines instruct. Guidelines § 4.1.1. And, as explained throughout this section, she also completely ignores the principles of reasonable interchangeability underlying the test. For example, she did not conduct any analysis of a relevant product market with more or fewer designers than the 16 Named Designers. (Schafer Dep. 43:23-45:11.) *See also In re Live Concert*, 863 F. Supp. 2d 966, 987 (C.D. Cal. 2012) (excluding testimony of expert who "never meaningfully considered any narrower definition of the market, nor did he ever 'expand that definition until all reasonable substitutes [were] included'").

Instead, she begins with the relevant market alleged in the Amended Complaint, and then concludes that, because Peaches had "market power"—in particular, because Peaches charged prices above MSRP from 2009 to 2012—no further analysis is necessary. (*See* Rep. ¶¶ 132-33; Schafer Dep. 41:20-42:16, 132:18-133:25.) But, as explained in Parts I and III herein, Dr. Schafer's opinions that Peaches had "market power" and charged "above-competitive prices" are contrary to law and fact, are wholly unreliable, and thus provide no basis for concluding that the hypothetical monopolist test was met.

Furthermore, an economist may not simply accept a complaint's allegations to define the relevant market and "look[] for corroborating evidence without meaningfully testing this assumption." *In re Live Concert*, 863 F. Supp. 2d at 987. Indeed, this case makes clear the dangers of failing to evaluate whether products in the relevant market are closely substitutable with products outside of that market. Under Dr. Schafer's logic, it would make no difference whether the Amended Complaint had alleged that the relevant product market was comprised of 5, 10, 20 or any other number of Named Designers. (*See* Kneuper Supp. ¶ 62.) As long as

Peaches priced above MSRP, Dr. Schafer would conclude that the alleged relevant market was proper—no matter what products were included. (*See, e.g.*, Schafer Dep. 55:2-14.)

Courts have excluded proposed relevant markets where experts mechanistically applied the hypothetical monopolist test without ensuring that reasonably interchangeable products were included. *See, e.g., In re Live Concert*, 863 F. Supp. 2d at 988-89; *In re Fresh Del Monte Pineapples,* 2009 WL 3241401, at *9; *Virginia Vermiculite,* 98 F. Supp. 2d at 738. This Court should do the same here.

## III. DR. SCHAFER'S RELIANCE ON "DIRECT EFFECTS" TO SHOW MARKET POWER CONTRADICTS HER OWN ADMISSIONS, IGNORES RELEVANT EVIDENCE, AND IS THUS WHOLLY UNRELIABLE

Dr. Schafer bases her opinion that Peaches had market power from at least 2009 until 2012 on supposed evidence of the "direct effects" of its alleged anticompetitive conduct, *i.e.*, evidence that Peaches charged more than MSRP for in-season prom and homecoming dresses. (Rep. ¶ 14; Schafer Dep. 246:18-19.) As discussed in Part I above, Seventh Circuit law prohibits this analysis. Dr. Schafer cannot rely on "direct effects" to prove "market power" unless and until it has been shown that Peaches "command[ed] a substantial share of the market." *Republic Tobacco*, 381 F.3d at 737. But Dr. Schafer avoids calculating Peaches' share of *any* market.

Even if Dr. Schafer could permissibly look to direct evidence of anti-competitive effects to prove market power, her opinion here should be excluded because *first*, her analysis turns on the demonstrably false assumption that there is but one "competitive" retail price for prom and homecoming dresses—the MSRP price; *second,* she has willfully ignored evidence showing that there can be no causal link between Peaches' alleged antitrust misconduct (sending "do not sell" emails to some designers) and the alleged "direct effect" of that conduct (the ability to sell at a price above MSRP); and *third*, she has shown no *anticompetitive* effect.

As background, Dr. Schafer recognizes that virtually all designers establish a MSRP for their dresses, which is generally set at twice the wholesale price (and is sometimes called the "keystone" price). (Rep. ¶ 34.) To be an authorized retailer, stores must agree not to price the designer's dresses below MSRP, but they may price them above MSRP. (*Id.*)

When Peaches first opened in 1985, it priced its dresses at MSRP + 15%, and it continued that practice, at least as to some dresses, through 2012. (*Id.* ¶ 89.) However, by 2009, ██████████████████████████████████████████████████ (SOF ¶ 78; *see also* Am. Compl. Ex. 31 (November 2010 email from Peaches' Jeff Surdej warning that because "Peaches is 15% above keystone and prom shop [a Peaches affiliated website] is keystone, if local Chicago customers knew prom shop was our website we could loose [sic] our entire business brick and mortar").) In 2012, Peaches abandoned its practice of charging MSRP + 15% in favor of a tiered-pricing structure; lower-priced dresses were priced at MSRP + 15% (as before), but more expensive dresses were priced at MSRP. (Rep. ¶ 91.) But a year later, ████████████████████████████████████████████████████ ██████████████████ (SOF ¶ 84.) By 2013, Peaches moved virtually all of its in-store dress prices to MSRP, where they have remained ever since. (SOF ¶ 85; *see also* Rep. ¶ 93.)

