# APPENDIX I

**Designers Sold At Four Brick-and-Mortar Retailers & On Two Websites**

| Designer | Peaches | Kimberly Bond | That Girl | Hannah's | Debbie's Dresses | NY Dress[15] | PG.com[16] |
|---|---|---|---|---|---|---|---|
| Allure | x | | | x | x | x | x |
| Angela & Alison | | x | | x | | x | |
| Alyce | x | x | x | x | x | x | x |
| Bari J Shimmer | x | | | | x | x | x |
| BG Haute | x | | | | x | x | |
| Blush | x | | | | | x | x |
| Clarisse | | x | | x | x | x | |
| Dave & Johnny | | x | | x | x | x | x |
| Faviana | x | | x | x | x | x | x |
| Maggie Sottero[17] | | | | | x | x | x |
| House of Wu | x | x | | x | x | x | x |
| Janique | | | | x | | x | |
| Jasz | x | | | | x | x | x |
| Josh & Jazz | | | | | x | | |
| Johnathan Kayne | | | | x | | x | |
| Jovani | x | x | x | | x | | x |
| Karishma | | x | | | | | |
| La Femme | x | x | | | | x | x |
| Landa | x | | | | x | x | |
| MNM | | | x | x | | x | |
| Mac Duggal | x | x | | x | x | x | x |
| Mori Lee | x | | | | x | x | x |
| Nika | | | x | x | | x | |
| PC Mary/Kiss Kiss | | x | | | x | | |
| Precious Formals | x | | x | | x | | |
| Primavera | | x | | x | | x | |

[15] NewYorkDress.com. NewYorkDress.com carries additional prom and homecoming dress lines that none of the boutiques carry; Defendants have only listed the lines NewYorkDress.com carries that are also sold in the five boutiques listed in Table 1. (SOF ¶ 113 n.2.)

[16] Promgirl.com. Promgirl.com carries additional prom and homecoming dress lines that none of the boutiques carry; Defendants have only listed the lines Promgirl.com carries that are also sold in the five boutiques listed in Table 1. (SOF ¶ 113 n.3.)

[17] Maggie Sottero no longer sells prom and homecoming dresses (SOF ¶ 17), but Plaintiff identified that line as one of the designers that it could not obtain. The stores listed above continue to list her as a designer they carry. Similarly, Plaintiff identified Party Time as a Named Designer, but that line was discontinued and rebranded in 2015 as "Rachel Allan." (SOF ¶ 19.)

| Designer | Peaches | Kimberly Bond | That Girl | Hannah's | Debbie's Dresses | NY Dress[15] | PG.com[16] |
|---|---|---|---|---|---|---|---|
| Rachel Allan (formerly Party Time) | x | x | x | x | x | x | |
| Riva | x | x | x | | x | x | x |
| Saboroma | | | x | x | | x | |
| Scala | x | | | | x | x | x |
| Sean | x | | | | | x | x |
| Shail K | x | | | | | x | |
| Sherri Hill | x | x | | | x | x | x |
| Tarik Ediz | x | | | | | x | |
| Terani | x | x | x | x | x | x | x |
| Mon Cheri | x | x | | | x | x | x |
| Wow | | | | | x | | |
| Xcite | | | x | | x | x | |

# APPENDIX II

**Appendix Table 1**
**Selected Examples of Specialty Boutiques that Sell Prom and Homecoming Dresses in the Chicago MSA**
**And Designer Lines Carried by These Boutiques**

| Designer | House of Brides | That Girl Boutique | Elegant Couture | Hannah's Boutique | Eva's Bridal en La Grange | The Kimberly Bond Boutique | Martellen's | Monalisa Boutique | Robin Elliot | Debbie's Dresses | The Dress by Nicole | BriZan Couture | Elegance Wedding & Evening Wear | Everything 4 Pageants | Special Occasions on the Avenue | Wolsfelt's Prom | Park Avenue Brides | The Prom Shoppe | A Pink Boutique | Shelley's Bridal Couture |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Miles from Peaches** | 5.1 | 7.9 | 8.9 | 10.8 | 13.3 | 13.8 | 15.0 | 15.9 | 17.1 | 17.8 | 18.5 | 19.8 | 22.7 | 23.3 | 28.5 | 29.3 | 29.8 | 31.4 | 32.2 | 33.8 |
| Allure (aka Madison James) | | | | X | | | | | | X | | | | | X | | | X | X | |
| Alyce | | X | | X | | X | X | | X | X | | | X | | | X | | X | X | |
| Angela & Alison | | | X | X | X | X | | | | X | | X | | | | X | | | | |
| Bari J Shimmer | | | | | | | X | | | | | | | | | | | | | |
| B/G Haute | | | | | | | | | | X | | | | | | | | | | |
| Blush | | | | | | | | X | | | | | | | | X | | X | X | |
| Cinderella's | | | | | | | | | | | | | | | | | | | | |
| Clarisse | | | X | X | | X | | X | X | X | X | | | | X | | | X | | X |
| Dave & Johnny | X | | | X | | X | | X | | X | | | | X | | | | | X | |
| Faviana | | X | | X | | | | X | X | X | X | X | X | | X | | | X | | |
| House of Wu | X | | | X | | X | | | | X | | | | X | | X | | X | X | X |
| Janique | | | X | X | | | | | | | | | | | | | | | | |
| Jasmine | | | | | X | | | | | | | | | | | X | | | | |
| Jazz | | | | | | | | | X | X | | | | | | | | X | | |
| John Paul Ataker | | | X | | | | | | | | | | | | | | | | | |
| Johnathan Kayne | | | X | X | | | | | | | | | | | | | | X | | |
| Jordan Fashions | | | | | | X | | | | | | | | | | | | | | |
| Josh & Jazz (Jolene) | | | | | | | | X | | X | | | | | | | | | | |
| Jovani | X | X | | | | X | | X | X | X | | X | | | X | | | X | X | |
| Kari-bea | | | | | | X | | X | | | | | | | | | | | | |
| La Femme | | | | | | X | | X | | | | | | X | X | | | X | X | |
| Landa | | | X | | | | | | | X | | | | | | X | | | | |
| Mac Duggal | | | | X | | X | | X | X | | X | | X | X | X | | | X | X | |
| Macis | | X | | | | | | | | | | | | | | | | | | |
| Maggie Sottero | | | | | | X | | | | X | | | | | | | X | X | | X |
| Milano | | | | | | | | X | | | | | | X | | | | | | |
| MNM | X | | X | X | | | | | | | | | | | | | | | | |
| Mori Chieri (Tony Bowls) | X | | X | | X | X | X | | X | X | | | X | | | | | | | X |
| Mori Lee | | | X | | | | X | X | | X | | | X | | | | | X | X | |
| Morrell Maxie | X | | X | | | | | | | | | | | | | | | | | |
| Nika | | X | X | X | | | | | | | | | | | | | | | | |
| Nina Canacci | X | | | | | | | | | | | | | X | | | | X | | |
| PC Mary / Kiss Kiss | | | | | | X | | | | X | | | | | | | X | | | |
| Precious Formals | | X | | | | | | | | X | | | | | | | | X | | |
| Primavera | | | X | X | | X | | | | | | | | | | | | | | |
| Rachel Allan (formerly known as Party Time) | | X | | X | | X | | | | X | | | | X | X | X | | X | X | |
| Rina Di Montella | | | X | | | | | | | | | | | | | | | | | |
| Riva | | X | | | | | | | | X | | | | | | | | | | X |
| Saboroma | | X | X | X | | | | | | | | | | | | | | | | |
| Scala | | | | | | | | | X | X | | | | | | | | | X | |
| Shail K | | | | | | | | | | | | | | | | | | | | |
| Sherri Hill | | | | X | | X | | | | X | | X | | | X | | | X | X | |
| Tarik Ediz | | X | | | | | | | | | | | | | | | | | | |
| Temptation | | | | | | | X | | | | | | | | | | | | | |
| Terani | X | X | X | X | X | X | | | | X | | | | | | | | | X | |
| Wow | | | | | | | | | | X | | | | | | | | | | |
| Xcite | | X | | | | | | | | X | | | | | | | | | | |

Notes:
Named Designers shaded grey.
Distances based on Google Maps straight line distances.
Listed designer lines represent a sampling of all lines available at these retailers and may not reflect all lines currently carried.
Information was collected in 2014 for the following retailers: Eva's Bridal en La Grange, and BriZan Couture
Information was collected in 2015 for the following retailers: House of Brides, That Girl Boutique, Elegant Couture, The Kimberly Bond Boutique, Martellen's, Debbie's Dresses, The Dress by Nicole, Elegance Wedding & Evening Wear, Everything 4 Pageants, Special Occasions on the Avenue, Park Avenue Brides, A Pink Boutique, and Shelley's Bridal Couture
Information was collected in both 2014 and 2015 for the following retailers: Hannah's Boutique, Monalisa Boutique, Robin Elliot, Wolsfelt's Prom, and The Prom Shoppe

Sources:
Retailers' Websites:
A Pink Boutique: http://www.apinkbtq.com/; BriZan Couture: http://www.brizancouture.com/products/prom-dresses/; Debbie's Dresses: http://debbiesdresses.wix.com/debbiesdresses#!page-3; Elegance Wedding & Evening Wear: http://www.eleganceweddingandevprom.---quinceel%C3%B3lera.html; Elegant Couture:
http://elegantcouture.com/prom/233323; Eva's Bridal en La Grange: http://www.evasnellagrange.com/Evening-0/event/, Everything 4 Pageants: http://www.everythingforpageants.com/Prom-Dresse_c5449.htm; Hannah's Boutique: http://www.hannahsboutique.com/store/C09Prom.html; House of Brides: http://www.housesofbrides.com/c-573-
prom.aspx_Martellen's: http://www.martellens.com/; Monalisa Boutique: http://monalisaboutique.net; Park Avenue Brides: http://www.parkavenuebrides.net/brandd.htm; Robin Elliot: http://robinelliotofchicago.com/prom/; Shelley's Bridal Couture: http://www.shelleysbridalcouture.com/#!prom/d14y; Special Occasions on the Avenue:
http://specialoccasionsontheavenue.com/; That Girl Boutique: http://www.thatgirl.boutiquewix.com/#about; The Dress by Nicole: http://shopthedress.com/prom/; The Kimberly Bond Boutique: http://www.kimberlybondboutique.com/Prom.html; The Prom Shoppe: http://www.thepromshoppe.net/; Wolsfelt's Prom: http://www.olefeltsprom.com/photos/

# Exhibit A
# (Filed Under Seal)

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

## CONFIDENTIAL--TO BE FILED UNDER SEAL
## SUBJECT TO PROTECTIVE ORDER

HANNAH'S BOUTIQUE, INC.

     Plaintiff,

   v.

BARBARA ANN SURDEJ, ROY SURDEJ, and
JEFFREY SURDEJ, D/B/A PEACHES
BOUTIQUE

    Defendants.

Case No.: 13-cv-2564

## EXPERT REPORT OF LESLIE E. SCHAFER, PH.D.

## Econ ONE Research, Inc.

## January 21, 2015

550 South Hope St., Suite 800
Los Angeles, CA 90071

# TABLE OF CONTENTS

I.     Experience and Qualifications ........................................................1

II.    Introduction and Assignment ......................................................2

III.   Summary of Conclusions ..........................................................4

IV.    Background ...........................................................................8

    A. Demand and Supply of Designer Prom and Homecoming Dresses........... 8

        1. Designers ................................................................. 9

        2. Retail Distribution .................................................... 15

        3. Retail Pricing .......................................................... 19

    B. The Parties ................................................................. 21

        1. Hannah's ................................................................ 21

        2. Peaches................................................................... 22

V.     Peaches Foreclosed Competitors' Ability to Sell Designers'
      Dresses ..............................................................................32

    A. Peaches Targets Particular Stores for Foreclosure ............................ 34

        1. International House of Couture ...................................... 35

        2. Hannah's Boutique .................................................... 37

    B. Peaches Targets Geographic Market for Foreclosure .......................... 39



Expert Report of Leslie E. Schafer, Ph.D.

    C.  Peaches' Anticompetitive Behavior Raised Rivals' Costs..................... 42

**VI.    Economic Analysis of Market Power .......................................43**

    A. Direct Economic Evidence of Peaches' Market Power........................... 49

        1. Peaches Charged Supracompetitive Prices through 2012 for Certain Prom and Homecoming Dresses.................................................... 49

        2. Peaches Engaged in Price Discrimination Between peachesboutique.com Customers Based on their Geographic Location to Maintain its Supracompetitive In-Store Pricing .............. 64

    B. Market Definition........................................................................ 69

        1. Relevant Product Market .............................................................. 70

        2. Relevant Geographic Market........................................................ 72

**VII.  Conclusion.............................................................................77**



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                        1/21/15

## I.    Experience and Qualifications

1.    My name is Leslie Schafer.  I am a Senior Economist at Econ One Research, Inc., an economic research and consulting firm with offices in Los Angeles; Sacramento; Berkeley; Houston; Memphis; Washington, D.C.; and New Delhi, India.  I specialize in the application of economic analysis and econometrics to litigation and consulting matters in antitrust, health care reimbursement, intellectual property valuation, and other commercial disputes.

2.    My academic credentials include a Master of Arts and Ph.D. in Managerial Science and Applied Economics from the University of Pennsylvania.  My doctoral coursework and dissertation were completed under the auspices of the Graduate Group in Managerial Science and Applied Economics, administered by Wharton Doctoral Programs at The Wharton School of Business.  My doctoral work concentrated on the fields within economics known as industrial organization, which involves the study of markets, competition, antitrust, and other forms of regulation, among other things, and applied empirical microeconomics.  Additionally, I hold a Master of Public Policy from the University of Maryland School of Public Policy (from which I received the Excellence in Scholarship Award, given each year to the best graduating student(s)),[1] and a Bachelor of Arts in Political Science, *cum laude*, from Tufts University.

3.    Prior to joining Econ One, I was a Managing Economist at Exponent, Inc. where I specialized in applied economics related to the estimation of damages in commercial litigation, the valuation of intellectual property rights, antitrust modeling, and business analytics to facilitate well-informed strategic decision making.  Previously, I was a Manager in the Advisory Services Practice of PricewaterhouseCoopers LLP and a Senior Evaluator at the U.S. Government Accountability Office.

4.    I have more than 16 years of economics-related research experience and more than 10 years of economic consulting experience.  I taught undergraduate and MBA-level

---

[1] Formerly, the University of Maryland School of Public Affairs.  The degree conferred to me was called a Master of Public Management.  However, the School now calls this degree a Master of Public Policy and confers a Master of Public Management to students with at least five years of public management and/or policy related experience.



Page 1

Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                    1/21/15

managerial microeconomics courses at The Wharton School of Business of the
University of Pennsylvania and an MBA-level microeconomics course at the
McDonough School of Business at Georgetown University. I am a member of the
American Economic Association and the American Bar Association, Antitrust,
Intellectual Property, and Health Law Sections.

5.      I have worked extensively on the analysis of markets and the assessment of
        allegations of anticompetitive conduct, including analyzing issues involving market
        power, market definition, and the competitive effects of firm behavior in matters
        involving high-performance swimwear, health insurance and provider reimbursement,
        vaccines, and industrial chemicals. A summary of my training, past experience, and
        prior testimony is set forth in **Exhibit 1**.

6.      Econ One is being compensated for the time I spend on this matter at my normal
        and customary rate of $375 per hour. Econ One also is being compensated for time
        spent by research staff on this project at their normal and customary rates. Neither
        Econ One nor my compensation in this case is dependent on the outcome of this
        case or the content of my opinion.

## II.     Introduction and Assignment

7.      I have been asked by counsel representing Hannah's Boutique, Inc. ("Hannah's" or
        "Plaintiff") to provide an expert opinion in the matter related to *Hannah's Boutique,
        Inc. v. Barbara Ann Surdej, Roy Surdej, and Jeffrey Surdej, D/B/A Peaches Boutique*.[2] In
        particular, I have been asked to examine, from an economic perspective, whether
        Peaches Boutique ("Peaches" or "Defendants") possesses or possessed market power
        in and around Chicago, IL in the market for the retail sale of special occasion prom
        and homecoming dresses manufactured by 16 high-end designers ("Designers"),[3]

---

[2] First Amended Complaint, *Hannah's Boutique, Inc., v. Barbara Ann Surdej, Roy Surdej, and Jeffrey Surdej d/b/a Peaches Boutique*, in the United States District Court for the Northern District of Illinois, Eastern Division, Case No.: 13-cv-2564, July 29, 2014 ("First Amended Complaint").

[3] Designers include Allure Bridals, Inc. ("Allure"); B.M.S. Designs ("Blush"); Maggie Sottero Designs, LLC d/b/a/ Flirt Prom ("Maggie Sottero" or "Flirt"); Formosa Sunrise Corporation d/b/a House of Wu ("House of Wu"); Jasz Couture; Jovani Fashion Ltd. ("Jovani"); La Femme Boutique, Inc. ("La Femme"); Creative Imports, LLC d/b/a Mac Duggal (Mac Duggal"); Mori Lee d/b/a Mori Lee ("Mori Lee"); Party Time Formals Inc. ("Party Time"), currently d/b/a Rachel Allen; Riva Designs, Inc. ("Riva Designs"); Scala



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                                    1/21/15

since at least 2009. My assignment included, but was not limited to, a review of the
analysis and opinions contained in the Declaration and deposition testimony of Dr.
Robert Kneuper submitted in this proceeding on behalf of Defendants.[4]

8.       According to the Plaintiff, the Defendants have acted "to control and monopolize
the women's prom and homecoming dress market in the geographic area comprised
of the following area codes: 630/331, 847/224, 708, 312/872, and 773. These area
codes include the City of Chicago, suburban Cook County, DuPage County, Lake
County, Kane County, and portions of Kendall County and Will County (the
"Chicago Market.")"[5] In this market, "[t]he demand for prom and homecoming
dresses [...] is dominated by the following high end designers: Allure, Blush, House
of Wu, Jasz Couture, Jovani, La Femme, MacDuggal [sic], Maggie Sottero, Mori Lee,
Party Time Formals, Riva Designs, Scala, Sherri Hill, Tarik Ediz, Terani, and Tony
Bowls (collectively, the "Designers")."[6]

9.       The Plaintiff alleges that "Peaches Boutique is the largest specialty boutique retailer of
prom and homecoming dresses in the Chicago Market,"[7] and has engaged in
"calculated, anticompetitive and predatory actions and conduct specifically aimed at
precluding its competition within the Chicago Market from obtaining dresses from
the Designers and, ultimately, foreclosing competition, controlling inventory and
raising prices, all in efforts to increase its profits."[8] The First Amended Complaint
continues, "Peaches Boutique's anticompetitive and predatory actions and conduct
consists of a relentless campaign of directing, demanding and coercing the Designers
not to sell its dresses to, or cancel orders from, other specialty boutiques within the

---

Eveningwear, Inc. ("Scala"); Sherri Hill, Inc. d/b/a Sherri Hill ("Sherri Hill"); Tarik Ediz; Countess
Corporation d/b/a Terani Couture ("Terani"); and Mon Cheri Bridals, LLC d/b/a Tony Bowls ("Mon
Cheri" or "Tony Bowls").

[4] Declaration of Dr. Robert Kneuper, October 8, 2014 ("Kneuper Declaration"); Deposition of Dr. Robert
Kneuper, December 13, 2014 ("Kneuper Deposition").

[5] First Amended Complaint at ¶ 1.

[6] First Amended Complaint at ¶ 6.

[7] First Amended Complaint at ¶ 9.

[8] First Amended Complaint at ¶ 9.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT 1/21/15

Chicago Market."[9] The result of Peaches actions has been "to reduce output in the Chicago Market by eliminating the ability of other specialty boutiques to obtain Designers' prom and homecoming dresses, thus reducing intrabrand competition and consumer options, and allowing Peaches Boutique to charge prices higher than its competition."[10]

10. As part of my investigation, I (or staff working under my direction) have considered a number of documents and other sources of information. The materials I reviewed include, but are not limited to, the following: (1) the First Amended Complaint ("Complaint") and other legal documents in this proceeding; (2) documents and data produced in discovery; (3) publicly available data and information regarding sales of prom and homecoming dresses; (4) academic publications regarding economic issues relevant to this proceeding; and (5) declarations and deposition testimony, including the declaration and supporting documentation of Dr. Kneuper. I have also conducted telephone interviews with the Plaintiff and third parties. A complete list of the materials considered is set forth in the footnotes and **Exhibit 2**.

## III. Summary of Conclusions

11. The relevant product market in the instant matter is high-end, special occasion prom and homecoming dresses sold in specialty boutiques from 16 specific designers. The 16 designers include: Allure, Blush, House of Wu, Jasz Couture, Jovani, La Femme, Mac Duggal, Flirt, Mori Lee, Party Time, Riva Designs, Scala, Sherri Hill, Tarik Ediz, Terani, and Tony Bowls (collectively, the "Designers").

12. The relevant geographic market for the sale of the Designers' prom and homecoming dresses includes the greater Chicago area covered by the area codes in which Peaches foreclosed its competition from receiving inputs. That geographic area can be approximated by area codes 630/331, 847/224, 708, 312/872, and 773 ("Plaintiff's relevant market" or "Chicago Market" or "local market"). It is consistent with 331 zip codes encompassing approximately 30 miles around Peaches' store in which Peaches also demanded that Designers not sell to its competition. The geographic

---

[9] First Amended Complaint at ¶ 10.

[10] First Amended Complaint at ¶ 14.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                           1/21/15

area is also consistent with the location of the specialty boutiques that Peaches specifically targeted and identified as its competition, and to which directed the Designers not to sell.

13.     When faced with entry by new and growing competition, rather than competing on the merits, Peaches demanded that the Designers not sell their dresses to its competition in the Chicago Market.  As the largest retailer of prom and homecoming dresses in the Chicago area, Peaches threatened the Designers that it would stop purchasing their dresses if the Designers sold to Peaches' competition. Through these efforts, Peaches maintained supracompetitive prices longer than it would have but for this anticompetitive behavior.

14.     At least between 2009 and 2012 ("the relevant time period"), Peaches possessed market power in the sale of Designer prom and homecoming dresses in the Chicago Market. There is direct evidence of Peaches' market power.  Peaches was able to profitably charge prices higher than the competitive level for in-season prom and homecoming dresses.  At least between 2009 and 2012, Peaches charged its in-store customers 15 percent higher prices than the Manufacturers' Suggested Retail Price ("MSRP") for Designer lines, the de facto competitive price in this industry given resale price maintenance.

- Dr. Kneuper is incorrect when he states in his Declaration that Peaches' pricing behavior is inconsistent with Plaintiff's allegations of monopolization. Dr. Kneuper argues there is no direct evidence because Peaches charged MSRP for some in-season dresses in 2012 and all in-season dresses in 2013. Even after admitting that Peaches charged MSRP+15 percent for decades (and through 2012), Dr. Kneuper erred by examining the wrong time period in his analysis.

- Furthermore, department stores and other brick-and-mortar retailers of prom and homecoming dresses did not constrain Peaches from supracompetitive pricing in the brick-and-mortar retail channel in the Chicago Market prior to 2013, as Dr. Kneuper contends.

15.     Peaches also competes in the internet retail channel for prom and homecoming dresses, where it does not have market power.  However, Peaches took material steps



CONFIDENTIAL – ATTORNEY WORK PRODUCT                                    1/21/15

on its branded website, peachesboutique.com, to protect its local market power by price discriminating between customers based on their geographic location.

- Other websites besides peachesboutique.com did not provide competitive discipline on Peaches' in-store pricing in the Chicago Market during the relevant time period.

- Peaches' branded website, peachesboutique.com, is now and has been tied intimately to the brick-and-mortar store for Chicago area customers. If Peaches had charged MSRP to all customers on peachesboutique.com, it likely would have prevented Peaches from exercising its market power in its brick-and-mortar store. However, in order to increase its internet sales outside of the Chicago area while still protecting supracompetitive prices in its brick-and-mortar store, Peaches engaged in third-degree price discrimination on peachesboutique.com ████████████████████████ (Third-degree) price discrimination is the practice of charging two or more groups of customers different prices for the same product.

- Beginning in 2009, Peaches posted prices ████████████████ ████████████████████████████████████████ ████████████████████████████████ Concurrently, Peaches charged MSRP for the same or similar dresses sold to all customers on its two other websites, promdressshop.com and dress4prom.com, which consumers did not know were affiliated with Peaches Boutique prior to 2013.

- As an economic matter, a firm must have market power in order to price discriminate.

16. Dr. Kneuper attempted to use indirect evidence to suggest that Peaches' market share in 2013 was too small for it to have market power. There are several errors and omissions in his analysis. They include the following:

- In one instance, Dr. Kneuper calculated market share based on retail square footage.

    - Dr. Kneuper's calculation is fatally flawed because the data he employed from Hoover's are unreliable. Dr. Kneuper produced the materials from Hoover's for the 55 stores he considered in his analysis



CONFIDENTIAL – ATTORNEY WORK PRODUCT                                          1/21/15

other than the parties in this matter. For Hannah's and Peaches, he used values for square feet consistent with those provided in testimony and/or discovery. However, Dr. Kneuper did not produce a Hoover's report for Peaches. In fact, Hoover's report for Peaches is grossly inaccurate; it reports the number of employees as 2 (they employ more than ▮ people), and, more importantly, lists its square footage as 4,000 (which is currently 20,000 and has never been 4,000 – Peaches' square footage was purported to be 4,400 prior to 2002-2003). Given these significant inaccuracies, the remaining Hoover's data Dr. Kneuper used for his analysis are unreliable.

- Even if the data were not unreliable, Dr. Kneuper's method is also flawed. Dr. Kneuper cites as his support for his method a submission to the FTC where market share of *wholesale distributors* is analyzed by estimating the capacity of those distributors' distribution centers. In other words, Dr. Kneuper points to a document that is completely silent on using capacity to measure market share in *retail* markets. *Wholesale* distribution capacity matters for competitive significance because larger distributors—i.e., those with larger physical distribution facilities—have significant advantages over smaller competitors because of significant economies of scale in wholesale distribution. This is very different from retail markets such as that for prom and homecoming dresses, where (for example), Dr. Kneuper claims there are "very low economies of scale." As a result, it is uneconomic for retailers to maintain excess capacity in order to respond rapidly to market opportunities in the same way wholesale distributors can.

- Dr. Kneuper's market share opinions based on square footage cannot be reconciled with any measure of market share based on revenue. As Peaches' own in-store transactional data shows, Peaches earned varying levels of sales per square foot for the same sized store. Between 2003 and 2005, when Peaches had an 8,400 square foot store, its sales per square foot ranged from ▮▮▮▮▮▮ dollars per square foot, a ▮ percent difference. Between 2011 and 2013, when Peaches had a 20,000 square foot store, its sales per square foot ranged from ▮▮▮ ▮▮▮ dollars per square foot, a ▮ percent difference.

- Finally, many of the boutiques identified by Dr. Kneuper as market participants sell other types of dresses in addition to prom and



CONFIDENTIAL – ATTORNEY WORK PRODUCT                                    1/21/15

> homecoming dresses, most notably bridal gowns. Peaches does not
> carry bridal gowns. Dr. Kneuper makes no adjustments to square feet
> in his analysis for this significant oversight.

- In another instance, Dr. Kneuper calculated market share based on the
  number of girls he believed attended a prom or homecoming dance in 2013.
  He admitted at his deposition that he used "intuition" to determine the
  number of girls who attend prom and homecoming dances for this calculation
  and provided no underlying economic or evidentiary basis for his decision.

17.   Peaches' anticompetitive behavior increased rivals' costs. Competitors foreclosed
      from selling Designer dresses were not able to carry the brands demanded by
      customers. They incurred increased search costs from finding alternative, potentially
      unknown and therefore more risky suppliers and in some cases, like Hannah's,
      resorted to purchasing Designer dresses from other retailers at higher costs in order
      to stay in business.

18.   I set forth the basis for these conclusions below. I understand that discovery is
      ongoing and that further evidence might emerge that is relevant to my analysis. I
      intend to consider additional evidence as it develops and may revise my conclusions
      or supplement their evidentiary basis as warranted by that evidence.

## IV.   Background

### A. Demand and Supply of Designer Prom and Homecoming Dresses

19.   Prom and homecoming dances are iconic events in American culture that "tend to
      take on a larger-than-life importance for many students[.]"[11] Prom (short for
      promenade), became tradition in the 1930's and 1940's as a celebration of maturity in
      the form of a parent-sanctioned party where adolescent boys and girls adorn
      themselves in tuxedos and evening gowns.[12] The event typically takes place in the
      spring, near the end of the school year. Culturally, it is a significant experience, "a

---

[11] Best, Amy L. *Prom Night: Youth, Schools, and Popular Culture.* New York: Routledge, 2000. ("Best"), p. 18.

[12] Graebner, William. *Coming of Age in Buffalo: Youth and Authority in the Postwar Era.* Philadelphia: Temple University Press, 1990, pp. 107, 112.



Expert Report of Leslie E. Schafer, Ph.D.

night in which to make memories that will be recollected alongside those of other important adolescent events; the first kiss, the first date, and the first day of high school."[13]  Similarly, homecoming is a tradition that takes place in the fall (near the commencement of the school year) most often centered around a football game as an event to promote school spirit and welcome back school alumni.  This celebration is typically accompanied by a formal or semi-formal dance.

20.     The formality and appeal to elegance that these two events promote to high school girls makes the buying of a dress one of the most important components.[14]  "The prom is a feminine space…where girls are expected to be heavily invested because they can use this space to solidify and display their feminine identities."[15]  When selecting a prom or homecoming dress, "[a] range of factors must be considered: not only must [a girl] set herself apart through what she wears at the prom, the dress must also be remembered in a particular way…How she remembers the prom is contingent on how she remembers the dress."[16]

### 1. Designers

21.     Given these powerful cultural indicators, over time a significant industry focused on dresses to be worn to prom and homecoming has developed to satisfy escalating demand.  Prom (and to some extent homecoming) is big business.[17]  Dress designers

---

[13] Best, p. 28.

[14] An article in 2012 in the newspaper *USA Today*, which comments on popular culture, said "Prom is the new wedding[.]"  And "With more adults marrying later, in many ways, prom has replaced weddings, debutante balls and coming-out parties as the formal occasion of a young adult's life, says Kit Yarrow, a marketing and psychology professor […]") ("Prom spending rises to average $1,078 this year, survey says", *USA Today*, April 12, 2012. ("*USA Today*")).

[15] Best, p. 35.

[16] Best, p. 48.

[17] See, e.g., Visa 2012 Prom Spending Survey, April 13, 2012. ("Despite continuing economic sluggishness, a new national survey by Visa Inc. shows that when it comes to high school proms, Americans appear to be willing to spend ever increasing amounts. American families who have teenagers will spend an average of $1,078 each on the prom, a 33.6% boost over the $807 spent in 2011." […] "Midwestern families will spend an average of $696") and Visa 2013 Prom Spending Survey ("Spending on the annual high school ritual of the prom continues to outpace inflation and grew for the second straight year, hitting an average of $1,139 per family in 2013" […] Midwestern families will spend an average of $722").



Expert Report of Leslie E. Schafer, Ph.D.

matter. Girls want to wear the dresses worn by their favorite stars on the red carpet and in magazines.[18] This season's *Seventeen Prom* Magazine cover features Maia Mitchell, a teen star from ABC Family's "The Fosters," wearing a Terani Couture ball gown.[19] *Teen Prom 2015* features ABC Family's "Pretty Little Liars" Sasha Pieterse on the cover in a prom dress by Rachel Allen.[20]

 

21    22

---

[18] See, e.g., *USA Today* ("Linda Korman, advertising director for *Seventeen Prom* and *Teen Prom*, says teen girls view prom as their "red-carpet moment" and are "heavily influenced" by celebrities who walk actual red carpets in designer gowns. "It's a rite of passage, and there's a legacy of how you look at your prom," she says. "Girls want to dress to impress."") See also, "Survey Shows Going To Prom Is Getting More Expensive Than Ever," *CBS New York*, April 13, 2012, available at http://newyork.cbslocal.com/2012/04/13/survey-shows-going-to-prom-is-getting-more-expensive-than-ever/ ("Reality television shows may be helping drive up prom costs. Some experts said teens watch those celebrities and want to mirror their red carpet moments."). Also, Interview with George Bigg, January 15, 2015 and Interview with Lamar and Evelyn Anderson, January 15, 2015. See also, PEACHES6064.

[19] *Seventeen Prom*, 2015 prom season, cover (See, SeventeenProm.pdf). This dress retails at Peaches for $570. (http://www.peachesboutique.com/Prom-Dress-Terani-151P0084.aspx) (last accessed 1/21/15).

[20] *Teen Prom 2015*, cover (See, TeenProm.pdf). The MSRP for this dress is $498. (*Teen Prom 2015*, p. 38).

[21] *Seventeen Prom*, 2015 prom season, cover (See, SeventeenProm.pdf).

[22] *Teen Prom 2015*, cover (See, TeenProm.pdf).



CONFIDENTIAL – ATTORNEY WORK PRODUCT                                              1/21/15

Both the Plaintiff and the Defendants in this matter have said that prom and homecoming events dominate their customer base.[23]

22.    Dresses worn to prom and homecoming are part of a differentiated product market.[24] As testified to by Mon Cheri CEO Stephen Lang: "Like in any business, you can buy budget all the way to couture."[25]  As explained by the Horizontal Merger Guidelines of the U.S. Department of Justice and the U.S. Federal Trade Commission, "[i]n differentiated product industries, some products can be very close substitutes and compete strongly with each other, while other products are more distant substitutes and compete less strongly.  For example, one high-end product may compete much more directly with another high-end product than with any low-end product."[26]  The Designers named in the First Amended Complaint produce high-end products that compete largely with other high-end products, with the Designers' dresses standing out especially as the styles demanded by consumers—in recent years, dresses with "bling" (e.g., embellishment, complex beadwork, colored crystals).[27]  The Designers named in this matter are generally considered the most sought after for specialty boutiques.[28]  For example, Stephen Lang testified that the top five designers of prom

---

[23] B. Surdej Deposition at 227:7-11, 241:16-243:2; J. Surdej Deposition at 50:21-51:16, 57:5-58:6; Susan Shaban Deposition at 182:20-183:1.

[24] "Differentiated Consumer Product Markets," Chapter III, *Market Definition in Antitrust: Theory and Case Studies*. The American Bar Association, Section of Antitrust Law, 2012 ("Market Definition in Antitrust"), p. 100:

> Products are said to be differentiated when each product sold is somewhat different from the other products available to consumers.  Using the approach outlined in the Horizontal Merger Guidelines, the question is whether there is a group of products that consumers view as close substitutes, with products outside the group being considered significantly more distant substitutes.

[25] Deposition of Stephen Lang, January 9, 2015 ("Lang Deposition") at 58:9-10.

[26] Horizontal Merger Guidelines, U.S. Department of Justice and the Federal Trade Commission, August 19, 2010, §§1.2. ("Merger Guidelines," or "Guidelines, or "HMG") at §6.1 (available at http://www.justice.gov/atr/public/guidelines/hmg-2010.html).

[27] Interview with George Bigg, January 15, 2015.  Mr. Lamar Anderson, former owner of Fit 2B Tied, called Designer dresses "flashier, louder, and more embellished." (Interview with Mr. Lamar Anderson, January 15, 2015).

[28] Matariyeh Declaration at ¶ 6, Anderson Declaration at ¶¶ 8, 13, Susan Shaban Deposition at 44:2-12.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                                    1/21/15

and homecoming dresses in terms of volume are Mon Cheri, La Femme, Jovani, Sherri Hill, and Mori Lee.[29]  Peaches prides itself on having "nearly every prom dress in every size and color from every prominent dress designer.  This is extremely important in the prom industry"[30] and its business is dominated by sales of these 16 Designers (Exhibits 3 -5).  When referring to the Designers, Susan Shaban testified "you have to understand there's designers you have to have in this business to be able to attract customers to your store. […] If you have the top designers, they come to your store.  They may see the other designers, but mostly they're looking for those top designers, that's what they want, that's what they're looking for."[31]

23.    Ms. Shaban testified also that the former owner of Sparkles explained to her that carrying dresses by the high-end designers (i.e., the Designers in this matter) were crucial to keeping a prom and homecoming dress boutique open.  Ms. Shaban recounts in her deposition:

> I can only say what she mentioned.  Because when I seen [sic] her in the meeting, she had explained that because they couldn't carry the designers they needed to carry and continue to do business the way they expected to do business, they couldn't handle trying to keep just bringing in these other designers to keep trying to make some sort of profit because -- how can I say -- when you have designer dresses by certain designers, you can -- those dresses are going to retail anywhere on an average of $400 to $800, $900, average is probably let's say $600 a dress, okay. So she -- she -- she knew just by having these lower-end designers that she wasn't being able to keep turning a profit enough to keep running her business.[32]

---

[29] Lang Deposition at 27-28.

