**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

HANNAH'S BOUTIQUE, INC., an Illinois )
corporation, )
                           )
         Plaintiffs, )
                           ) Case No.: 13-cv-2564
       v. )
                           )
BARBARA ANN SURDEJ, ROY SURDEJ )
and JEFFREY SURDEJ d/b/a PEACHES )
BOUTIQUE, )
                           )
         Defendants. )

**PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' MOTION**
**FOR SUMMARY JUDGMENT ON PLAINTIFF'S ANTITRUST CLAIMS**

Steven M. Laduzinsky(sladuzinsky@laduzinsky.com)
ARDC No. 6193407
David J. Riski (driski@laduzinsky.com)
ARDC No. 6272935
Conor Sickel (csickel@laduzinsky.com)
ARDC No. 6313993
Laduzinsky & Associates, P.C.
216 S. Jefferson St., Suite 301
Chicago, IL 60661
(312) 424-0700

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION…………………………………………………………………...1

II.     LEGAL STANDARD………………………………………………………………..2

III.    STATEMENT OF FACTS……………………………………………………………2

IV.     ARGUMENT……………………………………………………….......................7

    A.    OBJECTIONS TO DEFENDANTS' LOCAL RULE 56.1(a)
       STATEMENT OF FACTS…………………………………………………………7

    B.    COUNT II – CONSPIRACY TO MONOPOLIZE UNDER
       SECTION 2 OF THE SHERMAN ACT DOES NOT REQUIRE
       PROOF OF MARKET POWER………………………………………………..…….8

    C.    THE RULE OF REASON IS NOT THE SOLE MEANS
       OF DETERMINING WHETHER DEFENDANTS' ANTICOMPETITIVE
       VIOLATES ANTITRUST LAW……………………………………………………...8

        1.    Per Se…………………………………………………………………9

        2.    Quick Look………………………………………………………………9

        3.    Rule of Reason……………………………………………………………....10

    D.    DEFENDANTS' ANTICOMPETITIVE CONDUCT SHOULD
       BE ANALYZED UNDER THE PER SE STANDARD………………….................10

        1.    Price Fixing Is Analyzed Under Per Se Standard………………...…………10

        2.    Defendants' organization of group boycotts by the Designers
           should be analyzed under the per se standard…………………..…………13

    E.    EVEN IF THE COURT FINDS THAT A PER SE ANALYSIS DOES
       NOT APPLY, DEFENDANTS' ANTICOMPETITIVE CONDUCT
       SHOULD BE ANALYZED UNDER THE "QUICK LOOK"
       DOCTRINE…………………………………………………………………………...17

        1.    The Challenged Restraints Are Solely Intended to
           Eliminate Competition……………………………………………………18

        2.    Defendants' Purported "Exclusive Arrangements" Are Solely
           Intended to Eliminate Competition……………………………………..………19

           a.    Defendants' purported "Exclusive arrangements" do
               not prevent free riding…………………………………………………21

i

b. Defendants' purported "Exclusive Arrangements" do not preserve the uniqueness of the Designers' prom and homecoming Dresses……………………………………………23

c. Defendants' purported "Exclusive Arrangements" do not prevent market saturation……………………………………….....24

d. Defendants' purported "Exclusive Arrangements" have no procompetitive benefits or effects…………………………25

e. Defendants' purported "Exclusive Arrangements" do not promote interbrand or intrabrand competition…………………26

f. There is no evidence that the Designers acted independently………………………………………………27

F. EVEN UNDER THE RULE OF REASON, DEFENDANTS HAVE MARKET POWER……………………………………………......30

1. Defendants' Market Share Opinions are Inadmissible and Unreliable…………………………………………………………31

2. There is No Reliable Data to Calculate Defendants' Market Share…………………………………………………………..34

G. MARKET SHARE IS NOT THE ONLY MEANS TO PROVE MARKET POWER………………………………….................34

1. Defendants Charged Prices Above the Competitive Level Without Losing Any of Their Business………………………………………35

2. Defendants Excluded Competition………………………….....................39

H. EVEN UNDER A RULE OF REASONS ANALYSIS, NO DETAILED OR ELABORATE MARKET ANALYSIS IS NEEDED………………..40

I. PLAINTIFF HAS PROVIDED SUFFICIENT EVIDENCE OF THE "ROUGH CONTOURS" OF A RELEVANT PRODUCT AND GEOGRAPHIC MARKET TO DEFEAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT……………………………………………………47

1. Plaintiff has provided evidence of the "rough contours" of a relevant geographic market……………………………………………………..51

2. Plaintiff has provided evidence of the "rough contours" of a relevant product market…………………………………………………………………54

J. THE INTERNET IS A SEPARATE MARKET………………………....................58

K. DEPARTMENT STORES ARE A SEPARATE MARKET…………........................61

ii

L.    DEFENDANTS HAVE CREATED BARRIERS TO ENTRY
      IN THE CHICAGO MARKET……………………………………………………62

M.    DEFENDANTS' PURPORTED LIST OF COMPETITORS IS
      GROSSLY OVERSTATED……………………………………………………..63

V.    CONCLUSION……………………………………………………………………….64

**TABLE OF AUTHORITIES**

**CASES:**                                                                  **Page(s)**

*42nd Parallel N. v. E. St. Denim Co.,* 286 F.3d 401 (7th Cir. 2002)                    49, 52

*Agnew v. NCAA,* 683 F. 3d 329 (7th Cir. 2012)                                          10

*Am. Dermatologists' Med. Group, Inc. v. Collagen Corp.,*                               28, 29
595 F. Supp. 79 (N.D. Ill. 1984)

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)                             2

*Appraisers Coal. v. Appraisal Inst.,* 845 F. Supp. 592 (N.D. Ill. 1994)                8,18

*Arizona v. Maricopa Cnty. Med. Soc'y,* 457 U.S. 332 (1982)                             9

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985)                 21, 30

*Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328 (1990)                          9

*Audio Car Stereo, Inc. v. The Little Guys, Inc.,* 2004 No. 04 C 3562,                  48
2004 WL 3019298 (N.D. Ill. Dec. 28, 2004)

*Avnet, Inc. v. FTC,* 511 F.2d 70 (7th Cir. 1975                                        48

*Ball Mem. Hosp., Inc. v. Mut. Hosp. Ins., Inc.,* 784 F.2d 1325                         35, 40
(7th Cir. 1986)

*Bartman v. Allis-Chalmers Corp.,* 799 F.2d 311 (7th Cir. 1986)                         2

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)                                       13

*Besser Publ'g Co. v. Pioneer Press, Inc.,* 571 F. Supp. 640, 641 (N.D. Ill. 1983)      8

*Blackburn v. Sweeney,* 53 F.3d 825, 830 (7th Cir 1995)                                 40

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,* 441 U.S. 1 (1979)                   9

*Brown Shoe Co. v. United States,* 370 U.S. 294 (1962)                                  *passim*

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717 (1988)                          10

*Cal. Dental Ass'n. v. FTC,* 526 U.S. 756 (1999)                                        9, 10, 18

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)                                         2

*Center Video Indus. Co., Inc. v. United Media, Inc.,* 995 F.2d 735 (7th Cir. 1993)     10

*Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667 (7th Cir. 1992)          10

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)          17

*Danielson Food Prod., Inc., v. Poly-Clip Sys., Int'l.*, 120 F. Supp. 2d 1142  (N.D. Ill. 2000)          19

*DSM Desotech Inc. v. 3D Sys. Corp.*, No. 08 CV 1531, 2009 WL 174989          64
(N.D. Ill. Jan. 26, 2009)

*Fishman v. Wirtz*, 807 F.2d 520, 531-32 (7th Cir. 1986)          38, 51, 54

*FTC v. Illinois Cereal Mills, Inc.*, 691 F. Supp. 1131 (N.D. Ill. 1988)          51

*FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447 (1986)          *passim*

*FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069 (N.D. Ill. 2012)          51

*Garot Anderson Mktg. v. Blue Cross & Blue Shield United*, 772 F. Supp. 1054          38
(N.D. Ill. 1990)

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Association*, 744 F.2d 588          10, 18
 (7th Cir. 1984)

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485 (2nd  Cir. 2004)          49

*Hannah's Boutique, Inc. v. Surdej et al.,* No. 13 C 2564, 2013 WL 4553313,          54
(N.D. Ill August 28, 2013).

*Hennessy Indus, Inc. v. FMC Corp.*, 779 F.2d 402 (7th Cir. 1985)          10

*Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 146 (7th Cir. 1991)          31

*Illinois ex rel. Hartigan v. Panhandle E. Pipe Line Co.,* 730 F. Supp. 826 (C.D. Ill. 1990)          *passim*

*Indiana Grocery, Inc.  v. Super Value Stores, Inc.,*          35
 864 F.2d 1409 (7th Cir. 1989)

*In re Brand Name Prescription Drugs Antitrust Litig.,* 186 F.3d 781  (7th Cir. 1999)          17

*In re Dairy Farmers of Am., Inc.,* 767 F. Supp. 2d 880 (N.D. Ill. 2011)          8, 30

*Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939)          15, 16

*Jacobs v. Tempur-Pedic Int'l, Inc.,* 626 F.3d 1327 (11th Cir. 2010)          50

*Jamsports and Entertainment, LLC v. Paradema Productions, Inc.*,          48
 No. 02 C 2298, 2003 WL 1873563 (N.D. Ill. April 15, 2003).

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959)          13, 14

*K.M.B. Warehouse Distribs.,* 61 F.3d 123 (2nd Cir. 1995)    50

*Lerma v. Univision Commc'ns., Inc.,* 52 F. Supp. 2d 1011 (E.D. Wis. 1999)    30, 31

*L & W Lindco Prods., v. Pure Asphalt Co.,* 979 F. Supp. 632 (N.D. Ill. 1997)    39, 48

*Levine v. Cent. Fla. Med. Affiliates, Inc.,* 72 F.3d 1538 (11th Cir. 1996)    50

*Marco Holding Co. v. Lear Siegler, Inc.,* 606 F. Supp. 204 (N.D. Ill. 1985)    28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)    17

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.,* 708 F.2d 1081 (7th Cir. Ill. 1983)    21

*Miles Distribs. v. Specialty Constr. Brands, Inc.,* 417 F. Supp. 2d 1030 (N.D. Ind. 2006)    11

*Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752 (1984)    *passim*

*Nat'l Marine Elec. Distribs., Inc. v. Raytheon Co.,* 778 F.2d 190 (4th Cir. 1985)    11

*Nat'l Soc'y of Prof'l Engineers v. United States,* 435 U.S. 679 (1978)    9, 19

*NCAA v. Bd. of Regents,* 468 U.S. 85 (1984)    9, 18

*N. Pac. Ry. Co. v. United States,* 356 U.S. 1 (1958)    10

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284 (1985)    13

*Otter Tail Power Co. v. United States,* 410 U.S. 366 (1973)    21

*Paddock Publs. v. Chicago Tribune Co.,* 103 F.3d 42, 46 (7th Cir.1996)    20

*Paschall v. Kansas City Star Co.,* 727 F.2d 692 (8th Cir. 1983) *cert. denied,* 469 U.S. 872 (1984)    20

*Pierce v. City of Chicago,* 2012 WL 401026, at *3 (N.D. Ill. Feb. 7, 2012)    32

*Perington Wholesale v. Burger King Corp.,* 631 F.2d 1369 (10th Cir. 1979)    8

*Polk Bros., Inc. v. Forest City Enters., Inc.,* 776 F.2d 185 (7th Cir. 1985)    10

*Poller v. Columbia Broad. System, Inc.,* 368 U.S. 464 (1962)    2

*Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380 (7th Cir. 1984)    20, 25, 26

*Reifert v. S. Cent. Wis. MLS Corp.,* 450 F.3d 312 (7th Cir. 2006)    10

*Republic Tobacco v. N. Atl. Trading Co*., 381 F.3d 717 (7th Cir. 2004)   *passim*

*RSR Corp. v. FTC*, 602 F.2d 1317 (9th Cir. 1979)   51

*Science Prods. Co. v. Chevron Chem. Co*., 384 F. Supp. 793 (N.D. Ill. 1974)   54

*Sheridan v. Marathon Petroleum Co.,* 530 F.3d 590 (7th Cir. 2008)   35, 39-40, 64

*Sphere Drake Ins., Ltd. v. All Am. Life Ins. Co*., 300 F. Supp. 2d 606  (N.D. Ill. 2003)   2

*Stinnett v. Iron Works Gym/Executive Health Spa, Inc.,* 301 F.3d 610 (7th Cir. 2002)   2

*Tire Sales Corp. v. Cities Serv. Oil Co.,* 410 F. Supp. 1222, 1232 (N.D. Ill. 1976) *rev'd*, 637 F.2d 467 (7th Cir. 1980), *cert. denied*, 451 U.S. 920 (1981)   8

*Times-Picayune Pub. Co. v. United States*, 345 U.S. 594 (1953)   47

*Todd v. Exxon Corp*., 275 F.3d 191 (2nd Cir. 2001)   30, 50

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000)   *passim*

*United States v. Archer-Daniels-Midland Co.,* 866 F.2d 242 (8th Cir, 1988)   55

*United States v. Connecticut Nat'l Bank*, 418 U.S. 656 (1974)   47

*United States v. Cont'l Can Co*., 378 U.S. 441 (1964)   55

*United States v. General Motors Corp.,* 384 U.S. 127 (1966)   14

*United States v. Nat'l City Lines*, 186 F.2d 562 (7th Cir. 1951) *cert. denied*, 341 U.S. 916 (1951)   8

*United States v. Pabst Brewing Co*., 384 U.S. 546 (U.S. 1966)   47

*United States v. UPM-Kymmene Oyj*, 2003 WL 21781902 (N.D. Ill. July 25, 2003)   55

*United States v. E.I. du Pont de Nemours & Co*., 351 U.S. 377 (1956)   35

*U.S.A. v. Am. Express, Co.,* 21 F. Supp. 3d 187 (E.D.N.Y. May 7, 2014)   50

*Valley Liquors, Inc. v. Renfield Imps., Ltd*., 822 F.2d 656 (7th Cir. 1987)   10, 26, 34

*Valley Liquors, Inc. v. Renfield Imps., Ltd,* 678 F.2d 742 (7th Cir. 1982)   26, 35

*Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256 (2nd  Cir. 2001)   50

*Wagner v. Magellan Health Servs*., 121 F. Supp. 2d 673 (N.D. Ill. 2000)   35

*Weber-Stephen Prods. LLC v. Sears Holding Corp.*, No. 1:13-cv-01686,     37
2014 WL 656753 (N.D. Ill. Feb. 20, 2014).

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418–19 (7th Cir. 2005)     33


**STATUTES**

15 U.S.C. § 1     13

**OTHER**

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* (rev. ed. 1996)     30

Phillip Areeda, *Antitrust Law* (1986)     40, 42

PHILLIP E. AREEDA ET. AL, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPALS     34
AND THEIR APPLICATION 289 (4TH ED. 2014)

Charles F. Barber, *Refusals to Deal Under the Federal Antitrust Laws*, 103 U. PA. L. REV.     14
847 (1955).

PAUL W. FARRIS ET. AL, MARKETING METRICS: 50+ METRICS EVERY EXECUTIVE     34
SHOULD MASTER 16 (2006)

L. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST 229–30 (1977).     13

U.S. Department of Justice and the Federal Trade Commission,     34, 35
*Horizontal Merger Guidelines*, (August 19, 2010)

Plaintiff, HANNAH'S BOUTIQUE, INC. ("Hannah's), an Illinois corporation, by and through its attorneys, Steven M. Laduzinsky, David J. Riski and Conor Sickel of Laduzinsky & Associates, P.C., for its Response to Defendants BARBARA ANN SURDEJ, ROY SURDEJ and JEFFREY SURDEJ d/b/a PEACHES BOUTIQUE ("Defendants") Motion for Summary Judgment on Plaintiff's Antitrust Claims, states as follows:

I. **INTRODUCTION.**

On July 29, 2014, Plaintiff filed a twelve (12) count First Amended Complaint ("Complaint"). Count I alleges attempted monopolization under Section 2 of the Sherman Act; Count II alleges conspiracy to monopolize under Section 2 of the Sherman Act; Count III alleges monopolization under Section 2 of the Sherman Act; Count IV allege concerted refusal to deal under Section 1 of the Sherman Act; Count V alleges unreasonable restraint of trade under Section 1 of the Sherman Act; Count VI alleges sale on agreement not to use goods of competitor under Section 3 of the Clayton Act; Count VII alleges violation of the Illinois Antitrust Act (collectively the "Antitrust Claims").[1] On March 19, 2015, Defendants filed a Motion for Summary Judgment ("Motion") and accompanying Memorandum of Law ("Memorandum") on the Antitrust Claims on the basis that Defendants do not possess market power.

Defendants' Motion is primarily based on the assumption that Defendants have exclusive dealings with the Designers which are subject to the rule of reason, and that Plaintiff has not proven that the Defendants possess the requisite market share in a properly defined product and geographic market, and thus do not possess market power. However, these exclusive dealings are not supported by the evidence or the law and Defendants' Motion overlooks the effects of their anticompetitive emails and ignores the August 2012 meeting they organized and conducted with the top designers of prom

---

[1] The remaining claims allege tortious interference with contract, tortious interference with prospective business advantage, civil conspiracy, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, and declaratory judgment under 28 U.S.C. §2201.

1

and homecoming dresses in the United States (neither of which are mentioned in Defendants' Local Rule 56.1 Statement of Facts).

