**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HANNAH'S BOUTIQUE, INC., | ) | |
| an Illinois corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13-cv-2564 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| | ) | |
| BARBARA ANN SURDEJ, ROY | ) | |
| SURDEJ, and JEFFREY SURDEJ | ) | |
| d/b/a PEACHES BOUTIQUE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Hannah's Boutique, Inc. ("Hannah's") has moved to bar certain opinions of Defendants'[1] expert Dr. Robert Kneuper and to strike Dr. Kneuper's expert report pursuant to Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Federal Rule of Civil Procedure 37. For the following reasons, the Court denies Hannah's motion.

## BACKGROUND

Hannah's is a specialty boutique located in Palos Park, Illinois that sells prom and homecoming dresses. (R. 270, Pl.'s Resp. to Defs.' SOF ¶ 2.) Peaches Boutique also sells prom and homecoming dresses, and is the largest specialty boutique retailer in the Chicago area. (R. 270, Pl.'s Stmt. of Add'l Facts ¶¶ 3, 7, 16, 17.) Defendants Roy and Barbara Surdej opened Peaches in 1985, and Defendant Jeffrey Surdej is their son. (R. 270, Pl.'s Resp. to Defs.' SOF ¶

---

[1] The Court refers to Defendants Barbara Ann Surdej, Roy Surdej, and Jeffrey Surdej d/b/a Peaches Boutique collectively as "Defendants" or "Peaches."

3.)  Hannah's alleges that Peaches attained the largest market share in the Chicago Market[2] by engaging in anticompetitive and predatory acts specifically aimed at foreclosing competition. (R. 188, Am. Compl. ¶ 9.)  These alleged acts include demanding that certain high-end dress designers (the "Designers") not sell to specific specialty boutiques within the Chicago Market, including Hannah's, and organizing a meeting with the Designers at which Defendants attempted to impose policies on the Designers to limit the sale of dresses to other boutiques.  (*Id.* ¶¶ 10, 89-100.)  Based in part on these allegations, Hannah's filed suit against Peaches under Section 2 of the Sherman Act, 15 U.S.C. § 2, for attempted monopolization (Count I), conspiracy to monopolize (Count II), and monopolization (Count III); under Section 1 of the Sherman Act, 15 U.S.C. § 1, for concerted refusal to deal (Count IV) and unreasonable restraint of trade (Count V); under Section 3 of the Clayton Act, 15 U.S.C. § 15, for exclusive dealing (Count VI); and under the Illinois Antitrust Act for illegal monopolization and unreasonable restraint of trade (Count VII) (the "Antitrust Claims").  Hannah's also asserts a variety of non-antitrust Illinois state law claims against Peaches.  Peaches has moved for summary judgment solely on the Antitrust Claims, arguing that Hannah's cannot show that Peaches possessed "market power," which Peaches contends is required for each of the Antitrust Claims.

In support of its arguments, Peaches disclosed Dr. Kneuper as an economic expert.  He conducted an assessment of Hannah's antitrust allegations, and gives several opinions related to them.  First, Dr. Kneuper opines that it is not economically plausible that Peaches possesses or potentially possesses market power relating to the retail sale of prom and homecoming dresses. Second, he opines that Plaintiff's alleged antitrust market is overly narrow and arbitrary.  Third,

---

[2] Hannah's alleges that the "Chicago Market" consists of the geographic area comprised by area codes 630/331, 847/224, 708, 312/872, and 773.  (R. 188, Am. Compl. ¶ 1.)  Those area codes include the City of Chicago, suburban Cook County, DuPage County, Lake County, Kane County, and portions of Kendall County and Will County.  *Id.*

according to Dr. Kneuper, Plaintiff's allegations of direct anticompetitive effects are not supported by the economic evidence. Hannah's moves to exclude the first opinion on several different grounds, and to bar Dr. Kneuper from relying on certain of Defendants' sales spreadsheets in giving his opinions. Plaintiff does not otherwise challenge Dr. Kneuper's second and third opinions, nor does it challenge his qualifications as an economic expert.[3] The Court held a *Daubert* hearing on Plaintiff's motion on May 19, 2015 during which Dr. Kneuper testified.

