```
 1                 IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
      HANNAH'S BOUTIQUE, INC.,        ) Docket No. 13 C 2564
 4    an Illinois corporation,        )
                                      )
 5                    Plaintiff,      )
                                      )
 6             vs.                    )
                                      )
 7    ROY SURDEJ, doing business as   )
      PEACHES BOUTIQUE, et al.,       ) Chicago, Illinois
 8                                    ) May 20, 2015
                      Defendants.     ) 4:12 o'clock p.m.
 9

10            EXCERPT OF PROCEEDINGS - DAUBERT HEARING
                BEFORE THE HONORABLE AMY J. ST. EVE
11

12    APPEARANCES:

13
      For the Plaintiff:         LADUZINSKY & ASSOCIATES
14                               BY:  MR. STEVEN M. LADUZINSKY
                                      MR. DAVID J. RISKI
15                                    MR. CONOR SICKEL
                                 216 S. Jefferson St., Suite 301
16                               Chicago, Illinois  60661

17
      For the Defendants:        SIDLEY AUSTIN, LLP
18                               BY:  MR. JOHN W. TREECE
                                      MR. THEODORE R. SCARBOROUGH, JR.
19                                    MS. ASHLEY K. MARTIN
                                 One South Dearborn Street
20                               Chicago, Illinois  60603

21
      Court Reporter:            MR. JOSEPH RICKHOFF
22                               Official Court Reporter
                                 219 S. Dearborn St., Suite 1232
23                               Chicago, Illinois  60604
                                 (312) 435-5562
24            * * * * * * * * * * * * * * * * * *
                       PROCEEDINGS RECORDED BY
25                     MECHANICAL STENOGRAPHY
                   TRANSCRIPT PRODUCED BY COMPUTER
```

```
 1              THE CLERK:  13 C 2564, Hannah's Boutique vs. Surdej.
 2                          *   *   *   *   *
 3              MR. SCARBOROUGH:  Your Honor, we would recall
 4    Dr. Robert Kneuper to the stand.
 5              THE COURT:  Please come forward, Dr. Kneuper.
 6              And you are still under oath.
 7        ROBERT KNEUPER, DEFENDANTS' WITNESS, PREVIOUSLY SWORN
 8              THE COURT:  Do you want to switch out your witness
 9    books?
10              MR. SCARBOROUGH:  Yeah.
11              Your Honor, may I approach?
12              THE COURT:  Yes.
13              (Brief pause.)
14              MR. SCARBOROUGH:  Your Honor, I will be using the
15    white report binder from yesterday that has -- I'm sorry, the
16    white binder yesterday that has the three reports in it.
17              THE COURT:  Okay.
18              MR. SCARBOROUGH:  Before we start, your Honor, in
19    light of the Court's prior order, I am not planning to proffer
20    the supplemental report, but rather elicit the testimony.  I
21    guess, for the record, I would just like to say any objections
22    we have to the exclusion, I would like to preserve; but, for
23    purposes of this hearing, I do understand what the Court wants
24    us to do and I'm willing to get started.
25              THE COURT:  Please.  Go right ahead.
```

Kneuper - direct

3

1       MR. RISKI:  May I make just a preliminary objection

2  for the record?

3       As far as the supplemental report, we have not

4  received a single page of any backup data for any of the

5  materials that he relied upon.  So, there will be objections

6  that will be made if there are opinions that are offered that

7  -- where backup data was not produced.

8       THE COURT:  Okay.  And you can explore that with the

9  witness.

10       And I also told you I would give you the opportunity

11  to file a sur-reply on this issue only.  So, to the extent you

12  need to raise it, go ahead.

13       Go ahead, Mr. Scarborough.

14                    DIRECT EXAMINATION

15  BY MR. SCARBOROUGH:

16  Q.  Good afternoon, Dr. Kneuper.

17       For the record, were you in court today during the

18  course of Dr. Schafer's testimony?

19  A.  Yes, I was.

20  Q.  Let's start in directly -- I should be clear; let's start

21  in directly -- on the issue of direct anti-competitive

22  effects.  And I'd like to start with Dr. Schafer's opinion

23  that MSRP plus 15 percent is evidence based on market power.

24       Let's reset briefly.  How does an antitrust economist

25  typically determine whether or not a firm in a market has

1   market power?

2   A.   The way an antitrust economist typically does it is -- and

3   it's described well in the Merger Guidelines -- is do a

4   variety of analyses.  And I would generally put them in three

5   buckets.  One would be market definition and market share; a

6   second bucket would be entry barriers; and, then, a third

7   bucket would be competitive effects, which we've been calling

8   here, I think, direct effects.

9        And the notion is to look at all of the evidence and

10   to consider all three of those buckets and the evidence

11   related to those three buckets to evaluate whether the

12   evidence indicates that market power likely exists.

13   Q.   And is it something in your understanding of the

14   Horizontal Merger Guidelines which you mentioned that they're

15   meant to be complimentary approaches?

16        MR. RISKI:  I am going to object.  I don't think any

17   of this is in his supplemental report.

18        MR. SCARBOROUGH:  Your Honor, I am just laying -- I

19   think it is in his report.  It's the analysis he did provide.

20   And it's the basis of his criticism that she should have

21   defined a market --

22        THE COURT:  Overruled.

23        MR. SCARBOROUGH:  -- relevant share in the market.

24   BY MR. SCARBOROUGH:

25   Q.   You mentioned as an authoritative source the Horizontal

1    Merger Guidelines.  Is it true that the approach you just

2    described is consistent with the Horizontal Merger Guidelines?

3    A.  Yes.  In a nutshell, the way the Guidelines describe it,

4    those three buckets are complimentary approaches.  And the

5    question is to look at all three buckets, and then the

6    economist will put greater weight on those buckets which may

7    be more informative towards the analysis.  But looking at all

8    three is necessary.

9    Q.  If you could look at Tab D in your black witness binder in

10   front of you.  Tab D contains PX-12, which is a copy of the

11   Horizontal Merger Guidelines.

12           Dr. Kneuper, if you could, if you recall where in the

13   Horizontal Merger Guidelines you're referring to?  If not, I

14   believe it was referred to in your report.  And I would be

15   happy to direct you to the page.

16   A.  Okay.

17   Q.  Have you found it, or would you like me to give you the

18   page if I can find it?

19   A.  If you could give me the page.

20   Q.  Absolutely.

21   A.  I think the quote from the supplemental report is at Page

22   15, if I remember.

23   Q.  Looks like your report cites the Horizontal Merger

24   Guidelines in this proposition at Footnote 84 citing Section

25   5.

Kneuper - direct

6

1       What page did you say, Dr. Kneuper?

2   A.  It looks like it's Page 15, first paragraph of Section 5

3   of the Guidelines.

4   Q.  Could you read that into the record, please?

5   A.  "The Agencies normally consider measures of market shares

6   and market concentration as part of their evaluation of

7   competitive effects.  The Agencies evaluate market shares and

8   concentration in conjunction with other reasonably available

9   and reliable evidence for the ultimate purpose of determining

10  whether a merger may substantially lessen competition."

11  Q.  And is it -- do you have an opinion whether Dr. Schafer's

12  report and her testimony here today was conducted in a manner

13  consistent with the portion of the Horizontal Merger

14  Guidelines you just read?

15  A.  No.  It is my opinion that it is not consistent with the

16  approach advocated in the Horizontal Merger Guidelines.

17  Q.  And why is that?

18  A.  Because, as I said, first of all, the emphasis is on doing

19  the three buckets.  And, second of all, if greater weight --

20  if a lot of weight is going to be put on one of the buckets --

21  let's say a lot of weight is going to be put on competitive

22  effects -- then it's paramount that the economist carefully

23  look at and consider alternative explanations of, for example,

24  direct effects and carefully consider whether or not the

25  evidence is strong that those direct effects indicate market

Kneuper - direct

1   power as opposed to alternative explanations.

2          So, it's both a matter of looking at all the evidence

3   in the case, looking at all three buckets, putting it all

4   together, telling you what story it tells you; but, also,

5   making sure you carefully apply it, especially something like

6   direct effects, which is very challenging in many cases.

7   Q.  Why, from the perspective of antitrust economics, is the

8   direct effects analysis challenging?

9   A.  Because, as I said, it's well recognized in economics that

10  one cannot simply look at a firm's prices or profits and

11  conclude that firm has market power.  It's much more

12  complicated than that.  That's why we go through the whole

13  process of doing market definition and market shares and

14  looking at anti-competitive theories and looking at evidence:

15  Because it's a rather complex process.

16         As I said, we take all of those things into

17  consideration.  And if we're going to do a direct effects

18  analysis, it's very important that we carefully analyze and

19  exclude alternative explanations for a particular effect.

20         So, just quickly, an example with the merger, if I'm

21  examining the potential impact of a merger and I'm going to

22  use the effect of a historical merger to try to infer direct

23  effect, it's paramount that I consider -- let's say the

24  historical merger had a merger and somewhat of a price

25  increase.  What drove the price increase?  Was it the merger?

 1   Was it just a change in pricing strategy?  Was it -- did other

 2   firms' prices also increase?

 3           It would be a very elaborate analysis to try to

 4   determine whether or not the direct effect is attributable

 5   specifically to market power or reflects market power.

 6   Q.  Now, maybe I misunderstood her earlier today.  I thought

 7   Dr. Schafer testified that we can find monopoly power wherever

 8   the profits are equal to marginal cost.

 9           Is that correct?

10           MR. RISKI:  Objection.  Mischaracterizes her

11   testimony.

12   BY THE WITNESS:

13   A.  She was talking --

14           THE COURT:  You can clarify if you need to.

15           If there is an objection, just let me rule first,

16   please.

17           THE WITNESS:  Okay.  Sorry.

18           THE COURT:  But you may respond.  You can clarify.

19   BY THE WITNESS:

20   A.  I think it was price over marginal cost.  And that's

21   generally the measure --

22   BY MR. SCARBOROUGH:

23   Q.  Correct.

24   A.  I think she clarified it towards the end.  That's

25   generally the measure of market power that's used in your

1    intro micro class.  That just means anything other than

2    perfect competition.  Virtually every firm has price-evoked

3    marginal cost.

4    Q.  In the real world?

5    A.  In the real world.

6            So, the real test of market power is sometimes in the

7    textbooks called substantial market power.  And that's --

8    that's -- the relevant market power here.

9    Q.  So, when Dr. Schafer was saying, at least in part, you

10   could derive market power where you see evidence that profits

11   exceed marginal cost, is it fair to say she was relying on the

12   classic definition of the inverse of what perfect competition

13   is?

14   A.  I think you said "profits," again.  It's prices above --

15   Q.  Prices.  Sorry.  I keep doing that.  I'm sorry.  It's late

16   in the day for me, too.

17   A.  That's okay.

18           No, to the extent that she was talking about price

19   above marginal cost, then that would be considered the basic

20   intro micro type of market power that virtually every firm has

21   and that doesn't apply in an antitrust context.

22   Q.  So, when one teaches introduction to economics, is the

23   classic definition of perfect competition where a firm's

24   prices will be equal to marginal cost?

25   A.  Yes, and --

Kneuper - direct

1    Q.  And is that based on an assumption of what we call perfect

2    competition, and what are those assumptions?

3    A.  Yes.  It's a simple model in our intro micro classes of an

4    extreme form of ideal competition.  And there's various

5    assumptions -- homogeneous product, large number of

6    competitors, perfect information, such that every competitor

7    simply takes the market price and charges the market price;

8    every competitor operates at marginal cost.  Virtually no

9    firms or industries operate according to that perfectly

10   competitive model.

11   Q.  Is it fair to say that the perfectly competitive model

12   rarely, if ever, exists in the real world?

13   A.  Yes.

14   Q.  If you could take a look at Tab C in your binder, I would

15   like to discuss with you the history of Peaches' pricing.

16   A.  Okay.

17   Q.  Do you understand Dr. Schafer's opinion in this case to

18   mean that there is some correlation between the price Peaches

19   charges for its in-store dress sales and its market power?

20   A.  Yes, I do.

21   Q.  And, in fact, is she making a causal statement?  What is

22   the relationship that she is positing?

23          MR. RISKI:  Objection.  Calls for him to speculate as

24   to what her testimony -- what she meant by her testimony.

25          MR. SCARBOROUGH:  No.  I'm asking his understanding

1  of what her testimony is regarding the relationship between

2  the two.

3          THE COURT:  Overruled.

4          You may answer, if you can.

5  BY THE WITNESS:

6  A.  My understanding is that her testimony is that during 2009

7  to 2012, Peaches had market power because it priced at 15

8  percent above MSRP.

9  BY MR. SCARBOROUGH:

10  Q.  Okay.

11          Now, let's take a look at Tab C of your binder.

12          MR. SCARBOROUGH:  For the record, this has been

13  previously marked as DX-40.

14  BY MR. SCARBOROUGH:

15  Q.  And, Dr. Kneuper, let's just talk through this quickly.

16  The X axis on this -- did you prepare this chart or did

17  someone in your office prepare this chart?

18  A.  I believe someone at my office prepared it.

19  Q.  Okay.

20          Look at the X axis.  What does that represent?

21  A.  That's time.  So, it's starting in 1985 -- which is when

22  Peaches began -- at the very left, and up until the present,

23  at the very right.

24  Q.  And now looking at the Y axis on the left, what does the Y

25  axis represent; and, then, can you walk us through what the

Kneuper - direct

1    blue line going -- moving away from the Y axis shows?

2    A.  Sure.

3           As it says at the top left, that's in-store pricing

4    strategy.  And the blue line shows from the beginning at MSR

5    plus 15 percent strategy and that strategy continuing on

6    through up until 2012, which is when Peaches started

7    restructuring its pricing strategy, ultimately moving down to

8    MSRP.

9    Q.  And if I could just stop you, do you understand the dotted

10   lined to represent the year it experimented with tiered

11   pricing?

12   A.  Yes.  This would be the transition during 2012 which

13   included tiered pricing.

14   Q.  So, if I understand correctly, when Peaches opened and was

15   a dress apparel shop --

16           THE COURT REPORTER:  I'm sorry?

17           MR. SCARBOROUGH:  I'm sorry.

18   BY MR. SCARBOROUGH:

19   Q.  When Peaches opened in 1985 as a dress apparel shop, was

20   its business model to charge MSRP plus 15 percent?

21   A.  Yes, that's my understanding.

22   Q.  And what happened when it began to carry prom in the

23   mid-'90s?

24   A.  That's my understanding, is a fundamental part of the

25   Peaches business model -- including carrying a lot of

Kneuper - direct

13

1    inventory, carrying many sizes of the same color and style

2    dress, the dress registry, so forth and so on -- has been also

3    pricing at 15 percent above MSRP.

4    Q.  And that has been unchanged since Peaches started adopt-

5    -- started selling prom and homecoming dresses in the mid-'90s

6    until about three years ago, when it started to get competed

7    away; is that correct?

8    A.  That's correct.

9    Q.  Now, take a look at the Y axis on the right-hand side.

10   What does that represent?

11   A.  That's Peaches' square footage.  So, you'll see the sort

12   of pink or orange shaded area.  And that just shows you that

13   at the beginning, it was about 2400 square feet; and, in the

14   mid-'90s, up to, I think it was, 4400; ultimately, around

15   2003, I believe it was 8400; and, then, around 2010, 2011, up

16   to its current size of 25,000.

17   Q.  Do you see any evidence, at least in this chart, DX-40, of

18   a correlation between Peaches' pricing policy of MSRP plus 15

19   percent and any alleged market power?

20   A.  No, I do not.

21   Q.  And could you explain what you see in this chart that

22   leads you to that conclusion?

23   A.  Sure.  I mean, what I see in this chart leads me to the

24   conclusion that it's -- at least strongly indicates a lack of

25   market power.  What I'm seeing here is that this pricing

1    strategy is occurring when Peaches is very small.  So, it's

2    occurring when it's 2400 square feet.  It's occurring when

3    it's 4400 square feet.  So, these are time periods when it's

4    very unlikely that Peaches could have conceivably had market

5    power, which is -- sorry, I'm blanking out here.  It's very

6    unlikely during a period when Peaches had market power.

7         And it's also during a period when Peaches is growing

8    substantially and growing its dress sales.

9         So, what that tells to me is part of this key part of

10   the business strategy is to be able to not only carry the high

11   inventories, but to also price above MSRP; and, then, all of

12   that is going hand in hand in helping Peaches to grow, which

13   indicates to me it's likely to be pro-competitive.

14        And, then, finally, more generally, what I'm seeing

15   is, as Peaches is getting larger and, in fact, about the same

16   time or just after it goes to 25,000 square feet, it lowers

17   its price based on its pricing strategy.  So, that's almost --

18   in a general sense, it's the opposite of what one would expect

19   with market power.  It's getting larger and it's actually

20   lowering its price.

21   Q.  Okay.  Thank you very much.  That's all I need from that

22   document.

23        Let's focus on Dr. Schafer's conclusion that Peaches

24   charges above a -- or charges a monopoly price, as she puts

25   it, because all -- allegedly all -- other retailers, specialty

Kneuper - direct

15

 1  boutiques in the Chicago area are charging MSRP.

 2          Do you recall that testimony?

 3  A.  Yes, I do.

 4  Q.  Is it fair to say that this is a fundamental component of

 5  her market power opinion?

 6  A.  Yes.  I see it as really core to her opinion that the MSRP

 7  -- the notion of MSRP plus 15 percent as being above the

 8  competitive price is obviously core to her opinion.

 9  Q.  Did Dr. Schafer conduct any study of pricing in the

10  Chicago market?

11  A.  Not as far as I can recall.

12  Q.  Do you recall if she conducted a survey of retailers in

13  the Chicago market to survey their historical prices?

14  A.  No, she did not.

15          MR. RISKI:  I'm going to object.  It mischaracterizes

16  her testimony.  She said she talked to former store owners.

17          THE COURT:  You are free to cross-examine.

18          MR. SCARBOROUGH:  Yeah, and we're coming to that.

19  BY MR. SCARBOROUGH:

20  Q.  So, Dr. Kneuper, are you aware of any -- I'll just leave

21  it at that.

22          Now, what evidence did she rely on?

23  A.  There were a few declarations.  I know this morning she

24  mentioned the declaration of Steve Lang.

25  Q.  Uh-huh.

1     And she also mentioned the declarations of a couple

2  of store owners; is that correct?

3  A.  Correct.

4  Q.  Okay.

5     So, we have one data point, a store talking about

6  what's happened or what it perceives happening -- I'm sorry,

7  in this case, what it's charging -- correct?

8  A.  That's correct.

9  Q.  According to the declarations?

10  A.  And just to be clear for the record, importantly is the

11  time period.  So, we're talking about her opinion is specific

12  to the 2009 to 2012 time period.  So, it's important to keep

13  that in mind in thinking about the value of these declarations

14  in terms of -- or the relative economic importance of these

15  declarations.

16  Q.  And you understand these declarations were submitted by

17  the plaintiffs in this case, correct?

18  A.  Yes, with the exception of the Steve Lang.  I think it was

19  a deposition that she referred to there.

20  Q.  Okay.

21     Let's just focus on the declarations from --

22  A.  Okay.

23  Q.  -- I believe, two store owners.

24     Did they provide any specifics about the prices they

25  charged between -- in that time period you just mentioned?

1   A.  Nothing specific.  It just -- my recollection was general

2   impression that retailers sell at MSRP.

3   Q.  With respect to Mr. Lang's testimony, do you know if he

4   was talking about the Chicago market?

5   A.  I don't recall.  He was talking about some different

6   areas.

7           What I do recall is I had the same reaction that

8   Dr. Schafer does.  And I agree with her, it's very unclear as

9   to the time period he's talking about.  Because it's important

10  to remember 2009 to 2012 is -- you know, we're now in 2015.

11  So, that's three to six years ago.

12  Q.  So, we have maybe three data points, two store owners

13  talking about what they charged and Mr. Lang's testimony,

14  correct?

15  A.  Correct.  I would only disagree -- I wouldn't use the word

16  "data points."

17  Q.  Okay.

18  A.  I would just -- three pieces of, to me, qualitative

19  evidence.

20  Q.  Okay.

21          Is there any quantitative evidence that was

22  systematically gathered to provide the baseline MSRP support

23  for her opinion?

24  A.  No.

25  Q.  Would an economist reasonably rely on the evidence that

1    Dr. Schafer relied on to assume that the price of every

2    product in the market isn't the same?

3           MR. RISKI:  Objection to form.  He can testify to

4    what he would do, but not economists in general.

5           MR. SCARBOROUGH:  This is a Daubert hearing, your

6    Honor.  I think it is relevant what an economist would do.

7           THE COURT:  Overruled.

8           MR. SCARBOROUGH:  They're free to cross-examine.

9           THE COURT:  Overruled.

10   BY THE WITNESS:

11   A.  No.

12   BY MR. SCARBOROUGH:

13   Q.  Why not?

14   A.  Because for such a central point to a market power

15   analysis, if the only evidence one has is a handful of

16   declarations and it's unclear even whether they're talking

17   about 2009 to 2012, then I would want to look for more

18   information and more data.  And if I can't find it, I can't,

19   you know, make an inference about market power based on a

20   direct effect analysis.  It just can't be done then.

21   Q.  Would you expect that in a peer-reviewed journal the

22   results of Dr. Schafer's opinion could be published based on

23   the qualitative evidence she provided for the benchmark?

24   A.  No.

25   Q.  And why is that?

Kneuper - direct

19

1   A.  Because, as I said, there's very limited evidence to even

2   suggest that the only competitive price during 2009 to 2012

3   was MSRP.  No data to back that up.  In my opinion, it's quite

4   speculative.

5   Q.  Let's turn to the e-mails that Dr. Schafer also discussed.

6           I believe her testimony earlier today was that the

7   various "do not sell" e-mails are relevant to her inquiry, but

8   only to the extent that they demonstrate that the designers,

9   in fact, complied with the request.

10           Do you recall that testimony?

11  A.  I recall that testimony, yes.

12  Q.  Did Dr. Schafer conclude that Peaches successfully made

13  demands on all 16 named designers not to sell their dresses to

14  Peaches based on these e-mails?

15  A.  No.  What I heard is she did not.  She could not say it

16  for the 16 and could not give any type of specific number,

17  both in terms of -- well, just could not give a specific

18  number.

19  Q.  Did Dr. Schafer conduct an analysis to determine whether

20  the "do not sell" e-mails restricted output of prom and

21  homecoming dresses in the entire Chicago market alleged in the

22  amended complaint?

23  A.  No.

24  Q.  And the Chicago market, even as she alleges it in the

25  complaint, is just a little bit smaller than the entire

1    Chicago MSA; is that correct?

2    A.  Yes.  It's the eight area codes that we've been talking

3    about.

4    Q.  Do you have an understanding whether Peaches believed it

5    had agreements with various designers to provide some measure

6    of geographic protection in exchange for high volume of sales?

7            MR. RISKI:  Objection to form.

8            THE COURT:  Sustained on form.

9            Rephrase.

10   BY MR. SCARBOROUGH:

11   Q.  Are you -- is it your understanding that Peaches has

12   various arrangements with individual designers that provide it

13   some measure of protection for some, in many cases, undefined

14   area?

15           MR. RISKI:  Object to form.  Calls for speculation.

16           THE COURT:  Overruled.

17           You may answer.

18           And, then, if he does, you need to get a foundation

19   for it.

20           MR. SCARBOROUGH:  Okay.

21   BY THE WITNESS:

22   A.  Yes.  It's my understanding that Peaches believes it has

23   an understanding that for volume commitments, there will be

24   some degree of protection.

25   BY MR. SCARBOROUGH:

Kneuper - direct

21

1   Q.  And what's the basis for that understanding?

2   A.  The e-mails that I've seen and some of the affidavits I've

3   seen, as well.

4   Q.  Okay.

5       Do you have a name that you use as an economist for

6   these types of arrangements or agreements?

7   A.  Yes.  Vertical restriction.

8   Q.  Okay.

9       And as a matter of antitrust economics, are the

10  vertical agreements that Peaches has considered anti-

11  competitive without further inquiry?

12      MR. RISKI:  Objection.  Legal conclusion and beyond

13  the scope of his supplemental report.

14      MR. SCARBOROUGH:  Your Honor, I'm just trying to tie

15  up a few points about the e-mails to demonstrate that the --

16  despite the sharp language in the e-mails, they are doing

17  nothing more than enforcing what Peaches believes is a

18  perfectly lawful agreement that has pro-competitive value.

19      THE COURT:  I am going to sustain the objection.

20  That is a different question.  And part of this, we are going

21  into legal areas.

22  BY MR. SCARBOROUGH:

23  Q.  Well, let me just go directly to this:  How can vertical

24  selling restrictions be pro-competitive?

25  A.  They can be pro-competitive in a variety of ways.

Kneuper - direct

22

1    Economists recognize that although a vertical restriction, by

2    its nature, restricts what we would call intra-brand

3    competition, it often helps to facilitate inter-brand

4    competition.

5         For example, competition between manufacturers is

6    often facilitated by the fact that they limit the retailers

7    that they sell to.

8    Q.  Okay.

9         Now, as an antitrust economist to determine whether a

10   selling restriction is not pro-competitive, would you need to

11   look at something more than the e-mails that Ms. -- Dr.

12   Schafer looked at?

13   A.  Absolutely.  Because the general starting point for the

14   economist is that these are very often pro-competitive, then I

15   would need to look at theories -- there are some theories out

16   there of certain situations in which a vertical restriction

17   might be anti-competitive, and I would need to look carefully

18   at those theories and see if the facts of the case support

19   those theories.

20        I'd want to also look to see if there's market power

21   generally.  So, for example, if there's a vertical restriction

22   involving firms that are involved in industries which are

23   fragmented and have a lot of competition, then by definition

24   that vertical restriction cannot be anti-competitive.

25   Q.  Let me just apply that to this case.  Is Dr. Schafer's

Kneuper - direct

1    opinion consistent with the structure of the prom and

2    homecoming market in Chicago that you investigated?

3    A.  In my opinion, no.

4    Q.  And why is that?

5    A.  Because there's simply too much competition.  There's

6    competition from other specialty boutiques, competition from

7    department stores, competition from Internet retailers.  And

8    it's incumbent that the economists consider that and address

9    it and evaluate that and what it tells you.

10          And what it tells me is that there's just too much

11   competition to exercise market power.

12   Q.  Now, let's assume that Peaches was charging -- just as

13   Dr. Schafer does, that Peaches was charging -- MSRP plus 15

14   percent.  Let's assume for the sake of argument that the rest

15   of the relevant market was charging at MSRP.

16          If four or five stores went out of business as a

17   result of those e-mails -- this is purely hypothetical, but

18   let's assume the worst, that they did -- as an antitrust

19   economist, is that fact significant to you to demonstrate

20   whether Peaches has market power?

21          MR. RISKI:  Judge, this is beyond the scope of the

22   Daubert motion.  There's nothing about foreclosure or --

23   mentioned at all in the Daubert motion.

24          MR. SCARBOROUGH:  Your Honor, I'm trying to make a

25   very simple point.  I can't tell you what I'm trying to say

 1  without telling --

 2          THE COURT:  Overruled.

 3          MR. SCARBOROUGH:  -- the Court --

 4          THE COURT:  I get it.

 5          Overruled.

 6  BY THE WITNESS:

 7  A.  Could you repeat it, again?

 8  BY MR. SCARBOROUGH:

 9  Q.  Sure.

10          So, take Dr. Schafer's assumption of MSRP plus 15

11  with a baseline of MSRP and assume the relevant market --

12  geographic market -- that she assumes.  If she -- if Peaches'

13  e-mails to, let's say -- regarding four or five competitors

14  resulted in those four or five competitors being run out of

15  business, is that, without more, evidence of market power to

16  an antitrust economist?

17  A.  No.  It would not be sufficient because, first of all, if

18  Peaches lacks market power, then those particular effects

19  cannot be anti-competitive.  And, more generally, the key,

20  from an economics point of view, is:  Is this -- is this --

21  type of conduct harming competition as opposed to harming

22  competitors?

23  Q.  Could you --

24  A.  Exclusive arrangements, for example, by definition,

25  exclude certain competitors and, thereby, in some narrow

Kneuper - direct

1    sense, harm competitors.  But that doesn't mean they harm

2    competition.  And that's the fundamental -- in economics, the

3    question is:  Does the particular conduct harm competition;

4    and, in particular, does it restrict output?

5    Q.  What is the difference, from the perspective of antitrust

6    economics, between harm to competition and a harm to a

7    competitor?

8    A.  The difference is that -- the fundamental difference is

9    that -- harm to competition can only occur when -- or one of

10   the fundamental differences is harm to competition can only

11   occur when -- market power is being exercised.  So, there

12   might be, you know, two very small firms in an area and one

13   firm engages in some type of unfair competition against

14   another firm.  But if there's not market power, there's not

15   the potential for an anti-competitive effect.

16   Q.  Is market power by a single-site retailer -- that is, a

17   store that has only one location as opposed to a chain -- is

18   single-site retail power rare?

19   A.  I'm not aware of any antitrust case in the retail area

20   involving a single-site retailer.  All of them -- I've been

21   involved in a lot of them, and all of them that I know of

22   involve chains.

23   Q.  And this is -- so, this is your first one involving a

24   single-site retailer?

25   A.  Yes.

Kneuper - direct

1   Q.  And you're not aware of any other ones that have been

2   discussed in the economic literature or anywhere else that

3   you've seen?

4   A.  No.

5   Q.  And why is retail market power rare?

6   A.  Because retail is basically buying from a manufacturer and

7   reselling.  And very oftentimes the retailer, especially a

8   single-site retailer, is beholden to the manufacturer, very

9   subject to the manufacturers.  And, you know, in that kind of

10  situation where all you're really doing is buying and

11  reselling, it's very hard to imagine how market power could

12  potentially exist at the retail level.

13  Q.  Let me switch gears now.  And I'd like to move fairly

14  quickly, if I could, through Dr. Schafer's definition of the

15  product and geographic markets.  And let's move right into her

16  limitation of the product market to the 16 named designers.

17          Are you aware that she has made that limitation her

18  product market?

19  A.  Yes, I am.

20  Q.  Why is it important -- let's back up one step.  Why is it

21  important for an economist to properly define a relevant

22  product market?

23  A.  Because in order to get a reliable estimate of a market

24  share is measuring or proxying for at least the potential to

25  have market power, it's important that the economist identify

Kneuper - direct

1　the relevant substitutes -- those relevant, close-enough

2　substitutes -- that will allow one to basically draw a circle

3　around the relevant competitors.

4　　　　So, we do that by looking at product market and look

5　at which substi- -- which products can consumers and are

6　consumers willing to substitute, and we also do it by looking

7　at the geographic alternatives of consumers.

8　Q.　Now, you're aware of testimony in this case, or

9　declarations submitted, by designers discussing the number of

10　other designers who sell prom and homecoming, correct?

11　A.　Yes, I am.

12　Q.　Did you attempt to identify on your own a number of

13　designers based on publicly available information?  And that

14　is designers who sell prom and homecoming dresses.

15　A.　Yes, I did.

16　Q.　Could you just take a look at Tab 1 of the white witness

17　binder.  And I believe at -- it is Exhibit 3 to your expert

18　report.  If you could identify that and explain what it is for

19　the record?

20　　　　MR. RISKI:  Bob, which binder are you talking about?

21　I'm sorry.

22　　　　MR. SCARBOROUGH:  It's his expert report.

23　　　　THE COURT:  This is the original?

24　　　　MR. SCARBOROUGH:  The witness binder, I am referring

25　to.

```
 1                THE WITNESS:  This is the original.

 2                MR. SCARBOROUGH:  So, it's his --

 3                THE COURT:  Original expert report, correct?

 4                MR. SCARBOROUGH:  Correct.

 5           I'm sorry, your Honor.  I'm sorry, your Honor.

 6           Yes, his original expert report, Tab 1, Exhibit 3.

 7    BY THE WITNESS:

 8    A.   Yes.  This represents a list of a sampling of prom and

 9    homecoming dress designers.  Part of it was taken from

10    Hannah's' Web site, the designers it sells.  Peaches has a

11    vendor list.  I started with that and, then, based on Internet

12    research, identified those that sell prom and homecoming.

13    And, so, this is the sample list that I put together based on

14    that approach.

15                MR. RISKI:  Judge, I'm just going to object if we're

16    going to be going back to his initial report now.

17                THE COURT:  I am assuming it is going to be linked

18    up.

19                MR. SCARBOROUGH:  One more question and I'm linking

20    it up.

21                THE COURT:  Okay.

22    BY MR. SCARBOROUGH:

23    Q.   Did the list include all designers of prom dresses -- prom

24    and homecoming dresses -- in the United States?

25    A.   No, it did not.
```

Kneuper - direct

29

1    Q.   Okay.

2              Does Dr. Schafer disagree with your conclusion that

3    there are more designers of prom and homecoming dresses beyond

4    the 16 named designers?

5    A.   No, she does not.

6    Q.   And is it your opinion that the named designers and the

7    non-named designers compete with one another?

8    A.   Yes, it is my opinion that they do.

9    Q.   And does Dr. Schafer agree with that opinion?

10   A.   Yes.  That's my understanding in listening to her

11   testimony today and reading her report.

12   Q.   Now, is there a -- I think we've established in an

13   undisputed fashion there are more designers than the 16.  Is

14   there a generally accepted economic principle for determining

15   whether two products are in the same or different product

16   markets?

17   A.   The generally -- the generally -- accepted approach that

18   is commonly used is called a SSNIP test.  And that's a pretty

19   standard test.

20   Q.   Is there a more general -- and maybe I asked the question

21   incorrectly.

22             Is there a economic method or principle?  And because

23   it's late, I will just say I am trying to --

24   A.   No, I understand.

25   Q.   I think we all know I'm -- I know I'm -- trying to talk

Kneuper - direct

1   about substitutability.

2   A.   Right.

3   Q.   Are you familiar with that concept?

4   A.   Yes.

5   Q.   What is the concept of substitutability?

6   A.   So, that is at the core -- at the core of market

7   definition, both product market definition and geographic

8   market definition, is to assess the ability and willingness of

9   consumers to switch between products and switch between

10  geographic areas; and, in particular, to respond to shift if

11  they're dissatisfied with purchase -- purchasing a particular

12  product.

13           So, it's basically -- at the core is an analysis of

14  substitutability.

15  Q.   And why is that important from the perspective of

16  determining whether a firm in a market has market power?

17  A.   Because, obviously, if there are a lot of substitutes for

18  a product or there are a lot of geographic substitutes for a

19  firm's product, then it's not going to be able to exercise

20  market power.

21  Q.   Now, is a substitutability analysis typically undertaken

22  by an economist using fairly sophisticated econometrics?

23  A.   If the data's available, we would use -- economists would

24  look at and do analyses sometimes called econometric analyses.

25  Many times the data is not available and instead the economist

Kneuper - direct

31

 1    looks for certain information to infer a likely level of

 2    substitution.

 3    Q.   And what would those alternative measures be?

 4    A.   It would be price, use, quality.  Those are three very

 5    fundamental measures.

 6    Q.   Did Dr. Schafer apply any econometric analysis -- or

 7    conduct any econometric analysis -- to determine whether or

 8    not the 16 named designers were in a separate product market

 9    from the other designers?

10    A.   No.

11    Q.   Do you believe that she correctly applied principles of

12    use, quality and price in determining whether or not the 16

13    named designers should be in the same or different product

14    market?

15    A.   No, I don't believe she correctly applied those

16    principles.

17    Q.   Let's start with the use of dresses.

18           Is there any disagreement between Dr. Schafer and you

19    that prom and homecoming dresses made by both the named and

20    non-named designers can be used for the same purpose?

21    A.   No, no disagreement.

22    Q.   So, there's no disagreement that use can't be used here as

23    a differentiating feature between the two types of designers?

24    A.   That's right.  They're prom and homecoming dresses.

25    Q.   Okay.  Let's turn to quality.

Kneuper - direct

1          Do you and Dr. Schafer also agree that there are no

2    differences in quality that would provide a basis for dividing

3    the named designers and non-named designers into separate

4    product markets?

5    A.   Yes.

6    Q.   And in her report, notwithstanding the fact that she is

7    not relying on quality, she briefly touches, in her report, on

8    factors that one might consider quality differences.  And, so,

9    I just want to remove any doubt regarding those.

10          Dr. Schafer characterized the named designer dresses

11   as high end.  Do you recall that?

12   A.   Yes, I do.

13   Q.   Did Dr. Schafer offer any objectively verifiable standard

14   or evidence that the dresses of the named designers were high

15   end, but that the dresses of the non-named designers were not

16   high end?

17   A.   No, she did not.

18   Q.   In emphasizing the named designers, Dr. Schafer also

19   mentioned that they were, quote, "featured and advertised."

20   Did she analyze the magazines -- featured and advertised in at

21   least two prom magazines.

22          Are you aware whether she conducted any analysis,

23   again, using objective criteria, to see if the named designers

24   advertised or were discussed more than the non-named designers

25   in those two prom magazines?

Kneuper - direct

1    A.   I'm not aware of any analyses along those lines.

2    Q.   Dr. Schafer also suggested in her report that the dresses

3    of the named designers have more bling.  Do you have an

4    opinion whether Dr. Schafer has a basis for her conclusion

5    that the named designers have more bling?

6            MR. RISKI:  I'm just going to object.  She testified

7    that that was not something that she considered in her

8    alternate opinion on market power.

9            THE COURT:  I think it was in her report.

10            MR. SCARBOROUGH:  If that's clear, we'll just move

11    on.

12            THE COURT:  Okay.

13            MR. SCARBOROUGH:  As long as they're not suggesting

14    that bling matters.

15            THE COURT:  We will take the bling out.  Go ahead.

16            MR. SCARBOROUGH:  What's that?

17            THE COURT:  I said we will take the bling out.

18            (Laughter.)

19            THE WITNESS:  Still trying to figure out quite what

20    bling is, but --

21    BY MR. SCARBOROUGH:

22    Q.   Now, let's turn to the third measure of substitutability.

23    So, we've discussed price and quality, and I think we've

24    safely determined those aren't at issue here -- use and

25    quality.  I'm getting to price.  I'll get to price.  Use and

Kneuper - direct

34

 1   quality.

 2          Let's turn to that.  What did Dr. Schafer do to

 3   investigate the price differences between named and non-named

 4   designers?

 5   A.  Primarily what she did -- and I think she talked about it

 6   some earlier today -- was to compare the average and median

 7   prices of the dresses sold at Peaches for the named and

 8   non-named designers.

 9   Q.  And if you could turn to Dr. Schafer's report, Table --

10   Tab 2 of the white witness binder, and I'd like to direct your

11   attention to Exhibits 3, 4 and 5.

12   A.  Okay.

13   Q.  Do those exhibits reflect the analysis that Dr. Schafer

14   did on the price of Peaches in -- well, let me start with

15   Exhibit 3.

16          Does Exhibit 3 contain a set of summary statistics

17   regarding Peaches' in-store dress prices from 2011 to 2013?

18   A.  Yes, it does.

19   Q.  Okay.

20          And what is Exhibit 4 and 5?

21   A.  Exhibits 4 and 5 involve a similar type of comparison

22   where Exhibit 4 is limited to peachesboutique.com.  So, that's

23   their -- one of their Internet sites.  And, then, the Exhibit

24   5 is promdressshop.com and dressforprom.com.

25   Q.  Do you know whether Dr. Schafer relied on those exhibits

1   in reaching her opinion about the relevant product market?

2   A.  It was -- she certainly talked about them today.  And

3   there's, it appears to be, at least a suggestion in the report

4   that those might be relevant to her market definition.  It's a

5   bit unclear to me because I believe at deposition she said

6   that her findings with respect to this table did not matter

7   with respect to market definition.

8   Q.  In particular, do you recall her testimony on Page 141 of

9   her deposition that, "If this analysis shown in Exhibit 3 -- "

10  this is, I'm sorry, the question.

11      "If this analysis shown in Exhibit 3 had concluded

12  that there was no statistical difference between the price for

13  the named designers and the non-named designers --

14      "Answer:  Uh-huh.

15      "Question:  -- that would have not had any effect on

16  your opinions in the case?

17      "Answer:  That's correct.  It would not change my

18  opinion."

19      Is that the testimony you were referring to?

20  A.  Yes, that is.

21  Q.  Did you conduct any analysis based on Dr. Schafer's price

22  calculations?

23  A.  Yes, I did.

24  Q.  What did you do?

25  A.  What I did was took this a step further and looked at the

Kneuper - direct

36

 1   distribution of prices.

 2   Q.  And is that reflected in your supplemental report?

 3   A.  Yes, it is.

 4          MR. SCARBOROUGH:  Your Honor, I am going to ask him

 5   to refer to three figures in his supplemental report for

 6   purposes of his testimony, and this is really for ease of

 7   reference.

 8          THE COURT:  Okay.

 9   BY MR. SCARBOROUGH:

10   Q.  Dr. Kneuper, if I could direct your attention to Figures 1

11   and 2 in your report.  Do you see that?

12          And this is your supplemental report.  I'm sorry.

13   A.  In which binder?  Is it the black --

14   Q.  The white binder, I believe, Tab 3.

15          THE COURT:  Tab 3.

16   BY MR. SCARBOROUGH:

17   Q.  Tab 3 of the white binder.

18   A.  Thank you.

19          (Brief pause.)

20   BY THE WITNESS:

21   A.  Okay.  Figure 1?

22   BY MR. SCARBOROUGH:

23   Q.  Right.

24   A.  Okay.

25   Q.  Did you prepare Figure 1?

1    A.  Yes, I did.

2    Q.  What does Figure 1 show?

3    A.  It shows -- based on the data in Dr. Schafer's Exhibit 3

4    that we were just discussing, it shows -- the distribution of

5    the prices.  So, the red line going across horizontally, that

6    big circle is the mean.  And each --

7    Q.  The mean of, what?  The mean of --

8    A.  The mean is calculated by Dr. Schafer of named prom and

9    homecoming dresses sold at Peaches.

10    Q.  Got it.

11    A.  And, then, the two diamonds -- the red diamond to the

12    right and to the left -- are two standard deviations to the

13    right, two standard deviations to the left.  So, that gives

14    you a feel for the range of prices.

15          I did the same thing below it for the non-named

16    designers.  And what you see here is there is a substantial

17    overlap in prices between the named and the non-named

18    designers based on Dr. Schafer's own analysis.

19    Q.  So, Dr. Schafer, her -- the Exhibits 3, 4 and 5 that we

20    were looking at, they were focused in a sense on reporting the

21    red and the blue dots that we see here?

22    A.  Yes.  Her report of those red circles and the diamonds are

23    based on the reported mean and standard deviation in her

24    Exhibit 3.  So, I'm just, in effect, taking her Exhibit 3 and

25    demonstrating the distribution that one can infer from that

Kneuper - direct

38

1    exhibit.

2    Q.   Two standard deviations, if I recall correctly, is that

3    60-some percent?

4    A.   No, two standard deviations is about 95 percent.

5    Q.   95 percent, correct?

6    A.   And we also double-checked with her data and you'll see a

7    couple of sentences to the right to confirm that this includes

8    approximately 95 percent of the prices of named and non-named

9    designers.

10   Q.   And does Figure 1, in your view, demonstrate a substantial

11   overlap in the prices between the two categories?

12   A.   Yes.

13   Q.   Let's turn to Figure 2.

14          What is Figure -- did you prepare Figure 2?

15   A.   Yes, I did.

16   Q.   What does Figure 2 show?

17   A.   It shows a similar type of comparison, but for 2012.

18   Figure 1 was 2011 Peach prices.  Figure 2 is 2012.  So,

19   these -- both of these -- comparisons are during the period of

20   time which Dr. Schafer opines that Peaches had market power.

21   Q.   And is your conclusion regarding Figure 2 the same as it

22   was for Figure 1?

23   A.   Yes.

24   Q.   Now, let's take a look at Figure 3, which should be on the

25   next page of the supplemental report.  What is that?

Kneuper - direct

39

1    A.   That represents a distribution of Hannah's' prices for

2    prom and homecoming dresses sold during the spring of 2012,

3    again, taken from Dr. Schafer's report.

4         In this case, what we did was we took the actual data

5    points and we plotted them.  And, so, for the spring of 2012,

6    what this shows is -- I'm calling it the spring; January

7    through May, 2012, but basically the prom season -- it shows

8    red circles.  Those are the named designer dresses in the

9    red --

10   Q.   Do you mean blue circles?

11   A.   Thank you.

12        Blue circles are the named designer dresses and their

13   prices, and red triangles are the non-named designers.  So,

14   the horizontal axis is time.  So, this is showing different

15   transactions at different points in time.  And the vertical

16   transac- -- the vertical axis is showing the price.

17   Q.   And is it your view that if Dr. Schafer had been correct,

18   that the red -- the blue -- now you've got me doing it -- the

19   blue circles would cluster together and above the red

20   diamonds, as opposed to being interspersed with one another,

21   like we see here?

22   A.   Well, generally speaking, in a differentiated product

23   setting, in order to be able to distinguish a certain set of

24   products -- such as, for example, named designers from

25   non-named designers -- I'm looking for an indicator that

Kneuper - direct

40

1    there's some breaking point between the two.  And, typically,

2    that would be price.

3            So, we might have a high-end product could be a

4    market definition conceivably; but, that high-end product

5    would tend to be at a higher price point consistently,

6    compared to a lower-end product.

7            So, that's what I'm looking for here:  Is there a

8    clear break or distinction between the named designer and

9    non-named designer prices?

10   Q.  And what did you conclude from your analysis in Figures 1,

11   2 and 3?

12   A.  That there is a very substantial overlap in prices between

13   the dresses sold both at Peaches and Hannah's for named

14   designers and non-named designers.

15   Q.  Did Dr. Schafer conduct any similar types of analysis that

16   we see reflected in Figures 1, 2 and 3?

17   A.  No.  Other than the Exhibit 3 that we talked about in some

18   general statistics, like medians and averages, that she has in

19   some of her exhibits.  Nothing that breaks out the

20   distribution like this.

21   Q.  Let's go back and talk about her mean value calculations.

22           Did you conduct an alternative analysis on Dr.

23   Schafer's pricing data to check whether her methodology was

24   correct?

25   A.  Yes, I did.

Kneuper - direct

1  Q.  What did you do?

2  A.  Well, what I did was, assuming that this notion that this

3  differential might make sense -- or at least it was suggested

4  in her initial report that somehow comparing the median price

5  or the average price between named and non-named designers is

6  meaningful, which I don't believe it's very meaningful at all,

7  but even assuming that's the case -- what I did was to look at

8  alternative groupings of designers to see if one could

9  basically get the same type of result.

10  Q.  And when you did that, what did you find?

11  A.  Well, I found that the finding in her Exhibit 3 -- or one

12  of the fundamental findings and that she talked about this

13  morning -- was that the -- on average, the -- named designer

14  dresses were higher in price than the non-named designers.

15         But what I found was, if I changed the definition of

16  named designers and I drop out four of them and I only have 12

17  named designers or if I add four non-named designers -- so,

18  I'm up to 20 total named designers -- I can easily get the

19  same type of result.

20  Q.  Why is that significant?

21  A.  Because what it tells me is, it further confirms that that

22  kind of simple pricing comparison is not informative; and, it

23  certainly does not form a rationale for selecting the named

24  designers as being part of a separate product market.

25  Q.  And if you look at Page 20 of the supplemental report

Kneuper - direct

42

1   referring only to Table 1, does that reflect the result of

2   your alternative grouping analysis?

3   A.  Yes, it does.

4   Q.  Let's turn briefly now to the exclusion of the Internet in

5   the product market definition.

6          Do you have an opinion whether Dr. Schafer used an

7   acceptable economic methodology to conclude that Internet

8   sales should be excluded from the product market?

9   A.  Yes, I do.

10  Q.  And what is your opinion?

11  A.  My opinion was that she did not use appropriate economic

12  methodologies to exclude Internet and her opinion in that

13  regard is unreliable.

14  Q.  Okay.

15         What was improper about her methodology and analysis

16  in excluding the Internet?

17  A.  Fundamentally, what she relied upon was this argument of

18  MSRP plus 15 percent.  So, the logic is, despite the fact that

19  there are numerous Internet retailers that sell the exact same

20  dresses that are available at Peaches and elsewhere, despite

21  the fact that Peaches had to specifically change a

22  decades-long pricing policy because of the inroads made by the

23  Internet, she focused instead on this argument that, well, if

24  they're pricing above anti-competitive levels, then there must

25  not be a sufficient constraint from -- whatever is outside the

1  market that's pleaded in the complaint must not be

2  constraining because they're pricing anti-competitively; so,

3  if I assume someone's pricing anti-competitively, that

4  naturally means there's not a constraint -- a full

5  constraint -- from competitors.

6  Q.  Now, Dr. Schafer -- even Dr. Schafer acknowledges that at

7  some period between 2009 and 2012, even under her view, the

8  Internet becomes a competitive factor that, again, in her

9  view, ultimately leads to Peaches' reduction in pricing to

10  MSRP.

11        Do you recall that?

12  A.  I do recall that.

13  Q.  Does she provide any principal basis grounded in economic

14  theory or analysis to opine when the Internet is not a factor

15  and then becomes a factor?

16  A.  No.

17  Q.  Okay.

18        In fact, were you in the courtroom this afternoon

19  when she testified that the Internet was putting price

20  pressure on Peaches as early as 2009?

21  A.  I believe that was her testimony.

22  Q.  If you could just take a look at Figure 4 in your

23  original -- I'm sorry, in the supplemental report.

24  A.  Okay.

25  Q.  What does this table show?

Kneuper - direct

44

1    A.   That is showing what is generally recognized as one of the

2    highest growing categories on the Internet for Internet sales,

3    and that's Internet apparel.  So, it's basically showing very

4    substantial growth in sales of the Internet over time from --

5    starting in 1999 up till 2013, and particularly significant in

6    the last five or ten years.

7         MR. RISKI:  Judge, I'm going to object to this line

8    of questioning and move to strike.  There's been no backup

9    data at all for this particular Figure 4 in the supplemental

10   report.

11        MR. SCARBOROUGH:  Your Honor, it appears this was

12   retrieved from a publicly available source, the Euromonitor

13   Passport Global Market Research Database.

14        THE COURT:  Well, why don't you clarify with the

15   witness if he relied on anything else in connection with his

16   graph or if it is just something that he cut and pasted from

17   the publicly available source.

18        MR. SCARBOROUGH:  Sure.

19   BY MR. SCARBOROUGH:

20   Q.   Where did you get the data for this Figure 4?

21   A.   From the source which is footnoted there, which is a

22   publicly available source.

23   Q.   And does this chart -- other than a steep and steady rise

24   in Internet apparel sales, does it suggest that -- between

25   2009 and 2012, do you see anything in the chart that suggests

Kneuper - direct

45

1  there was an inflection point, something happened, anything?

2  A.  No.  No.  It's -- it's -- been a general increasing

3  phenomenon, both generally and based on my reading of the

4  record, in the prom and homecoming industry, as well.

5  Q.  If you could turn to Exhibit 7 of your original report at

6  Tab 1.

7  A.  Okay.

8  Q.  Do you see that?  Tell me when you're there.

9  A.  Okay.

10  Q.  Do you recognize Exhibit 7?

11  A.  Yes, I do.

12  Q.  Did you prepare Exhibit 7?

13  A.  Yes, I did.

14  Q.  What is Exhibit 7?

15  A.  It's, again, selected examples in this case, 20 -- I

16  believe it was 20 -- Internet retailers.  So, it shows the

17  retailer name, the Web address, the affiliated brick-and-

18  mortar location and the designers and designer lines they

19  carry as listed on their Web site.

20  Q.  And what is the significance of the bolding of certain

21  designer names in the fourth column?

22  A.  Those are the named designers in this case.

23  Q.  And what does this -- and I'm sorry if I asked you this.

24  What does this show to you?  What do you conclude from this

25  table?

1   A.   It shows to you that when you look at these Web sites,

2   many, many of these lines are prom and homecoming lines.  And,

3   generally, what you see is the types of prom and homecoming

4   dresses available at a brick-and-mortar store are available in

5   a very wide selection on the Internet.

6        So, many of these retailers have a very wide

7   selection of prom and homecoming dresses from both the named

8   and non-named designers.

9   Q.   And just quickly, if you could turn back to a prior set of

10  three exhibits, Exhibit 6-A, Exhibit 6-B and Exhibit 6-C and

11  Exhibit 6-D -- I meant to say four reports, not three --

12  briefly, what do these exhibits show?

13       MR. RISKI:  Judge, objection.  Beyond the scope of

14  her testimony.  She didn't provide any testimony about

15  Exhibits 6-A through 6-D of his report.

16       MR. SCARBOROUGH:  Your Honor, I'm just trying to

17  establish for the Court that, in fact, Internet pricing is the

18  same for certain dresses as are sold on online retailers.

19       Did not say that very well.  I hope it came through,

20  what I meant.

21       THE COURT:  I understood what you meant.

22       MR. RISKI:  I don't think that contradicts anything

23  regarding her testimony, so I don't know what the relevance

24  would be.

25       THE COURT:  I will sustain it at this point.

 1           It is also 5:15.  You have been going for over an

 2    hour now.  Do you have a sense of how close you are?

 3           MR. SCARBOROUGH:  Maybe 10 to 15 minutes.  And I will

 4    really try to --

 5           THE COURT:  Let's see if you can --

 6           MR. SCARBOROUGH:  I'll really try to rip through it.

 7           THE COURT:  I am not sure we are going to finish

 8    tonight, so -- which means you have to come back.

 9           THE WITNESS:  Would that be tomorrow morning or --

10           THE COURT:  I am full tomorrow.

11           THE WITNESS:  Okay.

12           THE COURT:  So, it would have to be Friday.

13           THE WITNESS:  Okay.  Thank you.

14           THE COURT:  If that works.

15           THE WITNESS:  I have to check my schedule.

16           THE COURT:  Okay.

17    BY MR. SCARBOROUGH:

18    Q.  Let's just touch briefly on price discrimination or

19    alleged price discrimination.

20           In the context at least of Internet pricing by

21    Peaches, Dr. Schafer contends that its pricing policy at one

22    time suggested that it was engaged in price discrimination,

23    which Dr. Schafer contends is evidence of market power.

24           Do you recall that?

25    A.  Yes, I do.

Kneuper - direct

1    Q.  Do you have an opinion whether Dr. Schafer's evidence of

2    Peaches' pricing strategy is the type of evidence that an

3    economist would rely on to conclude that a firm was engaged in

4    price discrimination?

5    A.  Yes, I do.

6    Q.  And what is that?

7    A.  The -- my review of what the pricing occurred there is --

8    I think she's mistaken in calling this price discrimination.

9    This is not what an economist would call price discrimination.

10         It's what I would call channel management.  They are

11   basically trying to prevent customers from going in store,

12   taking advantage of the in-store services provided and, then,

13   buying a prom or homecoming dress -- the exact same dress they

14   like in the store, but online from Peaches.

15   Q.  What distinguishes price discrimination from channel

16   management?

17   A.  Price discrimination involves, as I teach in my managerial

18   economics class, charging different prices to different

19   customers based on different elasticities of demand, different

20   sensitivities of demand.  So, I, for example, charge higher

21   prices to less price-sensitive customers and lower prices to

22   more price-sensitive customers.

23   Q.  Assuming only for the sake of argument that Dr. Schafer

24   was correctly applying the principle of price discrimination,

25   do you have an opinion whether she applied a appropriate

Kneuper - direct

1    methodology in determining whether there was price

2    discrimination?

3    A.   Yes.

4    Q.   And what is that?

5    A.   I don't think she -- I don't think she -- applied

6    appropriate methodology.  As I said, it wasn't -- in my

7    opinion, it's not price discrimination; but, also, more

8    importantly, she testified that it somehow indicates market

9    power, even though it's on the Internet that this is

10   occurring.

11        But more importantly, price discrimination is

12   ubiquitous.  I give many examples.  In Washington, D.C., for

13   example, the hot dog stands will charge higher prices -- they

14   don't list their prices.  They charge higher prices to

15   tourists compared to locals.  Obviously, the hot dog stands

16   don't have market power, but they price discriminate.

17        So, you can't draw inferences of antitrust-type

18   market power from the fact of price discrimination, even if it

19   were to exist in this case.

20   Q.   Did you find any principal basis for Dr. Schafer to select

21   what she called the Internet price discrimination as evidence

22   of market power for one purpose, but to exclude the Internet

23   as a -- from the product market for all other purposes in this

24   case?

25   A.   No.  That was confusing to me.  It seemed to be that she

1   was saying that peachesboutique.com somehow has market power

2   with respect to certain sales, but Internet retailers

3   obviously don't have market power.

4        I didn't find any basis for any inferences of market

5   power based on this. And, obviously, the Internet -- as I

6   said, the prices of these dresses are similar and widely

7   available on the Internet; and, she seemed to not address that

8   fact in terms of direct -- directly looking at it.

9   Q.  Quickly on exclusion of department stores, do you have an

10  opinion whether Dr. Schafer was correct to include department

11  stores -- exclude department stores?

12  A.  Yes.

13  Q.  And what is that?

14  A.  My opinion was she -- she provided no reliable basis to

15  exclude department stores.

16  Q.  On what basis did she justify excluding department stores

17  from the relevant market?

18  A.  Two -- two -- basic things. One was this 15 percent

19  argument; that if Peaches is pricing anti-competitively, then

20  department stores must not be a sufficient competitive

21  constraint. And, as I said, I believe that's flawed. So,

22  that doesn't work.

23       But even beyond that, even if that argument somehow

24  worked, an economist needs to look at interchangeability and

25  analyze data relating to interchangeability. And the data I

Kneuper - direct

1    saw indicated -- in fact, a big department store I visited

2    showed -- that there were similar prices at department stores

3    versus Peaches.  And these were prom dresses, same use,

4    similar price levels, presumably similar quality level.  So,

5    same basic problem as we discussed with respect to the

6    Internet.

7    Q.  Do you recall any, what you would consider, reliable

8    economic evidence that Dr. Schafer testified to or discussed

9    today or in her report that would suggest that sales at

10   department stores are in a different product market than

11   retail sales?  Any analysis she did?

12   A.  No, no.  In fact, I meant to mention, as well, she

13   suggests -- I think she uses a analogy in her report of

14   higher-end cars and lower-end cars, suggesting potentially

15   that somehow Peaches and other specialty boutiques are BMWs

16   and department stores are Honda Civics or -- I don't remember

17   the specific cars that she cited to.

18        But I've seen no evidence to support that.  I don't

19   believe she cited to any evidence to support that.

20   Q.  An analogy is not economic evidence?

21   A.  No, it is not.

22   Q.  Briefly, on the geographic market --

23        (Brief pause.)

24        MR. SCARBOROUGH:  Your Honor, bear with me.  I'm

25   trying to see if I can shorten this.

Kneuper - direct

52

1  BY MR. SCARBOROUGH:

2  Q.  Dr. Kneuper, if you could turn to Tab C in the -- I'm

3  sorry, Tab B in the black witness binder.

4      MR. SCARBOROUGH:  For the record, it's DX-30, Figure

5  3, from Dr. Schafer's -- excuse me, Dr. Kneuper's original

6  report.

7  BY MR. SCARBOROUGH:

8  Q.  Do you see that, Dr. Kneuper?

9  A.  Yes, I do.

10  Q.  Did you prepare this?

11  A.  Yes, I did.

12  Q.  The shaded area in pink or peach -- how appropriate,

13  peach -- but pink, let's go with pink -- those are the area

14  codes that define Dr. Schafer's product market, correct?

15  A.  Yes.

16  Q.  Okay.

17      Now, if you could --

18      MR. RISKI:  I think you just said "product market."

19  BY MR. SCARBOROUGH:

20  Q.  Geographic market.

21  A.  Thank you.

22      Her eight-area-code geographic market is represented

23  by the shaded pink area.

24  Q.  Okay.

25      And explain what the 30-mile and the 50-mile radius

Kneuper - direct

53

1    you've drawn on this reflects?

2    A.   Sure.

3         The star -- the red star -- in this map is Peaches.

4    So, the 30 -- the dotted semi-circle, which is 30 miles, shows

5    you 30 miles from Peaches; and, then, the wider dash line

6    shows you 50 miles radius from Peaches.

7         So, this is -- this is -- a fairly standard type of

8    analysis that economists do in retail markets in analyzing

9    geographic competition to look at appropriate radiuses around

10   competitors.

11   Q.   And this -- the area within the 30-mile radius in Indiana

12   and in the 815 and 779 that contains Joliet, do those

13   represent areas that are within 30 miles that Dr. Schafer

14   excluded from her geographic market?

15   A.   Yes.

16        As you can see here, the Joliet area, which is part

17   of area code 779/815, is outside the pink and, therefore,

18   outside the eight area codes.  And, similarly, to the right,

19   the Gary and Hammond, Indiana, areas, though they're within 30

20   miles, they're within area code 219 -- and they are in yellow;

21   they're not shaded pink -- and they are excluded and outside

22   of the eight-area-code market.

23   Q.   Are you familiar with Dr. Schafer's testimony today that

24   she said that she couldn't get ZIP Code information and,

25   therefore, relied on the area code information without further

Kneuper - direct

1  inquiry?

2  A.  Yes, I am.

3  Q.  Do you agree that there were not other ways for her to

4  calculate a proper geographic market, even if she wasn't

5  relying on the ZIP Codes?

6  A.  No, I do not agree that she could not do it.

7  Q.  And what do you think she reasonably could have done from

8  an economic perspective?

9  A.  She certainly could have looked at high schools.  While

10  there may be some differences in travel patterns to high

11  schools, high schools are going to be pretty local.  And the

12  prom and homecoming data from Peaches had extensive high

13  school descriptions in those fields.  In fact, I used those

14  in -- I think it was Table 3 of my original report.

15          So, high schools are readily available in the data

16  and can be used to more precisely identify geographic

17  boundaries compared to area codes.

18  Q.  Putting to one side any methodological issues, did

19  Dr. Schafer identify any economic reasons -- any economic

20  reasons -- that would justify excluding the areas within the

21  30-mile radius?

22  A.  No.  No.  In fact, given that there was 35 to 40 percent

23  of sales by Peaches outside of those eight area codes, that

24  would certainly, in most situations, unless there's some

25  explanation not to, lead an economist to broaden the

Kneuper - direct

1   geographic market.

2   Q.  Let's turn to the hypothetical -- and just so the record

3   is clear, when you looked at the percentage of Peaches'

4   in-store sales that were outside of her market, you originally

5   looked at 2013 data; is that correct?

6   A.  Yes, I did.

7   Q.  And in response to criticism from Dr. Schafer that you had

8   cherry picked 2013, did you not look at 2011 and 2012 data?

9   A.  Yes, I did that, as well.

10  Q.  Did that materially affect your conclusion that somewhere

11  between the low 30s to the high 30s -- percent -- of Peaches'

12  in-store sales were occurring outside of her geographic

13  market?

14          MR. RISKI:  I'm just going to object to the extent

15  offering new opinions as to 2011 and 2012.

16          MR. SCARBOROUGH:  It's in his report, your Honor.

17          MR. RISKI:  It's based upon data that he had at the

18  time he prepared his original report.  I think it's untimely

19  to offer --

20          THE COURT:  I will take it under advisement.

21          MR. SCARBOROUGH:  And, your Honor, just to defend

22  that, he simply is demonstrating --

23          THE COURT:  Got it.  Got it.

24  BY MR. SCARBOROUGH:

25  Q.  Hypothetical Monopolist Test and then we're done, Dr.

1   Kneuper.

2   A.  Okay.

3   Q.  Are you familiar with the Hypothetical Monopolist Test?

4   A.  Yes, I am.

5   Q.  And what is it?

6   A.  It's a basic test described in the Merger Guidelines, also

7   sometimes called a SSNIP test.  And that's S-S-N-I-P.

8   Q.  Did Dr. Schafer apply the Hypothetical Monopolist Test in

9   her analysis?

10  A.  She says she did; but, in my opinion, she did not do so

11  using accepted economic methodologies.

12  Q.  And how did she not use accepted economic methodologies?

13  A.  Well, as I said, she -- the fundamental perspective she

14  has in this case, the core argument is that Peaches is pricing

15  at MSRP plus 15 percent and that represents market power.  And

16  she also sort of ties this to these e-mails.  And that's the

17  core of her -- what she calls her -- direct effect analysis.

18      And she basically uses that analysis, which, to me,

19  is fundamentally flawed to somehow conclude that the market

20  definition in the complaint is consistent with the

21  hypothetical monopoly test.

22      So, in effect, she says, "Well, because my analysis

23  shows that they were able to raise prices or can raise prices

24  anti-competitively, I meet the hypothetical monopoly test."

25  Q.  Effectively, it's your opinion that she did not apply the

1    test, despite her suggestion that she attempted to?

2    A.   That's correct.

3    Q.   Okay.

4          MR. SCARBOROUGH:  That's all I have.  And I will pass

5    the witness.

6          THE COURT:  Let's take a five-minute break and then

7    we will pick up.

8          I am going to end at 6:00.  To the extent we are not

9    done tonight, we are going to pick up Friday morning.  So,

10   check your calendars, make sure you are clear.

11         Five minutes.

12         (Brief pause.)

13         THE COURT:  Mr. Scarborough has one more exhibit.

14         So, go ahead.

15   BY MR. SCARBOROUGH:

16   Q.   Dr. Kneuper, if you could turn to Tab 3 of the white

17   witness binder in front of you and turn to Appendix Table 1?

18   A.   Okay.

19   Q.   What is this document?

20   A.   This document shows examples of 20 of the specialty

21   boutiques.  The other day we were talking about the -- or

22   yesterday we were talking about the 70.  This shows examples

23   of 20 of them, but gives more information, including the

24   mileage from Peaches of each and the designers that they

25   carry, based on my research.

Kneuper - cross

58

1   Q.  So, it shows -- based on the scope of this project as

2   reflected in Table 1, it shows -- the specialty boutiques in

3   the Chicago MSA and what designer lines they carry, as well as

4   their -- the retail stores miles from Peaches?

5   A.  Yes.

6   Q.  And did you prepare this?

7   A.  Yes, I did.

8   Q.  And is it true and accurate, to the best of your

9   knowledge, information and belief?

10  A.  Yes.

11          MR. SCARBOROUGH:  Thank you very much.  No further

12  questions.

13          Thank you, your Honor.

14          THE COURT:  Cross-examination.

15                       CROSS-EXAMINATION

16  BY MR. RISKI:

17  Q.  Good evening, Dr. Kneuper.

18          Just briefly, I want to ask you a few questions about

19  your -- procedural questions about your -- supplemental

20  report.

21          Is it fair to say that you did not save or produce

22  any of the new information that you relied upon in preparing

23  that supplemental report?

24  A.  Are you talking about the backup?

25  Q.  Yes.

1  A.  I -- we -- as typical process, we would have given the

2  backup over to Sidley.  I can't speak beyond that.

3  Q.  Okay.

4       MR. RISKI:  Just for the record, your Honor, we have

5  not received any backup data regarding the supplemental

6  report, which is now dated two months ago.

7       MR. SCARBOROUGH:  Your Honor, in light of the dust-up

8  over the supplemental report, it was our original inclination

9  to wait to produce it.  The plaintiffs called us on Monday

10 asking about it.  Not asking for it, asking about it.  And we

11 said, "If you need something, please let us know and we will

12 get that to you," and they didn't call us back.

13       I can't say it was great that we didn't do it, your

14 Honor.  It certainly wasn't intentional.  And I don't think

15 there's any prejudice they've identified by not having it.

16       THE COURT:  What type of volume of material is there,

17 and how much material was relied on or was turned over in

18 connection with the first report that he relied on for this

19 one?

20       MR. SCARBOROUGH:  Do you know, Ashley?

21       MS. MARTIN:  I mean, I don't know the size of --

22       MR. RISKI:  From the first report?

23       THE COURT:  No, from this report.

24       How much information is there that he relied on, and

25 did you turn over any of that in connection with the first

1    report?

2           MS. MARTIN:  I honestly do not remember the size of

3    the files.

4           THE COURT:  Well, get that information for me before

5    Friday.

6           MS. MARTIN:  Okay.

7           THE COURT:  Go ahead.

8    BY MR. RISKI:

9    Q.  Dr. Kneuper, you sat through all of Dr. Schafer's

10   testimony, is that correct, over the last day or so?

11   A.  Yes, I did.

12   Q.  Okay.

13          Were you able to hear everything?

14   A.  Yes, I was.

15   Q.  Okay.

16          You heard her read from various economic literature?

17   A.  Yes.

18   Q.  Okay.

19          Were you able to hear what the titles of those

20   literature -- that literature was and who the authors were?

21   A.  Yes.

22   Q.  Okay.

23          Do you have any criticisms of any of the literature

24   that she read into the record?

25   A.  It would be -- I don't want to belabor the time and go

Kneuper - cross

61

1    through each one of them.  Nothing in particular comes to

2    mind, other than I think my primary criticism is reading parts

3    of things like the Horizontal Merger Guidelines, but ignoring

4    other parts.  That's probably my fundamental criticism.

5    Q.  The documents as a whole, do you have any dispute that

6    those are recognized authorities in the field of economics?

7          MR. SCARBOROUGH:  Your Honor --

8    BY THE WITNESS:

9    A.  Do you mean every one of them that you read?  I can't

10    remember every one of them.

11    BY MR. RISKI:

12    Q.  As you sit here today, do you have any criticisms or

13    objections to any of the literature that she relied upon or

14    read into the record of the last day as not an economic

15    authority?

16          MR. SCARBOROUGH:  Object to the form.  Compound.

17    He's asking him to summarize.

18          THE COURT:  You are asking about a lot of documents.

19          MR. RISKI:  Sure.

20          THE COURT:  I know you are probably doing that in the

21    interest of time.

22          Can you answer that, Doctor?

23    BY THE WITNESS:

24    A.  I can only say they were -- the Horizontal Merger

25    Guidelines was one you frequently used.  There are other parts

 1   that, I think, were not used that are relevant.

 2              So, I think the use of certain parts, but not others,

 3   was misleading.  But I recognize that as a recognized

 4   authority, used it myself in -- just a few moments ago.

 5   BY MR. RISKI:

 6   Q.  How about the ABA Monopolization and Dominance Handbook?

 7   A.  I've used that.  It's a recognized authority.  I certainly

 8   wouldn't agree with everything in the Handbook, but I do agree

 9   that that, generally speaking, is recognized.

10   Q.  How about the Market Power Handbook?

11   A.  Again, generally speaking, I would recognize it, although

12   there are particular parts of chapters I would certainly

13   disagree with.

14   Q.  Is it fair to say that economists don't agree on

15   everything, correct?  There is varied opinions?

16   A.  They don't agree on everything, but there are certainly a

17   consistent set of fundamental principles that economists

18   employ in antitrust cases.

19   Q.  How about Edlin and Rubinfeld, Exclusions of -- or

20   Efficient Prices, the Big Deal Bundling of Academic Journals?

21   Do you have any of particular criticisms on that?

22   A.  I don't have -- I would have to look at it to be able to

23   say one way or the other.

24   Q.  Okay.

25              Well, maybe you could do that before Friday.  Then

Kneuper - cross

63

1   maybe Friday would be the best time to go back and ask you

2   some questions about those authorities.

3            MR. SCARBOROUGH:  I object to the form of the

4   question, your Honor.

5            THE COURT:  I do not think it was a question, so --

6   BY MR. RISKI:

7   Q.  Part of your -- part of -- one critical fact that you rely

8   upon in your report is that Peaches' MSRP plus 15 pricing

9   policy dates back to 1985, correct?

10  A.  I wouldn't call it a critical factor, but it's relevant,

11  especially in critiquing Dr. Schafer's analysis.  I think it's

12  something that she did not dispute.

13  Q.  Okay.

14           Does your opinion change at all if they were charging

15  MSRP plus 15 starting in 1985 versus if they started it in

16  2009?

17  A.  No, it would not.

18  Q.  Okay.

19           Now, part of your criticism of Dr. Schafer is she

20  only relied upon some sources, but not enough sources, for her

21  opinions; is that correct?

22  A.  I don't -- I wouldn't characterize it that way.

23  Q.  Okay.

24           What was the information that you relied upon

25  regarding Peaches' pricing policy going back to 1985?

 1  A.  I believe it was declarations and testimony from Roy

 2  Surdej and maybe others from Peaches, but I remember his in

 3  particular.  And in Dr. Schafer's report, she acknowledges it,

 4  as well.

 5  Q.  Did you ask for any type of corroborating data or other

 6  evidence to show that they were actually charging MSRP plus 15

 7  going back to 1985?

 8  A.  Well, I asked for transactions data going back as far as

 9  it was available, and it was available back till 2011.

10  Q.  Okay.

11          MR. SCARBOROUGH:  Objection, your Honor, to

12  foundation.

13          If he's going to suggest in his line of questioning

14  as a factual, not as a hypothetical, that the fact is not

15  true, there is no evidence in the record to suggest that this

16  has not been Peaches' pricing policy since 1985.

17          THE COURT:  Do you want to rephrase that?

18          MR. RISKI:  I'll move forward.

19          THE COURT:  Okay.

20  BY MR. RISKI:

21  Q.  You don't dispute that Peaches did not sell prom or

22  homecoming dresses prior to at least some point in the 1990s?

23  A.  Could you repeat that?

24  Q.  Do you dispute that Peaches did not sell prom and

25  homecoming dresses before at least some point in the

 1   mid-1990s?

 2   A.   Correct.  I don't dispute that Peaches started business

 3   selling other types of dresses.

 4   Q.   Okay.

 5           And I was trying to take notes during your direct

 6   here as best as I could.  Was it your testimony that Peaches

 7   has been carrying large inventory the entire time of their

 8   existence?

 9   A.   Well, not necessarily the entire time, but from early

10   on -- very early on -- it's in existence, there's a -- I

11   described these in my expert report -- there is a set of --

12   there's a business strategy, a business approach that Peaches

13   used, including the large inventories and a lot of the same

14   dresses and the above-MSRP pricing, et cetera, et cetera.

15   Q.   Doesn't the record show that they were only in the range

16   of about 2500 to 4,000 square feet up until maybe ten years

17   ago?

18   A.   I believe that's correct.  That's what -- the charts

19   showed something to that effect.  I'd have to look at it to

20   make sure.

21   Q.   I think it's Figure -- sorry, maybe it's an exhibit here

22   to the supplemental report.

23           MR. RISKI:  Excuse me.

24           THE COURT:  Sure.  Go right ahead.

25           (Brief pause.)

Kneuper - cross

66

BY MR. RISKI:

Q.  Can you please look at Exhibit C to the black binder, that you should have in front of you?

A.  Okay.

Q.  This is a graph entitled, "Peaches In-Store Pricing History," correct?

A.  Correct.

Q.  Does this at all refresh your recollection as to what Peaches' square footage was over the years?

A.  Yes, it does.

Q.  And what was their square footage through about 2003?

A.  I think that was 4400.

Q.  Okay.

       And is it your testimony that they were able to carry large amounts of inventory through -- at the time that they were either 4400 square foot or less?

A.  Absolutely.

Q.  Okay.

       Is your testimony that other stores of that size do not also carry large inventory?

       MR. SCARBOROUGH:  Object to the form.

BY THE WITNESS:

A.  I don't know for sure.

       THE COURT:  Overruled.

BY THE WITNESS:

Kneuper - cross

1   A.  Just to clarify, a large inventory meaning particularly

2   relative to the size.  So, a 2400-square-foot or a

3   4400-square-foot facility could be carrying, allocating a

4   substantial amount of that space towards inventory and still

5   have essentially a high inventory-focused model, even though

6   it's smaller.

7   BY MR. RISKI:

8   Q.  Did you do any research to indicate what Peaches'

9   inventory levels were when they were 4400 square foot or less?

10  A.  You mean back in the 19 -- you mean 2005 or before?

11  Q.  Yes.

12  A.  Nothing separate and apart from my understanding of the

13  business model based on Mr. Surdej.

14  Q.  And he only told you that they carry large inventory, but

15  nothing more specific?

16  A.  No, certainly something more specific.

17  Q.  And what was more specific than that?

18  A.  It was not only a large inventory, it's a strategy focused

19  on carrying multiple numbers -- six or more -- of the same

20  style and color of a dress.  And that's part of the key to the

21  business model because the idea is that the customers can find

22  the dress they want in their size and walk out the store with

23  a dress.

24  Q.  There's a limited number of dresses you can carry if

25  you're only 4400 square foot or less?

Kneuper - cross

 1   A.  Yes.

 2   Q.  Okay.

 3        You criticized Dr. Schafer's testimony as far as the

 4   amount of evidence that she relied upon to determine what the

 5   competitive price level was.

 6        Do you recall that?

 7   A.  Yes, I did.

 8   Q.  How much evidence do you need to determine what the

 9   competitive price level is?

10   A.  In the type of analysis that she's doing here, where

11   essentially it's the core of her market power analysis, that

12   requires typically a very substantial amount of evidence to be

13   able to rule out alternative explanations of a change in price

14   or a pricing level and, therefore, conclude that it's due to

15   market power.

16   Q.  What type of evidence would that be?

17   A.  Typically, data.  Typically, in those types of situations,

18   you would do econometric types of analysis.

19   Q.  Data from where?

20   A.  From wherever you can get it.  From firms that are in the

21   market.  Whatever you're able to get.

22   Q.  Are you aware of any data that exists for any firms other

23   than Peaches and plaintiff regarding their transactional data?

24   A.  Well, I'm aware that it's likely, like most businesses,

25   that the competitors carry and keep data.

Kneuper - cross

69

1   Q.  Are you aware of that data being publicly available?

2   A.  I doubt it would be publicly available.  It's usually

3   proprietary.

4   Q.  Right.

5       Did you conduct any surveys or analysis of the market

6   to determine what other boutiques were charging during 2009 to

7   2012?

8   A.  No.  It certainly wasn't necessary, in my opinion.

9   Q.  Did you have any conversations with either Roy or Barb

10  about what other stores were charging during that time period?

11  A.  Yes, generally.

12  Q.  Okay.

13      And what did they tell you?

14  A.  Well, generally, the impression I got was it certainly,

15  back in time, was not unusual to charge above MSRP for the

16  brick-and-mortar retailers.  But especially as Internet has

17  come in and created even greater transparency, that's forced

18  the brick-and-mortar retailers to alter their pricing

19  strategies.

20  Q.  What specific evidence do you have that anyone other than

21  Peaches was charging higher than the MSRP during the relevant

22  time period?

23  A.  And you're talking about 2009 to 2012?

24  Q.  Yes.

25  A.  I know there's mention in a deposition.  I forget.  I

Kneuper - cross

1    think it is Mac Duggal.  I'm not sure entirely.  He mentions

2    his impression that MSR- -- above-MSRP pricing occurs?

3    Q.  Do you know if he gave any specific examples?

4    A.  I don't recall.

5    Q.  Do you know if he mentioned any of these stores being in

6    the Chicago market?

7    A.  I don't recall.

8    Q.  Do you recall if he mentioned how much over MSRP they were

9    charging?

10   A.  I don't recall.  I just recall generally he said something

11   to the effect that it happens -- charging above the MSRP

12   happens.  That would certainly be consistent with my

13   experience in retail economics, where differences in prices

14   for the same product are quite common in retail.

15   Q.  Is that evidence that you relied upon to determine that

16   MSRP was not the competitive level in the Chicago market?

17   A.  What evidence are you talking about?

18   Q.  Mr. Levin's testimony.

19   A.  Well, that's evidence that, in my opinion -- I don't know

20   about the Chicago market.  It's evidence -- I don't know that

21   others -- I don't recall the markets they talked about, but

22   just general evidence that, in my opinion, contradicted the

23   notion that all prices were somehow at MSRP -- all prices for

24   every prom and homecoming dress sold by specialty boutiques in

25   the Chicago area were at MSRP -- during 2009 to 2012 with the

1    exception of Peaches.

2    Q.  Do you know if Mr. Levin was talking about all prom and

3    homecoming dresses or just from the dresses that -- of the

4    designer that he worked for?

5    A.  I don't recall.

6    Q.  What if Dr. Schafer had testimony or declarations from ten

7    people saying that all the boutiques in the Chicago area

8    charge MSRP?  Does that change your opinion at all?

9    A.  During what time period are you talking about?

10   Q.  During the -- 2009 to 2012.  Would that be --

11   A.  No, it doesn't.

12   Q.  It can only come from transactional-level data; is that

13   what you're saying?

14   A.  Now, which opinion are you talking about?

15           I assumed you were talking about the opinion that

16   Peaches lacks market power.  Maybe you were talking about a --

17   Q.  No.

18   A.  -- different opinion.

19   Q.  Whether MSRP was the competitive-level pricing.

20   A.  No, that wouldn't change my opinion.  I mean, it's clear

21   to me there's an obvious explanation for -- even if Peaches

22   was uniquely at above MSRP, there's a very obvious basic

23   retail economics explanation for that.

24   Q.  An what's that?

25   A.  It's simply -- it's very well known in retail economics

Kneuper - cross

1    that retailers that provide a better shopping experience are

2    able to capture higher prices because of that.  So, higher

3    inventory levels, broader inventories, greater levels of

4    service.  That's why you typically see prices vary a lot in

5    retail.  Higher-end grocery stores tend to have a better

6    atmosphere, higher prices for similar products than lower-end

7    grocery stores.  It's a very common retail phenomena.

8    Q.  What research or analysis did you do to determine what the

9    customer service levels were across boutiques in the Chicago

10   market?

11   A.  In comparing the customer service levels?

12   Q.  Yes.

13   A.  I didn't do -- I didn't see the need to do any research.

14   To me, as I said, there was an obvious alternative explanation

15   for Peaches' pricing; and, certainly, Dr. Schafer did not

16   address those obvious explanations.

17   Q.  One of the reasons, you said that they have higher service

18   levels.  What is your basis for that?

19   A.  Well, I -- I -- mentioned that part of their business

20   model is higher service.  My basis for that, again, is the way

21   the business model has been described by the owner of the

22   business.

23   Q.  Other than pure inventory levels, what other service do

24   they provide that other stores do not?

25   A.  Well, it went through the list in Dr. Schafer's testimony.

Kneuper - cross

73

 1   You know, various ones that I think Dr. Schafer herself

 2   acknowledged:  The high inventory levels; high number of

 3   employees; buying, as I said, a lot of the same dress so that

 4   the right dress is in stock.  Various things like that.

 5   Q.  Do you believe that -- or is it your testimony that -- the

 6   number of employees determines the level of customer service

 7   that someone may receive?

 8   A.  Not necessarily.  But there certainly is a significant

 9   focus in their business model of trying to provide good

10   customer service.

11   Q.  Do you know what Yelp is?

12   A.  Yes, I do.

13   Q.  Did you conduct any type of research on Yelp or another

14   customer review Web site to determine how people perceive

15   Peaches' customer service versus how they may have perceived

16   the customer service of other boutiques in the Chicago area?

17   A.  No, I did not.

18   Q.  Is one of the customer services that Peaches claims they

19   provide is one-on-one customer service?

20   A.  I don't remember that.

21   Q.  Okay.

22        How about alterations?

23   A.  I don't remember that specifically.

24   Q.  How about beadwork or steaming?

25   A.  I do remember, when I visited Peaches, talking about some

Kneuper - cross

1  of the services -- that one comes to mind -- as sort of making

2  sure, for example, that the dress has all the beads it's

3  supposed to have and making sure it's ready to go out the

4  door, that sort of thing.

5  Q.  Do you have any evidence that, or did you do any research

6  whether, any other boutiques provide those same services?

7  A.  No, I did not.  I mean, beyond -- I don't know if you're

8  talking those specific services.  Beyond the half dozen I

9  visited, I obviously could observe what they do.  But beyond

10  that, no.

11  Q.  Okay.

12       But you didn't talk to anyone at those stores during

13  those visits?

14  A.  No, I -- yes, I did.

15  Q.  Okay.

16       Did you take the names of anyone that you spoke to?

17  A.  No, I didn't.

18  Q.  Did you take any notes of those conversations?

19  A.  No.

20  Q.  Did you report anything that was said during those

21  conversations in your initial report or your supplemental

22  report?

23  A.  Not the details, no.

24  Q.  Did you report anything about the conversations that you

25  had in your report?

Kneuper - cross

1   A.   I reported that I visited the stores in my report, and

2   that was -- that was -- all I said.

3   Q.   Okay.

4        Nothing about any conversations?

5   A.   Correct.

6   Q.   You claim that Dr. Schafer ignored explanations for why

7   Peaches may have been able to charge MSRP plus 15 percent,

8   correct?

9   A.   Well, I would recharacterize that.  I would say I claim

10  that she recognized what are obvious alternative business

11  explanations, but failed to address those explanations.

12  Q.   Is it your opinion that Peaches requesting designers not

13  to sell to certain stores had absolutely zero effect on their

14  ability to charge MSRP plus 15 percent during the relevant

15  time period?

16  A.   Absolutely zero effect.  I certainly haven't seen any

17  indication in my mind of any an- -- if you're talking about

18  anti-competitive effect, I haven't seen any indication here of

19  any kind of anti-competitive effect from those e-mails.

20  Q.   Is it your testimony that no designer took any action in

21  response to any of Peaches' requests not to sell to other

22  stores?

23  A.   No.

24  Q.   That is not your testimony?

25  A.   It's not -- it's not -- my testimony -- could you repeat

Kneuper - cross

1   the question?

2   Q.  Sure.

3   A.  Let me make sure I have it right.

4   Q.  Is it your testimony that the designers took no action in

5   result of any of the requests that Peaches made not to sell to

6   other stores?

7   A.  No, it's -- it's -- it's not my testimony.  The designers,

8   in some cases, seemed to have responded.

9   Q.  Do you have any particular testimony about which designers

10  responded and which ones didn't?

11  A.  I don't remember the details of which ones did and did

12  not.

13  Q.  How about which stores may have been affected and which

14  stores haven't been affected?

15  A.  Well, I know there's at least the suggestion that a couple

16  of the stores might have been closed allegedly because of

17  those.

18  Q.  Does your -- either your initial report or your

19  supplemental report contain any discussion or analysis

20  whatsoever about the e-mails that are really at issue in the

21  case?

22  A.  As we discussed in my deposition, I reviewed those and

23  looked them over.  I don't -- and they're most likely in my

24  list of materials considered.  But beyond that, I would have

25  to look at the report to answer your question.

Kneuper - cross

```
 1   Q.  And did you deem them immaterial to your ultimate

 2   opinions?

 3   A.  No.

 4   Q.  They were material?

 5   A.  They were things that I considered.  They were important

 6   to consider.  I didn't deem them as indicating any type of

 7   anti-competitive effect.

 8   Q.  Is there a minimum level of participation that you would

 9   need to see from the designers before you deemed the conduct

10   to be -- to rise to an anti-competitive level?

11   A.  First of all, I would need to have market power.  That

12   would be a necessary condition.

13   Q.  Okay.

14         You also refer generally to the pro-competitive

15   effects of vertical restraints, correct?

16   A.  Yes.

17   Q.  Okay.

18         And part of that would be inter-band -- I'm sorry,

19   inter-brand competition?

20   A.  That's correct.

21   Q.  How --

22   A.  And just to clarify, you said inter-brand?

23   Q.  Inter-brand.

24   A.  Okay.  Yes, that there can be pro-competitive effects with

25   respect to inter-brand competition.  Manufacturers better able
```

Kneuper - cross

1  to compete because they have vertical restrictions.

2  Q.  And that would be because a retailer would have more of an

3  incentive to promote and sell that particular designer?

4  A.  That's one reason.  That's one justification.

5  Q.  Okay.

6          How do you have inter-brand competition -- or how do

7  you promote inter-brand competition if one designer -- or, I'm

8  sorry, if one retailer is carrying at least 16 designers side

9  by side?

10  A.  It's very obvious that -- you know, in many cases, there's

11  exclusives.  And an exclusive enables a manufacturer or set of

12  manufacturers to better sell its product and better compete

13  against other manufacturers.  So, that is the extreme example

14  of a complete exclusive with a distributor and a retailer.

15  And, as I said, those are very often pro-competitive.

16  Q.  Okay.

17          In this particular case, how would inter-brand

18  competition be promoted if Peaches is selling at least 16

19  competing designers?

20  A.  I don't understand your question there.  They're selling

21  at least 16 competing designers that -- I don't understand

22  your question.

23  Q.  The purpose of inter-brand competition is so the store

24  promotes the designer, correct?

25  A.  That's one potential purpose for it.

Kneuper - cross

1   Q.  Okay.

2        How would they promote one particular designer if

3   they're selling 16 competing designers side by side?

4   A.  Well, that -- first of all, that's not the only purpose;

5   but, second of all, there are a variety of explanations how

6   vertical restrictions can be pro-competitive.

7        In this case, we're talking about a retailer making

8   significant volume commitments to designers and even investing

9   in certain designers, and that's facilitating their ability to

10   effectively sell product.  And a lot of the e-mails showed

11   that the designers want to sell at Peaches because they can

12   believe -- believe they can sell more dresses through Peaches

13   than through other alternatives.

14   Q.  Was it your testimony earlier that vertical restrictions

15   cannot be anti-competitive?

16   A.  No.

17   Q.  They can be?

18   A.  They can be under the right circumstances and evidence

19   supporting those circumstances.

20   Q.  Give me an example of when a vertical restriction would be

21   anti-competitive.

22   A.  A vertical restriction could be anti-competitive, for

23   example, if it's used to completely foreclose competitors.

24   So, if there is a -- if I'm a manufacturer and I'm trying to

25   cut off other manufacturers from access downstream and I --

Kneuper - cross

1   you know, I'm competing with one other manufacturer and I'm

2   trying to lock up the distribution channels so that

3   manufacturer can't get into them, I'm trying to foreclose

4   them, that would be a theory.

5   Q.  And does there have to be 100 percent foreclosure in that

6   situation for it to be anti-competitive?

7   A.  It depends on the facts of the case what it needs to be.

8   I mean, you -- foreclosure -- there's a lot of different ways

9   you would analyze foreclosure.  And, again, the starting point

10  is just basics of market power and market definition, market

11  share.  Because if you don't have that, then you can't have

12  anti-competitive foreclosure.

13          THE COURT:  Okay.  We are going to end for the day.

14  It is after 6:00.

15          We are going to pick up on Friday morning at 8:00

16  o'clock, and here is the schedule:  I am giving you 50 minutes

17  to complete your cross-examination of him and ten minutes on

18  redirect.  You will each have 45 minutes for closing

19  arguments.  You can split it up however you want.  If you want

20  to save some for rebuttal, you can save some for rebuttal.

21  But you get 45 minutes each.

22          I would like you to be prepared to address the legal

23  question in your closing argument of what legal standard --

24  what antitrust legal standard -- applies here -- the per se,

25  rule of reason, et cetera -- and what evidence supports that

1    the named designers entered into a horizontal agreement.

2         I know that dips over into the summary judgment some,

3    but there is a preliminary question, at least on Dr. Schafer's

4    opinions, with respect to that.  So, you should be prepared to

5    address that in your closing arguments.

6         You can assume I have read everything more than once.

7    I do not need you to rehash what is in your filings.  If you

8    want, you are going to waste your time.  But you may if you

9    want to.  I would focus your arguments more on what we have

10   heard during the hearings.

11        So, 8:00 o'clock, please, on Friday morning.

12        Doctor, you are excused.

13        THE WITNESS:  Thank you.

14        MR. TREECE:  Temporarily.

15        THE COURT:  Yes, just for today.

16        You can leave your boxes in the courtroom if you want

17   to line them up at the wall or put them in the cloakroom.

18        I have a full day of court tomorrow, so there might

19   be attorneys using the attorney/witness room.  I think you are

20   better off to leave it either in the cloakroom or you can push

21   it up against the wall or even put it on that extra table in

22   the courtroom.  I am fine with that.  That is probably a safer

23   bet.

24        Anything else I need to address tonight?

25        MR. LADUZINSKY:  What time will we be receiving the

1   supporting documents, since we are now down to --

2            THE COURT:  Why don't you talk to each other out in

3   the hall about that.

4            Before -- certainly tonight or tomorrow morning would

5   be ideal.  But I do not know what kind of volume we are

6   talking about.

7            All right.  I will see you Friday morning at 8:00

8   a.m.

9            MR. LADUZINSKY:  Thank you, your Honor.

10                      *      *      *      *      *

11

12  I certify that the foregoing is a correct excerpt from the
    record of proceedings in the above-entitled matter.

13

14
    /s/ Joseph Rickhoff                    May 28, 2015
15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25