83

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
        HANNAH'S BOUTIQUE, INC.,        ) Docket No. 13 C 2564
 4      an Illinois corporation,        )
                                        )
 5                      Plaintiff,      )
                                        )
 6              vs.                     )
                                        )
 7      ROY SURDEJ, doing business as   )
        PEACHES BOUTIQUE, et al.,       ) Chicago, Illinois
 8                                      ) May 22, 2015
                        Defendants.     ) 8:05 o'clock a.m.
 9

10            EXCERPT OF PROCEEDINGS - DAUBERT HEARING
                 BEFORE THE HONORABLE AMY J. ST. EVE
11

12      APPEARANCES:

13
        For the Plaintiff:          LADUZINSKY & ASSOCIATES
14                                  BY:  MR. STEVEN M. LADUZINSKY
                                         MR. DAVID J. RISKI
15                                       MR. CONOR SICKEL
                                    216 S. Jefferson St., Suite 301
16                                  Chicago, Illinois  60661

17
        For the Defendants:         SIDLEY AUSTIN, LLP
18                                  BY:  MR. JOHN W. TREECE
                                         MR. THEODORE R. SCARBOROUGH, JR.
19                                       MS. ASHLEY K. MARTIN
                                    One South Dearborn Street
20                                  Chicago, Illinois  60603

21
        Court Reporter:            MR. JOSEPH RICKHOFF
22                                 Official Court Reporter
                                   219 S. Dearborn St., Suite 1232
23                                 Chicago, Illinois  60604
                                   (312) 435-5562
24                 * * * * * * * * * * * * * * * * * *
                         PROCEEDINGS RECORDED BY
25                        MECHANICAL STENOGRAPHY
                     TRANSCRIPT PRODUCED BY COMPUTER
```

Kneuper - cross

1          THE CLERK:  13 C 2564, Hannah's Boutique vs. Surdej.

2          THE COURT:  Good morning.

3          MR. RISKI:  Good morning, your Honor.

4          THE COURT:  Our technical difficulties are resolved,

5   which is good.

6          Doctor, you may come forward.

7          We are going to pick up with cross-examination.  You

8   have 50 minutes for cross.

9          Doctor, you are still under oath, sir.

10          THE WITNESS:  Okay.

11          THE COURT:  Whenever you are ready.

12          MR. RISKI:  Thank you.

13      ROBERT KNEUPER, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

14              CROSS-EXAMINATION (Resumed)

15   BY MR. RISKI:

16   Q.  Good morning, Dr. Kneuper.

17   A.  Good morning.

18   Q.  I want to go back to your testimony from Wednesday

19   afternoon.  Is it your opinion that market power does not

20   exist when a firm profitably charges above the competitive

21   level for a sustained period of time?

22   A.  No, it's not my opinion.  Keeping in mind that that, being

23   the classic definition of market power, talks about a single

24   competitive price -- or it doesn't about -- it sort of talks

25   about the competitive price, and it's well recognized in

Kneuper - cross

1   almost every market there are a variety of competitive price

2   points.

3   Q.  And in this case, do you dispute that defendants were the

4   only ones that were charging MSRP plus 15 percent in the

5   Chicago area?

6   A.  At what time period are we talking about?

7   Q.  2009 to 2012.

8   A.  And do I dispute that?

9   Q.  Yes.

10  A.  I dispute that there's reliable evidence to show that.

11  Q.  What evidence do you have that somebody else was charging

12  the same amount the defendants were charging?

13  A.  I don't have any particular evidence going back to 2009 to

14  2012 on that.

15  Q.  And you don't dispute that the definition of market power

16  that I read to you, that's what -- that's how the Market Power

17  Handbook and the ABA Monopolization and Dominance Handbook

18  defines market power?

19  A.  Yes.  That's standard.

20  Q.  Okay.

21         And would you have any reason to disagree that that's

22  the definition that the Seventh Circuit uses to define market

23  power?

24  A.  No.

25  Q.  And you can't point to any economic authority which states

1    that this definition of market power does not apply if that

2    market power is obtained through higher inventory levels, wide

3    assortment of products or excellent customer service?

4    A.   However the market power is obtained -- it's obtained

5    pro-competitively, one certainly can get market power.  But I

6    have no reason to disagree except for, as I said the other

7    day, the -- if the higher price is explainable by things like

8    inventory levels, then it indicates a lack of market power.

9    Q.   So, it's not your testimony that you can only obtain

10   market power through anti-competitive means?

11   A.   No.

12   Q.   Okay.

13          On Wednesday, you testified that the Horizontal

14   Merger Guidelines required that a market share analysis must

15   be done in every determination of market power.  Do you recall

16   that?

17   A.   I don't remember my specific wording.  What I was

18   describing is the three buckets, which are certainly standard

19   in the vast majority of cases that the FTC has brought.

20   Q.   There's a binder in front of you that has a copy of the

21   Horizontal Merger Guidelines, which has been previously marked

22   as Plaintiff's Exhibit 34-A.

23          If I can have you turn to Page 15 of the Guidelines?

24   A.   Okay.

25   Q.   Do you see Section 5 on that page?

1    A.   Yes.

2    Q.   Do you recall that that's the same section from which you

3    read from on Wednesday afternoon?

4    A.   Yes.

5    Q.   Okay.

6          Can you just read the first sentence of that section?

7    A.   Okay.  Yeah, I think this is the first sentence of the two

8    sentences I read yesterday.

9          "The Agencies normally consider measures of market

10   shares and market concentration as part of their evaluation of

11   competitive effects."

12   Q.   And they use the term "normally consider," correct?

13   A.   That's correct.

14   Q.   Okay.

15         If I can have you flip to the page that's Section

16   5.2.  And if you can, again, read the first sentence of that

17   section.

18   A.   Okay.

19         "The Agencies normally calculate market share for all

20   firms that currently produce products in the relevant market

21   subject to the availability of data."

22   Q.   And that, again, uses the term "normally calculate market

23   shares," correct?

24   A.   That's correct.

25   Q.   Neither one of those sentences that you just read said

Kneuper - cross

1   that they must be done in every situation?

2   A.   That's correct.  No, as I said, the -- you know, every --

3   I think virtually every merger case I'm aware of, they do

4   market shares calculations.

5   Q.   And that particular sentence also says subject to the

6   availability of data, correct?

7   A.   That's correct.

8   Q.   And you are aware of various testimony by yourself and

9   Dr. Schafer that there was a lack of data in this case

10  relating to revenue of prom and homecoming dresses in the

11  Chicago market?

12  A.   You mean for a denominator?

13  Q.   Yes.

14  A.   Yes.

15  Q.   Okay.

16       On Wednesday afternoon you testified that you could

17  only determine the competitive price level for a product by

18  examining store level transactional data from the relevant

19  product market, correct?

20  A.   Could you repeat that, please?

21  Q.   Sure.

22       You testified that you can only determine what the

23  competitive price level is by examining store-level

24  transactional data in the particular market.

25  A.   I don't -- I don't -- think that correctly characterizes

1    my testimony.

2    Q.  Well, then how would you determine what the competitive-

3    level price was in a particular market?

4    A.  Well, as we discussed in my deposition, a clear way to do

5    that is to look at market concentration and entry barriers

6    because if there is not market concentration and entry

7    barriers, there can't be market power; and, therefore, there

8    can't be anti-competitive pricing.  So, that's one clear way

9    to do it.

10          You can also do a direct effects analysis.  And, as I

11   said the other day, if you're going to do that, you need to

12   carefully rule out non-market power explanations for the

13   pricing.

14   Q.  Okay.

15          Did you conduct any surveys of any other boutique

16   owners in the Chicago area to determine what prices they were

17   charging for prom and homecoming dresses during the relevant

18   time period?

19   A.  No, I did not.

20   Q.  Yet, you criticized Dr. Schafer for not conducting those

21   very same surveys?

22   A.  I don't -- I don't -- recall the specific criticism, but I

23   criticized her for the situation in which -- as a very strong

24   part of her opinion, where she's asserting pricing and market

25   power and it's based on a couple of statements in

Kneuper - cross

1    declarations.  And an economist making this kind of assertion

2    would need more information, especially data, however that can

3    be obtained.

4    Q.  And what's your economic authority for that?

5    A.  My economic authority is virtually every case, for

6    example, the FTC has brought asserting a heavy emphasis on

7    direct effects, that those are very rigorous types of analyses

8    that carefully isolate the behavior as being anti-competitive

9    or as demonstrating some principle related to market power.

10   Q.  Are you saying it's improper to rely upon declarations and

11   testimony to determine what the competitive price level is?

12   A.  No, I don't think it's improper to use -- rely on that in

13   part, but I think for that strong of an opinion, to have that

14   as a core opinion as part of a market power analysis as an

15   economist, you would need to do more.

16   Q.  Okay.

17           And that would be studying other data from other

18   stores?

19   A.  That would be the most obvious way, in my mind, to do it.

20   Q.  Okay.

21           And in this case, you agree that that data doesn't --

22   it doesn't exist in the record?

23   A.  It doesn't exist in the record.  One would have to go out

24   and obtain it.

25           But remember, with the plaintiff, if I'm working for

1    a plaintiff asserting market power, I need to opine as to a

2    likelihood of market power.  And, so, if that data's not

3    available, I simply can't opine to a likelihood of market

4    power.

5    Q.  If a store is simply just cut off from the ability to buy

6    designers -- a dress from a particular designer, isn't that an

7    effect?

8    A.  It's an effect in the market.  It's certainly by no means

9    an anti-competitive effect.

10   Q.  And you wouldn't need to analyze any transactional data to

11   determine that if a store was cut off, that had an effect?

12   A.  I don't quite understand your question.

13   Q.  Do you need to analyze transactional-level data to

14   determine whether or not a store was cut off from a particular

15   designer?

16   A.  You mean that store's transactional data?

17   Q.  Yes.

18   A.  You could do that.

19   Q.  Do you have to do that to determine -- to make that

20   determination?

21   A.  For that, it really depends on the context.  I think it

22   depends on how core it is to your opinion.  It's certainly --

23   if somebody were to say "I was cut off" and you -- you know,

24   they said that in a declaration, it's not core to your opinion

25   and -- you might accept that as part of an analysis if you're

1  comfortable with it.

2  Q.  And Wednesday afternoon you testified that Dr. Schafer did

3  not conduct a survey of other retailers in the Chicago market

4  to survey their historical prices.

5        Do you recall that?

6  A.  Yes.

7  Q.  Okay.

8        Did you conduct a survey of other retailers to

9  determine their historical prices?

10 A.  No, I did not.

11 Q.  And Wednesday you testified that Dr. Schafer did not

12 consider enough evidence to determine the competitive price

13 level.  And that's kind of what we were just referring to,

14 correct?

15 A.  Yes.  That she didn't do the kind of rigorous analysis

16 that an economist would need to do for that particular

17 opinion.

18 Q.  Well, what rigorous analysis did you do to determine what

19 the competitive price level was?

20 A.  Well, you mean in terms of the MSRP plus 15 percent or

21 MSRP?

22 Q.  Well, what did you do to determine MSRP plus 15 was not --

23 or was within the competitive price level?

24 A.  Well, the first thing I did was look at, you know, the

25 first two buckets I talked about.  I looked at market

Kneuper - cross

93

1    definition, market shares, entry conditions; and, both of

2    those things indicated to me that the pricing that was

3    occurring in the market would be competitive because the

4    conditions are competitive.

5    Q.  Okay.

6         Even if that was -- let's assume for a moment for the

7    purposes of my question that Peaches was the only store

8    charging MSRP plus 15 and that everyone else was charging

9    MSRP.  It's still your opinion that Peaches' pricing was

10   competitive?

11   A.  Absolutely.

12   Q.  Okay.

13        Do you have an explanation of why someone would pay

14   15 percent more for the same dress that they could purchase

15   somewhere else?

16   A.  Yes.

17   Q.  What's that?

18   A.  The reason is that, as we talked about the other day, is

19   because -- I mean, it happens all the time.  I buy products

20   all the time at a higher price than I can get somewhere else.

21   And in retail, oftentimes it's because of the shopping

22   experience.  I go somewhere where I enjoy the shopping

23   experience.  Let's say a higher-end grocery store.  I know I'm

24   paying extra money there, but I enjoy the experience.

25   Q.  Well, on Wednesday, you testified that you didn't do any

Kneuper - cross

1   study of Peaches' customer service or how it compared to other

2   stores in the area.

3   A.  Not a specific study.

4   Q.  So, how can you say that Peaches' customer experience is

5   different than an experience that someone may get at another

6   store if you didn't do the study?

7   A.  Well, I think even Dr. Schafer has conceded that Peaches

8   has higher inventory levels.  She describes most other prom

9   shops as being effectively like a showroom.  So, if I'm a

10  customer and I go in those other prom shops and I like a

11  dress, I don't know -- if it's not in my size, I don't know --

12  if it's going to fit; I can't walk out the door with a dress.

13  I can order it and wait several weeks.

14          If I go to Peaches, it's much more likely, because of

15  their business strategy, that I'll find a dress I like in

16  stock; and, therefore, I'm willing to buy it there, even

17  though it may have a higher price.

18  Q.  So, is it simply the higher inventory levels you believe

19  would justify a higher price?

20  A.  Well, it's not just the higher inventory.  A key -- a

21  standard key -- in retail economics is the breadth and depth

22  of inventory.  So, that means inventory needs to be deep.

23  That means carrying a lot of the same SKU and broad.  That

24  means carrying a wide variety.

25          Both of those things are attractive to customers who

Kneuper - cross

1   are willing to, therefore, pay a premium in those types of

2   situations.  It's also costly and risky to the retailer.

3   Q.  Okay.

4          And, so, a retailer would want some protection in

5   exchange for making those investments?

6   A.  Not necessarily.

7   Q.  Do you believe that in this case Peaches asked for

8   protections from the designers because of the amount of

9   inventory they purchased and the risk that they carried?

10  A.  I think -- I would characterize it more in terms of the

11  high volumes that they're committing to.  That they're

12  committing to very high volumes; and, therefore, there's some

13  indications in those e-mails that Peaches is seeking

14  protection.

15  Q.  We'll get to that a little bit later.

16         Let's go to Page 85 of your initial report, which

17  should be the first tab in the binder in front of you.

18         MR. SCARBOROUGH:  Counsel, what page?

19         MR. RISKI:  Page 36, Paragraph 85.

20  BY MR. RISKI:

21  Q.  Are you there, Doctor?

22  A.  Yes.

23  Q.  Can you please read the first portion of that sentence,

24  just through "MSRP" for this moment?

25  A.  Okay.

1          So, the first sentence of Paragraph 85, but stop at

2   "MSRP"?

3   Q.  Yes.  And I'll ask about the rest later.

4   A.  Okay.

5          "As mentioned in the previous section, Peaches prices

6   virtually all of its dresses at MSRP."

7   Q.  Is it fair to say when you wrote this sentence, you were

8   referring to their 2013 pricing levels, correct?

9   A.  2013 and 2014, that's correct.

10  Q.  Then can you please read the remainder of that sentence?

11  A.  Okay.

12         "Which even the plaintiffs appear to acknowledge

13  reflects competitive pricing levels."

14  Q.  Okay.

15         So, you don't dispute that MSRP is a competitive

16  price level?

17  A.  Is a competitive price level.  I think -- I think -- both

18  Dr. Schafer and myself and plaintiffs and defendants have

19  acknowledged that that is a competitive price level.

20  Q.  Okay.

21         Is it your testimony -- do you dispute --

22         MR. RISKI:  Let me strike that and start over.

23  BY MR. RISKI:

24  Q.  Do you dispute Dr. Schafer's testimony that there can only

25  be one competitive price for a single product?

 1   A.  Yes, absolutely.

 2   Q.  Okay.

 3        What's your economic authority for that?

 4   A.  My economic authority is you can look at the Retailing

 5   Management textbook that I cited to.  It's a very common

 6   phenomenon.  I mean, my -- I go shopping every day.  I do the

 7   grocery shopping in my family.  And I'll go to one store and

 8   pay much higher price for Tropicana orange juice, one gallon,

 9   than is available at another store.

10   Q.  That book that you just referred to, that's something

11   cited in your supplemental report, correct?

12   A.  That's correct.

13   Q.  Okay.

14        And that's a marketing textbook?

15   A.  It's a retailing -- a college retailing -- textbook.

16   Q.  Okay.

17        And that was authored by professors of marketing?

18   A.  I don't recall.

19   Q.  Okay.

20        Do you have any reason to believe that there were --

21   that economists authored that textbook?

22   A.  I -- I -- I would be surprised.  It's a standard,

23   well-accepted retailing textbook.

24   Q.  So, you believe that a retailing textbook provides

25   authority -- provides economic authority -- that there can be

Kneuper - cross

1    multiple price level -- competitive price levels for a single

2    product?

3    A.   Absolutely.   It's basic retailing economics.

4    Q.   Okay.

5         What economic literature can you point to for that?

6    A.   For -- in retailing specifically?

7    Q.   In any context.

8    A.   In any context?

9    Q.   Yes.

10   A.   It's just -- you know, it's such an obvious point.   I deal

11   with transactions data every day.   I'm doing work now on

12   office supplies.   I can tell you that the exact same ink toner

13   from the exact same manufacturer is available at a different

14   price at different office supply stores.   It's just very

15   standard.

16   Q.   Okay.

17        What is the -- you say it's so common.   There must be

18   an authority that you can cite to for that.

19   A.   It's an obvious economic phenomenon.   I don't know that I

20   can point to a particular authority.   There's a lot of

21   discussion of differentiated products.

22        I mean, I give you another one that I cited to, is

23   price dispersion in gasoline.   Unleaded gasoline is regarded

24   very commonly amongst economists as a homogeneous product.

25   It's basically the same at different gas stations.   There's a

Kneuper - cross

1    recognized dispersion of unleaded gas prices, maybe three to

2    five percent in a metro area.  It's virtually an identical

3    product.  People pay different prices.

4    Q.  Okay.

5         And, again, that's a document -- or the article

6    you're referring to is in your supplemental report, correct?

7    A.  I believe so, yes.

8    Q.  You didn't testify about that on Wednesday, correct?

9    A.  I believe I testified about the general idea of price

10   dispersion, but not that particular article.

11   Q.  Okay.

12        And that's another article that appears in a

13   marketing journal?

14   A.  No.  It's in a published economic journal.

15   Q.  What journal is that?

16   A.  I don't recall.  I'd have to look at the supplemental

17   report list of references.

18   Q.  I'm going to have you turn to Exhibit 3, to your initial

19   report.  That should be in front of you.

20        THE COURT:  You mean the rebuttal report?

21        MR. RISKI:  No, the initial report.

22        THE COURT:  What page?

23        MR. RISKI:  Exhibit 3.

24   BY MR. RISKI:

25   Q.  This list -- or this exhibit contains a list of prom and

Kneuper - cross

1   homecoming dress designers that you prepared in your initial

2   report, correct?

3   A.   Correct.

4   Q.   Okay.

5        And it says, "Selected prom and homecoming dress

6   designers"; is that right?

7   A.   That's correct.

8   Q.   Why did you only provide a list of selected designers?

9   Why not all designers?

10  A.   Because there are numerous designers.  I didn't expect to

11  be able to capture every one of them.

12       So, I started with -- as it says in the sources, I

13  started with -- a couple of larger lists.  Then I did research

14  to verify that they sell prom and homecoming.  That's how I

15  ended up with this list.

16  Q.   Okay.

17       And would you agree that there are 31 designers on

18  this list that Peaches does not carry?

19  A.   I would -- if you want me to count, I can count.  But I

20  won't disagree with you.

21  Q.   I'm not looking for an exact number.  I'm just trying to

22  get a general idea that there are about 30 designers on this

23  list that Peaches does not carry.

24  A.   I don't know the exact number.  There appear to be a lot

25  of designers that Peaches does not carry.

1    Q.  And in your proposed product market, you included every

2    single prom and homecoming dress; is that correct?

3    A.  Well, I wouldn't characterize it that way.  I would say --

4    the way I would characterize it is to say that I accepted a

5    market offered by the plaintiffs limiting to prom and

6    homecoming.  For my analysis, I accepted that.

7            I don't necessarily agree with it, but I accepted

8    that as a starting point with which to then analyze things

9    like market shares.

10   Q.  Well, in calculating your market share, you're comparing

11   Peaches' sale of prom and homecoming dresses to the sale of

12   all prom and homecoming dresses; is that right?

13   A.  You mean in the Chicago metro area?

14   Q.  In any of your calculations, that's what it was based

15   upon?

16   A.  I believe so, yes.

17   Q.  And it's your opinion that --

18   A.  Except for the square footage, as I said, is in sales.

19   Q.  So, it would be your opinion that all prom and homecoming

20   dresses are in the same relevant antitrust product market?

21   A.  No.

22   Q.  Okay.

23           Then why did you include all of them in your market

24   share opinion?

25   A.  Because, as I said, the way I approached things was accept

1    a part of plaintiff's pleaded market and say essentially,

2    well, even if you accept the prom and homecoming, then I do my

3    analysis.

4            I point out in my initial report I find it

5    challenging to limit to prom and homecoming because I'm

6    personally not quite sure how you make the distinction,

7    especially for a homecoming dress versus a short dress that a

8    girl would buy for homecoming at a, you know, popular local

9    women's apparel store.

10   Q.  Okay.

11           Well, you're aware that the designer declarations

12   that you relied upon in this case each identify that they make

13   specific prom and homecoming lines; isn't that right?

14   A.  Yes, that's true.

15   Q.  Okay.

16           But you didn't consider those parts of the

17   declarations in determining what the product market was?

18   A.  No, I considered them.  I -- you know, because

19   substitution is the key for me as an economist.  I'm more

20   focused on how they're used.  Things can be marketed for one

21   purpose and used for another.

22   Q.  Okay.

23           One of your criticisms of Dr. Schafer's product

24   market is that she failed to conduct a sophisticated

25   econometric analysis of the interchangeability between all

Kneuper - cross

1    prom and homecoming dresses, correct?

2    A.  I don't -- I don't -- recall me criticizing it that way.

3    I mean, the way I would characterize it is that she failed to

4    do a rigorous analysis to rule out obvious alternative

5    explanations for the Peaches pricing.

6    Q.  Okay.

7            Did you do any analysis of the 30 designers that are

8    on your Exhibit 3 of your initial report to determine what

9    their interchangeability was with the designers' prom and

10   homecoming dresses?

11   A.  Well, I did.  As I talked about the other day, I looked at

12   issues such as use, quality, price, between named and

13   non-named designers.

14   Q.  What examination of price and quality did you do on all of

15   the designers that are listed on Exhibit 3 of your report?

16   A.  I don't know that it was necessarily all here.  Remember I

17   looked at both Peaches and Hannah's.  So, that analysis --

18   those sets of analyses -- would have focused on the named and

19   non-named designers at Peaches and Hannah's.

20   Q.  So, you would agree that you did not do a price and

21   quality analysis of all prom and homecoming designers?

22   A.  I think it -- I would agree that it's likely that those

23   analysis I did did not capture all of the many designers --

24   prom and homecoming designers -- selling -- I assume you mean

25   -- selling in the Chicago area.

Kneuper - cross

1   Q.  Would you have any reason to dispute that there may be

2   differential pricing between some designers and other

3   designers?

4   A.  No, I wouldn't be surprised at that.  No, no reason to

5   dispute that.

6   Q.  Do you recall any testimony from Steve --

7         MR. RISKI:  Let me strike that.

8   BY MR. RISKI:

9   Q.  Did you read Steve Lang's deposition testimony?

10   A.  I did sometime ago.  But I did, yes.

11   Q.  Do you recall an answer that he had given regarding that

12   in the context of prom and homecoming dresses, that you can

13   buy all the way from budget to couture?  Does that sound

14   familiar?

15   A.  That sounds familiar, yes.

16   Q.  Will that indicate to you that there may be different

17   markets within prom and homecoming dresses?

18   A.  If you accept prom and homecoming as a market, which I do

19   not, you could -- you could -- if there were the right data

20   and facts to support it, it's conceivable in markets like that

21   that you can have some sort of high end and low ends.  It's

22   not necessarily clear, but it's conceivable.

23   Q.  Okay.

24         But you didn't do that analysis?

25   A.  I certainly looked at the pricing for named and non-named

1    designers.  No indication there of some clear distinction

2    between high end and low end.

3    Q.  Okay.

4          I just want to make sure we're clear for the record.

5    When you're referring to non-named designers, you're referring

6    to those that are carried just as Peaches?

7    A.  And Hannah's.

8    Q.  Where did you do an examination of the non-named

9    designers' dress prices carried at Hannah's?

10   A.  In the scatter plot figure that I talked about.

11   Q.  And that was all information that you had available to you

12   when you prepared your initial report?

13   A.  No.  The Hannah's data was not available to me then.  I

14   don't -- I don't -- believe it was.  I only got it once

15   Dr. Schafer generated her report.

16   Q.  Okay.

17         You don't believe that the same documents she used to

18   create her figures was available to you at the time you

19   prepared your initial report?

20   A.  The data?

21   Q.  Yes, the underlying data.

22   A.  The Hannah's underlying data, I don't recall seeing it.

23   Q.  Did you not have any of Hannah's' sales data available to

24   you when you prepared your initial report?

25   A.  I don't recall.  I certainly don't recall any Hannah's

1    transactions data of the type that I received from Dr. Schafer

2    after she issued her expert report.

3    Q.  But you at least concede that for the non-named designers

4    that are not carried by Hannah's and Peaches, you did no

5    economic analysis of their price, use and quality?

6    A.  I also did -- with the exception of the department store

7    pricing analysis I did, and I don't recall if I talked about

8    it the other day.  So, I don't know if it's -- I don't know if

9    I can talk about it now.  But aside from that, I don't recall

10   anything else.

11   Q.  Okay.

12          And of the price, use and quality factors that you

13   would look at to determine whether products are in the same

14   market, is there one particular factor that's more important

15   than others?

16   A.  I think -- I mean, it's difficult to say.  The way I would

17   characterize it is say typically economists will focus on

18   price.  In a differentiated product context, if an economist

19   is thinking it might be appropriate to distinguish a segment

20   within a set of products, then very often the economist will

21   look at price points.

22   Q.  Okay.

23          You can't just look at use of a product to determine

24   whether it's in the same relevant product market?

25   A.  I would agree.  You want to certainly look at more than

Kneuper - cross

107

1    simply use.

2    Q.  Okay.

3           When you determine that all prom and homecoming

4    dresses are in the same market, isn't it your opinion that

5    it's because they could all be used for prom and homecoming

6    events?

7           MR. SCARBOROUGH:  Objection, your Honor.  There's no

8    dispute that Dr. Schafer did not rely on use or quality.  And,

9    so, whether he did I just think is beside the point.

10          THE COURT:  What is your response?

11          MR. RISKI:  Well, your Honor, if he's going to be

12   criticizing Dr. Schafer for not doing something, I want to

13   show that he did not do the same exact thing.  I think it's --

14          THE COURT:  There is no dispute he did not, is what

15   was just said.

16          MR. RISKI:  If they're not --

17          MR. SCARBOROUGH:  No dispute that Dr. Schafer didn't

18   rely on use or quality.

19          MR. RISKI:  And that's why I'm asking did he do the

20   same thing when he determined his product market.

21          THE COURT:  I am not sure that is what you asked.

22   Why don't you rephrase it.

23          MR. RISKI:  Sure.

24   BY MR. RISKI:

25   Q.  That when you determined your product market of all prom

Kneuper - cross

1  and homecoming dresses, you did not do an analysis of price or

2  quality of those designers who are not carried by Hannah's and

3  Peaches?

4  A.  Well, aside from the department store analysis, I don't

5  recall doing an analysis of price and quality.

6  Q.  And it is not your opinion that every prom and homecoming

7  dress has the same use, price and quality?

8  A.  No, it's not my opinion.  If they're a prom and homecoming

9  dress and they're used for that, then that would obviously be

10  the same use.  But quality and price obviously differs across

11  the spectrum.

12  Q.  Do you disagree with the Merger Guidelines that the --

13       MR. RISKI:  Strike that.

14  BY MR. RISKI:

15  Q.  You're aware of what the Hypothetical Monopolist Test is,

16  correct?

17  A.  Correct.

18  Q.  You referred to that on Wednesday afternoon?

19  A.  Yes, I believe I did.

20  Q.  Do you disagree with the Merger Guidelines that the

21  Hypothetical Monopolist Test does not have to include all

22  possible substitutes and may include the smallest relevant

23  product market?

24  A.  I -- I -- I think you would need to show me that section

25  of the Guidelines.  It's -- I agree with the principle that

Kneuper - cross

1  once you've gotten to the point and you're applying the

2  hypothetical monopoly test, that you have passed the test;

3  then there's no need to broaden beyond that.  I do agree with

4  that, if that's what you're talking about, yes.

5  Q.  So, you would agree that the Merger Guidelines provide

6  that there could possibly be two relevant product markets or

7  more than one relevant product market?

8  A.  I don't -- I don't -- understand your question.

9  Q.  Is it possible for there to be one relevant -- more than

10  one relevant product market under the Hypothetical Monopolist

11  Test?

12  A.  In the same case?

13  Q.  Yes.

14  A.  I would have to look to the Guidelines on that.  I mean,

15  my experience is it's typical that one relevant market is

16  pleaded in a case at least with respect to, you know, a

17  particular area of competition.

18  Q.  Does the fact that two products may be advertised in the

19  same magazine must mean that they must be in the same relevant

20  product market for antitrust purposes?

21  A.  No.  Obviously not.

22  Q.  Okay.

23        Do you agree that the ultimate purpose of the

24  Hypothetical Monopolist Test is to determine whether Product A

25  would constrain a small but significant non-transitory price

Kneuper - cross

1   increase in Product B?

2   A.  Yes.  Conceptually, I would agree with that.

3   Q.  Okay.

4        So, the ultimate question is whether -- is not

5   whether or not the customer has the ability to purchase

6   Product A in light of a price increase in Product B, but

7   whether they would actually do so in light of a price increase

8   or in response to a price increase?

9   A.  Yeah, I would agree that you'd need both the ability and

10  willingness to switch in light of a hypothetical anti-

11  competitive price increase.

12  Q.  And isn't it true that the facts and data in this case

13  show that nobody was able to constrain Peaches from charging

14  MSRP plus 15 percent before 2013?

15  A.  Could you repeat that --

16  Q.  Sure.

17  A.  -- please?

18  Q.  Isn't it true that nothing in the facts or data in this

19  case shows that anyone was able to prevent Peaches from

20  charging MSRP plus 15 percent before 2013?

21  A.  I'm struggling with that because, as I testified the other

22  day, Peaches has chosen that pricing policy early on.  It's

23  part of their business strategy.  Does that mean back when it

24  was 2400 or 44 00 square feet that they weren't being

25  constrained?  I'm --

1      MR. RISKI:  I'm going to move to strike the answer --

2    BY THE WITNESS:

3    A.  -- just struggling with that.

4      MR. RISKI:  -- and ask for an answer to my question.

5      THE COURT:  Can you answer the question?

6    BY THE WITNESS:

7    A.  I -- I'm -- I quibble with the word "constrain."  They

8    made it -- in my mind, they made a choice to price at MSRP

9    plus 15 percent in a competitive market.  And that was an

10   attractive choice for them up until three or four years ago.

11   And that worked for them.

12   BY MR. RISKI:

13   Q.  I'm not asking you what the reasons are --

14   A.  Okay.

15   Q.  -- for their pricing policy.

16      I'm asking was anyone able to prevent them from

17   charging those prices before 2013?

18   A.  Do you mean did they -- were they able to keep business

19   and do that?

20   Q.  I'm saying did anything -- was anyone able to stop Peaches

21   from charging MSRP plus 15 percent before 2013?

22   A.  Well, the way I would characterize it is that they were

23   able to charge MSRP plus 15 percent and stay in business and

24   make sales and move forward.

25   Q.  Okay.

Kneuper - cross

112

```
 1        Do you have any evidence that anyone was able to stop

 2   them from charging those prices before 2013?

 3   A.  What do you mean by "stop"?  Prevent them or --

 4   Q.  Make them change their policy.

 5        MR. SCARBOROUGH:  Your Honor --

 6   BY THE WITNESS:

 7   A.  Obviously, they didn't.  And, you know, that's what I'm

 8   trying to say is they didn't.  They kept having sales.

 9   BY MR. RISKI:

10   Q.  Let's move to the geographic market briefly.

11        You criticized Dr. Schafer's geographic market

12   because it does not include area codes 219 and 815, correct?

13   A.  That sounds right.  I'd want to look at the map to make

14   sure, but the area codes around Joliet in -- in -- the

15   Illinois area and the area codes up in Indiana near Gary.

16   Q.  If you turn to the second tab in the binder before you,

17   which has been previously marked as DX-30, that contains the

18   map I think you're referring to.

19   A.  Yes.

20   Q.  Okay.

21        Is it your contention that all of area codes 219 and

22   815 should have been included in the relevant geographic

23   market?

24   A.  No, not necessarily, but it's -- it's -- challenging to

25   exclude at least significant portions of those areas.
```

Kneuper - cross

1  Q.  Okay.

2       You can see that both area codes contain areas that

3  are well outside the distance that girls are willing to

4  travel?

5  A.  No.  I -- I -- know, to Peaches, girls travel from very

6  far distances to come there.

7  Q.  Well, didn't you use the testimony of Susan Shaban that

8  girls typically travel between 45 minutes and an hour to

9  determine your 30- and 50-mile radius?

10 A.  Yes, that was part of the support for it.  But I took your

11 previous question to, you know, be fully inclusive.  And, so,

12 it's certainly clear that people will travel to Peaches, for

13 example, from very long distances.

14 Q.  Isn't it true that, at least for your 30-mile radius, that

15 most of area codes 219 and 815 are outside of that area?

16 A.  Yes.

17 Q.  Is that also true for your 50-mile radius?

18 A.  I believe so.  I haven't -- I know that Dr. Schafer was

19 looking at a broader area code map and I haven't seen those.

20 But I would not disagree with it.

21 Q.  Okay.

22      And when you calculated your market share in Table 2

23 of your original report, you actually used the same geographic

24 market that Dr. Schafer later proposed; is that correct?

25 A.  Yes, I did.

Kneuper - cross

1    Q.   Okay.

2         So, you calculated your market share opinion based

3    upon a geographic market which you find to be unreliable; is

4    that true?

5    A.   That's true.  I mean, the point I'm making is even within

6    plaintiff's geographic market, the market share is small.

7    Q.   Okay.

8         THE COURT:  You have ten minutes left.

9         MR. RISKI:  Thank you.

10   BY MR. RISKI:

11   Q.   What is your proposed product market in this case?  Is it

12   30-mile radius or is it 50-mile radius?

13        MR. SCARBOROUGH:  Counsel, I think you meant

14   geographic market.

15        MR. RISKI:  I did mean.  I'm sorry.

16   BY MR. RISKI:

17   Q.   What is your proposed geographic market?  Is it the

18   30-mile radius or is it the 50-mile radius?

19   A.   It's a national market.

20   Q.   Okay.

21   A.   It's because Internet -- you know, I think Internet should

22   at least be in the market.  So, as I talked about in my

23   initial report, that would indicate a national market.

24   Q.   Do you contend that a specialty boutique or department

25   store even in California competes with Peaches Boutique on

1    Archer Avenue in Chicago?

2    A.  No.  But I would contend that if that has an Internet Web

3    site, that it competes with Peaches' in-store.  The Internet

4    competes with brick and mortar.

5    Q.  One of your criticisms of Dr. Schafer is that she did not

6    do an analysis of the "Event Description" field in Peaches'

7    in-store spreadsheets to determine what, if any, portions of

8    219 and 815 should have been included in the relevant

9    geographic market, correct?

10   A.  Yes.  You mean the high school --

11   Q.  Yes.

12   A.  -- names?

13          Yes.

14   Q.  Did you do that analysis?

15   A.  Well, I did do that analysis, part of -- I think it was

16   Table 3.  So, I did use the high schools.  If you're asking

17   did I use it as part of my geographic analysis, I didn't need

18   to do that.  But I didn't do it.

19   Q.  Can you turn to Page 42 of your report, which is the first

20   tab in the binder before you.

21   A.  Okay.

22   Q.  And in that paragraph, you had determined, using the

23   "Event Description" fields, that Peaches had sold 81 dresses

24   to schools with "Joliet" in the "Event Description" field?

25   A.  I'm sorry, I'm trying --

Kneuper - cross

116

1   Q.  It's in Paragraph 42, the fourth line from the bottom.  It

2   would be the fourth and fifth lines down.

3   A.  Okay.  Okay.

4           Could you repeat, please?

5   Q.  Sure.

6           Do you see in your report where you say that Peaches'

7   2013 event data shows $31,400 in revenue from 81 dresses sold

8   for prom and homecoming events at Joliet West High School and

9   Joliet Central High School?

10  A.  Yes.

11  Q.  Okay.

12          81 dresses would be about less than one-half of one

13  percent of Peaches' total units sold in 2013; would that be

14  correct?

15  A.  Total dresses sold, yes.  It would be -- it would be --

16  small.

17  Q.  Okay.

18          So, it's your contention that even if less than

19  one-half of one percent of sales came from a particular city,

20  that city must be included in the relevant geographic market?

21  A.  No, no.  I was just pointing out an example of two high

22  schools.  When you look at that whole area code, I think it's

23  ten percent-plus sales by Peaches are in that area code.

24  Q.  You didn't do a determination of that "Event Description"

25  field to determine what portions, if any, should have been

Kneuper - cross

1   included in the relevant geographic market?

2   A.  I did not make that separate determination.  As I said, I

3   didn't feel the need to do it.

4   Q.  How about for area code 219?  Did you do any analysis of

5   the "Event Description" field to determine what portions, if

6   any, of 219 should have been included in the relevant

7   geographic market?

8   A.  No, I don't -- I don't -- think I did that.

9   Q.  Okay.

10          If you'd turn back to Tab 2 of the binder in front of

11  you, the map.

12  A.  Okay.

13  Q.  Would you agree that at least between the -- within a

14  30-mile radius you propose and Dr. Schafer's proposed

15  geographic market, there is not a substantial difference

16  between the two?

17  A.  No, I would not agree with that.

18  Q.  Okay.

19          Isn't it fair to say that there's a substantial

20  overlap between the two markets?

21  A.  Well, they -- there is some overlap; but, as I said in my

22  report, they're very different and it excludes -- the problem

23  is that the pink area excludes some really key competitive

24  areas.  And when you're doing a proper geographic market, you

25  can't exclude significant competitive areas.

Kneuper - cross

1   Q.  But you haven't done an analysis of what -- the impact of

2   those areas on Peaches' sales?

3   A.  You mean a specific data analysis or what --

4   Q.  The areas within 30 miles but outside of Dr. Schafer's

5   proposed geographic market, you have not done an analysis of

6   the data to determine what significance those areas have to

7   Peaches' sales?

8   A.  I haven't specifically analyzed those separate areas.

9   Obviously, there's long travel patterns here.  So -- and

10  Peaches sells very widely across the geographic area.

11              THE COURT:  You have about five minutes left.

12              MR. RISKI:  Thank you.

13              THE COURT:  Please wrap up.

14  BY MR. RISKI:

15  Q.  For the business model that you've been referring to in

16  your testimony, your sole reliance for that business model is

17  just a declaration of Roy Surdej, correct?

18  A.  Well, I've also been there.  I mean, I read his

19  declaration.  As I said, I think many aspects of the business

20  model Dr. Schafer mentions in her expert report, like the high

21  inventory levels.

22              And I've certainly been to the store.  I've seen the

23  business model at work.  And it was very uniquely different

24  from the other prom stores that I visited.

25  Q.  Going back to your example about the price differences

Kneuper - cross

1  between products, you mentioned something about toner,

2  correct?  And that there could be different prices for the

3  same toner?

4  A.  Yes.

5  Q.  Do you know if toner would have a resale price maintenance

6  policy?

7  A.  I don't know if it does.

8  Q.  Okay.

9       Would that make a difference of whether or not people

10  were charging different prices for the same product?

11  A.  It can affect.  If you have an enforced MSRP policy, it

12  can affect downstream pricing.

13  Q.  Okay.

14       In that particular case you're referring to, do you

15  know what the variation of price was between different stores

16  for the same product?

17  A.  It is remarkably wide.  It's well in excess of ten

18  percent.

19  Q.  Did you do any type of analysis to determine whether 15

20  percent above MSRP is the price that girls would pay, as

21  compared to buying it from another store, purely because of

22  the availability of the dress at that store?

23  A.  I don't -- I don't -- understand your question.

24  Q.  Did you ever do any surveys of any girls and say, "What is

25  the amount that you would pay extra for a dress in order to

Kneuper - cross

1    have the ability to take it home that day?"

2    A.  No, I did not.

3    Q.  And isn't it true that that would be the only basis for

4    Peaches to be able to charge those higher prices, is simply

5    because the girls can take the dress home that particular day?

6    A.  I wouldn't say it's the only basis, but Peaches invests in

7    a very unique shopping experience that obviously is attractive

8    to girls who buy many dresses there.

9    Q.  And that unique shopping experience is just lots of

10   dresses?

11   A.  Well, it's not just lots of dresses.  It's many dresses of

12   the same style and color.  Again, so, it's very important

13   because that means that if I'm a young girl, I go in and I

14   really like the look of a dress, then it's more likely at

15   Peaches -- compared to many of its competitors -- that they'll

16   have that dress and size; I can try it on; I can see if I like

17   it; and, I can bring it home that day.

18   Q.  Did you do any analysis of the assortment or variety that

19   was available at other specialty boutiques in the Chicago

20   market?

21   A.  Well, in the six stores I visited, it was very consistent

22   with Dr. Schafer's description of them being a bit like a

23   showroom.  I mean, they're not exactly a showroom, but they'll

24   have a rack of prom dresses, but not a lot of sizes of the

25   same style dress.

Kneuper - redirect

121

1  Q.  Okay.

2          Did you ask them anything about what type of

3  inventory they had available in the back room?

4  A.  No, I did not.

5          THE COURT:  Last question.

6          MR. RISKI:  Sure.

7          I'm done, your Honor.

8          THE COURT:  Cross-examination.

9          MR. SCARBOROUGH:  Your Honor, the only thing I will

10  need for --

11          THE COURT:  Redirect, I guess.  I am sorry.

12          MR. SCARBOROUGH:  The only thing I'll need, if you

13  have the supplemental report, I will be briefly referring to

14  that.

15          THE COURT:  Okay.  Thank you.  Tab 3.  I have it.

16          MS. MARTIN:  Your Honor, I'm just going to hand the

17  witness the binder from Wednesday, the March 20th -- May 20th

18  binder.

19          THE COURT:  Okay.  That is fine.

20                          REDIRECT EXAMINATION

21  BY MR. SCARBOROUGH:

22  Q.  Good morning, Dr. Kneuper.  I would like to start right in

23  on plaintiff's question this morning about direct effects.

24          Do you agree with the plaintiff's suggestion that an

25  economist can rely on direct effects analysis when sales or

Kneuper - redirect

1   revenue data is not available?

2   A.  You're saying when sales and revenue -- for example, for a

3   market share?

4   Q.  Correct.  Correct.

5   A.  No, I --

6   Q.  And, then, jump straight to a direct effects analysis.

7   A.  No.  So, I don't --

8   Q.  Why not?

9   A.  I don't agree, because to offer a direct effects analysis,

10  it needs to be a valid analysis.  So, you can't just say, for

11  example, I don't have market share data and so I can just

12  ignore evidence related to market structure -- for example,

13  the large number of competitors -- and I will just, you know,

14  do a direct effects analysis.

15  Q.  Why is market structure important to consider in

16  conjunction with a direct effects analysis?

17  A.  Well, because as I say --

18          MR. RISKI:  Actually, I have an objection.  Beyond

19  the scope of cross.

20          THE COURT:  Overruled.

21          You may answer, if you can.

22  BY THE WITNESS:

23  A.  It's because -- I discussed the other day, you know, both

24  analyses tell a story.  The only question to the economist --

25  for example, when I was working at the FTC and I'm looking at

Kneuper - redirect

1   a merger -- is, what is the story this information is telling

2   me?  Is there a coherent anti-competitive story from this

3   merger when I look at the nature of competition, the nature of

4   substitutes, the competitors in the market and when I look at

5   any evidence I might have available of direct effects?

6           I look at all of those things, and the question to me

7   is:  What is all that information telling me about the impact

8   of this merger?

9   Q.  And is that approach consistent with the Horizontal Merger

10  Guidelines?

11  A.  Yes.

12  Q.  Okay.

13          And, briefly, what does the Horizontal Merger

14  Guidelines say about the use of direct and indirect evidence?

15  A.  Well, it's basically -- it's basically -- a weighting.

16  So, what it says -- as I talked about the other day with the

17  three buckets, market definition, market share is one bucket;

18  entry barriers, a second bucket; and, the third bucket being

19  competitive effects or direct effects.

20          Depending on the case, depending on the evidence, an

21  economist might place greater weight in certain of those

22  buckets, but you consider all of them.  And, as I said, the

23  question is:  What do they tell you as an economist?

24  Q.  Plaintiff asked you whether a designer who cuts off a

25  retailer has engaged in a anti-competitive direct effect.  You

Kneuper - redirect

1   testified that it is not evidence of a direct effect, at least

2   given that hypothetical, correct?

3   A.  Yeah.  I testified that that's an effect.  Obviously, it's

4   something that occurs in the market.  But it's not an

5   anti-competitive effect unless there is market power and

6   unless -- what you're talking about there is a vertical type

7   of situation.

8           So, as an economist, what I need to do is look at the

9   theories in those cases where -- those situations where a

10  vertical restraint might be anti-competitive, realizing that

11  they're very typically pro-competitive; and, I see if those

12  conditions are met in a particular case.  So, there's a lot

13  more that you need to do than simply somebody is cut off.

14  Q.  And the example of the enforcement of a selling

15  restriction -- which is, I think, what he's talking about --

16  the fact that it happens to one retailer is of no moment

17  unless there are only two competitors in a relevant market;

18  would that be correct?

19  A.  Could you say that, again, please?

20  Q.  Sure.

21          If a -- let's just use the Chicago prom and

22  homecoming market.

23          Do you have an opinion whether or not a designer who

24  enforces a selling restriction that results in one designer

25  not getting the designer's goods, does that -- is that

Kneuper - redirect

 1   evidence to you of market power or direct effects?

 2          MR. RISKI:  Object to form.

 3   BY THE WITNESS:

 4   A.  I think you --

 5          THE COURT:  Overruled.

 6   BY THE WITNESS:

 7   A.  I think you --

 8          THE COURT:  Overruled.

 9          You may answer --

10          THE WITNESS:  Sorry.

11          THE COURT:  -- if you can.

12          THE WITNESS:  Sorry, your Honor.

13   BY THE WITNESS:

14   A.  I think you meant retailer in the question.

15          But if a designer -- if a retailer does not get

16   access to a designer, no, that wouldn't be -- in fact, it's

17   quite common in retailing that a retailer can't access all the

18   manufacturers the retailer would like to.

19   BY MR. SCARBOROUGH:

20   Q.  And isn't it established in antitrust economics that

21   vertical restriction -- selling restrictions -- often have

22   pro-competitive effects?

23   A.  Yes.

24   Q.  And isn't the consequence of a seller enforcing a selling

25   restriction often that another retailer against whom the

1    restriction is enforced loses out?

2    A.  Yes.

3            MR. RISKI:  Object to form.

4    BY MR. SCARBOROUGH:

5    Q.  Nevertheless, we consider that pro-competitive, correct?

6            MR. RISKI:  Object to form.

7            THE COURT:  Overruled.

8            You may answer, if you can.

9    BY THE WITNESS:

10   A.  Yes, that's the distinction we were talking about the

11   other day between intra-brand competition and inter-brand

12   competition.  Selling restrictions by their very nature limit

13   intra-brand competition.

14   BY MR. SCARBOROUGH:

15   Q.  Let me switch gears to a discussion about whether you

16   calculated the benchmark price or prices in the Chicago

17   market.

18           Why didn't you calculate whether there were multiple

19   competitive prices in the Chicago market as part of your

20   analysis?

21   A.  You mean back in the 2009, 2012 --

22   Q.  Correct.

23   A.  -- time period?

24   Q.  Correct.

25   A.  Because -- because -- in my mind, it wasn't necessary.  I

1 had an obvious alternative explanation. I also had this other

2 evidence, market shares and competition and department stores

3 and Internet. And in my mind, it wasn't necessary to go

4 through that exercise because, to me, the evidence clearly

5 indicates a lack of market power.

6 Q. And that's, in part, because of Peaches' very low

7 single-digit market share?

8        MR. RISKI: Object to form.

9        THE COURT: Sustained.

10       Rephrase that.

11       MR. SCARBOROUGH: I'll move on.

12 BY MR. SCARBOROUGH:

13 Q. You mentioned that it was well recognized that there are

14 multiple competitive prices in a retail market, correct?

15 A. Yes, I did.

16       Can I clarify my previous answer --

17 Q. Absolutely. Please.

18 A. -- for a second? Because this was the question about the

19 prices.

20       The other reason is even if I went back in time and

21 found that Peaches had a higher price, there's a reasonable

22 explanation for it having a higher price. So, even if I did

23 that exercise, it doesn't tell me that Peaches has market

24 power.

25 Q. Let's look at Paragraph 81 and -- 81 of the supplemental

Kneuper - redirect

1    report.

2              Do you have that in front of you?

3              MR. RISKI:  Judge, I'm going to object.  This is

4    beyond the cross.  I did not bring up his supplement- --

5    question him about his supplemental report.  I don't think

6    they can reopen the door to that now.

7              THE COURT:  Let's see --

8              MR. SCARBOROUGH:  Your Honor, these questions go

9    directly to what authorities he relied on for the proposition.

10   There were several questions on this.

11             THE COURT:  Let's see what the question is first.

12   Just the fact that he is bringing up the report does not alone

13   preclude it.

14   BY MR. SCARBOROUGH:

15   Q.  While you're looking for that, you were asked about

16   whether or not there were authorities to support the

17   proposition that the economic literature supports the

18   conclusion that competitive markets are characterized by a

19   range of competitive price points.

20             Do you remember that?

21   A.  Yes.

22   Q.  And if you could look at Paragraph 80- -- and were you

23   asked about whether you had cited -- could cite or had cited

24   -- any authority for that?

25   A.  Yes.

Kneuper - redirect

129

1   Q.  Look at Paragraph 81.  If you could read the second

2   sentence of Paragraph 81?

3           MR. RISKI:  Judge, I'm going to object to him

4   bringing in testimony that was not brought in during his

5   original direct.

6           MR. SCARBOROUGH:  He opened the door --

7           THE COURT:  Overruled.

8           MR. SCARBOROUGH:  -- on this area, your Honor.

9           THE COURT:  Overruled.

10  BY THE WITNESS:

11  A.  I'm having trouble finding my supplemental report.  Could

12  you direct me?

13  BY MR. SCARBOROUGH:

14  Q.  It's in the black binder.

15          THE COURT:  It is in a white binder, Tab 3.  If not,

16  here you go.

17          MR. SCARBOROUGH:  Your Honor, may I approach to --

18          THE COURT:  I think he has it.

19          THE WITNESS:  For some reason, I have the Horizontal

20  Merger Guidelines.

21          MR. SCARBOROUGH:  There it is.  It's in --

22          THE WITNESS:  Thank you.

23          MR. SCARBOROUGH:  Thank you, Judge.

24          THE WITNESS:  Okay.

25  BY MR. SCARBOROUGH:

Kneuper - redirect

130

1  Q.  Do you see Paragraph 81?

2  A.  81.

3       Yes, I do.

4  Q.  And read the second sentence, if you could, in Paragraph

5  81.

6  A.  "It is well understood in the economic literature that

7  competitive markets are characterized by a range of

8  competitive price points, particularly in a differentiated

9  product such as retail, a point that Dr. Schafer agrees with

10 in her deposition testimony."

11 Q.  And is that a true and correct statement from your

12 supplemental report?

13 A.  Yes.

14 Q.  And are the authorities cited in Footnote 109 the

15 authorities for that proposition?

16 A.  Yes.  There's a couple of them that I mentioned in -- just

17 a few moments ago.  And, then, there's about three or four

18 other articles.  It looks like about five or six articles.

19 Q.  Okay.

20      And could you look at Paragraph 84, as well, and read

21 that, please.  Just the first sentence of Paragraph 84.

22      MR. RISKI:  Can I just get caught up to make an

23 objection before he starts reading?

24      MR. SCARBOROUGH:  I'm just -- I have only got about

25 30 seconds left, so I am trying to --

Kneuper - redirect

131

```
 1              THE COURT:  I know.  I will give it back to you.  I
 2   will not let his delay take away from your time.
 3              MR. RISKI:  Again, Judge, I'm going to object.  It's
 4   beyond the scope of cross and it wasn't brought up in his
 5   direct.  It's prejudicial to allow him to now bring in new
 6   parts of his supplemental report.
 7              THE COURT:  But he is responding to what you asked on
 8   cross.
 9              MR. SCARBOROUGH:  This is a classic case of opening
10   the door.
11              THE COURT:  Yes.
12              MR. SCARBOROUGH:  I'm just --
13              THE COURT:  Overruled.
14              MR. SCARBOROUGH:  -- closing the loop.
15   BY MR. SCARBOROUGH:
16   Q.  Paragraph 84, the first sentence, could you read it,
17   please?
18   A.  "These examples illustrate the commonly recognized notion
19   of retail price dispersion whereby similar groups of products
20   are sold by different retailers at widely varying price -- "
21   "prices."
22   Q.  And did you -- is that a statement that you wrote in
23   your -- for your supplemental report?
24   A.  Yes.
25   Q.  And is that true and accurate?
```

1  A.  Yes.

2  Q.  And do you cite in Footnote 110 several authoritative

3  sources in support of that proposition?

4  A.  Yes.  And those really -- the second sentence in

5  particular, these different price points reflect different

6  strategies that retailers use in a competitive market to

7  differentiate their selling environments; and, then, again,

8  there's various cites in support of that.

9  Q.  Dr. Kneuper, one last question:  Do you have any doubt in

10  your mind that Peaches has a low single-digit market share in

11  the geographic market that plaintiff --

12          MR. RISKI:  Object to form.

13  BY MR. SCARBOROUGH:

14  Q.  -- has defined?

15          THE COURT:  Overruled.

16          You may answer.

17  BY THE WITNESS:

18  A.  No.

19          MR. SCARBOROUGH:  Thank you.

20          THE COURT:  Right on time.

21          Any recross?  You have about five minutes if you want

22  it.

23          MR. RISKI:  Just a few quick questions.

24                      RECROSS EXAMINATION

25  BY MR. RISKI:

Kneuper - recross

133

1   Q.  Dr. Kneuper, on the authorities that you just cited to --

2   I think it was Page 84 of your report -- of your supplemental

3   report.

4   A.  Paragraph 84.

5   Q.  Yeah.

6            You would agree that one of the books you cite -- we

7   discussed this a little bit earlier -- Retailing Management,

8   that's a marketing textbook, correct?

9   A.  Well, I would -- we have this retailing-marketing

10  disagreement.  I characterize it as a retailing -- college

11  retailing textbook.

12  Q.  And one of the other sources that you cite to, one of the

13  other articles, is in the Journal of Academy of Marketing

14  Science; is that right?

15  A.  That's correct.

16  Q.  And you have no personal knowledge that any of these

17  authors of these materials are economists?

18  A.  Oh, yes, I do.

19  Q.  Which one is an economist?

20  A.  Matthew Lewis.  Matt Lewis is an economist that I know.

21  Price Dispersion and Competition with Differentiated Sellers.

22           George Stigler certainly is an economist, The

23  Economics of Information.  He won the Nobel Prize.

24  Q.  I was asking you about the two textbooks -- the first two

25  that on your list.  Retailing Management, right?  Those are

Kneuper - recross

134

1    not economists?

2    A.  I don't know.

3    Q.  How about Fabio Ancarani and Shankar Venkatesh?  You

4    offered price levels and price dispersions within cross

5    multiplied retailer types from Journal of Academy of Marketing

6    Sciences.  Are they economists?

7    A.  I don't know.  I'd have to look at the articles themselves

8    to see.

9            MR. RISKI:  I have no further questions.

10           (End of excerpt.)

11                        *    *    *    *    *

12

13   I certify that the foregoing is a correct excerpt from the
     record of proceedings in the above-entitled matter.

14

15
     /s/ Joseph Rickhoff                    May 28, 2015
16   Official Court Reporter

17

18

19

20

21

22

23

24

25