**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HANNAH'S BOUTIQUE, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 13-cv-2564 |
| v. | ) ) | Hon. Amy J. St. Eve |
| | ) | |
| BARBARA ANN SURDEJ, ROY SURDEJ, and JEFFREY SURDEJ d/b/a PEACHES BOUTIQUE, | ) ) ) ) | |
| Defendants. | ) ) | |

## **MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Defendants Barbara Ann Surdej, Roy Surdej, and Jeffrey Surdej d/b/a Peaches Boutique (collectively "Defendants" or "Peaches") have moved to bar certain opinions of Plaintiff Hannah's Boutique, Inc.'s ("Hannah's") expert Dr. Leslie Schafer pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For the following reasons, the Court grants Defendants' motion.

## **BACKGROUND**

Hannah's is a specialty boutique located in Palos Park, Illinois that sells prom and homecoming dresses. (R. 270, Pl.'s Resp. to Defs.' SOF ¶ 2.) Peaches Boutique also sells prom and homecoming dresses, and is the largest specialty boutique retailer in the Chicago area. (R. 270, Pl.'s Stmt. of Add'l Facts ¶¶ 3, 7, 16, 17.) Defendants Roy and Barbara Surdej opened Peaches in 1985, and Defendant Jeffrey Surdej is their son. (R. 270, Pl.'s Resp. to Defs.' SOF ¶

1

3.) Hannah's alleges that Peaches attained the largest market share in the Chicago Market[1] by engaging in anticompetitive and predatory acts specifically aimed at foreclosing competition. (R. 188, Am. Compl. ¶ 9.) These alleged acts include demanding that sixteen high-end dress designers (the "Designers") not sell to specific specialty boutiques within the Chicago Market, including Hannah's, and organizing a meeting with the Designers at which Defendants attempted to impose policies on the Designers to limit the sale of dresses to other boutiques. (*Id.* ¶¶ 10, 84-134.) These alleged acts took place from September 2011 through approximately the end of 2013. (*Id.*) Based in part on these allegations, Hannah's filed suit against Peaches under Section 2 of the Sherman Act, 15 U.S.C. § 2, for attempted monopolization (Count I), conspiracy to monopolize (Count II), and monopolization (Count III); under Section 1 of the Sherman Act, 15 U.S.C. § 1, for concerted refusal to deal (Count IV) and unreasonable restraint of trade (Count V); under Section 3 of the Clayton Act, 15 U.S.C. § 14, for exclusive dealing (Count VI); and under the Illinois Antitrust Act for illegal monopolization and unreasonable restraint of trade (Count VII) (the "Antitrust Claims"). Hannah's also asserts a variety of non-antitrust Illinois state law claims against Peaches.

In support of its claims, Hannah's disclosed Dr. Leslie Schafer as an economic expert. She examined whether Peaches possesses or possessed market power in and around Chicago, Illinois in the market for the retail sale of special occasion prom and homecoming dresses manufactured by the Designers. She also reviewed the analysis and opinions contained in the report and deposition testimony of Defendants' expert Dr. Robert Kneuper.

---

[1] Hannah's alleges that the "Chicago Market" consists of the geographic area comprised by area codes 630/331, 847/224, 708, 312/872, and 773. (R. 188, Am. Compl. ¶ 1.) Those area codes include the City of Chicago, suburban Cook County, DuPage County, Lake County, Kane County, and portions of Kendall County and Will County. *Id.*

Dr. Schafer gives several opinions based on her analysis. (R. 250-1, Schafer Rep., at 8-12.) First, the relevant product market is high-end, special occasion prom and homecoming dresses manufactured by the Designers and sold in specialty boutiques. Second, the relevant geographic market for the sale of the Designers' prom and homecoming dresses is the "Chicago Market", the geographic area encompassed by area codes 630/331, 847/224, 708, 312/872, and 773. Third, between 2009 and 2012, Peaches possessed market power in the sale of Designer prom and homecoming dresses in the Chicago Market, which allowed it to charge supra-competitive prices. Fourth, Peaches maintained above-market prices longer than it otherwise would have been able to because of its anti-competitive behavior, in part because its actions increased its rivals' costs. Fifth, although Peaches does not have market power in the internet retail channel, it used its branded website to protect its local market power by price discriminating between customers based on their geographic location. Sixth, Dr. Kneuper's analysis of Defendants' market share contains several errors and omissions. Dr. Schafer concludes that although there is not sufficient data to estimate Peaches' market share, it possessed market power in the Chicago Market from at least 2009 through 2012 based on so-called "direct effects" – its ability to maintain its price above a competitive level by inducing certain of the Designers to not supply their dresses to its competitors. Defendants now move to exclude Dr. Schafer's opinions on several different grounds.

**LEGAL STANDARD**

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington N. Santa Fe*

3

*Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014); *see also Lewis v. Citgo Petroleum Co.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702, governing the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "In short, the rule requires that the trial judge ensure that any and all expert testimony or evidence admitted 'is not only relevant, but reliable.'" *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) *(quoting Daubert,* 509 U.S. at 589, 113 S.Ct. 2786); *see also Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 894 (7th Cir. 2011) (explaining that ultimately, the expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline"); *Lees v. Carthage College*, 714 F.3d 516, 521 (7th Cir. 2013). The *Daubert* principles apply equally to scientific and non-scientific expert testimony. *See Manpower, Inc.*, 732 F.3d at 806 (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

Under the expert-testimony framework, courts perform the gatekeeping function of determining whether the expert testimony is both relevant and reliable prior to its admission at trial. *See Manpower, Inc.*, 732 F.3d at 806; *Lees*, 714 F.3d at 521; *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). In doing so, courts "make the following inquiries before admitting expert testimony: First, the expert must be qualified by knowledge, skill, experience, training, or education; second, the proposed expert must assist the trier of fact in determining a relevant fact

4

at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case." *Lees*, 714 F.3d at 521-22; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *Pansier*, 576 F.3d at 737. A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (citing *Daubert,* 509 U.S. at 596). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id* (quoting *Daubert*, 509 U.S. at 596).

## ANALYSIS

Defendants make several arguments in support of their motion to exclude the expert opinions of Dr. Schafer, all of which are directed at Dr. Schafer's ultimate conclusion that Peaches possessed market power. First, as a legal matter, Defendants argue that Dr. Schafer may not rely on direct effects to establish Peaches' market power without an initial showing that Peaches possessed a substantial market share. Second, Defendants contend that even if the Court allows Hannah's as a matter of law to rely on direct effects evidence to establish Peaches' market power, Dr. Schafer's methodology in this case is unreliable. Finally, Defendants contend that the Court should exclude Dr. Schafer's opinions on the definitions of the relevant geographic and product markets, which Dr. Schafer uses to establish the relevant market in which Peaches possessed market power.

I.  **Legal Standards**

Defendants' first argument is that the applicable legal standard—the rule of reason—requires Hannah's to prove that Peaches possessed market power,[2] and Seventh Circuit precedent does not allow Hannah's to rely on direct effects to establish Peaches' market power without an initial showing that Peaches possessed a substantial market share. In response, Plaintiff makes two main arguments. First, Hannah's contends that the controlling law does not require it to show that Defendants possessed a certain market share to prove market power where Plaintiff can show evidence of Peaches' direct, anti-competitive effects. Instead, Plaintiff asserts that it may prove that Defendants possessed market power solely using the direct, anti-competitive effects themselves. Second, Plaintiff argues alternatively that either the "*per se*" or "quick look" legal standards should apply to its claims, not the rule of reason. Plaintiff contends that because neither of those standards requires a showing of market power, the Court should not exclude Dr. Schafer's opinions based on Plaintiff's failure to make an initial showing that Peaches possessed a substantial market share. The Court addresses each argument in turn.

   A.  **Market Share Requirement for Direct Effects**

First, Defendants argue that under the applicable Seventh Circuit law, for Plaintiff to have Dr. Schafer testify that direct evidence of Peaches' anti-competitive conduct shows that Defendants possessed market power, Plaintiff must first establish both the "rough contours of a relevant market and [] that the defendant commands a substantial share of the market." *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 736-37 (7th Cir. 2004). Plaintiff disagrees, arguing that the controlling law does not require Plaintiff to prove that Defendants possessed a certain market share where it can show evidence of direct, anti-competitive effects.

---

[2] *See, e.g., Agnew v. N.C.A.A.*, 683 F.3d 328, 335 (7th Cir. 2012) (holding that as a threshold matter under the rule of reason, "a plaintiff must show that the defendant has market power …")

6

Plaintiff agrees with Peaches, however, that to use direct effects to prove market power under the rule of reason analysis it still must show the "rough contours of a relevant market," which includes both a product market and a geographic market component.

There are two ways of proving market power. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000). The more conventional way "is by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case." *Id*. Under this method, the plaintiff "must precisely establish" both the relevant product and geographic dimensions of the relevant market. *Republic Tobacco Co.*, 381 F.3d at 736. A plaintiff also may establish market power through "direct evidence of anticompetitive effects." *Toys "R" Us, Inc.*, 221 F.3d at 937. Here, Plaintiff concedes that it cannot show that Defendants possessed a substantial market share because it cannot calculate it. Dr. Schafer testified at the hearing that she did not conduct a market share analysis because "there were not reliable data or facts available to calculate market share, even if [a market share analysis] was warranted." (5/20/15 A.M. Tr.) Thus, Hannah's does not make an initial showing that Peaches possessed a substantial share of the relevant market.[3]

The Court agrees with Defendants that for Plaintiff to use direct evidence of anti-competitive effects to establish that Defendants possessed market power, the controlling Seventh Circuit law requires Plaintiff to show both the "rough contours" of the relevant market, and that Defendants' possessed "substantial market share." In *Republic Tobacco*, the plaintiff argued that it should not have to establish the relevant geographic market because it had evidence of direct, anticompetitive effects. *Republic Tobacco*, 381 F.3d at 736-37. The Seventh Circuit disagreed. After analyzing the Supreme Court and Seventh Circuit precedent on the issue, it specifically

---

[3] The Court notes that Defendants' expert Dr. Robert Kneuper was able to estimate Peaches' market share using several different methods. The Court denied Plaintiff's *Daubert* motion challenging those opinions. (R. 329, Kneuper Opinion.)

7

held that in order for a plaintiff to establish market power using direct effects, the plaintiff must "show the rough contours of a relevant market, *and* show that the defendant commands a substantial share of the market." *Republic Tobacco*, 381 F.3d at 737 (emphasis added). As the court noted, "[e]conomic analysis is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market." *Id*. To ensure that the direct effects analysis is meaningful, a plaintiff needs to make a minimum initial showing that the defendant possesses a substantial market share in a roughly-defined relevant market.

Plaintiff attempts to draw support for its argument from the Seventh Circuit's earlier decision in *Toys "R" Us, Inc.*, 221 F.3d 928. In that case, the Seventh Circuit held that the Federal Trade Commission could use evidence of direct anti-competitive effects to establish that Toys "R" Us possessed market power. In reaching its decision, the court stated the following:

> [The defendant] seems to think that anticompetitive effects in a market cannot be shown unless the plaintiff, or here the Commission, first proves that it has a large market share. This, however, has things backwards. As we have explained elsewhere, the share a firm has in a properly defined relevant market is only a way of estimating market power, which is the ultimate consideration.

*Id*. at 937 (citation omitted). Plaintiff pounces on this passage to argue that the controlling law does not require it to prove that Defendants possessed a large market share. Later in the *Toys "R" Us* opinion, however, the court emphasized that the defendant "had 20% of the national wholesale market and up to 49% of some local wholesale markets." *Id*. at 937. Indeed, in reaching its holding, the *Republic Tobacco* court specifically relied on that passage in the *Toys "R" Us* decision. It held that the FTC was only able to use direct effects evidence to prove that Toys "R" Us had market power because it first showed that Toys "R" Us possessed a substantial share of the market. *Republic Tobacco*, 381 F.3d at 737. Thus, *Toys "R" Us* does not support Plaintiff's argument.

Plaintiff also tries to limit the holding in *Republic Tobacco* based on its facts. Plaintiff argues that "the plaintiff in *Republic Tobacco* offered no direct evidence of the defendant's market power through the ability to control price or exclude competition." (R. 288, Pl.'s Resp. at 13.) To the contrary, the plaintiff in *Republic Tobacco* alleged that the defendant effectively excluded it from its alleged market of the southeastern United States "by pursuing enhanced exclusivity agreements through its incentive programs for distributors and retailers." *Republic Tobacco*, 381 F.3d at 722. In other words, the plaintiff tried to show that the defendant unlawfully excluded it from the market. The Seventh Circuit affirmed the district court's grant of summary judgment because the plaintiff failed to show that the relevant market was the southeastern United States rather than the United States as a whole—not because the plaintiff failed to offer direct evidence of the defendant's market power. *Id*. at 737. Thus, this argument is also not successful.

For these reasons, Plaintiff's argument that it can use evidence of direct effects to prove market power while circumventing an initial showing of Peaches' market share is not persuasive as a matter of law. Accordingly, the Court excludes Dr. Schafer's testimony that Peaches possessed market power because Plaintiff does not make the required initial showing that Peaches possessed a substantial share of the market.

### B.     Alternative Legal Standards

Plaintiff also argues in the alternative that its claims do not require proof of market power because either the "*per se*" or "quick look" legal standards should apply, not the rule of reason. As explained in greater detail in the Court's Opinion on Defendants' Motion for Summary Judgment, the Court disagrees. Plaintiff's argument that the "*per se*" standard should apply hinges on its theory that Peaches induced certain of the Designers to enter into a horizontal

agreement with each other, either to boycott Hannah's or to fix a higher minimum price for internet retail sales. The facts simply do not support this theory, even when viewed in the light most favorable to Plaintiff. The evidence shows that Peaches made requests to certain Designers to stop supplying Peaches' competitors, including Hannah's, and discussed the idea of a higher minimum price for internet retail sales at a meeting with the Designers at the 2012 Atlanta Prom Market. At most though, Peaches entered into vertical agreements with certain Designers—there is no evidence that the Designers entered into a horizontal agreement with each other.

The "quick look" standard applies where "the per se framework is inappropriate, but where 'no elaborate industry analysis is required to demonstrate the anticompetitive character of … an agreement.'" *Agnew v. NCAA*, 683 F.3d 328, 336 (7th Cir. 2012) (quoting *NCAA v. Bd. of Regents*, 468 U.S. 85, 109, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)). Courts use it "when 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets,' but there are nonetheless reasons to examine potential procompetitive justifications.'" *Id.* (quoting *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999)). Here, the vertical restraints at issue require the full rule of reason analysis. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 907, 127 S.Ct. 2705, 168 L.Ed.2d 623 (holding that the rule of reason is the appropriate standard by which courts should judge vertical price restraints); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) ("When anticompetitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason.")

The Court agrees with Defendants that the rule of reason, not the *per se* or "quick look" standards, applies to the vertical restraints at issue here. Accordingly, an initial showing of market power is required.

## II.  Remaining Arguments

As a final matter, Defendants move to exclude Dr. Schafer's opinions on a number of other bases. Because the Court finds that the controlling law prevents Dr. Schafer from giving her market power opinions for the reasons discussed above, it does not address Defendants' remaining arguments.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to bar certain opinions of Plaintiff's expert Dr. Schafer.

**DATED:  July 2, 2015**                                                **ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge