**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HANNAH'S BOUTIQUE, INC., | ) | |
| an Illinois corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  13-cv-2564 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| | ) | |
| BARBARA ANN SURDEJ, ROY | ) | |
| SURDEJ, and JEFFREY SURDEJ | ) | |
| d/b/a PEACHES BOUTIQUE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Hannah's Boutique, Inc. ("Hannah's") filed suit against Defendants Barbara Ann Surdej, Roy Surdej, and Jeffrey Surdej d/b/a Peaches Boutique (collectively "Peaches") under Section 2 of the Sherman Act, 15 U.S.C. § 2, for attempted monopolization (Count I), conspiracy to monopolize (Count II), and monopolization (Count III); under Section 1 of the Sherman Act, 15 U.S.C. § 1, for concerted refusal to deal (Count IV) and unreasonable restraint of trade (Count V); under Section 3 of the Clayton Act, 15 U.S.C. § 14, for exclusive dealing (Count VI); and under the Illinois Antitrust Act for illegal monopolization and unreasonable restraint of trade (Count VII) (the "Antitrust Claims").  Hannah's also asserts a variety of non-antitrust Illinois state law claims against Peaches.  Peaches has moved for summary judgment on the Antitrust Claims, arguing that Hannah's cannot show that Peaches possessed "market power," which Peaches contends is required for each of those claims.  For the following reasons, the Court grants Defendants' motion.

**BACKGROUND**

## I.      Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994)).  Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue …" *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014) (quoting L.R. 56.1(a)(3)).  "The non-moving party must file a response to the moving party's statement, and, in the case of any disagreement, cite 'specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (quoting L.R. 56.1(b)(3)(B)).  The nonmoving party also may submit a separate statement of additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon to support those facts.  *See* L.R. 56.1(b)(3)(C); *see also Ciomber v. Coop. Plus, Inc.,* 527 F.3d 635, 643–44 (7th Cir. 2008).

As an initial matter, Plaintiff moves to strike Defendants' Statement of Additional Undisputed Material Facts.  (*See* R. 311, Pl.'s Mot. to Strike.)  Plaintiff also objects to certain statements in Defendants' Local Rule 56.1 Statement of Facts.  With respect to Plaintiff's motion to strike, the Court denies it as moot as the Court does not rely on facts contained in the Defendants' Statement of Additional Undisputed Material Facts in its Opinion.  To the extent the Court relies on facts contained in the Defendants' Local Rule 56.1 Statement to which Plaintiff objects, the Court takes up Plaintiff's objections where it relies on those facts in the Opinion.

*See Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 655 (7th Cir. 2011) (holding that district courts have broad discretion to enforce Local Rule 56.1).

## II. Relevant Facts

As Peaches is moving for summary judgment, the Court views the facts in the light most favorable to Hannah's and draws all reasonable inferences in its favor.[1]  *See Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).  Hannah's is a specialty boutique located in Palos Park, Illinois that sells prom and homecoming dresses.  (R. 270, Pl.'s Resp. to Defs.' SOF ¶ 2.)  Peaches Boutique also sells prom and homecoming dresses, and is the largest specialty boutique retailer in the Chicago area.  (*Id.*, Pl.'s Stmt. of Add'l Facts ¶¶ 3, 7, 16, 17.) Defendants Roy and Barbara Surdej opened Peaches in 1985, and Defendant Jeffrey Surdej is their son.  (*Id.*, Pl.'s Resp. to Defs.' SOF ¶ 3.)  When Defendants opened Peaches, the store was approximately 2,400 square feet.  (*Id.* ¶ 49.)  They have expanded the store over the years, first to 4,400 square feet, then to 8,400 square feet in 2003, and finally in 2011 to its current size of 25,000 square feet.  (*Id.* ¶ 53.)   Peaches' store has over 20,000 dresses in stock and advertises to its customers "that they will not find anyone else out there that carries that much stock."  (*Id.*, Pl.'s Stmt. of Add'l Facts ¶ 1.)  Peaches also sells dresses online through multiple websites that it controls.  (*Id.*, Pl.'s Resp. to Defs.' SOF ¶¶ 73-75.)  Susan Shaban opened Hannah's in May of 2009, with the intent of focusing on the sale of prom and homecoming dresses.  (*Id.*, Pl.'s Stmt. of Add'l Facts ¶¶ 23-24.)  In 2012, Hannah's moved to its current location, a 2,600 square foot store with five dressing rooms.  (*Id.*, Pl.'s Resp. to Defs.' SOF ¶¶ 102-103.)

Plaintiff argues that the relevant product market for antitrust purposes consists of high-end prom and homecoming dresses manufactured by sixteen designers (the "Designers") that are

---

[1] The controlling antitrust law, however, limits the Court from drawing certain inferences. *See* Analysis Section I(A)(1) below.

sold through specialty retail boutiques.[2]  (*Id.*, Pl.'s Resp. to Defs.' SOF ¶ 7.)  The Designers sell

their dresses to the public through a network of authorized retailers, including specialty

boutiques, department stores, and internet sites, although not all of the Designers sell through

department stores.[3]  (*Id.* ¶ 21.)  There are 42 department stores within 30 miles of Peaches, and

another 12 between 30 and 50 miles of Peaches.  (*Id.* ¶ 118.)  In the Chicago Market,[4] there are

56 specialty retailers other than Hannah's and Peaches that sell prom dresses.[5]  (*Id.* ¶ 149.)

Within 30 miles of Peaches, there are 70 specialty retailers other than Hannah's and Peaches that

sell prom dresses, and within 50 miles of Peaches, there are approximately 89.  (*Id.* ¶¶ 150-51.)

The 56, 70, and 89 specialty retailers have a combined retail space of 304,606 square feet,

323,945 square feet, and 402,713 square feet, respectively, although the parties dispute how

much of that square footage is dedicated to prom and homecoming dresses.  (*Id.* ¶¶ 149-151.)

Consumers also purchase prom and homecoming dresses on internet websites.  (*Id.* ¶ 122.)

Between 2009 and 2012, Defendants repeatedly requested to certain Designers by

telephone and e-mail that they not supply their dresses to specific specialty boutiques within the

Chicago Market, including Hannah's.  (*Id.*, Pl.'s Resp. to Defs.' SOF ¶ 58; Pl.'s Stmt. of Add'l

Facts ¶¶ 28-29, 34, 36, 38, 41, 43-46, 49-50, 102.)  Several of the Designers agreed to Peaches'

---

[2] The Designers are: Allure, Blush, House of Wu, Jasz Couture, Jovani, La Femme, Mac Duggal, Flirt (aka Maggie Sottero, Mori Lee, Party Time, Riva Designs, Scala, Sherri Hill, Tarik Ediz, Terani, and Tony Bowls.  (R. 270, Pl.'s Resp. to Defs.' SOF ¶ 7.)

[3] To the extent Plaintiff disputes only a portion of a statement of fact, the Court deems the remaining portion admitted.  *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.")

[4] Plaintiff argues that the relevant geographic market for antitrust purposes is the "Chicago Market," which it defines as encompassing area codes 630/331, 847/224, 708, 312/872, and 773.  (R. 250-1, Schafer Rep. ¶ 12.)

[5] Plaintiff objects to several of Defendants' statements of fact based on its *Daubert* motion.  The Court denied that motion, however, in its June 19, 2015 Opinion.  (R. 329, Kneuper Opinion.)

requests and agreed to not sell to certain of Peaches' competitors within the Chicago Market.[6] (*See Id.*, Pl.'s Resp. to Defs.' SOF ¶ 58; Pl.'s Stmt. of Add'l Facts ¶¶ 31, 45, 74, 79, 84.)

In August 2012, Peaches organized a meeting of prom and homecoming dress designers at the 2012 Atlanta Prom Market.  (*Id.*, Pl.'s Stmt. of Add'l Facts ¶¶ 55-56.)  Peaches invited a number of the Designers, but did not invite any other Chicago-area retail boutiques.  (*Id.*, Pl.'s Resp. to Defs.' SOF ¶ 34.)  At the meeting, Defendants distributed a handout titled "Prom Industry Concerns" that addressed the following "items of interest for discussion":

1) No opening of internet sites without a legitimate brick and mortar store …

2) No advertising a product without purchasing the minimums …

3) Stopping discounting on current products before 5/15 date …

4) MSIRP-manufacturer suggested internet retail price …

5) Counterfeiting …

6) Manufacturers should not own retail internet websites …

(*Id.*, Pl.'s Stmt. of Add'l Facts ¶ 61.)  Under item number four, the handout stated in part, "[m]any manufacturers are starting to enforce a 2.2 markup on internet pricing."  (*Id.*)  Defendant Jeffrey Surdej spoke at the meeting, and his notes indicate that he discussed that Defendants are part of a "very unique industry" due to seasonality, and that he discouraged the dress designers from opening new accounts because the teenage population is decreasing and the opening of new accounts would cut into Peaches' profit margin.  (*Id.* ¶ 65, Ex. 102.)

Shortly after the meeting, two Designers, Jovani and Terani, implemented a higher internet pricing policy, mandating a markup on their dresses of 2.2 times the wholesale cost.  (*Id.* ¶¶ 72-73.)  This was the first time that Terani implemented this higher online pricing policy. (*Id.*, Pl.'s Resp. to Defs.' SOF ¶ 34.)  Further, in the several months following the 2012 Atlanta

---

[6] Plaintiff's Statement of Facts does not provide an exact number.

Prom Market meeting, Hannah's attempted to place or placed orders for prom and homecoming dresses with the following Designers, all of which were rejected or cancelled after only partial fulfillment: Allure, Jovani, House of Wu, Party Time, Riva Designs, Terani, La Femme, Mori Lee, Mac Duggal, Scala, Sherri Hill, Tarik Ediz, Jasz Couture, Mon Cheri, and Blush. (*Id.* ¶77.) Prior to September of 2012, Peaches had been able to purchase dresses from seven of the Designers: Jovani, Mon Cheri, Terani, House of Wu, Tarik Ediz, Riva Designs, and Party Time. (*Id.* ¶ 54.)

Based in part on these allegations, Hannah's filed suit against Peaches. Peaches has moved for summary judgment solely on the Antitrust Claims, arguing that Hannah's cannot show that Peaches possessed "market power," which Peaches contends is required for each of those claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining summary judgment motions, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris,* 550 U.S. at 378, 127 S.Ct. 1769 (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see Kvapil v. Chippewa County, Wis.*, 752 F.3d 708, 712 (7th Cir. 2014). "The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact." *Kvapil v. Chippewa County, Wis.*, 752 F.3d at 712 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party meets this burden, the opposing party "must establish some genuine issue for trial such that a reasonable jury could return a

verdict in [their] favor." *United States v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013)

(quoting *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772-73 (7th Cir. 2012)).

## ANALYSIS

### I.     Legal Standard

Plaintiff alleges claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2,

and Section 3 of the Clayton Act, 15 U.S.C. § 14.  As an initial matter, Defendants argue that

each of these claims requires proof that Peaches possessed either monopoly power or substantial

market power.[7]  With respect to Plaintiff's claims under Section 1 of the Sherman Act and

Section 3 of the Clayton Act, Defendants contend that because Plaintiff submits evidence of

vertical rather than horizontal restraints, the "rule of reason" legal standard, which requires an

initial showing that Defendants possessed market power, applies to Plaintiff's allegations.

Plaintiff disagrees.  It argues that the Court should instead apply either the "*per se*" or "quick

look" legal standard.  With respect to Plaintiff's Section 2 claims, Plaintiff does not dispute that

its claims for attempted monopolization and monopolization require a showing of monopoly

power.  It argues only that its third Section 2 claim, conspiracy to monopolize, does not require it

to show that Peaches possessed monopoly power.  The Court addresses each of these issues in

turn.

---

[7] Plaintiff also alleges that Peaches' conduct constitutes illegal monopolization and unreasonable restraint of trade under the Illinois Antitrust Act, 740 ILCS 10/3.  (R. 188, Am. Compl. ¶ 262.)  Plaintiff does not dispute that those sections of the Illinois Antitrust Act are based on Sections 1 and 2 of the Sherman Act, and therefore the applicable legal standards are the same.  *See* 740 ILCS 10/11 ("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."); *Laughlin v. Evanston Hosp.*, 133 Ill.2d 374, 383-84, 140 Ill.Dec. 861, 550 N.E.2d 986 (1990) (applying decisions construing Section 1 of Sherman Act to claim for unreasonable restraint of trade brought under the Illinois Antitrust Act); *Int'l Equip. Trading, Ltd. v. AB SCIEX, LLC*, No. 13-C-1129, 2013 WL 4599903, at *3 n.1 (Aug. 29, 2013) (applying Sherman Act Section 2 analysis to attempted monopolization claim brought under the Illinois Antitrust Act).

## A.    Restraints on Trade

With respect to Plaintiff's claims under Section 1 of the Sherman Act and Section 3 of the Clayton Act, Plaintiff argues that its two theories of liability both require that the Court apply either the "*per se*" or "quick look" legal standards.  Section 1 of the Sherman Act provides in relevant part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce … is declared to be illegal."  15 U.S.C. § 1.  Section 3 of the Clayton Act makes it unlawful for an entity to "make a sale or contract for sale of goods … on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods … of a competitor …, where the effect … may be to substantially lessen competition or tend to create a monopoly …" 15 U.S.C. § 14.  Hannah's alleges that Peaches caused the Designers: 1) to agree to a group boycott of Hannah's and other retail boutique competitors of Peaches; and 2) to impose a vertical restraint on the internet retail price of the Designers' prom and homecoming dresses.  The Court examines the legal standard that applies to each theory of liability.

### 1.    Group Boycott

Plaintiff's main claim is that between 2009 and 2012, Defendants repeatedly requested to the Designers that they not sell to specific retail boutiques in the Chicago Market, including Hannah's.  (R. 270, Pl.'s Resp. to Defs.' SOF at ¶ 58; Pl.'s Stmt. of Add'l Facts at ¶¶ 28-29, 34, 36, 38, 41, 43-46, 49-50, 102.)  In response to Peaches' requests, certain of the Designers agreed to Peaches' demands and agreed to not sell to its competitors within the Chicago Market.  (*Id.*, Pl.'s Resp. to Defs.' SOF at ¶ 58; Pl.'s Stmt. of Add'l Facts at ¶¶ 31-33, 42, 45, 76-77, 79, 82, 84-85, 86, 88, 89-91, 94-100.)  With respect to Hannah's specifically, in the months following the 2012 Atlanta Prom Market Meeting it attempted to place or placed orders for prom and

homecoming dresses with the following Designers, all of which these Designers rejected or cancelled after only partial fulfillment: Allure, Jovani, House of Wu, Party Time, Riva Designs, Terani, La Femme, Mori Lee, Mac Duggal, Scala, Sherri Hill, Tarik Ediz, Jasz Couture, Mon Cheri, and Blush. (*Id.*, Pl.'s Stmt. of Add'l Facts ¶ 77.) Based on these facts, Hannah's argues that Peaches induced certain of the Designers to enter into a horizontal agreement to boycott Hannah's—*i.e.*, they agreed among each other to refuse to supply Hannah's with their prom and homecoming dresses. *See Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) ("[r]estraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.")

Plaintiff argues that in analyzing Peaches' conduct the Court should apply the *per se* standard. "The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work … Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices, or to divide markets." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) (citations omitted). Group boycotts are *per se* illegal if they involve "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) (quoting *Northwest Wholesale Stationers, Inc., v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 294, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985)).

On the other hand, "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that

it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative*, 551 U.S. at 886-87, 127 S.Ct. 2705 (citations omitted). Indeed, the rule of reason is "[t]he standard framework for analyzing an action's anticompetitive effects on the market." *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012). The Supreme Court has held, for example, that the rule of reason applies to allegations that a defendant entered into vertical agreements setting minimum resale prices. *Leegin Creative*, 551 U.S. at 907, 127 S.Ct. 2705.

In making its argument that the Court should apply the *per se* rule, Plaintiff relies heavily on *Toys "R" Us, Inc.*, 221 F.3d 928. In that case, the Seventh Circuit affirmed a decision of the FTC finding that Toys "R" Us had induced at least seven of its toy manufacturer suppliers to enter into a horizontal agreement to boycott certain of Toys "R" Us's competitors. *Id.* at 935-36. The Seventh Circuit rejected Toys "R" Us's argument that it had merely entered into a series of independent vertical agreements with each of the manufacturers. *Id.* Instead, the Seventh Circuit held that Toys "R" Us had also induced a horizontal agreement among the manufacturers to limit their sales, and applied the *per se* standard to Toys "R" Us's conduct. *Id.* Here, Plaintiff analogizes the facts to the *Toys "R" Us* decision, and requests that the Court similarly find a horizontal agreement among the Designers and apply the *per se* standard to Defendants' actions.

A plaintiff may prove a horizontal agreement "by either direct or circumstantial evidence." *Toys "R" Us*, 221 F.3d at 934. "When circumstantial evidence is used, there must be some evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (holding that even on summary judgment, "antitrust law limits the range of permissible inferences from ambiguous evidence" in

a case involving Section 1 of the Sherman Act). A plaintiff does not, however, have to exclude all possibility that the alleged conspirators acted independently. *Toys "R" Us*, 221 F.3d at 934-35; *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 787 (7th Cir. 1999).

Here, even reviewing the evidence in the light most favorable to Plaintiff, the Court agrees with Defendants that there is simply no evidence of a horizontal agreement between the Designers (or a smaller number of the Designers) to boycott Hannah's. First, Plaintiff does not present any direct evidence that the Designers reached an agreement among themselves. Second, with respect to Plaintiff's circumstantial evidence, it submits that from 2009 through 2012, Peaches contacted many of the Designers via telephone or e-mail and requested that they not supply competing retail boutiques with their dresses. Some of those communications specifically reference Hannah's, although many do not. (*See* R. 270, Pl.'s Stmt. of Add'l Facts ¶¶ 28-29, 34, 36, 38, 41, 43-44, 46, 49-50.) In response to those requests, Peaches received a variety of responses. Some of the suppliers appear to not have responded at all. (*See Id*., ¶ 34, Ex. 45) (Peaches e-mail to a number of Designers). Several responded positively, reassuring Peaches that it would be "taken care of," or that the Designer would "make a note in [its] system and inform [its] staff" of any orders from Hannah's. (*See Id*. ¶¶ 33, 85.) Some Designers responded explicitly that they were willing to protect Peaches' sales territory, or were willing to block Peaches' competitors, including Hannah's, from purchasing dresses. (*See e.g.*, *Id*. ¶¶ 31, 45, 74, 79, 84.) These varying responses do not indicate that all sixteen Designers (or even a smaller subset of them) reached an agreement among each other.

Importantly, Plaintiff also does not present evidence that any of the Designers sought assurances that the other Designers also agreed to limit their sales to Peaches. In *Toys "R" Us*,

for example, the Seventh Circuit considered such evidence central to its holding that the suppliers reached a horizontal agreement:

> If there was no evidence in the record tending to support concerted behavior, then we agree that [the controlling law] would require a ruling in [Toys "R" Us's] favor. But there is. The evidence showed that the companies wanted to diversify from [Toys "R" Us], not to become more dependent upon it; it showed that each manufacturer was afraid to curb its sales to the warehouse clubs alone, because it was afraid its rivals would cheat and gain a special advantage in that popular new market niche. The [FTC] was not required to disbelieve the testimony of the different toy company executives and [Toys "R" Us] itself to the effect that the only condition on which each toy manufacturer would agree to [Toys "R" Us's] demands was if it could be sure its competitors were doing the same thing.

*Toys "R" Us, Inc.*, 221 F.3d at 935-36. Here, there is no such evidence. Peaches had many communications with different Designers about limiting the supply of dresses to its competitors. There is no indication though that any of the Designers sought to expand their sales beyond Peaches, and were willing to agree to exclusively supply Peaches only if the other Designers agreed to the same deal. Instead, the evidence shows that the Designers that were communicating with Peaches individually evaluated the decision of whether or not to grant Peaches some measure of exclusivity. *See Toys "R" Us, Inc,* 221 F.3d at 937 ("[t]he typical story of a legitimate vertical transaction would have the [supplier] going to [the retailer] and asking it to be the exclusive carrier of the manufacturer's goods; in exchange for that exclusivity, the manufacturer would hope to receive more effective promotion of its goods, and [the retailer] would have a large enough profit margin to do the job well.")

Plaintiff also argues that the Designers reached a horizontal agreement during the 2012 Atlanta Prom Market Meeting. Viewing the evidence in the light most favorable to Plaintiff, Peaches organized the meeting and invited a number of the Designers, but did not invite any other Chicago-area boutiques. (R. 270, Pl.'s Resp. to Defs.' SOF ¶ 34.) Defendant Jeffrey Surdej spoke at the meeting, and his notes indicate that he spoke of how Defendants are part of a

"very unique industry" due to seasonality, and that he discouraged the Designers from opening new accounts because the teenage population is decreasing and the opening of new accounts would cut into Peaches' profits. (R. 270, Pl.'s Stmt. of Add'l Facts ¶ 65, Ex. 102.) In the months following the meeting, a number of the Designers rejected or cancelled orders from Hannah's, seven of whom Hannah's had been able to purchase dresses from in the past. (*Id*. ¶¶ 54, 77.)

As Plaintiff acknowledges in its brief, on summary judgment "antitrust law limits the range of permissible inferences from ambiguous evidence." *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348. Plaintiff must present some evidence that "tends to exclude the possibility" that the alleged conspirators acted independently. *Toys "R" Us*, 221 F.3d at 934. Here, there is no such evidence. First, there is no direct evidence that shows Peaches and certain of the Designers agreed to a group boycott of Hannah's at the 2012 Atlanta Prom Market Meeting. To the contrary, the available evidence does not show that the market participants even discussed Hannah's. Second, there is no evidence to exclude the possibility that the Designers acted independently in not selling to Hannah's. As discussed above, individual Designers may have been responding to Peaches' requests, but there is no indication that the Designers acted in concert with each other.

For these reasons, the rule of reason is the appropriate standard for evaluating any vertical agreements that may have existed between Peaches and the Designers to limit sales of the Designers' dresses to Hannah's.

### 2. Vertical Price Fixing

Plaintiff's second theory is that Defendants' requests caused two of the Designers to increase the minimum prices they required for prom and homecoming dresses sold on the

13

internet to a level above their minimum prices for dresses sold in brick and mortar stores. As an initial matter, Plaintiff in its Amended Complaint overwhelmingly focuses on its first theory that Peaches induced the Designers to boycott Hannah's. Nevertheless, Plaintiff does make several allegations of price fixing with respect to internet sales, and thus the Court will address that theory here. (*See, e.g.,* R. 188, Am. Compl. ¶¶ 16, 60, 92.) Plaintiff argues that Terani and Jovani raised their minimum price for internet sales to 2.2 times the wholesale price, up from 2 times the wholesale price for sales of their dresses at brick and mortar stores. Plaintiff contends that the Court should apply the per se standard to this theory, arguing that a vertical restraint is *per se* illegal when it includes an agreement on price or price levels.

In support of its argument, Plaintiff cites *Business Elecs. Corp*, 485 U.S. 717, 108 S.Ct. 1515. In that case, the Supreme Court held "that a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels." *Id.*, 485 U.S. at 735-36, 108 S.Ct. 1515. In reaching its holding, the Court noted that "[a]lthough vertical agreements on resale prices have been illegal *per se* since *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911) … the scope of *per se* illegality should be narrow in the context of vertical restraints." *Id.*, 485 U.S. at 724, 108 S.Ct. 1515. Twenty years later, however, the Supreme Court in *Leegin Creative* overturned its *Dr. Miles* decision, and held that the rule of reason, not the *per se* standard, is the applicable standard by which courts should judge whether vertical price restraints are lawful. *Leegin Creative*, 551 U.S. at 907, 127 S.Ct. 2705. Thus, to the extent Plaintiff's evidence establishes vertical agreements to impose a minimum price for internet retail sales between Terani and their retailers or Jovani and their retailers, the Court must evaluate those restraints under the rule of reason, not the *per se* standard.

Plaintiff also argues that the Court should apply the *per se* standard because Terani and Jovani raised their minimum prices for internet retail sales nearly simultaneously following the Atlanta 2012 Prom Meeting. Plaintiff's argument appears to be that Terani and Jovani entered into a horizontal agreement with each other to raise prices. As discussed above with respect to the group boycott theory, however, there is no evidence to infer that Terani and Jovani reached an agreement with each other. Plaintiff's evidence shows that Peaches presented the increased minimum internet retail pricing as an "item of interest" to a number of the Designers, and two of the sixteen later responded by raising their prices. A reasonable fact finder could not infer a horizontal agreement from these facts. *See also Leegin Creative*, 551 U.S. at 897, 127 S.Ct. 2705 ("When only a few manufacturers lacking market power adopt [resale price maintenance], there is little likelihood it is facilitating a manufacturer cartel, for a cartel then can be undercut by rival manufacturers.") Thus, the rule of reason applies.

### 3.    Quick Look Standard

As a final matter on the applicable legal standard, the Court also agrees with Defendants that the "quick look" standard does not apply to Plaintiff's Antitrust Claims. The "quick look" standard applies where "the per se framework is inappropriate, but where 'no elaborate industry analysis is required to demonstrate the anticompetitive character of … an agreement.'" *Agnew v. NCAA*, 683 F.3d at 336 (quoting *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 109, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)). Courts use it "when 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets,' but there are nonetheless reasons to examine potential procompetitive justifications.'" *Id.* (quoting *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999)). In *Agnew*, the

Seventh Circuit explained that the "quick look" standard applied, among other situations, "when a restraint would normally be considered illegal per se, but 'a certain degree of cooperation is necessary if the [product at issue] is to be preserved.'" *Id.* (quoting *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. at 117, 104 S.Ct. 2948).

The vertical agreements here are not obviously anti-competitive and courts would not normally consider them to be illegal *per se*. As the Supreme Court explained in detail in *Leegin Creative*, vertical restraints, including vertical agreements setting minimum resale prices, can have both pro-competitive and anti-competitive justifications. *Leegin Creative*, 551 U.S. at 889-894, 127 S.Ct. 2705. Thus, courts must evaluate them using the "rule of reason." *Id.* at 907, 127 S.Ct. 2705; *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) ("When anticompetitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason.")

For these reasons, the Court applies the "rule of reason" standard to Plaintiff's claims under Section 1 of the Sherman Act and Section 3 of the Clayton Act.

**B.    Conspiracy to Monopolize**

With respect to Plaintiff's Section 2 claims, Plaintiff does not dispute that its claims for attempted monopolization and monopolization require a showing of monopoly power.[8] It argues only that its third Section 2 claim, conspiracy to monopolize, does not require it to show that Peaches possessed monopoly power. In making its argument, Hannah's cites the Seventh Circuit's 1951 decision, *United States v. National City Lines*, 186 F.2d 562 (7th Cir. 1951). In that case, the defendants challenged the sufficiency of the indictment against them following

---

[8] *See, e.g., Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000) ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.")

their convictions for conspiring to monopolize in a criminal antitrust case. *Id*. at 564, 567-68.

They contended, among other arguments, that the indictment was insufficient because it did not

charge them with the monopolization of a specific geographic market. *Id*. at 567-68. The

Seventh Circuit denied their challenge, however, in part because the defendants' conduct alleged

in the indictment affected "a very substantial segment of interstate commerce." *Id*. The court

noted that the indictment charged the defendants with conspiracy to monopolize "all the busses,

all the tires and tubes and all the gas, oil and grease, used by the public transportation systems of

some 45 cities owned or controlled by [certain of the defendants]." *Id*. at 567. Thus, although

*National City* did not require the government to show market power in order to prove a

conspiracy to monopolize, the court still based its holding on the indictment containing "a charge

of elimination of competition, of monopolization, as to a substantial portion of interstate

commerce." *Id*.

As Defendants point out, courts in this district have criticized the holding of *National

City*, and several other circuits now hold that market power is a required element of a conspiracy

to monopolize claim under Section 2. *See Appraisers Coal. v. Appraisal Inst.*, 845 F.Supp. 592,

603 n.7 (N.D. Ill. 1994) (compiling cases criticizing *National City*); *Fraser v. Major League

Soccer, LLC*, 284 F.3d 47, 67 (1st Cir. 2002) (holding that allowing a jury to "condemn" an

exclusive dealing contract as a conspiracy to monopolize would "invite an end run around … the

case law for exclusive dealing under both section 1 and the attempt and monopolization

requirements of section 2 [of the Sherman Act]"); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211

(4th Cir. 2002). To the extent *National City* remains good law in the Seventh Circuit, however,

here Plaintiff does not raise an issue of fact as to whether any claimed conspiracy to monopolize

affected a substantial amount of interstate commerce. As discussed above, there is no evidence

that Peaches induced the Designers to enter into a horizontal conspiracy. Thus, to the extent they reached agreements, they were separate agreements between Peaches and the individual Designers. Assuming for the purposes of summary judgment that Plaintiff's product market is accurate and only includes the sixteen Designers, Plaintiff does not submit any evidence that any of the individual agreements substantially affected that market. Plaintiff, for example, does not show that any of the Designers themselves had market power, and it is undisputed that there are 56 other specialty retailers in the Chicago Market that sell prom dresses. (R. 270, Pl.'s Resp. to Defs.' SOF ¶ 149.) For these reasons, the Court grants Defendants' motion for summary judgment on the conspiracy to monopolize claim.

## II.      Market Power

As Plaintiff's Section 2 claims for monopolization and attempted monopolization require a showing of monopoly power, and its remaining Antitrust Claims require market power under the rule of reason, the Court analyzes whether Plaintiff can make that showing.

### A.      Requirements for Direct Effects Evidence

A party can prove market power through two separate ways. *Toys "R" Us, Inc.*, 221 F.3d at 937. The more conventional way "is by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case." *Id*. Under this method, the plaintiff "must precisely establish" both the relevant product and geographic dimensions of the relevant market. *Republic Tobacco Co.*, 381 F.3d at 738. A plaintiff also may establish market power through "direct evidence of anticompetitive effects." *Toys "R" Us, Inc.*, 221 F.3d at 937. Here, Plaintiff only attempts to establish that Defendants possessed market power through direct evidence of anticompetitive effects. It does

not try to show that Defendants had a substantial share of the relevant market. (*See* R. 250-1, Schafer Rep.)

Defendants argue that under the applicable Seventh Circuit law, for Plaintiff to use evidence of direct anti-competitive effects to establish that Defendants possessed market power, Plaintiff must first establish both the "rough contours of a relevant market and [] that the defendant commands a substantial share of the market." *Republic Tobacco Co.*, 381 F.3d at 737. Plaintiff disagrees. It argues that the controlling law does not require Plaintiff to prove that Defendants possessed a substantial market share where direct, anti-competitive effects are present. Plaintiff does agree with Peaches, however, that it must show the "rough contours of a relevant market."

The Court agrees with Defendants that for Plaintiff to use direct evidence of anti-competitive effects to establish that Defendants possessed market power, the controlling Seventh Circuit law requires Plaintiff to show both the "rough contours" of the relevant market, and that Defendants possessed "substantial market share." In *Republic Tobacco*, the plaintiff argued that it should not have to establish the relevant geographic market because it had evidence of direct, anticompetitive effects. *Republic Tobacco*, 381 F.3d at 736-37. The Seventh Circuit disagreed. After analyzing the Supreme Court and Seventh Circuit precedent on the issue, it specifically held that in order for a plaintiff to establish market power using direct effects, the plaintiff must "show the rough contours of a relevant market, *and* show that the defendant commands a substantial share of the market." *Id.* at 737 (emphasis added). As the court noted, "[e]conomic analysis is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market." *Id.* To ensure that the direct effects analysis is meaningful, a

plaintiff needs to make a minimum initial showing that the defendant possesses a substantial market share in a roughly-defined relevant market.

Plaintiff attempts to draw support for its argument from the Seventh Circuit's earlier decision in *Toys "R" Us, Inc.* In that case, the Seventh Circuit held that the Federal Trade Commission could use evidence of direct anti-competitive effects to establish that Toys 'R Us possessed market power. In reaching its decision, the court stated the following:

> [The defendant] seems to think that anticompetitive effects in a market cannot be shown unless the plaintiff, or here the Commission, first proves that it has a large market share. This, however, has things backwards. As we have explained elsewhere, the share a firm has in a properly defined relevant market is only a way of estimating market power, which is the ultimate consideration.

*Id*., 221 F.3d at 937. Plaintiff pounces on this passage to argue that the controlling law does not require it to prove that Defendants possessed a large market share. Later in the *Toys "R" Us* opinion, however, the court emphasized that the defendant "had 20% of the national wholesale market and up to 49% of some local wholesale markets." *Id*. at 937. Indeed, in reaching its holding, the *Republic Tobacco* court specifically relied on that passage in the *Toys "R" Us* decision. It held that the FTC was only able to use direct effects evidence because it first showed that Toys "R" Us possessed a substantial share of the market. *Republic Tobacco*, 381 F.3d at 737. Thus, Plaintiff's argument fails.

Plaintiff concedes that it cannot show that Defendants possessed a substantial share of the market because it cannot calculate Defendants' market share. Plaintiff also argues, however, that in the absence of publicly available data to calculate Peaches' market share, the Court should find that Peaches' possessed substantial market share because "[t]here is no dispute that Defendants control the largest and most substantial share of the Chicago Market for the Designers' prom and homecoming dresses." (R. 292, Pl.'s Resp., at 55.) With respect to the

data, Defendants' expert Dr. Robert Kneuper estimated Peaches' market share using several different methods that relied on publicly available data. (*See* R. 241-1, Kneuper Rep., at 25-26, 29.) Although Plaintiff filed a *Daubert* motion challenging the methodology that Dr. Kneuper employed in reaching his market share opinions, the Court denied Plaintiff's motion. (R. 329, Kneuper Opinion.) Second, although there is not a dispute that Peaches is a large store that encompasses over 25,000 square feet and carries approximately 20,000 dresses in inventory, that does not mean that Peaches "commands a substantial share of the market" under *Republic Tobacco*. (*See* R. 270, Pl.'s Resp. to Defs.' SOF ¶ 54.) Indeed, there are 56 specialty retailers other than Hannah's and Peaches that sell prom dresses in the Chicago Market. (*Id.* ¶ 149.) Although Peaches may be a large store, that fact on its own does not establish that it has significant market share.

For these reasons, under *Republic Tobacco*, the Court cannot allow Plaintiff to present direct evidence of anti-competitive effects to meet its burden to establish that Peaches possessed market power. As Plaintiff cannot show that Peaches possessed market power, the Court must grant Defendants' motion for summary judgment on the Antitrust Claims.

### B.  Defendants' Evidence of Lack of Market Power

Additionally, Defendants submit expert evidence through Dr. Kneuper that Peaches did not possess market power. As discussed above, a plaintiff may prove market power in one of two ways. The more conventional way "is by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case." *Toys "R" Us, Inc.*, 221 F.3d at 937. The Seventh Circuit has held that in cases alleging a violation of Section 1 of the Sherman Act, "a 20%-25% market share or less does not constitute market power." *Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656,

666 (7th Cir. 1987). With respect to Section 2 of the Sherman Act, the required market share showing is even higher. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1"). "Without a showing of special market conditions or other compelling evidence of market power, the lowest possible market share legally sufficient to sustain a finding of monopolization is between 17% and 25%." *Valley Liquors*, 822 F.2d at 667.

Here, Defendants submit the expert testimony of Dr. Kneuper. As mentioned above, in his expert report he calculated Defendants' market share using several different data sources and methodologies. His calculation of Peaches' market share ranged from 2.89% to 9% based on his estimates of the number of prom and homecoming dresses sold in the market claimed by Hannah's, and from 6.32% to 7.53% based on his estimates of Peaches' share of the available retail space. (R. 241-1, Kneuper Rep., at 25-27, 29.) These market share figures are far too small for Peaches to possess market power. Dr. Kneuper also notes in his report that Peaches' lack of market power makes sense given the low barriers to entry in the market for prom and homecoming dresses, and the number of competing specialty retail boutiques. (R. 241-1, Kneuper Rep., at 9-11.) Although Plaintiff contests Dr. Kneuper's market share opinions, they are evidence that Peaches does not possess market power. As the Court struck the opinions of Plaintiff's expert Dr. Schafer on legal grounds, Plaintiff has no expert evidence to affirmatively establish that Peaches does possess market power.

### III.    State Law Claims

As a final matter, Plaintiff also pleads Illinois common law claims for tortious interference with contract (Count VIII), tortious interference with prospective economic advantage (Count IX), and civil conspiracy (Count X), as well as a claim for a violation of the

Illinois Consumer Fraud and Deceptive Practices Act (Count XI). (R. 188, Am. Compl.) Plaintiff asserts that the Court has supplemental jurisdiction over these state law claims under 28 U.S.C. § 1367, and does not argue that the Court has original subject matter jurisdiction over them. (*Id.* ¶¶ 52-55.) As the Court grants Defendants' motion for summary judgment on the Antitrust Claims, it must decide whether to exercise supplemental jurisdiction over these remaining claims. A district court "may decline to exercise supplemental jurisdiction over a claim" if, among other reasons, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *In re Repository Techs., Inc.*, 601 F.3d 710, 724 (7th Cir. 2010). In addition to that statutory factor, the court "should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *In re Repository Techs., Inc.*, 601 F.3d at 724 (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997)). "It is the well-established law of this circuit," however, "that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Harvey v. Town of Merrillville*, 649 F.3d 526, 533 (7th Cir. 2011) (quoting *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999)).

Here, the Court declines to exercise jurisdiction over the remaining non-federal claims.[9] Plaintiff's directs its four state law claims at Defendants' alleged interference with Hannah's business and for using unfair methods of competition. (*See generally* R. 188, Am. Compl. ¶¶ 267-298.) Although the Court reviews Defendants' actions towards Hannah's in finding that any

---

[9] Although the parties do not discuss it, Plaintiff also pleads a Count XII which seeks a declaratory judgment under 28 U.S.C. § 2201 that the exclusive agreements between Peaches and the Designers are illegal under the Sherman Act and unenforceable under Illinois law. (R. 188, Am. Compl. ¶¶ 299-305.) Given the Court's summary judgment ruling, the Court dismisses Count XII with prejudice to the extent it seeks a declaratory judgment with respect to the Antitrust Claims, and without prejudice to the extent it seeks a declaratory judgment with respect to the remaining Illinois state law claims.

agreements between Peaches and the Designers were vertical and did not include a horizontal agreement among the Designers, the Court's ruling only addresses Defendants' actions from the perspective of federal antitrust law.  Whether Plaintiff has valid business tort claims under Illinois state law for Defendants' alleged interference with its commercial relationships or for unfair competition is a different question.  As Defendants themselves note in their summary judgment briefing, "If Peaches has committed a business wrong against Hannah's (which Peaches denies), Hannah's may have a business tort claim against Peaches, but it does not have an antitrust claim."  (R. 260, Defs.' Memo, at 10.)  For this reason, the Court dismisses Plaintiff's remaining claims without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment on Counts I – VII, dismisses Counts VIII - XI without prejudice, and dismisses Count XII with prejudice in part and without prejudice in part.


**DATED:  July 2, 2015**                                     **ENTERED**

                                                                          AMY J. ST. EVE
                                                                          United States District Court Judge