Dr. Schafer thus draws a three-part syllogism: (1) MSRP is *the* "competitive" price for prom and homecoming dresses, (2) Peaches charged above MSRP, (3) Peaches therefore had market power.[10] (*See* Schafer Dep. 53:21-54:3, 246:15-21.) Dr. Schafer's opinion, however, is

---

[10] Dr. Schafer also appears to claim that "Peaches" had market power because, beginning in 2009, the website PeachesBoutique.com charged ████████████████████████████████████████████ ████████████████████████████████████████ This "price discrimination," Dr. Schafer argues, proves that "Peaches" had market power. (Rep. ¶ 15.) This is demonstrably wrong for two reasons.

flatly contrary to numerous admissions that she made at her deposition, as well as several statements in her Report.  Moreover, it impermissibly ignores obvious alternative hypotheses for Peaches' pricing strategies.  Her opinion should therefore be excluded.

###### A.    Dr. Schafer's Opinion That There Is A Single "Competitive" Price Is Contrary to Her Testimony And Ignores Obvious Alternative Hypotheses

Dr. Schafer's opinion that Peaches had "market power" depends entirely on the erroneous proposition that there is a *single* competitive price for prom and homecoming dresses—MSRP— so that any price above MSRP is a "supra-competitive price."  (*See, e.g.*, Schafer Dep. 233:9-13.) However, she admits that, even in competitive markets, different retail stores may charge different prices for the same product for a variety of reasons, including to recover higher costs incurred to provide customers a more desirable shopping experience:

> Q.  Here is a quote.  Do you agree with it:  "To make a profit, retailers that offer broader variety, deeper assortments, and additional services need to charge higher prices"?  . . .

---

First, the brick-and-mortar store *Peaches* did not "price discriminate."  The website PeachesBoutique.com allegedly did.  But Dr. Schafer conceded at her deposition that—regardless of this differential pricing— PeachesBoutique.com **does not have market power**.  (Schafer Dep. 19:21-20:15.)

Second, Dr. Schafer fails to show that *any* Peaches-related business, including the website, engaged in price discrimination of the type that could suggest "market power."  Price discrimination may suggest market power when a seller can segment its customers by their demand elasticity and price its product differentially based on those elasticities.  The best example in this Circuit is found in *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 787 (7th Cir. 1999).  Pharmaceutical companies, which often have market power due to patent protection, may charge different customers (*e.g.*, HMOs, hospitals, retail pharmacies, etc.) different prices due to their different price elasticities.  Because retail pharmacies have the least elastic demand due to their need to "stock a full range of drugs in order to be able to fill prescriptions," they "can . . . be expected to be charged the highest prices."  *Id.*  But Dr. Schafer does not show that ███████████████████████████████████████████████████████████████████████ ████████████████████████████  (*See also* Kneuper Supp. ¶¶ 93-95.)  Rather, the "price discrimination" that Dr. Schafer observes simply reflects ████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

A.  Well, if you are saying that those are things that provide them additional costs, then they would charge a higher price to cover their costs.  **I think that sounds reasonable.**

(Schafer Dep. 255:10-256:5 (emphasis added); *see also id.* 54:15-25 (agreeing that there can be variations in price for products sold at retail).)[11]

Dr. Schafer agreed that even in a highly competitive market like grocery stores on Chicago's near north side, a high-end store, such as Treasure Island, can charge more than Costco for a common brand—for example, French's™ mustard—in part because customers are willing to pay more for the choice of many brands and a better shopping experience.

Q.  [W]ould you agree that because Treasure Island offers me a different shopping experience [than Costco] because the store is nicer; there is more staff; they are offering me lots of choices; and they have a big inventory; that I am going to pay more for that choice and that experience?

A.  I would say that there are consumers who would be willing to pay more.

(Schafer Dep. 252:1-8; *see also id.* 250:1-9 (agreeing that different retailers sell the same products at different prices because they offer different shopping experiences).)

Dr. Schafer's Report and deposition testimony also show that the circumstances in which she would expect different retailers to charge different prices in a competitive market fit the facts of this case to a "T."  She readily acknowledges that "Peaches is not typical of the industry." (Rep. ¶ 49.)  As she explains, specialty boutiques selling prom and homecoming dresses "are typically small in size" and they do not generally offer customers the opportunity to try on the

---

[11] The academic literature is consistent.  (*See* Kneuper Supp. ¶ 81 & n.109 (citing Levy, Michael, Barton A. Weitz, and Lauren Skinner Beitelspacher, *Retailing Management*, 8th Edition, McGraw-Hill Irwin, 2012, pp. 30-36; Ancarani, Fabio, and Venkatesh Shankar, "Price Levels and Price Dispersion Within and Across Multiply Retailer Types: Further Evidence and Extension," Journal of the Academy of Marketing Science, Vol 32, No. 2, 2004, pp. 176-87; Lewis, Matthew, "Price Dispersion and Competition with Differentiated Sellers," The Journal of Industrial Economics, Vol. 56, No. 3, 2008, pp. 654-78; Stigler, George, "The Economics of Information," Journal of Political Economy, Vol. 69, No. 3, 1961, pp. 213-25).)

dress they will ultimately purchase because "it is typical" for them "to buy stock to use as sample merchandise and then reorder the stock." (*Id.* ¶¶ 28, 49.)

In contrast, Dr. Schafer admits that Peaches buys an enormous inventory of ████████ ████████████████████████████████████████████████████████████ ██████████████ (Schafer Dep. 259:15-261:18, 264:7-265:6.) She also agrees that Peaches is unique in other ways including: its large retail space (currently 25,000 square feet), its large number of dressing rooms (40), its practice of ████████████████████████████ ████████████████████████ (Rep. ¶¶ 48, 49; Schafer Dep. 260:3-262:2.)

Dr. Schafer agrees that all of these elements of Peaches' business model ████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████ (Rep. ¶ 49; Schafer Dep. 259:15-265:6.) Indeed, Dr. Schafer testified that Peaches' large inventory is, ████████████████ ████████████████████████████████ (Schafer Dep. 228:8-24.)

In spite of these admissions, Dr. Schafer simply ignores—and certainly did not test—the obvious alternative hypothesis that ████████████████████████████████████ ████████████████████████████████████ ██████████████ (Schafer Dep. 265:18-268:10.) But an expert may not "conclude that a company . . . has market power by pointing to its price increases without further testing of alternative hypotheses." *Virginia Vermiculite*, 98 F. Supp. 2d at 736-37 (excluding expert that assumed that price increases showed that defendant had market power without considering alternative hypotheses); *see also Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773-74 (7th Cir. 2014) (affirming district court's exclusion of expert testimony as unreliable where expert failed

to consider "obvious alternative explanations"); *Obrycka v. City of Chicago*, 792 F. Supp. 2d

1013, 1019 (N.D. Ill. 2011) (St. Eve, J.) (courts should consider "whether . . . the expert has

adequately accounted for obvious alternative explanations" in evaluating reliability of an

expert's opinion).  Nor may an expert simply turn a blind eye to inconvenient facts.  *See, e.g.*,

*Barber*, 17 Fed. App'x at 437; *Fail-Safe,* 744 F. Supp. 2d at 889.  Having ignored the obvious

alternative explanations for Peaches' pricing policies—which were fundamentally unchanged

from the 1990s, when no one could credibly claim it had market power[12]—Dr. Schafer's opinion

that Peaches' ability to charge MSRP + 15% demonstrates "market power" is nothing more than

her *ipse dixit* and should be excluded.  *See, e.g.*, *General Elec. Co. v. Joiner*, 522 U.S. 136, 146

(1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to

admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.").

**B.**     **Dr. Schafer Fails To Establish A Causal Connection Between Peaches'
Alleged Antitrust Misconduct and Its "MSRP + 15%" Pricing**

A "direct effects" analysis must be premised on showing a clear causal link between the

alleged antitrust violation and anticompetitive effects—*i.e.*, that the effects flow *directly* from the

conduct.  It is thus incumbent upon an economist relying on "direct effects," *e.g.*, higher prices,

to show, through "sophisticated econometric analysis," that the purported direct effects are in

fact *caused by* allegedly anticompetitive conduct, as opposed to the result of healthy competition.

*Valley Liquors*, 822 F.2d at 668; *see also 42nd Parallel North v. E Street Denim Co.*, 286 F.3d

---

[12] Dr. Schafer attempts to skirt another fundamental piece of economic evidence that completely
undermines her so-called "direct effects" analysis.  While acknowledging that Peaches had its MSRP +
15% pricing policy for decades, including when it had a 2,400 square foot retail operation (about the size
of Hannah's today), Dr. Schafer dismisses that crucial economic fact, stating that Peaches "may not have
had market power originally" but "there came a time that MSRP became the de facto competitive pricing
level and Peaches' pricing remained above this competitive level." (Rep. ¶ 101.) This vague assertion
ignores an obvious and compelling alternative economic explanation— ██████████████████████
████████████████████████████████████████

401, 405 (7th Cir. 2002) ("Just because a retailer raises prices doesn't mean competition has been harmed."). This step is particularly crucial in cases involving vertical restraints, such as the semi-exclusive dealing arrangements challenged here, because those arrangements are presumptively legal and *procompetitive*.[13] *See, e.g.*, *Republic Tobacco*, 381 F.3d at 737.

Here, Dr. Schafer simply assumes, without any econometric analysis, that Peaches' MSRP + 15 % prices are direct evidence of an anticompetitive effect that was *caused by* the conduct Plaintiff challenges—specifically, emails Peaches sent that urged the Named Designers not to sell their dresses to certain stores or to stores within certain areas. (*See, e.g.*, Rep. ¶ 13 ("Peaches threatened the Designers that it would stop purchasing dresses if the Designers sold to Peaches' competition. Through these efforts, Peaches maintained supracompetitive prices longer than it would have but for this anticompetitive behavior."); Schafer Dep. 234:7-235:22, 236:18-237:15, 246:15-21.) In a nutshell, she assumes that because Peaches sent those emails, Named Designers "agreed" to Peaches' requests, and Peaches accordingly was able to charge "above-competitive" prices. (Schafer Dep. 234:7-19, 235:13-22, 237:9-15.) However, these assumptions willfully ignore unrebutted evidence that the Named Designer dresses are sold by numerous retail outlets in the Chicago area. She also makes these assumptions without undertaking any analysis or investigation that would allow her to reliably conclude that Peaches' emails harmed *competition* as a whole.

**Disregard of Evidence That Named Designer Dresses Remain Available.** Dr. Schafer ignores substantial evidence confirming that, notwithstanding the emails, Named Designers'

---

[13] Dr. Schafer herself acknowledged at her deposition that agreements between a supplier and a distributor (such as a retailer) that give the distributor an exclusive sales territory are generally procompetitive. (Schafer Dep. 237:16-22.) And, she agreed that, therefore, efforts by distributors to persuade supplies to abide by those presumptively legal and procompetitive agreements are also presumptively legal and procompetitive. (*Id.* at 239:8-16.)

26

dresses continue to be readily available to Chicago consumers. She disregards that Dr. Kneuper's Expert Report (to which her Report responds) showed that there are scores of specialty boutiques and other retail outlets selling prom and homecoming dresses in the Chicago area, and that many of them carry the dresses of numerous *Named* and Non-Named Designers. (*See* SOF Ex. 8, Kneuper Rep. ¶¶ 53, 91 & Table 6 (p. 39) & Exhs. 4 & 5.) Similarly, Peaches' October 8, 2014 summary judgment brief (Dkt. 201) included a table (a version of which is attached hereto as Appendix I), which showed that three boutiques in Hannah's and Peaches' vicinity collectively sell 14 of the 16 Named Designers' dresses. Several other examples of specialty boutiques selling both Named and Non-Named Designers' dresses also are shown in Appendix II hereto.

Dr. Schafer's own assertions confirm that Named Designers' dresses are widely available in the Chicago area. In her effort to distinguish the Named Designers from the Non-Named Designers, her Report states: "I understand that in the Chicago area it is an *absolute necessity* to carry a variety of lines from the [Named] Designers in order to even get customers into the store." (Rep. ¶ 32 (emphasis added).) At her deposition, she admitted that there are numerous specialty boutiques in the Chicago area that sell prom and homecoming dresses and thus, by definition, "get customers into the store." (Schafer Dep. 106:9-15.) Accordingly, she admitted that it is a "fair inference" that "a variety of lines from the [Named] Designers" are in fact carried by each and every one of those stores.[14] (*Id.* at 109:7-110:4.)

---

[14] At her deposition, Dr. Schafer attempted to backtrack from paragraph 32 of her Report, saying that it is not necessarily *her* opinion that carrying "a variety of lines from the [Named] Designers" is "an absolute necessity" to "get customers into the store"; rather, that is merely what she was told by the declarants whose testimony she is relying on. (Schafer Dep. 104:9-19, 106:5-108:10.) But that doesn't matter. If she intends to "merely parrot[] information provided to her," her opinion must be excluded. *State Farm Fire & Cas. Co. v. Electrolux Home Products, Inc.*, 980 F. Supp. 2d 1031, 1048 (N.D. Ind. 2013).

This concession, as well as the undisputed data supplied by Dr. Kneuper, are entirely inconsistent with Dr. Schafer's untested assumptions that Peaches' emails effectively denied specialty boutiques in the market access to the Named Designers' dresses—and that this conduct than *caused* the alleged "direct effects" that Dr. Schafer cites (Peaches' purportedly supra-competitive pricing). But an economic expert may not simply to bury her head in the sand on matters of such critical significance. *See, e.g.*, *Barber*, 17 Fed. App'x at 437; *LeClercq*, 2005 WL 1162979, at *4; *Klaczak*, 458 F. Supp. 2d at 667.

**No Showing of Harm to Competition.**  Moreover, to reliably conclude that Peaches' MSRP + 15% pricing is a "direct effect" of Peaches' alleged misconduct, Dr. Schafer must show that there was in fact an *anticompetitive* effect.  But Dr. Schafer impermissibly confuses injury to individual competitors with injury to competition; the antitrust laws are concerned only with the latter.  *See, e.g., Brown Shoe Co.*, 370 U.S. at 320 (the purpose of antitrust laws is the "protection of *competition*, not *competitors*").  For example, she relies on the Declaration of Mr. Lamar Anderson, who claims that Peaches' request to Named Designers that they not sell dresses to him caused his store, Fit 2B Tied, to exit the market.  (*See* Rep. ¶ 74 & n.206.)  But even if that were true—and at trial, Peaches would dispute it—Dr. Schafer assumes without any investigation or economic analysis that Fit 2B Tied's exit affected competition in the relevant market.  (Schafer Dep. 116:5-16, 117:14-19.)  That failure leads her to overlook that, in fact, there are *seven* stores that sell prom and homecoming dresses within just *5 miles* of Fit 2B Tied's former location. (SOF ¶ 115.)  There is no basis to assume *any* harm to competition.

Dr. Schafer also made no effort to analyze or investigate, for example, how many stores in the vicinity of Peaches carried the Named Designers' dresses.  (*See* Schafer Dep. 112:6-114:1.)  In fact, she testified that information regarding which stores in the Chicago area carried

the Named Designers' dresses, how many such stores there were, and where they are located relative to Peaches would be *irrelevant* to her opinions. (*See, e.g., id.* at 50:17-52:3, 52:23-53:19.) Thus, she takes the extreme and economically untenable position that, because Peaches charged above MSRP, Peaches had "market power" *regardless* of the number of competitors in the vicinity that also sold the Named Designers' dresses. (*Id.* at 55:2-14, 236:25-237:8.) But it simply defies belief that Peaches' emails harmed *competition* when there are dozens of competitors in the market that offer the same or competing products.

In sum, Dr. Schafer's assumptions—that there is a direct causal link between Peaches' conduct and its purported "above-competitive" prices and that Peaches' conduct harmed competition—are unsupported by any economic analysis and in fact are contrary to substantial evidence. As such, her opinion that Peaches has "market power" is fundamentally unreliable and fails to satisfy the requirements of *Daubert* and Rule 702.

## CONCLUSION

For the foregoing reasons, the Court should exclude Dr. Schafer's opinion that Peaches had "market power" from at least 2009 to 2012, as well as each of her subsidiary opinions, including her opinions regarding the relevant market and her opinion that there is direct evidence of anti-competitive effects of Peaches' conduct.

Dated: March 19, 2015                              Respectfully submitted,

                                                   By:  /s/ Ashley K. Martin
                                                   _____

                                                   One of Its Attorneys
                                                   John W. Treece
                                                   Theodore R. Scarborough
                                                   Ashley K. Martin
                                                   SIDLEY AUSTIN LLP

29

One South Dearborn Street
Chicago, Illinois 60603
Tel. (312) 853-7000
Fax (312) 853-7063
Firm I.D. No. 42418

-and-

Eric D. Anderson
STAUB ANDERSON GREEN, LLC
55 West Monroe, Suite 1925
Chicago, Illinois 60603
Tel. (312) 345-0545
Fax (312) 345-0544
I.D. No. 6220092

*Attorneys for Defendants Barbara Ann Surdej,
Roy Surdej, and Jeffrey Surdej, d/b/a Peaches
Boutique*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 19, 2015, I electronically filed the foregoing Defendants' Memorandum Of Law In Support Of Their *Daubert* Motion To Exclude Certain Opinions Of Plaintiff's Economic Expert, Dr. Leslie E. Schafer, which will send a Notice of Electronic Filing to all counsel of record.

<u>/s/ Ashley K. Martin</u>