[30] First Amended Complaint, Ex. 1.

[31] Susan Shaban Deposition at 44:2-12.  Also, Interview with Ameira Matariyeh (former owner of International House of Couture ("IHOC"), January 14, 2015.

[32] Susan Shaban Deposition at 51:5-20.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                      1/21/15

24.    When describing competition between boutiques, Barbara Surdej explained that what matters is which designers and lines the store carries. She said: "It's just that if they don't sell the same dresses we sell, if they sell dresses but they're not the same as what we are, we're not in competition with them."[33] When asked if another boutique was in competition with Peaches, Ms. Surdej stated: "I can't say because I didn't know what they were carrying. Because if they're carrying a dress for two hundred or a line that I don't carry, we wouldn't be competing for the same – Do you understand what I'm saying?"[34] When asked if it would be fair to say there is a different market with regard to the high-end dress designers, Ms. Surdej replied "Sometimes, yes"[35] and when asked if they are willing to pay for it, she said "In some instances they are. But it all depends on what they can afford."[36] On average, customers are willing to pay higher prices for Designer dresses, all else equal.[37]

25.    This understanding that customers demand the styles worn by the stars is supported further by the way many of the Designers market themselves on their websites—as "dressing the stars." Sherri Hill, for example, touts on its website that celebrities have worn her dresses on the red carpet. "[Sherri] Hill has dressed many for red carpet moments and performances including Selena Gomez, Ariana Grande, Bella Thorne, Carrie Underwood, Paris Hilton, Miranda Lambert, Carmen Electra and Sadie Robertson. She has become one of the go-to designers for young Hollywood and the success is steadily growing."[38] Designer La Femme also touts its luxury appeal, "La Femme fashions have walked the red carpet on several celebrities, including singers Taylor Swift and Jordan Sparks, screen actress Hayden Panettiere, Glee actress

---

[33] B. Surdej Deposition at 48:8-11.

[34] B. Surdej Deposition at 48:24-49:4.

[35] B. Surdej Deposition at 49:13.

[36] B. Surdej Deposition at 50:6-7.

[37] Declaration of George Bigg, January 19, 2015 ("G. Bigg Declaration"), Declaration of Marla Bigg, January 19, 2015 ("M. Bigg Declaration"), Declaration of Lamar Anderson, January 19, 2015 ("Anderson Declaration"), Declaration of Ameira Matariyeh, January 19, 2015 ("Matariyeh Declaration").

[38] http://www.sherrihill.com/brand/about-sherri-hill/



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                    1/21/15

Heather Morris, and teen TV star Victoria Justice."[39]  In addition, Mac Duggal
describes the branding of its dresses as follows:

> Mac Duggal's designs are spotlighted, worn and coveted by fashionistas
> and trendsetters alike.  From adorning actresses Gwyneth Paltrow,
> Jennifer Beal and Carmen Electra to headlining the stage on Carrie
> Underwood, Tina Turner, Bette Midler and Aretha Franklin, from
> guest segments on Jersey Couture and My Fair Wedding to
> appearances on the big screen in Country Strong, Titanic and Oceans
> 11 and crowning achievements on Miss America and Miss USA -- the
> brand has gained significant media prominence and celebrity buzz.
> Designer Mac Duggal won the DIVA 1998 Fashion Award for
> Designer of The Year in the Prom/Pageant category and has been the
> featured brand on the covers of Teen Prom, Pageantry Magazine and
> Seventeen Magazine.[40]

26.    These Designers are branded, described, viewed, and sold as high-end with a luxury
       distinction.  Most of the Designers were either featured or advertised in the prom-
       focused magazines described above.[41]  This distinction can be seen through the lens
       of Peaches' transactional data.  A Seventeen Magazine poll in 2012 found the typical
       price for a prom dress to be $231.[42]  As seen in Exhibit 3, the average (median) retail
       price for Designer dresses sold by Peaches in its store in 2012 was ████████  The
       average (median) retail price for non-Designer dresses sold by Peaches in 2012 in its
       store was ████████ a statistically significant difference.[43]

---

[39] http://www.lafemmefashion.com/about-us

[40] https://www.macduggal.com/Page/About-Mac-Duggal

[41] See, e.g., TeenProm.pdf and SeventeenProm.pdf.

[42] See also, "Survey Shows Going To Prom Is Getting More Expensive Than Ever," *CBS New York*, April 13,
2012, available at http://newyork.cbslocal.com/2012/04/13/survey-shows-going-to-prom-is-getting-more-
expensive-than-ever/  Dr. Kneuper cited also to a website from 2011 which said that the average prom dress
was $400.  See "The $4 Billion Prom Industry: By the Numbers," The Week , May 26, 2011,
http://theweek.com/article/index/215703/the-4-billion-prom-industry-by-the-numbers.

[43] Peaches transactional data are not normally distributed.  Therefore, I have used a non-parametric statistical
method called the Wilcoxon rank-sum (functionally equivalent to the Mann-Whitney U test) to test the



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                                    1/21/15

## 2. Retail Distribution

27.   Consumers can purchase dresses to be worn to prom and homecoming from two
      retail channels: brick-and-mortar establishments such as specialty boutiques,
      department stores, and retail chains, as well as on the internet. Each offers a different
      experience to suit the preferences of the customers.

28.   Retail women's clothing stores (dress shops and bridal shops, SIC 5621/NAICS
      44812) are brick-and-mortar "[e]stablishments primarily engaged in the retail sale of a
      general line of women's ready-to-wear clothing. This industry also includes
      establishments primarily engaged in the specialized retail sale of women's coats, suits,
      and dresses."[44]  Retail women's clothing stores typically cater to niche markets.
      Special occasion dresses sold in such boutiques are often purchased by customers
      with a specific special event in mind, such as a school dance (e.g., prom or
      homecoming), quinceanera, pageant competition, cotillion, bar or bat mitzvah, or
      other social events.  The retail dress shops relevant for the instant matter sell mostly
      non-bridal, high-end, formal dresses for special occasions, and predominantly focus

---

hypothesis that two independent samples (i.e., Designer versus non-Designer prices) are from populations
with the same distribution. This test is statistically significant at better than a one percent level. Technically,
nonparametric refers to statistical procedures "which hold under relatively mild assumptions regarding the
underlying populations from which the data are obtained." (Myles Hollander and Douglas A. Wolfe,
*Nonparametric Statistical Methods*, 2nd Ed., Canada, John Wiley & Sons, Inc., 1999 ("Hollander and Wolfe"), pp.
106-123. In practice, when a dataset or datasets are not normally distributed, one cannot use standard
parametric tests such as t-tests, for example, to analyze them because those tests have properties which
require that the data are normally distributed. Non-parametric tests are known as "distribution free," i.e., they
have little to no assumptions about the distribution of the underlying data. They were designed to be used
whether the data are normally distributed or not. The null hypothesis of the Mann-Whitney U test is that the
population relative frequency distributions for the two groups are identical. In a two-tailed test, the
alternative hypothesis is that the two populations' relative frequency distributions are not identical. In a one-
tailed test, the alternative hypothesis is that the relative frequency distribution for one of the two groups is
shifted to the right (or left) of the other (i.e., higher or lower). See, e.g., Dennis D. Wackerly, William
Mendenhall III, and Richard L. Schaeffer *Mathematical Statistics with Applications*, 5th Ed., U.S.A., Wadsworth
Publishing Company, 1996, pp. 663-669. See also, Hollander and Wolfe, pp. 106-123. See also, Exhibits 4
and 5. (The average (median) price for Designer dresses sold on Peaches' branded website was ███████
and on its non-branded websites was ███████).

[44]  (See, e.g., http://siccode.com/en/siccodes/5621/womens-clothing-store.)  This retail trade industry group
is known also by 44812 "Women's Clothing Stores."  See
http://www.census.gov/econ/isp/sampler.php?naicscode=44812&naicslevel=5. See also,
http://www.naicscode.com/search/MoreNAICSDetail.asp?N=448120 ("These establishments may provide
basic alterations, such as hemming, taking in or letting out seams, or lengthening or shortening sleeves.)



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                                    1/21/15

on the Designers' dresses made for prom and homecoming ("specialty boutiques" or "boutiques"). These boutiques are typically small in size[45] and are often found in neighborhood shopping plazas, strip malls, and regional shopping malls.[46] Both the Plaintiff and the Defendants are specialty boutiques, each with one location. Specialty boutiques are generally considered ideal environments for selling prom and homecoming dresses because they enable the customer to browse dresses in-person, touch the material, and try dresses on to ensure proper fit and have the dress expertly altered.[47] Girls want to feel the fabric, see the colors, and try on the dresses to make sure they get the right fit.[48]

29.    In any physical market, transportation costs play a large role in consumers' decisions to purchase a product. As a result, retail shops must not only be able to compete on the price and quality of their goods, but also compete on location. To a consumer shopping in a differentiated product market, having a store located in close proximity is valuable because it reduces the associated transportation cost to search for, purchase, and bring home the product they wish to consume. Consumers who want a brick-and-mortar shopping experience will prefer (all things equal) to shop at a closer retailer.

30.    Online shoppers have a different set of economic preferences. Some specialty boutiques, retail chains, and department stores have websites in addition to brick-and-mortar retail locations. Peaches, for example, has an internet business.[49] Some

---

[45] See, e.g., PEACHES0000416, 0001779-0001781, ("In an e-mail to designers about new stores opening in 2012 says that these stores are "roughly 800 square feet" and refers to their "small size").

[46] Interview with Lamar and Evelyn Anderson, January 15, 2015, Interview with George Bigg, January 15, 2015.

[47] Susan Shaban Deposition at 154:10-24, J. Surdej Deposition at 162:8-16, Interview with Lamar and Evelyn Anderson, January 15, 2015.

[48] Interview with Lamar Anderson and Evelyn Anderson, January 15, 2015.

[49] See, e.g., JOVANI 16 (on July 22, 2013, Peaches sent a letter to Jovani regarding an advertising opportunity which included the following: "Peaches Boutique has been dominating the online world (www.peachesboutique.com) since it was successfully launched in early 2006. With over 80 million page views and over 6 million unique visits per calendar year, www.peachesboutique.com has been getting tremendous exposure all over the world. Not only is it bringing us new customers from around the world, it is bringing new clients into the store every single day.")



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                                              1/21/15

boutiques use their websites as a marketing tool to get the girls into the store. Hannah's, for example, sold only ██ dresses on its website in 2013.[50]  Some websites have no brick-and-mortar retail channel, such as newyorkdress.com.[51]

31.     Typically, the market for garments sold in retail women's clothing stores in urban areas such as Chicago, IL is competitive, with relatively low barriers to entry when there is no anticompetitive exclusionary conduct present.[52]  Requirements to enter include things like the need to lease or buy retail space, possibly invest in custom improvements to that retail space, obtain inventory, and file any necessary state or local paperwork.  As an economic matter, it would be difficult to compete in a brick-and-mortar retail channel for special occasion dresses such as for prom and homecoming if one was charging prices higher than a competitive level without some sort of exclusionary behavior.  When a firm is realizing supranormal profits in a market with low barriers to entry, it is expected that competitors will enter in an attempt to seize some of those profits.[53]  As Stephen Lang testified, there is nothing unique about the prom and homecoming industry in the Chicago metropolitan area as opposed to anyplace else in the country.[54]  Mr. Lang also stated that stores selling at more than MSRP is not common, and that it may occur "but I tend to think the norm is more that consumers are pretty smart about what things cost …"[55]  He stated further "there are people that tell me that they can get a premium on our price because there's not as much competition in the area but I think it's more the

---

[50] Hannah's developed its website in late 2012.  See HANNAH'S 1791.

[51] See http://www.newyorkdress.com/Policies/FAQ.html (The website does state it has a "sister boutique at Oz Boutique, 70-09 Austin Street Forest Hills, NY 11375, (718) 544-1087).

[52] As Dr. Kneuper notes in his Declaration, "IBIS characterizes this industry as being highly fragmented with "low" barriers to entry."  When Dr. Kneuper says "this," IBIS is referring to clothing boutiques, which includes stores selling jeans, tops, and suits in addition to special occasion wear.  (See Kneuper Declaration at 97 and IBIS World Industry Report OD5616, Clothing Boutiques in the U.S., December 2013, pp.18-21). For a discussion of entry barriers, see "Entry Barriers," Chapter VII, *Market Power Handbook: Competition Law and Economic Foundations*, 2nd Ed., The American Bar Association, Section of Antitrust Law, 2012, pp. 163-183.

[53] *See, e.g.*, Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 5th Ed., Upper Saddle River, N.J.: Prentice Hall, 2001, pp. 273.

[54] Lang Deposition at 150:21-151:10.

[55] Lang Deposition at 81:11-18.



Expert Report of Leslie E. Schafer, Ph.D.

exception than the rule.  If you have someone in Montana who's the only store in town…" and that "it really is more if you're in isolated areas where you don't have a lot of choice.  I would think in a big city it's not going to happen, there's too much competition."[56]

32.  For specialty boutiques which sell prom and homecoming dresses, obtaining inventory is not trivial and something which sets prom and homecoming boutiques apart from stores which sell ready-to-wear garments.  One of the most critical components of operating a successful prom and homecoming boutique is the ability to obtain dresses by the designers which are demanded by customers.[57]  I understand that in the Chicago area it is an absolute necessity to carry a variety of lines from the Designers in order to even get customers into the store.[58]  Furthermore, for prom and homecoming dresses in particular, tastes and preferences for high-fashion clothing designs evolve swiftly as styles, colors, and materials move in and out of popularity from season to season.[59]  Out-of-season dresses remaining in inventory are often sold at a discount (or even donated to charity) to make room for the next season's dress lines.[60]

33.  It is common for specialty dress boutique owners to attend seasonal trade shows, which provide a myriad of services to market participants along the supply chain.[61] For example, both Peaches and Hannah's have attended annual prom and homecoming dress markets in Chicago ("National Bridal Market Chicago"[62]) and

---

[56] Lang Deposition at 81:24-82:5 and 82:21-24.

[57] See, e.g., First Amended Complaint, Ex. 1 ("We have nearly every prom dress in every size and color from every prominent dress designer.  This is extremely important in the prom industry because it has such a short selling season.").

[58] Interview with Ameira Matariyeh, January 14, 2015; Interview with Lamar and Evelyn Anderson, January 15, 2015; Declaration of Ameira Matariyeh; Declaration of Lamar Anderson.

[59] Deposition of Susan Shaban at 214:16-215:6; Generally, C. Kingsmill Deposition at 52:5-53:6; Interview with Marla Bigg, January 17, 2015.

[60] See, e.g., R. Surdej Declaration at ¶ 17.

[61] See, e.g., Interviews/Declarations of George and Marla Bigg; Plaintiff's Amended and Supp. Answers to Defendants' First Set of Int. Related to Market Power No. 3; Deposition of L. King at 40:3-41:9, 122:13-21.

[62] Although called a bridal market, this is a large tradeshow which includes prom and homecoming dresses in



CONFIDENTIAL – ATTORNEY WORK PRODUCT                                                    1/21/15

Atlanta ("Atlanta Americas Mart Prom Market").[63] Trade shows, or "market," enable
designers to exhibit new dress lines and the next season's dresses before a large
audience of retailers. The value of these shows to boutique owners is created not
only as a means to discover new trends (through attending designer showcases and
talking with suppliers in display booths), but more importantly they enable boutique
owners to physically inspect available merchandise for the next selling season, speak
with various designers, and place orders for new dresses. For a boutique owner,
market participation can be important to the success of his or her business.[64] There
is a significant lag between when a boutique owner orders dresses from designers and
eventually sells them in the store. The August Atlanta Market is the biggest in the
country and the prime time to order for the next prom season, which begins the next
January (Chicago Bridal Market is in September).[65] These orders and sales are risky
investments up-front as designers rarely allow returns of unsold inventory.[66]

### 3. Retail Pricing

34. In most cases, the industry standard MSRP for special occasion dresses is keystone,
or a 100 percent mark-up over wholesale cost (i.e., two times wholesale cost).[67]
House of Wu's MSRP is ███████████████[68] Dress designers request that authorized
retailers maintain at least a keystone resale price on dresses during the "busy" season

---

Chicago, IL. (See, e.g., Susan Shaban Deposition at 323:1-15).

[63] I understand that Peaches attends both each year, while Hannah's has attended Chicago Market each year
since 2011, has attended Atlanta since 2012, and attended the Dallas Market in 2014. Susan Shaban
Deposition at 78, R. Surdej Deposition at 295, Interview with Susan Shaban, December 15, 2014.

[64] Finell, Dorothy. *The Specialty Shop.* New York: AMACOM, 2007, p. 14.

[65] Interview with Ameira Matariyeh, January 14, 2015

[66] Lang Declaration at ¶ 13.

[67] See, e.g., J. Surdej Deposition at 83:16-84:12; BMS4; Declaration of M. Montenegro at ¶ 11; Deposition of
S. Simon at 64:2-5; Mr. George Bigg, a sales representative for, at various times during the past 15 years, La
Femme, Mon Cheri, Riva Designs, Scala, and Terani, in Illinois, Iowa, Indiana, Michigan, Minnesota, Ohio,
and Wisconsin, said that the prom and homecoming business is primarily keystone, unless a store is in so
rural an area that there is not likely to be a second store (Interview with George Bigg, January 15, 2015).

[68] J. Surdej Deposition at 94:6-7.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                                     1/21/15

for prom and homecoming.[69]  Some designers require a somewhat higher mark-up
than 2x wholesale cost.  For example, a designer may require a mark-up higher than
2x wholesale for limited edition dresses.[70]

35.  There exists also a manufacturer's suggested retail price specifically for the internet
("MSIRP").  Starting in late August of 2012, Terani required a ▮▮ mark-up on
internet sales.[71]  Jovani required a ▮▮ wholesale mark-up for internet sales starting
no later than September 26, 2013[72] and now requires a ▮▮ wholesale MSIRP for
2015.[73]  When Peaches held a private meeting with Designers at the 2012 Atlanta
Market, one of the items on the agenda was for designers to have a higher MSIRP
than MSRP to protect brick-and-mortar profits.[74]  Stephen Lang informed the
participants that such a policy would be illegal due to differential pricing,[75] and
followed up thereafter with an e-mail to the Designers on August 24, 2012 stating
that "If there were differing prices we would be in violation of the Clayton Act as

---

[69] See, e.g., BMS4.  The prom season is approximately January through May (See, Deposition of Roy Surdej, May 2, 2014 ("R. Surdej Deposition") at 91.)

[70] See, e.g., JOVANI 216 ("For the first time ever we are doing a limited edition dress collection of 16 styles that we will be offering ONLY to stores who have bought over 125 dresses.  […] We are putting an msrp on each and every dress with a ▮▮ mark-up.")

[71] A private meeting was held by Peaches with many of the Designers at the 2012 Atlanta Market, where Roy Surdej of Peaches proposed higher pricing for internet sales to protect brick-and-mortar profit margins.  See Deposition of S. Lang at 86:3-4, 8-13; PEACHES0002883; PEACHES0003022-0003023.

Shortly thereafter, Terani sent an email requiring that all online pricing, the MSIRP, for Terani prom dresses be priced at a ▮▮ markup. (HANNAHFS1411.) This is the first time that Terani implemented this online pricing policy. (Susan Shaban Deposition, 539:13-540:3)  Further, PEACHES0000394 is a Terani "Line Sheet" for homecoming dresses, although the relevant dates for this Terani price list are unclear, it shows a ▮▮ MSRP. In between the end of August and October of 2012, Jovani sent a packet out to its authorized retailers implementing and imposing a ▮▮ MSIRP markup for the first time. (Susan Shaban Deposition at 540:4-23.)  See also, R. Surdej Supp. Deposition at 73; JOVANI 216; Susan Shaban Deposition at 592-593, 611-612; J. Surdej Deposition at 171; B. Surdej Deposition at 306-310; and PEACHES0000394.

[72] PEACHES0006582.

[73] Simon Deposition at 102:11-13.  See also, PEACHES0006064.

[74] JOVANI 55 ("This will protect brick and mortar establishments that need that profit margin to survive in today's small business economy.")

[75] Lang Deposition at 80-81, 85-86.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT        1/21/15

suspected."[76] Sheri Simon admitted that the higher internet pricing policy was intended to give the sales to the brick-and-mortar stores and make it harder for online retailers to sell Jovani dresses.[77]

36. By default, MSRP is perceived by most retailers as the effective competitive price.[78] Authorized industry participants generally accepted MSRP as the competitive price during the period relevant for this matter. The court has found minimum resale prices can have procompetitive justifications in certain circumstances.[79]

37. As seen in Exhibits 6 and 7, Peaches and Hannah's, in-store average prices during the 2012 prom season were ▇▇ and ▇▇ respectively.[80] Between 2011 and 2013, prom dresses sold in-store by the two parties ranged in price from ▇▇ to ▇▇

## B. The Parties

### 1. Hannah's

38. The Plaintiff, Hannah's Boutique, is a women's specialty boutique which focuses on the sale of prom and homecoming dresses. After starting her prom and homecoming dress business in her home in early February 2009, Hannah's opened a 1,000 square foot boutique with three dressing rooms in Chicago Ridge, IL in May 2009.[81] Jovani

---

[76] PEACHES0001830.

[77] Simon Deposition at 102-103.

[78] Kneuper Declaration at ¶ 78; Interview with Ameira Matariyeh, January 15, 2015; Interview with Susan Shaban, December 16, 2014 ("Shaban Interview"); Interview with George Bigg, January 15, 2015; Interview with Lamar and Evelyn Anderson, January 15, 2015.

[79] See "Procompetitive Effects of RPM" in Resale Pricing Issues, Chapter II: *Antitrust law and Economics of Product Distribution*, The American Bar Association, Section of Antitrust Law, 2012, p. 58; See also, *Leegin*, 127 S.Ct. at 2716. (Leegin Creative Leather Products, Inc. v. PSKS, Inc., 127 S.Ct. 2705 (2007), "where the Supreme Court declared that vertical price restraints are not per se illegal anymore but instead are evaluated under the rule of reason, overruling *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911)."

[80] Analysis of Hannah's transactional data in this report are limited to January-May for 2012 and 2013. See Appendix I.

[81] Susan Shaban Deposition at 194. Hannah's Boutique incorporated in October 2009.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                               1/21/15

was one of Hannah's first suppliers during this time frame.[82]  After early success, Hannah's increased its square footage at the Chicago Ridge store in 2011 by expanding into the 700 square foot store next door. [83] In April 2012, Hannah's moved to a 2,600 square foot location with five dressing rooms in Palos Park, IL.[84] Between 2010 and 2011, Hannah's gross sales grew by █ percent, from █████ to █████ from 2011 to 2012, Hannah's gross sales grew by █ percent, to █████; and from 2012 to 2013, Hannah's gross sales grew by █ percent, to █████ [85]

39.  The ability to stock Designer dresses has been critical to Hannah's business success. Between 2010 and 2012, Hannah's was an authorized retailer for several Designer brands including House of Wu, Jovani, Mon Cheri, Party Time, Riva Designs, Scala, Tarik Ediz, and Terani.[86]  During the 2012 prom season, Hannah's sold █ dresses in total for about █████ in revenue of which █ percent (and █ percent of dresses) was from the sale of dresses by Designers. (Exhibit 7)  In 2013, Hannah's sold █ dresses during prom seasons for █████ of which █ percent (and █ percent of dresses) was from the sale of dresses by Designers. (Exhibit 7)

### 2. Peaches

40.  The Defendant, Peaches Boutique, is a women's specialty boutique which specializes in the sale of prom and homecoming dresses.  Peaches started its business in 1985 first by selling women's ready-to-wear clothing in a 2,400 square foot retail boutique in Chicago, IL.[87]  As Roy Surdej described, women's ready-to-wear includes clothing

---

[82] Susan Shaban Deposition at 226:18-24.

[83] Susan Shaban Deposition at 199-200.

[84] Plaintiff's Amended and Supplemental Answers and Objections to Defendant's Second Set of Interrogatories to Plaintiff, No. 10.  In deposition, Ms. Shaban recalls the square footage as 2,800 (Susan Shaban Deposition at 210).  Due to both initial success and dissatisfaction with the Chicago Ridge location. Ms. Shaban has testified that the parking at the Chicago Ridge store was insufficient.  (Susan Shaban Deposition at 201).

[85] HANNAH'S 1816-1857, 4085-4096, 4203-4214, 10714.

[87] Interview with Susan Shaban, December 15, 2014; Plaintiff's Amended and Supplemental Answer to Defendants' First Set of Int. Related to Market Power No. 3.

[87] R. Surdej Declaration, at ¶ 2.  See also, www.peachesboutique.com ("women's designer clothing").



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                              1/21/15

such as "sweaters, jeans, pants, suits […]".[88]  In the mid-1990's, Peaches narrowed its
offerings to "'color' special occasion dresses, including prom and homecoming
dresses[.]"[89]  In the 2000's, Peaches expanded in size significantly: to 4,400 square
feet in 2002, to 8,400 square feet in 2003, and eventually expanded to 20,000 square
feet (its current size) by January of 2011.[90]  Today, Peaches primarily sells dresses that
young women wear to prom and homecoming dances.[91]  Peaches stocks over 20,000
dresses; dedicating 90 percent of the floor space in its brick-and-mortar store to prom
dresses.[92]  Peaches is so large that is describes itself as follows: "Peaches is the largest
Prom, Pageant, and Formal wear store in the U.S."[93] and "We like to think of
ourselves as a tremendous retail store that warehouses all styles, all sizes, and all
colors."[94]  Sheri Simon, a national sales representative for Jovani, testified that ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[96] She also called
Peaches "the number one prom retailer"[97] and testified that Peaches is the largest

---

[88] IBIS World Industry Report OD5616, Clothing Boutiques in the US, R. Surdej Supp. Deposition at 8:8-17
("Q. In Paragraph 2 [of your Declaration] you reference the term "ready-to-wear apparel." And I just want to
make sure that we're clear on what you mean by ready to wear.  A. It's women's ready-to-wear clothes, so at
that time it was sweaters, jeans, pants, suits, that kind of stuff. Q. So would it be fair to characterize it as
every-day apparel versus special occasion apparel? A. Yeah. I mean, it would be.").

[89] Today, Peaches focuses on prom and homecoming dresses.  R. Surdej Declaration at ¶ 4.

[90] First Amended Complaint, Exhibit 1.  R. Surdej Declaration at ¶ 5 and Dr. Kneuper Declaration at ¶ 20
reports the square footage as 25,000.

[91] R. Surdej Declaration at ¶ 4.

[92] First Amended Complaint, Exhibit 1.

[93] First Amended Complaint, Exhibit 2.

[94] First Amended Complaint, Exhibit 1.

[95] Simon Deposition at 34:11-16; 119:15-22; 147.

[96] Simon Deposition at 42:14-43:2, 120:19-22.

[97] PEACHES0000654.



CONFIDENTIAL – ATTORNEY WORK PRODUCT                                      1/21/15

specialty boutique in the Chicago market.[98] Stephen Lang agreed that ███████████
████████████████████████████████████████████████████████████[99]

41.  In 2006 Peaches expanded its business model by selling dresses online at
     www.peachesboutique.com.[100]  In 2009, the company purchased a second website
     (www.promdressshop.com) and in 2011 started a third (www.dress4prom.com), with
     the latter ceasing operation in June 2014.[101]  Peaches' web presence is also large; Sheri
     Simon noted that Jovani only allows stores that buy more than 1,000 dresses at
     market to be online authorized retailers of Jovani dresses.[102]  Presently, Jovani only
     lists six websites authorized to sell Jovani dresses, of which two are owned by
     Peaches:  www.peachesboutique.com, and www.promdressshop.com.[103]  In fact,
     Jovani typically allows a store to include only one website.[104]

42.  I understand that, while known by dress designers, the affiliation of "promdressshop"
     and "dress4prom" to Peaches Boutique was not disclosed to customers or the public
     prior to the filing of the Complaint in this matter.[105]  As these two non-branded sites

---

[98] Simon Deposition at 147:13-19.

[99] Lang Deposition at 121:11-14. George Bigg, who, at various times over the past 15 years, has been a sales
representative for Designers including La Femme, Mon Cheri, Riva Designs, Scala, and Terani, said that
Peaches is the largest specialty boutique for prom and homecoming dresses in the Chicago area. Interview of
George Bigg, January 15, 2015.

[100] R. Surdej Declaration at ¶ 7.

[101] R. Surdej Declaration at ¶ 7.

[102] Simon Deposition at 47:3-11.  A store which sells at least 1,000 dresses is considered a "Jovani Club
Member."  In order to be a Jovani Club Member on Jovani's web page you must also have a brick-and-mortar
store. (Simon Deposition at 48:23-25).

[103] http://www.jovani.com/online-retailers.  Last accessed 1/8/15.  See also, Simon Deposition at 51:5-14.

[104] PEACHES0001875.

[105] See PEACHES0000271; PEACHES0002442-2466, PEACHES0002468-2473; Deposition of J. Surdej at
136-137:

    "Let's start first with PromDressShop.  That's a site that was acquired in 2009, correct? [...]
    A. Yes. Q. Where -- since 2009 through today's date, where has that website been operated
    from? What physical operation?  THE WITNESS: 5915 South Archer Avenue."

at 137:



charged MSRP during the relevant time period, the sites were intentionally made to appear independent from Peaches Boutique to protect "brick and mortar establishment and pricing."[106]  In order to accommodate its internet sales and provide an anonymous return address for the non-branded websites, Peaches used a warehouse in Wilmington, IL owned by Roy Surdej.[107]  However, I understand that

---

> Q. Okay. You're aware that at some point Peaches has represented that PromDressShop is located at 503 North Main Street in Wilmington? A. Not located, but we use that as an address for mail or returns if they did occur. Q. Okay. What was the purpose of using that address versus the Archer address? A. Well, it had a different URL, different domain name, so to have it sent to, you know, Peaches' brick and mortar could be confusing, or, you know -- so we just want to have a separate address, you know, it just made more sense if it's a different domain name.

at 138-139:

> Q. Okay. The same questions as to Dress4Prom. At one time that -- it was being told to designers to use 503 North Main Street as its address, correct?  […] A. Yes.

[106] PEACHES0002450.  In an e-mail to the designer Maggie Sottero (Flirt), Peaches makes the following request:

> Also as you may or may not know Peaches Boutique owns 2 other websites, www.promdressshop.com as well as www.dress4prom.com.  We would like for these websites to be added to your store locator so that we can send customers to your site to verify these are authentic websites authorized to sell your dresses.  However we do not want these websites listed under Peaches Boutique as they are not part of the brick and mortar establishment and pricing.

See also, PEACHES0000271 ("yes, prom dressshop.com is fully part of peaches boutique, b/c peaches is 15% above keystone and prom shop is keystone if local chicago [sic] customers knew prom shop was our website we could loose [sic] our entire business brick and mortaer. [sic]")

See also, J. Surdej Deposition at 139:

> Q. Is that for the same purpose, as for mailings? A. Mailings and to have a different address than Peaches Boutique. Q. And that was just to prevent customers from being confused? A. Yeah, I mean, I don't really know, to be honest, you know, if -- what the -- why we thought it was important, you know. I mean, now we look back at it, it didn't matter. But, yeah, it was for mailings, it was for returns, you know. You know, we had different pricing, you know. We wanted them to be two different entities to some extent, you know, so we didn't want Peaches' address to be confusing that, you know, wait a minute, you know -- Q. And would that be so customers didn't know that these websites were affiliated with Peaches? A. To some extent, yeah.

[107] See PEACHES0002450, JOVANI 23-25, and R. Surdej Deposition at 193.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT    1/21/15

these websites operated side-by-side with the brick-and-mortar store (at 5915 and 5917 S. Archer Ave).[108]  On May 5, 2014, Peaches finally requested that the store locators use its "proper brick and mortar address as the website is owned and operated by http://www.peachesboutique.com."[109]

43.     Income tax returns produced in this matter report that Peaches earned about ███ in sales in its brick-and-mortar store in 2003[110], with sales increasing to about ███████[111] from in-store and internet sales by 2013.[112]  As seen in Exhibits 3-5, transactional data produced from "The Peach" (Peaches point-of-sale system starting in January 2011)[113]  shows that in-store sales of special occasion dresses totaled ███████ in 2011, ██████████ in 2012, and ██████████ in 2013; and sales on www.peachesboutique.com increased from ██████████ in 2011 to ██████████ in 2012 and then increased in 2013 to ██████████  However, sales on www.promdresshop.com and www.dress4prom.com decreased from ██████████ in 2011 to ██████████ in 2012 and then decreased in 2013 to ██████████[114]

44.     As Peaches advertises, "[w]e have nearly every prom dress in every size and color from every prominent dress designer."[115]  The set of designers carried by Peaches has

---

[108] J. Surdej Deposition at 136-140.

[109] PEACHES0006598-PEACHES0006621.

[110] PEACHES0005456.

[111] PEACHES0005861.

[112] Although I requested them, digital data were not produced for Peaches dress-related transactions prior to 2011.  I understand that these data were not available from Peaches.

[113] See Affidavit of Jeffrey Surdej, April 13, 2014.

[114] Without applying data restrictions, in-store sales of special occasion dresses totaled ██████████ in 2011, ██████████ in 2012, and ██████████ in 2013; and sales on www.peachesboutique.com increased from ██████████ in 2011 to ██████████ in 2012 and then increased in 2013 to ██████████  However, sales on www.promdresshop.com and www.dress4prom.com decreased ██████████ from ██████████ in 2011 to ██████████ in 2012 and then decreased ██████████ in 2013 to ██████████

[115] First Amended Complaint, Ex. 1.



changed somewhat over time, but it has consistently sold dresses from all of the Designers between 2011 and 2014.[116]

45.   Designer dresses dominated Peaches' sales between 2011 and 2013. For in-store sales, Designers comprised the following share of Peaches' revenue: ██ percent in 2011, ██ percent in 2012, and ██ percent in 2013 (Exhibit 3). Results are similar for Peaches' branded website: ██ percent in 2011, ██ percent in 2012, ██ percent in 2013 (Exhibit 4); and unbranded websites: ██ percent in 2011, ██ percent in 2012, and ██ percent in 2013 (Exhibit 5).

46.   The importance of named Designers can also be seen not only in terms of revenue, but also in number of dresses sold. For Peaches' in-store sales, the number of Designer dresses sold compared to their overall number of dresses were ██ percent in 2011, ██ percent in 2012, and ██ percent in 2013 (Exhibit 3). Results are similar for Peaches' branded website (peachesboutique.com): ██ percent in 2011, ██ percent in 2012, and ██ percent in 2013 (Exhibit 4); and its unbranded websites (promdressshop.com and dress4prom.com): ██ percent in 2011, ██ percent in 2012, and ██ percent in 2013 (Exhibit 5). Further, including in-store and all websites combined, each year a smaller percentage of Designer dresses were sold by Peaches at a discount than non-Designer dresses.

### a. Peaches' Volume Advantage

47.   As described above, Peaches is acknowledged by some designers to be the largest prom and homecoming retailer in the Midwest.[117] Influential designers, including the

---

[116] See PEACHES0005757-PEACHES0005759; PEACHES0005785-PEACHES0005787; PEACHES0005812-PEACHES0005814; PEACHES0009383. Transactional level data are not available prior to 2011.

[117] For example, Jovani, one of the world's largest prom dress designers, refers to Peaches as "the number one prom retailer" (PEACHES0000654) and stresses that Peaches has "a very large credit line" (PEACHES0001723) and that ████████████████████████████████████ Simon Deposition at 42:14-25 and 43:1; See also S. Lang Deposition at 121:11-14 ████████; Deposition of M. Levin at 35:16-19 (Mac Duggal sales representative testifying that ████ ████████████████; Deposition of Barbara Surdej, May 8, 2014 ("B. Surdej Deposition") at 12-13. ("Q. Is Peaches the largest prom and homecoming retailer in the Midwest? [...] [S]ome of the designers tell us we're the largest. [...] It just means that we [...] sell the most amount of their products") and



CONFIDENTIAL – ATTORNEY WORK PRODUCT                                      1/21/15

named Designers, often require volume minimums before a store may carry their lines.[118]  I understand that Peaches' standard business policy was to order far more than these minimums—[119]  Roy Surdej testified that it has been Peaches' experience that

[120]  Since both high-end and low-end dresses take up the same amount of space, there is a natural economic advantage in carrying inventory comprised of Designer dresses that are more valuable.  Further, Designer dresses are more profitable (on a per-dress basis) than lower-end alternatives.[121]  As a result, it seems clear that Peaches (and any boutique) would rather stock Designer lines than non-Designer lines.

### b.  Peaches' Expansion Increases Its Risk

48.     As noted above, Peaches expanded the size of its store on multiple occasions (from 2,400 to 4,400 square feet in 2002, to 8,400 square feet in 2003, and to 20,000 square feet in 2011), and with it, the latest expansion increased number of dressing rooms increased from 14 to 40.[122]  At 8,400 square feet, Peaches was already larger than much of its competition.[123]  Mr. Roy Surdej considers

[124]  "Because the average prom or homecoming dress shopper

---

at 368 ("From what some of the manufacturer's [sic] tell me, that I do have a lot of dresses compared to most").

[118] See, e.g., Declaration of M. Montenegro at ¶ 11; Declaration of W. Wu at ¶ 3; Declaration of S. Simon at ¶ 4.

[119] Declaration of R. Surdej at ¶ 9.

[120] Declaration of R. Surdej at ¶ 6.

[121] Susan Shaban Deposition at 185-187 (noting that Hannah's had to sell "a lot more dresses" at the prices that non-Designer dresses commanded to maintain the profitability available selling Designer dresses).

[122] Declaration of R. Surdej at ¶ 5-6.

[123] Supra, note 45.

[124] Declaration of R. Surdej at ¶ 6.



Expert Report of Leslie E. Schafer, Ph.D.

making a purchase decision, "[125]

49.   As Roy Surdej explains also in his Declaration, "[b]ecause designers generally prohibit retailers from returning unsold dresses, carrying a large inventory of dresses carries a significant financial risk."[126] This is confirmed similarly by Stephen Lang, the CEO of Mon Cheri (including the Tony Bowls prom and homecoming lines).[127] Mr. Lang testified that it is typical for stores selling prom and homecoming dresses to buy stock to use as sample merchandise and then reorder the stock.[128] Mr. Lang testified that "we want you to have sample stock and then place reorders as much as you can."[129] He testified that this is the way the industry operates, not just Mon Cheri.[130] Thus, Peaches is not typical of the industry.

### c.  Competition Upsets Peaches' Business Model

50.   Even before its most recent expansion to 20,000 square feet, at 8,400 square feet Peaches was already larger than the typical prom and homecoming specialty boutique.[131]

51.   Such a strategy, combined with prices higher than MSRP (discussed below) exposed Peaches to challenges by competitors. However, in the face of such challenges, Peaches would target these competitors by cutting off their supply of dresses. The following is a list of some of the boutiques against whom Peaches directed its attacks:

---

[125] Declaration of R. Surdej at ¶ 6.

[126] Declaration of R. Surdej at ¶ 10.

[127] Declaration of S. Lang at ¶ 13 ("Mon Cheri does not allow retailers to return unsold dresses, and so the risk that a dress that has been ordered does not sell at the retail level passes to the retailer.").

[128] Lang Deposition at 44:12-15.

[129] Lang Deposition at 44:24-45:1.

[130] Lang Deposition at 45:2-5.

[131] About the time that Peaches expanded to 20,000 square feet, Hannah's was 1,000 square feet. When describing the opening of new stores in the area, a Peaches email states the new stores are "roughly 800 square feet" and referred to their "small size" (PEACHES0001779).



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                        1/21/15

- Hannah's Boutique, 9644 W. 131st Street, Palos Park, Illinois 60464[132]

- International House of Couture, 12327 S. Harlem Ave., Palos Heights, Illinois 60463[133]

- Maggie's Boutique, 3409 N. Harlem Ave., Chicago, Illinois 60634[134]

- Pink Slip Boutique, 18907 Wolf Road, Mokena, Illinois 60448[135]

- A Pink Boutique, 16203 94th Ave., Orland Hills, Illinois 60487[136]

- Jasmine, 2840 S. Highland Ave., Lombard, Illinois 60148[137]

- La Joli Mode, 4951 W. 95th Street, Oak Lawn, Illinois 60453[138]

- Elegant Couture, 12236 S. Harlem Ave., Palos Heights, Illinois 60463[139]

- DeJeCo Bridal, 2249 W. 111th Street, Chicago, Illinois 60619[140]

- Eva's Bridals, 5269 W. 95th Street, Oak Lawn, Illinois 60453[141]

- Kimberly Bond, 8659 W. 159th Street, Orland Park, Illinois 60462[142]

---

[132] PEACHES0002313, PEACHES0002698, PEACHES0000416, PEACHES0003817, PEACHES0002311, PEACHES0002309.

[133] PEACHES0002313, PEACHES0000391, PEACHES0001762, PEACHES0005527, PEACHES0001563, PEACHES0002311, PEACHES0002309, PEACHES0003725.

[134] PEACHES0001758.

[135] PEACHES0002313, PEACHES0002311.

[136] PEACHES0000416, PEACHES0003725.

[137] PEACHES0001766.

[138] PEACHES000416.

[139] PEACHES000416, PEACHES003725.

[140] PEACHES0005533, PEACHES0001765.

[141] PEACHES0005533.



Expert Report of Leslie E. Schafer, Ph.D.

52.   Dr. Kneuper argues in his Declaration that the existence of market entry by
      competitors is evidence that Peaches did not have market power.[143]  As Dr. Kneuper
      wrote in the chapter on entry barriers in the *Market Power Handbook*, "[b]oth the
      courts and the economic literature recognize that incumbent firms will be unable to
      exercise market power if any attempt to do so would be thwarted by entry of new
      firms."[144]  In other words, in an antitrust context, the key question is whether even
      the threat of entry, never mind actual entry, would prevent anticompetitive harm
      from occurring in the first place.[145]

53.   In the instant matter, the answer is no.  By assuming yes, Dr. Kneuper has ignored
      that Peaches' previous attempts to restrict its competition from access to key inputs
      were successful;[146] Peaches was able to prevent its competition from selling the same
      Designer lines that it had in its store.[147]  Therefore, there was reason for Peaches to
      believe that these same efforts would continue to be successful at foreclosing new
      entrants or existing entrants who wanted to carry the Designers' dresses such that the

---

[142] PEACHES000416, PEACHES0003725.

[143] Kneuper Declaration at ¶¶ 17, 29, 32, and 95.

[144] Market Power Handbook at pp. 163-164.

[145] Market Power Handbook at p. 167.

[146] See, e.g., PEACHES0001754:

> I want you to know something […] I work my ass off for your store, not just for orders but
> to service your store and that means watching who is opening up in your territory. […]
> When I took on Lee Roski the first thing I told him was your store and that we need to
> protect her.  To be honest with you, you are the only store I do protect.  My biggest account,
> ▮▮▮▮▮▮▮▮▮▮▮ [in Pennsylvania] that was good for $100K a year I don't protect anymore.
> I have made a commitment to you and will still continue to protect you […] your e-mail
> suggests getting thrown under the bus when I do not sell this store.  I have done everything
> you have asked why would I throw you under the bus?

See, also PEACHES0001779 ("We always appreciate that you vendors have always protected.") and
JOVANI 9 ("In the past, you've always protected our territory. […] When we've talked to all the
manufacturers, we have always expressed our concerns regarding new stores opening up. […] We try to talk
with our "favorites" at your company that take care of us, and you've always taken care of the matters.")

See "Peaches' Exclusionary Communications and Documents Spreadsheet" attached as Exhibit 9.

[147] Interview with Lamar and Evelyn Anderson, January 15, 2015.



CONFIDENTIAL – ATTORNEY WORK PRODUCT                                    1/21/15

threat of entry did not retard Peaches' supracompetitive pricing. As I describe in
section V below, Peaches had been engaging for years in anticompetitive conduct
designed to exclude competing boutiques from getting the Designer lines they needed
to sustain successful boutiques, which enabled Peaches to maintain its market power,
at least between 2009 and 2012. Increased entry by competing firms pricing Designer
lines at MSRP, concomitant with Peaches' significant expansion, threatened to erode
that market power. Unbeknownst to boutiques before they entered, Peaches would
be engaging in a campaign to foreclose them from competition once their entry was
discovered.

## V.    Peaches Foreclosed Competitors' Ability to Sell Designers' Dresses

54.    As an economic matter, when a firm is realizing supranormal profits, it is expected
       that rivals will enter in an attempt to seize some of those profits.[148] However, rather
       than competing on the merits when faced with entry by new (and growing) rival
       boutiques, Peaches employed exclusionary tactics to prevent competitors from
       obtaining key inputs—i.e., Designer prom and homecoming dresses. By doing so, it
       maintained supracompetitive prices longer than it would have but for this
       anticompetitive behavior. Peaches mounted a persistent campaign to restrict the sale
       of inputs to new stores, and prevent the opening of accounts and the sale of inputs to
       established stores. In combination with price discrimination of
       peachesboutique.com, described below, Peaches protected its brick-and-mortar store
       from competition. Such behavior is anticompetitive.[149]

---

[148] *See, e.g.*, Pindyck and Rubinfeld," p. 273.

[149] Jonathan B. Baker, "Exclusion as a Core Competition Concern." 78 Antitrust L.J. 527 (2013, Issue 3), note
1. See also, ABA Market Power Handbook at p.19 (Antitrust law "target[s] exclusionary activities that allow
firms to obtain or enhance market power.") See also *Understanding Single-Firm Behavior: Monopoly Power, Section 2
Joint Hearings* 25-26 (Mar. 7, 2009) at 155: 11-23, available at
http://www.ftc.gov/sites/default/files/documents/public_events/section-2-sherman-act-single-firm-
conduct-related-competition/070307.pdf

      (Tom) A third lesson from this that is relevant to section 2 cases, I think, is that it seems to
      me that we frequently hear it said that the mere exercise of market power is not prohibited
      by antitrust, and I think there is a statement to that effect in the Trinko decision by the
      Supreme Court a year and a half ago. Indeed, if I recall correctly, Justice Scalia not only said



Expert Report of Leslie E. Schafer, Ph.D.

55.     Peaches' leverage was its size, yet its expansion came without a guarantee of
        continued supranormal pricing while more competitors were entering the market.
        Interviews with former boutique owners and the evidence produced in discovery
        reveals that Peaches directed designers to not sell their dresses to Peaches' rivals.[150]
        As the largest specialty boutique of prom and homecoming dresses in the Chicago
        area,[151] the demands were significant.

56.     It is basic economics that if existing competitors and potential new entrants in the
        Chicago metropolitan area could sell dresses from the same Designer lines at lower
        prices (i.e., MSRP), then Peaches would no longer be able to grow its sales while
        charging higher prices (i.e., 15 percent above MSRP).  The dominance of Designer
        dresses to Peaches revenues, described above, indicate that the ability to restrict
        access to these lines by its competition was (and is) essential to Peaches' success.  In
        order to protect its ability to charge higher prices, Peaches demanded that Designers
        not sell dresses to competing boutiques.[152]  When new boutiques opened or planned
        to open within the Chicago area, Peaches contacted Designers repeatedly to demand
        that they not sell them their dresses.[153]  These demands included not only keeping
        Designers from making sales to new stores, but also led Designers to cancel orders
        from stores which had previously purchased supply from those Designers.[154]
        Peaches' anticompetitive behavior included foreclosing rivals in target geographic

---

it, but he said you sort of welcome that kind of behavior because it is a signal to people to
come enter the market. There are high prices. You can come in and do something. There is
nothing wrong with exercising market power if you have got it. The question is how you got
it.

Or, as relevant for the instant matter, how you keep it.

[150] See, e.g., Interview with Lamar and Evelyn Anderson Interview, January 15, 2015; Interview with Ameira
Matariyeh, January 14, 2015; Declaration of Lamar Anderson; Declaration of Ameira Matariyeh; "Peaches'
Exclusionary Communications and Documents Spreadsheet" attached as Exhibit 9.

[151] Simon Deposition at 147:13-19.

[152] See Section V.

[153] See footnotes 132-142.

[154] Plaintiff's Amended and Supplemental Answers to  First Set of Interrogatories - Market Power, 3.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                    1/21/15

areas as well as specific stores.[155]  Peaches succeeded in increasing costs for some
competitors, while some of these competitors were eventually forced to exit from the
market. Exhibit 9 presents a timeline of Peaches' exclusionary conduct provided to
me by Plaintiff's counsel, organized by competitor boutiques which Peaches targeted.
It includes examples of particular stores which Peaches targeted as well as examples
of Hannah's orders which were never booked or cancelled, as well as instances of
outright foreclosure, due to Peaches' conduct.

### A. Peaches Targets Particular Stores for Foreclosure

57.   Since before 2009 and particularly between 2011 and 2013, Peaches made concerted
      efforts to prevent competitors from carrying the same dress lines.  Peaches demanded
      that Designers not sell dresses to these businesses—in some cases leading Designers
      to cancel orders that had already been made.[156]  After its largest expansion, its
      exclusionary tactics accelerated and had significant impact by the end of 2012.[157]  For
      example, on December 18, 2012, Sheri Simon of Jovani asked that Peaches provide a
      list of stores that it wished Jovani not sell to.[158]  Just six weeks later, on February 6,
      2013, Sheri Simon emailed Peaches a list of stores they shut down in the area and
      stated that 5-7 online retailers were in the process of being removed.[159]

---

[155] "Peaches' Exclusionary Communications and Documents" attached as Exhibit 9.

[156] See, e.g., Allure_0003.

[157] PEACHES0001594 (This note from Jovani to Peaches in February 2013 states: "Abraham is walking on
cloud nice since you spoke last night.  He is so happy that you finally have confidence in him and he is so
excited about the future of our prom business together."  The note continues to list "all the stores we have
shut down in your area" including Don Galani, Mona Lisa, Kimberly Bond, That girl, A L'Amour,
International House of Couture, Hannah, Fit 2B Tied-oob ["out of business"], La fiesta, Embellish, Teranz,
That boutique, The pink boutique, Everything 4 pageants.com and her in house store.  Abraham is in the
process of removing about 5-7 more on-line retailers from the site[.]"  Sheri Simon testified that this e-mail
was probably the only time she had ever told a store about shutting down other stores.  (Simon Deposition at
128-129).  She testified further that the "5-7" on-line retailers were being shut down "[b]ecause they were the
biggest online retailers[.]" (Simon Deposition at 130).

[158] PEACHES0001723.

[159] PEACHES0001594.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                                1/21/15

58.   Below are more detailed examples of Peaches' efforts to foreclose competitors from the market.

### 1. International House of Couture[160]

59.   In March 2011, Ameira Matariyeh opened a prom and homecoming dress specialty boutique called International House of Couture, Inc. ("IHOC") at 12327 Harlem Avenue, Palos Heights, IL 60463 (about an 11 mile drive from Peaches). Prior to opening, she spent eight months researching the prom and homecoming dress market in the Chicago Area. She studied which designers were in demand and which styles were trendy, at what price points dresses were being sold and the revenue potential for the store, and where would be a good location to lease a space for her store. This included visiting other prom and homecoming specialty boutiques in the Chicago area to observe customers, reading prom-related magazines targeted at teenage girls, seeing which designers were endorsed by celebrities (which they were wearing on the red carpet), and attending the Chicago Market.

60.   Ms. Matariyeh selected her location on Harlem Avenue because it was near several high schools and, determined that she wanted to sell the prom and homecoming dress lines demanded by customers, including Allure, Blush, House of Wu, Jasz Couture, Jovani, La Femme, Mac Duggal, Maggie Sottero, Mori Lee, Party Time Formals, Riva Designs, Scala, Sherril Hill, Tarik Ediz, Terani, and Tony Bowls because they are were sold at higher price points. Even before signing the lease for her boutique location, Ms. Matariyeh secured confirmation from all Designers except for Sherri Hill that she would be able to open accounts and secure samples (and eventually orders) for her store. Sherri Hill, in contrast, said that it was not able to sell to IHOC because of a commitment to Peaches not to sell to new stores.

61.   Knowing that having the Designers' dresses were critical to draw customers in, and therefore the success of her boutique, when IHOC opened Ms. Matariyeh carried samples from Jasz Couture, Terani, Mori Lee, Jovani, La Femme, Party Time

---

[160] The sources for information presented in this section are an interview with Ms. Ameira Matariyeh on January 14, 2015 ("Matariyeh Interview") and the Declaration of Ameira Matariyeh, January 19, 2015 ("Matariyeh Declaration"), unless noted otherwise.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                    1/21/15

Formals, and Scala. None expressed any concern about saturation, brand dilution, or that there were too many boutiques in the Chicago area.

62.     When IHOC first opened in March, it priced all in-season prom and homecoming dresses at MSRP, and not, as Peaches had represented to Designers, at a discount.[161] It also provided one-on-one customer service, in-house alterations, beadwork, and steaming, which Ms. Matariyeh said is typical for boutiques selling high-end prom and homecoming dresses in the Chicago area.

63.     Preparing for the 2012 prom season, Ms. Matariyeh attended the 2011 Chicago Market, where she ordered dresses from the Designers again. She satisfied the minimum orders and every order was accepted. However, the dresses never shipped, despite IHOC having no payment issues with any designer (IHOC had paid for orders the prior season up-front, all of which she sold as an authorized retailer). After repeated attempts to determine when she would be getting the orders in, the Designers each informed IHOC that it was not going to deliver the dresses because of demands made by Peaches not to sell to a new store. This is consistent with documents produced in this matter that Peaches demanded that Designers not sell to IHOC.[162]

64.     Because IHOC had received pre-orders from customers, the store was forced to refund numerous deposits. Ms. Matariyeh said that without Designer dresses, the customers stopped coming to her store and sales dropped dramatically. IHOC considered buying Designer dresses from other retailers, but did not do so because the mark-ups she would have had to pay over and above wholesale cost (plus shipping charges) were cost-prohibitive. IHOC was therefore forced to close in July 2012.

---

[161] A. Matariyeh Declaration at ¶ 12, PEACHES0005529.

[162] PEACHES0005527, PEACHES0005529, BIGG2, PEACHES0001552, PEACHES0002311, PEACHES0001563, PEACHES0002398, PEACHES0003051.



Page 36

Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL - ATTORNEY WORK PRODUCT 1/21/15

### 2. Hannah's Boutique

65.     As described above in section IV.B.1, Hannah's has been in the retail prom and
homecoming dress business since 2009. After early success, Hannah's expanded two
times, including a move to a larger location in Palos Park, IL in 2012.[163] Between
2010 and 2012, Hannah's was an authorized retailer for several Designer brands
including House of Wu, Jovani, Mon Cheri/Tony Bowls, Party Time Formals, Riva
Designs, Scala, Tarik Ediz and Terani.[164] The importance of Designer dresses to
Hannah's business success has been critical. As seen in Exhibit █ about half of
Hannah's sales during prom season in 2012 and 2013 were from the sale of dresses
by Designers.

66.     In 2010, Peaches began sending messages to Designers not to sell to Hannah's, and
the Designers complied.[165] For example, Allure took an order from Hannah's and
cancelled it "because of Peaches."[166] In September 2012, Hannah's was prepared to
place a 300-piece order with Jovani at the 2012 Chicago Market. However, the day
before the Market started, a Jovani representative informed Hannah's via text
message that Jovani would not accept this, or any other, order from Hannah's
because of an agreement with Peaches not to sell to any other designers in the
Chicago area.[167] Prior to October 2012, Hannah's ordered and received dresses from

---

[163] Plaintiff's Amended and Supplemental Answers and Objections to Defendant's Second Set of
Interrogatories to Plaintiff, p. 67. In deposition, Ms. Shaban recalls the square footage as 2,800 (Susan
Shaban Deposition at 210). Due to both initial success and dissatisfaction with the Chicago Ridge location.
Ms. Shaban has testified that the parking at the Chicago Ridge store was insufficient. (See Susan Shaban
Deposition at 201).

[168] Interview with Susan Shaban, December 15, 2014; See also Susan Shaban Deposition at 226:20-227:7.

[165] PEACHES0002698 ("DO NOT SELL TO: Hannah's Bouitque [sic]"), PEACHES0002311,
PEACHES0002313, PEACHES0001772, PEACHES0003051, PEACHES0003461, PEACHES0001780,
PEACHES0001781, PEACHES0001723, PEACHES0003528, PEACHES0003817, Plaintiff's Amended and
Supplemental Answers to First Set of Interrogatories - Market Power, 3 (See reference to Mori Lee's refusals
to allow Hannah's to order at the 2010, 2011, or 2012 Chicago Markets "due to Peaches' demands to not do
business with Hannah's").

[166] Allure_0003, Allure_0008 ("8-10-11: Per Seth and Kelly not selling due to area of PEACHES").

[167] Plaintiff's Amended and Supplemental Answers to First Set of Interrogatories - Market Power, 3. See also,
HANNAH'S 1745-8.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL - ATTORNEY WORK PRODUCT                                1/21/15

House of Wu without incident.[168]  Yet, Hannah's placed an order with House of Wu at the 2012 Chicago Market, but was then refused delivery.[169]  Not only was this order refused, but also an order which Hannah's placed at the 2013 Atlanta Market was also cancelled.[170]  Prior to October 2012, Hannah's ordered and received dresses from Party Time Formals without incident.[171]  Yet, Hannah's placed an order with Party Time at the 2012 Chicago Market, but was then refused delivery.[172]  Riva Designs informed Peaches that it had already sent three dresses to Hannah's (including the style numbers of the three dresses), but then promised Peaches it would not to send any more.[173]  Despite Hannah's efforts, it was not able to re-open Designer accounts prior to the Complaint in the instant matter.[174]  Prior to October 2012, Hannah's ordered and received dresses from Terani without incident.[175]  Yet, Hannah's placed an order with Terani at the 2012 Chicago Market, but was then refused delivery.[176]  At both the 2011 and 2012 Chicago Markets, La Femme refused to allow Hannah's to make orders.[177]  Similarly, Mac Duggal refused Hannah's orders at the 2012 Chicago Market; Hannah's "could not open an account or place an order because of Peaches and territorial restrictions."[178]  Similar instances of refusals occurred with Scala, Sherri Hill, Tarik Ediz, Jasz Couture, Maggie Sottero, and Mon

---

[168] Plaintiff's Amended and Supplemental Answers to First Set of Interrogatories - Market Power, 3.

[169] Plaintiff's Amended and Supplemental Answers to First Set of Interrogatories - Market Power, 3. Hannah's also placed an order with House of Wu at the 2013 Atlanta Market. On September 7, 2013, House of Wu rejected this order because of Peaches. HANNAH'S 136.

[170] Plaintiff's Amended and Supplemental Answers to First Set of Interrogatories - Market Power, 3.

[171] Plaintiff's Amended and Supplemental Answers to First Set of Interrogatories - Market Power, 3.

[172] Plaintiff's Amended and Supplemental Answers to First Set of Interrogatories - Market Power, 3.

[173] PEACHES0001782-PEACHES0001783.

[174] PEACHES0001802-PEACHES0001810.

[175] Plaintiff's Amended and Supplemental Answers to First Set of Interrogatories - Market Power, 3.

[176] Plaintiff's Amended and Supplemental Answers to First Set of Interrogatories - Market Power, 3.

[177] Plaintiff's Amended and Supplemental Answers to First Set of Interrogatories - Market Power, 3.

[178] Plaintiff's Amended and Supplemental Answers to First Set of Interrogatories - Market Power, 3.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL - ATTORNEY WORK PRODUCT                                                1/21/15

Cheri.[179]  In all of these instances, Hannah's was informed that the reason it was being refused or cancelled was because of demands from Peaches.[180]

67.  Peaches foreclosure of Hannah's ability to get Designer dresses in 2012 for the 2013 prom season left Plaintiff unable to buy them directly from Designers.  Due to the importance of these Designers to the survival of Hannah's business, it was deemed necessary to obtain them from other retail stores in time for the 2013 prom season.[181] This did not occur until after the point in time in which Hannah's was unable to place orders directly with the Designers.[182]  In some instances, Hannah's paid 10 or 20 percent over wholesale cost to obtain Designer dresses.[183]  Illustrating the magnitude of the importance of these dresses to Hannah's business, during the 2013 prom season, ▉ percent of dresses sold were Designer dresses, of which ▉ percent were purchased from other retailers[184]. ▉ percent of dresses sold and ▉ percent of the revenue Hannah's earned was from Designer dresses obtained from other retailers. (Exhibit 8).  Just during prom season 2013, the sale of these dresses totaled approximately ▉▉▉▉ (Exhibit 8).

### B. Peaches Targets Geographic Market for Foreclosure

68.  Peaches did not merely target the Plaintiff, or even individual competitors.  Peaches set out to foreclose competition in the Chicago Market from selling the same Designer lines through a persistent campaign, which included e-mails as well as other means of communication.  Documentary evidence produced in discovery shows that Peaches, as early as 2009 and as recent as February 2013, was able to foreclose its

---

[179] Plaintiff's Amended and Supplemental Answers to First Set of Interrogatories - Market Power, 3.

[180] Plaintiff's Amended and Supplemental Answers to First Set of Interrogatories - Market Power, 3.

[181] Susan Shaban Deposition at 80-81; 91-94; 235-237; 256-257.

[182] See Plaintiff's Amended Answers to Defendants' Request to Admit, Nos. 1-3.

[183] Interview with Susan Shaban, December 16, 2014; Layaway 2013-2014 - Corrected 1.5.15.xlsx; Sales 2013 - Corrected 1.5.15.xlsx; Sales Order 2013-2014 - Corrected 1.5.15.xlsx.

[184] ▉▉▉▉ percent.



Expert Report of Leslie E. Schafer, Ph.D.

competition from obtaining dresses in large swaths of the Chicago area—greater than the Designers would have expected would be relevant for competition.[185]

69. In May 2009, Peaches wrote to various Designers, including directly to the owner's "right-hand man"[186] at Scala, directing not to sell to a list of area codes (708, 312, 773, 630, 815, and 847) as well as a set of Chicago suburbs (Berwyn, Cicero, Worth, Alsip, Orland Park, Mokena, Frankfort, and New Lenox) because they are "well within our sales area."[187] Peaches implores:

> After 25 years in business, is it too much to ask for a little territorial protection? We do not think so. […] We always order more that [sic] the minimum quantities even when the lines were not the strongest. Peaches feels as though we have been thrown under the bus to please a new unknown business. We truly feel as though this is a slap in the face. Not to investigate and just ship goods to an unknown entity is unacceptable.[188]

In its response, Scala acquiesces.[189]

70. Designers acknowledge that Peaches sets its territorial protection. For example, Sheri Simon asks Peaches for "a list of the retailers that you want us to protect you from."[190] She says further:

> [W]e want to figure out a way to increase our business together. [P]lease help me figure out a way that we can do more sales and secure

---

[185] See, e.g., JOVANI 224 ("[Dream Nights and Hannah's] are shut down immediately. [T]he pink boutique will be closed as well. [A]braham did not think a store 40 minutes away was a problem. His apology.")

[186] Interview with George Bigg, January 15, 2015.

[187] PEACHES0001755. This same message went to more Designers than merely Scala. See Jasz 516; PEACHES0001754; PEACHES0001757.

[188] PEACHES0001755.

[189] PEACHES0001755 ("Everyone in office has a copy of this letter. As always, we will advise if they call.")

[190] PEACHES0000654.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                            1/21/15

> that all dresses are sold only by you in your immediate radius of
> stores.[191]

71.   Additionally, in September 2011, Peaches sent an email identifying International
      House of Couture, Hannah's and Pink Slip Boutique as stores not to sell to due to
      direct competition.[192] In the same email, Peaches went on to identify five area codes
      (630, 815[193], 708, 312, 773) to "[d]o not sell to" and further requested notification of
      any new accounts trying to open.[194]

72.   As another example, in November 2011, (in addition to targeting two stores) Peaches
      sent out an email listing nine area codes (708, 773, 847, 815, 312, 224, 217[195], 309[196],
      and 618[197]) with the statement "Area Codes to watch out for and DO NOT SELL
      are as follows."[198] The same e-mail listed hypertext links from www.zip-codes.com
      for 331 "Zip Codes to watch out for and DO NOT SELL." Using a distance
      calculator, the zip codes range, in distance from Peaches, between zero miles (its own
      zip code, 60638) and 29.92 miles away (zip code 60404).[199]

73.   As recently as February 2013, Peaches continued to provide Designers with
      instructions for where not to sell. In one instance, Peaches provided Terani with a
      list of area codes (708, 219[200], 312, 773, 847, 630, 815, 331, 779, 224, 872).[201] This

---

[191] PEACHES0000654.

[192] PEACHES0002313.

[193] Area codes 779/815 cover most of northern Illinois outside of the Chicago and IL-Quad Cities areas.

[194] PEACHES0002313.

[195] The 217 area code includes Illinois' capital Springfield, plus Champaign, Urbana, Decatur, Danville,
Quincy, and Rantoul. Springfield is almost 200 miles away from Peaches.

[196] The 309 area code serves the west-central area of Illinois, including the cities of Bloomington, Macomb,
Moline, Normal, Peoria, and Rock Island.

[197] The 618 area code serves southern Illinois, including the cities of Carbondale and Cairo, and also includes
the majority of the East St. Louis area.

[198] PEACHES0005533-PEACHES0005337.

[199] Id.

[200] The 219 area code covers northwest Indiana that includes Lake, Porter, LaPorte, Newton, and Jasper



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                          1/21/15

request notes also that "Northern Indiana is only 15 minutes maximum from us also").[202]  In the original note, the correspondent from Terani acknowledges that "I have alerted my order dept. before entering any order in IL to fax you first so you can Google and advise.  This is the best I can think of.  You can review list."[203]

### C. Peaches' Anticompetitive Behavior Raised Rivals' Costs

74.   An anticompetitive effect of Peaches behavior was to raise rivals' costs.[204]  Peaches foreclosure campaign forced competitors, such as Hannah's, to obtain Designer dresses at a higher cost and substitute the sale of new products (bridal gowns) in order to stay in business.[205]  Other competitors were forced to close.[206]  By increasing rivals' costs, Peaches maintained its market power in the sale of prom and homecoming dresses at least until 2013.[207]

75.   If competitors are foreclosed from selling the Designers' dresses, then they are challenged in two ways that raise their. First, input restrictions mean they are not able to carry the brands demanded by customers. Second, they incur increased

---

counties.

[201] PEACHES0003725.

[202] According to Google Maps, Gary, IN is an approximately 35 mile drive from Peaches Boutique, depending upon the route taken.

[203] PEACHES0003725.

[204] *See, e.g.,* Thomas G. Krattenmaker and Steven C. Salop, "Anticompetitive Exclusion:  Raising Rivals' Costs To Achieve Power over Price," 96 Yale L.J. 209, December, 1986 ("Krattenmaker and Salop") at p. 238. ("[T]he purchaser, in effect, orchestrates cartel-like discriminatory input pricing against its rivals") and at p. 246 ("Thus, if exclusionary rights significantly raise costs for potential entrants, such rights will raise entry barriers into the market and enhance established firms' power to raise price.")

[205] Susan Shaban Deposition at 80-81; 91-94; 183:9-11; 235-237; 256-257.

[206] Interview of Ameira Matariyeh, January 14, 2015; Declaration of Ameira Matariyeh at ¶ 20; Interview of Lamar and Evelyn Anderson, January 15, 2015; Declaration of Lamar Anderson at ¶ 21.

[207] *See, e.g.,* Steven C. Salop and David T. Scheffman, "Raising Rivals Costs," The American Economic Review, Vol. 73, No. 2, Papers and Proceedings of the Ninety-Fifth Annual Meeting of the American Economic Association (May, 1983), pp. 267-271. (At p. 267 "[R]aising rivals' costs can be profitable even if the rival does not exit from the market."  And p. 270 "For antitrust analysis, exclusionary strategies may be characterized by three conditions- profitability to the dominant firm; competitor injury; consumer welfare reduction- and their sum, the allocational efficiency (or aggregate welfare) effect)."



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                                1/21/15

search costs from finding alternative, potentially unknown and therefore more risky suppliers. Peaches argues that exclusionary agreements are beneficial because it prevents oversaturation of the market.[208] And yet, the Defendants' Statement of Facts exclaims "[n]o one Designer has a dominant market share."[209] If this were true, then competition to get their dresses into stores would be robust. Stephen Lang testified if a store in the Chicago market wanted to buy 2,000 dresses, he would sell it to them[210] "in a heartbeat"[211] because "business is business."[212] Sheri Simon wrote an email to Peaches on December 18, 2012 telling Peaches that Jovani has the capacity to "quadruple" their business together,[213] suggesting a considerable increase in sales would not saturate the market. She also testified that Jovani's owner has never denied her the ability to open up a new account because another store was too close.[214] Furthermore, that no one designer is dominant means that they are beholden to Peaches to get their dresses into the Chicago Market because Peaches does possess market power, described below.

## VI. Economic Analysis of Market Power

76.  Peaches used a campaign of exclusionary tactics to foreclose rivals from the market for prom and homecoming dresses. The anticompetitive harm alleged to flow from Peaches' behavior is reduced competition in the retail sale of prom and homecoming dresses manufactured by the Designers and higher prices for Peaches' customers. A firm cannot injure competition through anticompetitive means unless it possesses market power. Therefore, an assessment of whether Peaches possessed market power is required, including an assessment of the relevant market.

---

[208] See Roy Surdej's Amended and Supplemental Answer to Int. No. 14.

[209] Defendants' Statement of Facts at ¶ 5, citing Simon Decl. ¶ 2, Ex. 7; Lang Decl. ¶ 6, Ex. 6; Decl. of Wen Wu, ¶ 7, Ex. 9; Decl. of Marco Montenegro, ¶ 12, Ex. 10.

[210] Lang Deposition at 115:9-12.

[211] Lang Deposition at 116:2.

[212] Lang Deposition at 117:9-11.

[213] PEACHES0001723 and JOVANI 224.

[214] Simon Deposition at 81:9-13.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                        1/21/15

77.    A market is considered competitive when sellers cannot profitably raise or maintain prices above the competitive level. In a competitive market, any attempt to set prices above the competitive level will result in losing customers to competitors which offer the same or similar products for lower prices.[215] Firms in a competitive market cannot increase profits through higher prices--any benefit derived from charging inflated prices to remaining customers is outweighed by the customers lost to lower-priced competition. As a result, any attempt to increase profits in a competitive market by charging prices above the competitive level would result in lower profits instead.

78.    In order to sustain prices above the competitive level, a firm must have monopoly power.[216] The ABA's Market Power Handbook explains "[e]conomists often define market power as the ability of a firm or group of firms within a market to *profitably* charge prices above the *competitive level* for *sustained periods of time*.[217] As an economic matter, a firm with monopoly power must be able to limit its competitors' ability to attract the firm's customers. Unless a firm can limit customer defections, it cannot maintain supracompetitive prices without sacrificing profits. Recall, market power includes the ability to prevent prices from falling to competitive levels.[218]

---

[215] See, ABA Monopolization and Dominance Handbook (2011), p. 59.

[216] Edlin and Rubinfeld (2004), p. 140 ("Monopoly power is defined as 'power to control price or the power to exclude competition.'" Citation omitted). For the purposes of this Report, the terms "monopoly power" and "market power" are used interchangeably.

[217] See "Definition of Market Power," Chapter I, *Market Power Handbook: Competition Law and Economic Foundations,* 2nd Ed., The American Bar Association, Section of Antitrust Law, 2012, p. 1. Dr. Kneuper notes that this definition often includes also the concept that monopolization is the ability of a firm to reduce output below the competitive level. (See Kneuper Declaration at Note 28). However, this is not always required.

[218] *Understanding Single-Firm Behavior: Monopoly Power, Section 2 Joint Hearings* 25-26 (Mar. 7, 2009) at 153: 5-10, available at http://www.ftc.gov/sites/default/files/documents/public_events/section-2-sherman-act-single-firm-conduct-related-competition/070307.pdf ("Point one, market and monopoly power include the power to keep prices from falling to competitive levels. I do not think we forget this a lot. We usually just say it is the ability to raise prices, but when confronted with the ability to keep prices from falling, we usually recognize that as market power, but you should in case you did not) and at 153:18-19 ("It is market power to be able to keep prices from falling to competitive levels.")



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                                    1/21/15

79.   Monopoly power can be created and/or maintained through wrongful
      (anticompetitive) conduct. For example, a dominant firm can create or maintain
      monopoly power by denying rivals access to key inputs required to satisfy customers'
      demands. As long as rivals cannot meet customers' demands, the dominant firm's
      anticompetitive conduct will preserve the firm's ability to profitably maintain prices
      above the competitive level. In other words, if Peaches can restrict rivals' ability to
      obtain dresses from critical manufacturers, then it can continue to price above a
      competitive level.

80.   Monopoly power can also be created through conduct that is not anticompetitive.
      For example, a firm's ability to price above the competitive level may be driven by
      unique business acumen such as introducing an innovative or superior product that
      customers are willing to pay a premium to acquire. However, even if a firm earned its
      monopoly power initially through competitively benign means, conduct which places
      limits on rival firms' ability to compete for customers--thereby preserving the firm's
      ability to maintain its supracompetitive pricing without losing sales--would still be
      considered anticompetitive. "Exclusion is anticompetitive if the excluding [firm uses]
      it to obtain or maintain market power, as by raising price or keeping a
      supracompetitive price from declining."[219]

81.   As an economic matter, monopoly power can be demonstrated through either direct
      or inferential (i.e., indirect) evidence.[220] Generally, demonstrating market power
      through direct evidence involves showing that prices *were* maintained significantly
      above the competitive level. Inferential evidence aims to answer a similar, but
      different, forward-looking question: Does the firm in question have the *ability* to price

---

[219] Jonathan B. Baker, "Exclusion as a Core Competition Concern." 78 Antitrust L.J. 527 (2013, Issue 3), note 1. See also, ABA Market Power Handbook at p. 19 (Antitrust law "target[s] exclusionary activities that allow firms to obtain or enhance market power.")

[220] *See, e.g.,* "Horizontal Merger Guidelines," U.S. Department of Justice and the Federal Trade Commission, August 19, 2010, §§ 2.1.2-2.1.3. ("HMG") (available at http://www.justice.gov/atr/public/guidelines/hmg-2010.html). See also, Chapter I, *Market Power Handbook: Competition Law and Economic Foundations,* 2nd Ed., The American Bar Association, Section of Antitrust Law, 2012, p. 20 ("A Section 2 plaintiff can prove monopoly power by proffering direct evidence of the defendant's ability to control price or to exclude competition."). See also, ABA Monopolization and Dominance Handbook (2011), p.63 ("Monopoly power may be established through either direct evidence--evidence that a firm exercises actual control over prices or output, or has the ability to exclude competitors—or indirect evidence of such power.")



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                    1/21/15

above the competitive level?  In other words, would buyers shift their purchases
sufficiently to a competitor if a firm attempted to exercise its market power and raise
prices?[221]  Inferential evidence concerns structural indicators of monopoly power,
typically including analysis of the firm's market share in the relevant market.[222]
Where the firm's market share of that relevant market is deemed sufficiently high, the
firm's ability to maintain prices above the competitive level is inferred.  Conversely,
where the firm's market share is estimated below some threshold, then it is unlikely
that the firm possesses an ability to maintain supracompetitive prices.

82.    Naturally, the value of any inference about a firm's monopoly power based on market
share is inextricably tied to the definition of the relevant market in which that
measurement is made.  Defining the appropriate relevant market can frequently be a
contentious task.[223]  Defendants typically argue for a more broadly-defined relevant
market, which will result in lower market shares for participants in that market.  If the
market is defined too broadly, it will necessarily understate the extent of any
monopoly power.[224]  Conversely, plaintiffs typically present evidence consistent with

---

[221] See, e.g., ABA Market Power Handbook at p. 61.

[222] Edlin and Rubinfeld (2004).  See also, HMG, § 4.1.1 ("… the purpose of defining the [relevant] market
and measuring market shares is to illuminate the evaluation of competitive effects.")

[223] Richards (2012), p. 55 (noting that district courts have sometimes gotten "confused" by market definition
based on "notions that have had little if anything to do with any power to constrain a rise in prices").

[224] HMG (2010), § 4:

> Defining a market broadly to include relatively distant product or geographic substitutes can
> lead to misleading market shares. This is because the competitive significance of distant
> substitutes is unlikely to be commensurate with their shares in a broad market. Although
> excluding more distant substitutes from the market inevitably understates their competitive
> significance to some degree, doing so often provides a more accurate indicator of the
> competitive effects […] than would the alternative of including them and overstating their
> competitive significance as proportional to their shares in an expanded market.
>
> *Example 4:* Firms A and B, sellers of two leading brands of motorcycles, propose to
> merge. If Brand A motorcycle prices were to rise, some buyers would substitute to
> Brand B, and some others would substitute to cars. However, motorcycle buyers see
> Brand B motorcycles as much more similar to Brand A motorcycles than are cars. Far
> more cars are sold than motorcycles. Evaluating shares in a market that includes cars
> would greatly underestimate the competitive significance of Brand B motorcycles in
> constraining Brand A's prices and greatly overestimate the significance of cars.



Expert Report of Leslie E. Schafer, Ph.D.

a more narrowly-defined relevant market where participants possess larger market shares. If the market is defined too narrowly, then market power will be overstated. The difficulties in defining a relevant market,[225] as well as in interpreting the resulting market shares once that market has been defined,[226] have led many economists to caution against relying on inferential evidence to answer questions about a firm's monopoly power.[227]

83.   The use of direct evidence that a firm was able to profitably maintain prices above the competitive level is far less dependent on subjective interpretations. When such evidence is available, by definition, it bears directly on the salient question--i.e., whether the firm did (or did not) maintain prices above the competitive level. Evidence that shows that the firm in question was able to price above the competitive level answers the question of whether a firm has monopoly power (or not), without any need for "interpretation."[228] Direct evidence may be "in the form of ability to exclude competition, supracompetitive prices as compared to a competitive benchmark, the restriction of output, diminished quality, or reduced innovation."[229]

84.   For this reason, economists, legal scholars and the U.S. antitrust enforcement agencies have described the use of direct evidence (where available) as the preferred approach to answering questions about monopoly power.[230] For example, Professor Salop notes that:

---

[225] See, e.g., Baker (2007). See also, Richards (2012), p. 58; Werden (2000), p. 216.

[226] Baker, J. and T. Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power," in P. Buccirossi, ed., Handbook of Antitrust Economics, 2008, Chapter 1 (pp 1-42), p. 6 (noting that market share calculations are "not necessarily meaningful" in identifying competitive problems). See also, Kaplow, L., "Market Definition and the Merger Guidelines," Harvard Law School Discussion Paper No. 695 (May, 2011), p. 3). See also,.

[227] See, e.g., Kaplow (2013), Richards (2012), Werden (2000).

[228] See, e.g., ABA Monopolization and Dominance Handbook (2011), p. 64 ("[W]here legitimate direct evidence of monopoly power exists, it may be deemed conclusive even in the absence of definite proof of market structure and market share.")

[229] ABA Monopolization and Dominance Handbook (2011), p. 64.

[230] See, e.g., Salop (2000), p. 200. See also, ABA Monopolization and Dominance Handbook (2011), p. 64



> If there is direct evidence of anticompetitive effect, then a separate test
> of market power, let alone a threshold test of market power, is
> redundant. In essence, the evidence of anticompetitive effect also
> proves market power in the affected market.[231]

85. The U.S. DOJ/FTC's 2010 Horizontal Merger Guidelines note similarly that, in the
merger context, the availability of direct evidence of competitive effects reduces the
need to make inferences based on structural indicators of monopoly.[232]

86. Professors Edlin and Rubinfeld note that the value of using inferential evidence to
assess monopoly power is restricted to cases where direct evidence of prices above
the competitive level is unavailable:

> [I]f power [over price] can be shown directly, there is no need for
> market definition: the value of market definition is in cases where
> power cannot be shown directly and must be inferred from sufficiently
> high market share in a relevant market.[233]

87. As a matter of economic logic, evidence that prices are above the competitive level is
sufficient to show monopoly power.[234] Where direct evidence regarding a firm's

---

and note 35.

[231] Salop (2000), p. 200. See also, ABA Monopolization and Dominance Handbook (2011), p. 64 and note 35.

[232] HMG (2010), § 4 ("Such evidence [i.e., direct evidence of competitive effects] also may more directly predict the competitive effects of a merger, reducing the role of inferences from market definition and market shares.") In my experience, economists routinely apply the methodologies described in the HMG outside of the merger context.

[233] Edlin and Rubinfeld (2004), p. 141.

[234] Edlin and Rubinfeld (2004), p. 140 ("If a publisher has already raised price substantially above competitive levels and maintained that price increase for a substantial period of time, *this evidence is sufficient* to establish that publisher's monopoly power over price." Emphasis added.) See also, "Monopoly Power," Chapter III, *Monopolization and Dominance Handbook,* The American Bar Association, Section of Antitrust Law, 2011, p. 64:

> Although rarely available, where legitimate direct evidence of monopoly power exists, it may
> be deemed conclusive even in the absence of definite proof of market structure and market
> share. Direct proof monopoly power may be in the form of ability to exclude competition,
> supracompetitive prices as compared to a competitive benchmark, the restriction of output,
> diminished quality, or reduced innovation. (citations omitted)



CONFIDENTIAL - ATTORNEY WORK PRODUCT                                1/21/15

market power is available, a properly conducted relevant market definition (and any subsequent analysis of market shares) can never support a different "answer." For example, when there is direct evidence that the firm did, in fact, price above the competitive level, an inference about the firm's market power based on market shares in a relevant market will either (a) corroborate the conclusion based on direct evidence that the firm had sufficient market share to exercise market power or (b) indicate that the relevant market proposed and/or the market share calculation is incorrect. After all, a firm can never be incapable of increasing or maintaining price above the competitive level, while at the same time succeed in doing just that. Of course, to the extent that a relevant market definition is necessary (e.g., required by the courts), then it is only logical that direct evidence can inform the market delineation process.

88.     As explained in the remainder of this section, there is undisputed direct evidence in this matter that Peaches priced above the competitive level in the market for prom and homecoming dresses in the Chicago area through 2012. Furthermore, Peaches employed a policy of price discrimination on peachesboutique.com by customer geographic location in order to maintain supracompetitive prices in its brick-and-mortar store—a pricing policy feasible only for a firm which possesses market power.

## A. Direct Economic Evidence of Peaches' Market Power

### 1. Peaches Charged Supracompetitive Prices through 2012 for Certain Prom and Homecoming Dresses

89.     As noted above, the general accord in the market for Designer prom and homecoming dresses is that MSRP for retailers for in-season dresses is "keystone," which is two times the wholesale cost of the dress. However, Peaches' pricing policy was to charge prices 15 percent higher than MSRP for in-season dresses from the day the store began selling prom and homecoming dresses[235] through 2011 and for some of its dresses, through 2012.[236]

---

[235] And, in fact, since the store opened selling women's ready-to-wear.

[236] See PEACHES0000271 and PEACHES0003406. Mr. Roy Surdej confirmed that Peaches charged MSRP+15 percent for in-season dresses from the time Peaches opened until some point in 2012 (R. Surdej



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                    1/21/15

90.    A pricing policy of MSRP + 15 percent is reflected generally in Peaches in-store
       transactional data.  On average, Peaches charged about 15 percent above MSRP in
       2011 for in-season Designer dresses.

91.    Peaches owner, Roy Surdej, testified that in January 2012, Peaches instituted a
       "tiered" pricing policy "where the retail price of the in-season dress varied based on
       the MSRP price of the dress."[237]

              We charged prices ranging from 0% to 15% above MSRP, with the
              percentage charged above MSRP decreasing as the MSRP price of the
              dress increased.  That is, the most expensive dresses had no markup
              above MSRP, and the least expensive dresses had the highest market
              (15% above MSRP).  Dresses with an MSRP price of ▮▮▮▮ or greater
              were sold at MSRP.[238]

92.    At his deposition, Mr. Surdej could not identify any of the other tiers except for
       dresses with an MSRP price of ▮▮▮▮▮▮▮▮▮ were sold at MSRP.[239]  In other
       words, Peaches' policy was to charge supracompetitive prices for every full-priced
       dress it sold below ▮▮▮▮ in 2012.  At least ▮▮ percent of dresses sold in-store were
       priced above MSRP.

93.    The transactional data suggest that Peaches finally dropped its price to the
       competitive MSRP level in 2013, although there continue to be sales at higher
       multiples than keystone.[240]  As seen in Exhibit 10, more than ▮▮ percent of dresses

---

Supp. Deposition at pp. 9-11, 66).  When Peaches opened, it sold women's ready-to-wear apparel.  The store
began to sell "color" special occasion dresses in the 1990's.  Roy Surdej states in his declaration that Peaches
has charged MSRP+15 percent for both the ready-to-wear apparel and the "color" special occasion dresses.
(Declaration of Roy Surdej at ¶¶ 2-4.)  Mr. R. Surdej states also that Peaches shifted to price tiers in 2012.  He
states further that Peaches' 2013 prices were all at MSRP.

[237] Declaration of R. Surdej at ¶ 22.  See also, R. Surdej Supp. Dep. at 69:15-71:5.

[238] Declaration of R. Surdej at ¶ 22.

[239] R. Surdej Supp. Dep. at 69:23-70:13.

[240] See, e.g., Kneuper Declaration at ¶ 78 (Kneuper stated that Peaches has been pricing virtually all of its
dresses at MSRP starting in January of 2013).



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                    1/21/15

sold in 2013 were priced above MSRP.[241]  However, whether or not Peaches obtained its market power through competitive means originally, when faced with entry by competitors it used its market power to foreclose them in order to maintain supracompetitive prices.  Whatever potential competition existed, it was not able to discipline Peaches' pricing prior to 2013.

94.     In his Declaration, Dr. Kneuper described MSRP as the competitive price in the relevant market[242] yet acknowledges that Peaches charged prices 15 percent higher than MSRP for "decades."[243]  The only logical conclusion from Dr. Kneuper's statements is that Peaches possessed market power prior to 2013.  And yet, Dr. Kneuper opines in his Declaration that "Plaintiff's allegations of monopolization […] are not supported by the economic evidence[.]"[244]  His support for this position is that "Peaches sells its prom and homecoming dresses at MSRP, which is the same price level as Hannah's and numerous other brick-and-mortar and internet retailers, and the minimum pricing level required by dress designers."[245]  Dr. Kneuper's

---

[241] The data produced by Peaches in this matter make it difficult to confirm Peaches' mark-up precisely.  I understand that, on occasion, Peaches would buy dresses from designers at considerable discounts from lines that were in-season in prior years.  This discounted unit cost information would be entered into "The Peach" as the unit cost for that dress.  Then, when data reports are pulled, like those in the instant matter for in-store and internet sales, ████████ (Kneuper Deposition at 134-135).  This would tend to ███████████  For example, suppose that the unit cost of a dress purchased in 2011 was █████  Its MSRP would be ███ and Peaches' price at MSRP+15 percent would be ████████████.  Suppose in 2014, Peaches buys that dress from a designer again, but this time at $75 and changes the unit cost variable in the Peach to ███  When the data are pulled from the Peach after this date, the sale recorded in 2011 will appear to have ████

I understand that Dr. Kneuper dealt with this problem by excluding from his analysis a certain set of transactions about which Peaches informed him that this problem occurred in the data.  (Kneuper Deposition at 135.  Kneuper Declaration, Backup Materials for Table 5).  I have done the same.  See also, Appendix I. (The calculations for this exhibit have been adjusted to account for MSRP greater than two for House of Wu).

[242] Kneuper Declaration at ¶ 85.

[243] See, e.g., Kneuper Declaration at ¶ 78 (describing Peaches' MSRP + 15 percent prices as a "decades-long policy.").

[244] Kneuper Declaration at ¶ 32.

[245] Kneuper Declaration at ¶ 19.



Expert Report of Leslie E. Schafer, Ph.D.

mistake is that he analyzes the wrong year, the wrong set of sales, or both.[246]  For example, Dr. Kneuper analyzes internet pricing data for 2014, and uses the result of this analysis to argue that Peaches' does not have market power, when the appropriate time period to evaluate is prior to 2013.  When examined correctly, the direct evidence of market power and anticompetitive impact are clear.

### a. Department Stores Did Not Constrain Peaches from Supracompetitive Pricing

95.   Dr. Kneuper's asserts in his Declaration that including the sale of prom and homecoming dresses by Chicago-area department stores in his market share calculation shows that Peaches did not have sufficient market share to have market power.[247]  He notes further in his deposition that department stores "are a substitute […] and they have a substantial competitive constraint" on Peaches.[248]  If this were true during the time period relevant for measuring Peaches market power, meaning prior to 2013, then buyers would have shifted their purchases to the department stores in the face of Peaches' attempt to maintain its supracompetitive pricing, and Peaches would have had to reduce its prices on prom and homecoming dresses to the competitive level long before 2013.[249]  However, Peaches *was* able to charge 15 percent higher prices than MSRP during a period of time when Dr. Kneuper claims department stores were a "very important competitive constraint"[250] in a market with

---

[246] See, e.g., Kneuper Declaration at ¶ 78 ("Peaches moved away from its decades-long policy of pricing at 15% above MSRP in January 2012 and has been pricing virtually all of its dresses at MSRP (i.e., a 100% markup above unit cost or "keystone") in January 2013, which is in line with the competitive pricing levels acknowledged by Plaintiff in its Amended Complaint and the minimum price allowed by manufacturers.") and ¶ 81("Since Q1 2013, virtually all of Peaches' prom and homecoming dresses have been sold at or very near 100% mark-up ("keystone") which represents MSRP for most dress manufacturers. These data confirm that Peaches is selling its prom and homecoming dresses at MSRP and therefore cannot be charging anticompetitive pricing based on Plaintiff's own admissions and manufacturers' MSRP policies (which generally do not allow retailers to sell in-season dresses at prices below MSRP).")

[247] Kneuper Declaration at ¶¶ 17, 56.

[248] Kneuper Deposition at 97:19-23.

[249] ABA Market Power Handbook at p. 61 ("[W]ould buyers shift their purchases sufficiently in the face of an attempted exercise of market power that the attempt would be thwarted.").

[250] Kneuper Declaration at ¶ 56.



"'low' barriers to entry."[251] This would be a paradox. If Dr. Kneuper believes that department stores constrained Peaches pricing prior to 2013, then he is incorrect. If Dr. Kneuper believes they constrained Peaches pricing in 2013 and beyond, then his argument is irrelevant.

96.     As part of his argument, Dr. Kneuper refers to the declarations of two designers and the 2014 websites for Nordstrom's, Neiman Marcus, and Von Maur to prove that certain department stores carry dresses by the Designers (and, ergo, provided competitive discipline on Peaches' pricing).[252] However, he ignores the following evidence:

- House of Wu does not sell to department stores.[253]

- Stephen Lang testified that some Von Maur department stores do not sell prom dresses and he is unaware as to how Von Maur distributes the dresses, suggesting they may not have been available in Von Maur stores in the Chicago Market during the relevant time period for this matter.[254]

- Mon Cheri sells to department stores on a national level; Mr. Stephen Lang has no personal knowledge how these are distributed across U.S.[255]

- Sheri Simon has no personal knowledge how Jovani dresses sold to department stores are distributed across the U.S.[256]

---

[251] Kneuper Declaration at ¶ 97.

[252] Kneuper Declaration at note 61 (Declaration of S. Lang at ¶¶ 3, 10; and Declaration of S. Simon at ¶ 3); http://shop.nordstrom.com/; http://www.neimanmarcus.com/; and https://www.vonmaur.com/.) He notes also that Sheri Simon referred to Dillard's in her declaration as well. Susan Shabani Deposition at 223:9-10 (testifying, "I don't think of department stores for prom dresses.").

[253] In his declaration, Wen Wu states that House of Wu does not sell prom and homecoming dresses to department stores, and only lists specialty boutiques where House of Wu sells its prom and homecoming dresses in Northern Illinois. Declaration of W. Wu at ¶¶ 2, 6.

[254] S. Lang Deposition at 73:2-11.

[255] S. Lang Deposition at 73:21–74:13; S. Lang Declaration at ¶ 10.

[256] S. Simon Deposition at 94-95. See, also, JOVANI 210. (Peaches wrote to Sheri Simon at Jovani



CONFIDENTIAL – ATTORNEY WORK PRODUCT                                               1/21/15

- During the relevant period, Jovani and Mon Cheri sold to chain stores (Cache and Group USA) under private labels such that a customer could neither request these Designers nor know that they were sold by these retail chains. Mon Cheri did not place Mon Cheri tags on the dresses it sold to Group USA and there was no indication on the dress that was a Mon Cheri dress. Jovani did the same for Cache.[257]

- Mori Lee no longer sells prom dresses to department stores.[258]

- Although Sheri Simon states that Jovani sells to Dillards, it does not have a store located anywhere near Chicago. The closest location to Peaches is in Moline, Illinois—more than 150 miles away. All others are more than 200 miles away. This is further than the evidence in this matter suggests a customer is willing to travel to find a prom dress.[259]

- Michael Levin testified that Mac Duggal sells to department stores, but he did not know whether this included their prom and homecoming lines and he was "almost 100 percent sure" they don't sell to department stores in the Chicago area, but in other areas of country "I'm sure that's probably the case."[260]

- Further, as of April 5, 2013, the store locators for Jasz Couture, Allure, Party Time Formals and Terani did not identify any department stores as authorized retailers.[261]

---

apparently to complain that a customer found a dress sold by Peaches also at Von Maur, and allegedly for a lower price. Ms. Simon replied "I apologize this is causing you a problem I will call the buyer and make sure she raises the msrp. As I told barb, I honestly did not feel this dress would cause any issues at von maur since this dress is now 3 years old.")

[257] S. Lang Deposition at 74–75; S. Simon Deposition at 96-97.

[258] M. Montenegro Declaration at ¶ 3 ("Our prom and homecoming dresses are sold in specialty boutique retailers and over the internet. In prior years, we sold our prom and homecoming dresses to Macy's and Carson Pirie Scott. Although we no longer sell to department stores, I know that department stores carry prom and homecoming dresses from other designers.")

[259] http://www.dillards.com/html/findastore.html#Illinois.

[260] M. Levin Deposition at 16:1-17, 118:6-19.

[261] Terani Where to Buy 4.5.13 (No Dept. Stores Listed).pdf, Partytime Formals Store Locator 4.5.13 (No Dept. Stores Listed).pdf, Jasz Couture Auth Retailer 4.5.13 (No Dept. Store).pdf, Allure Where to Buy 4.5.13



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL - ATTORNEY WORK PRODUCT                                       1/21/15

97.    Additionally, I searched the internet archive wayback machine for examples from
       Nordstrom's to determine whether they were selling the same Designer brands sold
       by Peaches such that they would have been a competitive constraint on Peaches
       pricing prior to 2013.[262]  Pages for "prom dresses" were available for Nordstrom in
       2011 and 2012.  In each year, there were six dresses sold by La Femme and five
       dresses sold by Sean, a non-Designer brand but sold by Peaches during that time
       frame.[263]

98.    As I noted above, these results may help to explain why department stores were not
       able to discipline Peaches' supracompetitive pricing; this is a trivial amount of
       inventory relative to Peaches 20,000 dress inventory in stock.  In 2011, Peaches sold
       about ▮▮ dresses by La Femme alone and ▮▮ in 2012.[264]  Four La Femme and two
       Sean dresses are not a competitive constraint on Peaches.  Barbara Surdej testified
       that she does not consider stores to be competitors if they do not sell or carry the
       same quantities at Peaches. When asked whether other stores would be competitors
       of Peaches if they had the same dress as Peaches at the same price, Barbara Surdej
       testified as follows:

              Q. Okay. Well, if they had the same dress at the same price, is it your
              view that they would be a competitor of Peaches?

              THE WITNESS: I can't tell you that because -- If I carry ten Jovani's
              and they carry one Jovani, I don't think we would be in competition.[265]

99.    There are different segments of consumers who buy designer dresses from boutiques
       or other dresses from department stores, just like there are different segments of
       consumers who buy economy or luxury cars.  We would be hard pressed to argue

---

(No Dept. Stores Listed).pdf.

[262] https://archive.org/web/. See waybackmachine_dresses_nordstrom.pdf.

[263] Some of the dresses on the archived web page were unavailable.  Therefore, it is unclear whether some of
those dresses were repeats of other dresses elsewhere on the web page.

[264] Peaches in-store transactional data show that Peaches sold ▮ Sean dresses in 2011 and ▮ in 2012, in each
case far less than ▮▮▮▮▮ of Peaches sales for that year.

[265] Deposition of B. Surdej at 78.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL - ATTORNEY WORK PRODUCT                                        1/21/15

that a Chevy Malibu is in the same relevant market as a Mercedes-Benz S Class.
There exist luxury department stores, and it makes sense to examine whether they
provide downward pricing pressure on the Defendants. Whether it is because
department stores did not carry Designers in the Chicago area or offered so few
Designer dresses for sale, they did not discipline Peaches' supracompetitive pricing
prior to 2013.

        b. **Dr. Kneuper is Incorrect When He States that Peaches' Pricing
            Behavior is Inconsistent with Plaintiff's Allegations of Monopolization**

100.    Dr. Kneuper argues in his Declaration that because Peaches had been charging prices
15 percent higher than MSRP "since the very early days of its operations" means they
could not have had market power.[266] He argues also that because Peaches has
"moved away from its decades-long policy of pricing at 15% above MSRP" and is
selling at MSRP this contradicts Plaintiff's theory of anticompetitive pricing.[267] Dr.
Kneuper refers to Table 5 of his Declaration as support for his argument, showing
how much over MSRP it priced, on average each year since 2011.[268] Further, Dr.
Kneuper refers to the idea that "high service oriented retailers […] charge relatively
high unit mark-ups in order to recover their high overhead and related costs."[269] He
remarks, "high service, high quality grocery retailers such as Whole Foods typically
have higher mark-ups compared with many other grocery retailers"[270] and refers to
support for his argument that Whole Foods has higher gross margins than Kroger.[271]
I take each one of these arguments in turn.

101.    The fact that Peaches charged 15 percent higher prices than MSRP, while MSRP was
understood as the competitive price level, means that it had market power. It may
not have had market power originally. However, there came a time that MSRP

---

[266] Kneuper Declaration at ¶ 82.

[267] Kneuper Declaration at ¶ 78.

[268] These data are not available prior to 2011.

[269] Kneuper Declaration at ¶ 83.

[270] Kneuper Declaration at ¶ 83.

[271] Kneuper Declaration at note 94.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL - ATTORNEY WORK PRODUCT                                    1/21/15

became the de facto competitive pricing level and Peaches' pricing remained above this competitive level. Regardless of how Peaches obtained its market power, turning to exclusionary behavior in the face of increased competition in order to maintain it is anticompetitive.

102.   The fact that Peaches charged MSRP for some dresses in 2012 and most dresses in 2013 does not mean that they did not have market power. By 2009, Peaches understood that its brick-and-mortar store could no longer compete on the merits while charging prices higher than MSRP. Peaches charged different prices for difference customers across its websites and the challenge a discovery of its strategy would pose to Peaches' store.

> "[Because] [P]eaches is 15% above keystone and prom shop is keystone if local chicago [sic] customers knew prom shop was our website we could loose [sic] our entire business brick and mortaer [sic]."[272]

103.   Table 5 in Dr. Kneuper's Declaration shows that Peaches had market power in 2011 and 2012 because, in order to have an average percentage mark up above unit cost exceeding 100 percent, it must be charging higher than MSRP—the de facto competitive price in an industry in which Dr. Kneuper proffers that dress designers compete vigorously.[273]

104.   Finally, the WSJ article to which Dr. Kneuper cites proves my point precisely. The article notes three things: (1) Whole Foods was able to charge higher prices originally because it sold different products than other grocery stores (i.e., it obtained market power through competitive means); (2) given Whole Foods' supranormal margins, rivals entered Whole Foods' market; and (3) the article implies that Whole Foods will have a difficult time charging higher prices as rivals continue to enter with the same or similar products. As the article notes, Kroger is giving Whole Foods a run for its money because it is offering more of the same products as Whole Foods. Common sense dictates that Whole Foods purchases large volumes of produce and groceries

---

[272] PEACHES0000271.

[273] Kneuper Declaration at ¶ 81.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL - ATTORNEY WORK PRODUCT                                          1/21/15

from its suppliers.  If Whole Foods used its market power to demand that its suppliers not sell the same products to its rivals such as Kroger, Trader Joe's, or Sprouts,[274] it would be anticompetitive, exclusionary conduct.

### c. Dr. Kneuper's "Square Feet" Analysis is an Unreliable Measure of Market Share in the Chicago Prom and Homecoming Dress Market

105.   As noted in Section A above, if direct evidence of market power is not available and one must estimate the potential for market power indirectly, a common technique is to estimate market share.[275]  Market share is a ratio of a firm's revenue over a particular time period to the total revenue for all firms in the relevant product and geographic market during the same time period.  If market share is high, then the firm's ability to maintain prices above the competitive level is inferred.[276]  When revenue information is not available to measure market share (as in the case of small private retail stores such as specialty boutiques), then it may be possible to use an alternative measure as a proxy.  However, for an alternative measure to be reliable, there must be a consistent relationship between the variable you can measure and the revenue that you cannot.

106.   Dr. Kneuper attempts to measure Peaches' share of the relevant market he defines by using estimates of retail space (i.e., square feet) for the dress sellers he identifies.[277]  This methodology for estimating market shares for retail boutiques that sell prom and homecoming dresses (Dr. Kneuper's proposed relevant market) compound the problems with Dr. Kneuper's approach to defining the relevant market.  In particular, the amount of retail space a particular boutique may have is not a useful proxy for its sales of prom and homecoming dresses--nor, more importantly, is square footage a reliable indicator for a boutique's competitive significance.  As a consequence, Dr. Kneuper's market share estimates shed very little light on the competitive constraints

---

[274] See, e.g., http://www.hoovers.com/company-information/cs/competition.Whole_Foods_Market_Inc.6061e2f55006cb67.html

[275] Edlin and Rubinfeld (2004).  See also, HMG, § 4.1.1 ("... the purpose of defining the [relevant] market and measuring market shares is to illuminate the evaluation of competitive effects.")

[276] Edlin and Rubinfeld (2004), p. 141.

[277] Kneuper Declaration at ¶¶ 54-55 and Table 4.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                           1/21/15

Peaches faced or, ultimately, Peaches' ability to price above the competitive level within that market.

107.   In support of his use of retail square footage as a measure of boutique market shares, Dr. Kneuper makes two claims.  First, Dr. Kneuper claims that this methodology is "common practice" in markets where there are firms of different sizes.[278]  Second, Dr. Kneuper claims that "[s]quare footage is also a useful indicator of competitive significance in retail cases because it represents a retailer's capacity to carry products and inventory at their store."[279]

108.   Even assuming that Dr. Kneuper's first claim is true, it is irrelevant in this context. While I agree with Dr. Kneuper's observation that retail boutiques can vary widely in terms of the size of their locations (among other things), it does not follow that the size of a boutique's retail space in any way accurately represents the retailer's revenue or competitive significance in the market for prom and homecoming dresses.

109.   Retail boutiques differ in the range of products that they carry.  Many boutiques-- including Peaches--dedicate retail space to the sale of products besides women's dresses, such as shoes, jewelry or other accessories. More importantly, while the "bulk" of Peaches' dress sales are prom dresses,[280] many of the boutiques identified by Dr. Kneuper as market participants sell other types of dresses in addition to prom and homecoming dresses, most notably bridal gowns.  Peaches does not carry bridal gowns.[281]  For this, Dr. Kneuper makes no accommodation in his analysis.

110.   In this context, total retail square footage may have very little relationship either to boutiques' sales of prom and homecoming dresses, or to their competitive significance in constraining Peaches' prices for prom and homecoming dresses. Clearly, a boutique that mainly offers wedding dresses, and sells very few prom or

---

[278] Kneuper Declaration at note 56.

[279] Kneuper Declaration at note 56.

[280] Deposition of B. Surdej at 227.

[281] L. King Deposition at 74:15-21; J. Surdej Deposition at 51:14-16.



Expert Report of Leslie E. Schafer, Ph.D.

homecoming dresses--even if the boutique is very large (in terms of retail space)--will have little competitive significance in the prom and homecoming market.

111.    This problem is not merely hypothetical. Peaches' Barbara Surdej described the difficulty in comparing stores' physical sizes, given differences in boutiques' focus on prom and homecoming dresses:

> I guess that's hard because there are some stores that I have heard of that are bigger per square footage. But they also carry white, and I am just a color store. So therefore, their store, under the same blanket name, might be bigger in square footage, but I don't know how much prom they sell because they are both a prom and a bridal -- or maybe bridesmaids -- I don't know for that fact.[282]

112.    Indeed, because of the problems Hannah's faced with getting an adequate supply of prom and homecoming dresses, it was "forced to go into the bridal" in order to stay in business and maintain relationships with designers.[283] In other words, Peaches' conduct potentially served to make Hannah's a less-effective competitor in the prom and homecoming dress market during a time when the size of its physical retail location (i.e., Dr. Kneuper's measure of market share) was generally increasing.

113.    Dr. Kneuper's second claim in support of his methodology--i.e., that square footage is a reliable indicator of competitive significance in *retail* markets--is also misplaced. As an initial observation, the document cited by Dr. Kneuper in support of this claim is a submission to the FTC where market shares of *wholesale distributors* is analyzed by estimating the capacity of those distributors' distribution centers. In other words, Dr. Kneuper points to a document that is completely silent on using capacity to measure market shares in *retail* markets. At his deposition, Dr. Kneuper asserted the importance of square feet as a competitive constraint, but admitted that he could not point to any economic literature to support its use to estimate market share in the *retail* setting.[284]

---

[282] Deposition of B. Surdej at 366-367.

[283] Susan Shaban Deposition at 198-199.

[284] Kneuper Deposition at 229:23-230:5.



CONFIDENTIAL – ATTORNEY WORK PRODUCT

114. Again, this distinction is not merely academic. As Dr. Kneuper's cited document notes, wholesale distribution capacity matters for competitive significance because larger distributors--i.e., those with larger physical distribution facilities--have significant advantages over their smaller competitors.[285] One reason for this is that there are significant economies of scale in wholesale distribution. This is very different from retail markets, where (for example) Dr. Kneuper claims "that there are very low economies of scale in the retail sell [sic] of prom and homecoming dresses."[286] As a result, it is typically uneconomic for retailers to maintain excess capacity (e.g., only use half of the available inventory space) in order to respond rapidly to market opportunities in the same way as wholesale distributors can.

115. A cursory review of Dr. Kneuper's results makes the problems with his methodology readily apparent. For example, Dr. Kneuper's market shares based on square footage cannot be reconciled with any measure of market shares based on revenue. Dr. Kneuper estimates the size of Peaches' retail location as 25,000 square feet.[287] Elsewhere, Dr. Kneuper estimates Peaches' in-store sales at ██████████[288] Thus, according to Dr. Kneuper's figures, Peaches' sales per square foot of retail space was approximately ████ At the same time, Dr. Kneuper reports Hannah's square footage to be 2,600 square feet,[289] and sales at ████████[290] Again, according to figures reported by Dr. Kneuper, Hannah's sales were only about ███/sq. ft--i.e., about ████ ████ of Peaches' sales per square foot of retail space. This can be seen even within Peaches own sales per square foot of retail space. Figure 1 presents a plot of Peaches square feet and revenue for in-store sales in 2003-2005, during which time Peaches had an 8,400 square foot store, and from 2011-2013 during which time it had a 25,000 square foot store (using Dr. Kneuper's value).[291] Between 2003 and 2005, at

---

[285] Food & Water Watch, "Submission to the FTC," dated January 8, 2014, pp. 2-3, 6.

[286] Kneuper Declaration at ¶ 96.

[287] See, e.g., Kneuper Declaration at Table 4.

[288] Kneuper Declaration at ¶ 20.

[289] Kneuper Declaration at Table 4.

[290] Kneuper Declaration at ¶¶ 24-25.

[291] The revenue data employed for this analysis include Peaches gross income in 2003-2005. This is



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL - ATTORNEY WORK PRODUCT                                      1/21/15

8,400 square feet Peaches revenue per square foot varies from ███████ to about █████
Between 2011 and 2013, Peaches revenue per square foot varies from about █████ to
about █████ Dr. Kneuper offers no explanation for this discrepancy, nor does he
offer any opinion as to which of these figures is more representative of sales per
square foot of retail space in the prom and homecoming dress market more generally.

116.   Furthermore, even if there was a measurable relationship between revenue and square
feet, Dr. Kneuper's use of square feet to measure market share is fatally flawed in this
instance because the data he employed from Hoover's are unreliable. Dr. Kneuper
produced the materials from Hoover's for the 55 stores he considered in his analysis.
For Hannah's and Peaches, the values he used for square feet are consistent with
those provided in testimony and/or discovery.[292] However, Dr. Kneuper did not
produce a Hoover's report for Peaches. If he had, he would have seen that the data
reported for Hoovers is grossly inaccurate; it reports a year of founding in 1977 (it
was 1985), the number of employees as 2 (they employ more than 25 people), and,
most importantly, lists square footage of 4,000[293] (rather than 20,000). The official
Hoover's report for Peaches does not include a revenue figure, which is provided in
the reports produced by Dr. Kneuper for the other boutiques. However, it is
available on Hoover's website and reports revenue for Peaches of $0.14 million.[294]
Peaches' revenue ██████████████ in the period of time for which Peaches
earliest financial data were produced in this matter.[295] In sum, if the Hoover's data

---

[292] Plaintiff's Amended and Supplemental Answers and Objections to Defendant's Second Set of
Interrogatories to Plaintiff, No. 7. In deposition, Ms. Shaban recalls the square footage as 2,800 (Susan
Shaban Deposition at 210). Due to both initial success and dissatisfaction with the Chicago Ridge location.
Ms. Shaban has testified that the parking at the Chicago Ridge store was insufficient. (Susan Shaban
Deposition at 201).

[293] Peaches Hoover's Data.pdf.

[294] Peaches Hoovers Search.pdf.

[295] Peaches annual revenue reported to the IRS for 2003 was approximately ████████
(PEACHES0005456-PEACHES0005457)



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL - ATTORNEY WORK PRODUCT                                        1/21/15

for Peaches are so far off, then there is no way to know whether or not the other Hoover's data are reliable and therefore should not be used for this exercise.

### d. Dr. Kneuper's "High School Enrollment" Analysis is an Unreliable Measure of Market Share in the Chicago Prom and Homecoming Dress Market

117.    Similar to his use of retail square footage, Dr. Kneuper's use of high school enrollment figures to estimate market share is unreliable.[296]  Dr. Kneuper testified that, in his numerator, he only included those dresses where a prom or homecoming event description was used, as opposed to whether the dress was from the designers' prom or homecoming line.[297]  In other words, only Peaches' transactions where the type of event is explicitly "prom" or "homecoming."[298]  This set of transactions is incomplete.  The relevant product market, described below, is not dresses that girls wear to prom or homecoming events, but prom and homecoming lines manufactured by the high-end Designers.  This may seem minor, but is an important distinction.  A girl may buy a prom dress and choose to wear it to a different event or buy it for a prom and choose not to register it for an event or event type.  Kneuper's analysis ignored these transactions even if the same style from the same Designer was also bought for a prom and/or homecoming event.[299]  Similarly, dresses from Designer lines may have been bought for other events than prom and homecoming, but would be considered a prom and homecoming dress by the Designers.[300]  All of these transactions are relevant and, thus, Dr. Kneuper's numerator is too low.  Second, Dr. Kneuper provides no underlying economic or evidentiary basis for his decisions

---

[296] Kneuper Declaration at ¶¶ 46-49.

[297] Kneuper Deposition at 124-126.

[298] Letter from Ashley K. Martin to David J. Riski, November 3, 2014.

[299] Kneuper Deposition at 124-126.

[300] Note also that Dr. Kneuper excluded about ███ observations where the event type is "NULL" or "No Event Needed." PEACHES0009383; See also Objections and Answer to Plaintiff's Fourth Set of Interrogatories to Defendants, November 21, 2014, No. 2. ("The entries "NULL", "No Event Needed" or blank information under "Event" (Column I) and "Event Type" (Column K), typically reflect sidewalk sales.")



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                    1/21/15

about how many girls attend a prom or homecoming dance.[301]  In fact, Dr. Kneuper admitted as much at his deposition that he used "intuition."[302]

### 2. Peaches Engaged in Price Discrimination Between peachesboutique.com Customers Based on their Geographic Location to Maintain its Supracompetitive In-Store Pricing

118.   Not only did Peaches charge higher prices than other brick-and-mortar retailers selling prom and homecoming dresses in Chicago, but Peaches also charged different prices to different groups of its own customers for the same dresses on peachesboutique.com; a practice known as third-degree price discrimination.[303]  By definition, the ability of a firm to price discriminate requires market power.[304]  If Peaches did not exploit the market power it had in Chicago then the prices on peachesboutique.com in the Chicago area would have dropped to MSRP sooner than 2012/2013.

119.   Price discrimination provides a basis for concluding that sales to different groups of consumers constitute separate relevant product markets.  Called "price discrimination markets" in the Merger Guidelines,[305] as Baker (2007) notes, a price discrimination

---

[301] Kneuper Declaration at ¶ 48. ("[O]nly half (50%) of high school aged girls attend prom or homecoming; and only 3 out of 4 (75%) of the girls who attend prom or homecoming during the year buy one new prom or homecoming dress.")

[302] Kneuper Deposition at 221-222.

[303] *See, e.g.,* "Pindyck and Rubinfeld," pp. 369-376.

[304] *See, e.g.,* Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization,* 2th Ed., Boston: Pearson, Addison-Wesley, 1994, p. 435 ("A firm must have some market power (the ability to set price above marginal cost profitably); otherwise, it can never succeed in charging any consumer more than the competitive price."). See also, "Pindyck and Rubinfeld," pp. 369-376.  See also, ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 238 (6th ed. 2007) (citing United States v. Eastman Kodak Co., 63 F.3d 95, 106 (2d Cir. 1995); Coal Exps. Ass'n v. United States, 745 F.2d 76, 91 (D.D.C. 1984)) (which includes the ability to price discriminate as one of the "other factors" that may be considered by the courts in determining whether monopoly power exists.)

[305] HMG (2010), §4.1.4.

> (If a hypothetical monopolist could profitably target a subset of customers for price increases, the Agencies may identify relevant markets defined around those targeted customers, to whom a hypothetical monopolist would profitably and separately impose at least a SSNIP. Markets to serve targeted customers are also known as price discrimination



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT 1/21/15

market is defined not just by its products and locations; the definition also must identify the targeted buyers.[306] The Market Power Handbook explains "[i]n certain situations, price discrimination provides a basis for concluding that sales of a product to a particular group of customers constitute a relevant product market separate from sales of the same product to other customers."[307] "Price discrimination demonstrates the presence of market power and, if the level of discrimination is significant and nontransitory, suggests that antitrust geographic or product markets should be narrowly defined."[308]

120. The evidence produced in this matter, described below, reveals that in order to protect supracompetitive prices in its brick-and-mortar store while still competing in the wider internet market, Peaches used information asymmetry to charge in-store and Chicago area internet customers higher prices for the same (and similar) dresses than internet customers outside of the Chicago area.

### a. Price Discrimination

121. Price discrimination, or charging different prices to different customers for the same product, is one way that firms with market power set prices.[309] In particular, "third-degree price discrimination," seen in this matter, is a technique whereby a firm with market power divides consumers into two or more groups based on their price sensitivity and charges a different price to each group.[310]

---

markets. In practice, the Agencies identify price discrimination markets only where they believe there is a realistic prospect of an adverse competitive effect on a group of targeted customers.)

In this instance, Peaches has charged a subset of internet customers 15 percent higher prices.

[306] Baker (2007), Market Definition: An Analytical Overview, 74 *Antitrust Law Journal* No. 1, p. 151.

[307] Market Power Handbook at p. 71 and Market Power Handbook at note 31 ("In *FTC v. Whole Foods Market*, 548 F.3d 1028, 1038 (D.C. Cir. 2008), the D.C. Circuit found that a group of "core" customers for which a supplier can price discriminate can constitute a relevant market".) See also, HMG (2010), § 4.2.

[308] McAfee p. 484.

[309] *See, e.g.*, "Pindyck and Rubinfeld," pp. 369-371.

[310] *See, e.g.*, "Pindyck and Rubinfeld," pp. 369-371.



Expert Report of Leslie E. Schafer, Ph.D.

_

122.    The existence of price discrimination in a market requires three conditions:

> (1) Consumers must differ in their demands for a given good or service (i.e., different segments of the market have different limits on their willingness to pay, or different price elasticity of demand),

> (2) A firm can distinguish between groups of customers with different levels of elasticity and charge a higher price to consumers with lower elasticity (i.e., the firm *has* market power), and

> (3) Arbitrage between the different groups can be prevented or limited (i.e., resale from the more elastic group to the less elastic group is difficult or impossible generally).[311]

123.    For example, given a customer base with two separate groups, a successful third-degree price-discriminating firm will charge a lower price to the group with the identifiably lower willingness to pay and a higher price to the other group, while at the same time preventing someone from the low-price group from selling their purchased good to someone in the high-price group. By definition, the ability of a firm to price discriminate requires market power, since it involves profitably setting prices above the competitive level.[312]

### b. Peaches Implementation of Price Discrimination

124.    When peachesboutique.com was created in 2006, prices were set at MSRP+15 percent. Peaches realized that its website could not able to compete with other websites charging MSRP (i.e., rival websites were charging lower prices). Peaches

---

[311] *See, e.g.*, R. Preston McAfee, *Price Discrimination*, in 1 Issues in Competition Law and Policy 465 (ABA Section of Antitrust Law 2008) ("McAfee") and Market Power Handbook at pp. 71-72.

[312] *See, e.g.*, Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th Ed., Boston: Pearson, Addison-Wesley, 2005, p. 435 ("A firm must have some market power (the ability to set price above marginal cost profitably); otherwise, it can never succeed in charging any consumer more than the competitive price."). See also, "Pindyck and Rubinfeld,", pp. 369-376. See also, ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 238 (6th ed. 2007) (citing United States v. Eastman Kodak Co., 63 F.3d 95, 106 (2d Cir. 1995); Coal Exps. Ass'n v. United States, 745 F.2d 76, 91 (D.D.C. 1984)) (which includes the ability to price discriminate as one of the "other factors" that may be considered by the courts in determining whether monopoly power exists.)



responded by dropping prices for most of its peachesboutique.com customers. Beginning in 2009, Peaches updated the technical design of its branded website such that customers ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

                                                          This continued for dresses priced above ███████ until January 2012 and for dresses priced below ████ until January 2013.[314]

125.    Mr. Roy Surdej testified that the technical implementation of this methodology was performed by Peaches' internet specialist.[315]  In so doing, █████████████████████

███████████████████████████████████████████ This method, by its nature, has inherent limitations for this purpose[316] as I understand that it will not tell you the ███████████████████████████████ but rather it will give the location of the internet service protocol ("ISP") or her respective internet provider.  Roy Surdej stated that ████████████████████████████████████████████████"[317]  I have not seen any evidence produced in this matter which explains the methodology used to implement the technical solution or whether it was indeed implemented with a ███████ ██████████████  However, I am able to determine from the peachesboutique.com

---

[313] J. Surdej Deposition at 99-100.

[314] Declaration of R. Surdej at ¶¶ 22-24.

[315] R. Surdej Supp. Deposition at 78:10-17.

[316] Geolocation is typically derived from IP addresses, which are leased to ISPs and so can be fairly inaccurate in scope.  Some claims have been made to track Geolocation to within 1km of a given spot. See, e.g., http://www.usenix.org/events/nsdi11/tech/full_papers/Wang_Yong.pdf, at p. 1 ("While client-assisted systems capable of providing highly accurate IP geolocation inferences do exist [3, 5, 9], many applications such as location-based access restrictions, context-aware security, and online advertising, can not rely on clients' support for geolocation," and "Despite a decade of effort invested by the networking research community in this area, e.g., [12, 15–19], and despite significant improvements achieved in recent years (e.g., [17, 24]), the desired goal, a geolocation service that would actually enable the above applications, has not yet been met.")

[317] R. Surdej Supp. Deposition at 77-80.



Expert Report of Leslie E. Schafer, Ph.D.

internet transactional data[318] that price discrimination was practiced███████
███████████████[319]

126.  In order to test for price discrimination in the data, I compared the prices of the same
Designer dress sold ██████████████████████████from Peaches Boutique.
In the Peaches' internet data provided, I was able to use Peaches' zip code (60638)
along with the zip code of each customer, where available, to determine████████
████████████████████████████████[320] I
understand that this ████████████is more precise than using a customer's IP
address. Using this ████████████ I am able to isolate the dresses sold on███
█████████████████████████████for the purchase of the same
dress at ████████████████

127.  For this analysis, I identified the set of ████unique Designer dresses bought during
the 2011 prom season (Jan-May) on Peachesboutique.com.[321] From this population,
████████████████████████as my designation of dresses sold



---

[318] The first Peaches' internet transactional data produced in this matter (PEACHES0009383), which was
provided to me on October 20, 2012 as part of the back-up production for Dr. Kneuper's Declaration of
October 8, 2014, did not include a variable which identified on which of Peaches' three websites the sale was
made. Therefore, I requested that this variable be produced. I received a new dataset (PEACHES 0010945)
on December 17, 2014 which included said variable. However, approximately████████████transactions
had different values for other variables which had been included previously. The variable most-often
changed was unit cost. I understand from Dr. Kneuper's deposition that, on occasion, Peaches would buy
dresses from designers at considerable discounts from lines that were in-season in prior years (Kneuper
Deposition at 134-135). This discounted unit cost information would be entered into "The Peach" as the
unit cost for that dress. Then, when data reports are pulled, like those in the instant matter for in-store and
internet sales,████████████████████████████████████████ In order to
preserve the more accurate unit cost variable from the first dataset, I merged the two datasets together in
order to attach the "website" variable from the second dataset to the first, using all other variables besides
unit cost. ████transactions ████████from the first dataset do not match the second dataset because of
differences in other variables (such as zip code, area code, and event descriptions) which I have excluded
from my analysis. Additionally, there are████transactions in the second dataset that are not in the first
dataset. Without explanation for why they were excluded from the first dataset, I have excluded them from
my analysis as well.

[319] Ms. Shaban testified in her deposition that she also noticed that prices appeared higher than MSRP and
relative to other websites by about $30 to $100. (Susan Shaban Deposition at 221-222)

[320] PEACHES0010945.

[321] I also employed here the restrictions that were used for other analysis in this report.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT 1/21/15



█████████████" Next, I identified dresses where there was at least one dress sold ██████████████ In the circumstance where there are multiple dresses sold either ██████████████of a unique dress, I applied three different methods of determining the comparative dress price.

- First, I looked only at dresses where the price did not vary within the ████████ ██████populations for a unique dress. ████dresses at a ████████████

- Second, I used the mode, or the most common price, that exists for each of the ████████████prices of a unique dress.

- Lastly, I use a median price for each population of a unique dress.

128. In Exhibit 11, under the first method, █████████████████████) dresses have a higher price ███████████████████████████████████ ██████████████ and ███████████████████████ The results are more clear when a ████████████is employed. ████dresses███████ had a higher price███████████████████████████dresses where the price is the same and █dress had a higher price████████████ These results suggest it is possible that Peaches' actual practice might have been████████████████ █████████████████████████████████ It is difficult to say whether this was intentional or unintentional████████████ █████████████████████████ as noted above. The results are similar when the other methods are employed, with the main difference being that a handful of dresses had a higher price████████████ ████████████ Regardless of the method of prices selected for measurement, there does appear to be a pattern of price discrimination on peachesboutique.com in 2011.

## B. Market Definition

129. A relevant market defined for antitrust purposes is not the same thing as a "market" in the everyday sense of the term. Rather, a relevant antitrust market is an analytical construct designed to capture the sources of competitive discipline that would prevent alleged conduct from resulting in supracompetitive pricing. A relevant antitrust market should be defined in relation to the conduct at issue. As Professors



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                    1/21/15

Edlin and Rubinfeld have written, "[b]ecause there are frequently many possible
markets one can take into consideration, the relevant markets depend on the
competitive concerns that are at issue."[322]  In essence, one seeks through market
definition to identify the alternatives (both in product and geographic dimensions)
that would prevent the firm in question from acquiring or maintaining monopoly
power.[323]

### 1. Relevant Product Market

130.    The conceptual framework for market definition generally employed in Section 2
matters is taken from the Merger Guidelines that have been issued and refined by the
US antitrust enforcement agencies.  The operative principle in the Guidelines for
mergers is that the relevant market should only include those competing alternative
products that would prevent the Defendants from profitably increasing prices
through the conduct at issue.[324]  The key issue, however, is not simply whether these
factors are present when it comes to other alternatives, but whether they exist to a
sufficient degree as to confer competitive discipline on pricing.

131.    In identifying such alternatives, one can use the "hypothetical monopolist"
framework set forth in the Guidelines.[325]   The Agencies employ the hypothetical
monopolist test to evaluate whether groups of products in candidate markets are
sufficiently broad to constitute relevant antitrust markets and to identify a set of

---

[322] Edlin, A. and D. Rubinfeld, "Exclusion or Efficient Pricing: The 'Big Deal' Bundling of Academic
Journals," *Antitrust Law Journal*, v.72, no.1, 2004 at 126.  *See also*, Baker, J., "Market Definition: An Analytical
Overview," *Antitrust Law Journal*, v.74, no.1, 2007 at 173 ("Moreover, market definition does not take place in
a vacuum: in any particular case, demand substitution must be evaluated with reference to the specific
allegations of anticompetitive effect in the matter under review."); Larner, R. and C. Nelson, "Market
Definition in Cases Involving Branded and Generic Pharmaceuticals," *ABA Economics Committee Newsletter*,
v.7, no. 2, Fall 2007 at 4–7 ("[…]the proper antitrust market in a case is the market relevant to an analysis of
the competitive effects of the alleged behavior").

[323] Merger Guidelines, § 4.

[324] Merger Guidelines, § 4.1.1 ("… the purpose of defining the [relevant] market and measuring market shares
is to illuminate the evaluation of competitive effects.").

[325] Merger Guidelines, § 4.1.1. First introduced in 1982, the hypothetical monopolist test has been updated
and refined over time, most recently in 2010. (*See* http://www.justice.gov/atr/hmerger/11248.htm; Merger
Guidelines, § 1 (footnote 1).



Expert Report of Leslie E. Schafer, Ph.D.

products that are reasonably interchangeable with a product sold by one of the merging firms. Within that framework, products belong in the relevant market if a hypothetical monopolist of the products at issue would need to control them (either in terms of price or output) in order to have significant market power; i.e., in order to be able to profitably raise prices above the level that competition would otherwise provide by a significant, non-transitory amount (what the antitrust agencies refer to using the acronym SSNIP).[326]

132.    To define the relevant product market using this conceptual approach, one starts with the products affected by the conduct in question as a candidate relevant product market, and then ask whether or not a hypothetical monopolist (as the only seller of these products) would have significant market power. If the answer is "yes"--i.e., a hypothetical monopolist would have that power based upon control of those products alone--then the process stops and the candidate market becomes the relevant product market for analyzing the conduct at issue. If the evidence shows instead that a hypothetical monopolist in this candidate market would not have significant market power, then the candidate market is expanded to include the next closest product substitute and the market power that would flow from monopoly control of this expanded product market is then assessed. This process is repeated until the candidate relevant market is broad enough such that the hypothetical monopolist would have significant market power. In the instant matter, the smallest product affected by the conduct in question (i.e., the candidate relevant product market) includes special occasion prom and homecoming dresses manufactured by the Designers.

133.    As is described above in Section A there is undisputed direct evidence in this matter that Peaches priced above the competitive level in the market for prom and homecoming dresses through 2012, including for all of the Designers in the candidate product market. Since the answer is "yes" to the question whether a firm did have market power based upon control of those products alone--then the process stops;

---

[326] The DOJ/FTC "most often" define a SSNIP (small, significant but non-transitory price increase) to be 5 percent. *See also*, Merger Guidelines, § 4.1.2 ("The SSNIP is intended to represent a 'small but significant' increase in the prices charged by firms in the candidate market for the value they contribute to the product or services used by customers.").



the candidate market of Designer prom and homecoming dresses becomes the relevant product market for analyzing the conduct at issue. Further, there is no evidence that the sale of non-Designer prom and homecoming dresses in and around the Chicago Market was sufficient to prevent Defendants from maintaining supracompetitive prices on the Designers' prom and homecoming dresses.

### 2. Relevant Geographic Market

134.    The relevant market also has a geographic dimension. In the Seventh Circuit, identifying a geographic market requires a two-step process which includes, "careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies."[327]  In other words, we look not only at where customers are located, but also at the location of suppliers to determine the relevant market.

### a. Chicago In-Store Retail Channel

135.    In the instant matter, the area directly affected by the conduct at issue (the candidate geographic market) is a set of area codes which the Defendants gave to the Designers to indicate the area in which to exclude Peaches' competitors.  As noted in the First Amended Complaint, these area codes include 630/331, 847/224, 708, 312/872, and 773 ("Plaintiff's relevant market" or "Chicago Market"), which include the location of all of the specialty boutiques which Peaches sought to foreclose of Designer dresses, and is an area approximately 30 miles around Peaches Boutique.  This distance is consistent with documentary evidence produced by the Defendants in which Peaches insisted in 2011 that its territory be protected for 331 zip codes within 30 miles of Peaches.[328] Jovani, one of the world's largest manufacturers of prom and homecoming dresses, "did not think a store 40 minutes away was a problem."[329] Similarly, Susan Shaban testified that a majority of her customers come from within 20 minutes, but that girls are willing to travel up to 45 to 60 minutes to purchase a

---

[327] *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736-739 (7th Cir. Ill. 2004) citing *Tampa Electric*, 365 U.S. at 327.

[328] See PEACHES0005533-PEACHES0005537.

[329] PEACHES0001723.



CONFIDENTIAL - ATTORNEY WORK PRODUCT                                          1/21/15

prom dress (which is about 30 to 50 miles depending on the area and traffic congestion).[330] Further, as can be calculated from Exhibits 3 and 12, approximately ███ percent of Peaches' in-store sales of Designer dresses in 2011 and 2012 were by customers in these area codes.[331]

136.    Given that Peaches unilaterally chose the areas in which it wanted Designers to foreclose competitors of their dresses,[332] one would expect the distances to be exaggerated to encompass all potential areas in which there was even a chance of another store competing with Peaches if it were to receive the same dress lines, particularly since Peaches "take[s] threats to [its] sales territory very seriously."[333] This freedom continues even into 2013. For example, Terani tells Peaches in February 2013:

A. Please email me a list of stores not to sell to. So we can block them in our system ASAP.

B. Keep in mind that we do not know the area. If an order says something other than Chicago, this is the problem.

C. Best to give me a list. As it gets crazy here and in order dept.

D. Please remember that I kept my word and agreement. We closed several accounts. As you know it is not a perfect world, we try hard. Waiting for email as we discussed.

E. I have alerted my order dept. before entering any order in IL to fax you first so you can Google and advise. This is the best I can think of. You can review list.

137.    In 2013, Terani gave Peaches the option to exclude any location in IL and it replied with a list of 11 area codes (708, 219, 312, 773, 847, 630, 815, 331,779, 224, and

---

[330] Susan Shaban Deposition at 269:1-8.

[331] [███████████████████]. I understand from counsel that, at the time of filing the First Amended Complaint Plaintiff was without the benefit of Peaches' transactional data.

[332] See, e.g., PEACHES0003725.

[333] JOVANI 9.



Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                    1/21/15

872).[334]  All area codes proposed by Peaches but 779/815 and 219 are within
Plaintiff's relevant market.   Dr. Kneuper argues in his Declaration that the area codes
815/779 and 219 should be included.  He alleges that Plaintiff's geographic market is
"gerrymandered"[335] because "[779/815 and 219] include competitive geographic
areas that are within 30 miles of Peaches, such as Joliet, IL, Hammond, IN and Gary,
IN."  However, the large majority of these area codes are not only outside of 30
miles, but also well outside of 50 miles and even 100 miles from Peaches.  Further,
the boutiques specifically targeted by Peaches while it was charging supracompetitive
prices are all within the Chicago Market.[336]

138.    In Figure 3 of his Declaration, Dr. Kneuper presents a map of the greater Chicago
        area with 30- and 50-mile radii around Peaches Boutique's zip code.  His use of this
        figure to suggest that significant proportions of these two sets of area codes are well
        within a 30 or 50 mile radius of Peaches is misleading.  By inserting the text for area
        codes 779 and 815 within the 30-mile radius circle in his picture near Joliet, IL, Dr.
        Kneuper has drawn the figure to insinuate that by not including 779/815 the Plaintiff
        has purposefully left out a small, but important geographic area near Chicago.
        Rather, 779/815 is an enormous area code which stretches completely across the
        state of Illinois to the Iowa border.  For example, 779/815 includes Jo Daviess
        County, IL, a drive of approximately 170 miles taking over three hours without
        traffic.  Similarly, area code 219 includes Chalmers, IN, which is 120 miles and two
        hours from Peaches.

139.    Most importantly, despite the existence of these boutiques in 815 and 219, Peaches
        was able to profitably maintain supracompetitive prices through 2012.  Therefore, it
        must be the case that consumers in the Chicago Market did not turn to those

---

[334] PEACHES0001740.  While the list includes 11 area codes, they are in sets of two as area codes across IL
regional areas were split to accommodate increased demand for telephone numbers.  See, e.g.,
http://www.prnewswire.com/news-releases/verizon-will-introduce-new-779-area-code-in-illinois-815-
calling-area-to-accommodate-growing-need-for-telephone-numbers-54984082.html.

[335] Kneuper Declaration at ¶¶ 18, 40, and 42.

[336] Stores referenced in Section IV.B.2.c supra.  One other store which Peaches targeted, Dream Night, was
outside of the Plaintiff's Chicago Market, but Peaches targeted this store because of alleged violations of
transshipping, not because it viewed Dream Nights as a competitor. PEACHES0003817.


Expert Report of Leslie E. Schafer, Ph.D.

CONFIDENTIAL – ATTORNEY WORK PRODUCT                                                              1/21/15

boutiques outside the area (815, 219 or elsewhere) for the supply of prom and homecoming dresses in sufficient numbers, at least during that time period.

140.    The relevant geographic market for the Chicago area, approximated by sales made in the brick-and-mortar retail channel, is not, as Dr. Kneuper proposes, part of a national market. In the context of the Merger Guidelines, were firms in this area of Chicago to increase their prices by a small, significant but non-transitory price increase, in-store customers would not turn to shopping in stores in Boston, Los Angeles, or Atlanta, for example. Dress manufacturers understand this. For example, Barbara Surdej writes to a manufacturer called Johnathan Kayne to complain that a boutique in Peabody, Massachusetts is offering a coupon during the 2013 prom season. The manufacturer replies "This store is in Massachusetts, and should have no effect on what you are doing in your store in Chicago."[337]

### b. National Internet Retail Channel

141.    As noted in the Merger Guidelines, "[a] single firm may operate in a number of different geographic markets."[338] In addition to the Chicago market for in-store retail channel sales, Peaches also competes in the internet retail channel for prom and homecoming dresses[339] where it does not have market power. Dr. Kneuper proposed in his Declaration that Peaches' participation in the sale of prom and

---

[337] PEACHES0001588.

[338] "Horizontal Merger Guidelines," U.S. Department of Justice and the Federal Trade Commission, August 19, 2010, §§1.2. ("Merger Guidelines," or "HMG") (available at http://www.justice.gov/atr/public/guidelines/hmg-2010.html).

> Absent price discrimination, the Agency will delineate the geographic market to be a region such that a hypothetical monopolist that was the only present or future producer of the relevant product at locations in that region would profitably impose at least a "small but significant and nontransitory" increase in price, holding constant the terms of sale for all products produced elsewhere. That is, assuming that buyers likely would respond to a price increase on products produced within the tentatively identified region only by shifting to products produced at locations of production outside the region, what would happen? If those locations of production outside the region were, in the aggregate, sufficiently attractive at their existing terms of sale, an attempt to raise price would result in a reduction in sales large enough that the price increase would not prove profitable, and the tentatively identified geographic area would prove to be too narrow.

[339] See discussions of Peaches' websites, supra, Sections IV.A.2 and IV.B.2.



Expert Report of Leslie E. Schafer, Ph.D.

homecoming dresses on the internet means that Peaches competes in a national market for prom and homecoming dresses and therefore has no market power, even in the in-store Chicago Market.[340] If one were to use an inferential method to assess whether a firm has market power, as Dr. Kneuper did, if the relevant geographic market was national, then clearly Peaches would have had a very small share of that market during the relevant time period, and would not have been able to charge supracompetitive prices in its brick-and-mortar store. However, the facts present in this matter reveal that Peaches <u>did</u> charge supracompetitive prices in-store, and therefore customers in the Chicago Market <u>did not</u> turn to the internet for the purchase of prom and homecoming dresses in sufficient numbers to constrain Peaches' market power in the local Chicago Market. Dr. Kneuper's geographic market definition must be incorrect.

142.     As noted above, Peaches ran three websites during the relevant time period in this matter: peachesboutique.com, promdressshop.com, and dress4prom.com. On Peaches' two non-branded websites, Peaches charged MSRP since the moment it first took ownership of them. As noted above, Peaches also charged MSRP for ████ customers on peachesboutique.com. The fact that Peaches was able to charge supracompetitive prices in its brick-and-mortar store concurrent with MSRP pricing on the internet is evidence that these and other websites unaffiliated with Peaches did not provide competitive discipline on Peaches' in-store pricing in the Chicago Market during the relevant time period. As a matter of economic logic, Peaches would not have offered the same or similar dresses for sale on the internet at lower prices than in its brick-and-mortar store if it believed that would impact its ability to charge higher prices in the store.

143.     In contrast, Peaches' branded website, peachesboutique.com, has been tied intimately to the brick-and-mortar store for Chicago area customers. An unprotected, branded website likely would have prevented Peaches from exercising its market power locally. However, Peaches took extra measures to insulate its brick-and-mortar store from competition through price discrimination.

---

[340] Kneuper Declaration at ¶¶ 32, 39.



CONFIDENTIAL – ATTORNEY WORK PRODUCT                                    1/21/15

## VII.  Conclusion

144.  At least between 2009 and 2012, Peaches possessed market power in the sale of
      Designer prom and homecoming dresses in the Chicago Market.  When faced with
      entry by new and growing competition, rather than competing on the merits, Peaches
      took concrete steps to protect its brick-and-mortar store customers.  First, Peaches
      demanded that the Designers not sell their dresses to its competition in the Chicago
      Market.  As the largest retailer of prom and homecoming dresses in the Chicago area,
      Peaches threatened the Designers that it would stop purchasing their dresses if the
      Designers sold to Peaches' competition.  Second, Peaches took material steps on its
      branded website, peachesboutique.com, to protect its local market power by price
      discriminating between customers▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Through these
      efforts, Peaches maintained supracompetitive prices longer than it would have but for
      this anticompetitive behavior.



Expert Report of Leslie E. Schafer, Ph.D.

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**                                      1/21/15

Leslie Schafer, Ph.D.
January 21, 2015



Exhibit 1

**Leslie Schafer, Ph.D.**
*Senior Economist*
Los Angeles, CA
Tel: 213 624 9600
lschafer@econone.com

Dr. Leslie Schafer is a Senior Economist with Econ One Research, Inc. in Los Angeles, CA. With more than ten years of experience in economic consulting, Dr. Schafer applies economic analysis and econometrics to liability and damages estimation for antitrust, intellectual property, health care reimbursement, and other complex litigation matters. Dr. Schafer also values intellectual property for joint ventures and other non-litigation contexts. Her analyses have covered a wide variety of industries ranging from health care, insurance, information technology, and asset-based lending, to products such as vaccines, consumer packaged goods, high-performance swimwear, and power tools. Dr. Schafer has particular expertise analyzing large relational databases, cross-sections, and panel datasets of health care claims and commercial transactions, especially in the large-scale, class action context.

Dr. Schafer has served as a testifying expert on benchmarking the reasonableness of billed charges for health care services, intellectual property damages, and the use of cost-benefit analysis in product liability. On numerous occasions, she has been an expert witness with the National Institute for Trial Advocacy (NITA) and the Trial Advocacy Group. As a consulting expert, Dr. Schafer has provided analysis in antitrust and intellectual property cases on issues such as market pricing, competition and market power, market definition, common impact, reasonable royalties, and by constructing financial and econometric damages models. Additionally, Dr. Schafer has valued trade secrets and monitored the viability and competitiveness of business divestitures of merging multinational firms as part of compliance with structural remedies for the U.S. Federal Trade Commission, the European Commission, and the German Bundeskartellamt (Federal Cartel Office). For example, for the acquisition of Gillette by Proctor & Gamble, Dr. Schafer managed the merging firms' compliance with divestitures of the Spinbrush toothbrush business, Rembrandt (a Gillette oral care product line), Right Guard and other Gillette deodorant brands.

In addition to consulting, Dr. Schafer has taught microeconomics at The Wharton School of Business, University of Pennsylvania and the McDonough School of Business at Georgetown University.

## Education

Ph.D. & M.A. in Managerial Sciences and Applied Economics, Wharton School of Business, University of Pennsylvania

M.P.P. in Public Policy, University of Maryland

B.A. in Political Science, Tufts University, *cum laude*

## Work Experience

Econ One Research, Inc.
Senior Economist, November 2011 – Present

McDonough School of Business at Georgetown University
Adjunct Professor, 2010–2011

Exponent, Inc., Health Sciences
Managing Economist, 2010 – September 2011

Leslie Schafer, Ph.D.
*Senior Economist*
Page 2 of 8

**Work Experience, Continued**

> PricewaterhouseCoopers LLP, Advisory Services
>> Manager, 2006–2009
>> Senior Associate, 2005–2006
> The Wharton School of Business, University of Pennsylvania
>> Lecturer & Teaching Assistant, Managerial Microeconomics (undergraduate and MBA), 1999–2004
> United States Government Accountability Office (Formerly United States General Accounting Office) – National Security and International Affairs Division
>> Senior Evaluator, 1996–1998
>> Evaluator, 1992–1996

**Expert Reports and Testimony**

> ***David Escamilla v. M2 TECHNOLOGY, INC.***
> David Escamilla (Plaintiff)
> U.S. District Court for the Eastern District of Texas, Sherman Division, No. 4:12-CV-634 RAS DDB
> - Expert Report (December, 2013)
> - Assessment of damages from trademark infringement using reasonable royalty analysis.

> ***Sanjiv Goel, MD v. Coalition America, Inc.; Multiplan, Inc.; Interplan Health Group, Inc.; Cigna Healthcare of California; Health Net Life Insurance Company; Health Net of California, Inc.; TC3 Health, Inc.,***
> Gibson, Dunn & Crutcher LLP (Defendant),
> Manatt, Phelps & Phillips, LLP (Defendants)
> U.S. District Court for the Central District of California, No. CV11-02349 GAF (Ex)
> - Expert Report (January, 2013)
> - Benchmarking analysis employed to assess whether charges billed for cardiac health care services were reasonable.

> ***Zdzislaw Ptak v Black & Decker Corporation, Black & Decker (U.S.) Inc., DeWALT Industrial Tool Co., and Home Depot U.S.A., Inc.,***
> Miles & Stockbridge P.C. (Defendants)
> U.S. District Court for the Northern District of Illinois, Eastern Division, No. 08 CV 6212
> - Expert Report (June, 2010)
> - Deposition (August 4, 2010)
> - Assessment of cost-benefit analysis of and consumer willingness-to-pay for a table saw safety feature.

Leslie Schafer, Ph.D.
*Senior Economist*
Page 3 of 8

**Other Representative Engagements**

*Antitrust Litigation*

> For a class of direct purchasers of a vaccine, performed economic analysis to establish that evidence common to members of the proposed class could be used to show that all or virtually all class members were overcharged and that the aggregate amount of overcharge damages incurred by the proposed class as a whole could be calculated on a class-wide, formulaic basis using a reliable methodology.

> For a class of direct purchasers of hospital healthcare services, performed economic and econometric analysis to establish that a health insurance payer's contracts with hospitals artificially inflated class members' payments for hospital services, that evidence common to members of the proposed class could be used to show that all or virtually all class members were overcharged, and that the aggregate amount of overcharge damages incurred by the proposed class as a whole could be calculated on a class-wide, formulaic basis using a reliable methodology.

> For a health insurance provider involved in a class action antitrust matter, performed statistical benchmarking analysis of usual and customary ("UCR") billed charges for out-of-network health care services.

> For a U.S. industrial chemicals manufacturer, designed an econometric model to estimate potential damages from class action civil litigation following resolution of a price fixing dispute with the U.S. DOJ. The purpose of the model was to control for other market forces that may have increased prices, revealing the premium paid due to the alleged price-fixing behavior.

> For a U.S. manufacturer of high-performance swimwear, estimated damages related to antitrust and other commercial claims. Analyzed market pricing and unit sales to assess the market dominance of the defendant.

*Intellectual Property Valuation & Litigation*

> For a software development company involved in a patent infringement dispute, estimated reasonable royalties and damages for defendant's use of its instant search processing technology.

> For a software technology company involved in two patent infringement disputes, estimated reasonable royalties and damages for defendant's use of its patented stateless packet-based processing technology in application delivery networking products.

Leslie Schafer, Ph.D.
*Senior Economist*
Page 4 of 8

Assisted an information technology outsourcer in negotiations to grant license rights for a large portfolio of information technology-related trade secrets. Multi-year, multi-phased engagement included estimation of approximately $800 million in reasonable royalties for the subject IP.

For a Taiwanese manufacturer of broadband networking and internet routing communication devices, estimated reasonable royalties for trade secrets associated with multiple product lines to determine the company's shareholder contribution to a joint venture.

For a U.S. manufacturer of industrial chemicals involved in a patent infringement dispute and antitrust counterclaim, analyzed price erosion as a component of lost profits.

For a U.S. global positioning device manufacturer involved in a patent infringement dispute, estimated reasonable royalties appropriate for defendant's use of product features enabled by the patented technology.

Assisted a U.S. software developer in its IP-licensing compliance efforts with antitrust-related rulings and settlement agreements with the European Commission related to FRAND rates set by standard setting organizations.

*Other Commercial Litigation*

Retained by Plaintiffs' counsel in *H. Cristina Chen-Oster and Shanna Orlich v. Goldman, Sachs, & Company and The Goldman Sachs Group, Inc.* (a class of female employees in the financial services industry involved in a gender discrimination suit) to calculate duration of tenure in certain business units and frequency of cross-business unit performance reviews.

For an asset-based lender, retained as a consulting expert to estimate lost profits related to the denial of an insurance claim.

For a real estate developer involved in a breach of contract dispute related to a condemnation action, analyzed measures of economic compensation potentially due to client as well as aspects of property value diminution.

Performed a literature review of the economics of vertical and horizontal market definition to support expert's rebuttal in MTBE litigation.

For a food manufacturer, performed statistical and econometric analysis in response to allegations of employment discrimination.

Leslie Schafer, Ph.D.
*Senior Economist*
Page 5 of 8

*Economics and Business Analytics Consulting*

For an energy company, estimated long-tailed liabilities related to retiree health care benefits and workers' claims for occupational injury. Designed economic models using publicly available data and extensive analysis of employees' claim records to present a distribution of potential liability outcomes.

For an insurance carrier, retained as a consulting expert to estimate the value of medical research samples that were lost in a freezer malfunction at a major university.

For a health insurance provider with Medicare Advantage contracts, performed statistical analysis of enrollees sampled for government audits to examine appropriateness of statistical sampling methods selected and representativeness of the sample selected.

Estimated the market size and strategic opportunity for a specific business unit of a U.S. technology company.

For a consumer-packaged goods industry association, assessed a sub-industry's economic impact on the U.S. economy, including the direct and indirect economic flows that result from supply chain purchases.

Estimated the market size and drivers of political risk insurance premiums and client market share.

Prepared an impact assessment of the free trade agreement between the United States and another country. Assessment included identification of industries and companies with highest potential to be affected by the agreement and therefore potential trading and investment partners.

*Monitoring and Compliance Matters*

For the U.S. Federal Trade Commission (FTC) and the European Commission (EC), member of team monitoring the implementation of and compliance with structural remedies involving assets for the BASF/Ciba merger in the chemical industry. Responsibilities included monitoring the financial and economic viability of the divestiture businesses, the divestiture process, suitability of potential buyers, and ring-fencing of confidential business information as assets were being sold. Reported on analyses concerning financial stability and viability of the divestment businesses, respondent technical efforts to restrict access to confidential business information in IT systems, and divestiture transition progress. *See, e.g.,*
http://www.ftc.gov/os/caselist/0810265/index.shtm and
http://ec.europa.eu/competition/elojade/isef/case_details.cfm?proc_code=2_M_5355

Leslie Schafer, Ph.D.
*Senior Economist*
Page 6 of 8

For the German Bundeskartellamt (Federal Cartel Office), member of team monitoring compliance with structural remedies for the Stihl/ZAMA merger in the hand-held power tools industry. Traveled to Japan, Hong Kong, and China for meetings with parent company, with potential buyers, and assessment of controls in Chinese manufacturing facility.

For the FTC, member of team monitoring the implementation of and compliance with structural remedies involving assets for the Pernod Ricard/V&S merger. *See e.g.,* http://www.ftc.gov/os/caselist/0810119/index.shtm

For the FTC and the EC member of team monitoring the implementation of and compliance with structural remedies involving assets in the United States and Europe for the P&G/Gillette merger. *See e.g.,* http://www.ftc.gov/os/caselist/0510115/0510115.shtm and http://ec.europa.eu/competition/elojade/isef/case_details.cfm?proc_code=2_M_3732

## Invited Presentations and Publications

Economic Expert Witness, National Institute for Trial Advocacy (NITA), Robert H. Hanley Advanced Trial Skills Program, San Francisco, CA, September 18, 2014.

"Surveys Gaining Attention for Patent Damages," 2014 Patent Disputes Forum. Thomson Reuters Legal Executive Institute, Costa Mesa, CA, May 6, 2014.

"Apportionment for Patent Damages," 2013 Patent Disputes Forum. Thomson Reuters West LegalEdCenter, Santa Clara, CA, November 14, 2012.

Expert Witness Cross-Exam Workshop. The State Bar of California 85th Annual Meeting (With the Trial Advocacy Group), October 13-14, 2012.

Cross Examining Expert Witnesses, LA County Bar Association (With the Trial Advocacy Group), October 8, 2012.

Schafer, L. "Unique Tips for Expert Witness Cross-Examination," Women Lawyers Association of Los Angeles E-Newsletter: October, 2012. http://www.wlala.org/displaycommon.cfm?an=1&subarticlenbr=231

Schafer, L. "If You Can't Measure Income, Then Track Consumer Preferences: Did Orbitz Side Step Omitted Variable Bias With Predictive Analytics?" Econ One Twitter feed, June 28, 2012 (available upon request).

Cross Examining Expert Witnesses, LA County Bar Association (With the Trial Advocacy

Leslie Schafer, Ph.D.
*Senior Economist*
Page 7 of 8

Group), November 11, 2011.

Vanderhart, J., Villarraga, M., Ong, K., and Schafer, L. "Changes in the Patent Landscape: Legislative Bills and Judicial Decisions—How They Affect Life Sciences and Other Industries," Health News - Exponent Health Sciences News Release, June 3, 2011.

Cantor, R, Schafer, L., Schmier, J., and Mittelman, M. "Emerging Issues in Health Care Reimbursement," Health News - Exponent Health Sciences News Release, August 20, 2010.

Gold E, Andreassen-Henderson S, and Schafer L. "Insights from an M&A monitor." *Executive Counsel – C-level Insights for Business Leaders* 2009; 6(3):62–64.

Bringing innovation to supply chain risk. Textron ETC & OEC Joint Council Meeting, November 19, 2008.

Crossfire: Difficult-to-measure but important metrics. Presented at *Aviation Week* Management Forums – Metrics Used by Top Performing Companies, September 16–17, 2008.

Economic Expert Witness, National Institute for Trial Advocacy (NITA), Robert F. Hanley Advanced Advocacy Skills Program, Louisville, CO, June 27-28, 2007.

PwC-Ropes & Gray Financial Expert Witness Training Program, Washington, DC, 2006.

Schafer, L. "International Privatization: Estimating the Returns to U.S. Acquirers of Foreign State-Owned Enterprises," Ph.D. Dissertation, 2005.


**Professional and Academic Honors**

PwC Chairman's Award, Washington, DC Metro - Technology Client Team, 2008
PwC Chairman's Award, Florham Park, NJ - Grocery Manufacturers Association Team, 2007
The Wharton School, University of Pennsylvania Doctoral Fellowship, 1998–2002
GAO Special Commendation Award - Defense Acquisition Workforce Team, 1996
The Honor Society of Phi Kappa Phi, 1992
Excellence in Scholarship Award (For Best Graduating Student), University of Maryland School of Public Policy, 1992
Gladys Noon Spellman Fellowship, University of Maryland School of Public Policy, 1991–1992
Chessie Railroad Fellowship, University of Maryland School of Public Policy, 1990-1991

Leslie Schafer, Ph.D.
*Senior Economist*
Page 8 of 8

**Professional Affiliations and Activities**

American Economics Association
American Bar Association – Health Law, Intellectual Property, and Antitrust Sections, *Associate Member*
Los Angeles Intellectual Property Law Association
Women Lawyers Association of Los Angeles
Wharton Women in Business, 2009-2011
*Aviation Week and Space Technology* Top Performing Companies Council of Advisors, 2008 and 2009
PricewaterhouseCoopers LLP Diversity Initiatives, 2006-2009
    National GLBT Partnership Advisory Board - Sponsorships, Strategic Relationships, and Community Investment Sub-Committee Chair
    Washington Metro GLBT Diversity Circle - Leadership Committee

Highly Confidential
Subject to Protective Order

Exhibit 2
Hannah's Boutique, Inc., v. Barbara Ann Surdej, Roy Surdej, and Jeffrey Surdej d/b/a Peaches Boutique
List of Materials Considered

**Pleadings and Opinions**
2014-11-21 Objections & Answers to Plf's 4th Interrogs to Defts
Amended and Supplemental Answer to Interrogatory No. 14, (4/14/14)
Barb, Jeff and Agnes' Original Objections and Answers to Plaintiff's First Set of Interrogatories
Barb, Jeff and Agnes Second Supplemental Objections and Answers to Plaintiff's First Set of Interrogatories
Barb, Jeff andAgnes First Supplemental Objections and Answers to Plaintiff's First Set of Interrogatories
Complaint, Hannah's Boutique, Inc., v. Barbara Ann Surdej, Roy Surdej, and Jeffrey Surdej d/b/a Peaches Boutique, and Agnieszka Bialas, in the United States District Court for the Northern District of Illinois, Eastern Division, Case No.
13-cv-2564,
Defendants Answer and Separate and Affirmative Defenses to Plaintiff's First Amended Complaint (10/10/14)
Defendants' Memorandum in Support of Their Motion for Summary Judgment on Plaintiff's Antitrust Claims (and Exhibits) (10/8/14)
Defendants' Motion for Summary Judgment on Plaintiff's Antitrust Claims (and Exhibits) (10/8/14)
Defendants' Motion to Dismiss Federal Antitrust Counts (I-IV) of Plaintiff's Complaint and Incorporated Memorandum of Law (5/29/13)
Defendants' Objections and Response to Plaintiff's Second Set of Requests to Admit
Defendants' Objections and Response to Plaintiff's First Set of Requests to Admit (3/13/14)
Defendants' Original Objections and Answers to Plaintiff's Second Set of Interrogatories
Defendants' Responses and Objections to Plaintiff's 1st Set of Requests for Production
Defendants' Responses and Objections to Plaintiff's 2nd Set of Requests for Production
Defendants' Responses and Objections to Plaintiff's 3rd Set of Requests for Production
Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment on Plaintiff's Antitrust Claims (10/8/2014)
First Amended Complaint and Exhibits, Hannah's Boutique, Inc., v. Barbara Ann Surdej, Roy Surdej, and Jeffrey Surdej d/b/a Peaches Boutique, In the United States District Court for the Northern District of Illinois, Eastern Division,
Case No.: 13-cv-2564 (7/24/2014)
Memorandum Opinion and Order, Hannah's Boutique, Inc., v. Barbara Ann Surdej, Roy Surdej, and Jeffrey Surdej d/b/a Peaches Boutique (8/28/13)
Plaintiff's Objections to Defendants' Second Set of Interrogatories to Plaintiff (5/29/14)
Plaintiff's Amended and Supplemental Answers and Objections to Defendant's Second Set of Interrogatories to Plaintiff
Plaintiff's Amended and Supplemental Answers to  First Set of Interrogatories - Market Power (5/19/14)
Plaintiff's Amended and Supplemental Response to  Requests for Documents Related to Market Power
Plaintiff's Amended and Supplemental Response to Defendants Requests for Documents Related to Issues Other Than Market Power (5/19/14)
Plaintiff's Amended and Supplemental Responses and Objections to Second Set of Document Requests
Plaintiff's Amended Answers to Defendants' Requests to Admit (8/15/14)
Plaintiff's Answer to Defendants' First Set of Interrogatories Related to Issues Other than Market Power, (12/3/13)
Plaintiff's Answer to Defendants' First Set of Requests to Admit
Plaintiff's Answers to Defendants' First Set of Interrogatories Related Issues Other Than Market Power, (12/3/13)
Plaintiff's Answers to Defendants' First Set of Interrogatories Related to Market Power, (11/26/13)
Plaintiff's Objections to Defendants' Second Set of Document Requests to Plaintiff
Plaintiff's Response to Defendants' Requests for Documents Related to Issues Other than Market Power (4/15/14)
Plaintiff's Response to Defendants' Requests for Documents Related to Market Power, (11/26/13)
Responses and Objections of Barbara Ann Surdej, Roy Surdej, Jeffery Surdej and Agnieszka Bialas to Plaintiff's First Set of Requests for Production, (11/21/13)
Roy's Amended Answer to Interrogatory No. 14 Re Exclusive Agreements
Roy's First Supplemental Objections and Answers  to Plaintiff's First Set of Interrogatories
Roy's Objections and Answers to Plaintiff's First Set of Interrogatories
Roy's Second Supplemental Objections and Answers  to Plaintiff's First Set of Interrogatories to Roy Surdej
Second Supplemental Objections and Answers of Roy Surdej to Plaintiff's First Set of Interrogatories to Roy Surdej and Exhibits, (2/21/14)
Second Supplemental Objections and Answers to Plaintiff's First Set of Interrogatories to Barbara Ann Surdej, Jeffery Surdej, and Agnieszka Bialas, (2/21/14)

**Affidavit**


**Correspondence**


**Declarations and/or Exhibits**
Declaration of Marco Montenegro, October 6, 2014
Declaration of Roy Surdej, October 8, 2014.
Declaration of Shari Simon, October 8, 2014.
Declaration of Stephen Lang, October 8, 2014.
Declaration of Wen Wu, October 8, 2014
Declaration of Robert Kneuper, October 8, 2014
Declaration of Lamar Anderson, January 19, 2015
Declaration of George Bigg, January 19, 2015
Declaration of Marla Bigg, January 19, 2015
Declaration of Ameira Matariyeh, January 19, 2015

**Depositions and/or Exhibits**
Deposition of Agnes Bialas, May 16, 2014.
Deposition of Barbara Surdej, May 8, 2014.
Deposition of Christie Kingsmill, August 28, 2014.
Deposition of Heidemarie Frangella, September 15, 2014.
Deposition of Jeff Surdej, April 23, 2014.
Deposition of Jill Cairo, August 27, 2014.
Deposition of Lindsey King, May 23, 2014.

Highly Confidential
Subject to Protective Order

Exhibit 2
Hannah's Boutique, Inc., v. Barbara Ann Surdej, Roy Surdej, and Jeffrey Surdej d/b/a Peaches Boutique
List of Materials Considered

Deposition of Michael Levin, September 16, 2014.
Deposition of Roy Surdej, May 2, 2014.
Deposition of Sahar Shaban, May 9, 2014.
Deposition of Summar Shaban, May 9, 2014.
Depositions of Susan Shaban, September 4, 2014 and September 11, 2014.
Deposition of Stephen Lang, January 9, 2015.
Deposition of Sheri Simon, January 8, 2015.

**Documents**

Documents cited in Exhibit [XX] Peaches' Exclusionary Communications and Documents Spreadsheet

| *Allure* | 1 | - | 27 |
| *Alyce* | 1 | - | 2 |
| *BIGG* | 1 | - | 115 |
| *BMS* | 1 | - | 4 |
| *Faviella* | 1 | - | 16 |
| *HANNAH'S* | 1 | - | 11548 |
| *IASZ* | 516 | | |
| *IOVANI* | 1 | - | 135 |
| *KRUEGER* | 1 | - | 4 |
| *MacDougal* | 1 | - | 524 |
| *Mon Cheri* | 1 | | 35 |
| *NOVA* | 1 | | 49 |
| *Party Time* | 1 | | 339 |
| *PEACHES* | 1 | - | 10351 |
| | 10815 | - | 10944 |
| | 10352 | - | 10482 |
| | 10483 | - | 10666 |
| | 10667 | - | 10814 |
| *Scala* | 1 | - | 11 |
| *Sheri Hill* | 1 | - | 8 |
| *Terani* | 1 | - | 23 |
| *Weissman* | 1 | - | 141 |

**Data**

Peaches' Competitor Lists, "main Indiana.xlsx," "Prom Stores in IL Final.xlsx," and "wisconsin.xlsx"
Peaches' Vendor List, "Lsitofvendors.xlsx"
Layaway 2013-2014 - Corrected 1.5.15.xlsx
Sales 2013 - Corrected 1.5.15.xlsx
Hannah's 2012 Sales to Customers - Corrected 11.26.14.xlsx
Hannah's Internet Sales - 1.1.13 - 10.14.14.xlsx
Sales Order 2013-2014 - Corrected 1.5.15.xlsx

Highly Confidential
Subject to Protective Order

Exhibit 2
Hannah's Boutique, Inc., v. Barbara Ann Surdej, Roy Surdej, and Jeffrey Surdej d/b/a Peaches Boutique
List of Materials Considered

**Other**

Dress4Prom order_201403191127.pdf
Hannahs Customer Invoice Sample.pdf
peachesboutique.com order_201404011618.pdf
PromDressShop.Order_201309261516.pdf

**Publicly Available Materials**

Frequently Asked Questions, SBA Office of Advocacy, http://www.sba.gov/sites/default/files/sbfaq.pdf
Horizontal Merger Guidelines, U.S. Department of Justice and the Federal Trade Commission, August 19, 2010,
http://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf
Use Tax Questions and Answers, http://tax.illinois.gov/individuals/faqs-use-tax.htm."Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act," U.S. Department of Justice, 2008."Core Based Statistical Area

"Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act," U.S. Department of Justice, 2008.
"Metropolitan Combined Statistical Areas," US Census Bureau, http://tigerweb.geo.census.gov/tigerwebmain/Files/tigerweb_acs13_metro_cbsa_us.html
"Population Change for Metropolitan Statistical Areas in the United States and Puerto Rico," US Census Bureau, http://www.census.gov/population/www/cen2010/cph-t/CPH-T-5.pdf
2013 IL High School Enrollments, http://www.isbe.state.il.us/research/htmls/fall_housing.htm
Complaint, In the Matter of Simon Property Group, Inc., November 10, 2010, http://www.ftc.gov/sites/default/files/documents/cases/2010/11/101110simoncmpt.pdf
Statement of the Commission Concerning Federated Department Stores, Inc./ The May Department Stores Company, FTC File No. 051-0111, August 30, 2005
Submission to the FTC, January 8, 2014 by Food & Water Watch, concerning Sysco Corp. and U.S. Foods Holding Corp., US_Foods_merger.pdf
Apparel Drives US Retail Ecommerce Sales Growth, eMarketer, April 5, 2012, http://www.emarketer.com/newsroom/index.php/apparel-drives-retail-ecommerce-sales-growth/
Global Womenswear, Datamonitor Industry Profile, September 2008.
The Days of Wine and Cruises: Prom Manufacturers Are Enticing Retailers with Lavish Premarket Incentives,Women's Wear Daily, August 11, 2005.
Womenswear in the United States, MarketLine Industry Profile, June 2013.
Chris Cashman, "New Formal Wear Store Opens in Crystal Lake," Northwest Herald, April 17, 2012, http://www.nwherald.com/2012/04/17/new-formal-wear-store-opens-in-crystal-lake/ay7bb6b/.
David R. Bell, Jeonghye Choi and Leonard Lodish, "What Matters Most in Internet Retailing," MIT Sloan Management Review Magazine , Fall 2012
Hoover's Business Profiles
IBISWorld Industry Report 44812 - Women's Clothing Stores in the US, December 2013.
IBISWorld Industry Report C1311-GL, Global Apparel Manufacturing, November 2013.
IBISWorld Industry Report OD5616, Clothing Boutiques in the U.S., December 2013.
"2014 Store Count and Square Footage," Macy's, https://www.macysinc.com/for-investors/store-information/storecount/2014/default.aspx.
Hoover's, www.hoovers.com/about-us.html
Mary Coleman and James Langenfeld, "Natural Experiments," Issues in Competition Law and Policy , ABA Section of Antitrust Law, 2008.
Phillip E. Areeda and Herbert Hovenkamp, Fundamentals of Antitrust Law , 4th Ed., New York: Wolters Kluwer Law & Business, 2011
Robert H. Bork and J. Gregory Sidak, "The Misuse of Profit Margins to Infer Market Power," Journal of Competition Law & Economics , 9(3), 2013.
Best, Amy L. (2000), Prom Night: Youth, Schools, and Popular Culture. New York: Routledge, 2000. ("Best")
Graebner, William. (1990) Coming of Age in Buffalo: Youth and Authority in the Postwar Era. Philadelphia: Temple University Press, 1990
 ("Prom spending rises to average $1,078 this year, survey says", USA Today, April 12, 2012. ("USA Today")).
Visa 2012 Prom Spending Survey, April 13, 2012
Seventeen Prom, 2015 prom season, cover.
"Differentiated Consumer Product Markets," Chapter III, Market Definition in Antitrust: Theory and Case Studies. The American Bar Association, Section of Antitrust Law, 2012 ("Market Definition in Antitrust")
Robert S. Pindyck and Daniel L. Rubinfeld, Microeconomics, 5th Ed, Upper Saddle River, N.J.: Prentice Hall, 2001
"Entry Barriers," Chapter VII, Market Power Handbook: Competition Law and Economic Foundations, 2nd Ed., The American Bar Association, Section of Antitrust Law, 2012
IBIS World Industry Report OD5616, Clothing Boutiques in the U.S., December 2013

**Legal**

Leegin, 127 S.Ct. at 2716. (Leegin Creative Leather Products, Inc. v. PSKS, Inc., 127 S.Ct. 2705 (2007)

**Interviews**

Interview with George Bigg, January 15, 2015
Interview with Lamar and Evelyn Anderson, January 15, 2015
Interview with Amera Matariyeh, January 14, 2015

**Websites**

http://www.peachesboutique.com/
http://www.promdressshop.com/
http://www.hannahsboutique.com/
http://www.allurebridals.com/
http://www.blushprom.com/
http://www.maggiesottero.com/
http://www.houseofwu.com/
http://www.jazzcouture.com/
http://www.jovani.com/
http://www.lafemmefashion.com/
https://www.macduggal.com/Prom-Dresses/Mac-Duggal-Prom
http://www.morilee.com/
http://www.rachelallan.com/
http://www.rivadesigns.com/

Highly Confidential
Subject to Protective Order

**Exhibit 2**
**Hannah's Boutique, Inc., v. Barbara Ann Surdej, Roy Surdej, and Jeffrey Surdej d/b/a Peaches Boutique**
**List of Materials Considered**

http://www.scalausa.com/
http://www.sherrihill.com/
http://www.tarikediz.com/v2015/
http://www.teranicouture.com/
http://tonybowls.com/
http://shop.nordstrom.com/
Internet Archive Wayback Machine, https://archive.org/web/
http://www.allareacodes.com/
http://newyork.cbslocal.com/2012/04/13/survey-shows-going-to-prom-is-getting-more-expensive-than-ever/
http://www.peachesboutique.com/Prom-Dress-Terani-151P0084.aspx) (last accessed 1/21/15)
http://www.sherrihill.com/brand/about-sherri-hill/
http://www.lafemmefashion.com/about-us
https://www.macduggal.com/Page/About-Mac-Duggal
http://newyork.cbslocal.com/2012/04/13/survey-shows-going-to-prom-is-getting-more-expensive-than-ever/
http://siccode.com/en/siccodes/5621/womens-clothing-store
http://www.census.gov/econ/isp/sampler.php?naicscode=44812&naicslevel=5
http://www.newyorkdress.com/Policies/FAQ.html

CONFIDENTIAL -- Attorneys' Eye Only

**Exhibit 3: Summary Statistics of In-Store Dress Prices**
**Peaches Boutique**
**2011 - 2013**

| Year | Dresses Included | Number of Dresses | Prices at Time of Sale | | | | | Total Revenue ($ millions) | Number of Dresses | Prices at Time of Sale (Full-Price Dresses Only) | | | | | Total Revenue ($ millions) |
| | | | Minimum Price | Median Price | Average Price | Maximum Price | Standard Deviation of Price | | | Minimum Price | Median Price | Average Price | Maximum Price | Standard Deviation of Price | |
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| 2011 | All Dresses | | | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | | | |
| 2012 | All Dresses | | | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | | | |
| 2013 | All Dresses | | | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | | | |
| 2011-2013 | All Dresses | | | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | | | |

Note
See Appendix I for data restrictions.

Source: Peaches in-store transactional data (PEACHES0009383).

Econ One
1/21/2015

CONFIDENTIAL -- Attorneys' Eye Only

**Exhibit 4: Summary Statistics of Peachesboutique.com Dress Prices**
**Peaches Boutique**
**2011 - 2013**

| Year | Dresses Included | Number of Dresses | Prices at Time of Sale | | | | | Total Revenue | Number of Dresses | Prices at Time of Sale (Full-Price Dresses Only) | | | | | Total Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Minimum Price | Median Price | Average Price | Maximum Price | Standard Deviation of Price | ($ millions) | | Minimum Price | Median Price | Average Price | Maximum Price | Standard Deviation of Price | ($ millions) |
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| 2011 | All Dresses | | | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | | | |
| 2012 | All Dresses | | | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | | | |
| 2013 | All Dresses | | | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | | | |
| 2011-2013 | All Dresses | | | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | | | |

Note
See Appendix I for data restrictions.

Sources: Peaches internet transactional data (PEACHES0009254 and PEACHES0010945).

CONFIDENTIAL -- Attorneys' Eye Only

**Exhibit 5: Summary Statistics of Promdressshop.com and Dress4Prom.com Dress Prices**
**Peaches Boutique**
**2011 - 2013**

| Year | Dresses Included | Number of Dresses | Prices at Time of Sale | | | | | Total Revenue | Number of Dresses | Prices at Time of Sale (Full-Price Dresses Only) | | | | | Total Revenue |
| | | | Minimum Price | Median Price | Average Price | Maximum Price | Standard Deviation of Price | ($ millions) | | Minimum Price | Median Price | Average Price | Maximum Price | Standard Deviation of Price | ($ millions) |
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| 2011 | All Dresses | | | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | | | |
| 2012 | All Dresses | | | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | | | |
| 2013 | All Dresses | | | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | | | |
| 2011-2013 | All Dresses | | | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | | | |

Note
See Appendix I for data restrictions.

Sources: Peaches internet transactional data (PEACHES0009254 and PEACHES0010945).

CONFIDENTIAL -- Attorneys' Eye Only

**Exhibit 6: Summary Statistics of Prom Season, In-Store Dress Prices**
**Peaches Boutique**
**2011 - 2013**

| Year | Dresses Included | Number of Dresses | Prices at Time of Sale | | | | | Total Revenue | Number of Dresses | Prices at Time of Sale (Full-Price Dresses Only) | | | | | Total Revenue |
| | | | Minimum Price | Median Price | Average Price | Maximum Price | Standard Deviation of Price | ($ millions) | | Minimum Price | Median Price | Average Price | Maximum Price | Standard Deviation of Price | ($ millions) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| 2011 | All Dresses Designer Non-Designer | | | | | | | | | | | | | | |
| 2012 | All Dresses Designer Non-Designer | | | | | | | | | | | | | | |
| 2013 | All Dresses Designer Non-Designer | | | | | | | | | | | | | | |
| 2011-2013 | All Dresses Designer Non-Designer | | | | | | | | | | | | | | |

Notes:
1) See Appendix I for data restrictions.
2) Prom Season is from January through May.

Source: Peaches in-store transactional data (PEACHES0009383).

Econ One
1/21/2015

CONFIDENTIAL -- Attorneys' Eye Only

# Exhibit 7: Summary Statistics of Prom Season Dress Prices
## Hannah's Boutique
## Jan 2012 - May 2012, Jan 2013 - May 2013

| Year | Dresses Included | Number of Dresses | Prices at Time of Sale ($) | | | | | Total Revenue |
|------|------------------|-------------------|---------------|--------------|---------------|---------------|------------------------------|---------------|
| | | | Minimum Price | Median Price | Average Price | Maximum Price | Standard Deviation of Price | |
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 2012 | All Dresses | | | | | | | |
| | Designer | | | | | | | |
| | Non-Designer | | | | | | | |
| 2013 | All Dresses | | | | | | | |
| | Designer | | | | | | | |
| | Non-Designer | | | | | | | |
| 2012-2013 | All Dresses | | | | | | | |
| | Designer | | | | | | | |
| | Non-Designer | | | | | | | |

Notes:
1) See Appendix I for data restrictions.
2) Prom Season is from January through May.

Sources: Layaway 2013-2014 - Corrected 1.5.15.xlsx; Sales 2013 - Corrected 1.5.15.xlsx; Sales Order 2013-2014 - Corrected 1.5.15.xlsx; Hannah's Internet Sales - 1.1.13 - 10.14.14.xlsx; Hannah's 2012 Sales to Customers - Corrected 11.26.14.xlsx

CONFIDENTIAL -- Attorneys' Eye Only

**Exhibit 8: Dresses Procured From Other Retailers Summary Statistics**
**Hannah's Boutique**
**Jan 2012 - May 2012, Jan 2013 - May 2013**

| Year | Dresses Included | Other Retailers | | | | Manufacturers | | | | Total of Other Retailers and Manufacturers | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Number of Dresses | | Revenue | | Number of Dresses | | Revenue | | Number of Dresses | | Revenue | |
| | | Count | Percent | Total | Percent | Count | Percent | Total | Percent | Count | Percent Procured | Total | Percent Procured |
| | | | (%) | ($) | (%) | | (%) | ($) | (%) | | (%) | ($) | (%) |
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (1)+(5) (9) | (1)/(9) (10) | (3)+(7) (11) | (3)/(11) (12) |
| 2012 | All Dresses | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | |
| 2013 | All Dresses | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | |
| 2012-2013 | All Dresses | | | | | | | | | | | | |
| | Designer | | | | | | | | | | | | |
| | Non-Designer | | | | | | | | | | | | |

Note:
See Appendix I for data restrictions.

Sources: Layaway 2013-2014 - Corrected 1.5.15.xlsx; Sales 2013 - Corrected 1.5.15.xlsx; Sales Order 2013-2014 - Corrected 1.5.15.xlsx; Hannah's 2012 Sales to Customers - Corrected 11.26.14.xlsx

**Attorney Client and Work ProductPriviledged Document**

| Exhibit 9 - Peaches' Exclusionary Communications and Documents | | | | |
|---|---|---|---|---|
| Pink Slip Boutique | | | | |
| Bates Number | Date | Description | Sent by | Received by |
| PEACHES1-2 | 2/21/2009 | Internal Emails re: Revising a Letter to be sent to Manufacturers (Designers) warning them of a "potentially hazardous" situations of new stores opening and how this would be a "monumental catastrophe" | The Cairo's (teamcairo3@sbcglobal.net) | Barbara Surdej (support@peachesboutique.com) |
| PEACHES1750 | 2/25/2009 | Prom and H/C designer Forwarding Peaches Lauren McKeague of Pink Slip Boutique's Business information and Request to place an order | Derek Horn (derekhorn@sbcglobal.net) | support@peachesboutique.com |
| PEACHES3-4 | 2/27/2009 | Internal Emails re: Revised Letters to be sent to Manufacturers (Designers) warning them of a "potentially hazardous" situations of new stores opening and how this would be a "monumental catastrophe", and about a new store, Pink Slip Boutique | The Cairo's (teamcairo3@sbcglobal.net) | Barb Surdej (support@peachesboutique.com) |

Attorney Client and Work ProductPriviledged Document

| | | | | |
|---|---|---|---|---|
| JASZ 451-453 | 5/5/2009 | Letters sent to Designers directing them to use "procedures" before opening accounts so new stores would not be "'slipping through the cracks", and advising them of "potentially hazardous" attempts to open accounts and thanking designers for their "cooperation in this dire matter." | support@peachesboutique.com | Tawinder Singh (jaszcouture@yahoo.com) |
| JASZ 516 | 5/7/2009 | Peaches' email to Jasz Couture and other designers advising of a new store, Pink Slip Boutique looking to get stock, and requesting "territorial protection" in designated area codes and suburbs around the Chicago area. | support@peachesboutique.com | Tawinder Singh (jaszcouture@yahoo.com) |
| PEACHES1754 | 5/8/2009 | Brian Egitto of Mon Cheri's advising Peaches that it is "the only store I protect" in response to Peaches Email to designers designating area codes and suburbs "to watch for" | Brian Egitto (Begitto@mcbridals.com) | support@peachesboutique.com; Heide Frangella (hfrangella@aol.com) |
| PEACHES1755 | 5/8/2009 | Michael Wulfe of Scala (at the time of this email) stating 'we will advise if they call" in response to Peaches' Email to Designers designating area codes and suburbs "to watch for" | Barbara & Roy Surdej (support@peachesboutique.com) | Michael Wulfe (michaelw@scalausa.com) |

**Attorney Client and Work ProductPriviledged Document**

| | | | | |
|---|---|---|---|---|
| PEACHES1756-1757 | 5/10/2009 | Steve Lang, owner of Mon Cheri, stating, "if you want to grow Peaches, increase your margins, have dresses no one else has... let's plan to fight together" in response to Peaches' Email to Designers designating area codes and suburbs "to watch for" | Steve Lang (SLang21008@aol.com) | Brian Egitto (Begitto@mcbridals.com), Barbara & Roy Surdej (support@peachesboutique.com), Heidi Frangella (Hfrangella@aol.com) |
| PEACHES2311 | 9/2/2011 | Email from Terani to Peaches stating, "provide a list of stores in your area that you would like to be blocked due to direct compeition. We have not received your request previously. Please advise so that we may address the matter immediately"; and Peaches responding "here are the ones for sure" - listing Pink Slip Boutique, Hannah's, and IHOC | Lindsay King (support@peachesboutique.com) | Terani Couture (sales@teranicouture.com) |
| PEACHES2313 | 9/10/2011 | Email from Peaches instructing Terani to "not sell to IHOC, Hannah's, and Pink Slip Boutique"; to "Do not sell to" to area codes in the Chicago area, and to call and advise them whenever there is a new account trying to open | Barbara Surdej (support@peachesboutique.com) | Terani Couture (sales@teranicouture.com) |

Attorney Client and Work ProductPriviledged Document

| Maggies Boutique | | | | |
|---|---|---|---|---|
| Bates Number | Date | Description | Sent by | Received by |
| PEACHES1758 | 3/25/2010 | Peaches blast email to designers directing them to "DO NOT SELL" to Maggie's Boutique and Steve Lang of Mon Cheri responding, "call me" | Steve Lang (SLang21008@aol.com) | support@peachesboutique.com |
| PEACHES1759 | 3/25/2010 | Peaches blast email to designers directing them to "DO NOT SELL" to Maggie's Boutique and precious fomals responding | Alex@preciousformals.com | support@peachesboutique.com |
| PEACHES1760 | 3/25/2010 | Peaches blast email to designers directing them to "DO NOT SELL" to Maggie's Boutique and Response Alyce responding | Rene Hamm(rene@alycedesigns.com) | support@peachesboutique.com; thedickmansltd@gmail.com |
| PEACHES1761 | 3/26/2010 | Joel Dickman email to Peaches stating they refused to sell to Maggie's Boutique | Joel Dickman (thedickmans@gmail.com) | support@peachesboutique.com |

| Int. House of Couture | | | | |
|---|---|---|---|---|
| Bates Number | Date | Description | Sent by | Received by |
| Peaches5527 | 4/19/2011 | Peaches Email to Jill Peterson of Maggie sottero, stating "Do Not Sell" to Int. House of Couture because they "service the same schools as we do" | support@peachesboutique.com | Jill Peterson (Jill.Peterson@maggiesottero.com) |
| Peaches5529 | 4/23/2011 | Peaches email to designers regarding IHOC and stating "we have addressed this situation with some of you, the rest of you please take care of this immediately" | support@peachesboutique.com | Brian Egitto (Begitto@mcbridals.com); info@kbboutique.com |

Attorney Client and Work ProductPriviledged Document

| PEACHES9 | 7/7/2011 | Email between Peaches' employees Lindsay King and Jill Cairo regarding revisions to a letter about IHOC opening and Peaches being "Very diligent and staying up on these new stores opening up" | Jill Cairo (teamcairo3@sbcglobal.net) | Lindsay King (Ldaisy5432@aol.com) |
|---|---|---|---|---|
| BIGG2 | 7/7/2011 | Peaches Email to designers stating, "Peaches has expanded this year … if you won't help us protect our territory, please let us know now, so we do not waste our time at market writing a line… we have brought this up to you in the past, and the two stores that were opened and sold to have now been closed and are out of business. The name of the store is: International House of Couture… The reason we are number one and still here is because we're very diligent and take threats to our sales territory very seriously…" | support@peachesboutique.com | Robert (sales@teranicouture.com) |

**Attorney Client and Work ProductPriviledged Document**

| PEACHES1552 | 7/21/2011 | Steve Lang, owner of Mon Cheri, stating "I need to discuss this communication with you" in response to Peaches' email stating "if you won't help us protect our territory, please let us know now, so we do not waste our time at market writing a line... we have brought this up to you in the past, and the two stores that were opened and sold to have now been closed and are out of business. The name of the store is: International House of Couture..." | Steve Lang (Slang@mcbridals.com) | support@peachesboutique.com; Brian Egitto (Begitto@mcbridals.com) |
| PEACHES1762 | 7/25/2011 | Nancy Mehta of Sean Collection responding to Peaches email stating, "I need to discuss this communication with you" in response to Peaches' email stating "if you won't help us protect our territory, please let us know now, so we do not waste our time at market writing a line... we have brought this up to you in the past, and the two stores that were opened and sold to have now been closed and are out of business. The name of the store is: International House of Couture..." | Nancy Mehta (nancym@seancollection.com) | support@peachesboutique.com |

**Attorney Client and Work ProductPriviledged Document**

| | | | | |
|---|---|---|---|---|
| PEACHES2311 | 9/2/2011 | Email from Terani to Peaches stating, "provide a list of stores in your area that you would like to be blocked due to direct compeition. We have not received your request previously. Please advise so that we may address the matter immediately"; and Peaches responding "here are the ones for sure" - listing Pink Slip Boutique, Hannah's, and IHOC | Lindsay King (support@peachesboutique.com) | Terani Couture (sales@teranicouture.com) |
| PEACHES2313 | 9/10/2011 | Email from Peaches instructing Terani to "not sell to IHOC, Hannah's, and Pink Slip Boutique"; to "Do not sell to" to area codes in the Chicago area, and to call and advise them whenever there is a new account trying to open | Barbara Surdej (support@peachesboutique.com) | Terani Couture (sales@teranicouture.com) |
| PEACHES1563 | 12/19/2011 | Brian Egitto email to Peaches regarding shutting down IHOC and letting them know "they must take everything down regarding Tony Bowls" | Brian Egitto (Begitto@mcbridals.com) | support@peachesboutique.com |
| PEACHES2398 | 1/10/2012 | Peaches Email to designers regarding IHOC, stating: "Please have them take down that they're selling your dresses. This is still listed on their website as well as the flyers they are passing out in their store." | support@peachesboutique.com | Michael Levin (Michael@macduggal.com); Dawn Sallis (dawnsallis@macduggal.com); Brian Egitto (BEgitto@mcbridals.com); Steve Lang (slang@mcbridals.com); Wen Wu (wenwu@houseofwu.com); Jennifer Hill (hillj@houseofwu.com); (brendal@scalausa.com); (kimiscala@gmail.com) |

**Attorney Client and Work ProductPriviledged Document**

| PEACHES2309 | 6/27/2012 | Precious Formals stating, "OMG" in response to Peaches' Email stating, "we are trying to get the complete list of stores in the area together, but for sure please do not sell to House of Couture and Hannah's. We should have that list to you soon though!" | (Alex@preciousformals.com) | support@peachesboutique.com |
|---|---|---|---|---|
| PEACHES3051 | 9/18/2012 | Jovani email to Peaches regarding how Jovani will not sell to IHOC and Hannah's for the 2013 Prom season, stating: "we will not sell Hannah's or International this prom 2013 season. It's all yours." | support@peachesboutique.com | Sheri Simon (ssimon@jovani.com) |

| Hannah's Boutique | | | | |
|---|---|---|---|---|
| Bates Number | Date | Description | Sent by | Received by |
| PEACHES2311 | 9/2/2011 | Email from Terani to Peaches stating, "provide a list of stores in your area that you would like to be blocked due to direct compeition. We have not received your request previously. Please advise so that we may address the matter immediately"; and Peaches responding "here are the ones for sure" - listing Pink Slip Boutique, Hannah's, and IHOC | Lindsay King (support@peachesboutique.com) | Terani Couture (sales@teranicouture.com) |

**Attorney Client and Work ProductPriviledged Document**

| PEACHES2313 | 9/10/2011 | Email from Peaches instructing Terani to "not sell to IHOC, Hannah's, and Pink Slip Boutique"; to "Do not sell to" area codes in the Chicago area, and to call and advise them whenever there is a new account trying to open | Barbara Surdej (support@peachesboutique.com) | Terani Couture (sales@teranicouture.com) |
|---|---|---|---|---|
| PEACHES2309 | 6/27/2012 | Precious Formals stating, "OMG" in response to Peaches' Email stating, "we are trying to get the complete list of stores in the area together, but for sure please do not sell to House of Couture and Hannah's. We should have that list to you soon though!" | (Alex@preciousformals.com) | support@peachesboutique.com |
| PEACHES2698 | 7/9/2012 | Peaches' Email to Dusty Hill and Jennifer Strafer of Sherri Hill stating: "DO NOT SELL TO: Hannah's Boutique, 9644 W 131st St., Palos Park, IL 60464" | support@peachesboutique.com | Dusty Hill (dusty@sherrihill.com); Jennifer Strafer (jennifer@sherrihioll.com); Jeff Surdej (j_surdej@yahoo.com) |
| PEACHES1772 | 7/9/2012 | Jennifer Strafer of Sherri Hill responding to Peaches' email stating: "DO NOT SELL TO: Hannah's Boutique, 9644 W 131st St., Palos Park, IL 60464" | Jennifer Strafer (jennifer@sherrihill.com) | support@peachesboutique.com |
| PEACHES3051 | 9/18/2012 | Jovani email to Peaches regarding how Jovani will not sell to IHOC and Hannah's for the 2013 Prom season, stating: "we will not sell Hannah's or International this prom 2013 season. It's all yours." | support@peachesboutique.com | Sheri Simon (ssimon@jovani.com) |

Attorney Client and Work ProductPriviledged Document

| PEACHES3461 | 12/6/2012 | Peaches' blast email to designers regarding Elegant Couture and A Pink Boutique opening, La Joli Mode and Hannah's Boutique reopening and stating: "we must address the topic of two new brick and mortar stores opening in our area...We always appreciate that you vendors have always protected." | support@peachesboutique.com | Sheri Simon (ssimon@Jovani.com); Barbara Motorzesku (bmotorzesku@Alyceparis.com); Tammy Watts (tammy@barijay.com); Jodi Boser (jodiboser@aol.com); Micahel Wulfe (mjw920@gmail.com); Dawn Sallis (dawnsallis@MacDuggal.com) Michael Levin (michael@MacDuggal.com); corinne@faviana.com; omid@faviana.com; Melissa Fox (melissa.fox@MaggieSottero.com); Wen Wu (wenw@houseofwu.com); Jennifer LeBlanc (leblancj@HouseofWu.com); Singh Tawinder (Jaszcouture@yahoo.com); michaelk@lafemmefashion.com; Shannon Malone (shannonm@LaFemmefashion.com); Edmund Chan (wingster88@aol.som); (wing@Landadesigns.com); Kris Henslin (henslink@charter.net); Marco Montenegro (marco@morilee.com); mudell@morilee.com; Janna Looney (janna@AllureBridals.com); Jackie Purcell (jackie@AllureBridals.com); Kelly Crum (kelly@allurebridals.com); Alex@Preciousformals.com); (Kelsey@Preciousformals.com); Sunny Malhotra (Rivadesigns@gmail.com); Andrea Melore (andrea@scalausa.com); Beata Grover (Beatag@gmail.com); Nancy Mehta (nancym@SeanCollection.com); Jennifer@Sherrihill.com; Wow_Prom@yahoo.com; Dusty Hill (dusty@sherrihill.com) |

**Attorney Client and Work ProductPriviledged Document**

| | | | | |
|---|---|---|---|---|
| PEACHES1780 | 12/6/2012 | Michael Wulfe of Blush Prom (at the time of this email) stating: "Everyone ALWAYS rejects these accounts." in response to Peaches' email regarding Elegant Couture, A Pink Boutique opening, and La Joli Mode and Hannah's Boutique reopening | Michael Wulfe (mjw920@gmail.com) | support@peachesboutique.com |
| PEACHES1781 | 12/6/2012 | Sheri Simon of Jovani response to Peaches' email regarding Elegant Couture, A Pink Boutique opening, La Joli Mode and Hannah's Boutique, stating that Jovani "will not open" accounts for these stores | Sheri Simon (ssimon@jovani.com) | support@peachesboutique.com |
| PEACHES1782-1783 | 12/6/2012 | Email chain between Sonny Malhotra, owner of Riva Designs, and Peaches where Riva designs sends Peaches the style number of the three (3) dresses that Hannah's received from a twenty-five piece dress order, and explains that will not fulfill the remaining order and Hannah's "will not be getting any further dresses" | Sunny Malhotra (rivadesigns@gmail.com) | support@peaches.com |
| Peaches1784 | 12/6/2012 | Seth Kruger of Allure bridals stating, "we have always granted your requested prefix areas" in response to Peaches' email regarding Elegant Couture and A Pink Boutique opening, and La Joli Mode and Hannah's Boutique reopening | Seth Kruger (seth_kruger@yahoo.com) | support@peachesboutique.com; Kelly Crum (kelly@allurebridals.com) |

**Attorney Client and Work ProductPriviledged Document**

| PEACHES1723 | 12/18/2012 | Sher Simon of Jovani email to Peaches, requesting that Peaches send a list of stores that they do not want Jovani to sell to, and advising that dream nights Hannah's and a pink boutique would be closed, apologizing for selling to A Pink Boutique and explaining that "Abraham did not think a store 40 minutes away was a problem." | Sheri Simon (ssimon@Jovani.com) | support@peachesboutique.com |
|---|---|---|---|---|
| PEACHES3528 | 12/19/2012 | Peaches' email to Marc Weissman of Tarik Ediz regarding Elegant Couture and A Pink Boutique opening, La Joli Mode and Hannah's Boutique reopening and stating: "we must address the topic of two new brick and mortar stores opening in our area...We always appreciate that you vendors have always protected." | support@peachesboutique.com | Marc Weissman (marc@weissmankrull.com) |
| PEACHES1802 | 3/21/2013 | Jennifer Strafer of Sherri Hill's email to Peaches, stating: "Just called to let you know that Hannah's in IL tried to open an account with us." | Jennifer Strafer (jennifer@sherrihill.com) | support@peachesboutique.com |

**Attorney Client and Work ProductPriviledged Document**

| | | | | |
|---|---|---|---|---|
| PEACHES3817 | 3/22/2013 | Peaches' blast Email to designers advising them that "Hannah's has been contacting vendors trying to get stock again," and going on to state: "This prom season has been stellar and we truly want to continue through the end of this season and next year also. So it is imperitive to be diligent in your efforts to keep this account in check." | support@peachesboutique.com | Barbara Motorozesku (bmotorozesku@Alyceparis.com); Jean Paul Hamm (jeanpaul@Alyceparis.com); Tammy Watts (tammy@Barijay.com);  Jodi Boser (jodiboser@aol.com); Micheal Levin (michael@MacDuggal.com); omid@faviana.com; Melissa Fox (melissa.fox@MaggieSottero.com); Wen Wu (wenw@HouseofWu.com); Tawinder Singh (singh@jasz.com); Shannon Malone (shannonm@LaFemmefashion.com); Michael Kasher (michaelk@LaFemmefashion.com); Brian |
| PEACHES1803 | 3/22/2013 | Jennifer Strafer of Sherri Hill stating, "Sent you an email yesterday letting you know they faxed over a stock order to us" in response to Peaches' email advising designers that "Hannah's has been contacting vendors trying to get stock again." | Jennifer Strafer (jennifer@sherrihill.com) | support@peachesboutique.com |
| PEACHES1804 | 3/22/2013 | Brian Egitto of Mon Cheri stating, "I know they tried and was blocked on our computer" in response to Peaches' email informing designers that "Hannah's has been contacting vendors trying to get stock again." | Brian Egitto (Begitto@mcbridals.com) | support@peachesboutique.com |

**Attorney Client and Work ProductPriviledged Document**

| | | | | |
|---|---|---|---|---|
| PEACHES1805 | 3/22/2013 | Michael Levin of MacDuggal stating, "Thanks folks. Don't worry - we got you covered. Yeah, they sent us a fax request for a stock order which Marianne promptly returned to them letting them know we will not sell them…" in response to Peaches' email informing designers that "Hannah's has been contacting vendors trying to get stock again." | Michael Levin (michael@MacDuggal.com) | support@peachesboutique.com |
| PEACHES1806 | 3/22/2013 | Brenda Lewis of Shail K stating, "noted," in response to Peaches' email informing designers that "Hannah's has been contacting vendors trying to get stock again." | Brenda Lewis (brendal@ShailKusa.com) | support@peachesboutique.com |
| PEACHES1807 | 3/22/2013 | Layo Gbasdamosi of Jovani stating, "We will certainly keep a look out," in response to Peaches' email informing designers that "Hannah's has been contacting vendors trying to get stock again." | Layo Gbadamosi (layo@jovani.com) | support@peachesboutique.com; Sheri Simon (Jovani) |
| PEACHES1808 | 3/22/2013 | Sonny Malhotra of Riva Designs stating, "I know she placed a stock order for 30pcs few days ago. And my staff held the order before it got processed. We are on top of it as of now," in response to Peaches' email informing designers that "Hannah's has been contacting vendors trying to get stock again." | Sunny Malhotra (RivaDesigns@gmail.com) | support@peachesboutique.com |

| PEACHES1809 | 3/22/2013 | Tawinder Singh, owner of Jasz Couture, stating, "we will be careful and will keep an eye," in response to Peaches' email informing designers that "Hannah's has been contacting vendors trying to get stock again." in response to Peaches' email informing designers that "Hannah's has been contacting vendors trying to get stock again." | Singh Tawinder (singh@Jasz.co) | support@peachesboutique.com |
| PEACHES1810 | 3/22/2013 | Robert Feinberg of Terani stating, "That store is closed. We are on the look out for this and other locations as promised," in response to Peaches' email informing designers that "Hannah's has been contacting vendors trying to get stock again." | Robert Feinberg (robert@Teranicouture.com) | support@peachesboutique.com |

| De Je Co Bridal | | | | |
|---|---|---|---|---|
| **Bates Number** | **Date** | **Description** | **Sent by** | **Received by** |
| PEACHES5533-5537 | 11/18/2011 | Peaches' Email to Jodi Boser of Blush and Kris Henslin of Mori Lee requesting that these designers "do not sell" to De Je Co Bridal and Eva's Bridals, and provide a list of area codes surrounding the Chicagoland area, including 224 | support@peachesboutique.com | Jodi Boser (jodiboser@aol.com), Kris Henslin (henslink@charter.net) |
| Peaches2348 | 11/21/2011 | Email chain between Brian Egitto of Mon Cheri and Peaches clarifying that Peaches directed Mon Cheri to not sell to De Je Co Bridal | Brian Egitto (Begitto@mcbridals.com) | support@peachesboutique.com |

Attorney Client and Work ProductPriviledged Document

| Eva's Bridals | | | | |
|---|---|---|---|---|
| Bates Number | Date | Description | Sent by | Received by |
| PEACHES5533-5537 | 11/18/2011 | Peaches' Email to Jodi Boser of Blush and Kris Henslin of Mori Lee requesting that these designers "do not sell" to De Je Co Bridal and Eva's Bridals, and provide a list of area codes surrounding the Chicago market, as well as 331 separate zip codes within 30 miles of Chicago, to "DO NOT SELL TO." Peaches ends the email stating, "You have always protected us in the past ...please call us if there is any new store close that is trying to carry your line." | support@peachesboutique.com | Jodi Boser (jodiboser@aol.com), Kris Henslin (henslink@charter.net) |

**Attorney Client and Work ProductPriviledged Document**

| Jasmine | | | | |
|---|---|---|---|---|
| **Bates Number** | **Date** | **Description** | **Sent by** | **Received by** |
| PEACHES2366 | 12/21/2011 | Peaches' email to designers stating, "There is a new store opening up very close to us in January. Please do NOT sell to them as they are in our direct competition." | support@peachesboutique.com | Barbara Motorozesku (bmotorozesku@Alyceparis.com); Jodi Boser (jodiboser@aol.com); Michael Wulfe (mjw920@gmail.com); lyceparis.com); Tammy Watts (tammy@Barijay.com); Micheal Levin (michael@MacDuggal.com); Michael Kasher (michaelk@lefemmefashion.com); Shannan Malone (shannonm@lafemmefashion.com); alex@preciousformals.com; Ruby Ashraf (ruby@promzstar.com); Wen Wu (wenw@houseofwu.com); Jennifer Hill (hillj@houseofwu.com); Sheri Simon (ssimon@jovani.com); Abraham Maslavi (AM@jovani.com); Marco Montenegro (marco@morilee.com); Maria Montenegro (maria@morilee.com); Kris Henslin (henslink@charter.net); Jennifer Strafer (jennifer@sherrihill.com); Dusty Hill (dusty@sherrihill.com); omid@faviana.com; Brian Egitto (begitto@mcbridals.com); Steve Lang (SLang@mcbridals.com); Heide Frangella (Hfrangella@aol.com); Kelly Crum (kelly@allurebridals.com); Jackie Purcell (jackie@allurebridals.com); Janna Looney (janna@allurebridals.com); Sunny Malhotra (rivadesigns@gmail.com); Brendal@scalausa.com; Nancy Mehta (nancym@seancollection); zekeisha@seancollection.com; sales@teranicouture.com; Wing Chan (wingster88@aol.com) |

**Attorney Client and Work ProductPriviledged Document**

| | | | | |
|---|---|---|---|---|
| PEACHES2367 | 12/21/2011 | Peaches' email regarding Jamine to Dusty Hill of Sherri Hill, stating: "it looks like they will be selling all Jasmine products, MOB, Bridal, Prom, etc. However, we do NOT want them to start trying to carry all of the lines that we sell. Please keep us informed if you hear anything else." | support@peachesboutique.com | Dusty Hill; Jeff Surdej |
| PEACHES1767 | 12/21/2011 | Tawinder Singh, owner of Jasz Couture, stating, "well noted and we will be careful - thanks - singh," in response to Peaches' email directing designers to do not sell to Jasmine because "they are in our direct competition." | Singh Tawinder (Jaszcouture@yahoo.com) | support@peachesboutique.com |
| PEACHES1768 | 12/21/2011 | Dusty Hill of Sherri Hill stating, "We will need to team up and work hard to out do them," in response to Peaches' email directing designers to do not sell to Jasmine because "they are in our direct competition." | Dusty Hill (dusty@SherriHill.com) | support@peachesboutique.com |
| PEACHES1769 | 12/21/2011 | Shannon Malone of La Femme stating, "This has been added as a conflict in our system," in response to Peaches' email directing designers to do not sell to Jasmine because "they are in our direct competition." | Shannon Malone (shannonm@lafemmefashion.com) | support@peachesboutique.com |
| PEACHES1770 | 12/22/2011 | Brian Egitto of Mon Cheri stating, "Not to worry," in response to Peaches' email directing designers to do not sell to Jasmine because "they are in our direct competition." | Brian Egitto (Begitto@mcbridals.com) | support@peachesboutique.com |

Attorney Client and Work Product Priviledged Document

| PEACHES1771 | 12/22/2011 | Jodi Boser of Blush stating, "No problem," in response to Peaches' email directing designers to do not sell to Jasmine because "they are in our direct competition." | Jodi Boser (jodiboser@aol.com) | support@peachesboutique.com |

| Yailene Casa Boutique | | | | |
|---|---|---|---|---|
| **Bates Number** | **Date** | **Description** | **Sent by** | **Received by** |
| PEACHES3287-3288 | 11/7/2012 | Email chain between Peaches and Sheri Simon of Jovani regarding Peaches finding Yailene Casa Btq on Jovani's store locator and Sheri Simon stating, "They will be removed immediately. We don't sell them." | support@peachesboutique.com | Sheri Simon (ssimon@Jovani.com) |

| A Pink Boutique | | | | |
|---|---|---|---|---|
| **Bates Number** | **Date** | **Description** | **Sent by** | **Received by** |
| PEACHES1776 | 12/5/2012 | Jennifer Strafer of Sherri Hill sending an email regarding A Pink Boutique's application to become an authorized retailer to Peaches and asking, "Is this the store?" | Jennifer Strafer (jennifer@Sherrihill.com) | support@peachesboutique.com |
| PEACHES1777 | 12/5/2012 | Heide Frangella of Mon Cheri sending an email to Peaches with link to A Pink Boutique's Facebook page stating, "Here you go. She took everything off from yesterday. But today I can see her again. With no dresses listed." | Heide Frangella (hfrangella@aol.com) | support@peachesboutique.com |

**Attorney Client and Work ProductPriviledged Document**

| | | | | |
|---|---|---|---|---|
| PEACHES3461 | 12/6/2012 | Peaches' blast email to designers regarding Elegant Couture and A Pink Boutique opening, La Joli Mode and Hannah's Boutique reopening and stating: "we must address the topic of two new brick and mortar stores opening in our area...We always appreciate that you vendors have always protected." | support@peachesboutique.com | Sheri Simon (ssimon@Jovani.com); Barbara Motorzesku (bmotorzesku@Alyceparis.com); Tammy Watts (tammy@barijay.com); Jodi Boser (jodiboser@aol.com); Micahel Wulfe (mjw920@gmail.com); Dawn Sallis (dawnsallis@MacDuggal.com) Michael Levin (michael@MacDuggal.com); corinne@faviana.com; omid@faviana.com; Melissa Fox (melissa.fox@MaggieSottero.com); Wen Wu (wenw@houseofwu.com); Jennifer LeBlanc (leblancj@HouseofWu.com); Singh Tawinder (Jaszcouture@yahoo.com); michaelk@lafemmefashion.com; Shannon |
| PEACHES1780 | 12/6/2012 | Michael Wulfe of Blush Prom (at the time of this email) stating: "Everyone ALWAYS rejects these accounts." in response to Peaches' email regarding Elegant Couture, A Pink Boutique opening, and La Joli Mode and Hannah's Boutique reopening | Michael Wulfe (mjw920@gmail.com) | support@peachesboutique.com |
| PEACHES1781 | 12/6/2012 | Sheri Simon of Jovani response to Peaches' email regarding Elegant Couture, A Pink Boutique opening, La Joli Mode and Hannah's Boutique, stating that Jovani "will not open" accounts for these stores | Sheri Simon (ssimon@jovani.com) | support@peachesboutique.com |

**Attorney Client and Work ProductPriviledged Document**

| | | | | |
|---|---|---|---|---|
| PEACHES1782-1783 | 12/6/2012 | Email chain between Sonny Malhotra, owner of Riva Designs, and Peaches where Riva designs sends Peaches the style number of the three (3) dresses that Hannah's received from a twenty-five piece dress order, and explains that will not fulfill the remaining order and Hannah's "will not be getting any further dresses" | Sunny Malhotra (rivadesigns@gmail.com) | support@peaches.com |
| Peaches1784 | 12/6/2012 | Seth Kruger of Allure bridals stating, "we have always granted your requested prefix areas" in response to Peaches' email regarding Elegant Couture and A Pink Boutique opening, and La Joli Mode and Hannah's Boutique reopening | Seth Kruger (seth_kruger@yahoo.com) | support@peachesboutique.com; Kelly Crum (kelly@allurebridals.com) |
| PEACHES1723 | 12/18/2012 | Sher Simon of Jovani email to Peaches, requesting that Peaches send a list of stores that they do not want Jovani to sell to, and advising that  dream nights Hannah's and a pink boutique would be closed, apologizing for selling to A Pink Boutique and explaining that "Abraham did not think a store 40 minutes away was a problem." | Sheri Simon (ssimon@Jovani.com) | support@peachesboutique.com |

**Attorney Client and Work ProductPriviledged Document**

| | | | | |
|---|---|---|---|---|
| PEACHES3528 | 12/19/2012 | Peaches' email to Marc Weissman of Tarik Ediz regarding Elegant Couture and A Pink Boutique opening, La Joli Mode and Hannah's Boutique reopening and stating: "we must address the topic of two new brick and mortar stores opening in our area...We always appreciate that you vendors have always protected." | support@peachesboutique.com | Marc Weissman (marc@weissmankrull.com) |

**Attorney Client and Work ProductPriviledged Document**

| Elegant Couture | | | | |
|---|---|---|---|---|
| **Bates Number** | **Date** | **Description** | **Sent by** | **Received by** |
| PEACHES3461 | 12/6/2012 | Peaches' blast email to designers regarding Elegant Couture and A Pink Boutique opening, La Joli Mode and Hannah's Boutique reopening and stating: "we must address the topic of two new brick and mortar stores opening in our area...We always appreciate that you vendors have always protected." | support@peachesboutique.com | Sheri Simon (ssimon@Jovani.com); Barbara Motorzesku (bmotorzesku@Alyceparis.com); Tammy Watts (tammy@barijay.com); Jodi Boser (jodiboser@aol.com); Micahel Wulfe (mjw920@gmail.com); Dawn Sallis (dawnsallis@MacDuggal.com) Michael Levin (michael@MacDuggal.com); corinne@faviana.com; omid@faviana.com; Melissa Fox (melissa.fox@MaggieSottero.com); Wen Wu (wenw@houseofwu.com); Jennifer LeBlanc (leblancj@HouseofWu.com); Singh Tawinder (Jaszcouture@yahoo.com); michaelk@lafemmefashion.com; Shannon Malone (shannonm@LaFemmefashion.com); Edmund Chan (wingster88@aol.som); (wing@Landadesigns.com); Kris Henslin (henslink@charter.net); Marco Montenegro (marco@morilee.com); mudell@morilee.com; Janna Looney (janna@AllureBridals.com); Jackie Purcell (jackie@AllureBridals.com); Kelly Crum (kelly@allurebridals.com); Alex@Preciousformals.com); (Kelsey@Preciousformals.com); Sunny Malhotra (Rivadesigns@gmail.com); Andrea Melore (andrea@scalausa.com); Beata Grover (Beatag@gmail.com); Nancy Mehta (nancym@SeanCollection.com); Jennifer@Sherrihill.com; Wow_Prom@yahoo.com; Dusty Hill (dusty@sherrihill.com) |

Attorney Client and Work ProductPriviledged Document

| PEACHES1780 | 12/6/2012 | Michael Wulfe of Blush Prom (at the time of this email) stating: "Everyone ALWAYS rejects these accounts." in response to Peaches' email regarding Elegant Couture, A Pink Boutique opening, and La Joli Mode and Hannah's Boutique reopening | Michael Wulfe (mjw920@gmail.com) | support@peachesboutique.com |
| --- | --- | --- | --- | --- |
| PEACHES1781 | 12/6/2012 | Sheri Simon of Jovani response to Peaches' email regarding Elegant Couture, A Pink Boutique opening, La Joli Mode and Hannah's Boutique, stating that Jovani "will not open" accounts for these stores | Sheri Simon (ssimon@jovani.com) | support@peachesboutique.com |
| PEACHES1782-1783 | 12/6/2012 | Email chain between Sonny Malhotra, owner of Riva Designs, and Peaches where Riva designs sends Peaches the style number of the three (3) dresses that Hannah's received from a twenty-five piece dress order, and explains that will not fulfill the remaining order and Hannah's "will not be getting any further dresses" | Sunny Malhotra (rivadesigns@gmail.com) | support@peaches.com |

**Attorney Client and Work ProductPriviledged Document**

| | | | | |
|---|---|---|---|---|
| Peaches1784 | 12/6/2012 | Seth Kruger of Allure bridals stating, "we have always granted your requested prefix areas" in response to Peaches' email regarding Elegant Couture and A Pink Boutique opening, and La Joli Mode and Hannah's Boutique reopening | Seth Kruger (seth_kruger@yahoo.com) | support@peachesboutique.com; Kelly Crum (kelly@allurebridals.com) |
| PEACHES3528 | 12/19/2012 | Peaches' email to Marc Weissman of Tarik Ediz regarding Elegant Couture and A Pink Boutique opening, La Joli Mode and Hannah's Boutique reopening and stating: "we must address the topic of two new brick and mortar stores opening in our area...We always appreciate that you vendors have always protected." | support@peachesboutique.com | Marc Weissman (marc@weissmankrull.com) |

**Attorney Client and Work ProductPriviledged Document**

| La Joli Mode | | | | |
|---|---|---|---|---|
| **Bates Number** | **Date** | **Description** | **Sent by** | **Received by** |
| PEACHES3461 | 12/6/2012 | Peaches' blast email to designers regarding Elegant Couture and A Pink Boutique opening, La Joli Mode and Hannah's Boutique reopening and stating: "we must address the topic of two new brick and mortar stores opening in our area...We always appreciate that you vendors have always protected." | support@peachesboutique.com | Sheri Simon (ssimon@Jovani.com); Barbara Motorzesku (bmotorzesku@Alyceparis.com); Tammy Watts (tammy@barijay.com); Jodi Boser (jodiboser@aol.com); Micahel Wulfe (mjw920@gmail.com); Dawn Sallis (dawnsallis@MacDuggal.com) Michael Levin (michael@MacDuggal.com); corinne@faviana.com; omid@faviana.com; Melissa Fox (melissa.fox@MaggieSottero.com); Wen Wu (wenw@houseofwu.com); Jennifer LeBlanc (leblancj@HouseofWu.com); Singh Tawinder (Jaszcouture@yahoo.com); michaelk@lafemmefashion.com; Shannon Malone (shannonm@LaFemmefashion.com); Edmund Chan (wingster88@aol.som); (wing@Landadesigns.com); Kris Henslin (henslink@charter.net); Marco Montenegro (marco@morilee.com); mudell@morilee.com; Janna Looney (janna@AllureBridals.com); Jackie Purcell (jackie@AllureBridals.com); Kelly Crum (kelly@allurebridals.com); Alex@Preciousformals.com); (Kelsey@Preciousformals.com); Sunny Malhotra (Rivadesigns@gmail.com); Andrea Melore (andrea@scalausa.com); Beata Grover (Beatag@gmail.com); Nancy Mehta (nancym@SeanCollection.com); Jennifer@Sherrihill.com; Wow_Prom@yahoo.com; Dusty Hill (dusty@sherrihill.com) |

**Attorney Client and Work ProductPriviledged Document**

| PEACHES1780 | 12/6/2012 | Michael Wulfe of Blush Prom (at the time of this email) stating: "Everyone ALWAYS rejects these accounts." in response to Peaches' email regarding Elegant Couture, A Pink Boutique opening, and La Joli Mode and Hannah's Boutique reopening | Michael Wulfe (mjw920@gmail.com) | support@peachesboutique.com |
| PEACHES1781 | 12/6/2012 | Sheri Simon of Jovani response to Peaches' email regarding Elegant Couture, A Pink Boutique opening, La Joli Mode and Hannah's Boutique, stating that Jovani 'will not open" accounts for these stores | Sheri Simon (ssimon@jovani.com) | support@peachesboutique.com |
| PEACHES1782-1783 | 12/6/2012 | Email chain between Sonny Malhotra, owner of Riva Designs, and Peaches where Riva designs sends Peaches the style number of the three (3) dresses that Hannah's received from a twenty-five piece dress order, and explains that will not fulfill the remaining order and Hannah's "will not be getting any further dresses" | Sunny Malhotra (rivadesigns@gmail.com) | support@peaches.com |

| | | | | |
|---|---|---|---|---|
| Peaches1784 | 12/6/2012 | Seth Kruger of Allure bridals stating, "we have always granted your requested prefix areas" in response to Peaches' email regarding Elegant Couture and A Pink Boutique opening, and La Joli Mode and Hannah's Boutique reopening | Seth Kruger (seth_kruger@yahoo.com) | support@peachesboutique.com; Kelly Crum (kelly@allurebridals.com) |
| PEACHES3528 | 12/19/2012 | Peaches' email to Marc Weissman of Tarik Ediz regarding Elegant Couture and A Pink Boutique opening, La Joli Mode and Hannah's Boutique reopening and stating: "we must address the topic of two new brick and mortar stores opening in our area...We always appreciate that you vendors have always protected." | support@peachesboutique.com | Marc Weissman (marc@weissmankrull.com) |

| GENERAL | | | | |
|---|---|---|---|---|
| PEACHES1749 | 2/23/2009 | Jennifer Strafer of Sherri Hill forwarding an email from Evening Goddess(Connie and Meysoon) to Peaches regarding the illegality of designers forwarding her personal information to other retailers | Jennifer Strafer (jennifer@SherriHill.com) | support@peachesboutique.com |

**Attorney Client and Work ProductPriviledged Document**

| | | | | |
|---|---|---|---|---|
| PEACHES1751 | 2/27/2009 | Robert Feinberg of Terani email to Peaches stating, "Re your e-mail, we appreciate your concern, however we called them 2 times and sent a letter for them ro remove our name from their web site as we do not sell them and will not sell them. What to do?" | Robert Feinberg (sales@teranicouture.com) | support@peachesboutique.com |
| PEACHES1752 | 5/5/2009 | Michael Wulfe of Scala (at time of this email) email stating, "Thank you for forwarding letter. I screen all incoming email. Have not yet received, but we are extremely careful with Chicago. I will let you know if I get anything." | Michael Wulfe (michaelw@scalausa.com) | support@peachesboutique.com |
| PEACHES1753 | 5/6/2009 | Wen Wu email to Peaches and House of Wu employees stating, "Please watch closely this area of new store, we are to protect Peaches' territory," in response to Peaches May 5, 2009 letters. | Wen Wu (wenwu@HouseofWu.com) | support@peachesboutique.com; Jennifer Hill (hillj@houseofwu.com); Tim Cohen (timlapeer@yahoo.com) |
| PEACHES414 | 7/25/2012 | Internal emails between Peaches' employees Lindsay King and Christy Kingsmill regarding Catherine's Bridal not having access to a Precious formals line because "Naperville is soo close to" Peaches. | Lindsay King (Ldaisy5432@aol.com) | Christy Kingsmill (dgskier7@yahoo.com) |

**Attorney Client and Work ProductPriviledged Document**

| PEACHES1723 | 12/18/2012 | Sher Simon of Jovani email to Peaches, requesting that Peaches send a list of stores that they do not want Jovani to sell to, and advising that dream nights Hannah's and a pink boutique would be closed, apologizing for selling to A Pink Boutique and explaining that "Abraham did not think a store 40 minutes away was a problem." | Sheri Simon (ssimon@Jovani.com) | support@peachesboutique.com |
| --- | --- | --- | --- | --- |
| PEACHES3528 | 12/19/2012 | Peaches' email to Marc Weissman of Tarik Ediz regarding Elegant Couture and A Pink Boutique opening, La Joli Mode and Hannah's Boutique reopening and stating: "we must address the topic of two new brick and mortar stores opening in our area...We always appreciate that you vendors have always protected." | support@peachesboutique.com | Marc Weissman (marc@weissmankrull.com) |

| ZIP CODES/TERRITORY | | | | |
| --- | --- | --- | --- | --- |
| Bates Number | Date | Description | Sent by | Received by |
| JASZ 516 | 5/7/2009 | Peaches' email to Jasz Couture and other designers advising of a new store, Pink Slip Boutique looking to get stock, and requesting "territorial protection" in designated area codes and suburbs around the Chicago area. | support@peachesboutique.com | Tawinder Singh (jaszcouture@yahoo.com) |

Attorney Client and Work ProductPriviledged Document

| | | | | |
|---|---|---|---|---|
| PEACHES1754 | 5/8/2009 | Brian Egitto of Mon Cheri's advising Peaches that it is "the only store I protect" in response to Peaches Email to designers designating area codes and suburbs "to watch for" | Brian Egitto (Begitto@mcbridals.com) | support@peachesboutique.com; Heide Frangella (hfrangella@aol.com) |
| PEACHES1755 | 5/8/2009 | Michael Wulfe of Scala (at the time of this email) stating 'we will advise if they call" in response to Peaches' Email to Designers designating area codes and suburbs "to watch for" | Barbara & Roy Surdej (support@peachesboutique.com) | Michael Wulfe (michaelw@scalausa.com) |
| PEACHES1756-1757 | 5/10/2009 | Steve Lang, owner of Mon Cheri, stating, "if you want to grow Peaches, increase your margins, have dresses no one else has...let's plan to fight together" in response to Peaches' Email to Designers designating area codes and suburbs "to watch for" | Steve Lang (SLang21008@aol.com) | Brian Egitto (Begitto@mcbridals.com), Barbara & Roy Surdej (support@peachesboutique.com), Heidi Frangella (Hfrangella@aol.com) |


**Attorney Client and Work ProductPriviledged Document**

| PEACHES2313 | 9/10/2011 | Email from Peaches instructing Terani to "not sell to IHOC, Hannah's, and Pink Slip Boutique"; to "Do not sell to" to area codes in the Chicago area, and to call and advise them whenever there is a new account trying to open | Barbara Surdej (support@peachesboutique.com) | Terani Couture (sales@teranicouture.com) |
|---|---|---|---|---|
| PEACHES5533-5537 | 11/18/2011 | Peaches' Email to Jodi Boser of Blush and Kris Henslin of Mori Lee requesting that these designers "do not sell" to De Je Co Bridal and Eva's Bridals, and provide a list of area codes surrounding the Chicago market, as well as 331 separate zip codes within 30 miles of Chicago, to "DO NOT SELL TO." Peaches ends the email stating, "You have always protected us in the past ...please call us if there is any new store close that is trying to carry your line." | support@peachesboutique.com | Jodi Boser (jodiboser@aol.com), Kris Henslin (henslink@charter.net) |

**Attorney Client and Work ProductPriviledged Document**

| | | | | |
|---|---|---|---|---|
| PEACHES414 | 7/25/2012 | Internal emails between Peaches' employees Lindsay King and Christy Kingsmill regarding Catherine's Bridal not having access to a Precious formals line because "Naperville is soo close to" Peaches. | Lindsay King (Ldaisy5432@aol.com) | Christy Kingsmill (dgskier7@yahoo.com) |
| PEACHES3725 | 2/1/2013 | Peaches email to Terani stating, "Do not sell to the following stores" and lists Pink Boutique, Elegant Couture, International House of Couture, Kimberly Bond, Embellishments, Dream nights and Everything for Pageants. Peaches goes on to state, "please if you would check these area codes and acall us with the store name and address and we will let you know right away" and lists several area codes comprising the Chicago | Robert Feinberg (sales@Teranicouture.com) | support@peachesboutique.com |

**Attorney Client and Work ProductPriviledged Document**

| | | | | |
|---|---|---|---|---|
| PEACHES1594 | 2/6/2013 | Sheri Simon of Jovani Email to Peaches stating, "just wanted to fill you in on all the stores we have shut down in your area....." and goes on to list Don Galani, Mona Lisa, Kimberly Bond, That Girl, A l'amour, International House of Couture, Hannah's, Fit 2B Tied, La Fiesta, Embellish, Teranz, That Boutiqe, A Pink Boutique, and Everything 4 Pageants." | Sheri Simon (ssimon@jovani.com) | support@peachesboutique |

CONFIDENTIAL -- Attorneys' Eye Only

## Exhibit 10: Percent of Dresses Above MSRP, In-Store Sales
## Peaches Boutique
## 2011 - 2013

| Dresses Included | 2011 | 2012 | 2013 |
|---|---|---|---|
| | (%) | | |
| | (1) | (2) | (3) |
| All Dresses | | | |
| Prom Season[2], All Dresses | | | |
| Full-Price | | | |
| Prom Season[2], Full Price | | | |

Notes:

1) See Appendix I for data restrictions.

2) Prom Season is from January through May.

Sources: Peaches in-store transactional data (PEACHES0009383).

CONFIDENTIAL -- Attorneys' Eye Only

**Exhibit 11: Price Discrimination Analysis of Full-Priced, Prom Season Dresses From Peachesboutique.com**
**Peaches Boutique**
**Jan 2011 - May 2011**

| Description | Method 1 (No Deviation) | | Method 2 (Mode Price) | | Method 3 (Median Price) | |
|---|---|---|---|---|---|---|
| | Number of Dresses | Percent of Dresses | Number of Dresses | Percent of Dresses | Number of Dresses | Percent of Dresses |
| | | (%) | | (%) | | (%) |
| | (1) | (2) | (3) | (4) | (5) | (6) |



Notes:

1) Where there are multiple sales of the same dress ██████████████████ ████████ three methods were employed to determine the comparative price. Method 1: restrict comparison to transactions where the price at time of sale did not vary in ████████ and did not vary ████████████████ If the prices were not uniform, then this product ID was dropped from the analysis. Method 2: compare the most common ("mode") price paid ████████ and the most common price paid ████████ Also, note that if no single price pre-dominates, then a mode is not generated. This would ██████ a greater number of ██████ to be included in the population utilizing Method 3 compared to Method 2, which is depicted in the table. Method 3: compare the median pri██████ to the median pri██████

2) See Appendix I for data restrictions.

3) Prom Season is from January through May.

Sources: Peaches internet transactional data (PEACHES0009254 and PEACHES0010945).

Econ One
1/21/2015

CONFIDENTIAL -- Attorneys' Eye Only

**Exhibit 12: Summary Statistics of In-Store Dress Prices in the 'Chicago Market'**
**Peaches Boutique**
**2011 - 2013**

| Year | Dresses Included | Number of Dresses | Prices at Time of Sale | | | | | Total Revenue ($ millions) | Number of Dresses | Prices at Time of Sale (Full-Price Dresses Only) | | | | | Total Revenue ($ millions) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Minimum Price | Median Price | Average Price | Maximum Price | Standard Deviation of Price | | | Minimum Price | Median Price | Average Price | Maximum Price | Standard Deviation of Price | |
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| 2011 | All Dresses Designer Non-Designer | | | | | | | | | | | | | | |
| 2012 | All Dresses Designer Non-Designer | | | | | | | | | | | | | | |
| 2013 | All Dresses Designer Non-Designer | | | | | | | | | | | | | | |
| 2011-2013 | All Dresses Designer Non-Designer | | | | | | | | | | | | | | |

Notes:
1) See Appendix I for data restrictions.
2) The 'Chicago Market' is defined as being within the area codes: 224,847,331,630,708,312,872,773 as detailed in the First Amended Complaint, Paragraph 1.

Sources: First Amended Complaint, dated 7/29/14, Peaches in-store transactional data (PEACHES0009383).

CONFIDENTIAL -- Attorneys' Eyes Only

# Figure 1: Peaches In-Store Revenue per Square Foot
## 2003-2005, 2011-2013



Sources: [2003-2005 Revenue] Peaches Illinois Department of Revenue, Form 1040 (PEACHES0005456-60);
[2011-2013] Peaches transactional data (PEACHES0009383).

Econ One
1/21/2015

CONFIDENTIAL -- Attorneys' Eyes Only

## Figure 2: Number of Dresses Sold by In-store, PeachesBoutique.com, PromDressShop.com, Dress4Prom.com 2011-2013



■ In-Store    ■ PeachesBoutique.com    ■ PromDressShop.com, Dress4Prom.com

Sources: Peaches internet transactional data (PEACHES0009254 and PEACHES0010945); Peaches in-store transactional data (PEACHES0009383).

Econ One
1/21/2015

CONFIDENTIAL --Attorneys' Eyes Only

# Appendix I

## Peaches' Sales Data

Peaches' sales data were made available in two different sets, in-store and internet sales.

The in-store dress sales dataset, *PEACHES0009383,* contains ▮▮▮▮ unique dress transactions. It includes the following fields: date, designer, product, area_code, zip_code, price, full_price, unit_cost, event, event_date and event_type. Field definitions were provided in Objections and Answers to Plaintiff's Fourth Set of Interrogatories to Defendants, November 21, 2014.

The first Peaches internet transactional data produced in this matter, *PEACHES0009383* ("old"), which was provided to me on October 20, 2012 as part of the back-up production for The Declaration of Dr. Robert Kneuper, October 8, 2014, did not include a variable which identified on which of Peaches three websites the sale was made (peachesboutique.com, promdressshop.com, and dress4prom.com). Therefore, I requested that this variable be produced. I received a new dataset, *PEACHES 0010945* ("new"), on December 17, 2014. The old dataset contains ▮▮▮▮ unique dress transactions and the new dataset contains ▮▮▮▮ unique dress transactions.[1] Both files contain the following fields: date, designer, product, area_code, zip_code, price, full_price, event, event_date, and event_type. The new file also includes the indicator for the website on which a sale was made ("sitename"). Additionally, when I compare the two files using every variable except sitename in the new dataset, there are ▮▮▮▮ transactions from the old file and ▮▮▮▮ transactions from the new file for which fields have different values. The large majority of the discrepancies are in the unit cost field. I understand from counsel and the Deposition of Dr. Robert Kneuper, December 3, 2014, that the reason for these discrepancies is the dynamic nature in which unit costs are updated over time within "The Peach," Peaches' sales tracking system (Kneuper Deposition at 134-135). On occasion, Peaches would buy dresses from designers at considerable discounts from lines that were in-season in prior years. This discounted unit cost information would be entered into The Peach as the unit cost for that dress. Any changes to the data within the system will cause previously recorded values to be overwritten for all respective transactions to reflect the updated values. As a result, I interpret the old dataset to more accurately represent the values of past transactions.

However, because I require the website indicator from the new dataset, I merged the two datasets together to attach the website indicator to the transactions in the old file. There is no unique transaction identifier between the old and new internet datasets. In order to merge the files together, I match on every variable except for unit_cost due to reasons

---

[1] The discrepancy in the number of observations in the two datasets has not been provided to me (They are not merely more recent transactions).

described above. This results in [redacted] matched transactions in the old dataset, excluding [redacted] unmatched transactions (which accounts for less than 1% of the data).

## Peaches' Sales Data Restrictions

A standard and normal practice in data analysis involves "cleaning" the data to remove outliers. As noted in Dr. Kneuper's backup production ("PEACHES0010351_CONFIDENTIAL—Attorneys' Eyes Only") and his deposition (Kneuper Deposition at 134-135), he imposed a number of data cleaning restrictions for certain of his analyses (which he called "outlier exclusion criteria"). In addition to Dr. Kneuper's restrictions, I impose additional cleaning restrictions for certain analyses. These restrictions are identified below, and noted in my report, where applicable:

1) Dr. Kneuper's restrictions:
   a) Removal of any dress with a unit cost that is less than or equal to $25 for dresses from JASZCOUTURE.
   b) Removal of any dress with a unit cost that is less than or equal to $15 for dresses from NIGHTMOVES.
   c) Removal of any dress with a unit cost that is less than or equal to $125 or greater than or equal to $375 for dresses from LA FEMME or LA FEMME SHORT.

2) Data cleaning exclusions:
   a) Removal of any dress with a 'unit cost' equal to 0.
   b) Removal of any dress with a 'price' that is less than or equal to 'unit_cost'.
   c) Removal of any dress where the designer is [redacted] because they have unusually low prices.

3) Dress styles that do not compete in the relevant market (See Appendix II):
   a) Removal of Mother-of-the-Bride dresses ("MOB").
   b) Removal of bridal gowns.
   c) Removal of Children's Pageant dresses.

4) For some analyses in my report, I examine only full-priced dresses. Dresses sold at a discount (i.e. not sold at "Full Price") are identified as follows:
   a) From in-store data, if 'event' or 'event_type' are coded as "NULL" or "No Event Needed". These are were dresses sold primarily at annual sidewalk sales. (Objections and Answers to Plaintiff's Fourth Set of Interrogatories to Defendants, November 21, 2014, No. 2).
   b) If 'full_price' is not zero. When the full_price field is populated with a non-zero value, the dress has a discounted 'sale' price. 'FullPrice' is non-zero if the dress is on sale, then The Peach will capture what was considered the full price of the product. This field is generally only captured for sale- priced products (Objections and

CONFIDENTIAL --Attorneys' Eyes Only

Answers to Plaintiff's Fourth Set of Interrogatories to Defendants, November 21, 2014, No. 2).

c) If a dress is priced below MSRP. By definition these dresses would be considered "sale."

    i) MSRP is defined as keystone, or 2x unit cost, with the following exceptions:

        (1) For "House of Wu" dresses, the designer required their dresses priced at ███. ████████████ Above this threshold was considered above MSRP, and below this threshold was considered below MSRP. ( See footnote 69).

        (2) For Terani dresses in 2012 and 2013 sold on the internet, the designer suggested their dresses priced at ██ times unit_cost. This was considered their MSIRP. Less than ██ times unit_cost was considered below and above ██ was considered above (See footnote 72).

        (3) For all other dresses, MSRP and MSIRP was calculated at two time unit_cost. Below MSRP and MSIRP was defined as below the two times threshold and above was defined as above the time times unit_cost threshold (See footnote 68).

## Hannah's Sales Data

The Hannah's sales data were made available in the following files: Layaway 2013-2014 - Corrected 1.5.15.xlsx; Sales 2013 - Corrected 1.5.15.xlsx; Sales Order 2013-2014 - Corrected 1.5.15.xlsx; Hannah's Internet Sales - 1.1.13 - 10.14.14.xlsx and Hannah's 2012 Sales to Customers - Corrected 11.26.14.xlsx 1)

## Hannah's Sales Data Restrictions

For Hannah's sales data, we used the following data restrictions based on interviews with Hannah's owner, Susan Shaban, on December 16, 2014 and January 5, 2015.

1) Data cleaning:
    a) Removal of all dresses sold under ███ Ms. Shaban identified these transactions for accessories and shoes. She did not sell any dresses for less than ███

2) Dress styles that do not compete in the relevant market:
    a) Removal of all Mother-of-the-Bride dresses ("MOB").
    b) Removal of bridal gowns.
    c) Removal of Children's Pageant dresses.

**Appendix II**
**Designer and Overall Designer Determination**
**for Hannah's /Peaches Original Data Production**

| Data Set | Original in Data - Designer | Cleaned - Designer | Assigned - Design House | Designer | Product Category |
|---|---|---|---|---|---|
| Hannahs | MISC | | | 0 | MISC |
| Hannahs | N/A | | | 0 | N/A |
| Hannahs | ALLIYS | ALLIYS | ALLIYS | 0 | |
| Hannahs | NIGHT MOVES | NIGHT MOVES | ALLURE | 1 | |
| Hannahs | NIGHT MOVES BY ALLURE | NIGHT MOVES | ALLURE | 1 | |
| Hannahs | ALLURE BRIDAL | ALLURE BRIDAL | ALLURE_Hannah's | 0 | BRIDAL |
| Hannahs | MADISON JAMES | MADISON JAMES BRIDAL | ALLURE_Hannah's | 0 | BRIDAL |
| Hannahs | ALLURE | ALLURE | ALLURE_Hannah's | 0 | |
| Hannahs | ALYCE | ALYCE | ALYCE | 0 | |
| Hannahs | ALYCE DESIGNS | ALYCE | ALYCE | 0 | |
| Hannahs | ALYCE PARIS | ALYCE PARIS | ALYCE | 0 | |
| Hannahs | ALYCES | ALYCE | ALYCE | 0 | |
| Hannahs | BLACK LABEL | BLACK LABEL | ALYCE | 0 | |
| Hannahs | ANAISS | ANAISS | ANAISS | 0 | |
| Hannahs | ANGELA AND ALISON | ANGELA AND ALISON | ANGELA AND ALISON | 0 | |
| Hannahs | ANSONIA | ANSONIA ACCESSORIES | ANSONIA | 0 | ACCESSORIES |
| Hannahs | BARI JAY | BARI JAY BRIDESMAIDS | BARI JAY BRIDESMAIDS | 0 | BRIDESMAIDS |
| Hannahs | BENJAMIN WALK | BENJAMIN WALK SHOES | BENJAMIN WALK | 0 | SHOES |
| Hannahs | JOYCE | JOYCE SHOES | BENJAMIN WALK | 0 | SHOES |
| Hannahs | BIL LEVKOFF | BIL LEVKOFF | BIL LEVKOFF | 0 | |
| Hannahs | BLUSH | BLUSH | BLUSH | 1 | |
| Hannahs | BRIDAL OUTLET | BRIDAL OUTLET | BRIDAL OUTLET | 0 | BRIDAL |
| Hannahs | CLARISSE | CLARISSE | CLARISSE | 0 | |
| Hannahs | COLORRIFFICS SHOES | COLORRIFFICS SHOES | COLORIFFICS | 0 | SHOES |
| Hannahs | SIZZLE SHOES | COLORIFFICS SHOES | COLORIFFICS | 0 | SHOES |
| Hannahs | DANA MATHERS | DANA MATHERS | DANA MATHERS | 0 | BRIDAL |
| Hannahs | DAVE & JOHNNY | DAVE AND JOHNNY | DAVE AND JOHNNY | 0 | |
| Hannahs | DAVE&jOHNY | DAVE&jOHNY | DAVE&jOHNY | 0 | |
| Hannahs | EDDY K | EDDY K BRIDAL | EDDY K | 0 | |
| Hannahs | EDWARD BERGER | EDWARD BERGER BRIDAL | EDWARD BERGER | 0 | |
| Hannahs | FAVIANA | FAVIANA | FAVIANA | 0 | |
| Hannahs | FERIANA | FERIANI | FERIANI COUTURE | 0 | |
| Hannahs | FERIANI | FERIANI | FERIANI COUTURE | 0 | |
| Hannahs | FIRST LADY | FIRST LADY | FIRST LADY | 0 | |
| Hannahs | FOREVER YOURS PROM | FOREVER YOURS PROM | FOREVER YOURS | 0 | |
| Hannahs | HELEN HEART | HELEN HEART | HELEN HEART | 0 | |
| Hannahs | FOUAD SARKIS | FOUAD SARKIS | HOUSE OF MNM | 0 | |
| Hannahs | HOUSE OF MNM | HOUSE OF MNM | HOUSE OF MNM | 0 | |
| Hannahs | MNM | MNM COUTURE | HOUSE OF MNM | 0 | |
| Hannahs | MNM COUTURE | MNM COUTURE | HOUSE OF MNM | 0 | |
| Hannahs | PANOLPY | PANOLPY | PANOLPY | 1 | |
| Hannahs | QUINCEANERA | QUINCEANERA | HOUSE OF WU | 1 | QUINCEANERA |
| Hannahs | STUDIO 17 | STUDIO 17 | HOUSE OF WU | 1 | |
| Hannahs | TIFFANY | TIFFANY | HOUSE OF WU | 1 | |
| Hannahs | TIFFANY DESIGNS | TIFFANY | HOUSE OF WU | 1 | |
| Hannahs | HOUSE OF WU | HOUSE OF WU | HOUSE OF WU_Hannah's | 0 | |
| Hannahs | PRETTY MAIDS | PRETTY MAIDS BRIDAL | HOUSE OF WU_Hannah's | 0 | BRIDAL |
| Hannahs | IMPRESSION BRIDAL | IMPRESSION BRIDAL | IMPRESSION | 0 | BRIDAL |
| Hannahs | LA PERLE | LA PERLE | IMPRESSION | 0 | |
| Hannahs | XCITE | XCITE | IMPRESSION | 0 | |
| Hannahs | INTERLUDE | INTERLUDE USA | INTERLUDE USA | 0 | |
| Hannahs | INTERLUDE USA | INTERLUDE USA | INTERLUDE USA | 0 | |
| Hannahs | IVANA D | IVANA D | IVANA D | 0 | |
| Hannahs | JANIQUE | JANIQUE | JANIQUE | 0 | |
| Hannahs | JASZ COUTURE | JASZ COUTURE | JASZ COUTURE | 1 | |
| Hannahs | JAZZ COUTURE | JAZZ COUTURE | JASZ COUTURE | 1 | |
| Hannahs | JOHNATHAN KAYNE | JOHNATHAN KAYNE | JOHNATHAN KAYNE | 0 | |
| Hannahs | JOLENE | JOLENE | JOLENE | 0 | |
| Hannahs | JOSH & JAZZ | JOSH & JAZZ | JOLENE | 0 | |
| Hannahs | JOSH AND JAZZ | JOSH & JAZZ | JOLENE | 0 | |
| Hannahs | BEYOND | JOVANI BEYOND | JOVANI | 1 | |
| Hannahs | JOVANI | JOVANI | JOVANI | 1 | |
| Hannahs | MAC DUGGAL | MACDUGGAL | MACDUGGAL | 1 | |
| Hannahs | MACDUGGAL | MACDUGGAL | MACDUGGAL | 1 | |
| Hannahs | MACIS | MACIS DESIGN | MACIS DESIGN | 1 | |
| Hannahs | MARTIZA'S BRIDAL VEILS, INC | MARTIZA'S BRIDAL ACCESSORIES | MARTIZA'S BRIDAL VEILS | 0 | BRIDAL ACCESSORIES |
| Hannahs | KISS KISS | KISS KISS | MARYS BRIDAL | 0 | |
| Hannahs | KISS KISS PROM | KISS KISS | MARYS BRIDAL | 0 | |
| Hannahs | MARYS | MARYS | MARYS BRIDAL | 0 | |
| Hannahs | MARYS BRIDAL | MARYS BRIDAL | MARYS BRIDAL | 0 | BRIDAL |
| Hannahs | MARYS KISS | KISS KISS | MARYS BRIDAL | 0 | |
| Hannahs | MILANO | MILANO | MILANO | 0 | |
| Hannahs | MON CHERI | MON CHERI | MON CHERI | 1 | |
| Hannahs | MON CHERI BY MONTAGE | MOB-MONTAGE | MON CHERI | 1 | MOB |
| Hannahs | TONY BOWLS | TONY BOWLS | MON CHERI | 1 | |
| Hannahs | DAVID TUTERA | DAVID TUTERA BRIDAL | MON CHERI_Hannah's | 0 | BRIDAL |
| Hannahs | IVONNE | MOB-IVONNE D | MON CHERI_Hannah's | 0 | MOB |
| Hannahs | IVONNE D | IVONNE D | MON CHERI_Hannah's | 0 | MOB |
| Hannahs | MON CHERI IVONNE D | IVONNE D | MON CHERI_Hannah's | 0 | MOB |
| Hannahs | ME PROM | ME PROM | MOONLIGHT BRIDAL | 0 | |
| Hannahs | MOON LIGHT | MOONLIGHT BRIDAL | MOONLIGHT BRIDAL | 0 | BRIDAL |
| Hannahs | MOONLIGHT | MOONLIGHT BRIDAL | MOONLIGHT BRIDAL | 0 | BRIDAL |
| Hannahs | MORI LEE | MORI LEE | MORI LEE | 1 | |
| Hannahs | VM COLLECTION MORI LEE | MOB-VM COLLECTION MORI LEE | MORI LEE_Hannah's | 0 | MOB |
| Hannahs | MORREL MAXIE | MORREL MAXIE | MORREL MAXIE | 0 | |
| Hannahs | MUSANI | MUSANI | MUSANI | 0 | |
| Hannahs | MUZAFFER | MUZAFFER | MUZAFFER | 0 | |
| Hannahs | NIKA | NIKA | NIKA | 0 | |
| Hannahs | PARADOX LONDON | PARADOX LONDON SHOES | PARADOX LONDON | 0 | SHOES |
| Hannahs | PARTY TIME FORMALS | PARTY TIME FORMALS | PARTY TIME | 1 | |
| Hannahs | PRINCESS COLLECTION | RACHEL ALLAN | PARTY TIME | 1 | |
| Hannahs | RACHEL ALLAN | RACHEL ALLAN | PARTY TIME | 1 | |
| Hannahs | PERFECT ANGEL | RACHEL ALLAN PERFECT ANGEL | PARTY TIME_Hannah's | 0 | CHILDREN'S PAGEANT |
| Hannahs | PARTY TIME | PARTY TIME | PARTY TIME_Hannah's | 0 | |
| Hannahs | PRECIOUS FORMALS | PRECIOUS FORMALS | PRECIOUS FORMALS | 0 | |
| Hannahs | PRIMAVERA | PRIMAVERA COUTURE | PRIMAVERA COUTURE | 0 | |
| Hannahs | RINA DI MONTELLA | RINA DI MONTELLA | RINA DI MONTELLA | 0 | |
| Hannahs | RIVA | RIVA DESIGNS | RIVA DESIGNS | 1 | |

CONFIDENTIAL -- Attorneys' Eyes Only

**Appendix II**
**Designer and Overall Designer Determination**
**for Hannah's/Peaches Original Data Production**

| Data Set | Original in Data - Designer | Cleaned - Designer | Assigned - Design House | Designer | Product Category |
|---|---|---|---|---|---|
| Hannahs | RIVA DESIGNS | RIVA DESIGNS | RIVA DESIGNS | 1 | |
| Hannahs | ROXCII | ROXCII | ROXCII | 0 | |
| Hannahs | SABORAMA | SABORAMA | SABORAMA | 0 | |
| Hannahs | SASSY SOUTH | SASSY SOUTH ACCESSORIES | SASSY SOUTH | 0 | ACCESSORIES |
| Hannahs | BG HAUTE | BG HAUTE | SCALA | 1 | |
| Hannahs | SCALA | SCALA | SCALA | 1 | |
| Hannahs | SHERRI HILL | SHERRI HILL | SHERRI HILL | 1 | |
| Hannahs | SHERRI HILL | SHERRI HILL | SHERRI HILL | 1 | |
| Hannahs | SOPHIA TOLLI | SOPHIA TOLLI BRIDAL | SOPHIA TOLLI BRIDAL | 0 | BRIDAL |
| Hannahs | SPARKLE | SPARKLE | SPARKLE | 1 | |
| Hannahs | SWEETIE'S SHOES | SWEETIE'S SHOES | SWEETIE'S SHOES | 0 | SHOES |
| Hannahs | SYMPHONY BRIDAL | SYMPHONY BRIDAL | SYMPHONY BRIDAL | 0 | BRIDAL |
| Hannahs | TARIK EDIZ | TERANI COUTURE | TARIK EDIZ | 1 | |
| Hannahs | TERANI | TERANI | TERANI | 1 | |
| Hannahs | TERANI COUTURE | TERANI COUTURE | TERANI_Hannah's | 1 | |
| Hannahs | TINY TREASURE | TINY TREASURE | TINY TREASURE | 0 | |
| Hannahs | VAL STEOHANIE | VAL STEFANIE | VAL STEFANIE | 0 | |
| Hannahs | VAL STEPHANIE | VAL STEFANIE | VAL STEFANIE | 0 | |
| Peaches | ALEX EVENINGS | ALEX EVENINGS | ALEX EVENINGS | 0 | |
| Peaches | Z-ALISHA HILL | ALISHA HILL SHOES | ALISHA HILL | 0 | SHOES |
| Peaches | EVENINGS BY ALLURE | EVENINGS BY ALLURE | ALLURE | 1 | |
| Peaches | NIGHT MOVES | NIGHT MOVES | ALLURE | 1 | |
| Peaches | NIGHT MOVES PLUS SIZE | NIGHT MOVES | ALLURE | 1 | |
| Peaches | ALYCE | ALYCE | ALYCE | 0 | |
| Peaches | ALYCE SHORT | ALYCE SHORT | ALYCE | 0 | |
| Peaches | ATELIER ALYCE | ATELIER ALYCE | ALYCE | 0 | |
| Peaches | BDAZZLE | BDAZZLE | ALYCE | 0 | |
| Peaches | MOB-JEAN DE LYS | MOB-JEAN DE LYS | ALYCE | 0 | MOB |
| Peaches | ATRIA SALE DRESSES | ATRIA | ATRIA | 0 | |
| Peaches | V 2012 BARJAY BRIDESMAIDS | BARJAY BRIDESMAIDS | BARJAY BRIDESMAIDS | 0 | BRIDESMAIDS |
| Peaches | SHIMMER | SHIMMER | BARJAY BRIDESMAIDS | 0 | |
| Peaches | BETSY AND ADAM | BETSY AND ADAM | BETSY AND ADAM | 1 | |
| Peaches | BLUSH | BLUSH | BLUSH | 1 | |
| Peaches | BLUSH TOO | BLUSH | BLUSH | 1 | |
| Peaches | CLARISSE | CLARISSE | CLARISSE | 1 | |
| Peaches | DANA MATHERS | DANA MATHERS | DANA MATHERS | 0 | |
| Peaches | DAVE AND JOHNNY | DAVE AND JOHNNY | DAVE AND JOHNNY | 0 | |
| Peaches | DEBORA RACHELLE | DEBORA RACHELLE | DEBORA RACHELLE | 0 | |
| Peaches | RAGAZZA | RAGAZZA | ESMERALDA BRIDAL | 0 | |
| Peaches | FAVIANA | FAVIANA | FAVIANA | 0 | |
| Peaches | FLIP | FLIP | FLIP | 0 | |
| Peaches | FOUAD SARKIS | FOUAD SARKIS | HOUSE OF MNM | 0 | |
| Peaches | MNM COUTURE | MNM COUTURE | HOUSE OF MNM | 0 | |
| Peaches | HANNAH S | HANNAH S | HOUSE OF WU | 1 | |
| Peaches | PANOPLY | PANOPLY | HOUSE OF WU | 1 | |
| Peaches | STUDIO 17 | STUDIO 17 | HOUSE OF WU | 1 | |
| Peaches | TIFFANY | TIFFANY | HOUSE OF WU | 1 | |
| Peaches | TIFFANY QUINCEANERA | TIFFANY QUINCEANERA | HOUSE OF WU | 1 | QUINCEANERA |
| Peaches | MOB-JADE | MOB-JADE | JASMINE | 0 | MOB |
| Peaches | JASZ COUTURE | JASZ COUTURE | JASZ COUTURE | 1 | |
| Peaches | JESSICA MCCLINTOCK | JESSICA MCCLINTOCK | JESSICA MCCLINTOCK | 0 | |
| Peaches | JOHNATHAN KAYNE | JOHNATHAN KAYNE | JOHNATHAN KAYNE | 0 | |
| Peaches | Z-JOSH AND JAZZ | JOSH & JAZZ | JOLENE | 0 | |
| Peaches | JOLI | JOLI | JOLI | 0 | |
| Peaches | JOVANI | JOVANI | JOVANI | 1 | |
| Peaches | JOVANI BEYOND | JOVANI BEYOND | JOVANI | 1 | |
| Peaches | JOVANI COCKTAIL | JOVANI COCKTAIL | JOVANI | 1 | |
| Peaches | JVN BY JOVANI | JVN BY JOVANI | JOVANI | 1 | |
| Peaches | MOB-LABELLE MOTHER OF BRIDE | MOB-LABELLE | LA BELLE | 0 | MOB |
| Peaches | Z-LA FEE | LA FEE | LA FEE | 0 | |
| Peaches | GIGI | GIGI | LA FEMME | 1 | |
| Peaches | LA FEMME | LA FEMME | LA FEMME | 1 | |
| Peaches | LA FEMME SHORT | LA FEMME SHORT | LA FEMME | 1 | |
| Peaches | CIRE' | CIRE' | LANDA | 0 | |
| Peaches | LANDA PAGEANT | LANDA PAGEANT | LANDA | 0 | |
| Peaches | LANDA QUINCEANERA | LANDA QUINCEANERA | LANDA | 0 | QUINCEANERA |
| Peaches | SPLASH | SPLASH | LANDA | 0 | |
| Peaches | STAR | STAR | LANDA | 0 | |
| Peaches | V 2012 LIZ FIELDS PROM DRESSES | LIZ FIELDS | LIZ FIELDS | 0 | |
| Peaches | CASSANDRA STONE | CASSANDRA STONE | MACDUGGAL | 1 | |
| Peaches | CASSANDRA STONE II PLUS SIZE | CASSANDRA STONE | MACDUGGAL | 1 | |
| Peaches | FABULOUSS PLUS SIZE | FABULOUSS PLUS SIZE | MACDUGGAL | 1 | |
| Peaches | FLASH | FLASH | MACDUGGAL | 1 | |
| Peaches | MACDUGGAL | MACDUGGAL | MACDUGGAL | 1 | |
| Peaches | MACDUGGAL COCKTAIL | MACDUGGAL COCKTAIL | MACDUGGAL | 1 | |
| Peaches | MACDUGGAL COUTURE | MACDUGGAL COUTURE | MACDUGGAL | 1 | |
| Peaches | FLIRT | FLIRT | MAGGIE SOTTERO | 0 | |
| Peaches | MOB-CAMERON BLAKE | MOB-CAMERON BLAKE | MON CHERI | 1 | MOB |
| Peaches | MOB-MONTAGE | MOB-MONTAGE | MON CHERI | 1 | MOB |
| Peaches | MON CHERI | MON CHERI | MON CHERI | 1 | |
| Peaches | TONY BOWLS EVENINGS | TONY BOWLS EVENINGS | MON CHERI | 1 | |
| Peaches | TONY BOWLS LE GALA | TONY BOWLS LE GALA | MON CHERI | 1 | |
| Peaches | TONY BOWLS PARIS | TONY BOWLS PARIS | MON CHERI | 1 | |
| Peaches | TONY BOWLS SHORTS | TONY BOWLS SHORTS | MON CHERI | 1 | |
| Peaches | MORI LEE | MORI LEE | MORI LEE | 1 | |
| Peaches | MORI LEE STICKS & STONES | MORI LEE STICKS & STONES | MORI LEE | 1 | |
| Peaches | VIZCAYA | VIZCAYA | MORI LEE | 1 | |
| Peaches | Z-NIKI LIVAS | NIKI LIVAS | NIKI LIVAS | 0 | |
| Peaches | NINA CANACCI | NINA CANACCI | NINA CANACCI | 0 | |
| Peaches | PARK AVE | PARK AVE | PARK AVE | 0 | |
| Peaches | PARTY TIME FORMALS | PARTY TIME FORMALS | PARTY TIME | 1 | |
| Peaches | PRIMA DONNA | RACHEL ALLAN | PARTY TIME | 1 | |
| Peaches | PRINCESS | RACHEL ALLAN | PARTY TIME | 1 | |
| Peaches | RACHEL ALLAN | RACHEL ALLAN | PARTY TIME | 1 | |
| Peaches | RACHEL ALLAN PRINCESS | RACHEL ALLAN | PARTY TIME | 1 | |
| Peaches | PATRA | PATRA | PATRA | 0 | |
| Peaches | GLAM GURLZ | GLAM GURLZ | PRECIOUS FORMALS | 0 | |
| Peaches | PRECIOUS FORMALS | PRECIOUS FORMALS | PRECIOUS FORMALS | 0 | |

CONFIDENTIAL -- Attorneys' Eyes Only

**Appendix II**
**Designer and Overall Designer Determination**
**for Hannah's/Peaches Original Data Production**

| Data Set | Original in Data - Designer | Cleaned - Designer | Assigned - Design House | Designer | Product Category |
|---|---|---|---|---|---|
| Peaches | PRIVATE COLLECTIONS | PRIVATE COLLECTIONS | PRIVATE COLLECTIONS | 0 | |
| Peaches | RIVA | RIVA DESIGNS | RIVA DESIGNS | 1 | |
| Peaches | BG HAUTE | BG HAUTE | SCALA | 1 | |
| Peaches | SCALA | SCALA | SCALA | 1 | |
| Peaches | SEAN | SEAN | SEAN | 0 | |
| Peaches | SHAIL K. | SHAIL K. | SHAIL K. | 0 | |
| Peaches | SHERRI HILL | SHERRI HILL | SHERRI HILL | 1 | |
| Peaches | SHERRI HILL SHORT | SHERRI HILL SHORT | SHERRI HILL | 1 | |
| Peaches | Z-SHERRY COUTURE | SHERRY COUTURE | SHERRY COUTURE | 0 | |
| Peaches | SPARKLE | SPARKLE | SPARKLE | 0 | |
| Peaches | TARIK EDIZ | TARIK EDIZ | TARIK EDIZ | 1 | |
| Peaches | V 2012 TEMPTATIONS PROM DRESSES | TEMPTATIONS | TEMPTATIONS | 0 | |
| Peaches | TERANI | TERANI | TERANI | 1 | |
| Peaches | TERANI EVENINGS | TERANI EVENINGS | TERANI | 1 | |
| Peaches | Z-VENUS | VENUS | VENUS | 0 | |
| Peaches | Z-VIVACE | VIVACE | VIVACE | 0 | |
| Peaches | WOW | WOW | WOW | 0 | |