II.     **LEGAL STANDARD.**

Summary judgment is only appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue for trial only exists when there is sufficient evidence favoring the nonmovant for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). When determining whether evidence is sufficient, all inferences should be drawn in favor of the nonmovant. *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir. 1986). The entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Sphere Drake Ins., Ltd. v. All Am. Life Ins. Co*., 300 F. Supp. 2d 606, 612 (N.D. Ill. 2003). The material submitted need not be admissible at trial, but must set forth evidence that would be admissible if presented in appropriate form at trial. *Stinnett v. Iron Works Gym/Executive Health Spa, Inc*., 301 F.3d 610, 613 (7th Cir. 2002). Many antitrust actions, "where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot," are poorly suited for summary judgment. *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 473 (1962). Thus, in complex antitrust cases, summary judgment should be used sparingly. *Poller,* 368 U.S. at 473. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. *Id.*

III.    **STATEMENT OF FACTS.**

Defendants are the "largest Prom, Pageant, and Formal wear store in the U.S." (Plaintiff's Additional Statement of Facts ("Pl.'s SOF") at ¶3). Defendants' brick-and-mortar store has over

2

20,000 dresses in stock and advertises to customers "that they will not find anyone else out there that carries that much stock." (Pl.'s SOF at ¶1). Defendants dedicate 90% of their retail floor space to prom dresses. (Pl.'s SOF at ¶2). Defendants' website states: "We have nearly every prom dress in every size and color from every prominent dress designer. This is extremely important in the prom industry because it has such a short selling season." (Pl.'s SOF at ¶4). Jovani, MacDuggal and Mon Cheri all state that Defendants are their biggest accounts in the Chicago area. (Pl.'s SOF at ¶¶7, 9, 13, 14). Defendants are the largest specialty boutique retailer in the Chicago area. (Pl.'s SOF at ¶¶7, 16, 17). Defendants believe their competition is other stores who sell the same dress lines they carry and at similar price points. (Pl.'s SOF at ¶¶135-36).

From 2011-2013, approximately ███ of Defendants' total gross receipts resulted from the sale of dresses designed by the Named Designers. (Pl.'s SOF at ¶5). Named Designers' dresses sold for statistically significant, higher average (median) prices than Non-Named Designers' dresses at Defendants' brick-and-mortar retail location. (Pl.'s SOF at ¶152). It is common practice for prom and homecoming designers to establish a Manufacturer's Suggested Retail Price ("MSRP") for retail dress sales, MSRP pricing practices have existed nationwide for many years and MSRP is the minimum price at which a retailer must sell a prom and homecoming dress. (Defendants' 56.1 Statement of Facts ("Defs.' SOF") at ¶29). From 2009 through as recently as November 26, 2012, Defendants were able to sell their in-season Named Designer prom and homecoming dresses at prices 15% higher than MSRP. (Pl.'s SOF at ¶104). During this time, Defendants charged more than the "whole industry." (Pl.'s SOF at ¶106). It is extremely rare for a store to be able to charge higher than MSRP, and a store would not be able to charge higher than MSRP unless there was little or no competition in the area, such as isolated places where there is only one (1) store in town. (Plaintiff's Response to Defendants' Statement of Facts ("Pl.'s Resp. to Defs.' SOF") at at ¶29; Pl.'s SOF at ¶107). No other brick-and–mortar prom and homecoming stores in the Chicagoland area charged higher than MSRP. (Pl.'s Resp. to Defs.' SOF at ¶29; Pl.'s SOF at ¶¶110-11). If another retailer tried to sell below MSRP, even if by a

3

penny, Defendants would report them to the Named Designers. (Pl.'s SOF at ¶112). Over the last ten (10) years, Defendants have realized substantial growth in revenue and profits, which exceed the industry average. (Pl.'s SOF at ¶¶18-20).

Defendants also operated two (2) non-branded websites, Promdressshop.com and Dress4prom.com, out of their brick-and-mortar location at 5915 South Archer Avenue, Chicago, Illinois. (Pl.'s SOF at ¶114; Pl.'s Resp. to Defs.' SOF at ¶27). Defendants did not want customers to know that Promdressshop.com and Dress4Prom.com were affiliated with Peaches Boutique "as they are not part of brick and mortar establishment and pricing." (Pl.'s SOF at ¶115; Pl.'s Resp. to Defs.' SOF at ¶27). Defendants instead requested that the Named Designers list a Wilmington, IL address for PromDressShop.com and Dress4prom.com on their store locators. (Pl.'s SOF at ¶116). Consumers did not know Promdressshop.com and Dress4prom.com were connected to Peaches Boutique. (Pl.'s SOF at ¶119). During the time Defendants sold their dresses at 15% higher than MSRP in their brick-and-mortar store, Defendants sold the same dresses on PromDressShop.com and Dress4Prom.com at MSRP. (Pl.'s SOF at ¶133). However, Peachesboutique.com pricing was the same as the brick and mortar store. (Pl.'s SOF at ¶134). Beginning in 2009, Peachesboutique.com charged different prices based on a customer's IP address and distance from Defendants' brick-and-mortar store. (Pl.'s SOF at ¶¶134, 161). That is, customers who shopped online and were potential customers of Defendants' brick-and-mortar store would be charged the same price as the store, while those further away would be charged MSRP. (Defs.' SOF at ¶78; Pl.'s Resp. to Defs.' SOF at ¶78). Thus, Defendants' engaged in price discrimination. (Pl.'s SOF at ¶161). Internet retailers did not constrain Defendants' supracompetitive pricing. (Pl.'s SOF at ¶160).

Many of the Named Designers do not sell to department stores in the Chicago Market. (Pl.'s SOF at ¶¶ 154-155). Others that claim to sell to department stores have no control over the allocation of inventory. (Pl.'s SOF at ¶157). The Named Designers have done no research on market saturation and have no caps on the number of dresses or stores they will sell to in the Chicago Market. (Pl.'s SOF

at ¶¶146-148). Department stores did not constrain Defendants' supracompetitive pricing. (Pl.'s SOF at ¶160).

In May of 2009, Susan Shaban opened a boutique at 10500 Southwest Highway, Chicago Ridge, Illinois. (Pl.'s SOF at ¶23). Plaintiff's intent was to focus on the sale of prom and homecoming dresses. (Pl.'s SOF at ¶24). Between 2010 and 2013, Plaintiff's profits went from a ▅▅▅▅▅ to ▅▅▅▅ in profits. (Pl.'s SOF at ¶22).

Between 2009 and 2012, and unbeknownst to Plaintiff, Defendants repeatedly communicated with the Named Designers by phone and email demanding that they not sell to specific specialty boutiques within the Chicago Market, including Plaintiff. (Pl.'s Resp. to Defs.' SOF at ¶58; Pl.'s SOF at ¶¶28-29, 34, 36, 38, 41, 43-46, 49-50, 102). Defendants also demanded that the Named Designers not sell within area codes and zip codes that are substantially within the Chicago Market. (Pl.'s Resp. to Defs.' SOF ¶58; Pl.'s SOF at ¶¶29, 43-44, 90). Defendants also requested that Designers advise them of boutiques attempting to open new accounts. (Pl.'s Resp. to Defs.' SOF at ¶58; Pl.'s SOF at ¶¶43-44, 90). Designers notified Defendants of other boutiques' attempting to open accounts, including forwarding applications, contact information and tax information. (Pl.'s Resp. to Defs.' SOF at ¶58; Pl.'s SOF at ¶¶25, 28, 34, 81, 87, 92). Designers also acquiesced to Defendants' demands and agreed to not sell to boutiques within the Chicago Market. (Pl.'s Resp to Defs.' SOF at ¶58; Pl.'s SOF at ¶¶ 31-33, 38-39, 42, 45, 76-77, 79, 82, 84-85, 86, 88, 89-91, 94-100). Roy and Barb approved all emails directing designers to not sell to certain retailers and/or within certain area and zip codes. (Pl.'s SOF at ¶103).

In August 2012, Defendants organized a one-of-a-kind meeting of prom and homecoming designers and their owners and/or representatives, where Defendants set forth policies regarding the designers' sale of prom dresses to boutiques, which included not opening internet accounts to retailers who do not have brick-and-mortar retail locations, not allowing retailers to advertise online without satisfying purchase minimums, implementing harsher penalties for discounting below MSRP from the

5

implementing a higher MSRP percentage for internet, implementing a different, higher MSRP for internet dress sales than brick-and-mortar dress sales, and instructing designers' to not sell prom dresses directly to customers. (Pl's. Resp. to Defs.' SOF at ¶58; Pl.'s SOF at ¶¶55-62). Defendant Jeffrey Surdej spoke at the meeting how Defendants are of a "very unique industry" due to seasonality, and discouraged the designers from opening new accounts because the teenage population is decreasing and the opening of new accounts will cut into Defendants' profit margin. (Pl.'s SOF at ¶¶64-66).

Shortly after this meeting, Jovani and Terani, two (2) Named Designers implemented a higher internet pricing policy. (Pl.'s SOF at ¶¶72-73). Jovani also notified Defendants that they will not be selling to Hannah's for the 2013 prom season. (Pl.'s SOF at ¶¶76, 86). Prior to the 2012 Atlanta Market Meeting, Plaintiff was able to purchase dresses directly from Jovani, Mon Cheri, Terani, House of Wu, Tarik Ediz, Riva Designs and Party Time. (Pl.'s SOF at ¶54). In the weeks and months following this meeting, Plaintiff attempted to and/or placed orders for prom and homecoming dresses with Allure, Jovani, House of Wu, Party time, Riva Designs, Terani, La femme, Mori Lee, Mac Duggal, Scala, Sherri Hill, Tarik Ediz, Jasz Couture, Mon Cheri, Blush, all of which were rejected and/or cancelled after only partial fulfillment. (Pl.'s SOF at ¶77).

Riva informed Defendants that Plaintiff would not be getting any more dresses from them. (Pl.'s SOF at ¶¶82, 85). Blush responded to an email in which Defendants request they not sell to several Chicago area boutiques: "Everyone ALWAYS rejects these accounts." (Pl.'s SOF at ¶84). Terani advised Defendants that it kept its "word" and "closed several accounts," and further requested Defendants to send a list of stores they do not want Terani to sell to. (Pl.'s SOF at ¶89). Defendants responded the same day with a list of seven (7) stores, including Plaintiff. (Pl.'s SOF at ¶90). On December 18, 2012, Jovani requested that Defendants send them a list of stores they do not want Jovani to sell to. (Pl.'s SOF at ¶86). A few weeks later, Jovani emailed Defendants informing them that they shut down fourteen (14) stores in Defendants' "area." (Pl.'s SOF at ¶91). After Defendants

sent a blast email to the Named Designers in January 2013 informing them that Plaintiff was trying to get stock again, Defendants received numerous responses in which the Named Designers agreed not to sell to Plaintiff. (Pl.'s SOF at ¶¶93-99). In September of 2013, House of Wu sent a letter to Plaintiff stating that it would not be able to place its order because of a long time verbal agreement with Defendants. (Pl.'s SOF at ¶100). Jovani, Mon Cheri and MacDuggal are unaware of any exclusive arrangements with the Defendants. (Pl.'s SOF at ¶¶140-143). ████████████████████████

████████████████████████████████████████████████████████████

████████████. (SOF ¶¶ 137-138). ████████████████████████████

████████████████████████████████████. (SOF ¶¶ 138-39).

The relevant product market is high end, prom and homecoming dresses sold in specialty boutiques from the Named Designers. (Schafer Report at ¶¶11, 130-133, Ex. 26 to Defs.' SOF).The relevant geographic market is approximated by area codes 630/331, 847/224, 708, 312/872 and 773. (Schafer Report at ¶¶11, 135-143, Ex. 26 to Defs.' SOF). Defendants possessed market power in the sale of the Designers' prom and homecoming dresses in the Chicago Market between 2009 and 2012. (Schafer Report at ¶¶14, 53, 75, 89-95, 101, 103, 118, 141, 144, Ex. 26 to Defs.' SOF).

IV.     **ARGUMENT.**

A.      **OBJECTIONS TO DEFENDANTS' LOCAL RULE 56.1(a) STATEMENT OF FACTS.**

Plaintiff objects and moves to strike certain paragraphs of Defendants' Local Rule 56.1 Statement of Fact. Plaintiff objects to ¶¶8, 10, 13, 27–29, 34-35, 45, 63, 76, 78, 91-92, 95, 105, 119, 125, 130-131, 152, 158 and 163 because they contain numerous statements of fact in contravention of Local Rule 56.1. Plaintiff objects to ¶¶17, 23, 46, 56, 78, 82, 108-110, 118-119, 121, 123, 125, 130-131, 144, 147-148, 160 and 163 because they mischaracterize the record. Plaintiff objects to ¶¶45, 95-96, 113, 124-127, 132-134 and 138 because they improperly refer to third-party internet websites with no supporting documentation attached. Plaintiff objects to ¶¶39, 56, 59 and 130

7

because they contain statements of opinions, not facts. Plaintiff objects to ¶¶66, 82, 84, 88, 89, 147-148, 154, 156 and 158 because they are improper factual arguments and/or opinions. Plaintiff objects to ¶¶4-5 because they contain statements that are not based upon personal knowledge. Plaintiff objects to ¶¶9, 20, 63, 84-85, and 91-92 as they contain vague and undefined terms. Plaintiff objects to ¶¶8 and 131 because they rely upon deposition testimony where an objection is pending. The factual basis for each objection is set forth in Plaintiff's Local Rule 56.1(b) Response to Defendants' Statement of Facts.

**B.    COUNT II – CONSPIRACY TO MONOPOLIZE UNDER SECTION 2 OF THE SHERMAN ACT DOES NOT REQUIRE PROOF OF MARKET POWER.**

Defendants' Motion is premised upon the assumption that _all_ of Plaintiff's Antitrust Claims require proof of Defendants' market power in a properly defined market. (Motion at ¶12). However, a conspiracy to monopolize claim under §2 of the Sherman Act does not require a proof of market power in a relevant market. _Appraisers Coal. v. Appraisal Inst_., 845 F. Supp. 592, 603 (N.D. Ill. 1994) (citing _Perington Wholesale v. Burger King Corp_., 631 F.2d 1369, 1376-77 (10th Cir. 1979)); _see also United States v. Nat'l City Lines_, 186 F.2d 562, 568 (7th Cir. 1951), _cert. denied_, 341 U.S. 916 (1951)[2]; _See also In re Dairy Farmers of Am., Inc.,_ 767 F. Supp. 2d 880, 907-08 (N.D. Ill. 2011). Defendants have not moved for summary judgment on the conspiracy to monopolize claim under Count III on any basis other than market power. Thus, Defendants' Motion as to Count III must be denied.

**C.    THE RULE OF REASON IS NOT THE SOLE MEANS OF DETERMINING WHETHER DEFENDANTS' ANTICOMPETITIVE CONDUCT VIOLATES ANTITRUST LAW.**

Defendants' Motion is predicated on the argument that the rule of reason, and proof of market power in a precisely defined market, is the only applicable standard to Plaintiff's Antitrust Claims. (Defendants' Memorandum at Pgs. 12-13). However, courts have established three (3) categories of

---

[2] While _United States v. Nat'l City Lines_ has been criticized, _see Besser Publ'g Co. v. Pioneer Press, Inc.,_ 571 F. Supp. 640, 641 (N.D. Ill. 1983); _Tire Sales Corp. v. Cities Serv. Oil Co.,_ 410 F. Supp. 1222, 1232 (N.D. Ill. 1976), _rev'd_, 637 F.2d 467 (7th Cir. 1980), cert. denied, 451 U.S. 920 (1981), it remains the law in this Circuit.

analysis – per se, quick-look, and rule of reason – for determining whether actions have anticompetitive effects, though the methods often blend together. *Cal. Dental Ass'n. v. FTC*, 526 U.S. 756, 779 (1999) ("The truth is that our categories of analysis of anticompetitive effect are less fixed than terms like 'per se,' 'quick look,' and 'Rule of Reason' tend to make them appear."). "There is often no bright line separating per se from Rule of Reason analysis," since "considerable inquiry into market conditions" may be required before the application of any so-called "per se" condemnation is justified. *NCAA v. Bd. of Regents*, 468 U.S. 85, 104, n. 26 (1984). Whether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same, whether or not the challenged restraint enhances competition. *Cal. Dental*, 526 U.S. at 779-780.

### 1. Per Se.

The first framework utilized by courts, the per se rule, is employed when a "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Bd. of Regents*, 468 U.S. at 100 (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc*., 441 U.S. 1, 19-20 (1979)). Restraints that would fall under this category are illegal as a matter of law for reasons of efficiency; in essence, it is simply not worth the effort or resources of a rule of reason analysis when "the Court [can] predict with confidence that the Rule of Reason will condemn [a restraint]." *Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 342 (1990) (quoting *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 344 (1982)). Under the per se framework, a restraint is deemed unreasonable without any inquiry into the market context in which the restraint operates. *Bd. of Regents*, 468 U.S. at 100.

### 2. Quick Look.

The second framework is the "quick-look" analysis, which is used where the per se framework is inappropriate, but where "no elaborate industry analysis is required to demonstrate the anticompetitive character of . . . an agreement," and proof of market power is not required. *Bd. of Regents*, 468 U.S. at 109 (quoting *Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 692

(1978)). The "quick-look" approach can be used when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental*, 526 U.S. at 770. Under this approach, if no legitimate justifications for facially anticompetitive behavior are found, no market power analysis is necessary and the court "condemns the practice without ado." *Chicago Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 673 (7th Cir. 1992). The quick-look doctrine permits plaintiffs to dispense with any showing of market power, and thus the existence of a relevant market, until a procompetitive justification is shown. *Agnew v. NCAA*, 683 F. 3d 329, 337 (7th Cir. 2012).

### 3. Rule of Reason.

The third framework for analyzing an action's anticompetitive effects on a market is the rule of reason. *Chicago Prof'l Sports*, 961 F.2d at 674. Under the rule of reason framework, the plaintiff must show that an agreement or contract has an anticompetitive effect on a given market within a given geographic area. *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006). As a threshold matter, a plaintiff must only show that the defendant has market power — that is, the ability to raise prices significantly "without losing all of one's business." *Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987) ("*Valley II*");  *Hennessy Indus., Inc. v. FMC Corp.*, 779 F.2d 402, 404-05 (7th Cir. 1985); *Polk Bros., Inc. v. Forest City Enters, Inc.*, 776 F.2d 185, 191 (7th Cir. 1985); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Association*, 744 F.2d 588 (7th Cir. 1984).

### D. DEFENDANTS' ANTICOMPETITIVE CONDUCT SHOULD BE ANALYZED UNDER THE PER SE STANDARD.

### 1. Price Fixing is Analyzed Under the Per Se Standard.

Under the per se approach, certain restraints have such a "pernicious effect on competition" and are so "lacking in redeeming value" that they are deemed per se unlawful. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724  (U.S. 1988) (quoting *N. Pac. Ry. Co. v. United states,* 356 U.S. 1, 5 (1958)). When a restrictive practice is per se unlawful, the practice violates the Sherman Act and there is no need to further examine its anticompetitive effects. *Center Video Indus. Co., Inc. v.*

10

*United Media, Inc.,* 995 F.2d 735, 737 (7th Cir. 1993). A vertical restraint is per se illegal when it includes an agreement on price or price levels. *Sharp Elecs.,* 485 U.S. at 735-36. In order to conspire to restrain retail price competition there must be some agreement to set, control, fix, maintain, or stabilize prices. *Miles Distribs. v. Specialty Constr. Brands, Inc*., 417 F. Supp. 2d 1030, 1036 (N.D. Ind. 2006) (citing *Nat'l Marine Elec. Distribs., Inc. v. Raytheon Co*., 778 F.2d 190, 192-93 (4th Cir. 1985)). The appropriate analysis is not whether such a restraint agreement is vertical or horizontal, but whether the plaintiff has provided sufficient evidence of an agreement to fix price or price levels to withstand a motion for summary judgment. *Miles Distribs.,* 417 F. Supp. 2d at 1036.

Here, the evidence reveals an agreement between Defendants and certain Designers to increase the prices for prom and homecoming dresses sold on the internet at a higher level than the prices charged at brick-and-mortar retailers. On August 1, 2012, Defendants sent an email to the Designers and their representatives inviting them to attend meeting at the 2012 Atlanta Prom Market to "discuss some topics now before the season starts …" (Pl.'s SOF at ¶55; *see also* Pl.'s Resp. to Defs.' SOF at ¶¶34, 58–59, 63, 66). The "Pre Prom Meeting" took place on August 9, 2012, the first day of the Atlanta Market. (Pl.'s SOF at ¶56). At this meeting, Defendants distributed a handout marked "Prom Industry Concerns", yet they concede that no other retailer was consulted in the preparation of this document. (Pl.'s SOF at ¶¶61, 63; *see also* Pl.'s Resp. to Defs.' SOF at ¶¶34, 58–59, 63, 66). The 2012 Pre-Prom Meeting was the only meeting of its kind in the industry. (Pl.'s SOF at ¶59; Pl.'s Resp. to Defs.' SOF at ¶¶34, 58–59, 63, 66). Mac Duggal sales representative Michael Levin ("Levin") testified that "most of the major manufacturers that sell prom dresses were there" and could not recall seeing any other store owners at the meeting. (Pl.'s SOF at ¶60).

Defendants' handout pushed a 2.2 markup for prom dresses sold on the internet, as opposed to the 2.0 markup that applied to brick-and-mortar retailers, in order to protect the profit margin of brick-and-mortar retailers. (Pl.'s SOF at ¶¶61–62; Pl.'s Resp. to Defs.' SOF at ¶¶34, 58–59, 63, 66). Mon Cheri CEO Stephen Lang ("Lang") confirmed that Defendant Roy Surdej brought up the issue

of higher online pricing during this meeting. (Pl.'s SOF at ¶62; Pl.'s Resp. to Defs.' SOF at ¶¶34, 58–59, 63, 66).

On August 24, 2012, Defendants emailed the very same handout to the same designers and their representatives on the August 1, 2012 invitation email, including representatives from Jovani and Terani, thanking them for attending and to "remind" them of what was discussed during the meeting. (Pl.'s SOF at ¶70; Pl.'s Resp. to Defs.' SOF at ¶¶34, 58–59, 63, 66). On the very same day, Lang responded to the Defendants' email, copied the designers and their representatives, and stated that he questioned counsel for the ABPIA (American Bridal & Prom Industry Association)[3] regarding the issue of MSRP and IMSRP (internet MSRP) and stated that "if there were differing prices we would be in violation of the Clayton Act as suspected. There are criteria to allow for differential pricing and if you study the act, there is no legal basis for varied pricing in this context." (Pl.'s SOF at ¶71).

On August 31, 2012, within weeks of Defendants' August 9th meeting and a mere seven (7) days after Defendants' August 24, 2012 email reminding all of the attendees of what was discussed at the meeting, including higher internet pricing, Terani sent an email to Plaintiff informing them of a new 2.2 markup on internet sales. (Pl.'s SOF at ¶¶56, 72; *see also* Pl.'s Resp. to Defs.' SOF at ¶34). This markup was identical to that suggested by Defendants on its "Prom Industry Concerns" handout. (Pl.'s SOF at ¶61). Between the end of August and October of 2012, Jovani sent a packet to Plaintiff which discussed a new 2.2 markup on internet sales. (Pl.'s SOF at ¶73). Jovani sales representative Sheri Simon ("Simon") testified that the purpose of this new internet pricing policy was to make it harder for online retailers to sell Jovani dresses and drive customers into brick-and-mortar retailers. (Pl.'s Resp. to Defs.' SOF at ¶34). This is the exact same motive set forth by Defendants on its "Prom Industry Concerns" handout distributed at the August 9th meeting and attached to Defendants' August 24, 2012 email reminding all of the attendees of what was discussed at the meeting, including higher internet pricing. (Pl.'s SOF at ¶¶61, 70).

---

[3] Lang is the President of the ABPIA. (Pl.'s SOF at ¶71).

Therefore, the only reasonable inference that can be drawn is that Terani and Jovani raised their prices for internet sales in response to Defendants' August 9th meeting and August 24, 2012 email. The timing of these changes in pricing structure excludes the possibility that Terani and Jovani acted independently and that their actions were wholly independent of Defendants' conduct. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 557 (1955) (an unprecedented change in pricing structure made at the very same time by multiple competitors would support inference of a conspiracy). As a result, the Court should deny Defendants' Motion for Summary Judgment and find this conduct constitutes a per se violation of the Sherman Act.

> **2.      Defendants' organization of group boycotts by the Designers should be analyzed under the per se standard.**

The Supreme Court has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of §1 of the Sherman Act. *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 290 (U.S. 1985). Section 1 of the Sherman Act states, in relevant part, as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal…" 15 U.S.C. §1. Cases to which this Court has applied the per se approach have generally involved joint efforts *by a firm* or firms to disadvantage competitors by "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Northwest Wholesale Stationers*, 472 US. At 294 (quoting L. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST 229–30 (1977) (emphasis added). Under such circumstances the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote. *Id.*

In *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 209-213 (1959), the Supreme Court found a group boycott, where a single retailer combined with twelve (12) well-known appliance

manufacturers and distributors to boycott a competing retailer, constituted a per se violation. In that case, the defendant, similar to the Defendants in this case, argued there were hundreds of other retailers selling the same and competing appliances in the same community and contended that the controversy was a private quarrel between petitioner and the defendant that did not amount to a public wrong proscribed by the Sherman Act. *Id.* at 290. However, under such circumstances the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote. *Id.* at 294.

However, like the facts of this case, *Klor's* was not a case of a single trader refusing to deal with another, nor of a single manufacturer and dealer agreeing to an exclusive distributorship which excludes another dealer. 359 U.S. at 212. Rather, the Supreme Court stated:

> This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products. It deprives the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale, and in some instances forbids them from selling to it on any terms whatsoever. It interferes with the natural flow of interstate commerce. It clearly has, by its "nature" and "character," a "monopolistic tendency." As such it is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy. Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups.

*Klor's,* 359 U.S. at 213.

The Court concluded that the alleged group boycott of even a single trader violated the statute without regard to the reasonableness of the conduct in the circumstances. *Id.* Group boycotts of a trader, said the Court, are among those "classes of restraints which from their 'nature or character' were unduly restrictive . . . ." *Id.* at 211. The principle of these cases is that where businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct. *United States v. Gen. Motors Corp.,* 384 U.S. 127, 146 (1966) (citing Charles F. Barber, *Refusals to Deal Under the Federal Antitrust Laws*, 103 U. PA. L. REV. 847, 872–85 (1955). Exclusion of traders from the

14

market by means of combination or conspiracy is so inconsistent with the free-market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins or their system for distributing automobiles, any more than by reference to the allegedly tortious conduct against which a combination or conspiracy may be directed. *Id.*

In discussing *Klor's*, the Supreme Court in *Gen. Motors* stated:

The Court concluded that the alleged group boycott of even a single trader violated the statute without regard to the reasonableness of the conduct in the circumstances. Group boycotts of a trader, said the Court, are among those "classes of restraints which from their 'nature or character' were unduly restrictive . . . ." 359 U.S., at 211. This was not new doctrine, for it had long been recognized that "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use," and that group boycotts are of this character. *Northern Pac. R. Co*. v. *United States*, 356 U.S. 1, 5. See also *Fashion Originators' Guild of America, Inc*. v. *Federal Trade Comm'n*, 312 U.S. 457, and *Eastern States Retail Lumber Dealers' Assn*. v. *United States*, 234 U.S. 600, 613-614, neither of which involved price-fixing.

*Id.* at 145.

This case is also factually similar to *Toys "R" Us*, where a single retailer was able to organize a group boycott among ten (10) major toy manufacturers to prevent the sale of toys to warehouse clubs to protect Toys "R" Us from having to lower its prices to meet the warehouse clubs' price levels. 221 F.3d 928, 937 (7th Cir. 2000). Finally, this case is factually similar to *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), which was described by the Seventh Circuit in *Toys "R" Us* as follows:

That case too involved actors at two levels of the distribution chain, distributors of motion pictures and exhibitors. Interstate Circuit was one of the exhibitors; it had a stranglehold on the exhibition of movies in a number of Texas cities. The antitrust violation occurred when Interstate's manager, O'Donnell, sent an identical letter to the eight branch managers of the distributor companies, with each letter naming all eight as addressees, in which he asked them to comply with two demands: a minimum price for first-run theaters, and a policy against double features at night. The trial court there drew an inference of agreement from the nature of the proposals, from the manner in which they were made, from the substantial unanimity of action taken, and from the lack of evidence of a benign motive; the Supreme Court affirmed. The new policies represented a radical shift from the industry's prior business practices, and the Court rejected as beyond the range of probability that such unanimity of action was explainable only by chance.

15

221 F.3d at 935.

Similar to *Klor's*, *Gen. Motors*, *Toys "R" Us* and *Interstate Circuit*, the present case involves actors at two (2) levels of the distribution chain, Defendants (a single large retailer) and the Designers (suppliers). Here, Defendants sent similar emails, and sometimes identical group emails, to the Designers asking them not to sell to Plaintiff and other boutiques and in certain area and zip codes, followed by a unprecedented meeting between Defendants and the Designers on August 9, 2012, followed by unanimous action by the Designers in rejecting Plaintiff's attempts to purchase their prom and homecoming dresses. (Pl.'s SOF at ¶¶26-29, 34, 36, 38-39, 43-44, 46, 49-50, 54-57, 59-60, 65, 74-79, 81-86, 90-100). Further, there is also evidence that other boutiques in the Chicago area were boycotted after this meeting. (Pl.'s SOF at ¶¶74, 81, 83-91, 99; *see also* Pl.'s Resp. to Defs.' SOF at ¶¶58-59, 63, 66, 160, 161).

This is similar to *Toys "R" Us*, where the toy manufacturers' decision to stop dealing with the warehouse clubs was a shift from the past, and it was suspicious for a manufacturer to deprive itself of a profitable sales outlet and the record here included the direct evidence of communications. *Id.* Like *Toys "R" Us*, this case also has elements of both vertical and horizontal agreements. There is evidence that some Designers, who once sold to Plaintiff, abruptly stopped after the August 9th meeting. (Pl.'s SOF at ¶¶54, 56-59, 77). There is also evidence of group communications with the Designers by email demanding that they not sell to Plaintiff and other boutiques, and evidence that they were all in same room, without any other Chicago area boutique present, discussing both pricing policies and restrictions on selling to additional boutiques with Defendants as it would hurt the profits of existing boutiques due to the limited supply of buyers. (Pl.'s SOF at ¶¶26-29, 34, 36, 38-39, 43-44, 46, 49-50, 54-57, 59-65, 74-79, 81-86, 90-100). These actions had no procompetitive benefits, did not enhance efficiencies, only served to protect the Defendants' interests, and more specifically, allow Defendants to maintain or increase their profits (*see* Section E below).

16

It is important to note that such agreements may be proven by either direct or circumstantial evidence. *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 785-86 (1984). When circumstantial evidence is used, there must be some evidence that "tends to exclude the possibility" that the alleged conspirators acted independently. *Monsanto,* 465 U.S. at 764, *quoted in Matsushita,* 475 U.S. at 588. This does not mean, however, that a plaintiff must exclude *all* possibility that the manufacturers (or in this case, the Designers) acted independently. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986). As pointed out in *In re Brand Name Prescription Drugs Antitrust Litig.,* a rule to the contrary would place an absurd and legally unfounded burden on a plaintiff to prove with 100% certainty that an antitrust violation occurred." 186 F.3d 781, 787 (7th Cir. 1999). Such inference will only have to be made where the court finds that the challenged conduct was as consistent with permissible competition as with an illegal conspiracy. *Matsushita,* 475 U.S. at 588. On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Id*. at 587. The test states only that there must be *some* evidence which, if believed, would support a finding of concerted behavior. *Toys "R" Us, Inc.* 221 F.3d at 935. Here, the group mails and August 9, 2012 meeting following by unanimous conduct certainly raises the inference of concerted action. As such, these group boycotts should be deemed illegal per se, and no further inquiry is required. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768 (1984). As a result, this Court must deny Defendants' Motion for Summary Judgment on the Antitrust Claims on the basis that proof of market power is not required.

E. **EVEN IF THE COURT FINDS THAT A PER SE ANALYSIS DOES NOT APPLY, DEFENDANTS' ANTICOMPETITIVE CONDUCT SHOULD BE ANALYZED UNDER THE "QUICK LOOK" DOCTRINE**

A restraint may be determined to be a violation of the Sherman Act after an abbreviated, or "quick look" analysis, if its anticompetitive effects are obvious. *Cal Dental Ass'n,* 526 U.S. at 770. In other words, if the elimination of competition is apparent on a quick look, without undertaking the kind of searching inquiry that would make the case a rule of reason case in fact if not in name, the

17

practice is illegal per se. *Gen. Leaseways*., 744 F.2d at 595. The quick look is a means by which the per se rule and rule of reason have been collapsed. *Appraisers Coal,* 845 F. Supp. at 606, n, 10. Thus, in determining whether the quick look method should be applied, the Court must examine whether the challenged restraints are solely intended to eliminate competition. *Cal. Dental*, 526 U.S. at 780; *Bd. of Regents*, 468 U.S. at 104.

      **1.**      **The Challenged Restraints are Solely Intended to Eliminate Competition.**

Defendants defend their anticompetitive emails under the guise that they are simply requests to enforce their "exclusivity arrangements" with designers. (Defendants' Memorandum at Pg. 35). However, these purported "exclusivity arrangements" are a fallacy only concocted to justify Defendants' actions.

First, not a single one (1) of the Defendants' emails to the Designers makes any mention or reference to any preexisting "exclusivity arrangement" or other agreements. (Pl.'s SOF at ¶¶26-29, 34, 36, 38-39, 43-44, 46, 49-50, 54-57, 59-60, 65, 74-79, 81-86, 90-100). Also, Lang testified that he has no personal knowledge of a store ever making a request upon Mon Cheri to not sell to certain area codes or zip codes. (Pl.'s SOF at ¶140). Of the three (3) designers who were deposed thus far, none were aware of any agreement which gave Defendants exclusivity over a geographic area. (Pl.'s SOF at ¶¶141-143). Further, despite its claims of "exclusivity arrangements", Defendants contend that each Designer also sells to other boutiques near Defendants' brick-and-mortar store. (Defs.' SOF at ¶90).

Moreover, in those instances where Defendants purport to have "exclusivity arrangements" with the Designers, they ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████. (Defs.' SOF at ¶94; Pl.'s SOF at ¶137). ██████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████. (Defs.' SOF at ¶36; Pl.'s SOF at ¶137). Finally, Defendants concede that "███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ (Pl.'s SOF at ¶137).

It is clear that these emails are naked restraints that exist simply to prevent those boutiques who Defendants perceive to be a threat from obtaining the Designers' prom and homecoming dresses so that Defendants could maintain their brick-and-mortar pricing policy of MSRP + 15%, when all other boutiques charged MSRP. (Pl.'s SOF at ¶¶104, 106-107, 110-111; s*ee also* Pl.'s Resp. to Defs.' SOF at ¶¶29, 58-59, 63, 66, 160, 161). Such restraints offer no innovation or product development. *See Danielson Food Prod. Inc., v. Poly-Clip Sys., Int'l.*, 120 F. Supp. 2d 1142, 1144 (N.D. Ill. 2000).

Thus, even an observer with a rudimentary understanding of economics would conclude that the challenged restraints would have an anticompetitive effect on the market. As a result, the Court should apply the quick look method, without any further market analysis, to conclude that the elimination of competition is the sole purpose of Defendants' conduct. Consequently, this Court should not only deny Defendants' Motion for Summary Judgment, but enter judgment in favor of the Plaintiff on the Antitrust Claim.

### 2. Defendants' Purported "Exclusivity Arrangements" are Solely Intended to Eliminate Competition.

Even if credence is given to Defendants' purported claims of preexisting "exclusivity arrangements" with the Designers, they fail to produce any procompetitive benefits. *Nat'l Soc'y of Prof'l Engineers*, 435 U.S. at 696 (a business justification defense cannot be premised upon the assumption that competition will somehow be bad within the context of the particular industry or conduct in question, for the antitrust laws do "not support a defense based on the assumption that competition itself is unreasonable.") *See also, FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 462-464 (1986).

The cases that Defendants rely upon for the proposition that their "exclusivity arrangements" are "very common, almost always pro-competitive, and therefore presumptively legal absent extraordinary circumstances which do not exist here" are expressly distinguishable from the facts of this case. (Defendants' Memorandum at Pg. 36). In each of those cases, there was an agreement between a single supplier and dealer and there was no dispute over its terms. ███████████████

████████████████████████████████████████████ ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ (Pl.'s

SOF at ¶137). Under the law, these are not exclusive dealings. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, (exclusive dealing requires a meeting of the minds; one mind is not enough); *See Paddock Publs. v. Chicago Tribune Co.*, 103 F.3d 42, 46 (7th Cir. Ill. 1996) (exclusive dealing obliges a firm to obtain its inputs from a single source).

Moreover, Defendants appear to equate "presumptively" legal with "automatically" legal as there is no discussion in their Memorandum that these "exclusivity arrangements" actually have any procompetitive benefits; rather, they simply argue that ████████████████ ████████████████ ████████████████. (Defendants' Memorandum at Pg. 36).

However, the test of a legitimate business justification defense is whether the challenged conduct actually "promote[s] the redeeming virtues of competition: lower prices, greater efficiency and innovation, and more responsive service." *Illinois ex rel. Hartigan v. Panhandle E. Pipe Line Co*., 730 F. Supp. 826, 932-33 (C.D. Ill. 1990) (citing *Paschall v. Kansas City Star Co*., 727 F.2d 692, 698 (8th Cir. 1983), *cert. denied*, 469 U.S. 872 (1984)). As expressed by the Supreme Court, legitimate business reasons that may justify otherwise illegal actions consist of conduct which "benefit[s] consumers by making a better product or service available.. ." as distinguished from improper conduct

which "has the effect of impairing competition." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608-11 (U.S. 1985).

Also, a defendant cannot claim that it was reasonable to replace competition with monopolistic arrangements. *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1139 (7th Cir. Ill. 1983). Where a business justification defense is asserted, the defendant must prove that it was motivated by a legitimate business objective and that, in pursuing that objective, it employed the least competitive restrictive alternatives available. *Panhandle E. Pipe Line Co.*, 730 F. Supp. at 932. Similarly, it is not a legitimate business justification that a defendant sought to protect itself from added costs or lost profits. *Id.* at 932-33. It is also not a legitimate business justification to suggest that the defendant would be a "better" provider of the particular product or service than its competitors. *Id.* at 933. The Sherman Act "assumes that an enterprise will protect itself against loss by operating with superior service, lower costs, and improved efficiency," and not by substituting "anticompetitive uses of its dominant economic power." *Otter Tail Power Co. v. United States,* 410 U.S. 366, 380 (U.S. 1973). Moreover, a purported business justifications should not be taken at simple face value. *Panhandle E. Pipe Line Co.*, 730 F. Supp. at 933.

> ### a. Defendants' purported "Exclusive arrangements" do not prevent free riding.

The Seventh Circuit in *Toys "R" Us* explained free riding as follows:

The manufacturer of a product, say widgets, has an incentive to distribute as many widgets as it can, while keeping its costs of distribution down as low as possible. In many instances, this means that the manufacturer will want to sell its widgets for a particular wholesale price and it will want its retailer to apply as low a mark-up as possible (i.e. put the product on the market for as little extra expense as possible). Sometimes, however, the manufacturer will want the retailer to provide special services or amenities that cost money, such as attractive premises, trained salespeople, long business hours, full-line stocking, or fast warranty service. But the costs of providing some of those amenities (usually pre-sale services) are hard to pass on to customers unless some form of restricted distribution is available. What the manufacturer does not want is for the shopper to visit the attractive store with highly paid, intelligent sales help, learn all about the product, and then go home and order it from a discount warehouse or (today) on-line discounters. The shopper in that situation has taken a "free ride" on the retailer's efforts; the retailer never gets paid for them, and eventually it stops offering the services. *If* those services were genuinely useful, in the

21

sense that the product plus service package resulted in greater sales for the manufacturer than the product alone would have enjoyed, there is a loss both for the manufacturer and the consumer. Hence, antitrust law permits nonprice vertical restraints that are designed to facilitate the provision of extra services, recognizing that a manufacturer in a competitive market who has guessed wrong will eventually be forced by the market to abandon the restrictions. See *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 724, 99 L. Ed. 2d 808, 108 S. Ct. 1515 (1988), quoting *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 52 n.19, 53 L. Ed. 2d 568, 97 S. Ct. 2549 (1977).

… the most important insight behind the free rider concept is the fact that, with respect to the cost of distribution services, the interests of the manufacturer and the *consumer* are aligned, and are basically adverse to the interests of the retailer (who would presumably like to charge as much as possible for its part in the process). See *Premier Electrical Construction Co. v. Nat'l Electrical Contractors Ass'n,* 814 F.2d 358, 369-70 (7th Cir. 1987) ("[the rationale for permitting restricted distribution policies] depends on the alignment of interests between consumers and manufacturers. Destroy that alignment and you destroy the power of the argument.").

*Toys "R" Us*, 221 F.3d at 937-38.

In rejecting Toys "R" Us' free riding argument, the Seventh Circuit stated:

What TRU wanted or did not want is neither here nor there for purposes of the free rider argument. Its economic interest was in maximizing its own profits, not in keeping down its suppliers' cost of doing business. Furthermore, we note that the Commission made a plausible argument for the proposition that there was little or no opportunity to "free" ride on anything here in any event. The consumer is not taking a *free* ride if the cost of the service can be captured in the price of the item. As our earlier review of the facts demonstrated, the manufacturers were paying for the services TRU furnished, such as advertising, full-line product stocking, and extensive inventories. These expenses, we may assume, were folded into the price of the goods the manufacturers charged to TRU, and thus these services were not susceptible to free riding. On this record, in short, TRU cannot prevail on the basis that its practices were designed to combat free riding.

*Id.* at 938.

Similarly, Defendants' purported "exclusivity agreements" only seek to maximize their own interests and profits, and not those of either the Designers or the consumers. ███████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████. (Pl.'s SOF at ¶139). Any

argument that Defendants raised their prices above MSRP because of the added costs associated with

carrying substantial inventory and employing a large staff is summarily defeated because they set forth

that they continued this practice after they transitioned back to MSRP pricing sometime in 2013 (Defs.' SOF at ¶¶56, 58-59, 60-62), and still earned a ███████████ ████████, or ██████ of gross receipts (Pl.'s SOF at ¶19); evidencing that MSRP, which includes a 100% markup (Defs.' SOF at ¶29), provides enough profit margin to cover these added costs without charging a supracompetitive price.

Further, due to the resale price maintenance which has existed for the Designers' prom and homecoming dresses, boutiques are not allowed to sell for less than MSRP. (Defs.' SOF at ¶¶29, 32; Pl.'s SOF at ¶111). In fact, Defendants vigorously report any attempts by other retailers for discounting below the MSRP to the Designers, even if by a penny. (Pl.'s SOF at ¶112). Thus, Defendants' free riding argument only makes sense when taking into consideration the fact that Defendants were charging consumers 15% more than all other boutiques (Pl.'s SOF at ¶¶106-107, 109-110; Pl.'s Resp. to Defs.' SOF at ¶29) for the Designers' dresses, which explains why Defendants wanted to prevent other Chicago area boutiques from carrying the Designers' dresses – Defendants clearly did not want other boutiques having access to, and selling, the same dresses they sold at their boutiques for MSRP, a cheaper price than what the dresses were available for at Defendants' boutique. This also explains why, when Defendants started their transition to MSRP pricing at their brick-and-mortar store, Defendants pushed the Designers to charge higher prices for dresses sold on the internet. (Pl.'s SOF at ¶61).

**b.      Defendants' purported "Exclusive Arrangements" do not preserve the uniqueness of the Designers' prom and homecoming Dresses.**

Next, Defendants' claim their purported "arrangements, understandings and expectations" preserve the uniqueness of the Designers' dresses in order to prevent two (2) girls from wearing the same dress to the same event. First and foremost, this is not a legitimate business justification to exclude competition. Moreover, Lang testified that store-run dress registries do not preserve uniqueness as another girl from the same school buying the same dress can simply go to another store and purchase the same dress. (Pl.'s SOF at ¶145). While Defendants sell the illusion of uniqueness,

23

Defendant Roy Surdej admitted that girls are not even required to register their dresses to an event when purchasing from Defendants' brick-and-mortar store (Pl.'s SOF at ¶144), and Defendant Jeffrey Surdej admitted that Defendants' websites do not require any registration of dresses to events when purchasing online. (Pl.'s Resp. to Defs.' SOF at ¶62).

Defendants' argument actually supports the creation of a monopoly, as uniqueness is only preserved if the dress is only available from a single source that could track and register the sales of every single dress to a particular school. In that scenario, a retailer would be able to charge whatever they wanted for the dress; which is exactly what Defendants were able to do during the relevant time period. (Pl.'s SOF at ¶¶106-107, 109-110; Pl.'s Resp. to Defs.' SOF at ¶29).

### c. Defendants' purported "Exclusive Arrangements" do not prevent market saturation.

A final justification Defendants set forth for Defendants' purported "agreements, understandings and expectations" with the Designers is to prevent oversaturation of the market for the Designers' dresses. (Defendants' Memorandum at Pgs. 3-4). There are numerous problems with the argument. First, at the retailer level, Defendants never expressed any concerns with the oversaturation of the Designers' dresses; rather, their concern was only with the number of stores, or oversaturation of stores selling the Designers' dresses. (Pl.'s SOF at ¶83). It is clear that Defendants' concern was not with the oversaturation of the Designers' dresses, but with competition.

Secondly, there is no admissible evidence even suggesting that the Designers' dresses were oversaturated in the Chicago area. Lang testified that Mon Cheri has done no research on the saturation level of dresses in the Chicago Market and, if someone offered to purchase 2,000 Mon Cheri dresses in the Chicago Market, he would "do it in a heartbeat." (Pl.'s SOF at ¶¶146-147; Pl.'s Resp. to Defs.' SOF at ¶¶23-25). Simon also lacked any knowledge of any cap on the number of Jovani dresses that could be sold in the Chicago Market and, as recently as 2012, believed Jovani had the ability to "quadruple" its already substantial business with Defendants. (Pl.'s SOF at ¶¶86, 148; Pl.'s Resp. to Defs.' SOF at ¶¶23-25). Further, while Defendants claim that Mon Cheri and Jovani sell their prom

24

and homecoming dresses to department stores (Defs.' SOF ¶¶21, 90, 118-119), Lang and Simon have no knowledge as to how their respective dresses are allocated once shipped to the department stores. (Pl.'s SOF at ¶157; Pl.'s Resp. to Defs.' SOF at ¶¶21, 90, 118-119). As department stores can ship inventory amongst individual stores (Defs. SOF at ¶155), this precludes any control a designer might have over the amount of inventory in any market and defeats any alleged concern with oversaturation in any market.

Clearly, the Designers were not concerned with oversaturating any market, particularly any market in the Chicago area. If both Mon Cheri and Jovani are willing to sell more dresses in the Chicago Market, but only choose not to do so because of Defendants' demands or purported "exclusivity," it is evidence that Defendants' are able to restrict output in the Chicago Market.

### d. Defendants' purported "Exclusive Arrangements" have no procompetitive benefits or effects.

These purported "exclusivity arrangement" with the Designers do not have any other procompetitive benefits or effects. As articulated in *Toys "R" Us*, "the typical story of a legitimate vertical transaction would have the manufacturer [here, a Designer] going to TRU [here, Defendants] and asking it to be the exclusive carrier of the manufacturer's goods; in exchange for that exclusivity, the manufacturer would hope to receive more effective promotion of its goods, and TRU would have a large enough profit margin to do the job well." *Toys "R" Us*, 221 F.3d at 936.

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████. (Pl.'s SOF at ¶¶128, 139). *See Roland Mach.,* 749 F.2d at 395 (exclusive dealing leads dealers to promote each manufacturer's brand more vigorously than would be the case under nonexclusive dealing).

Here, Defendants do not advertise the Designers in their brick-and mortar store and do not have Designers' signs or logos in their store. (Pl.'s SOF at ¶¶123-124). When Defendants do advertise for the Defendants, it is only on their internet websites and they charge the Designers up to ████/week for the privilege. (Pl.'s SOF at ¶¶130-132). They do not section off their floor space by Designer; rather, they mix the Designers' dresses together. (Pl.'s SOF at ¶127). Defendants even remove the Designers' tags from the their in-store dresses (Pl.'s SOF at ¶125); while Simon has testified that she "would want the tags to remain." (Pl.'s SOF at ¶126). Further, Defendants' salespersons do not receive any specialized training in the Designers' products from the Defendants or the Designers. (Pl.'s SOF at ¶128). There is no evidence, or even argument, that these purported arrangements create higher levels of customer service, and the evidence shows that all boutiques in the Chicago Market generally offer similar services to their customers, such as one-on-one service, alterations, beadwork, and steaming. (*See* Pl.'s Resp. to Defs.' SOF at ¶¶59, 61).

Further, these purported arrangements do not promote dealer loyalty between Defendants and any of the Designers, as Defendants claim to have ███████████████████████. *See Roland Mach.*, 749 F.2d at 395 (a dealer who expresses his willingness to carry only one manufacturer's brand of a particular product indicates his commitment to pushing that brand; he doesn't have divided loyalties). If the dealer carries several brands, his stake in the success of each is reduced. *Id.* Here, Defendants carried all sixteen (16) of the Designers side-by-side.

### e. Defendants' purported "Exclusive Arrangements" do not promote interbrand or intrabrand competition.

To further determine whether Defendants' conduct has unreasonably restrained competition, a court may consider the challenged restraint's effects on both intrabrand and interbrand competition. *Valley Liquors, Inc. v. Renfield Imps., Ltd.,* 678 F.2d 742, 745 (7th Cir. 1982) ("Valley I"). Because measuring and balancing these effects can be difficult, the Seventh Circuit has adopted a threshold requirement, a "shortcut" as it were, that the plaintiff needs to show that the defendant has market power; whether it can raise prices above a competitive level without losing its business. *Valley II,* 822

F.2d at 666-68. As stated in Section (G)(2) below, the evidence reveals that Defendants charged prices up to 15% higher than anyone else during the relevant time period without losing any of its business (and, in fact, increased both revenues and profits). (Pl.'s SOF at ¶¶19, 20, 106). Thus, no further inquiry into interbrand/intrabrand competition should be required.

These purported "arrangements understandings and expectations" do not encourage any investment by Defendants in the Designers beyond the purchase of dresses and do not promote any efficiencies, productivity, or output in the Chicago Market. They exist solely to restrict and eliminate, not enhance or improve, competition for the Designers' prom and homecoming dresses.

### f. There is no evidence that the Designers acted independently.

Finally, the cases Defendants rely upon to support their position that their anticompetitive emails are simply legal enforcement of exclusive dealings are expressly distinguishable from this case. First and foremost, these cases all involve a distributor asking that a manufacturer terminate a business relationship with a single distributor pursuant to an agreement between a single dealer and supplier to terminate a competing supplier. (Defendants' Memorandum at Pg. 36). Here, Defendants went clearly above and beyond, asking multiple and competing Designers to not sell to or terminate their business relationships with Plaintiff, numerous other boutiques, and to not to sell to any boutiques within certain zip and area codes. (Pl.'s SOF at ¶¶26-29, 34, 36, 38-39, 43-44, 46, 49-50, 54-57, 59-60, 65, 74-79, 81-86, 90-100; s*ee also* Pl.'s Resp. to Defs.' SOF at ¶¶58-59, 63, 66, 160, 161). These requests had no legitimate purpose, such as cutting off a free rider, ensuring the provision of adequate services, or efficiency enhancement. These were clearly intended to eliminate Defendants' competition for the Designers' prom and homecoming dresses.

Defendants rely upon *Monsanto,* 465 U.S. at 764, for the proposition that a manufacturer's decision to do business with one retailer and not another is a legitimate competitive response. (Defendants' Memorandum at Pg. 36, n. 33). However, the *Monsanto* Court only considered the standard of proof required to find a vertical price-fixing conspiracy between a manufacturer and

retailer in violation of Section 1 of the Sherman Act. 465 U.S. 752, 764 (1984). Furthermore, the Northern District of Illinois has stated that the Supreme Court's analysis was only "directed to the standard of proof which a plaintiff must satisfy in order to prevail *ultimately*, not to defeat a motion for summary judgment." *Marco Holding Co. v. Lear Siegler, Inc.*, 606 F. Supp. 204, 209-10 (N.D. Ill. 1985)(emphasis in original); *see also Am. Dermatologists' Med. Group, Inc. v. Collagen Corp.*, 595 F. Supp. 79, 82 n.2 (N.D. Ill. 1984) (emphasizing that the *Monsanto* plaintiff was given the opportunity to present his case to the jury).

In *Monsanto*, the Court reiterated an important distinction at the center of distributor-termination cases, which is that Section 1 of the Sherman Act does not prohibit "independent" action; a manufacturer can refuse to deal with whomever it likes, as long as it does so independently. *Monsanto*, 465 U.S. at 760-1. Something more than evidence of mere complaints are needed, such as evidence that "tends to exclude the possibility that the manufacturer and non-terminated distributors were acting independently." *Id.* at 764. That is, "[t]here must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* In *Marco*, the Northern District of Illinois discussed and analyzed the *Monsanto* standard as follows:

> In the context of Lear Siegler's motion for summary judgment, we believe that plaintiff has produced enough evidence so that a trier of fact might reasonably decide that it meets the *Monsanto* standard.[2] *See American Dermatologists, supra*, 595 F. Supp. at 82. Given the timing and practically undisputed vehemence of Serson Supply's and Chicago Hi-Speed's complaints, the attendant threats to reduce or eliminate business with Lear Siegler, the timing of the termination, and the different discount price schedules offered by MIS and Lear Siegler, Marco is entitled to present its antitrust claim to the jury.

*Marco,* 606 F. Supp. at 210.

In denying the defendant's motion for summary judgment in *Am. Dermatologists,* 595 F. Supp. at 82, which was based in part upon the *Monsanto* standard, the Court stated:

> As we have stated, there are numerous factual questions which are unresolved in this case. Frankel has presented a plausible, albeit somewhat complex, view of the facts. The inferences Frankel draws from these facts are certainly not so far-fetched that a

28

trier of fact should not be allowed to consider them. Defendants' protests as to the circumstantial nature of Frankel's evidence are unavailing. Conspiracy cases almost always involve such evidence, and it was recognized long ago that circumstantial evidence may be sufficient to support a finding of a price-fixing conspiracy. *E.g., Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S. Ct. 467, 83 L. Ed. 610 (1939).

*Id.* at 82.

*Marco* and *Am. Dermatologists'* are both factually similar to the instant case, where Defendants' numerous emails and subsequent August 9th meeting at the 2012 Atlanta Prom Market coincided with the Designers' unanimous decisions to cut Plaintiff and other Chicago area boutiques off from the ability to purchase their prom and homecoming dresses. (Pl.'s SOF at ¶56, 60, 77; *see also* Pl.'s Resp. to Defs.' SOF at ¶¶58-59, 63, 66, 160, 161). However, unlike *Marco*, the evidence is not based upon mere complaints made by Defendants about Plaintiff or other boutiques, such as violations of the Designers' policies, but naked demands not to sell to them because they are in Defendants' direct competition, too close to the Defendants' brick-and-mortar boutique, or within area and zip codes that Defendants perceived to be their sales territory. (Pl.'s SOF at ¶¶26-29, 34, 36, 38-39, 43-44, 46, 49-50, 54-57, 59-60, 65, 74-79, 81-86, 90-100; s*ee also* Pl.'s Resp. to Defs.' SOF at ¶¶58-59, 63, 66, 160, 161). As the evidence of a conspiracy in this case is even stronger than that produced by plaintiff in *Marco*, where the defendant's summary judgment was denied, it is clear that summary judgment here must similarly be denied. Here, the facts and evidence undoubtedly satisfy the *Monsanto* standard.

Therefore, the Court must find that there are no procompetitive benefits or justifications for Defendants' naked restraints and that the effects are those that would always or almost always tend to restrict or restrain competition and that there is sufficient evidence to conclude that the Designers did not act independently. It is clear that even an observer with a rudimentary understanding of economics would conclude that the conduct in question would have an anticompetitive effect on both customers and markets. As a result, the Court should  apply the quick look doctrine, which permits a plaintiff to

forgo any strict showing of market power and thus a specific definition of the relevant market, and deny Defendants' Motion for Summary Judgment on the Antitrust Claims.

**F.     EVEN UNDER THE RULE OF REASON, DEFENDANTS HAVE MARKET POWER.**

Assuming the Court finds that the evidence of Defendants' conduct does not fall under the per se rule or quick look method, and that the rule of reason is the only applicable standard, the evidence does indicate, and at the very least raise a question of fact, that Defendants have market power. It is well established that a plaintiff may prove market power either: (1) "through direct evidence of anticompetitive effects," or (2) "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in that case." *Toys "R" Us, Inc.*, 221 F.3d at 937; *In re Dairy Farmers of Am.*, 767 F. Supp. 2d at 902.

Under the first method, if a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, it is a strong indicator of market power; in fact, this arguably is more direct evidence of market power than calculations of elusive market share figures. *Todd v. Exxon Corp.*, 275 F.3d 191, 206  (2d Cir. 2001). Courts should consider whether the conduct "has impaired competition in an unnecessarily restrictive way." *Aspen Skiing*, 472 U.S. at 605. Anticompetitive or exclusionary conduct "impairs the opportunities of rivals and is neither 'competition on the merits' nor more restrictive than reasonably necessary for such competition. The definition of the challenged conduct is objective and does not depend, in any ordinary sense, on the purpose, intent, or willfulness of the defendant or on the non-inevitability of its action." *Lerma v. Univision Commc'ns., Inc.*, 52 F. Supp. 2d 1011 (E.D. Wis. 1999)(citing  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* P 650a (rev. ed. 1996). Courts should ask:

> whether the underlying purpose of the firm's conduct was to enable the firm to compete more effectively. Did the firm engage in the challenged conduct for a legitimate business reason? Or was the firm's conduct designed solely to insulate the firm from competitive pressure? . . . When courts speak of a firm's intent in a monopolization case, they refer to the legitimacy of the firm's conduct as measured by its intended effect on the competitive process.  . . . Conduct that tends to exclude

competitors may therefore survive antitrust scrutiny if the exclusion is the product of a "normal business purpose" . . ..

*Lerma,* 52 F. Supp. 2d at 1011 (citing *Illinois ex rel Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1481 (7th Cir. 1991)). Whether valid business reasons motivated this conduct generally is a question of fact. *Id.*

Defendants' Motion primarily focuses on the second method (market share in a relevant product and geographic market) and argues that Defendants' market share in any properly defined relevant market in far too law to have any market power. Defendants' Motion dismisses the evidence of direct evidence of anticompetitive effects under the guise that they have ███████████ ██████████████████████████, and argues that, in cases involving vertical exclusive dealings, Plaintiff must still prove market power. (Defendants' Memorandum at 30-31). First of all, and for the reasons set forth in Section E above, Defendants do not have exclusive dealings with the Defendants. Second, Defendants fail to realize that direct evidence of anti-competitive effects *is* proof of market power, regardless of whether the restraint is vertical or horizontal.

### 1. Defendants' Market Share Opinions are Inadmissible and Unreliable.

Defendants' expert, Dr. Robert Kneuper ("Kneuper"), has offered various market share opinions, all of which are the subject of a *Daubert* challenge filed by Plaintiff on March 19, 2015. (Dckt. 240).

Kneuper's first set of market share opinions uses the number of dresses that Defendants *sold and registered to specific prom and homecoming events* in 2013 as the numerator. (Pl.'s Resp. to Defs.' SOF at ¶¶136, 140, 144, 147-148). However, Defendants' Memorandum twists and manipulates this into "the number of those dresses that Peaches sold in the 'Chicago Market' in 2013…" (Defendants' Memorandum at 27-28). This is a blatant misrepresentation of Kneuper's opinions. Kneuper made it clear that he only included those dresses that Defendants sold *and registered* to a specific prom and homecoming *event* into his analysis and admitted that he excluded the sale of prom

31

and homecoming dresses for which no specific prom or homecoming event was registered. (Pl.'s Resp. to Defs.' SOF at ¶¶136, 140, 144, 147-148). This is important, as Defendant Roy Surdej concedes that dresses do not need to be registered to an event. (Pl.'a SOF at ¶144). Thus, Kneuper's opinion relies upon an inaccurate figure for determining Defendants' alleged market share because it excludes the sale of prom and homecoming dresses for which no prom or homecoming event was registered.

For the denominator of his market share opinions, Defendants rely on the allegations in Plaintiff's First Amended Complaint regarding the population of high school aged girls who set the demand for prom and homecoming dresses in the Chicago Market, and attempt to twist and manipulate it into an admission by Plaintiff that this is the number of girls who actually purchase prom and homecoming dresses each year. (Defendants' Memorandum at 27). This is a deliberate misrepresentation of the record, as Plaintiff's Amended Complaint only alleges population figures to show the potential customer base for prom and homecoming dresses in the Chicago Market and in no way admits that it represents that it is the number of girls who actually purchase prom and homecoming dresses. Judicial admissions must be deliberate, clear and unequivocal. *Pierce v. City of Chicago*, 2012 WL 401026, at *3 (N.D. Ill. Feb. 7, 2012). Here, there is no deliberate and clear admission by Plaintiff that this is the number of girls who actually purchase dresses. Thus, this argument must be rejected.

Notwithstanding, Kneuper's opines that Defendants sold between ███ and ███ of the prom and homecoming dresses purchased in the Chicago Market in 2013 based upon Plaintiff's alleged admission regarding the number of girls who purchase prom and homecoming dresses in the Chicago Market.[4] (Defs.' SOF at ¶144). Kneuper then takes this opinion a step further and makes completely and wholly unsupported assumptions that only half of the girls buy dresses and that three-quarters only buy one (1) dress to conclude that Defendants sold less than ███ of all prom and

---

[4] This opinion is the subject of a *Daubert* challenge filed by Plaintiff on March 19, 2015 (Dckt. No. 240).

homecoming dresses in the Chicago Market in 2013.[5] (Defs.' SOF at ¶147). Notably, to reach this conclusion, he admits that he relied upon nothing more than his "basic intuition" (Pl.'s SOF at ¶159), which is not a proper basis for an expert opinion. [6] *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418–19 (7th Cir. 2005).

Kneuper's other market share opinion took the purported square footage of Defendants' brick-and-mortar store as the numerator and the square footage of other brick-and-mortar boutiques: (1) in the Chicago Market; (2) within 30 miles of Defendants' boutique; and (3) within 50 miles of Defendants' brick-and-mortar store, as the denominator. (Pl.'s Resp. to Defs.' SOF at ¶130; Defs.' SOF at ¶¶149-151). The data he used for the denominator was obtained through Hoover's, a Dun & Bradstreet Company.[7] (Defendants' Memorandum at 28). Based solely upon the Hoover's data, Kneuper opines that Defendants' share of square footage was 7.53% in the Chicago Market, 7.11% within 30 miles of Defendants' brick-and-mortar store, and 5.81% within 50 miles of Defendants' brick-and-mortar store.[8] (Defendants' Memorandum at Pg. 28). When including department stores, which he assumes, again without any factual support, allocate 500 square feet of space to the sale of specialty occasion dresses, he claims that Defendants' share of square footage falls to 4.72% to 6.71%.[9] (Defendants' Memorandum at Pg. 29). However, Kneuper included the square footage for numerous bridal boutique and failed to account for this or make any adjustments in his opinions. Thus, a substantial portion of the square footage he include to reach his opinion include space devoted to bridal dresses, which Defendants do not carry. (Pl.'s SOF at ¶4; Pl.'s Resp. to Defs.' SOF at ¶¶149-151).

---

[5] This opinion is the subject of a *Daubert* challenge filed by Plaintiff on March 19, 2015 (Dckt. No. 240).

[6] This opinion is the subject of a *Daubert* challenge filed by Plaintiff on March 19, 2015 (Dckt. No. 240).

[7] Although the Hoovers' Reports that Kneuper used for square footage also contained revenue data, he did not attempt to use this data to calculate market share because of its unreliability.

[8] This opinion is the subject of a *Daubert* challenge filed by Plaintiff on March 19, 2015 (Dckt. No. 240).

[9] This opinion is the subject of a *Daubert* challenge filed by Plaintiff on March 19, 2015 (Dckt. No. 240).

Defendants then contend that Kneuper's market share opinions are lower than any minimum market share found by a court to constitute market power. However, this is a misstatement of the law. The Seventh Circuit has only found that the lowest possible market share legally sufficient to sustain a finding of monopolization is between 17% and 25% "*without a showing of special market conditions or other compelling evidence of market power.*" *Valley II*, 822 F.2d at 667 (emphasis added).

### 2. There is No Reliable Data to Calculate Defendants' Market Share.

Market share is based upon a firm's actual or projected revenues in the relevant market. U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines*, §5.2 (August 19, 2010); PHILLIP E. AREEDA ET. AL, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPALS AND THEIR APPLICATION 289 (4TH ED. 2014). ("Presumptively, therefore, [market] shares should be measured by sales . . ."); PAUL W. FARRIS ET. AL, MARKETING METRICS: 50+ METRICS EVERY EXECUTIVE SHOULD MASTER 16 (2006) ("Market share is the percentage of a market (defined in terms of either units or revenue) accounted for by a specific entity."). In this case, there is simply no publically available data regarding the sales of prom and homecoming dresses to calculate Defendants' market share in a relevant market. (Pl.'s Resp. to Defs SOF at ¶159).

### G. MARKET SHARE IS NOT THE ONLY MEANS TO PROVE MARKET POWER.

Defendants' insistence that Plaintiff can only prove Defendants' market power through market share in a properly defined market in order to succeed on its Antitrust Claims is misplaced. This position was also offered by the defendant in *Toys "R" Us*, which was summarily rejected by the Seventh Circuit, which stated as follows:

> TRU seems to think that anticompetitive effects in a market cannot be shown unless the plaintiff, or here the Commission, first proves that it has a large market share. This, however, has things backwards. As we have explained elsewhere, the share a firm has in a properly defined relevant market is only a way of estimating market power, which is the ultimate consideration. *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance,* 784 F.2d 1325, 1336 (7th Cir. 1986).

*Toys "R" Us, Inc.*, 221 F.3d at 937.

34

Market share is only used as an indication of market power in certain, appropriate cases, as the two are not necessarily one in the same. *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1414 (7th Cir. 1989). Market share is not the only indicator of market power, which is the "the power to control prices or exclude competition." *Wagner v. Magellan Health Servs.*, 121 F. Supp. 2d 673, 680 (N.D. Ill. 2000) (citing *United States v. E.I. du Pont de Nemours & Co*., 351 U.S. 377, 391-92 (1956)). At best, market share is only an indicator of market power. *Indiana Grocery, Inc.,* 864 F.2d at 1414. It is not the exclusive approach in assessing the presence *or absence* of monopoly power. *Panhandle E. Pipe Line Co.,* 730 F. Supp. at 904 (emphasis added). As observed by the Seventh Circuit, many cases from have said that "market share is simply an indication of [market] power and possesses no other significance." *Ball Mem. Hosp., Inc. v. Mut. Hosp. Ins., Inc*., 784 F.2d 1325, 1336 (7th Cir. 1986). When there are better ways to estimate market power, the court should use them. *Id*. at 1336.

### 1. Defendants Charged Prices Above the Competitive Level Without Losing Any of Their Business.

Market power is the "power to raise prices significantly above the competitive level without losing all of one's business." *Valley I,* 678 F.2d at 745; see also *Sheridan v. Marathon Petroleum Co.,* 530 F.3d 590, 594 (7th Cir. 2008) (market power is the ability to charge a price persistently above competitive level despite the existence of competitors). It has also been defined as the power to exclude competition or control prices. *Indiana Grocery.,* 864 F.2d at 1414. The U.S. Department of Justice's Horizontal Merger Guidelines set forth the SSNIP test ("small but significant and non-transitory increase in price") to determine the smallest relevant market within which a hypothetical monopolist could impose a profitable significant increase in price without its customers turning away and choosing other goods and services from other suppliers. U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines*, §4.1.1 (August 19, 2010). The SSNIP test uses a hypothetical 5% price increase as the measuring stick. *Id.* at §4.1.2.

35

Here, the evidence shows that Defendants, from at least 2009 through 2012, charged prices 15% higher than anyone else for Designer prom and homecoming dresses sold at its brick-and-mortar boutique.[10] (Pl.'s SOF at ¶¶104, 106, 109-112). Defendants contend that their pricing was not anticompetitive because they have higher costs and provide excellent customer service. (Defendants' Memorandum at Pgs. 33-34). However, that does not determine whether a price is competitive; rather, the focus should be the price that the competition was charging for the same product.

In this case, the evidence establishes that the Designers' used resale price maintenance for their prom and homecoming dresses – commonly referred to as MSRP – and that boutiques in the Chicago Market charged MSRP for the Designers' prom and homecoming dresses. (Def.'s SOF at ¶29; Pl.'s Resp. to Defs.' SOF at ¶29; Pl.'s SOF at ¶¶107, 109-112). There is no evidence in the record that any boutique (or any retailer for that matter) in the Chicago Market besides Defendants was selling the Designers' prom and homecoming dresses at any price higher than MSRP. In fact, the evidence indicates that any boutique attempting to sell below MSRP was quickly thwarted by the Defendants' protests and complaints to the Designers. (Pl.'s SOF at ¶¶40, 112). Further, Defendants charged MSRP for in-season dresses on two (2) of its websites, and on a third website, www.peachesboutique.com, only charged MSRP if they could confirm that the customer's IP address was far enough away from their brick-and-mortar location to protect their higher brick-and-mortar pricing. (Pl.'s SOF at ¶¶133-134).

Finally, Defendants contend that they changed their prices back to MSRP at their brick-and-mortar location in 2013 because that was the price that every other retailer "in the whole industry" was charging. (Defs.' SOF at ¶85; Pl.'s SOF at ¶106). This is sufficient evidence to establish, or at the very least, raises a question of fact, that the competitive pricing level for the Designers' prom and homecoming dresses was MSRP during the relevant time period.

---

[10] Defendants never discount any dresses on the sales floor in their brick-and-mortar, only on their websites. (Defs.' SOF at ¶68; Pl.'s Resp. to Defs. SOF at ¶81). The only exception to this is the an annual sidewalk sales held one (1) weekend every August where Peaches Boutique will sell dresses that more than two (2) years old. (Defs.' SOF at ¶69; Pl.'s Resp. to Defs. SOF at ¶81).

Despite charging prices up to 15% higher than their competition from 2009 through at least 2012, Defendants were not only able to prevent the loss of sales at its brick-and-mortar location, but substantially increased them. (Pl.'s SOF at ¶20). When considering total sales, Defendants' revenue substantially increased each and every year from 2003 through 2012. (Pl.'s SOF at ¶19). For the period of 2011-2012, Defendants' brick-and-mortar sales increased from ▮▮▮▮▮▮▮ in 2011 to ▮▮▮▮▮▮▮ in 2012, an increase of ▮▮▮▮▮▮, or ▮▮▮. (Pl.'s SOF at ¶20). Although Defendants claim that pressure from the internet was the driving force behind their decision to switch to MSRP level pricing at its brick-and-mortar location in 2013, this claim is inconsistent with Defendants' financial records. For the period of 2011-2012, Defendants' total internet sales actually ▮▮▮▮▮▮ from ▮▮▮▮▮▮ in 2011 to ▮▮▮▮▮ in 2012, a ▮▮▮▮▮ of ▮▮▮▮▮, or ▮▮. (Pl.'s SOF at ¶20).

Defendants also argue that their MSRP + 15% pricing policy cannot equal market power because they have priced that way since they opened in 1985. (Defs.' SOF at ¶79). First, they cite no authority for this statement. Second, it ignores the fact that Defendants did not transition into prom and homecoming until the mid-to-late 1990's. (Pl.'s Resp. to Defs.' SOF at ¶79). Further, the offense of monopoly under §2 not only relates to the acquisition of that power, but maintenance of the same. *Weber-Stephen Prods. LLC v. Sears Holding Corp.*, No. 1:13-cv-01686, 2014 WL 656753, *6 (N.D. Ill. Feb. 20, 2014) (monopoly power is the willful acquisition <u>or</u> maintenance of that power).

Defendants then attempt to counter this evidence by arguing that, when there is a differentiated market, the same products may have different prices; thus, there is no anticompetitive pricing level. (Defendants' Memorandum at Pg. 34). Here, Defendants charged significantly higher  prices  for the exact same Designer dresses that the whole industry was selling at MSRP. (Pl.'s SOF at ¶106). Lang testified at his deposition that a store would not be able to charge higher than MSRP for these dresses unless there was little or no competition in the area and that it would be more common in isolated areas such as Montana, were there may only be a single store in town. (Pl.'s SOF at ¶107). Lang stated further that this is not going to happen in a big city because there is too competition. (*Id.*). Here, the

37

evidence supports a finding that Defendants were able to raise the Designers' prom and homecoming dresses at their brick-and-mortar boutique 15% higher than the competitive level in a big city without losing any of their business and, in fact, increased their sales. (Pl.'s SOF at ¶20).

Finally, Defendants argued that they charged more simply because they have higher costs. (Defendants' Memorandum at Pgs. 33-34). However, a defendant seeking to protect itself from added costs or lost profits this is not a legitimate business justification for antitrust purposes. *Panhandle E. Pipe Line Co.,* 730 F. Supp. at 932-33. The Sherman Act requires that the choice between the defendant and its competitor "result from unconstrained competition on the merits." *Fishman v. Wirtz,* 807 F.2d 520, 537.

Further, the evidence indicates that the higher prices charged by Defendants did not cover additional costs, but inflated their profits. Between, 2009 and 2012, when Defendants charged up to MSRP plus 15%, their profits ranged between ▮▮▮ and ▮▮▮▮ of revenue. (Pl.'s SOF at ¶19).[11] Lang testified that it is "very hard for retailers" in the prom and homecoming dress business to make money and the average profit of a retail store is "6, 7 percent." (Pl.'s SOF at ¶18). "Smaller industries which are the backbone of America that do the most GDP averaged last year about 6-and-a-half percent." (*Id.*). If a store was doing a profit of more than 10%, they were doing pretty well and that it "usually will relate to a larger store. Smaller stores generally – the average size of a bridal store in America is about $650,000 …They're struggling with PBT's of 2, 3, 4 percent. You cannot make money." (*Id.*). He further testified that the prom industry is "bleeding to death right now." (*Id.*). Nevertheless, Defendants were pulling in profits consistently in excess of those generally in the economy. (Pl.'s SOF at ¶19). *See Garot Anderson Mktg. v. Blue Cross & Blue Shield United,* 772 F. Supp. 1054, 1059 (N.D.

---

[11] Although Figure 1 of Kneuper's Report purported indicates a decrease in revenue from 2011 and 2012, there revenue actually went up. Defendants' 2012 revenue reports indicate that their actual revenue in 2012 was ▮▮▮▮▮▮▮; ▮▮▮▮▮▮▮▮ more than what was reported on their 2012 Schedule C. (Pl.'s Resp. to Defs.' SOF at ¶52). Roy Surdej admitting to the discrepancy between his 2012 Schedule C and Defendants' 2012 revenue reports. (*Id.*). Taking this into account, a more accurate figure for Defendants' 2012 profits is ▮▮▮▮▮▮, pushing Defendants' 2012 profit percentage to a whopping ▮▮ of gross receipts.

Ill. 1990) (a finding of monopoly power may be based on a showing that Defendants realized profits consistently in excess of those found generally in the economy).

Further, Defendants' defense of higher costs as a justification for higher prices falls flat when you consider that they transitioned back to MSRP pricing sometime in 2013 and still earned a profit of ███, a personal record for Defendants, and more than double the industry average. (Pl.'s SOF at ¶¶18-19). Thus, Defendants were still able to make a hefty profit at MSRP, which already includes a substantial 100% markup. (Defs.' SOF at ¶29).

### 2. Defendants Excluded Competition.

Here, the evidence shows that Defendants not only had the ability to prevent Plaintiff from obtaining the Designers' prom and homecoming dresses, but numerous other boutiques at well. (Pl.'s SOF at ¶¶26-29, 34, 36, 38-39, 43-44, 46, 49-50, 54-57, 59-60, 65, 74-79, 81-86, 90-100; *see also* Pl.'s Resp. to Defs.' SOF at ¶¶58-59, 63, 66, 160, 161). *See L & W Lindco Prods., v. Pure Asphalt Co*., 979 F. Supp. 632, 629 (N.D. Ill. 1997) (an antitrust plaintiff must allege defendant's conduct harmed to more than just its business).

Defendants also precluded new competition from entering the Chicago Market. There is no evidence that any new retailers, other than Plaintiff, have entered the Chicago Market selling the Designers' prom and homecoming dresses in the last five (5) years. The only examples cited in Defendants' Motion were preexisting prom stores that merely opened second locations or reopened after a fire. (Pl.'s Resp. to Defs.' SOF at ¶108). This is yet further evidence to conclude that Defendants' possessed market power and have been successful in preventing new and competing entrants into the Chicago Market.

Defendants argue that, even assuming Plaintiff allegations are true, at best they only harmed a handful of competitors, but not competition in general. (Defendants' Memorandum at Pg. 38). However, as stated above, Defendants actions were not merely aimed at Plaintiff or a "handful" of competitors. *See Sheridan*, 530 F.3d at 594 (the word "monopoly" in the expression "monopoly

power" was never understood literally, to mean a market with only one seller). The purpose and intent of Defendants' conduct was intended to eliminate competition and restrict the output of Designer prom and homecoming dresses in the Chicago Market so they could continue to charge consumers higher prices and protect their profits. This is harm to competition. *See Blackburn v. Sweeney*, 53 F.3d 825, 830 (7th Cir. 1995) (citing *Ball Mem. Hosp.*, 784 F.2d at 1334) (harm to competition includes higher prices and lower output). At the very least, there is a genuine issue of material fact as to whether Defendants' actions harmed competition in the Chicago Market.

## H. EVEN UNDER A RULE OF REASONS ANALYSIS, NO DETAILED OR ELABORATE MARKET ANALYSIS IS NEEDED.

Defendants insist that, even where direct anticompetitive effects are present, Plaintiff must prove market power through an elaborate market analysis establishing that Defendants "command a substantial share of" a precise product and geographic market. (Defendants' Memorandum at Pgs. 30-32).

Plaintiff submits that no such market analysis is necessary to defeat Defendants' Motion, as there is authority from both the United States Supreme Court and Seventh Circuit which establish that proof of actual detrimental effects obviates the need for an elaborate market analysis into market power. *See Indiana Fed'n of Dentists,* 476 U.S. at 460-61 (applying *rule of reason* to find challenged restraint unreasonable under Sherman Act § 1 "even in the absence of elaborate market analysis")(emphasis added). Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, "proof of actual detrimental effects, such as a reduction of output," can obviate the need for an inquiry into market power, which is but a "surrogate for detrimental effects." *Id.* (quoting Phillip Areeda, *Antitrust Law*, ¶ 1511, at 429 (1986)). Instead, the focus is on analyzing the actual market effects of the facts to the extent necessary to determine the nature and extent of any anticompetitive effects flowing from the agreements from which plaintiff complains. *See generally Cal Dental Assn.*, 526 U.S. at 779.

40

In *Indiana Fed'n of Dentists,* the FTC alleged that a restraint among a group of dentists who refused to provide x-rays to insurers to process claims was unlawful under the Sherman Act. 476 U.S. at 451-52. Although the case involved a horizontal agreement among competing dentists, the Supreme Court found that the *rule of reason* standard was applicable, as opposed to the per se standard, as the horizontal agreement did not involve a boycott of suppliers or customers in order to discourage them from doing business with a competitor.[12] *Id.* at 458. In doing so, the Supreme Court noted that no credible argument was advanced for the proposition that making it more costly for insurers and patients to obtain the information needed for evaluating dentists' diagnoses had any procompetitive effects. *Id.* at 459.

Similarly, Defendants offer no credible argument to support the proposition that their naked restraints demanding that Designers boycott Plaintiff, other boutiques, and certain zip codes and area codes have any procompetitive effects.[13] Defendants' use of these naked restraints were clearly intended to eliminate competition for the Designers' prom and homecoming dress and protect Defendants' profits.

In *Indiana Fed'n of Dentists,* Defendants argued that, despite the lack of competitive virtue, the FTC had failed to provide specific evidence of a market in which the defendants unreasonably restrained trade. *Id.* at 460. The Court rejected this argument, noting that it runs counter to the Supreme Court's holding in *Nat'l Collegiate Athletic Assn. v. Board of Regents of Okla.*, *supra*, "that [as] a matter of law, the absence of proof of market power does not justify a naked restriction on price or output." *Id.* To the contrary, when there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement. *Id.*

---

[12] See Section (C)(2) above.

[13] See Section (E) above.

41

Thus, the FTC's failure to engage in a detailed market analysis was not fatal to its finding, even though it conducted a *rule of reason* analysis. *Id.* Instead of calculating a market share in a relevant market, or even defining a geographic market, the FTC merely found that the Federation of Dentists constituted "heavy majorities" of dentists in just two (2) non-contiguous cities in Indiana (Anderson and Lafayette), and as a result of the Federation's efforts, insurers were unable to obtain compliance with their x-ray requests in those areas. *Id.* Since the purpose of market definition is to determine whether an arrangement has the potential for adverse effects on competition, "proof of actual detrimental effects …" can obviate the need for an inquiry into market power. *Id.* at 460-61 (citing 7 P. Areeda, Antitrust Law para. 1511, p. 429 (1986)).

Thus, the Supreme Court concluded that "the finding of actual sustained adverse effects on competition in those areas where Federation dentists predominated, viewed in light of the reality that markets for dental services tends to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of the elaborate market analysis." *Id.* at 461. There was never any finding in *Indiana Fed'n of Dentists* that such analysis was limited to horizontal restraints, or specifically excluded vertical restraints; in fact, the Court determined that the agreement at issue in that case, even though horizontal, was subject to a rule of reason analysis. Thus, if anything, this case supports a finding that no elaborate market analysis is needed in rule of reason cases if there is a finding of actual sustained adverse effects on competition.

The Seventh Circuit addressed *Indiana Fed'n of Dentists* several years later in *Toys "R" Us*, 221 F.3d at 928. That case involved the actions of Toys "R" Us in reaching agreements with various toy manufacturers to not sell the same products they sold to Toys "R" Us to warehouse clubs. *Id.* at 932. This was despite the fact that there was other competition from conventional discounters like Wal-Mart and K-Mart, who did not impose any constraints upon Toys "R" Us' prices because they could not offer anything like the variety of items Toys "R" Us had and whose prices were not too far off Toys "R" Us' mark. *Id.* at 931, 937.

42

While the Seventh Circuit did engage in a discussion as to whether Toys "R" Us' actions constituted vertical or horizontal agreements, it was only in the context of whether the per se rule should apply. *Id.* at 936. As the Court found support for the FTC's finding of a horizontal agreement among the manufacturers, the Court determined that the per se rule applied and, thus, an extensive market analysis unnecessary. *Id.* As stated in Section (D)(2) above, this case similarly has elements of horizontal restraints.

Nevertheless, the Court, in dicta, addressed Toys "R" Us' market power argument, assuming arguendo, that the agreements were instead found to be vertical. Insisting that no horizontal agreement was present, Toys "R" Us argued that anticompetitive effects could not be shown without proof that it had a large market share. *Id.* at 937. This is the exact same argument advanced in the Defendants' Motion. However, the Court found that market share constitutes only one way of proving market power and, citing to *Indiana Fed'n of Dentists,* stated that "the finding of actual, sustained adverse effects on competition in those areas where IFD Dentists predominated, viewed in light of the reality that markets for dental services tend to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis." *Id.* The FTC found that Toys "R" Us was remarkably successful in causing ten major toy manufacturers to reduce the output of toys to the warehouse clubs, and that this protected Toys "R" Us from having to lower its prices to meet the warehouse clubs' pricing levels. *Id.* The Court concluded that, "proof that this is what Toys "R" Us was doing is sufficient proof of actual anticompetitive effects [and] that no more elaborate market analysis was necessary." *Id.* Thus, even if *Toys "R" Us* involved vertical restraints as opposed to horizontal, the Court still held that proof of sustained effects on competition does not require an elaborate market analysis to prove market power.

*Indiana Fed'n of Dentists* and *Toys 'R' Us* were later discussed by the Seventh Circuit in *Republic Tobacco v. N. Atl. Trading Co.*, 381 F.3d 717 (7th Cir. 2004), which Defendants primarily rely upon for their argument that Plaintiff must prove that Defendants "command a substantial share"

of a precisely defined market. In that case, the plaintiff, a manufacturer of rolling papers, contended that a competitor pursued enhanced exclusivity agreements with wholesalers and distributors of rolling papers in the southeastern United States. *Id.* at 722-24.

Defendant moved for summary judgment on the antitrust counts on the basis that plaintiff failed to identify a proper geographic market, which the district court granted. Plaintiff appealed to the Seventh Circuit on the basis that the district court erred in concluding that plaintiff did not establish the existence of a geographic market. *Id*. at 736. Plaintiff argued that, under *Indiana Fed'n of Dentists* and *Toys 'R' Us,* it was not required to prove that defendant had market power in a properly defined product and geographic market. *Id*. The Seventh Court found that plaintiff's reliance upon *Toys 'R' Us* was misplaced, as that case involved horizontal, not vertical, agreements, which are illegal per se. *Id.* As discussed in Section (D)(2) above, this case involves a group boycott with elements of both horizontal and vertical agreements; thus, no market definition is necessary.

The Seventh Circuit also found that the fact that direct evidence of anticompetitive effects has not been used outside the context of horizontal agreement "did not entirely dispose of [plaintiff's] argument." *Id.* at 737. Rather, it held that "it may be that, in a proper case alleging vertical restraints, a direct anti-competitive effects analysis can establish the defendant's market power." *Id.* Nevertheless, the Court found that this was not that case, as neither *Indiana Fed'n of Dentists* nor *Toys 'R' Us* entirely disposed of market definition. *Id.* However, the court did not explain or identify what types of vertical restraints could establish a defendant's market power under a direct anticompetitive effects analysis. Instead, the Seventh Circuit stated that "these cases [*Indiana Fed'n of Dentists* and *Toys 'R' Us*] stand for the proposition that if a plaintiff can show the rough contours of a relevant market, and show that defendant commands a substantial share of the market, then direct evidence of anticompetitive conduct can establish market power – in lieu of the usual showing of a precisely defined relevant market and monopoly market share." *Id*. Thus, while the Court used the term "commands a substantial share of the market," it specifically excluded proof of "monopoly share" in a

44

"precisely defined relevant market." The Court did not define, discuss or elaborate on what "commands a substantial share of the market" means, and no subsequent case has done so. It is important to note that the plaintiff in *Republic Tobacco* offered no direct evidence of the defendant's market power through the ability to control prices or exclude competition and, further, argued it was not required to prove that defendant had market power in a properly defined product and geographic market. *Id.* at 736. Further, *Republic Tobacco* did not reverse the long line of established precedent stating that market power can be proven through the power to control prices and exclude competition. Thus, a fair reading of *Republic Tobacco* only requires a market share analysis where other evidence of market power is not present. Since that evidence is present in this case, no market share or elaborate market analysis showing that Defendants' "command a substantial share" of a precsise market is required.

Defendants' Motion fails to explain what *Republic Tobacco's* use of the phrase "command a substantial share of the market" means; they simply equate it to "market share" using a market analysis. However, it is illogical to conclude that market share is the only way of proving market power (the other being direct anticompetitive effects), yet require proof of market share in a direct anticompetitive effects case. If that was the case, then market share would be the *only* way to establish market power and direct effects would essentially be irrelevant in vertical restraint cases; which would effectively reverse a long line of case law establishing that market share is only one way of proving market power. This is entirely inconsistent with *Indiana Fed'n of Dentists*, where there was no market share discussion whatsoever even through its was analyzed under the rule of reason, and *Toys 'R' Us*, which only discussed market share in the alternative to actual, sustained anticompetitive effects, rather than as a requirement of market power. 221 F.3d at 936-37.

It is also important to note that, in this case, the information that is typically used to calculate market share is not present. (Pl.'s Resp. to Defs.' SOF at ¶159). There is no publically available information regarding the sales of prom and homecoming dresses, either by revenue or sales, in any

45

market, much less the Chicago Market. (*Id.*). However, there is evidence that Defendants carry the largest stock of prom dresses in the United States (Pl.'s SOF at ¶1). Also, Defendants claim to operate the "largest Prom, Pageant and Formal wear store in the U.S."  (Pl.'s SOF at ¶3).  No one has identified a larger store, in terms of inventory, size or revenue, in the Chicago Market. (Pl.'s SOF at ¶¶7, 9, 16-17; *see also* Pl.'s Resp. to Defs.' SOF at ¶¶23-25). Representatives and/or owners of MacDuggal, Jovani and Mon Cheri, who were the only depositions that Plaintiff was permitted to take of the Designers before the close of market power discovery, all testified that Peaches Boutique was their biggest account in the Chicago area. (Pl.'s SOF at ¶¶ 7, 9, 13, 14; *see also* Pl.'s Resp. to Defs.' SOF at ¶¶23-25). Simon stated that she considered $25,000 to be a significant account, while Defendants purchased at least ▮▮▮▮▮ worth of dresses from Jovani from January 1 through November 13, 2013 alone. (Pl.'s SOF at ¶¶11-12).

Moreover, Defendants' brick-and-mortar store is 25,000 square foot, carries 20,000 dresses in inventory, and in 2013 had in-store revenues of nearly ▮▮▮▮▮ and total revenues of nearly ▮▮▮▮▮. (Defs.' SOF at ¶53; Pl.'s SOF at ¶¶1, 19-20). By comparison, Hannah's Boutique is 2,600 square feet, carries far less inventory, and its 2013 revenue was less than ▮▮▮▮▮ (Defs.' SOF at ¶¶103, 106). Most boutiques have only 800 square feet and have revenues of approximately ▮▮▮▮▮ (Pl.'s SOF at ¶¶18, 83).

Thus, Defendants are approximately 1000% bigger than Plaintiff in terms of square footage, and at least ▮▮▮▮▮ bigger in terms of revenue. Compared to the average boutique, they are at least ▮▮▮▮▮ bigger in terms of revenue, and at least 3125% bigger in terms of square footage. There is no dispute that Defendants control the largest and most substantial share of the Chicago Market for the Designers' prom and homecoming dresses. However, due to the privately held nature of the information, it is impossible to determine their exact share of revenue or units sold within the market. Plaintiff's Antitrust Claims should not be disposed of on summary judgment simply because there is no publicly available or reliable evidence to prove Defendants' exact share of revenue or units sold of

the Designers' prom and homecoming dresses in the Chicago Market under an elaborate market analysis.

Finally, *Republic Tobacco* determined that there was no evidence for plaintiff's allegation of a "Southeast" geographic market because the district court concluded that the only wholesale market for rolling papers was national. *Id.* at 738. Thus, only because plaintiff alleged a regional market, instead of a national one, the Seventh Circuit found that plaintiff did not pass the "rough contours" test. *Id.* It did not, as Defendants suggest, wholly reject the use of this standard in all vertical restraint cases. Therefore, *Republic Tobacco* merely holds that, in vertical restraint cases, a plaintiff must still show the "rough contours" of a market, without explaining exactly what that phrase actually means or is required by a plaintiff. *Id.* No subsequent case has determined what is sufficient to meet this "rough contours" standard.

## I. PLAINTIFF HAS PROVIDED SUFFICIENT EVIDENCE OF THE "ROUGH CONTOURS" OF A RELEVANT PRODUCT AND GEOGRAPHIC MARKET TO DEFEAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

Congress prescribed a pragmatic, factual approach to the definition of the relevant market and "not a formal, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). The "market," as most concepts in law or economics, cannot be measured by metes and bounds. *Times-Picayune Pub. Co. v. United States,* 345 U.S. 594, 611 (1953); *see also United States v. Pabst Brewing Co.*, 384 U.S. 546 (U.S. 1966) (this phrase does not require delineation by metes and bounds). In *United States v. Connecticut Nat'l Bank*, the government alleged a geographic market of the State of Connecticut regarding the merger of two (2) local banks. 418 U.S. 656, 670 (1974). The Supreme Court disagreed, stating that the entire State of Connecticut could not be the relevant market because the banks do not operate statewide, nor do their customers use banks on that basis. *Id.* at 667. Instead, the Court found that the relevant geographic market was the localized area in which the acquired bank was in significant, direct competition with other banks. *Id.*

47

In *Avnet, Inc. v. FTC*, the Seventh Circuit stated that a "rough approximation" may be sufficient to make out a prima facie case of the relevant product market. 511 F.2d 70, 77, n. 19 (7th Cir. 1975). This means that markets need not - indeed cannot - be defined with scientific precision. *Connecticut Nat'l Bank*, 418 U.S. at 669. Thus, the law is clear that Plaintiff need not provide a "precise" product or geographic market and that a "rough" approximation is sufficient.

Further, market definition involves a deeply fact-intensive inquiry. *Jamsports and Entertainment, LLC v. Paradema Productions, Inc.,* No. 02 C 2298, 2003 WL 1873563 (N.D. Ill. April 15, 2003). That is, although a plaintiff must eventually convince a trier of fact that a relevant market exists, a court need only find that a plaintiff could prove a set of facts supporting the relevant market definitions it has alleged. *Id.* at *18. As such, market definitions are questions of fact ordinarily determined at trial. *L&W/Lindco Prods.,* 979 F. Supp. at 638.

*Audio Car Stereo, Inc. v. The Little Guys, Inc*., 2004 No. 04 C 3562, 2004 WL 3019298 (N.D. Ill. Dec. 28, 2004) (St. Eve, J.), which was decided by this Court just months after the Seventh Circuit's *Republic Tobacco* opinion, was the first case to address the "rough contours" standard in an alleged direct anti-competitive effects case. In that case, the plaintiff, a local stereo store, alleged that defendant, another local stereo store, caused a single stereo manufacturer to terminate its distributor agreement with plaintiff and give it to defendant. *Id.* at *1-4. Defendant moved to dismiss on the basis that plaintiff did not allege any actual anti-competitive effects in a relevant market. *Id*. at *1.

Plaintiff argued that it did not need to allege a relevant market as long as it alleged direct anti-competitive effects and cited to *Indiana Fed'n of Dentists and Toys 'R' Us*.[14] *Id.* at *5. Defendant argued that plaintiff failed to allege even the "rough contours of a market" as set forth in *Republic Tobacco*, and thus, the anti-competitive effect analysis provided in *Indiana Fed'n of Dentists* and *Toys 'R' Us* did not apply. *Id.* at *5-6. The Court agreed, finding that plaintiff did not even argue that it

---

[14] Despite Defendants' insistence in their Motion and accompanying Memorandum of Law, Plaintiff does not contend, if the court finds that the rule of reason is the only applicable standard, that absolutely no market definition is necessary. However, that market definition need only satisfy the "rough contours" standard set forth in *Republic Tobacco*.

sufficiently alleged a relevant geographic market and even conceded that the "Chicagoland area" was not a legally cognizable market. *Id.* at *6-7. Thus, the Court granted defendant's motion to dismiss, but granted plaintiff leave to file an amended complaint. *Id.* at *7. No subsequent Northern District of Illinois or Seventh Circuit case has elaborated on the "rough contours" standard or what it requires.

The *42nd Parallel* case cited by Defendants is also factually distinguishable from this case. In that case, which was decided after *Indiana Fed'n of Dentists* and *Toys 'R' Us,* but before *Republic Tobacco*, the district court found that plaintiff properly alleged a geographic market for purposes of a motion to dismiss (retail clothing in the central business district of Highland Park), but failed to allege anti-competitive effects on the market, as plaintiff only alleged harm to itself. *42nd Parallel N. v. E. St. Denim Co.,* 286 F.3d 401 (7th Cir. 2002). On appeal, the Seventh Circuit affirmed the district court, finding that plaintiff failed to allege that manufacturer-defendants had market power in the alleged geographic market and/or that the retailer defendant had market power. *Id.* The Seventh Circuit's opinion focused on the Sherman Act's purpose to protect competition, not competitors, as plaintiff failed to allege that any other competitors were harmed. The Court also criticized the geographic market of the central business district of Highland Park as too small. *Id.* at 406. However, nowhere did the Court find that an elaborate market analysis was required to prove market power in vertical restraint cases. It merely stated that a plaintiff must allege market power through harm to competition, not just competitors. *Id.* at 405. In this case, Plaintiff has both alleged and provided evidence of harm to competition, as Defendants were able to charge consumers 15% more than anyone else for the Designers' prom and homecoming dresses because of their ability to their prevent competition from carrying those dresses.

Other courts have gone a step further than *Republic Tobacco* and eliminated the market power requirement where actual adverse effect on competition is shown. For example, the Second Circuit has consistently held that market power is not a requirement under the rule of reason if a plaintiff can prove actual adverse effect on competition. *See Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,* 386

F.3d 485, 509 (2nd Cir. 2004) (citing *Ind. Fed'n of Dentists*, 476 U.S. at 460-61); *K.M.B. Warehouse Distribs*., 61 F.3d 123, 128-29 (2nd Cir. 1995); *see also Todd*, 275 F.3d at 206 ("a threshold showing of market share is not a prerequisite for bringing a Section 1 claim."); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2nd Cir. 2001). Instead, the Second Circuit has suggested that actual adverse effect on competition may in some instances demonstrate market power. *Todd,* 275 F.3d at 206 (stating that actual adverse effect "arguably is more direct evidence of market power than calculations of elusive market share figures."). The Second Circuit is not alone in adhering to *Indiana Fed'n of Dentists*. *See Jacobs v. Tempur-Pedic Int'l, Inc.,* 626 F.3d 1327, 1336 (11th Cir. 2010) (Under rule of reason analysis, a plaintiff may show either actual or potential harm to competition) (citing *Levine v. Cent. Fla. Med. Affiliates, Inc.,* 72 F.3d 1538, 1551 (11th Cir. 1996)).

One of the more recent cases to address this issue is *U.S.A. v. Am. Express, Co.,* 21 F. Supp. 3d 187 (E.D.N.Y. 2014). In that case, American Express was accused of anticompetitive behavior under §1 of the Sherman Act by prohibiting retailers who accept American Express cards from steering customers to Visa, MasterCard, and Discover, which allowed American Express to charge retailers higher prices for their services. *Id.* at 190. The threshold question in that case was whether American Express had market power in the relevant market despite its low market share. *Id.* at 194-95. The Court found that "[m]arket power is an alternative method by which a plaintiff can establish a Section 1 violation if unable to prove that the challenged conduct has an actual adverse effect on competition" and that "[s]hould plaintiff attempt to prove their case by showing market power, they also have more modes of proof available to them than simply relying upon market share as a determinant." *Id.* at 195.

Plaintiff recognizes these cases are persuasive at most, but they nevertheless show a shift from requiring market definition when actual, direct anticompetitive effects are shown. Although the Seventh Circuit has not yet explicitly followed these circuits in eliminating the need for any market definition, the Seventh Circuit *has*, since the Supreme Court's 1986 holding *Indiana Fed'n of Dentists,* eliminated the need for an elaborate market analysis (even where the rule of reason applies) where

actual adverse effects are present and where there are at least evidence of the rough contours of a relevant market.

The facts of this case are the precisely the reason why such an elaborate market analysis is unnecessary. Rarely do antitrust cases have such substantial and direct evidence of actual, sustained anticompetitive effects through Defendants' ability to exclude competition and charge supracompetitive prices, while at the same time substantially increasing its revenue.

### 1. Plaintiff has provided evidence of the "rough contours" of a relevant geographic market.

A geographic market is the area in which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition. *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1076 (N.D. Ill. 2012). Where a competitor seeks access to a particular market in which the defendant competes, the focus on the relevant geographic inquiry is the market to which access is sought, *even though other markets may exist*. *Fishman v. Wirtz*, 807 F.2d at 531-32 (emphasis added). The scope of the relevant geographic market includes the area in which sellers of the relevant product can increase price or cut output without triggering a flow of supply into the area from outside it. *FTC v. Illinois Cereal Mills, Inc.*, 691 F. Supp. 1131, 1142 (N.D. Ill. 1988) (citing *RSR Corp. v. FTC*, 602 F.2d 1317, 1323 (9th Cir. 1979)).

Here, Plaintiff has alleged the rough contours of a geographic market, which consists of the following area codes: 312, 773, 847/224, and 630/331 ("Chicago Market"), which generally include the City of Chicago, suburban Cook County, DuPage County, Lake County, Kane County, and portions of Kendall County and Will County. These area codes are all common to those identified by Defendants in their anticompetitive emails to the Designers. (Pl.'s SOF at ¶¶29, 43, 45, 90).

In addition, all the boutiques that Defendants targeted in their anticompetitive emails as its "direct competition," or being "too close," or within their "sales territory," are located within these area codes. (Pl.'s SOF at ¶¶26-29, 34, 36, 38-39, 43-44, 46, 49-50, 54-57, 59-60, 65, 74-79, 81-86, 90-100). Defendants did not specifically request that any Designer not sell their dresses to any

51

boutique located outside of the Chicago Market. (*Id.*). Moreover, these area codes are generally consistent with a list of 331 zip codes that Defendants have identified within a thirty (30) miles radius of their brick-and-mortar store in one (1) of their anticompetitive emails. (Pl.'s SOF at ¶44).



" (Pl.'s Resp. to Defs.' SOF at ¶¶36, 89

. (*See generally* Pl.'s SOF at ¶¶35, 37 (

).

Finally, these area codes are generally consistent with the testimony in this case that most customers come from 20 to 30 minutes away but may travel up to 45 minutes to an hour to buy a prom or homecoming dress. (*See* Pl.'s Resp. to Defs.' SOF at ¶¶22, 128). At a minimum, this evidence is certainly sufficient to raise a question of fact in support of the rough contours of the alleged Chicago Market.

Like the dental services at issue in *Indiana Fed'n of Dentists*, the retail market for prom and homecoming dresses is primarily localized, as there is no evidence that a reasonable consumer will travel hours, across several states or nationally, to purchase a prom or homecoming dress (just as they would not do so for dental services). As result, this case is plainly distinguishable from *Republic Tobacco*, where the plaintiff attempted to allege a regional southeast U.S. market when common sense indicated that wholesale markets were national; the instant matter involves a retail market, not a wholesale market. It is also distinguishable from *42nd Parallel*, where the plaintiff attempted to allege a geographic market of t-shirts and blue jeans as the "Central Business District of Highland Park," and the Court stated that common sense dictates that consumers' choices for blue jeans are not limited to such a small geographic area. 286 F.3d at 401. Finally, this case is clearly distinguishable

from *Little Guys*, where the plaintiff only alleged the geographic market as the "Chicagoland area," but in its response to defendants' motion to dismiss, admitted that this was not a legally cognizable market. 2004 No. 04 C 3562, 2004 WL 3019298.

Here, conversely, there is no evidence that the geographic market for prom and homecoming dresses is limited to the City of Chicago, or even Defendants' zip code (60638) or even area code (773), which would be too small, or is statewide (Illinois), regional (Midwest) or national (United States), which would be too large.[15]

Defendants' argument that Plaintiff "gerrymandered" their alleged geographic market to purposefully exclude area codes 219 and 815 is unfounded. (Defendants' Memorandum at Pg. 23). To support their position, Defendants use their in-store sales data to show what percent of their sales come from area codes 219 and 815 in 2013, but when Plaintiff requested the data in discovery, Defendants objected on the basis that it was irrelevant to any issue in the case, including market power.[16] Then, when the Court ordered Defendants to produce it (Dckt. No. 221), they refused.[17] Defendants should not be able to rely on this very information to try and support their contention that they have no market power in the Chicago Market. The simple fact is, a large majority of both the 219 and 815 area codes lie well outside the distances that a reasonable consumer is willing to travel to purchase a prom and homecoming dress. (*See* Pl.'s Resp. to Defs.' SOF at ¶¶22, 128, 131). Thus, there was both a logical and factual justification and basis for their exclusion. Notwithstanding, any relevant portions of 219 and 815 would be so insignificant that they would not defeat the "rough contours" standard set forth in *Republic Tobacco*.

Here, the geographic market identified in the Amended Complaint as the "Chicago Market" is supported by emails of Defendants targeting specific boutiques, area codes and zip codes, ██

---

[15] Plaintiff addresses Defendants' argument regarding the existence of a national market in Section (J) below.

[16] This is subject to Rule 37 Motion filed by Plaintiff on March 19, 2015. (Dckt. No. 240).

[17] This is subject to Rule 37 Motion filed by Plaintiff on March 19, 2015. (Dckt. No. 240).

███████████████████████████████████████████████, and the

evidence on the record as to how far a customer is willing to travel to purchase such a dress. (Pl.'s

SOF at ¶163). Thus, relevant geographic market is approximated by area codes 630/331, 847/224,

708, 312/872 and 773. (Pl.'s SOF at ¶163). While this market may not be "scientific" "precise" or

"exact," it is neither "gerrymandered" nor "indefensible." While Defendants may not agree with the

boundaries of the alleged geographic market, it is more than sufficient to raise a question of fact under

the "rough contours" standard set forth in *Republic Tobacco* and, regardless, as discussed *supra,* is a

factually intensive inquiry that should be instead resolved by the trier of fact.

### 2. Plaintiff has provided evidence of the "rough contours" of a relevant product market.

Plaintiff has also provided evidence of the rough contours of relevant product market of prom

and homecoming dresses. In its August 28, 2013 Order denying Defendants' Motion to Dismiss the

Antitrust claims, this Court stated "that homecoming and prom dresses and related apparel are

sufficiently unique, and not interchangeable with other types of dresses or apparel." *Hannah's

Boutique, Inc. v. Surdej et al.,* No. 13 C 2564, 2013 WL 4553313 (N.D. Ill August 28, 2013). This

Court further stated: "Indeed, the relevant market here is also particularly narrow – lacking

interchangeability – because it relates to dresses obtained from particular designers." *Id.*

A product submarket may determined by the reasonable interchangeability of use or the cross-

elasticity of demand between the product itself and substitutes for it. *Brown Shoe*, 370 U.S. at 325.

The cross-elasticity of demand between products is measured by the responsiveness of the sales of one

(1) product to price changes of the other. *Science Prods. Co. v. Chevron Chem. Co*., 384 F. Supp. 793,

795 (N.D. Ill. 1974); *see also Fishman*, 807 F.2d at 541 n. 18 (finding adequate proof of monopoly

power over a market consisting of a single stadium where the evidence demonstrated that the

defendant could raise its rent to team sports events far above those being charged by adjacent stadiums

without causing those events to switch arenas).

The boundaries of a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. *Brown Shoe*, 370 U.S. at 325. If buyers of one (1) product would not switch to another product in numbers sufficient to defeat the profitability of a small but significant, non-transitory price increase, then those functionally similar products are not in the same market. *United States v. UPM-Kymmene Oyj*, 2003 WL 21781902, at *8 (N.D. Ill. July 25, 2003) (citing *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988)). In *UPM-Kymmene Oyj*, although defendants had shown that customers could and might use products that were functionally similar to paper labels, there had not been a showing that this would occur enough to defeat the profitability of a small, but significant, non-transitory price increase. *Id*. at 21-22. The overriding principle is to identify meaningful competition where it actually exists. *United States v. Cont'l Can Co*., 378 U.S. 441, 449 (1964).

Here, Plaintiff's Amended Complaint alleges a product market of sixteen (16) Designers' prom and homecoming dresses from whom Defendants were able to charge consumers higher prices higher than anyone else. (Pl.'s SOF at ¶¶19, 20, 106). This is expressly and highly distinguishable from the single-brand cases cited by the Defendants, which are routinely rejected by Court as a distinct market. (Defendants' Memorandum at Pgs. 16-17).

The evidence also shows that these Designers comprise approximately ███ of Defendants' prom and homecoming dress sales over the relevant time period. (Pl.'s SOF at ¶6). These are the Designers to whom Defendants directed their anticompetitive conduct to prevent the sale of their prom and homecoming dresses to Defendants' competition in the Chicago Market under the fallacy of ████████████████████████████. (Pl.'s SOF ¶¶137, 138).

The product market of the Designers' prom and homecoming dresses is also supported by the fact that Defendants were able to charge up to 15% over the competitive price level for the Designers'

prom and homecoming during the relevant time period and not only maintain its sales, but grow them at a substantial rate. (*See* Section (F)(1) above). This alone shows that consumers were not sensitive to Defendants' higher prices for the Designers' prom and homecoming dresses and did not turn to other designers or substitute dresses despite the higher prices charged by Defendants. As stated in *Brown Shoe*, sensitivity to price changes are evidence of a distinct product market. 370 U.S. at 325.

 Even Defendants themselves admit that they carry the "most prominent dress designers," which they deem to be "extremely important in the prom industry." (Pl.'s SOF at ¶5). Lang testified that the prom and homecoming dress business is "like any business, you can buy from budget to couture" and that Mon Cheri is the highest value in terms of quality. (Pl.'s SOF at ¶149). Of the top five (5) prom and homecoming dresses designers listed by Lang, all are within Plaintiff's defined product market (Mon Cheri, La Femme, Terani, Sherri Hill, and Jovani). (Pl.'s SOF at ¶150). Moreover, two (2) former boutique owners in the Chicago Market and (2) former sales representatives with substantial experience in the prom and homecoming industry in the Chicago Market, have stated that the Designers' dresses are those demanded by customers and critical to a Chicago Market's boutique's survival. (Pl.'s SOF at ¶151). When asked who she considered to be a competitor of Defendants, Barb Surdej, testified: "if they don't sell the same dresses we sell, if they sell dresses but they're not the same as what we are, we're not in competition with them" you don't sell what we sell you are not a competitor" and if a store is "carrying a dress for two hundred or a line that I don't carry, we wouldn't be competing..." (Pl.'s SOF at ¶136). Here, the Designers' dresses represent the higher end of the prom and homecoming market and are the dresses that customers ask for by name. (Pl.'s SOF at ¶153). As stated in *Brown Shoe*, industry recognition may be evidence of a distinct product market. 370 U.S. at 325.

 Further, the median sales price of a Designers' dresses at Defendants' brick-and mortar location was significantly higher than the average sale price of other designers' dresses, with the "average (median) retail price for Designer dresses sold by Peaches in its store in 2012 of ▮▮▮

56

████ and average (median) retail price for non-Designer dresses sold by Peaches in 2012 of

████.” (Pl.'s SOF at ¶¶152). As stated in *Brown Shoe*, distinct prices may be evidence of a

separate product market. 370 U.S. at 325.

Moreover, in *Toys "R" Us* case, the Seventh Circuit stated:

The toys customers seek in all these stores are highly differentiated products. The little
girl who wants Malibu Barbie is not likely to be satisfied with My First Barbie, and she
certainly does not want Ken or Skipper. The boy who has his heart set on a figure of
Anakin Skywalker will be disappointed if he receives Jar-Jar Binks, or a truck, or a
baseball bat instead. Toy retailers naturally want to have available for their customers
the season's hottest items, because toys are also a very faddish product, as those old
enough to recall the mania over Cabbage Patch kids or Tickle Me Elmo dolls will
attest.

221 F.3d at 931.

This is also the case in the prom and homecoming dress industry. Even though a named

Designers' prom and homecoming dress may sell side-by-side to a non-named designers' prom and

homecoming dress, just like the Malibu Barbie and My First Barbie at Toys "R" Us, it does not mean

they are part of the same product market. Here, high school aged girls wanted the Designers' dresses

and were willing to, and in fact did, pay higher prices for those dresses compared to non-named

designer dresses. They are not satisfied with a substitute dress. If they want a Designers' dress, they

will be disappointed with something else. Due to the trendiness and seasonality of prom and

homecoming dresses, boutiques want the hottest styles from the best designers, and during the

relevant time period, that was the Designers' prom and homecoming dresses. Even though

Defendants may not agree with the scientific precision of the alleged product market (Pl.'s SOF at

¶164), and argue that Plaintiff provided no elaborate economic analysis of the product market (which

Plaintiff contends is not necessary in a direct anticompetitive effects case even when vertical

restraints are present (See Section (H) above)), the facts and evidence certainly raise a question of fact

as to whether the alleged product market satisfies the "rough contours" tests set forth in *Republic

Tobacco*.

57

### J.     THE INTERNET IS A SEPARATE MARKET

Defendants suggest that Plaintiff's alleged "Chicago Market" is indefensible because the market for the Designers' prom and homecoming dresses is national due to the availability of these dresses on the internet. (Defendants' Memorandum at 21, 29). However, Defendants fail to consider the possibility of two (2) separate and distinct markets for the Designers' prom and homecoming dresses in the Chicago area, an in-store "Chicago Market," and the internet market. (*See* Pl.'s SOF at ¶¶68-69; Pl.'s Resp. to Defs.' SOF at ¶¶40-46). The primary reason for these distinct markets is the price discrimination that Defendants employed based on customers' geographic location during the same relevant time period. (Pl.'s SOF at ¶¶160-161).

For their brick-and-mortar sales, Defendants utilized a pricing policy which resulted in all dresses priced 15% above MSRP through 2011, and then an ████████████████ in 2012. (Defs.' SOF at ¶¶81, 83). In conjunction with their brick-and-mortar store, Defendants also operated three (3) websites from which they sold the Designers' prom and homecoming dresses: (1) peachesboutique.com; (2) promdressshop.com; and (3) dress4prom.com. (Pl.'s SOF at ¶¶73-75). Promdressshop.com and dress4prom.com charged MSRP for the Designers' in-season dresses, and then sale prices for out-of-season dresses. (Defs.' SOF at ¶77; Pl.'s Resp. to Defs.' SOF at ¶77). At the same time, Defendants undertook careful effort to prevent consumers from determining that promdressshop.com and dress4prom.com were affiliated with Defendants – even though they sold dresses that came from Defendants' brick-and-mortar inventory and shipped them from Defendants' brick-and-mortar store – by requesting that the Designers use a fake address for each website. (Pl.'s SOF at ¶¶114-121; *see also* Pl.'s Resp. to Defs.' SOF at ¶78). The address that Defendants asked the Designers to advertise on their respective websites was in Wilmington, Illinois. (Pl.'s SOF at ¶116). Defendants recognized the importance of keeping these websites' affiliation with Peaches Boutique

hidden from consumers as independent competitors, as Defendants priced their dresses at MSRP plus 15%, and "if customers knew this, they could lose their entire brick-and-mortar." (Pl.'s SOF at ¶121). This shows that Defendants recognized these websites were <u>*not*</u> in the same market with their brick-and-mortar store, as they charged vastly different prices. (Pl.'s SOF at ¶¶160-161). Further, the concern here was not for internet versus brick-and-mortar, but whether these websites were viewed as <u>*the same store*</u> in light of the variant pricing. (Pl.'s SOF at ¶121; *see also* Pl.'s Resp. to Defs.' SOF at ¶78).

For its branded website, peachesboutique.com, Defendants charged consumers the same MSRP + 15% prices they charge at its brick-and-mortar store through 2009. (Defs.' SOF at ¶78). In 2009, Defendants starting charging customers different prices for the Designers' prom and homecoming dresses based upon the user's internet protocol address ("IP Address") to determine whether that person was a potential customer of their brick-and-mortar store (i.e. close enough to Defendants' brick-and-mortar store). (Pl.'s SOF ¶¶ at 160-161; Defs.' SOF at ¶78; *see also* Pl.'s Resp. to Defs.' SOF at ¶78). That is, if it could be determined that the customer's IP address was within a certain range of Defendants' brick-and-mortar store, peachesboutique.com would show the MSRP + 15% pricing so that consumers would see the same price as the brick-and-mortar store. (*Id.*). If the customer's IP address was determined to be far enough away from the brick-and-mortar store that Defendants did not believe the consumer would likely visit their brick-and-mortar location, it would show MSRP pricing similar to promdressshop.com and dress4prom.com. (Pl.'s SOF ¶¶ at 160-161; Defs.' SOF at ¶78; *see also* Pl.'s Resp. to Defs.' SOF at ¶78). Thus, Defendants tried to charge the same MSRP + 15% prices for those consumers at peachesboutique.com that may potentially shop at its brick-and-mortar location, but straight MSRP prices for those who were, based on their IP address, unlikely to be customers of the brick-and-mortar location.[18] (Pl.'s SOF at ¶121; *see also* Pl.'s Resp. to Defs.' SOF at ¶78). This is evidence that a separate market existed for internet sales and in-

---

[18] This is a violation of the Section 2(a) of the Clayton Act, which prohibits price discrimination for the same commodity.

store sales in the Chicago Market. (Pl.'s SOF ¶¶ at 160-161). As discussed above, the concern here was not for internet versus brick-and-mortar, but whether these web sites were *the same store* due to the variant pricing. (Pl.'s SOF at ¶121; *see also* Pl.'s Resp. to Defs.' SOF at ¶78). If these markets were one (1) and the same, Defendants would not be able to charge such distinct prices between the different outlets for the exact same product. As stated in *Brown Shoe*, a group of customers who pay a distinct price may constitute a separate market. *Brown Shoe*, 370 U.S. at 325.

Further, there is evidence that consumers of prom and homecoming dresses prom and homecoming dress consumers who shop over the internet have "different preferences" that are distinct from those who prefer the experience of purchasing the dress at the brick-and-mortar store. (Pl.'s SOF at ¶¶68-69; Pl.'s Resp. to Defs.' SOF at ¶¶40-46). They "would rather go to a store to go and buy a prom dress. They want to "try it on, feel it, see it, see how it fits on them…look at the dress, look at the color." (Pl.'s SOF at ¶68). Most girls "want to try their dress on and be able to take it home the same day to show off to family and friends."  (Pl.'s Resp. to Defs.' SOF at ¶¶40-44). "No one wants to take a chance of ordering a dress and waiting 10 weeks to receive it!" (Pl.'s Resp. to Defs.' SOF at ¶¶40-44). Shopping for a prom and homecoming dresses is an important social experience as customers want their friends, mothers and other family members to see them try on the dress, give feedback and support them and make them feel comfortable in making a decision on a $500-800 dress purchase. (Pl.'s SOF at ¶69). Certain consumers may be turned away from the internet because of the possible of purchasing a counterfeit dress, which does not exist in brick-and-mortar stores. (Pl.'s Resp. to Defs.' SOF at ¶¶15, 40-44, 122). Other consumers are simply not trusting of internet. (Pl.'s Resp. to Defs.' SOF at ¶¶40-44, 122).

Further, if, as Kneuper suggests, the internet was such a competitive force during the relevant time period, and a cheaper avenue for purchasing the Designers' prom and homecoming dresses because of the purported sales tax discount and free shipping, he fails to explain how Defendants brick-and-mortar location charged MSRP + 15% and substantially increased their in-store sales at a

higher rate than their internet sales. (Pl.'s SOF at ¶20). This is further evidence that Defendants' brick-and-mortar customers did not view the internet as an alternative supplier of Designers' prom and homecoming dresses in the Chicago Market. This is akin to *Toys "R" Us*, where the FTC found that discount stores such as Wal-Mart and K-Mart, even though in competition with Toys "R" Us, did not constrain Toy "R" Us' prices and, thus, were *not* in the same market. 221 F.2d at 931-937. Kneuper's analysis confirms this, as only a fraction of Defendants' internet sales came from customers within 50 miles of Defendants' brick-and-mortar store.[19]

Finally, by arguing that the market for the Designers' prom and homecoming dresses is national instead of local due to the availability of these dresses on the internet, logic would dictate that you would also have to conclude that every boutique in the entire United States who carries the same dresses are in the same market and compete with Defendants for the exact same customers. There is simply no legal or factual basis for that assertion and it lacks common sense. In fact, when Defendants reported a boutique in Peabody, Massachusetts to a designer for offering a coupon and selling below MSRP, that designer responded: "This store is in Massachusetts, and should have no effect on what you are doing in your store in Chicago." (Pl.'s SOF at ¶113). Clearly, Defendants' brick-and-mortar store did not, and does not, compete against boutiques in Arizona, Florida, Oregon, Maine, or Massachusetts for the same customers seeking the Designers' prom and homecoming dresses and these boutiques did not constrain Defendants' pricing. Thus, there is not a national market for the Designers' prom and homecoming dresses.

### K.     DEPARTMENT STORES ARE A SEPARATE MARKET.

Defendants also suggest that Plaintiff's Amended Complaint improperly excludes department stores from the relevant product market. (Defendants' Memorandum at 20). However, the evidence indicates that many of the Designers *do not* sell to department stores in the Chicago Market, including Mori Lee, House of Wu, Jasz Couture, Allure, Party Time Formals, and Terani. (Pl.'s SOF at ¶¶154-

---

[19] On March 19, 2015, Plaintiff moved to strike this opinion under Rule 37 as it relies upon previously requested but undisclosed evidence. (Dckt. No 240).

158; Pl.'s Resp. to Defs.' SOF at ¶¶21, 23-25, 90, 116-117, 119). Moreover, MacDuggal sales representative Michael Levin testified that, while MacDuggal sells to department stores, he didn't know whether this included their prom and homecoming lines that he was "almost 100% sure" they don't sell to department stores in the Chicago area, but stated that in other areas of country he was "sure that's probably the case." (Pl.'s SOF at ¶155).

For Jovani and Mon Cheri, two (2) Designers who submitted Declarations in support of Defendants' Motion for Summary Judgment, and whom both stated they sell to department stores, testified at their respective depositions that they have no control over the allocation of their prom and homecoming dresses once sold to department stores, and have no knowledge of their distribution or sale in the Chicago Market. (Pl.'s SOF at ¶157). Further, Simon's Declaration states that Jovani sells to Dillards, but there is no Dillards located in or near the Chicago Market. (Pl.'s SOF at ¶158). Defendants have offered no evidence that the Designers' prom and homecoming dresses were actually sold on the sales floor of department stores in the Chicago Market during the relevant time period.

Finally, while Kneuper contends that department stores had the ability to expand their sales area of prom and homecoming dresses in response to any anti-competitive pricing, he did not identify any facts or evidence that any department store in the Chicago Market *actually* expanded its square footage, floor space or inventory in response to Defendants' supracompetitive pricing during the relevant time period. (Pl.'s Resp. to Defs. SOF at ¶156). This is, again, similar to *Toy "R" Us*, where the Court found that Wal-Mart and K-Mart did not constrain Toy "R" Us' prices and thus were not in the same market (221 F.2d at 931-937); thus, it must follow that department stores did not constrain Defendants' pricing and are not in the same market. (Pl.'s SOF at ¶160).

**L.  DEFENDANTS HAVE CREATED BARRIERS TO ENTRY IN THE CHICAGO MARKET.**

Defendants argue that barriers to entry are low at both the designer and retailer level. (Defendants' Memorandum at Pgs. 25-26). However, this case does not involve entry at the designer

62

level; rather, it involves access to the retail level. Thus, this argument is irrelevant. In regard to barriers to entry at the retail level, Defendants argue that the opening of a boutique requires minimal experience and investment. However, this analysis wholly ignores the most critical aspect of opening a boutique, the ability to inventory. Defendants wholly ignore this because of their creation of barriers to obtain the Designers' prom and homecoming dresses in the Chicago Market. (*See* Pl.'s Resp. to Defs.' SOF at ¶¶58-59, 63, 66, 160, 161). Rather, they try and focus on the new stores that have opened in the last few years, including Eva's Bridal, Wolsfelt's Prom, and Gipper's Prom and Pageant. (Defendants' Memorandum at Pg. 26). However, as acknowledged by Kneuper, Wolsfelt's Prom and Gipper's Prom and Pageant only opened second locations; both were already selling prom dresses from an original location and thus had already established access to inventory. (Pl.'s Resp. to Defs.' SOF at ¶108). Further, both of Gipper's locations are outside the distances that girls are willing to travel to purchase a prom and homecoming dress. (Pl.'s Resp. to Defs.' SOF at ¶20). Moreover, Eva's Bridal was not a new store. (Pl.'s Resp. to Defs.' SOF at ¶108). It merely reopened after a fire and, now, only sells bridal and bridesmaids dresses. (*Id.*). As such, Defendants have failed to identify a new store, other than Hannah's, that has opened in the Chicago Market the last several years. The record reflects that stores that did try to open where shut out from access to the Designers' prom and homecoming dresses and are now closed. (*See* Pl.'s Resp. to Defs.' SOF at ¶¶58-59, 63, 66, 160, 161). At a minimum, there is a question of fact as to whether Defendants' conduct has created barriers to entry in the Chicago Market for the Designers' prom and homecoming dresses.

## M. DEFENDANTS PURPORTED LIST OF COMPETITORS IS GROSSLY OVERSTATED.

Defendants' Motion emphasizes the number of the other purported boutiques in the area to support its claim that the market for prom and homecoming dresses in the Chicago area is "highly competitive." (Defendants' Memorandum at Pg. 28). Defendants solely rely upon Kneuper's Report for this conclusion. (Defs.' SOF at ¶¶149-151). However, of the boutiques that Kneuper lists on Exhibit 4 to his Report, at least forty-two (42) have the word "bridal," "bride," or "wedding" in their

63

title. (Kneuper Rep. at ¶55, Exhibit 4, Ex. 8 to Defs.' SOF). As Defendants do not carry bridal, they would not be competitors. (Pl.'s SOF at ¶¶135-136). Another sixteen (16) boutiques admittedly do not even sell prom dresses. (Kneuper Rep. at Exhibit 4, Ex. 8 to Defs.' SOF). Other identified boutiques that Kneuper lists are outside the distances that girls are willing to travel to purchase prom and homecoming dresses. (Pl.'s Resp. to Defs.' SOF at ¶151). Further, Kneuper's list offers no evidence whether the identified boutiques even carry the Designers' prom and homecoming dresses, which is the alleged product market. (Kneuper Rep. at ¶55, Exhibit 4, Ex. 8 to Defs.' SOF). Defendant Barbara Surdej testified: "if they don't sell the same dresses we sell, if they sell dresses but they're not the same as what we are, we're not in competition with them." (Pl.'s SOF at ¶¶135-136). Thus, his competitor list is wholly unreliable and grossly overstated.

Finally, antitrust law does not require the elimination all competition to constitute a violation. *See Sheridan*, 530 F.3d 590 at 594 (monopoly power was never understood to mean a market with only one seller"); *see also DSM Desotech Inc. v. 3D Sys. Corp.*, No. 08 CV 1531, 2009 WL 174989, at *7-8 (N.D. Ill. Jan. 26, 2009) (allowing an attempted monopolization claim to go forward despite the existence of other competitors in the market).

V.    **CONCLUSION.**

WHEREFORE, Plaintiff, HANNAH'S BOUTIQUE, INC., respectfully requests that this Court

enter an Order denying Defendants' Motion for Summary Judgment on Plaintiffs' Antitrust Claims,

and for such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

HANNAH'S BOUTIQUE, INC.


By: /s/ David J. Riski
One of its attorneys

Steven M. Laduzinsky (sladuzinsky@laduzinsky.com)
ARDC No. 6193407
David J. Riski (driski@laduzinsky.com)
ARDC No. 6272935
Conor Sickel (csickel@laduzinsky.com)
ARDC No. 6313993
Laduzinsky & Associates, P.C.
216 S. Jefferson St., Suite 301
Chicago, IL 60661
Tel: (312) 424-0700
Fax: (312) 424-2646