## LEGAL STANDARD

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014); *see also Lewis v. Citgo Petroleum Co.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702, governing the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"In short, the rule requires that the trial judge ensure that any and all expert testimony or evidence admitted 'is not only relevant, but reliable.'" *Manpower, Inc. v. Ins. Co. of Pa.* 732 F.3d 796, 806 (7th Cir. 2013) *(citing Daubert,* 509 U.S. at 589, 113 S.Ct. 2786); *see also Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 894 (7th Cir. 2011) (explaining that ultimately, the

---

[3] Dr. Kneuper also submitted a supplemental expert report on March 19, 2015. After Plaintiff moved to bar that report on the grounds that it was untimely and prejudicial, the Court entered an order striking the supplemental report with respect to Defendants' motion for summary judgment, and instructing that Defendants could only rely on the report to challenge Plaintiff's expert to the extent Dr. Kneuper testified about the opinions contained in it in open court and was subject to cross-examination. (R. 266.) Accordingly, the Court does not address the supplemental report here.

expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline"); *Lees v. Carthage College*, 714 F.3d 516, 521 (7th Cir. 2013) (explaining the current version of Rule 702 essentially codified *Daubert* and "remains the gold standard for evaluating the reliability of expert testimony"). The *Daubert* principles apply equally to scientific and non-scientific expert testimony. *See Manpower, Inc.*, 732 F.3d at 806 (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

Under the expert-testimony framework, courts perform the gatekeeping function of determining whether the expert testimony is both relevant and reliable prior to its admission at trial. *See Manpower, Inc.*, 732 F.3d at 806; *Lees*, 714 F.3d at 521; *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). In doing so, courts "make the following inquiries before admitting expert testimony: first, the expert must be qualified as an expert by knowledge, skill, experience, training, or education; second, the proposed expert must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case." *Lees*, 714 F.3d at 521-22; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *Pansier*, 576 F.3d at 737. A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (citing *Daubert,* 509 U.S. at 596). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual

evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id*.

## ANALYSIS

Hannah's moves to strike Dr. Kneuper's first opinion that Peaches does not possess market power on several grounds. Dr. Kneuper bases his market power opinion on his conclusion that Peaches lacks market share, and Hannah's directs the majority of its arguments at that conclusion. Hannah's argues that a) Dr. Kneuper's use of the population of high school aged girls is not an accepted methodology for determining market share in the economic community; b) Dr. Kneuper's use of "basic intuition" to calculate market share is not admissible; c) the Court should exclude Dr. Kneuper's market share opinions because they only include Defendants' 2013 dress sales where a specific prom or homecoming event was registered; d) Dr. Kneuper's use of square footage to calculate Defendants' market share does not satisfy *Daubert*; e) Dr. Kneuper bases his market share opinions regarding the percent of square footage that Defendants possess upon unreliable data; and f) Dr. Kneuper's market power opinions ignore relevant and material sales data. Finally, Hannah's also moves to bar Dr. Kneuper from relying on several spreadsheets of sales data because Peaches allegedly did not produce the underlying data to Plaintiff in contravention of a Court order. The Court addresses each argument in turn.

## I.       Market Power Opinion

The Court first examines Hannah's arguments directed towards Dr. Kneuper's opinion on market power.

## A.    Estimation of Market Size Based Upon Populations of High School Aged Girls

Hannah's first two arguments, in which it criticizes Dr. Kneuper's reliance on population figures of high school aged girls and his use of "basic intuition" to calculate market share, both relate to Dr. Kneuper's estimate of the total market size, so the Court addresses them together. In reaching his conclusion that Peaches does not possess market power because its market share is too low, Dr. Kneuper performed several market share calculations. In one of them, he calculated Peaches' market share by comparing Peaches' unit sales with his estimate of the total unit sales in the relevant market. Dr. Kneuper calculated the total unit sales in part based on information that Plaintiff alleges in the Amended Complaint and that Plaintiff's witnesses confirm. In one of his calculations, he assumed that 50% of all high school aged girls attend prom or homecoming and that 75% of those girls attending dances buy one or more dresses. When asked about his basis for this assumption at his deposition, Dr. Kneuper testified that he based it upon "a combination of information [he] reviewed in this case and just basic intuition." (R. 241-2, Kneuper Dep. at 221.) He stated further, "I can't point you to a document in the case that provides those numbers if that's what you're asking." (*Id*. at 222.) In its motion, Hannah's challenges both Dr. Kneuper's methodology for calculating Peaches' market share based on population data, and Dr. Kneuper's use of his "basic intuition" in his calculations.

"The role of the judge is to ensure that … the expert is using a valid methodology (scientific or otherwise), that there is sufficient data to justify the use of the methodology in the particular case, and that the expert applied the methodology appropriately." *Stollings*, 725 F.3d at 765. "Rule 702's requirement that the district judge determine that the expert used reliable methods does not ordinarily extend to the reliability of the conclusions those methods produce— that is, whether the conclusions are unimpeachable." *Id*. "Rule 702's reliability elements require

the district judge to determine only that the expert is providing testimony that is based on a correct application of a reliable methodology and that the expert considered sufficient data to employ the methodology." *Id*. at 766. The Seventh Circuit has instructed that the "critical inquiry is whether there is a connection between the data employed and the opinion offered." *Manpower, Inc.*, 732 F.3d at 806. If the opinion is "connected to existing data 'only by the *ipse dixit* of the expert,'" then it "is properly excluded under Rule 702." *Id*. (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

Dr. Kneuper performed his challenged calculations as follows. In its Amended Complaint, Plaintiff cites data from the United States Census Bureau that the Chicago Market has approximately 271,761 girls between the ages of 15 and 19, and approximately 221,146 girls between the ages of 14 and 17. (R. 188, Am. Compl. ¶ 4.) Plaintiff alleges that "[t]hese high school girls attend one (1) or more prom and homecoming dances each year, and many of these high school girls purchase different dresses for each event." (*Id*. ¶ 5.) At her deposition, Susan Shaban, the owner of Hannah's, confirmed that she continued to believe that these statements are accurate. (R. 269-1, Shaban Dep. Tr. 163-165.) Dr. Kneuper also determined independently that there were 207,858 females enrolled in Illinois public high schools located within the Chicago metropolitan statistical area during 2013. (R. 241-1, Kneuper Rep. at 26.)

Using these figures, Dr. Kneuper made several different estimates of the number of units sold in the Chicago Market. First, he used the 271,161, 221,146, and 207,858 figures themselves as his estimate of the total number of units sold in the market. Then he conducted what he terms a "sensitivity analysis," in which he assumed that only 50% of high school aged girls attend prom or homecoming, and only 75% of the girls attending those dances buy one new prom or homecoming dress. He then applied those percentages to each of the 271,161, 221,146, and

207,858 numbers and estimated the total size of the market to be 101,910, 82,930, and 77,947 units, respectively.

Hannah's first argues that the Court should exclude Dr. Kneuper's estimates of the size of the market because using population data to calculate market size is not a valid economic methodology. In response, Peaches argues that Dr. Kneuper is not using population data to calculate the market size, but instead is using the total number of units sold. Peaches contends that in estimating the total number of units sold it is merely relying on the population data that Plaintiff alleges in its complaint, and that Plaintiff's principal Ms. Shaban re-affirmed at her deposition. Peaches then asserts that Dr. Kneuper's calculation of the size of the market based on the total number of units sold is a valid economic methodology.

The Seventh Circuit recently addressed a similar issue in *Stollings*. In *Stollings*, the district court had barred the plaintiff's expert in a personal injury case from testifying to his opinion that the costs of including automatic braking technology on the model of saw that caused the alleged injury would not outweigh its benefits to society. *Stollings*, 725 F.3d at 764. The expert's opinion was based on his estimate that the automatic braking technology would be 90 percent effective, which he in turn based on the testimony of another witness that the technology worked in the "vast majority" of instances. *Id*. The district court excluded his testimony in part because it found the 90 percent figure to not be reliable, which it determined rendered the expert's entire opinion unreliable. *Id*. at 764-65.

The Seventh Circuit reversed, noting that because the district court had found the expert's methodology to be reliable, it "should have let the jury determine how the uncertainty about the effectiveness rate" affected the weight of the expert's testimony. The Seventh Circuit also noted that "[a]lthough the 90 percent figure was undoubtedly a rough estimate, it is also clear that [the

expert's] bottom-line estimate of societal costs of saw accidents was so high that his opinion would have remained essentially the same even if the effectiveness rate were actually quite a bit lower … A jury should be capable of understanding how the value of the estimate affected [the expert's] conclusions." *Stollings*, 725 F.3d at 766-67.

Here, the Court similarly finds Dr. Kneuper's methodology of using total unit sales to determine the market size reliable. He cites several economic sources in support of this methodology, including the Horizontal Merger Guidelines of the United States Department of Justice and Federal Trade Commission, and Plaintiff itself does not contest using unit sales to calculate market size. As Dr. Kneuper explained at the hearing when asked how an expert typically calculates market share in an antitrust case:

> Well, typically, one uses sales if sales are available. In most situations, sales is preferred. Some situations, other measures may be preferred. Where sales are not available, economists will typically look at – and by "sales," I mean dollar sales. Economists will typically, in the alternative, look at unit sales or they will look at, in some cases, some count of competitors or what I would call an adjusted competitor count, as well, or capacity.

(5/19/15 A.M. Hearing Tr.) Dr. Kneuper testified that because he could not find reliable dollar sales data, he calculated Peaches' market share using a unit sales approach.

With respect to using population data specifically to estimate unit sales, Dr. Kneuper had the following colloquy with the Court:

> THE COURT:          And, so, the question is: Do you have any literature that supports your use of those units? Are there any economic studies –
>
> THE WITNESS:     Yes.
>
> THE COURT:          -- or literature?
>
> THE WITNESS:     There's some –
>
> THE COURT:          And what is it?

> THE WITNESS:     It is -- for example, standard industrial organization textbooks will talk about, and antitrust treatises will talk about, measuring market shares using unit sales.  The Merger Guidelines talk about it, as well.
>
> THE COURT:       And when you talk about unit sales in that context, does that cover population?
>
> THE WITNESS:     If – if -- there is a[n] understanding or representation that the population is correlated with unit sales, then yes, those are consistent.
>
> THE COURT:       So, the literature that you are referring to and the case book you are referring to, that supports and uses population as a unit?
>
> THE WITNESS:     It doesn't specifically talk about using population.  It talks about using units.  But if population is then equated to units, then it fits that literature.
>
> THE COURT:       Have you ever relied on population equated to units in doing such an analysis in the past?
>
> THE WITNESS:     I – I -- don't recall.  I – I -- rely on – I'm looking for units. I'm looking for some measure of sales in units in the evidence.  And if the pop- -- if it's the situation where the population equates to units, I'll use that.  But I don't recall if I've done this in the past.

(5/19/15 P.M. Hearing Tr.)

Although Dr. Kneuper's use of population data to estimate the total number of units sold leads to "undoubtedly rough" estimates, as in *Stollings*, it is consistent with the economic literature on using unit sales to calculate market size.  In addition, Dr. Kneuper based his estimates on the factual record.  Specifically, the testimony of Hannah's principal Ms. Shaban regarding the demand for prom and homecoming dresses among high school-aged girls supports the estimates.  Dr. Kneuper also relied on data from the United States Census Bureau and Chicago public high school enrollment figures.  (R. 241-1, Kneuper Rep. at 25-27.)  Contrary to Plaintiff's contentions, the unit sales estimates are not based merely on the "*ipse dixit*" of Dr. Kneuper.  While Dr. Kneuper admits that he does not have specialized knowledge with respect to

prom and homecoming dresses, Ms. Shaban does have such knowledge as the principal of Hannah's.

Further, as in *Stollings*, Dr. Kneuper's bottom line conclusion that Peaches lacks market share would remain the same even if the actual size of the market decreased significantly. Peaches contends in its motion for summary judgment, for example, that under controlling Seventh Circuit law, a "20%-25% market share or less does not constitute market power." *Valley Liquors, Inc. v. Renfield Importers, Inc.*, 822 F.2d 656, 666 (7th Cir. 1987). This is the point of Dr. Kneuper's sensitivity analysis. He varied his estimate of the total size of the market for prom and homecoming dresses to test its effect on his calculation of Peaches' market share. Dr. Kneuper's largest market share calculation gives Peaches a market share of only 9%. (R. 241-1, Kneuper Rep. at 22 n.55.) Thus, even if the actual market were only half as large as the market calculated by Dr. Kneuper, Peaches' market share would still only be 18%—too small for Peaches to possess market power.

The Court also disagrees with Plaintiff's argument that the Court should exclude Dr. Kneuper's market share opinion because he relies on his "intuition." In the Seventh Circuit case that Hannah's cites for this proposition, *Zenith Electronic Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419-420 (7th Cir. 2005), the court affirmed the exclusion of an expert's opinion that a company would experience rapid growth where the expert admitted that he did not base that opinion on any methodology whatsoever other than his "expertise." In *Obrycka v. City of Chicago*, No. 07-C-2372, 2011 WL 2600554, at *7 (N.D. Ill. June 29, 2011), another case that Plaintiff cites, this Court excluded the qualitative opinions of a statistician that he drew from his data regarding alleged misconduct at the Chicago Police Department where he admittedly had no expertise in policing, police misconduct, or the disciplinary systems of police departments.

Here, Dr. Kneuper is an economic expert testifying to his conclusions reached using a valid economic methodology. Although he testified at his deposition that he estimated the total number of prom and homecoming dresses sold based in part on his intuition, as discussed above, he also based it on the testimony of Hannah's principal, Ms. Shaban, and the United States Census Bureau and Chicago public high school enrollment data. Further, Dr. Kneuper clarified at the hearing that his use of intuition in estimating the size of the market is based on his knowledge and experience conducting sensitivity analyses. (5/19/15 A.M. Hearing Tr.); *see Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony"); *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive a particular conclusion"). For these reasons, the Court will not strike this opinion on a *Daubert* challenge.

### B. Dresses Linked to Specific Events

Next, Plaintiff argues that Dr. Kneuper's estimate of the number of dresses sold by Peaches is also unreliable. In calculating the number of prom and homecoming dresses sold by Peaches, Dr. Kneuper only included the 7,383 to 7,853 dresses that Peaches registered to a specific prom or homecoming event. Because Peaches does not require dress customers to register an associated event with their purchase, Plaintiff argues that Dr. Kneuper's data is unreliable. Because Peaches sold more than 10,000 additional dresses in 2013 that could have included sales from Defendants' prom and homecoming lines, Plaintiff contends that Dr.

Kneuper underestimated the number of prom and homecoming dresses that Peaches sold. In response, Peaches argues that only a small percentage of its dress sales do not have a registered event associated with them and using the event registry is the best method of approximating the number of dresses sold by Defendants that are designed to be worn to prom or homecoming.

The Seventh Circuit recently held that "the selection of data inputs to employ in a model is a question separate from the reliability of the methodology reflected in the model itself." *Manpower, Inc.*, 732 F.3d at 807. In that case, the Seventh Circuit reversed the district court's exclusion of an expert's opinion where the district court had agreed that the expert had employed a valid methodology but thought that the expert should have selected different data. *Id.* The Seventh Circuit held that the question of whether the expert selected the best data was "a question for the jury, not the judge. Assuming a rational connection between the data and the opinion—as there was here—an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility." *Id.* at 809.

Accordingly, since Hannah's only challenges the reliability of Peaches' dress sales data, not Dr. Kneuper's methodology in using it to calculate market share, the Court denies Plaintiff's *Daubert* motion on this basis. Dr. Kneuper's inclusion of only the dress sales with an associated prom or homecoming event in his estimation of Peaches' prom and homecoming dress sales is rationally connected to his opinion. As such, Hannah's remains free to explore the issue on cross-examination.

### C. Market Share Estimates Based on Square Footage

Next, Plaintiff challenges Dr. Kneuper's use of retail square footage in the prom and homecoming dress market, which he used as an alternative basis for estimating Peaches' market share. Defendants describe his calculation as follows:

…Dr Kneuper first identified the number of specialty boutiques that compete with Peaches in the variously defined geographic markets. (Kneuper Rep. ¶¶ 50-53.) He then calculated the total square footage of retail space in those areas that is available to sell prom and homecoming dresses by multiplying the average square footage of specialty boutiques other than Hannah's and Peaches (which he determined using square footage data for individual stores reported by Hoover's Inc.) by the number of competitors in the geographic market at issue. He then used Peaches' current square footage (25,000 square feet) to calculate that Peaches' share of available retail space in specialty boutiques in Chicago is between 4.98% and 7.53%—which is consistent with his earlier determination that Peaches' market share is very low.

(R. 269, Defs.' Resp., at 8.)

Hannah's argues that calculating Peaches' market share based on its share of the available retail space in the market is not an acceptable methodology. Further, Plaintiff argues that the data in reports from Hoovers, Inc. (a subsidiary of Dun & Bradstreet) on which Dr. Kneuper relied in calculating the square footage of the relevant retail space is inaccurate. According to Peaches, however, it is common in retail cases involving a large number of independent competitors to use competitor counts or similar measures to measure market share. Peaches contends that Dr. Kneuper used a competitor count methodology, and added a level of precision by including Peaches' share of the available retail square footage as well. As Kneuper states in his expert report:

In cases such as this involving a large number of independent competitors, it is common practice in antitrust to use measures such as competitor counts or square footage to measure market shares, particularly when sales data from individual firms are not readily available. Square footage data provide useful measures of market shares in situations where some individual competitors differ in size from others. Square footage is also a useful indicator of competitive significance in retail cases because it represents a retailer's capacity to carry products and inventory at their store.

(R. 241-1, Kneuper Rep. at 23 n.56.)

At the hearing, Dr. Kneuper testified in depth about his use of the square footage methodology. Dr. Kneuper explained why he used square footage to estimate Peaches' market share:

> Because it's commonly understood that in the retail industry, that size is very important, it's very competitively relevant; and, particularly so in this case because size translates into a greater capacity to carry inventory, a greater ability to carry dresses on the floor, a larger number of dressing rooms. So, it's a very relevant measure of competitive significance, and it's something I've used in other similar types of situations.

(5/19/15 A.M. Hearing Tr.)

Dr. Kneuper also had the following colloquy with counsel for Hannah's:

Q:      Sir, with regard to square footage, you cite no economic literature in your report that supports the use of square footage in determining market share in a differential product antitrust case, correct?

A:      No, I disagree with that. Are you talking about specifically describes the measure square footage, as opposed to the methodology that goes beyond the square footage?

Q:      I'm asking for the methodology of using square footage to analyze market share in an antitrust case.

A:      The methodology related to square footage, as I talked about in my direct, it's capacity-based methodology; or, alternatively, you can also think of it as an adjusted competitor count. And those methodologies are discussed – certainly capacity is discussed in the literature.

Q:      And that's discussed in the literature with regard to homogeneous products, correct?

A:      In the Merger Guidelines, it is; but, that is, as I said, based on the focus of when is capacity a better measure of market share. The principle of using capacity is that competitors can quickly respond to market opportunities.

Q:      But capacity does not equate to market – to square footage, correct?

A:      In retail, I would – that's incorrect. In retail, capacity is square footage.

(5/19/2015 P.M. Hearing Tr.)

Based on Dr. Kneuper's report and his testimony at the hearing, the Court agrees that his calculation of Peaches' market share based on retail square footage is a reliable methodology. The Court credits Dr. Kneuper's testimony that the use of capacity to calculate market share is supported by the economic literature, including the Horizontal Merger Guidelines of the United States Department of Justice and Federal Trade Commission, and that, "[i]n retail, capacity is square footage." (*Id*.) Plaintiff remains free to cross-examine Dr. Kneuper on his methodology at trial and to attack the weight of Dr. Kneuper's findings.

With respect to the data on which Dr. Kneuper relied to calculate market share based on square footage, as discussed above, the Seventh Circuit recently held that if an expert's methodology is reliable, an expert's reliance on faulty data is a matter to be explored on cross-examination—it does not affect the admissibility of the expert's opinion. *Manpower, Inc.*, 732 F.3d at 809. Because the Court finds Dr. Kneuper's methodology to be reliable, Hannah's can thoroughly explore this issue on cross-examination. Further, the Court accepts Dr. Kneuper's testimony that while Hoover's estimate of the size of a given individual store might not be accurate, Dr. Kneuper did not find (and Plaintiff does not allege) any systematic bias in the data. (5/19/15 P.M. Hearing Tr.) In other words, there is no indication that the Hoover's data tends to under-report or over-report retail square footage. (5/19/15 A.M. Hearing Tr.) This is important because Dr. Kneuper used the Hoover's data to calculate the average square footage of approximately forty individual stores, from which he estimated the total square footage of all the retail stores in the relevant market. (*Id*.) He did not rely on the data to estimate the size of any individual store on its own. (*Id*.) Dr. Kneuper also explained at the hearing that he confirmed the reliability of the average retail square footage figure that he calculated by visiting six stores in-person, investigating the websites of many others, speaking with Hoover's regarding its

methodology, and relying on his past experience with retail stores as an economist. (*Id.*) This testimony further supports the accuracy of the Hoover's data.

The cases cited by Plaintiff regarding the reliability of Dun & Bradstreet reports are not to the contrary. In the Northern District of Illinois cases that Plaintiff cites, the courts found that a plaintiff could not establish through information in a Dun & Bradstreet report that the court had personal jurisdiction over a given defendant, or that a given individual served as a director of a company so he could accept service on its behalf. *See Am. Top English, Inc. v. Golden Gate Capital, L.P.*, No. 03-cv-7021, 2004 WL 407031, at *3 (N.D. Ill. Feb. 25, 2004); *Salon Group, Inc. v. Salberg*, 156 F.Supp.2d 872, 878 (N.D. Ill. 2001). Those factual circumstances do not apply here. For these reasons, the Court denies Plaintiff's motion on the basis that Dr. Kneuper relies on unreliable data in the Hoover's Reports.

### D.      Other Relevant and Material Sales Data

Plaintiff's final argument with respect to market share is that Dr. Kneuper's market share opinions ignore relevant and material sales data. Specifically, Hannah's argues that Dr. Kneuper had access to Defendants' 2011 and 2012 sales data, but Dr. Kneuper failed to include that data in his analysis and only "cherry-picked" the favorable 2013 sales data. In response, Peaches argues that Plaintiff's Amended Complaint alleges that Peaches is engaged in ongoing anticompetitive conduct, so Dr. Kneuper logically analyzed Peaches' market share in the most recent year for which it had full-year data. Further, because Dr. Kneuper submitted his report first, he was not aware that Dr. Schafer was going to focus exclusively on the pre-2013 time period.

As discussed above, "the selection of data inputs to employ in a model is a question separate from the reliability of the methodology reflected in the model itself." *Manpower, Inc.*,

732 F.3d at 807. "Assuming a rational connection between the data and the opinion—as there was here—an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility." *Id*. at 809. Thus, Dr. Kneuper's use of data solely from 2013 is a matter to be explored on cross-examination.

Further, the cases upon which Plaintiff relies are distinguishable. In *Barber v. United Airlines*, the Seventh Circuit noted approvingly the district court's decision to exclude expert testimony when the expert could not adequately explain why he ignored certain facts or data which did not support his opinion. *Barber v. United Airlines, Inc.*, 17 F. App'x. 433, 437 (7th Cir. 2001). In *LeClercq v. The Lockformer Co.*, the court similarly excluded the expert's opinion where he could not explain why he excluded data that clearly contradicted his opinion. *LeClercq v. The Lockformer Co.*, No. 00-cv-7164, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005). Here, Dr. Kneuper does provide such an explanation, namely, that he analyzed Peaches' most recent data because Plaintiff alleges ongoing anticompetitive conduct.

## II.    Sales Spreadsheets

Plaintiff's final argument is that the Court should bar Defendants under Federal Rule of Civil Procedure 37 from relying on certain sales spreadsheets because the Court ordered Defendants to produce the data underlying the spreadsheets, which Defendants never did. In response, Defendants argue that they in fact did produce this data, because the spreadsheets themselves contain the underlying data that Plaintiff seeks.

The spreadsheets at issue are two Microsoft Excel files (the "Sales Spreadsheets") which Defendants represent contain data for every sales transaction that Peaches made in the store or on any of their three websites from January 19, 2011 through April 7, 2014. (R. 269, Defs.' Resp. at 12-13.) Defendants generated the Sales Spreadsheets from "the Peach," which is Defendants'

customized electronic point-of-sale system. (*Id*. at 13.) In preparing his expert report, Dr. Kneuper requested certain data fields from Peaches, and a Peaches employee ran a query in "the Peach" to extract the data into a usable, spreadsheet form. The Sales Spreadsheets contain the eleven fields[4] of information that Dr. Kneuper requested for 101,114 discrete Peaches transactions. (*Id*. at 13-14.)

The Court addressed this issue in depth at the November 10, 2014 hearing. In discovery, Plaintiff had requested "all documents and electronically stored information related to Peaches Boutique's dress registry, including but not limited to all data" that Peaches inputted into the dress registry. (R. 212, Pl.'s Mot. to Strike, at 7.) Defendants objected on several grounds, including that Plaintiff's request was overly broad. (*Id*.) On October 17, 2014, Defendants produced the two Sales Spreadsheets upon which Dr. Kneuper relied, but not any of the other information that Plaintiff requested relating to Peaches' sales transactions. (R. 294, Pl.'s Reply, at 12.) Plaintiff then filed a motion to strike Dr. Kneuper's expert report, based in part on the grounds that Defendants withheld the production of Plaintiff's requested information. (R. 212, Pl.'s Mot. to Strike, at 7.)

At the November 10, 2014 hearing, the Court denied Plaintiff's motion to strike Dr. Kneuper's expert report without prejudice. (R. 221.) At that hearing, Plaintiff's counsel requested that Defendants produce the actual source data from "the Peach." The following exchange then took place between the Court and Defendants' counsel:

> THE COURT: Have you made the underlying data available? Because under the Federal Rules, you certainly have to do that. If you have not made the underlying data from these spreadsheets available to the other side, then you must do so.

---

[4] Those fields are (1) date of sale, (2) designer of the dress sold, (3) product number of the dress sold, (4) purchaser's area code, (5) purchaser's zip code (where available), (6) sale price, (7) full price, (8) cost of the dress sold, (9) the event type for which the dress was purchased, (10) the event data, and (11) the event description. (R. 269, at 14 n.18.)

MS. MARTIN: Are we talking about the spreadsheets the expert relied on or the spreadsheets that they claim they don't have information on?

THE COURT: The ones I am --

MS. MARTIN: Because these are two separate things.

THE COURT: The ones I am talking about are the spreadsheets that the expert relied on.

MS. MARTIN: We did make that underlying data available.

THE COURT: Okay. So, if that has already been made available, identify for them where it is because they do not seem to think that it has been. So, identify for them where it has been. If not, you should make it available to them.

MR. SCARBOROUGH: Of course …

(R. 224, 11/10/2014 Hearing Tr., at 6.) That exchange was also reflected in the following

passage from the minute order entered following the November 10, 2014 hearing:

Defendants' spreadsheets upon which expert Kneuper relied on shall be produced on or before 11/14/14 if they haven't already done so. Defendants should identify the underlying data for plaintiffs.

(R. 221, Minute Order.)

Plaintiff argues that because Defendants have not produced the underlying "Peach" data

from which the Sales Spreadsheets were generated, the Court should strike Dr. Kneuper's expert

report. The Court disagrees. First, "underlying data" in this context is a bit of a misnomer. As

Defendants explain in their opposition brief, the two Sales Spreadsheets themselves contain the

underlying data on which Dr. Kneuper relies. Defendants created them by exporting data

directly from the "Peach" in order to convert the data requested by Dr. Kneuper into a usable

format. To the extent Plaintiff is arguing that Defendants did not identify the underlying data for

them, Plaintiff's counsel questioned Dr. Kneuper at length about the information in the two

spreadsheets at Dr. Kneuper's deposition following the November 10, 2014 hearing. (R. 241-2,

Kneuper Dep.)  Dr. Kneuper explained the data that he requested from Peaches, the time period

of that information, and his knowledge with respect to how Peaches extracted the data to create

the spreadsheets.  (*Id*. at 20-34.)  Simply put, Plaintiff had the opportunity to have its questions

answered with respect to the underlying data.

     While Plaintiff also argues that it is prejudiced because the Sales Spreadsheets only

contain the fields requested by Dr. Kneuper, and Plaintiff has not received the additional sales

information that it requested in discovery, that is a separate issue.  As discussed above, at the

November 10, 2014 hearing the Court only ordered Defendants to produce the underlying data

upon which Dr. Kneuper relied.  The November 10, 2014 minute order reflects the same.  (R.

221, Minute Order.)

     Finally, Plaintiff argues that the Court should also bar Dr. Kneuper's expert report

because Defendants did not timely produce the Sales Spreadsheets.[5]  The Court also does not

find this argument persuasive.  Defendants produced the Sales Spreadsheets on October 17,

2014, nine days after submitting Dr. Kneuper's expert report.  As Defendants note, this gave

Plaintiff's expert Dr. Schafer more than three months to review and analyze the data before she

submitted her report on January 21, 2015.  It also gave Plaintiff's counsel more than one month

to review the Sales Spreadsheets before deposing Dr. Kneuper on December 3, 2014.  (R. 241-2,

Kneuper Dep. at 221.)  Thus, the Court denies Plaintiff's motion with respect to the Sales

Spreadsheets.

---

[5] Plaintiff argues that Federal Rule of Evidence 1006 also requires Defendants to make the underlying information in the Sales Spreadsheets available to Plaintiff.  As discussed above, however, the Sales Spreadsheets are not summaries.  They contain information extracted directly from Defendants' point-of-sale system.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion to exclude certain opinions of Defendants' expert Dr. Kneuper and to strike his expert report.


**DATED:  June 19, 2015**                               **ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge